# Exhibit A

**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

GREG SAWICKI, Individually )
and On Behalf of All Others )
Similarly Situated, )
                            )
          Plaintiff,        )
                            )
  VS.                       )   **No. C 18-6208 JD**
                            )
STITCH FIX, INC., KATRINA   )
LAKE, PAUL YEE, and MIKE C. )
SMITH,                      )
                            )
        Defendants.         )
_____ )
STEVEN WEISMANN, individually )
and On Behalf of All Others )
Similarly Situated,         )
                            )
          Plaintiff,        )
                            )
  VS.                       )   **No. C 18-6565 JD**
                            )
STITCH FIX, INC., KATRINA   )
LAKE, PAUL YEE, and MIKE C. )
SMITH,                      )
                            )
        Defendants.         )
_____ )

[Caption continues on the following page]

                    San Francisco, California
                    Thursday, January 17, 2019

**TRANSCRIPT OF PROCEEDINGS**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Official Reporter - U.S. District Court

[Captions continues as follows:]

FREDERIC SAN GIORGI,                )
Individually and On Behalf of       )
All Others Similarly Situated,      )
                                    )
          Plaintiff,                )
                                    )
  VS.                               )     **No. C 18-6965 JD**
                                    )
STITCH FIX, INC., KATRINA           )
LAKE, PAUL YEE, and MIKE C.         )
SMITH,                              )
                                    )
          Defendants.               )
_____)

                          San Francisco, California
                          Thursday, January 17, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

Proposed Lead Counsel for Plaintiff:
                ROBBINS, GELLER, RUDMAN & DOWD LLP
                655 West Broadway, Suite 1900
                San Diego, California  92101
          BY:   **TRICIA L. McCORMICK, ESQ.**

                ROBBINS ARROYO LLP
                5040 Shoreham Place
                San Diego, California  92122
          BY:   **SHANE P. SANDERS, ESQ.**

For Lead Plaintiff Movants Daphine Campbell and
Paragon Fund Management LLC:
                GLANCY PRONGAY & MURRAY LLP
                1925 Century Park East, Suite 2100
                Los Angeles, California 90067
          BY:   **PETER ARTHUR BINKOW, ESQ.**

(Appearances continued on next page)

**APPEARANCES (continued):**


For Proposed Lead Plaintiff Ronald G. Bishop, Sr.:
                FARUQI & FARUQI, LLP
                685 Third Avenue, 26th Floor
                New York, New York 10017
        **BY: RICHARD W. GONNELLO, ESQ.**
             **SHERIEF MORSY, ESQ.**

For Paul Phillips, Jeffrey Burke, and Dennis Slater:
                LEVI & KORSINSKY, LLP
                1101 30th Street NW, Suite 115
                Washington, DC 20007
        **BY: DONALD J. ENRIGHT, ESQ.**

Also Present:          Jessica Santamaria, Esq.

**Thursday - January 17, 2019**                              **10:35 a.m.**

                          **P R O C E E D I N G S**

                               **---oOo---**

THE CLERK:  Your Honor, now calling civil matters 18-6208, Sawicki v. Stitch Fix; 18-6565, Weismann v. Stitch Fix; and 18-6965, San Giorgi v. Stitch Fix.

If the parties could please come forward and state their appearances.

MR. ENRIGHT:  Good morning, Your Honor.  Donald J. Enright for plaintiff movants or proposed lead plaintiffs, Paul Phillips, Jeffrey Burke, and Dennis Slater, who have been called the Stitch Fix Investor Group in the lead plaintiff motions filed before the Court.

THE COURT:  I'm sorry, you said Mr. Enright?

MR. ENRIGHT:  Yes, Donald J. Enright, Your Honor.

THE COURT:  Got it.  Okay.

MS. McCORMICK:  Good morning, Your Honor.  Tricia McCormick, from Robbins Geller Rudman & Dowd, on behalf of named plaintiff Greg Sawicki and also the lead plaintiff movant Ganesh Kasilingam.

MR. BINKOW:  Good morning, Your Honor.  Peter Binkow, Glancy Prongay & Murray.  I'm here on behalf of lead plaintiff movants Daphine Campbell and Paragon Fund Management.

THE COURT:  You all are not contesting the lead plaintiff role?

MR. BINKOW: Our position is we're second in line, and we have not disputed who's first in line. But if the Court does not approve, then we believe we should be next.

THE COURT: Okay.

MR. SANDERS: Good morning, Your Honor. Shane Sanders, from Robbins Arroyo on behalf of lead plaintiff movant Mr. Kasilingam.

THE COURT: All right. You're here with Ms. McCormick?

MR. SANDERS: Correct, Your Honor.

MR. GONNELLO: I'm sorry, which firm are you with?

MR. SANDERS: Robbins Arroyo.

THE COURT: Is that a new one?

MR. GONNELLO: I thought it was Robbins Geller.

Richard Gonnello, with Faruqi & Faruqi, on behalf of Ronald G. Bishop, Sr.

THE COURT: Okay.

MR. MORSY: Sherief Morsy, Faruqi & Faruqi, on behalf of Ronald Bishop, Sr.

THE COURT: And you're with Faruqi too?

MR. MORSY: As well, yes.

THE COURT: Okay.

MR. MORSY: Thank you, Your Honor.

MS. SANTAMARIA: Good morning, Your Honor. Jessica Santamaria on behalf of Stitch Fix, and we take no position.

**THE COURT:** Oh. The defendant, you're just here to watch the fun.

**MS. SANTAMARIA:** We're just here to observe today.

**THE COURT:** Can we have one lawyer from each of the three competing plaintiffs come on up.

**MR. ENRIGHT:** Do you want us to go in order, Your Honor?

**THE COURT:** No, no. I want to ask you a question, and then you can all figure out...

This is unusually hotly contested. You all couldn't work this out, uhm?

**MR. ENRIGHT:** Your Honor, I think it's fair to say that the PSLRA lead plaintiff process is designed in such a way as to discourage horsetrading among counsel for, among other reasons, because they want this type of litigation to be driven by the class representatives, by the lead plaintiffs, and not by counsel.

**THE COURT:** Well, I do agree with that, of course. But, I mean, the tone of some of these filings are fairly sharp.

**MR. ENRIGHT:** I wholeheartedly agree, Your Honor. I think there are some very irresponsible accusations made in some of the papers.

**THE COURT:** All right. Here's what I would like to do. I am going to end up writing, I think, a fairly -- there

are many interesting issues.

Get closer.

So I am going to do something that's probably going to take me a couple of weeks to get out, so we're not going to decide it today because you all have raised a number of complex issues, to some extent.

I do want to ask -- I need clarification. The *ad hominem* commentary aside, the papers were very thorough, so I just want clarification on a couple of points.

The first is, assuming that a team approach is fine, okay, what is wrong with this specific Stitch Fix team? Why would that group -- okay.

So they weren't taking holidays together and spending Christmas and things like that, but why aren't they sufficiently cohesive to go forward?

Who wants to try that first?

**MS. McCORMICK:** I'm happy to, Your Honor.

**THE COURT:** Ms. McCormick.

**MS. McCORMICK:** Yes.

**MR. ENRIGHT:** Would you like us to sit down and take turns, Your Honor?

Or do you want us all to remain...

**THE COURT:** Yes, that's fine. You can sit down.

**MR. ENRIGHT:** Okay. Thank you, Your Honor.

**MS. McCORMICK:** I don't plan to be that long.

And Your Honor is right that the PSLRA does allow for a group of plaintiffs to serve as lead plaintiff, but --

**THE COURT:**  Well, let's assume.  I think that's probably right, but I want to take a little more look at it.  Assuming that's true.

**MS. McCORMICK:**  Right.  Well, the PSLRA does say that the most adequate plaintiff is the plaintiff or group of plaintiffs with the largest financial interest.  And I think that the sticking point comes to, what does that mean?  What is a group?

And courts in this district have seemed to say that it's more than just an amalgamation of unrelated plaintiffs.  They have to show somehow that they're cohesive.

And in one of the orders in *Silicon Storage*, by Judge Hamilton, she said that once the plaintiffs are introduced by counsel, any subsequent relationship that they have developed is not enough to make them an adequate group.

**THE COURT:**  Well, I just -- this is all just sort of made up.

I mean, what's wrong with the group that's put together by a lawyer?  What's wrong with that?

I mean, they all have the common issue of being allegedly defrauded investors.  Why do you need more than that?

**MS. McCORMICK:**  Well, the concern in the cases, especially in the Northern District and as expressed by

Judge Patel in the *Verifone* case, is that ignoring the basis of how the group was formed and appointing a group of unrelated investors, it undercuts the primary purpose of the PSLRA to eliminate lawyer-driven litigation.

So, otherwise, it would encourage lawyers to go out and get a group of plaintiffs that all lost maybe small amounts, maybe large amounts, and put them all together in the hopes that they, at the end of the day, have the largest financial interest.

And that's what -- the courts that have ruled against groups have said that where the groups have been formed by counsel in this way, that that would counter -- it's counterproductive to the PSLRA's purpose of eliminating lawyer-driven litigation because the lawyers are driving who's going to be the client, as opposed to the PSLRA, which says the plaintiff with the largest financial interest.

**THE COURT:** Well, but just leaving aside -- first of all, if that concept were applied to class actions generally, half the class actions or more would be stopped because it's usually the lawyer, who's the legal expert, who provides the right counsel and advice to say, you know, this is a complicated area, you might have a claim here.

I don't find that -- you know, I understand Congress possibly had a mercenary aspect in mind, but you do need to have some sophisticated legal advice on these issues in order

to have a claim and understand you can act on it.

So I'm not inherently put off by -- a lawyer might say, I'm a specialist in this field, I'd like you know what your rights are, would you consider exploring that?  Okay.  So I'm a little more hesitant, maybe, than others have been on that issue.

But leaving that aside, they're all stakeholders in the alleged fraud.  I'm emphasizing "alleged."  But they're all stakeholders in the alleged fraud.  Why isn't that enough?  What more do they have to be, buddies?  I mean, what makes a group a group?

**MS. McCORMICK:**  Well, that's a question that courts have been struggling with since the passage of the PSLRA.  And it appears that the majority of courts, in the Northern District at least, require some additional indication that the group is more than just an amalgamation of unrelated plaintiffs that counsel just went out and put together in order to get -- to get the largest financial interest, knowing that that, at the end of the day, is typically the determining factor in who gets appointed.

So in the beginning of the PSLRA, plaintiffs' lawyers would put together hundreds of plaintiffs' certifications and say, here, we have the largest financial interest, we have 15 million in losses because we were able to get, you know, 2,000 certifications.

Case 3:18-cv-06206-JD   Document 71   Filed 02/19/19   Page 11 of 39

Well, that was cut down by *Network Associates* and *McKesson*, and whittled down by the SEC saying maybe a group of three to five.

And then there are courts, specifically in the Northern District, that say, well, you can't still just put three to five people together and say here's a group.  You have to show that they are cohesive enough to work together so that they're controlling --

**THE COURT:**  Well, I'm with you on that, but this all gets into, kind of, a buzzword thing.  You know, they're a group, they're cohesive.  What are the facts that show that?

Okay.  So you have CalPERS, which is sort of inherently a large group of people, but it's actually the organization that's suing.

What is it that makes a group a group to be an adequate plaintiff?

**MS. McCORMICK:**  Well, courts have said that institutions, for one, and pension funds, even though they have many members, that functions as one group because there's a board of trustees that runs that group.  So that's particularly looked at as an individual client.

And, in fact, groups that have included institutional investors, courts look at where they're a little more sophisticated, and sometimes that's okay.

But here I think the fact that it's just three unrelated

plaintiffs that didn't know each other until -- and they admit that they didn't even know of each other's existence until counsel kind of got them all together.

And their reasoning was that one has options, you know, a couple of them have stock.  But that's not a requirement of the lead plaintiff to have standing on every claim.

THE COURT:  But my -- the problem is we all -- you know, you start off by saying, I think correctly, the PSLRA expressly recognizes groups can go forward.

And then all the cases you're citing seem to -- the logical inference from all those is, in fact, no, you can't have a group unless it's a pension fund or an institution, which really isn't a group in the way that the statute is talking about.

That's not what the statute -- the statute could easily have said it can be an individual or a pension fund, but it said group.  And it clearly contemplates just folks getting together to bring a lawsuit.

And what -- I am torturing you a little bit, and I agree with you that I am.  You just happened to be first.  You volunteered.

MS. McCORMICK:  I did.  I did.

(Laughter)

THE COURT:  You volunteered.

Give me some evidentiary signposts, because everything

you're saying and suggesting the cases say, in fact, as a de facto matter, you can never have a group.

MS. McCORMICK:  Well, and that's true.

THE COURT:  But that's not -- you can't read that out of Congress and say -- I am bound by Congress's words.  The words -- you know, I can reel out 15 statutory interpretation rules, which I embrace as you do.  I can't do that.

It says "groups."  I can't edit out "groups."  And I think the opinions you're citing come very close to saying that.  I have some qualms about that.  I just do.

It makes no sense to me to say, okay, you can have a group but you can't really have a group because you all didn't go to Mexico together four times, you know, for Christmas in the prior years, or you're not married, or you're not part of a family, or you didn't form an investment club.  You know, you're not -- you're not emailing each other socially.

MS. McCORMICK:  So I --

THE COURT:  What is a group, in your mind?

What would be -- aside from a pension fund, what would be an adequate group?

MS. McCORMICK:  Well, an adequate group is -- and the judges in this district have said that you have to look at the formation of the group.  Who was the catalyst behind the group's formation?  Is it the lawyers or is it the group members?  Did the group members say, hey, this other guy also

Case 3:19-cv-01651-WHO Document 73-2 Filed 06/18/19 Page 15 of 40    14

lost money and I want to, you know, be a lead plaintiff with that person.

And then it comes down to what -- what's the -- dividing the fiduciary role of the lead plaintiff, which Congress intended to be one strong lead plaintiff with a large financial interest.

So if you say "any group," then it could be a group, each one having $20,000 in losses, and then you have one guy that has 93,000 in losses, and then are you going to say those five with 20,000 in losses trump the guy with 93?  Because then it seems to get away from the PSLRA and the Congress's intent to have the one strong lead plaintiff with significant losses that leads the group.  And you're also breaking up that fiduciary role into two, three, five different people.  And then you have disagreements.

And so I think the courts that have ruled against groups are concerned with that division of efficiency and division of the fiduciary role of the lead plaintiff.

**THE COURT:**  You said something that interests me, and I'll call it a formation test.

**MS. McCORMICK:**  Okay.

**THE COURT:**  Which is, did they kind of come together on their own or did a lawyer -- you know, if you use a spoke-and-hub analogy, is the lawyer the hub just sort of connecting all of these spokes in a way that might be

intentioned with the -- some of the other goals in the statute?

Do you know of any cases that have sort of articulated that way? The test for a group is, did it come together naturally, so to speak, organically, holistically, whatever you want to say, or was it expressly made for litigation by an attorney?

**MS. McCORMICK:** Absolutely. There's a number of them in the Northern District.

Judge Patel, as I noted in *Verifone*, she said ignoring the basis of the formation is -- would be -- would undercut the primary purpose of the PSLRA.

And then Judge Hamilton went on to describe that when the lead plaintiff movants are introduced by counsel, then any subsequent relationship that they might have isn't enough to show that they're adequate. You have to show that they were adequate at the time of the group's formation.

And in *Verifone*, Judge Patel goes through a number of things that courts can look at. Were they related? How did they come together? Do they have decision-making protocols in place? And all of that is set out in the briefing as well.

And *Critical Path* was another one by Judge Orrick, where he denied a group's motion even where they had an individual with the largest loss, finding that the group had not come together on their own but was just an assemblage of people that counsel brought together.

And we cite a number of other cases in the Northern District as well.

THE COURT: All right. Thank you. I may call you back.

Let me hear from the group proponent.

MS. McCORMICK: Thank you.

MR. ENRIGHT: Your Honor, do you want to hear from --

THE COURT: Stitch Fix.

MR. ENRIGHT: Okay.

THE COURT: That's the group.

MR. ENRIGHT: That's me, Your Honor.

THE COURT: Okay.

MR. ENRIGHT: Hi. Donald J. Enright representing the Stitch Fix Investor Group, which I'll just refer to as "The Group," if that's all right, Your Honor.

THE COURT: That's fine.

MR. ENRIGHT: So, Your Honor, I think you really hit upon the real crux of what's before the Court today.

There's a bunch of side issues that are mostly just distractions and shiny objects that were proposed by some of the other movants before the Court. I think all of those have been debunked. All of those disintegrate upon any kind of scrutiny.

What really comes before the Court today is this issue of, what's a group and what's permissible. And as the Court's

Case 3:18-cv-06206-JD  Document 71  Filed 02/19/19  Page 19 of 39

already noted, the PSLRA explicitly allows groups of persons.

So what is a permissible group?  Well, when you really do a survey of what the -- the greater part of the body of all this developed over the last 25 years since the passage of the PSLRA.  What you find is that, number one, smaller is better, okay.

Large groups are more diffuse, more unwieldy.  The members have a diluted interest in the litigation and they -- and they are less likely to take an active hand in the actual management of the litigation.  So smaller is better.

**THE COURT:**  And you have four or five.

**MR. ENRIGHT:**  Three.  Three.

**THE COURT:**  Three.  Oh, yes.  That's right.

**MR. ENRIGHT:**  And most -- most of the decisions, as counsel noted, have held that anything smaller than five is okay.  Here we have only three, okay.

Then you want to see, are they in a position to supervise, monitor, manage, and prosecute these claims in a plaintiff-driven, class representative-driven way rather than being dominated by the lawyers?

Because this whole issue of relatedness or preexisting relationships, that appears nowhere in the statute.  That appears nowhere in the legislative history.

What does appear is this concept of wanting to ensure that it's the plaintiffs who govern and manage and oversee the

litigation and make the crucial decisions so that the litigation is pursued for the benefit of the shareholders, of the investors, the class members, rather than for the lawyers.

So the question --

THE COURT:  Just to jump in a minute.  So it is clear, though, I think, as Ms. McCormick said, Congress was responding to the idea of lawyer-driven litigation.

MR. ENRIGHT:  Absolutely.

THE COURT:  So what about the idea that a group is inherently not suitable if it's the lawyer who puts the group together?

In other words, they had no contact with each other before, and now they're a team just because of the attorney.

MR. ENRIGHT:  Again, Your Honor, the origins -- that appears nowhere in the legislative history.  It appears nowhere in the statute.

So the question isn't how did it originate.  The question is, are they positioned to drive the litigation in a class-oriented, class-driven way, class representative-dominated way, rather than lawyer-dominated way.  Okay.  So that's the question before the Court.

And it's crucial to recognize that that's what the statute was intended to do and that's what the language does.  So what the Court, I think, needs to look at -- and most of the decisions recognize this.

Case 3:18-cv-06206-JD   Document 71-2   Filed 02/19/19   Page 19 of 39

What the Court needs -- even the decisions represented by Ms. McCormick recognize that the Court needs to look at, do they have the indicia of a plaintiff group that will adequately and responsibly oversee the litigation of the case in a way to ensure that the decisions that are made are in the interests of the class rather than the interests of the lawyers.

Here we have three individuals, each of whom has lost an enormous amount of money.  Mr. Phillips, lost over 400,000; Mr. Burke, $157,000; Mr. Slater, $184,000.

These are each individuals with a huge financial interest. This is extremely important to each one of them.  And these aren't billionaires, Your Honor.  One's a retired school teacher.  You know, these are ordinary people, and so this is an important amount of money.

They are knee-deep in this case, okay.  And we put two joint declarations, which each one of them has signed, before the Court, one with our opening papers, one with our opposition papers, to explicitly describe the decision-making protocols that they put in place.

And the protocols that they put in place is that they intend to litigate the case on a consensus basis.  If they can't reach consensus amongst themselves, they'll consult with counsel.  If, after consulting with counsel, they still can't reach consensus, decisions will be made on a majority vote basis.

THE COURT:  So I saw some of that.  What you're saying is you're going to propose -- you're their lawyer, you're going to say, I think we ought to do this.

Then they're going to say, as a group, we agree or disagree.

MR. ENRIGHT:  Correct.

THE COURT:  And if they don't agree, it's an uneven number, how does that get worked out?

MR. ENRIGHT:  Then majority vote.

THE COURT:  So if it's two to one, you do it.  And if all three have different views, what happens then?

Settlement amounts, let's say you get to that point.

MR. ENRIGHT:  I think what you'd have to do then, Your Honor, is sort of do essentially an algorithm approach where you say yes or no on each question, this or that, and proceed that way rather than offering a menu.

THE COURT:  Do I have all these protocols in the record?

MR. ENRIGHT:  Yes.  They are described at length in the joint declarations before Your Honor.

THE COURT:  All right.

MR. ENRIGHT:  They have negotiated a fee structure for plaintiffs' counsel showing that they are taking an active interest in limiting the costs to the class of this litigation, to maximize the recovery for themselves and the people that

they're seeking to represent.

In terms of how they came together, they contacted -- each of them contacted my firm individually.  We made them aware of each other, but they -- and gave them the information to contact each other.

THE COURT:  There's nothing wrong with this.

MR. ENRIGHT:  Right.

THE COURT:  So don't take it in a way that I'm not intending it, but I assume that you posted something and they responded.

MR. ENRIGHT:  Correct.

THE COURT:  So they all responded to your website.

MR. ENRIGHT:  Correct.

THE COURT:  All right.

MR. ENRIGHT:  So we put them in touch with each other.  We didn't tell them, hey, we're going to move for you as a group for lead plaintiff.

We said, you should be aware of each other, you all have a huge interest in this, we'd like you to speak to each other and decide if you'd like to move forward together.  And that's what they did.

They communicated directly amongst themselves, both with and without counsel, prior to the motion, I believe by both phone and by email.  And they came to the decision to move together for a number of reasons.

Number one, they all have a very large financial interest here. And I guess to some extent misery likes company, and they found a certain solidarity together.

Number two -- and this is crucial -- Mr. Phillips traded exclusively in options while Mr. Slater and Mr. Burke traded -- had a long position in the stock.

Now, Counsel says that, well, there's no requirement that any lead plaintiff have bought all the different securities at issue. But in their own brief they also pointed out that Northern District courts have held that options traders alone may not -- who only trade options, may not be adequate as a -- or typical as a class representative or as a lead plaintiff. They have a string cite a page long in one of their briefs on this.

That's why we thought -- and, specifically, Mr. Phillips and Mr. Burke and Mr. Slater thought that it was important that they work together so that all constituencies are represented, options traders and stock purchasers, so that there's no question as to standing, there's no question as to adequacy, there's no question as to typicality. They've got all their bases covered.

So they have -- again, this is all laid out in the joint declarations.

**THE COURT:** That's right. Okay. I mean, I -- okay.

**MR. ENRIGHT:** And that was the reason, Your Honor,

counsel's papers said -- let me see if I can find the quote real quick, Your Honor.

They said that there's no clear and persuasive reason for the group members to have joined together.  That's just simply wrong.

There is a clear and persuasive reason for them to join together; and that is in order to have the benefits of having all the constituencies represented and reflected in the plaintiff group, to make sure there's no question as to typicality and adequacy and standing -- Article III standing to assert all of the claims for all the constituencies that are implicated in these claims.

**THE COURT:**  Okay.  Thank you.

Ms. McCormick, any last words?

There's one other issue I want to raise.

**MR. GONNELLO:**  Your Honor, may we speak?

**THE COURT:**  Yes.  I was going to invite any other comments after Ms. McCormick.

**MS. McCORMICK:**  Thank you, Your Honor.

I would just like to respond to a couple of points, the first one being that courts have been given this option before of putting together a group of lead plaintiffs that have options and stock and preferred stock if it's involved in the case.

And there's a particular case in the Southern District of

New York that's been cited continuously and -- in addition to a Second Circuit case, but in the *IPO* case, Judge Schindlin said that this possibility that the court should cobble together a plaintiff group that has standing to sue on all possible causes of action has been repeatedly rejected by courts and undermines the purpose of the PSLRA.

So that, again, is the point that, in putting together a big group, that's okay at the class cert stage.  You might need another class representative that purchased options or that purchased preferred stock.  That might become an issue at class cert.  But as far as the lead plaintiff goes, the lead plaintiff structure is not one that should be split apart by numerous lead plaintiffs.

In addition --

**THE COURT:**  Well, I mean, there are two shareholders and one option holder.  Is that really splitting atoms?

Why is that really fragmented that it makes no sense to go forward?

**MS. McCORMICK:**  Well, if you take Your Honor's concern about disagreements between the group members and they say, okay, well, then the group is going to rule by majority rule, then it could be the two security holders against the options guy who actually lost more than both of the stockholders put together.  So then it sets up a situation where it's not the plaintiffs with the largest financial interests that are making

Case 3:18-cv-06205-JD   Document 71   Filed 02/19/19   Page 25 of 39

the decision on behalf of the group.

And this is the problem that comes up when you have group members, particularly that aren't related and don't have a common preexisting relationship before the litigation, which I think has been pointed out in our papers and numerous courts in the Northern District.

**THE COURT:**  Mr. Phillips is an option trader; is that right?

**MS. McCORMICK:**  That's correct.

**THE COURT:**  All right.  Any other thoughts, Mr. Gonnello?  Is that right?

**MR. GONNELLO:**  Good morning, Your Honor.

With respect to some of your questions earlier to Ms. McCormick, I realize that the statute is ambiguous in terms of which groups can be lead plaintiffs according to the PSLRA. It doesn't spell out particular requirements for the group, at least expressly.

But given the history of the statute and what it was designed to prevent, and as someone who practices in this area, knows what goes on in terms of clients being pawned off and traded, I don't think that's what Congress envisioned.

I don't think they had any thought that, when they would propose this language, that plaintiffs' attorneys would then go out and retain clients, pass them off to each other without them knowing what's going on.

And when you look at this case in particular, you can see how this group has actually functioned in the litigation itself.

In particular, there are two issues where they take contradictory positions that are adverse to the interests of Mr. Phillips.

First, in the reply brief on page 13 they claim that they --

THE COURT:  Which reply brief?

MR. GONNELLO:  The Stitch Fix.

THE COURT:  Do you have the docket number?

MR. GONNELLO:  Yes.  I'll give you the ECF number. It's ECF number 61.

THE COURT:  What page?

MR. GONNELLO:  Page 13.

THE COURT:  Okay.

MR. GONNELLO:  And it starts -- I guess it's line 10.

MR. ENRIGHT:  I'm sorry, counsel, which document are we talking about?

MR. GONNELLO:  Your reply brief.

THE COURT:  61?

MR. GONNELLO:  Yeah.  ECF number 61.

THE COURT:  Okay.

MR. GONNELLO:  What I think is line 15, the second sentence of the paragraph, it says:

"Moreover, by certifying that they read the complaint filed in the related actions, by moving for lead plaintiff to be appointed to litigate the claims alleged and by incorporating by reference the facts set forth in the Sawicki action in its lead plaintiff motion, the record indicates the group has complied with civil local rule 3-7C by stating that they reviewed the complaint and specified the allegations they intend to assert in this motion's supporting declarations."

The Sawicki action was the first-filed complaint.  It is only on behalf of stock investors.  So Mr. Phillips has no claim under the allegations that they intend to assert.  He has zero losses based on the Sawicki complaint.

**THE COURT:**  Let me ask you this, and then I do want to get to the next question.

Assuming that your characterization is right -- and I'm not questioning it, but let's just assume it for today that Congress's goal is to prevent all of the bad manipulations of clients that you were describing.

You know, the evidence here seems to suggest that your colleague did a number of things to make sure that that wasn't the way it was being handled.

So what do you think in the record suggests -- other than that passage, what in the record suggests to you that this is a manipulation of clients?

MR. GONNELLO:  I can tell you what suggests.  They've taken positions in their brief that options-only investors, like Mr. Phillips, are atypical.  So they are arguing against his own interest.

In a class cert, the defendants are going to be able to come back and say, look, they've already taken the position that an investor like Mr. Phillips is atypical.

And they only did that because they're trying to fend off our arguments.  So that is the lawyers putting their interests ahead of Mr. Phillips.

THE COURT:  All right.

MR. GONNELLO:  Additionally, one last point, Your Honor.

THE COURT:  Yes.

MR. GONNELLO:  There was a reference to fee negotiations.  As far as I can tell, based on the supplemental declaration that was filed, there was only a discussion of fees after lead plaintiff motion was filed.

So I don't even know if there was a retainer agreement when all of these people were retained because the declaration, which is -- I guess it's -- one of the ones I have for Mr. Phillips is ECF 53-3.  And this is in paragraph 4 of the declaration.  And it's talking about incidents that occurred after the lead plaintiff motions were filed.

And it says in paragraph 5:

"We also discussed attorneys' fees and came to an arrangement with Levi & Korsinsky."

So they're making fee arrangements after the motion was filed, which calls into question what fee arrangements existed at the time the motion was filed and whether or not they actually formed a legitimate group that's cohesive and can adequately prosecute this litigation.

THE COURT:  All right.  Thank you.

Okay.

MR. ENRIGHT:  Your Honor.

THE COURT:  Mr. Enright, why don't you briefly address that last point.

MR. ENRIGHT:  Sure.

THE COURT:  And then we'll get to my second question.

MR. ENRIGHT:  Your Honor, this is very much representative of the briefing that came out of Mr. Bishop's counsel, which I have to say strikes me as both intentionally obtuse on a number of points and irresponsible in the accusations they make on a number of points.

I have to say --

THE COURT:  All right.  Let's just get to the --

MR. ENRIGHT:  -- I'm really disappointed.

THE COURT:  All right.

MR. ENRIGHT:  Number one, with regard to the complaint allegations, as counsel knows and as was laid out in the

briefs, the -- the complaints before the Court, at least one was on behalf of securities purchasers, not just stock.

And then Mr. Gonnello's complaint that was filed the day of specifically adopted on behalf of options traders.

So there's no question that the complaints that are before the Court embrace the -- not just stock purchasers but securities generally and specifically options traders.

So the notion that that has -- that we have somehow betrayed Mr. Phillips by referencing the Sawicki action is the sort of nitpickery that I think, again, is typical of lawyer-driven litigation rather than an approach that is calculated to do substantial justice for the presumptive most adequate lead plaintiffs before the Court.  Those with the greatest financial interest.  That's number one.

Number two, Mr. Gonnello, in his reply brief as well as today, said that we threw Mr. Phillips under the bus by saying that people who only traded in options are atypical.  That's not what we said.

What we said is that an investor who only traded options by himself may not be adequate or typical or have standing to assert claims on behalf of common stock purchasers.  And that's why Mr. Phillips teamed with Mr. Slater and Mr. Burke here.  So the notion that we somehow have sold him out is absolutely ridiculous.

What we're saying here is that's the reason why a group is

appropriate and why Mr. Phillips wanted to team with stock purchasers, okay.

**THE COURT:**  Well, okay.  But what about the idea that all of the fee arrangements and group decision-making were all implemented only after it became clear that people were unhappy with the group?

**MR. ENRIGHT:**  No.  No, not true at all.

**THE COURT:**  Okay.

**MR. ENRIGHT:**  The first joint declaration that we put in explains how they had all these protocols in place, how they communicated before the motion was filed, how everything was -- all those Is were dotted and all those Ts were crossed before we filed the motion.

He raised the issue about the assignment of Mr. Phillips' wife's claims to Mr. Phillips because he had the trading authority over her account.  Okay.  We put in the assignment, which was also signed before the motion was filed.

But the joint declaration makes it very clear that all these communications took place before the motion was filed and that all these protocols were agreed upon and put in place before the motion was filed.

There are retainer agreements that each of them signed, agreed to with my firm.  It was after that and, candidly, after the motion was filed, on a phone call, that Mr. Burke raised the issue of, you know what, I think that given the value of

Case 3:18-cv-06200-JD   Document 71   Filed 02/19/19   Page 32 of 39

this case we should try to negotiate an even better fee arrangement than what was in the original retainers.  So they went beyond what was in the original retainer to negotiate an even better fee arrangement, okay.

So, to be clear, there were retainer agreements that laid out --

**THE COURT:**  In the sense that, if you prevail, you retain less.

**MR. ENRIGHT:**  Yes, better for the class, Your Honor.

So they continued to negotiate an even better fee arrangement, a more limited fee arrangement for counsel even after the motions --

**THE COURT:**  And you agreed?

**MR. ENRIGHT:**  Yeah, Your Honor, because, number one, we want to keep our clients happy; and, number two, we still think it's still within an equitable range.

**THE COURT:**  All right.  Thank you.

Here's my next question.

Ms. McCormick, I might as well start with you.  You're the trailblazer.

So if I decide that the group is not the proper group, who then is left to decide between?  Is it just your client and the Bishop --

**MS. McCORMICK:**  That's correct.  It would be between --

THE COURT:  In other words, I wouldn't go back and say maybe Mr. Slater and Mr. Burke would be able to do it?

MS. McCORMICK:  Well, that's a great question, and that's something that was also addressed in our briefing, and specifically by Judge Orrick in *Critical Path* and also Judge Patel in *Verifone*, where they said, to break the group apart and consider just the individual members of the group, we're not going to do that.

First, they didn't ask for us to do that, and that was not asked here as well; and, secondly, to do that, as Judge Chen recently noted in the Tesla action, *Isaacs v. Musk*, he noted that even a request to do that would suggest how loosely the group was put together and that it shouldn't have been a group in the first place.

So it would be our position that the next -- under the Cavanaugh approach, as when the group is disqualified, move to the movant with the next largest financial interest, and that's Mr. Bishop.  And Mr. Bishop would be -- as we have discussed, is inadequate because he purchased only -- or sold only the put options.

And there's the case in this district, the *Metavation* case, where the Court said an options-only purchaser should not be appointed as sole lead plaintiff in order to represent a class that's made up of a majority of stockholders.

And then the next in line is my client, Mr. Kasilingam.

**THE COURT:** Okay. Thank you.

Mr. Gonnello, what are your views?

**MR. GONNELLO:** I echo what Ms. McCormick just said. If the group is rejected, it is either Ms. McCormick's client or our client, Mr. Bishop.

**THE COURT:** Okay.

**MR. GONNELLO:** For the same reasons. They didn't move individually. They moved as a group. If they're going to abandon the group at this point, it just demonstrates they lack cohesion, and everything is simply lawyer driven.

With respect to the options versus stock purchaser, we recognize that there is a split. There are some courts that say options investors are not adequate or typical to represent class, and there are other courts, which we've cited, that say there are.

We think, in light of the more recent standing law which is out there, such as the Second Circuit's decision in the *Royal Bank of Scotland* case, which says a purchaser of one class of securities has standing to represent a purchaser or seller, if it's a put seller, in another class of securities provided that the claims, essentially, are the same set of circumstances.

**THE COURT:** Okay. All right.

Anybody else want to add anything on that point? Second point? Yes.

MR. ENRIGHT: Very briefly, Your Honor.

THE COURT: Yeah.

MR. ENRIGHT: Your Honor, we certainly -- we are not -- and unlike in the *Tesla* case, we are not in any way suggesting the Court should break apart our group. They came to the party together and they're sticking together.

What I would note is that the issues that counsel just both discussed in terms of the standing of options purchasers to represent stock purchasers -- or options traders to represent stock purchasers highlights why this group made sense here and why it was formed in the first place and why it's before the Court today.

What happens if the Court rejects the group, candidly, I don't have a dog in that fight. But I would strongly urge the Court that the Court should not reject the group and that the group is properly before the Court as a cohesive unit that will properly, adequately, efficiently, and zealously litigate this case for the benefit of the class and not for the benefit of the lawyers.

THE COURT: Okay. Well, thank you. That was all very helpful. And everything is just going to stay stayed until I get this out, which is probably going to be a couple of weeks.

Okay. Anything else in the meantime?

MR. BINKOW: Can I?

THE COURT: Oh, yes.

MR. BINKOW:  Peter Binkow for the Movants Daphine Campbell and Paragon Fund Management.

I'm assuming the Court doesn't really want to address the side issues about attorneys and the attacks made upon my clients.

THE COURT:  Oh, no.

MR. BINKOW:  If the Court is not going to opine on that, I don't need to speak on it.

THE COURT:  It's not going to -- look --

(Unreportable simultaneous colloquy.)

THE COURT:  People do what they do, but it's not going to affect the -- you know, the day may come when something like that is material.  I don't think any of it is.  So it's all gone.  I wouldn't worry about it.  No one is tarred and feathered as a result of the briefing.  Okay?

MR. BINKOW:  Okay.  Thank you.

THE COURT:  Actually, I thought I had it in my standing order.  I may have just said it at the case management conference, but I really prefer, in situations like this, people should promote why they should be the lead counsel and not why the other people should not be, unless there's something like the person has been disbarred or the SEC has opened ten investigations about this law firm, something at that level maybe.

But the general theme should be here's why you should pick

me and not throwing things at other people.

MR. BINKOW:  Right.  I appreciate that, Your Honor.  I only showed up today because my client was a little upset at the accusations made at her.

THE COURT:  I understand.  Yes.

MR. GONNELLO:  Your Honor, with respect, the issues we raised -- and I realize Your Honor doesn't want to hear them, but they are relevant to our discovery requests.

The only way we can get discovery is if we produce evidence that shows there's a reasonable question as to whether or not we're correct.

So the only way to do that is by showing what they've done or what firms have done in other cases, showing what we've done in this case and trying to connect the two.  So there was no other way to ask for discovery.

Since I'm intimately familiar with the ongoings of plaintiffs' firms and the trading of clients, I thought it was an issue that is a fair question.

THE COURT:  That's fine.  We'll just do this one thing at a time.  And if the issue needs further attention, we can revisit the issue.  But for now I don't want to do that, and I don't think we need to do that.

And so I'll decide this, then we'll have a consolidated complaint, most likely.  In the meantime, I'm sure you have other things to work on.

Case 3:18-cv-06206-JD Document 71 Filed 02/19/19 Page 38 of 39

And that will be the order.  Okay.  All right.  Thank you.

(Counsel thank the Court.)

(At 11:19 a.m. the proceedings were adjourned.)

- - - -

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, February 19, 2019

*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter