**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Stephanie A. Bartone (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: sbartone@zlk.com
Email: gpotrepka@zlk.com

*Attorneys for Lead Plaintiff Shimon Hedvat,*
*Plaintiff City of Miami Fire Fighters' and*
*Police Officers' Retirement Trust, and the Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | Master File No. 3:19-cv-01651-WHO |
| | Hon. William H. Orrick |
| | **CLASS ACTION** |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE ISSUES (CIVIL L.R. 7-4(A)(3)) ............................................. VIII

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

    I.     DEFENDANTS SECRETLY REALLOCATE SPENDING AWAY FROM CRITICAL PIPELINE GENERATION CAUSING SALES LEADS AND SALES TO PLUMMET ................................................................................................................. 3

    II.    SALES SHRINK FURTHER AS DELL STOPS SELLING NUTANIX PRODUCTS .. 4

    III.   NUTANIX ADDRESSES ITS REVENUE CRISIS BY SECRETLY PULLING-IN SALES FROM FUTURE QUARTERS TO MEET QUARTERLY SALES FORECASTS ................................................................................................... 5

    IV.   NUTANIX'S SALES EXECUTION IS HAMPERED BY A HIRING FREEZE, PRODUCT DEFECTS, AND EMPLOYEE TURNOVER ........................................... 6

    V.    DEFENDANTS AND OTHER INSIDERS LIQUIDATE MASSIVE STOCK HOLDINGS ................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    I.     THE COMPLAINT ALLEGES FALSE AND/OR MISLEADING STATEMENTS ..... 9

         A.    False and Misleading Statements Regarding Lead Generation ........................... 9

         B.    False and Misleading Statements Regarding Dell Leads and Demand ............. 11

         C.    Defendants' Undisputed and Undisclosed Pulling-In Scheme Rendered Their Class Period Statements False and Misleading ................................................. 15

         D.    False and Misleading Statements Regarding Sales Hiring ................................ 16

         E.    False and Misleading Statements Regarding Product Quality ........................... 17

    II.    THE COMPLAINT PLAUSIBLY ALLEGES A STRONG INFERENCE OF SCIENTER ................................................................................................. 18

    CONCLUSION ................................................................................................................ 25

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF AUTHORITIES

**Cases**

*Applestein v. Medivation, Inc.,*
   861 F. Supp. 2d 1030 (N.D. Cal. 2012) ............................................................. 23

*Azar v. Yelp, Inc.,*
   2018 WL 6182756 (N.D. Cal. 2018) ................................................. 10, 22, 24

*Backe v. Novatel Wireless, Inc.,*
   607 F. Supp. 2d 1145 (S.D. Cal. 2009)............................................................. 12

*Batwin v. Occam Networks, Inc.,*
   2008 WL 2676364 (C.D. Cal. 2008)................................................................. 22

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008) ............................................................................. 9

*Brendon v. Allegiant Travel Co.,*
   2019 WL 4255051 (D. Nev. 2019) ................................................................... 21

*Buttonwood Tree Value Partners, LP v. Sweeney,*
   2012 WL 13026910 (C.D. Cal. 2012)......................................................... 23, 24

*City of Miami Gen. Emples.' & Sanitation Emples.' Ret. Trust v. RH, Inc.,*
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..................................................... 10, 12

*City of Royal Oak,*
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................... 14

*Coble v. Broadvision Inc.,*
   2002 WL 31093589 (N.D. Cal. 2002) .............................................................. 17

*Cunha v. Hansen Natural Corp.,*
   2012 WL 12886194 (C.D. Cal. 2012).............................................................. 9

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford,*
   794 F.3d 297, 301 (2d Cir. 2015).................................................................... 20

*Evanston Police Pension Fund v. McKesson Corp.,*
   2019 WL 5587311 (N.D. Cal. 2019) ............................................................... 22

*Gammel v. Hewlett-Packard Co.,*
   2013 WL 1947525 (C.D. Cal. 2013)................................................................ 12

*Glazer Capital Mgmt., LP v. Magistri,*
   549 F.3d 736 (9th Cir. 2008) ........................................................................... 21

*Hatamian v. Advanced Micro Devices, Inc.,*
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) ............................................................. 18

*In re Accuray Sec. Litig.,*
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ............................................................. 14

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. 2014) ........................................................................ 18

*In re Atossa Genetics, Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ..................................................................................... 8

*In re Autodesk, Inc. Sec. Litig.*,
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ...................................................................... 21

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................... 19

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ......................................................................... 13, 23, 25

*In re DOT Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ..................................................................... 14

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. 2018) ........................................................................ 20

*In re Flowers Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. 2018) ........................................................................ 13

*In re Galena Biopharma, Inc. Secs. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................................... 24

*In re Gilead Scis. Sec. Litig.*,
    2009 WL 1561584 (N.D. Cal. 2009) ........................................................................ 11

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ....................................................................... 9

*In re Intuitive Surgical Secs. Litig.*,
    2014 WL 7146215 (N.D. Cal. 2014) ............................................................. 20, 24, 25

*In re JDS Uniphase Corp. Sec. Litig.*,
    2005 WL 43463 (N.D. Cal. 2005) ............................................................................ 19

*In re MannKind Secs. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ...................................................................... 25

*In re Mellanox Techs. Ltd. Sec. Litig.*,
    2014 WL 12650991 (N.D. Cal. 2014) ...................................................................... 14

*In re Nimble Storage, Inc. Sec. Litig.*,
    2016 WL 7209826 (N.D. Cal. 2016) ........................................................................ 11

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ................................................................................. 18

*In re Quality Sys. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ....................................................... 10, 12, 14, 19

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. 2013) ................................................................. passim

*In re Silicon Graphics Inc. Secs. Litig.*,
   183 F.3d 970 (9th Cir. 1999), *superseded by statute on other grounds* .......................................... 24

*In re Snap Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. 2018)...................................................................................... 8, 12

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) .................................................................................................... 14

*In re Supreme Specialties, Inc. Secs. Litig.*,
   438 F.3d 256 (3d Cir. 2006)....................................................................................................... 22

*In re Terayon Communications Systems, Inc.*,
   2002 WL 989480 (N.D. Cal. 2002) .......................................................................................... 25

*In re Urban Outfitters, Inc. Secs. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ....................................................................................... 21

*In re Vantive Corp. Secs. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ............................................................................................ 23, 24

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) .................................................................................................... 18

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. 2019) ................................................................................... 13

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)................................................................................................ 14, 21

*Iowa Pub. Emples. Ret. Sys. v. MF Global, Ltd.*,
   620 F.3d 137 (2d Cir. 2010)..................................................................................................... 17

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .................................................................................................. 9, 25

*Lipton v. PathoGensis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) .................................................................................................. 23

*Livid Hldg. Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) .................................................................................................... 11

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .................................................................................................. 18

*Mallen v. Alphatec Hldg. Inc.*,
   861 F. Supp. 2d 1111 (C.D. Cal. 2012) ................................................................................... 15

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................................ 24

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
   2018 WL 6181241 (D. Ariz. 2018)........................................................................................... 13

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................................... 17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ..................................................................... 23

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................... 19

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. 2017), *adopted*, 2017 WL 3610523 (D. Or. 2017).............................. 15

*Nathanson v. Polycom, Inc.*,
    2015 WL 12964727 (N.D. Cal. 2015) ........................................................... 16

*No. 84 Employer-Teamster Joint Council-Pension Tr. Fund v. Am. W. Hldg. Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................. 22, 25

*Petrie v. Elec. Game Card, Inc.*,
    761 F.3d 959 (9th Cir. 2014) ..................................................................... 18

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    2012 WL 1868874 (N.D. Cal. 2012) ........................................................... 20

*Prodanova v. H.C. Wainwright & Co., LLC*,
    2018 WL 8017791 (C.D. Cal. 2018)............................................................ 15

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ..................................................................... 21

*Rihn v. Acadia Pharm. Inc.*,
    2016 WL 5076147 (S.D. Cal. 2016) ........................................................... 20

*Robb v. Fitbit Inc.*,
    2017 WL 219673 (N.D. Cal. 2017) ............................................................. 20

*Roberti v. OSI Systems, Inc.*,
    2015 WL 1985562 (C.D. Cal. 2015)............................................................ 15

*S. Ferry LP # 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................... 18, 21

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................... 10, 22

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..................................................................... 23

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) .......................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................ 18, 23, 24

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...................................................... 19

*Turocy v. El Pollo Loco Hldgs., Inc.*,
    2017 WL 3328543 (C.D. Cal 2017)............................................................. 20

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

*U.S. v. Laurienti,*
    611 F.3d 530 (9th Cir. 2010) ........................................................................................ 9

*Vancouver Alumni Asset Hldgs., Inc. v. Daimler AG,*
    2017 WL 2378369 (C.D. Cal. 2017) ........................................................................... 11

*Wozniak v. Align Tech., Inc.,*
    2011 WL 2269418 (N.D. Cal. 2011) ........................................................................... 20

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ...................................................................................... 21

**Statutes**

15 U.S.C. §78u-4(b)(2)(A)................................................................................................. 18

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

## COUNTERSTATEMENT OF THE ISSUES (CIVIL L.R. 7-4(A)(3))

1.     Have Defendants met their burden of proof that the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws does not plausibly state a securities fraud claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder?

2.     Have Defendants met their burden of proof that the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws does not plausibly allege a claim for "controlling person" liability under Section 20(a) of the Exchange Act?

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# INTRODUCTION[1]

The Class Period takes place in the midst an industry-wide shift away from hardware products to novel, public cloud-oriented products. At that time, Nutanix was already behind the eight ball because it did not have a public cloud product like many of its competitors who had been marketing products like Amazon Web Services ("AWS") since 2016. Desperate to catch up, Defendants decided prior to the Class Period during Nutanix's "planning process" for Fiscal Years 2018 and 2019 to "reallocate" money away from lead generation activities to the research and development ("R&D") of new cloud-based products. Lead generation is a "**key** component to building pipeline" and refers to *marketing* activities used to educate customers about Nutanix products. Defendants' end of Class Period admission confirms this was no fraud by hindsight. It was intentional ***fraud by foresight***.

Defendants would like this Court to believe that this case is about nothing more than bad business decisions that later did not pan out. Defendants are wrong. This case is simple. Defendants told the market in every Class Period SEC filing that Nutanix was "increasing" spending on marketing, which Defendants do not dispute is mainly comprised of lead generation, and that "lead-generation activities" were "broaden[ing.]" when, in fact, they had decided long before to keep lead generation spending "***flat***." As an inescapable consequence, Nutanix's sales pipeline became "pretty dry" and, according to CWs, by no later than May 2018 it was "very obvious" that the pipeline was depleted.

Pipeline depletion was exacerbated by the complete loss of sales leads from Dell, Nutanix's largest and most important original equipment manufacturer ("OEM") "by far," which had accounted for about 40% of Nutanix's sales leads. According to CWs, in 2017, after Dell acquired VMware (Nutanix's main rival) Dell began providing Nutanix with fewer new leads and, by 2018, was not providing Nutanix with ***any*** new leads, in violation of the companies' OEM agreement. Dell's Vice Chairman confirmed CW1's account after the first corrective disclosure stating "there is no question about what we lead with…[w]e will provide [Nutanix XC servers], but we will lead with VMware." ¶123. Rather than disclose the loss of Dell sales leads, Defendants told investors that "nothing ha[d]

---

[1] All references to "¶__" are to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint" or "AC"). Unless otherwise noted, capitalized terms shall have the same meanings as in the AC, emphasis is added, and internal quotations and citations are omitted. References to "DB" are to Defendants' motion to dismiss memorandum. References to "Ex." are to Plaintiffs' exhibits filed herewith. References to "D.Ex." are to Defendants' motion's exhibits.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

changed" in the relationship and that "we've navigated [the VMware] competition waters really well."

The pipeline also suffered from an undisclosed hiring freeze, attrition at every level within the sales team, and undisclosed product defects to Nutanix's "core" technology. Rather than disclose such issues, Defendants misled investors by telling them Nutanix "significantly increased our sales and marketing personnel" and touted product quality as a cause of increased demand and customer growth.

To conceal Nutanix's revenue crisis, Defendants engaged in an <u>undisclosed</u> pull-in scheme whereby they instructed sales personnel to pull in customer orders from future quarters into the current quarter to meet sales forecasts. According to CWs, Nutanix pulled-in orders in every quarter during the Class Period. This practice intensified in 2018, coinciding with the loss of Dell leads, when Defendants told the sales force Nutanix was "significantly behind" on its revenue goals and the need for revenue was "presented as a pending disaster every quarter." To induce pull-ins, Nutanix offered customers steep discounts of 75-80% on hardware and 90% on software. Defendants never disclosed that the purported positive results they touted were only possible because of Defendants' undisclosed pull-in scheme.

Defendants knew none of their statements were true. CWs corroborated that Defendants were always informed about the status of Nutanix's pipeline through weekly internal reports from Salesforce.com containing granular detail about deals at every point in the sales cycle. The reports showed that by April or May 2018, the pipeline was "pretty dry." Pandey and Williams also both attended quarterly All-Hands meetings with CWs where they personally discussed concerns about Nutanix's depleted pipeline, the cessation of Dell leads, product quality issues, and sales execution issues. Product quality issues and deteriorating performance metrics were also discussed during Quarterly Business Review ("QBR") meetings attended by David Sangers, Pandey's direct report, and memorialized in Key Performance Indicators ("KPI") on "dashboard" reports on a Company shared drive accessible to the Defendants.

As a result of Defendants' fraudulent scheme, Pandey and Williams were able to, collectively, unload ***more than $30.5 million*** of their holdings of Nutanix securities at artificially-inflated prices.

Unable to hide from their end of Class Period admissions, Defendants' Motion relies heavily on misleading aggregate sales and marketing expense figures to show such expenses were purportedly reported to investors and increasing. But that elides the point. These figures specify neither quarterly

*lead generation* spending (Defendants kept it flat), nor quarterly *sales* hires (Defendants admit was not on "pace" with growth goals). Defendants' belated confession was not the result of innocuous spending "imbalances," as Defendants say. The alleged fraud was a scheme of systemic misrepresentations fueled by desperation and personal self-interest. Defendant's Motion should be denied.

## FACTUAL BACKGROUND

### I.   DEFENDANTS SECRETLY REALLOCATE SPENDING AWAY FROM CRITICAL PIPELINE GENERATION CAUSING SALES LEADS AND SALES TO PLUMMET

Founded in 2009 by Defendant Pandey, Nutanix provides computing solutions, including its "core" HCI technology. ¶¶57, 61. Nutanix's HCI solutions economize the various functions of its customers' computing needs into a single machine—the server. ¶64. This enables systems to scale out as needed using servers as building blocks. ¶65. Nutanix offers its solutions either as stand-alone software or pre-installed on hardware built by its OEMs or Nutanix itself. ¶66. By the start of 2017, the market had overwhelming moved to a software-only model leveraging public cloud options such as AWS. ¶¶7, 68. Market analysts found it "critical to Nutanix's long-run success" to enter the public cloud space. ¶70. Thus, in June 2017, Nutanix announced it was developing Xi, its public cloud product. ¶71. In the first quarter of FY2018, Nutanix began offering its products through software-only sales. *Id.*

To facilitate its transition to the public cloud, in 2018, Nutanix acquired Minjar, Inc., Netsil, Inc., and Mainframe2, Inc., each of which were part of the Company's foundation for a new public cloud solution. ¶¶69, 98. In order to develop these new products, Nutanix needed to invest "quite a bit" into R&D. ¶95. However, because the Company did not have disposable cash to invest, Defendants covertly "deci[ded]" during the "planning process" to reallocate spending for the upcoming FY2018 and FY2019 period away from lead generation to R&D and admittedly "kept lead generation spend flat." ¶¶292, 296, 309; D.Ex.18 at 16. Defendants reallocated lead spending despite that "a [k]ey element" of Nutanix's "growth strategy" is to "[i]nvest to acquire" new leads by "increasing investment in sales and marketing" to educate customers about Nutanix products. ¶81. Williams admits that "[l]ead generation spending is a *key* component to building pipeline." ¶328. Pandey admits that sales success is comprised of: "salespeople and ***pipeline spend, the demand gen spend***[.]" ¶¶292, 297.

As Defendants revealed at the end of the Class Period, the "magnitude of the shift" away from

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

lead generation spending was "not an insignificant amount[,]" but "tens of millions" of dollars. ¶292. CWs confirmed the underspend. CW4, observed that lead generation spending for Digital Marketing remained flat from 3QFY2018 through 2QFY2019. ¶¶53, 96. CW5 corroborated CW4's account, stating that during the Class Period, Nutanix insufficiently invested in the development of new global accounts. ¶¶54, 97. CW1 similarly observed that by summer 2018, 80% of Nutanix's sales came from 15% of customers who were mainly *existing* accounts, rather than new leads. ¶¶50, 97.

Given the importance of lead generation, Defendants scrutinized Nutanix's pipeline throughout the Class Period. CWs 1, 3, 5, and 7 recalled that the pipeline was tracked in Nutanix's internal Salesforce.com system, which reports granular sales information at every point in the sales cycle for all customers—new and existing—for all deals (confirmed and "prospective"), and their status (*i.e.*, discovery stage, proof of concept). ¶168. Pandey had access to, and received pipeline reports from, Salesforce.com on a weekly basis. ¶170. Moreover, CW5 personally informed Pandey and Williams throughout the Class Period about the status of CW5's new deals because it was Nutanix's "goal" to get senior executives in front of customers. ¶167. Indeed, Pandey was known amongst Nutanix employees and the analyst community as being very "active [] in the sales process." ¶¶354-57.

Defendants' decision to divert funds away from lead generation negatively impacted Nutanix's "bookings, billings and revenue." ¶292. According to CWs 1 and 3, it was "pretty obvious" from the pipeline reports in Salesforce.com by April or May 2018 that the Company's pipeline was "pretty dry" and in trouble from the lack of credible sales leads. ¶172. Pandey discussed concerns about the significant decrease in pipeline at every quarterly Class Period All-Hands meeting in FY2018 and FY2019—all of which he and Williams attended. ¶¶112, 174. Defendants kept lead spending flat, despite knowing from doing it before in FY2017 that it would be disastrous for Nutanix's sales. ¶¶351-53.

Throughout the Class Period, Defendants concealed from the market that Nutanix had kept lead generation spending flat and the negative consequences it was having on the pipeline, even in the face of direct inquiries from market analysts about new lead generation and customer growth. ¶¶184, 227.

## II.    SALES SHRINK FURTHER AS DELL STOPS SELLING NUTANIX PRODUCTS

At the beginning of the Class Period, Nutanix's largest and most important OEM "by far" was Dell, which offered Nutanix on its Dell XC product line. ¶¶5, 88, 90. Dell's importance to Nutanix

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

derived in significant part from the OEM agreement that governed their relationship, including obligations owed when dealing with end-customers. ¶90. CW1 stated that the "rules of engagement" in the OEM agreement required Dell to sell Nutanix software on Dell XC hardware to Nutanix's existing customers and new leads, and Dell could not present competitors' quotes, including its own. *Id.* Nutanix relied heavily on Dell because Dell generated at least 40% of Nutanix's overall sales leads. ¶¶5, 88-89.

However, Dell's relationship with Nutanix turned sour in 2016 when Dell acquired VMware, Nutanix's biggest rival. ¶5. Shortly thereafter, Dell began "really pushing" VMware software (Dell's VX Rail product) over Dell XC products, in violation of the OEM agreement, causing Nutanix's sales leads from Dell to dissipate. ¶¶114-15. In January 2018, Dell changed its compensation structure to reward Dell salespersons for promoting VMware instead of Nutanix. ¶¶117-18. At that point, Nutanix stopped receiving ***any*** new sales leads from Dell. ¶119.

Defendants concealed from the market that the Dell relationship had deteriorated and Dell stopped providing new leads. They told shareholders as late as November 2018 that "in terms of the competitive landscape, nothing has changed" and that Nutanix expected the Dell relationship to improve with its shift to a software-only company. ¶¶186, 269. CWs confirmed that Pandey and Williams "knew exactly" what percentage of Nutanix's sales and sales leads came from Dell at any given time from Salesforce.com reports and because they attended quarterly All-Hands meetings where Defendants discussed it, as well as Dell's change in compensating its sales people. ¶89. By at least April or May 2018, quarterly All-Hands meeting discussions focused on the inadequate number of new leads (including from Dell), and that the leads Nutanix had were not sufficiently profitable. ¶¶115-17, 174. In addition to pipeline reports, Salesforce.com also included a "touch box" where employees, including CW1, reported violations of the Dell OEM agreement during the Class Period. ¶¶115, 168-73.

## III.   NUTANIX ADDRESSES ITS REVENUE CRISIS BY SECRETLY PULLING-IN SALES FROM FUTURE QUARTERS TO MEET QUARTERLY SALES FORECASTS

As a result of reallocating lead generation spending and losing Dell sales, Nutanix year-over-year revenue growth plummeted—declining from 44% in Q2FY2018 (compared to Q2FY2017, the Class Period Start) and (1%) in Q3FY2019 (compared to Q3FY2018, the Class Period end). Nutanix's customer growth declined for the same period from 14% to 6%. *See* Ex. C. During that time, upper

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

management, including the National Sales Manager, Craig Bumpus, who reported directly to Pandey, communicated "loud and clear" that Nutanix needed more revenue and instructed salespeople throughout the Class Period to "pull-in" sales from future quarters to meet forecasts. ¶148. Ordinarily, this means that the ensuing quarter will be depleted of orders in the pipeline, and the pull-in process will have to be repeated until it becomes "over-procured." *Id.*, ¶143.

CW1 recalled that every quarter during CW1's employment, salespersons were pressured to identify orders that could be "pulled in" to the present quarter and upper management reviewed every prospective deal in Salesforce.com for the same. ¶¶1444, 148. CW1 confirmed the practice intensified in 2018 because management told CW1 that the Company was "significantly behind" on its revenue goals and the need for revenue was "presented as a pending disaster every quarter." ¶¶145, 148-49. In CW1's region, alone, Nutanix secretly pulled in approximately $3.8mm in two separate quarters in 2018. ¶145. To effectuate the pull-in scheme, Nutanix enticed customers with steep discounts of up to 75-80% on hardware and 90% on software. ¶151. CWs confirm that by April or May in 2018, Nutanix had over-procured and the pipeline was "pretty dry," which was "very obvious" from Salesforce.com reports and discussions at "All Hands" meetings. ¶¶147-48.

## IV.   NUTANIX'S SALES EXECUTION IS HAMPERED BY A HIRING FREEZE, PRODUCT DEFECTS, AND EMPLOYEE TURNOVER

**Hiring Freezes and Attrition**: Exacerbating Nutanix's revenue crisis, sales execution faced significant undisclosed headwinds throughout the Class Period. Although Defendants told the market they "significantly *increased* our sales and marketing personnel" every quarter (*e.g.*, ¶211), multiple CWs confirmed Nutanix secretly implemented hiring freezes of all sales personnel in calendar 2018. ¶135-36. Moreover, CW7 reported that following a change in management in December 2017, Nutanix suffered from turnover at every level throughout the sales organization. ¶134. These issues resulted in insufficient sales personnel to close deals. For example, CW4's Digital Marketing group had more money budgeted to it than personnel to use it. ¶136. CW5 confirmed that during the Class Period, Nutanix chronically understaffed its sales teams for large "global" accounts by 80% as compared to competitors. ¶137. CWs 4 and 5 also observed that the understaffed sales department lacked the time for adequate training which, coupled with too many new products, resulted in "general sales readiness"

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

being "poor" and thus declining pipeline ¶141. Defendants confirmed the CW accounts, admitting in February 2019 that, contrary to their prior statements Nutanix was increasing sales hiring, Defendants had actually under-hired for all of 2018 (¶291) and "took too much on in terms of new products in 2018" resulting in a "confused" sales team, where Pandey conceded Nutanix "let chaos reign." ¶¶142, 293.

**Product Quality:** While Nutanix became absorbed with new products, its "core" HCI product quality suffered as a consequence. ¶101. CW6 recalled that, for example, throughout calendar 2018, Nutanix's HCI technology no longer offered "one click upgrades"—a feature that customers demanded and Nutanix marketed as a competitive advantage. ¶102. HCI quality issues were a significant problem for Nutanix because 80% of its customers used this "core" product. ¶103. Although Defendants boasted that Nutanix offered an "unmatched" "consumer-grade experience" (¶200), purported strong growth of "our core business" (¶265), and alleged success in "adding Nutanix Core customers" (¶271), they knew that these undisclosed HCI product quality issues were causing Nutanix to lose sales because such issues were discussed at QBR meetings attended by VPs of Products and Support and COO David Sangster, Pandey's direct report, and at every quarterly All-Hands meeting throughout calendar 2018. ¶¶20, 107, 111-12. QBR meetings included a review of KPIs for each business segment reviewable on "dashboard" reports that contained a unit's quarterly performance against the prior forecast. ¶¶109-10. *Id.* The KPIs, dashboard reports, and other materials were stored on a shared drive accessible to QBR attendees (including CW6), and all Director level employees and above (including Pandey and Williams). ¶111. On May 13, 2019, Pandey admitted these previously undisclosed "product quality" issues existed at least "the last six to nine months." ¶113.

## V.    DEFENDANTS LIQUIDATE THEIR MASSIVE STOCK HOLDINGS

Capitalizing on Nutanix's artificially-inflated stock price, Pandey and Williams, neither of whom sold any Nutanix securities prior to the Class Period, suddenly dumped 704,500 shares of common stock and stock options for over $30.5 million in proceeds. ¶363. Specifically, between December 7, 2017 and December 20, 2017, Pandey unloaded 104,500 shares of common stock for over $3.7 million in gross proceeds—*fifteen times* his yearly salary. ¶¶365-66. Williams unloaded 600,000 stock options in only four trading days for $25 million in profits—*seventy to one-hundred times* his 2017 and 2018 salaries. ¶368. Pandey and Williams sold their shares shortly after Nutanix reached historically-high trading

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

prices and strategically timed such sales to occur immediately following earnings announcements rife with misleading statements that caused artificial increases in Nutanix's stock price. ¶¶367, 370.

The truth was ultimately revealed over two partial disclosures. On February 28, 2019, Nutanix revealed that, contrary to Defendants' prior statements that Nutanix was increasing its investment in sales and marketing and sales hiring, Nutanix did the opposite and actually had an "inadequate marketing spending for pipeline generation and slower than expected sales hiring," causing the Company to issue substantially-lower third quarter guidance. ¶¶288-89. Pandey further admitted that "over the past few quarters, we have not kept pace with our bullish sales hiring goals. This plays a role in our sales pipeline development." ¶291. As a result, the price of Nutanix common stock dropped from $50.09 per share on February 28, 2019 to $33.70 per share on March 1, 2019. Then, on May 30, 2019, Defendants revealed that Nutanix's problems were far worse than represented and Nutanix failed to meet its revenue targets as a result of needing to "rebuild our pipeline by doubling down on lead generation and increasing our focus on sales hiring and execution." ¶¶321-22. On this news, Nutanix's common stock dropped from a closing price of $32.67 per share on May 30, 2019 to $28.07 per share on May 31, 2019. ¶323. Thereafter, numerous analysts issued downgrades (¶¶324-25), with Morgan Stanley citing competitive pressures, particularly *from Dell*, as one of the key reasons for the downgrade. ¶324. Piper Jaffray remarked that "[i]t is clear this model is unsustainable, requiring massive amounts of spending just to support modest revenue growth, which we believe is attributable to competition" and that "[t]he company continues to struggle with execution[.]" ¶325. Stifel noted that "[c]haos still reigns." ¶325.

## ARGUMENT

To state a Section 10(b) claim, the AC must allege (1) a material misrepresentation or omission (i.e., falsity), (2) scienter, (3) a connection with the transaction, (4) reliance, (5) economic loss, and (6) loss causation. *In re Atossa Genetics, Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017).[2] On a motion to dismiss, all factual allegations must be accepted as true and all reasonable inferences drawn in Plaintiffs' favor. *In re Snap Sec. Litig.*, 2018 WL 2972528, **3-4 (C.D. Cal. 2018).

---

[2] Defendants challenge falsity and scienter and, thus, concede the remaining elements.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# I.   THE COMPLAINT ALLEGES FALSE AND/OR MISLEADING STATEMENTS[3]

"A statement is misleading…if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Only if reasonable minds could not disagree" as to falsity "should the district court dismiss under 12(b)(6)." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021-22 (S.D. Cal. 2005). Rule 10b-5 prohibits telling a "material half-truth[]," *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010), which is the failure "to state a material fact necessary in order to make the statements made…not misleading". *Id.* "Once defendants choose to tout positive information" they cannot do so misleadingly, and must even disclose "adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018). Even "literally true [statements] can be misleading and thus actionable under the securities laws." *Cunha v. Hansen Natural Corp.*, 2012 WL 12886194, *3 (C.D. Cal. 2012).

## A.   False and Misleading Statements Regarding Lead Generation

Nutanix stated in the 2018 10-K that its "marketing program" includes ***lead generation*** activities and "[t]he ***majority*** of our sales and marketing investment is used to educate our end customers about the benefits of our solution," *e.g.*, lead generation. ¶¶80-81; D.Ex. 4 at 43. Defendants ultimately admitted in the first corrective disclosure that "during our planning process" immediately preceding the Class Period, they secretly decided to "reallocate[]" funds budgeted for lead generation to R&D and keep "***lead generation spend flat***" for FY2018 and FY2019. ¶292. Yet, Defendants falsely told investors in each Class Period quarterly and annual SEC filing that Nutanix had "***increased***" critical spending on marketing for FY2018 and FY2019. *See, e.g.*, ¶193 ("we have continually ***increased*** our marketing activities related to brand awareness, promotions, trade shows and partner programs"); ¶¶212, 236, 255, 277 (same); ¶¶189-90, 193, 195, 209, 211-12, 214, 233, 235-36, 238, 252, 255-56, 259, 274, 276-77, 279 ("marketing" efforts "expand[ing]," "increase[ing]" or "continue to" do so); ¶253 ("lead-generation activities" were "broaden[ing.]").

Defendants' statements were false when made because a reasonable investor would have

---

[3] Due to space limitations, Plaintiffs do not address every false statement herein. For the Court's convenience, Plaintiffs prepared a chart detailing each alleged false statement, the reasons why it is false, and the applicable supporting scienter facts. *See* Ex. A.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

understood statements that Nutanix was "increasing" marketing activities to mean Nutanix was also increasing the most critical component of marketing—lead generation—when, in fact, this was not true. *City of Miami Gen. Emples.' & Sanitation Emples.' Ret. Trust v. RH, Inc.*, 302 F. Supp. 3d 1028, 1039-40 (N.D. Cal. 2018) (misleading to represent "inventory investments" increasing when investment in critical subset of inventory was "negligible"); *In re Quality Sys. Sec. Litig.,* 865 F.3d 1130, 1144 (9th Cir. 2017) (touting metrics as "growing, compared to previous quarters" actionable where "created an impression of a state of affairs that differed in a material way from the one that actually existed."); *Azar v. Yelp, Inc.*, 2018 WL 6182756, *11, *17 (N.D. Cal. 2018) (statements actionable where "inconsistent with any awareness Defendants had" of adverse trend, ***as later disclosed***).

Shenwick v. Twitter, Inc., 282 F. Supp. 3d 1115 (N.D. Cal. 2017) is instructive. In *Shenwick*, Twitter made "positive" statements suggesting "user engagement," an important metric for Twitter in attracting advertisers, "was improving." *Id.* at 1127-28, 1139. That claim is akin to Defendants' statements regarding "increased" marketing investment. Just as marketing investment is instrumental for Nutanix to develop its sales pipeline, user engagement was important for Twitter in attracting advertisers. *Id.* at 1125. The *Shenwick* court found it misleading for Twitter to report positive user engagement without reporting a key component thereof (DAU) was "***flat*** or declining…during the Class Period." *Id.* at 1140. Here too it was misleading for Defendants to claim Nutanix "increased" marketing spending when, in fact, Defendants had kept lead generation flat.

Seeing no way around their end of Class Period admissions, Defendants try to change Plaintiffs' theory into one about the adequacy of Nutanix's lead generation spend. DB10. But the crux of Plaintiffs' claim is not whether lead spending was sufficient (it was not). Rather, Plaintiffs' claim is simple. Defendants said they were increasing marketing spending—and thus, lead generation spending because lead generation was a self-described "[k]ey element to [Nutanix's] growth strategy" (¶252)—when they were not. Further, the disclosure of quarterly aggregate sales and marketing expense figures do not, as Defendants contend (DB10), equate to disclosure of the subset lead generation spend. *Shenwick*, 282 F. Supp. 3d at 1142-43. Similarly, Defendants' contention that their statements are not false because sales and marketing expense increased in whole dollars (DB10) is not an apples-to-apples comparison because it includes, as Defendants concede (DB13), other components. Indeed, "factually accurate" historical

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

data does not immunize other misleading statements. *In re Gilead Scis. Sec. Litig.*, 2009 WL 1561584, *3 (N.D. Cal. 2009). This is because "the disclosure required by the securities laws is measured not by literal truth[.]" *Vancouver Alumni Asset Hldgs., Inc. v. Daimler AG*, 2017 WL 2378369 (C.D. Cal. 2017). Defendants are also wrong because sales and marketing expense (excluding stock-based compensation) as a percentage of sales for FY2017 and FY2018 was 50% and 51%, respectively. Dkt. 108-2 at 92-93 of 209. Thus, it did ***not*** increase. Regardless, this factual dispute is premature at this stage. *Livid Hldg. Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005).[4]

Defendants' reliance on *In re Nimble Storage, Inc. Sec. Litig.*, 2016 WL 7209826 (N.D. Cal. 2016) is misplaced. In *Nimble*, defendants diverted sales and marketing expenditures for their "Commercial" division to their "Enterprise" division but, as the plaintiffs "conceded," the reallocation was ***disclosed***. *Id.* at *3 n.6, *7. Moreover, unlike in *Nimble*, Defendants here specifically stated that lead generation spending was "increasing." There were no similarly specific false statements made in *Nimble* before defendants disclosed the reallocation. *Compare Id.* at *6 ("continues to *do* investments") *with* ¶193 ("we have continually ***increased*** our marketing activities related to [lead generation]").

### B. False and Misleading Statements Regarding Dell Leads and Demand

Despite that Dell was not providing Nutanix ***any*** new sales leads in calendars 2018 and 2019 and was promoting its own VMware product, Defendants told investors the opposite. For example, when asked whether the transition away from hardware would increase business with Dell, Pandey stated "absolutely, we expect the friction to go down." ¶186. Similarly, during the November 28, 2018 conference call, Pandey responded to an analyst question regarding whether there had "been any changes" in the competitive environment that: "in terms of the competitive landscape, nothing has changed" (¶269) and "we've navigated [the VMware] competition waters really well." *Id.* While the Salesforce.com pipeline report showed declining sales leads throughout the Class period, Defendants told investors "[w]e expect continued strong top line growth in the remainder of fiscal 2018" (¶179),

---

[4] Defendants' claim that Plaintiffs did not cite internal reports or detailed enough CW allegations (DB12-13) to show their statements are false ignores the pipeline reports, which showed zero new leads from Dell and a massively declining pipeline in 2018 due to Defendants' decision to keep spending flat and institute hiring freezes. Moreover, Plaintiffs' CW allegations are not "a shared opinion"—they corroborate Defendants' own admissions. Finally, Plaintiffs do not contend Nutanix had a duty to disclose the dollar amount spent on lead generation. DB13. Rather, Plaintiffs allege Defendants had a duty to be truthful that they were not increasing lead generation as Defendants falsely claimed.

"[d]emand for our solution remains strong" (¶220) and Nutanix had a "record number of new customers." (¶200). Even the day before Nutanix revised guidance down on February 27, 2019, Defendants falsely stated, that Nutanix was "seeing a ton of demand for [the Nutanix platform]" and "[Pipeline is] definitely fairly strong to where we were last year." ¶285. Such "temporal proximity" between the misstatement and corrective disclosure supports falsity *RH*, 302 F. Supp. 3d at 1042; *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, *15 (C.D. Cal. 2013) (same).

These statements were also materially false when made because Nutanix's overall pipeline was significantly declining due to the loss of Dell sales and Defendants' decision to keep lead generation spending flat. ¶¶114, 119. Indeed, according to CWs 1 and 3, Nutanix's Salesforce.com pipeline showed by April or May 2018 that leads were "pretty dry" and it was "very obvious" there was a problem, which was discussed at quarterly All-Hands meetings in 2018 and 2019. ¶¶147, 172.[5] Thus, contrary to Defendants' statements, demand was declining, not "strong," and "friction" with Dell was increasing, not decreasing, because Dell was violating the OEM agreement by selling its own VMware, which significantly altered the competitive landscape as Nutanix quickly lost market share to VMware. *Backe v. Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1159 (S.D. Cal. 2009) (claim of "strong demand" for products misleading where company losing market share to competitors); *Quality Sys.*, 865 F.3d at 1144 (statements about pipeline false where CWs recounted contradictory non-public facts).

Defendants also included in every 10-K and 10-Q an identical purported warning that "Dell may be more likely to promote and sell its own solutions" and "[i]f Dell decides to sell its own solutions over our products, that could adversely impact our OEM sales and harm our business . . ." ¶¶197, 216, 240, 262, 281. Defendants' purported risk factors (DB15) were false and misleading because, as explained above, the risk had already materialized causing a significant sales pipeline decline. *Cutler v. Kirchner*, 696 Fed. Appx. 809, 813 (9th Cir. 2017) (risk factor misleading where it "disclosed a risk in the abstract by omitting the fact that it had already…come to fruition"); *Snap*, 2018 WL 2972528 at *6 (same). Relatedly, the PSLRA safe harbor does not apply where defendants repeat "the same language" in their

---

[5] Defendants criticize Plaintiffs for not "quantifying" the precise amount of decline in sales leads from Dell. DB 15. But Plaintiffs did quantify it—Dell was providing *zero* new leads. ¶124.

periodic SEC reports. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, *11 (M.D. Ga. 2018).

Relying only on Nutanix's fiscal 2017 and 2019 financial results, but **omitting fiscal 2018**, Defendants disingenuously argue Plaintiffs' Dell allegations are "refuted by SEC filings" because Dell revenue purportedly "remained steady with a slight increase." DB14.[6] Defendants are wrong—Dell sales decreased from $104 million in FY2018 to $86.5 million in FY2019—a 17% decline. *See* Ex. C. Moreover, CW1's account that Dell provided approximately 40% of sales leads is not, as Defendants' contend (DB14), contradicted by Nutanix's SEC filings reporting actual Dell sales because not all sales leads translate into sales and not all Dell sales leads translate into Dell sales. Further, Plaintiffs allege that Dell stopped providing **new** sales leads, not that Nutanix did not receive any sales from Dell (*e.g.*, **existing** customers from upgrades and other products).

Defendants also incorrectly argue that the CWs were not in a position to know the facts alleged. DB14. But CW allegations are sufficiently pled where, as here, Plaintiffs identify each CW's title, dates of employment, job duties, and the person to whom they reported. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005) (sufficient to allege job description, responsibilities, title, and to whom CW spoke); *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *11 (D. Ariz. 2018) (same). Defendants' (incorrect) contention that CW1 has no basis to know about Nutanix's relationship with Dell because CW1 worked in the Midwest region (DB14-15) is wrong. But, CW1 was required to know the Dell OEM agreement terms because CW1 personally liaised with Nutanix alliance partners and resellers assigned to the Dell account (¶121) and reported Dell's violations in the "touch box" in Salesfoce.com. ¶173. CW1 also attended quarterly All-Hands meetings where Pandey discussed the declining Dell sales leads and pipeline. ¶117. CW1's account is corroborated by CWs 3, 5 and 6. *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, *5 (W.D. Wash. 2019) (CWs credited where averments "consistent and interlocking"). Similarly, CW4 worked on developing lead generation strategies and thus was in a position to know the status of sales leads from Dell. Defendants' criticism that because CW4 started in January 2018, CW4 cannot speak to Dell sales leads in 2017 (DB15) is wrong. Dell

---

[6] While Plaintiffs dispute that Defendants may rely on SEC filings not alleged in the AC that were issued after its filing (*see* Opposition to Request to Judicial Notice filed herewith), in any event, the 2019 10-K further supports Plaintiffs' case.

allegedly stopped providing any new leads starting in calendar 2018, right when CW4 started.[7] Moreover, given the sales cycle is about six months, declining sales leads in mid-2017 would not be seen until early 2018. ¶82.

While Defendants may be correct that Nutanix is not responsible for predicting a competitor's plans (DB15), Plaintiffs allege facts showing Defendants already ***knew*** Dell was violating the OEM agreement because (i) Dell was Nutanix's most important OEM; (ii) Salesforce.com showed the pipeline was in trouble by April 2018; and (iii) Pandey discussed declining Dell sales leads and lack of new deals at quarterly All-Hands meetings (¶¶115-17). Thus, Plaintiffs alleged particularized facts demonstrating when Nutanix stopped receiving new Dell leads (January 2018), and quantified them (zero). ¶124.[8]

Further, Defendants argue that the increase in Nutanix's revenue and customer-base belies any argument that sales leads from Dell or other sources declined. DB16. On the contrary, from 2018Q2 to 2019Q3, year-over-year revenue and customer growth steadily ***decreased*** from 44% to (1%) and from 14% to 6%, respectively. Ex. C. Thus, Nutanix's SEC filings support Plaintiffs' theory. In any event, this is an issue of fact inappropriately resolved on a motion to dismiss. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 n.31 (3d Cir. 2009) (where "reported financial results are in tension with the reports of the CWs and analysts…we do not resolve factual disputes--even in [PSLRA] cases").

Finally, Defendants' claim that the PSLRA's safe harbor applies (DB16-17) fails because their statements were not forward-looking or are "mixed" statements under *Quality Sys.*, 865 F.3d at 1142. *See, e.g.*, ¶202 ("We ***have*** a full-court press on hiring…" and admitting "headcount shortfall"); ¶¶192, 211 ("We plan ***to continue*** to invest….We ***have*** significantly increased….We intend ***to continue*** to grow…."). Such statements are not protected. *See Roberti v. OSI Systems, Inc.*, 2015 WL 1985562, **8-

---

[7] Defendants' cases (DB15) are inapposite. *See In re DOT Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1162-63 (S.D. Cal. 2008) (CWs unreliable where alleged job description "too vague," plaintiff did not allege job duties and facts came from unreliable "hallway conversations."); *In re Accuray Sec. Litig.*, 757 F. Supp. 2d 936, 943-45 (N.D. Cal. 2010) (CW lacked knowledge of specific contracts at issue); *City of Royal Oak*, 880 F. Supp. 2d 1045, 1064-65 (N.D. Cal. 2012) (plaintiff failed to allege how problems CWs identified prevented defendant from attaining alleged false projections).

[8] Defendants' cases (DB15) are distinguishable. *See In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, *17 (N.D. Cal. 2014) (statements not false where falsity premised on "rumors"); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996) (risk disclosure warning competition from new products sufficient where introduction of competitive product was uncertain). Unlike *Mellanox* and *Stac*, Defendants *knew* (as opposed to a mere rumor) that Dell was violating the OEM contract.

9 (C.D. Cal. 2015) ("should also *continue* to generate revenues" unprotected); *Mallen v. Alphatec Hldg. Inc.*, 861 F. Supp. 2d 1111, 1126 (C.D. Cal. 2012) (same). The safe harbor is also inapplicable to the AC's omissions. *Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, *12 (C.D. Cal. 2018).

## C. Defendants' Undisputed and Undisclosed Pulling-In Scheme Rendered Their Class Period Statements False and Misleading

Throughout the Class Period, Nutanix secretly instructed salespeople to "pull in" sales from future quarters to make quarterly forecasts. ¶¶143-44. In CW1's region, alone, Nutanix secretly pulled in approximately $3.8 million in two different quarters in 2018. *Id.* Pulling-in sales, or "draining the swamp," was directed by upper management to compensate for Nutanix's empty pipeline—which was supposed to be 2.5 to 4 times more than the amount of prospective deals in a given quarter. ¶¶143, 146.

Defendants' surreptitious pull-in scheme rendered their statements attributing Nutanix's ability to meet forecasts to purported "strong" demand and customer growth, false and misleading. *See e.g.,* ¶200 (misattributing positive results to "record number of new customers"); ¶220 (misattributing "strong" demand and "growth in…billings" to "successfully executing" Nutanix's "software-defined business model"), ¶227 (misattributing customer expansion to organic growth), ¶245 (touting "sales productivity" and "customer repeat purchase multiples" caused by undisclosed pull-ins), ¶265 (misattributing purported positive results to core business growth), ¶285 (touting a purported "ton of demand…in almost all of our districts"); ¶¶195, 214, 238, 259, 279 (the "increase" in "sales and marketing" investment responsible for "increase in product revenue" and "increased demand").

By putting Nutanix's success at issue, Defendants had duty to disclose they were only able to meet forecasts by engaging in the undisclosed and unsustainable practice of pulling-in future sales. *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, *9 (D. Or. 2017), *adopted*, 2017 WL 3610523 (D. Or. 2017) (misleading to tout sales growth "without disclosing that a material portion…resulted from an unsustainable practice of pulling in sales"); *In re Questcor Sec. Litig.*, 2013 WL 5486762, *14 (C.D. Cal. 2013) (once the cause of financial success at issue, defendant must "disclose information concerning the source of its success"). Courts have sustained securities fraud claims based on similar allegations. *Murphy*, 2017 WL 3084274 at *9. In *Murphy*, the defendants touted the company's "organic growth" while concealing it "was aggressively pulling in sales, offering discounts, and extending

payment options to encourage larger sales." *Id.* Here too, Nutanix aggressively pulled in sales by enticing customers with steep discounts. ¶151 (75-80% on hardware, 90% on software). *Murphy* also noted that the purported "sustainable organic growth" from pull-ins was touted by defendants to show they were "hitting benchmarks along the way to achieving" a goal. *Id.* at *9, *13. So too here. ¶265 (misrepresenting "results this quarter prove" Nutanix on "solid path to meet our [billings] goal"). Defendants **do not dispute** their statements were false as a consequence of the secret pull-ins, thus waiving any such challenge. *See Nathanson v. Polycom, Inc.*, 2015 WL 12964727, *1 (N.D. Cal. 2015).

### D.    False and Misleading Statements Regarding Sales Hiring

Throughout the Class Period, Defendants falsely stated to the market that Nutanix was doing a "lot of hiring" (¶182), "invest[ing] heavily in the growth of our business" by "expand[ing] our international sales and marketing presence" (¶190), that it had "significantly increased our sales and marketing personnel" (¶192) and "ramped hiring to support our growth plans." ¶225; *see also* ¶¶190, 192-93, 209, 211-12, 223, 235, 256-57, 274, 276, 203. As Defendants would later admit, *contrary* to their public statements, Nutanix had "not kept pace with our bullish sales hiring goals" throughout the Class Period (¶291) and thus, "our pipeline targets were further impacted by a shortage of sales reps in the first half of the fiscal year, resulting in an **under-spend by several million dollars**." ¶292.

This "severe" (¶300) under-hiring was not merely an oversight, as Defendants suggest. Despite that "salespeople" headcount was, with lead generation spending, one of the two stated key "inputs" to Nutanix's success (¶297), according to CW1 and CW7, Defendants secretly froze the hiring of all sales personnel during the Class Period. ¶136. CW4 similarly revealed that during CW4's tenure, the Digital Marketing group lacked sufficient personnel for the money budgeted to it (¶136) and CW5 stated Nutanix had to staff sales teams with two people when competitors' teams had eight or twelve. ¶137. Contrary to Defendants' contention (DB12), the AC is sufficiently particularized because it describes the CWs (¶¶50-56) who were employed in *sales*, quantifies the hiring underspend as "several million

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

dollars," and Defendants admit their under hiring of salespeople contributed to pipeline shortage.[9]

As stated above, Defendants' contention that their statements are not false because aggregate sales and marketing expense increased in whole dollars (DB10) ignores that those figures do not break out sales personnel salaries and that, as a percentage of revenue, they **remained flat** for FY2017 and FY2018. Moreover, Defendants' purported real-time disclosure that Nutanix was facing challenges in meeting hiring goals is insufficient where, as here, they knew they would not meet hiring goals because Nutanix implemented undisclosed hiring freezes and attrition.

### E.   False and Misleading Statements Regarding Product Quality

With the focus on Nutanix's newly acquired public cloud products, its "core" HCI technology, which 80% of customers used, was disregarded and thus sustained quality issues throughout 2018 such as the lack of previously offered "one click upgrades" marketed to customers as an advantage over competitors. ¶¶68-79, 102. Pandey *admitted* that Defendants were aware of such "product quality" issues for "the last six to nine months" preceding the close of the Class Period (since mid-2018), contributing to lower sales. ¶113. These problems likely occurred even earlier.[10] Thus, Defendants' statements touting the purported "record number of new customers" due to "unmatched" "consumer-grade experience," (¶200), "strong" purported "demand for our solutions" (¶220), purported strong growth of "our core business" (¶265); and alleged success in "adding Nutanix Core customers" (¶271) were false when made because demand and customer growth were declining due to product quality issues.

Defendants' only argument is their contention that CW6 cannot speak to events occurring before CW6 started in June 2018. DB13. But they do not dispute that CW6 knew product quality issues persisted "throughout 2018." *Compare id.*, *with* ¶¶101, 201, 221, 266, 268, 272, 286, 310. Thus,

---

[9] Defendants' cases (DB12) are distinguishable. *See Coble v. Broadvision Inc.*, 2002 WL 31093589, at *11-12 (N.D. Cal. 2002) (no falsity where, unlike here, defendants did not represent they "would increase its staffing," only that they "expected an increase in **average** headcount" and discounting hiring freeze allegations because, unlike here, the CW was only identified as a "former employee," not alleged to be employed at the relevant time or alleged to know the relevant facts); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (no falsity where "sales personnel issues" disclosed and staffing problems based on "vague" allegations, unlike here where CWs provide specific examples of under hiring that negatively impacted sales).

[10] *See Iowa Pub. Emples. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 n. 13 (2d Cir. 2010) (dismissal because misconduct was alleged in February 2008, but not July 2007, reversed because "[t]his conclusion fails to draw a reasonable inference in the plaintiffs' favor" and the existence of a problem at one time "may support an inference that it was present six months earlier").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

Defendants concede the falsity of statements made during CW6's employment. Further, Defendants cannot contest the truth of CW6's averment on a motion to dismiss, that CW6 knows Nutanix's product quality began deteriorating in 2018. ¶101. *See Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 966 (9th Cir. 2014). This is especially so given CW6's knowledge from receipt of detailed "dashboard reports" and personal attendance at every quarterly QBR meeting. ¶111.[11]

## I.   THE COMPLAINT PLAUSIBLY ALLEGES A STRONG INFERENCE OF SCIENTER

Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs need not allege Defendants "*actually knew*" they were making false statements. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (emphasis in original). Recklessness is sufficient. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (defendants "on notice of facts" supporting recklessness). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). The scienter analysis requires facts to be "***taken collectively***." *Tellabs*, 551 U.S. at 310. A scienter inference is "strong" if it is "at least as likely as any plausible opposing inference." *Id.* at 324, 328-29. "[T]he tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, *8 (C.D. Cal. 2014).

**Defendants' Admissions Support Scienter:** Defendants admitted actual knowledge of most of the facts underlying Plaintiffs' claims. Williams conceded in the first corrective disclosure that although "lead generation spending is a ***key*** component to building pipeline," he and Pandey "reallocated" such spending *ex ante* based their "decision" during the "planning process." ¶¶292, 309; *c.f. S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (finding scienter where defendant admitted "we did not complete integration…because we ***decided*** at the time" on a course of action inconsistent with their statements). The amount of the reallocation was admittedly "not an insignificant amount," it

---

[11] The CW statements in *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1061-62 (9th Cir. 2014) (DB13) were not cited for their knowledge of particular facts as alleged here, *e.g.*, deteriorating product quality as measured by quantifiable metrics such as KPIs and NPS. Rather, they consisted of general aspersions on the defendants' character and recollections of bad acts. *Id.* at 1061.

was "tens of millions." ¶292. Defendants' hiring freeze was also admittedly "an under-spend by several million dollars." ¶331. Pandey also conceded that Defendants chose to "let chaos reign" in the "first half of '18" such that lapses in employee training "affected demand gen." ¶¶335-36. Further, over the "six to nine" months preceding May 2019, Pandey admittedly knew of HCI "product quality" issues. ¶315. Admissions contradicting earlier misstatements support scienter. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016); *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("a later statement may suggest that a defendant had…knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement"); *In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 43463, *3, *9 (N.D. Cal. 2005) ("later admi[ssion]" that defendant knew "financial difficulty" demonstrated scienter).

**Internal Reports and Meetings Support Scienter:** Defendants knew that the Company's sales pipeline and sales were dissipating from conversations with employees, meetings and internal reports. Four CWs in multiple locations, spanning multiple levels within the Company, confirmed that Defendants had access to Salesforce.com, which tracks pipeline, customer leads, and information about every customer (existing or prospective) "at any point in the sales cycle." ¶168.[12] *Quality Sys.*, 865 F.3d at 1145 ("statements . . . reported by [CWs] with sufficient reliability and personal knowledge must themselves be indicative of scienter"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (strong inference of scienter where, as here, CWs "spanned levels of [the company's] hierarchy and geographic origin, where the accounts remained consistent over time.").

CWs confirmed reviewing pipeline reports daily and Defendants' access to and receipt of those reports. ¶170. Salesforce.com tracked both quantitative and qualitative data. ¶173 (employees reported Dell issues in a "touch box"). CWs 1 and 3 confirmed that Salesforce.com evidenced the pipeline declining in 2017 and that by April or May 2018 it was "pretty dry." ¶172. *Quality Sys.*, 865 F.3d at 1145 (finding strong inference of scienter where "reports and sales forecasts *through the Salesforce software*" showed trends "available to executives"). Moreover, Pandey and Williams were both present at "every" quarterly All-Hands meeting where they personally discussed "the percentage of sales and leads from Dell, Nutanix's declining sales pipeline," that "there were not enough new deals in"

---

[12] Defendants misrepresent that only CW5 had "any contact with…Pandey and Williams." DB18. Not so—CW1 and CW6 also had direct contact at the All-Hands meetings. ¶¶112, 115.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Salesforce, and that the new opportunities "were not of sufficient monetary value[.]" ¶¶89, 112, 115, 347. Thus, Plaintiffs allege more than Defendants' "mere access" to reports. DB19-20. Regardless, that the reports "were available to executives" permits a scienter inference in Plaintiffs' favor. *Quality Sys.*, 865 F.3d at 1145. Further, where, as here, Defendants "personally attended meetings" where pertinent issues were discussed, scienter is satisfied. *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, *28 (N.D. Cal. 2018); *In re Intuitive Surgical Secs. Litig.*, 2014 WL 7146215, *5 (N.D. Cal. 2014).

Defendants' "access" to KPIs, dashboard reports, and review materials discussing HCI product quality issues (¶¶107-12) further supports scienter. *Turocy v. El Pollo Loco Hldgs., Inc.*, 2017 WL 3328543, **16-17 (C.D. Cal 2017); *Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, *9 (S.D. Cal. 2016). That Pandey's direct report, COO Sangster, attended QBR meetings discussing the HCI issues also supports scienter. ¶349; *Robb v. Fitbit Inc.*, 2017 WL 219673, *6 (N.D. Cal. 2017) (reports to COO regarding issues affecting "basic functioning of products" supported holistic scienter analysis even though complaint did "not contain express allegations that COO" told defendants).

While Defendants demand that the specific contents of every report be pled in exacting detail, that is not required. *Intuitive Surgical*, 2014 WL 7146215, at *5 ("the Ninth Circuit does not appear to require the contents of the report to be alleged"); *Robb*, 2017 WL 219673, at *8 (same); *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 301, 307 (2d Cir. 2015) (crediting witness allegations and reversing dismissal based on lacking specificity).[13] Plaintiffs allege sufficient detail about the reports, including subject matter (sales and pipeline), the data therein (customer, deal status and deal value) and that they showed the pipeline was declining and when. Nothing more is required.

**Defendants' Past Practice Supports Scienter:** Defendants were aware of the impact that diverting investment away from lead generation would have on Nutanix's pipeline, and ultimately sales,

---

[13] Defendants' cases miss the mark. In *Police Ret. Sys. v. Intuitive Surgical, Inc.*, the court gave "little weight" to CW testimony that required the court to "string[] together these various witnesses' statements" to find scienter where several CWs "were not employed at Intuitive" throughout and, in some cases, at all during the class period. 2012 WL 1868874, *20 (N.D. Cal. 2012). Here, the CWs were employed throughout the crucial points in the Class Period and CWs 1 and 5 were employed through all but one month of the Class Period. Defendants only argue (incorrectly) that CWs 4 and 6 were not in a position to know of sales leads from 2017 because they started in 2018, but their accounts are not even necessary to establish Pandey and Williams' participation at All-Hands meetings. *See* ¶¶89, 115, 347 (citing CW1's testimony). In *Wozniak v. Align Tech., Inc.*, only the CEO was named as an individual defendant, and he was not alleged to have attended meetings. 2011 WL 2269418, *12 (N.D. Cal. 2011).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

because they had utilized the same strategy in the past. ¶351. The results were so ruinous that Defendants admit they "woke up" in 2017, and had to increase lead spending by 75%. *Id.* Despite this recent experience, Defendants reallocated lead generation spending again during the Class Period. The similarity of the prior conduct to what is alleged in the Complaint establishes a pattern that supports a strong inference of scienter. *Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) (that defendants made statements "[i]n the wake of a crisis that has the potential to repeat itself" evidenced scienter).

**Pandey's Active Participation/Core Operations Supports Scienter:** Pandey and Williams were aware of Nutanix's declining sales pipeline because, by Defendants' own admissions, they "regularly monitor billings . . . to help us evaluate our growth . . . and identify trends in our sales activity." ¶354; D.Ex.1 at 26. As Chief Operating Decision Makers they concededly "assesse[d] financial performance based upon discrete financial information at the consolidated level." ¶¶43-44. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter....'"). Multiple CWs and analysts confirm Pandey was "active [ ] in the sales process," "very hands-on," regularly attended customer sales pitches and received detailed pipeline briefing from individuals like CW5. ¶¶167, 303, 355. Further, Pandey frequently responded to analyst questions regarding the pipeline and, thus would have had to inform himself of its contents prior to speaking. *See e.g.,* ¶¶184, 227-28.[14] *See S. Ferry LP # 2*, 687 F. Supp. 2d at 1259 (confident responses "in the face of direct questioning" from analysts supported scienter); *In re Urban Outfitters, Inc. Secs. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (citing *Avaya*, 564 F.3d at 270 n. 43) (omissions in response to analyst questions evidenced scienter).

On these facts, it would be "absurd" for Defendants to claim lack of knowledge. *See Brendon v. Allegiant Travel Co.,* 2019 WL 4255051, *7 (D. Nev. 2019) ("absurd" to suggest no knowledge where the "10-Ks (signed by [defendants]) stated that management closely supervises all maintenance functions" and defendants "responded to at least one [analyst] question…suggesting they were familiar

---

[14] Defendants' cases (DB20 & n. 3) are inapposite as none involved facts where, as here, the CEO admitted to monitoring sales, had access to reports showing sales declines, and had meetings discussing pipeline decline. *In re Autodesk, Inc. Sec. Litig.,* 132 F. Supp. 2d 833 (N.D. Cal. 2000) (no CWs alleged to show basis of knowledge); *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981 (9th Cir. 2009) (signing SOX certifications insufficient); *Juniper,* 880 F. Supp. 2d at 1068 (officer position insufficient).

with the…issues."); *Shenwick*, 282 F. Supp. 3d at 1146 ("absurd for [defendants] not to have been aware of adverse DAU trends" where DAU was "integral" to the company's growth and "monitored closely"); *Evanston Police Pension Fund v. McKesson Corp.*, 2019 WL 5587311, *11 (N.D. Cal. 2019) (where defendants touted "intimate knowledge" of generic drug pricing, "it was at least deliberately reckless not to investigate the accuracy of their statements"); *Questcor*, 2013 WL 5486762 at *19 (same).[15]

**Defendants' Stock Sales Support Scienter:** When determining whether insider sales are probative of scienter, courts consider the following factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *No. 84 Employer-Teamster Joint Council-Pension Tr. Fund v. Am. W. Hldg. Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). No one factor is outcome determine. *Id.* Defendants' stock sales here are highly suspicious and strongly support scienter.

**Pandey:** In less than two weeks, Pandey, who had ***never previously sold a single share*** of Nutanix stock, rapidly unloaded 104,500 shares, or 35.2% of his total common stock holdings, for gross proceeds of over $3.7 million, or ***fifteen times*** his annual salary. ¶¶365-66. Rapid sales of this magnitude support an inference of scienter. *See, e.g., In re Supreme Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (sales over four times annual salary supported scienter); *Am. W. Hldg.*, 320 F.3d at 940 ("flurry" of insider trading over three-months suspicious); *Questcor*, 2013 WL 5486762, at *18 (almost no sales in prior 18 months evidence of scienter for class period sales); *Azar*, 2018 WL 6182756, at **18–19 (sale of 20% of supports scienter); *Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, **14-15 (C.D. Cal. 2008) (sale of 7% sufficient).

Further, Pandey strategically timed his sales to occur only one week after the Q1 2018 earnings announcement, which led to an artificial 10% increase in Nutanix stock price, enabling Pandey to sell his stock during historically-high trading prices as of that time. ¶¶366-67. *Am. W. Hldg.*, 320 F.3d at 939 (sales made while company was making "optimistic statements" suspicious); *Questcor*, 2013 WL 5486762, at *17 (sales made after jumps in stock price due to company announcements raise

---

[15] The alleged departures of four executives in sales or product development immediately following the corrective disclosures (¶¶358-61) further supports scienter. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, *14 (N.D. Cal. 2002) ("[c]orporate [r]eshuffling" supports scienter).

suspicions).[16] In fact, Pandey's December 20, 2017 sales occurred only two days after Nutanix reached its then historically-high closing price of $36.57, on December 18, 2017. *Am. W. Hldg.*, 320 F.3d at 939 ("troubling" to the court that insiders sold "near the stock's peak"). While Defendants argue these sales were not suspicious because Nutanix's stock closed at a higher price three months later, "the Ninth Circuit does not require that insiders sell at the absolute highest point to raise a strong inference of scienter-it is enough that the insiders traded in such a way as to indicate they took advantage of their false statements." *Questcor*, 2013 WL 5486762, at *17 (*citing Daou Sys.*, 411 F.3d at 1024 (insider sales at $22.68 when class period high reached over $34 probative of scienter).[17]

Moreover, Defendants' contention that Pandey lost $369 million through retained shares (DB23) does not negate scienter. *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, *2 (C.D. Cal. 2012). In making this argument, Defendants fail to account for Pandey's cost basis and that he only retained 192,512 shares of stock by the end of the Class Period—a significant decrease from the 297,012 shares he owned at the start. Thus, unlike *Applestein v. Medivation, Inc.,* 861 F. Supp. 2d 1030 (N.D. Cal. 2012) (DB23), Pandey held less stock at the end of the class period.[18] Further, "a 10b5–1 trading plan does not provide an absolute defense. Rather, it requires an "additional factual finding of good faith." *Stocke v. Shuffle Master, Inc.,* 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009); *Questcor,* 2013 WL 5486762, at *16) ("10b5–1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales."). Defendants' reliance on the 10b5-1 plan has been repeatedly rejected where, as here, the Form 4 does not state when the plan was entered into, making it impossible to

---

[16] Defendants' cases (DB22) are inapposite. *See In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1094-96 (9th Cir. 2002) (sales in first month not suspicious where no other defendant sold until two months later), *abrogated on other grounds recognized by South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (*Tellabs* "suggests that perhaps *Silicon Graphics*, *Vantive*, and *Read–Rite* [DB13] are too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright."); *Lipton v. PathoGensis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (sale following announcement not suspicious because defendant retained 98.6% of holdings and no other insiders sold).
[17] For this reason, *Vantive* and *Ronconi* (DB22) are unpersuasive. Additionally, in those cases, the defendants did not make sales shortly after the stock had reached its then highest peak, nor did the stock decrease immediately thereafter before steadily rising three months later, as here.
[18] While *Metzler Inv. GMBH v. Corinthian Colleges, Inc.* (DB23) involved the sale of a similar percentage of holdings (37%) as Pandey's, those sales were not suspicious in timing and lacked corroborating insider sales, factors that are present here. 540 F.3d 1049 (9th Cir. 2008).

determine whether it was entered into in good faith. *Azar,* 2018 WL 6182756, at **18–19.[19]

   **Williams:** Williams also ***never sold any shares*** prior to the Class Period yet unloaded 600,000 stock options in only four trading days for over $26.8 million in gross proceeds and nearly $25 million in profits. ¶¶368-69. This equates to the sale of 51.4% of Williams' vested and exercisable stock options through the date of his final Class Period sale, or approximately 25-29% of his total holdings (DB23), and profits of ***seventy to one hundred times*** his 2017 and 2018 salaries. ¶368-69. *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) ("Twenty percent of a corporate insider's shares, especially where the dollar amounts involved are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation.").

   Williams' sales were not made pursuant to a trading plan, and they were strategically timed to occur following the announcement of positive Q1 2018 and Q3 2018 earnings (¶¶369-70), at a time when he knew of Nutanix's depleted pipeline. ¶370. *See In re Galena Biopharma, Inc. Secs. Litig.*, 117 F. Supp. 3d 1145, 1167 (D. Or. 2015) (scienter found where sales "not made pursuant to a pre-arranged Rule 10b5-1 trading plan" and defendant had not sold in four years); *Intuitive Surgical*, 65 F. Supp. 3d at 838-39 (sales suspiciously timed where plaintiff alleged defendants sold at times they knew adverse information that would impact the price of the stock). Williams' sales occurred just weeks after Nutanix was trading at a historical high. ¶371. Despite Defendants' argument (DB24 n. 10), "the length of the Class Period in this case suggests . . . that Defendants were able to ride the wave of their misleading marketing for the entire Class Period." *Questcor,* 2013 WL 5486762, at *15 & n.12. Thus, the timing and magnitude of William's sales support an inference of scienter.[20]

   Defendants argument that the value of Williams' decreased holdings does not negate scienter. *Sweeney*, 2012 WL 13026910, *2. Further, while Defendants argue that the percentage of Williams' holdings increased, they conveniently omit his options from their analysis. DB24. When both common

---

[19] Defendants' cases (DB22) do not disagree, as those all specified the terms and dates of the plans.

[20] *Compare* DB24 (citing *Vantive,* 283 F.3d 1079, 1094-96 (9th Cir. 2002) (sales not suspicious despite "substantial" percentage of stock sold where sales occurred prior to stock increase, were not inconsistent with prior trading, lacked comparative trading history, or amounted to lesser percentages of holdings than here); *In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999), *superseded by statute on other grounds* (sales comprised "insignificant portion of the allegedly suspicious sales," lacked a prior trading history, or defendant was unable to make sales prior to class period); *Questcor,* 2013 WL 5486762, at *15 & n.12 (*Vantive* more exacting than what *Tellabs* requires and *Vantive* decided "in part because the allegations did not support an inference of fraud throughout the class period.")).

stock and options are considered, Williams' holdings dropped from 1,212,976 to 803,609 during the Class Period, an approximate 33% decline. That Williams did not sell on the same day as the historical high (DB24) is immaterial, as the shares were only sold between $3.95 to $5.57 less than the historical high. *Am. W. Hldg.*, 320 F.3d at 939 (stock sold three months after historical high and within $5 of high price suspicious). *Questcor*, 2013 WL 5486762, at *17.[21]

**Motive to Inflate Stock to Conduct Public Offerings and Make Acquisitions:** As industry demand switched to cloud-based programs, Nutanix needed additional funds to engineer and launch Xi to compete (¶385), which were ultimately obtained through the January 2018 public offering, that raised net proceeds of $564.2 million while Nutanix stock was artificially inflated. ¶384. Where, as here, defendants conduct a public offering to obtain much-needed capital, it is probative of motive. *In re MannKind Secs. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) ("allegation[s] that defendants were motivated to inflate artificially [the company's] stock price...and obtain much-needed operating capital does allege facts of a palpable motive for fraud, as it goes beyond the generic desire to raise capital").

Defendants were also motivated to artificially inflate Nutanix's stock to complete the acquisitions of Netsil and Frame, two cloud-based companies, in March and August 2018, respectively. ¶¶378, 380. These acquisitions were critical for Nutanix to compete against VMWare and enabled it to remain compliant with the "Rule of 40," a performance metric for technology startups that analysts use to evaluate the Company. ¶382. Williams frequently boasted about Nutanix's compliance with the Rule of 40 and, had these acquisitions not occurred, Nutanix's cash flow would have dropped to levels that violated the Rule of 40. ¶382. Accordingly, such motive is unique to Nutanix and stronger than the "generic motive" Defendants claim (DB24-25). *Daou Sy.*, 411 F.3d at 1023-24 (stock funded acquisitions probative of scienter); *In re Terayon Communications Systems, Inc.*, 2002 WL 989480, *10 (N.D. Cal. 2002) (same).[22]

## <u>CONCLUSION</u>

Wherefore, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.[23]

---

[21] Suspiciously timed and sized non-defendant sales are probative of corporate scienter. ¶¶372-76.

[22] Because Plaintiffs plausibly allege primary violations, the control-person claim should be sustained. *See Intuitive Surgical*, 65 F. Supp. 3d at 839.

[23] If the Court dismisses any portion of the AC, Plaintiff respectfully requests leave to amend. *Khoja*, 899 F.3d at 1011.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

DATED: December 9, 2019                    **LEVI & KORSINSKY, LLP**

 _/s/ Shannon L. Hopkins_
Shannon L. Hopkins (admitted *pro hac vice*)
Stephanie A. Bartone (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: sbartone@zlk.com
Email: gpotrepka@zlk.com

Adam M. Apton (SBM 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

*Lead Counsel for Plaintiffs and the Class*

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS