BORIS FELDMAN, State Bar No. 128838
IGNACIO E. SALCEDA, State Bar No. 164017
LAURA G. AMADON, State Bar No. 321524
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Email: boris.feldman@wsgr.com
        isalceda@wsgr.com
        lamadon@wsgr.com

*Attorneys for Defendants
Nutanix, Inc., Dheeraj Pandey, and Duston M.
Williams*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | CASE NO.:  5:19-cv-01651-WHO |
| | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| | Hearing Date: February 12, 2020 |
| | Time: 2:00 p.m. |
| | Courtroom: 2 |
| | Hon. William H. Orrick |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

    I.    THE OPPOSITION CONFIRMS THAT PLAINTIFFS HAVE FAILED TO PLEAD A FALSE STATEMENT ................................................................................. 2

        A.    Plaintiffs Fail to Plead with Particularity Any Material Misrepresentations or Omissions Regarding Nutanix's Investments in Sales and Marketing. .................................................................................... 2

        B.    Plaintiffs Fail to Plead with Particularity Any Material Misrepresentations about Nutanix's Relationship with Dell. ...................... 4

        C.    Plaintiffs Fail to Plead with Particularity Any Material Misrepresentations about Nutanix's Sales Growth. ................................... 7

            1.    General Statements About Optimism Are Inactionable. ................ 7

            2.    There Were No Misrepresentations Related to Pull Ins. ................ 7

            3.    Alleged Product Quality Issues Are Inactionable. .......................... 8

        D.    The Forward-Looking Statements Are Protected by the Safe Harbor. ....... 8

    II.    PLAINTIFFS HAVE FAILED TO PLEAD FACTS SHOWING A STRONG INFERENCE OF SCIENTER ................................................................. 9

        A.    Plaintiffs' Confidential Witness Allegations Fail to Set Forth Particularized Facts Supporting a Strong Inference of Scienter. ................ 9

        B.    Plaintiffs Fail to Allege that Any Internal Company Reports or Meetings Support An Inference of Scienter. ............................................. 10

        C.    The Stock Sales Do Not Raise an Inference of Scienter. .......................... 10

        D.    The Corporate Motive Allegations Are Insufficient. ................................ 12

        E.    Defendants Did Not Make Any "Admissions" of Scienter. ....................... 13

        F.    The Core Operations Inference is Inapposite. ........................................... 14

        G.    Considered Holistically, the Only Plausible Inference Is Nonculpable. ............................................................................................ 14

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Peregrine Pharm., Inc.*,
654 F. App'x 281 (9th Cir. 2016)........................................................................................13

*Applestein v. Medivation, Inc.*,
2011 WL 3651149 (N.D. Cal. Aug. 18, 2011)......................................................................11

*Bao v. SolarCity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ..........................................................................9, 10

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)..................................................................................................3

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016).......................................................................12

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) ...................................................................................10

*In re Donald J. Trump Casino Sec. Litig.*,
793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993)...........................................3

*In re Fusion-io, Inc. Sec. Litig.*,
2015 WL 661869 (N.D. Cal. Feb. 12, 2015)............................................................................9

*In re LeapFrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...........................................................................7, 8, 9

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011)....................................................................................13

*In re NVIDIA Corp. Sec. Litig.*,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010).........................................................................12

*In re Remec Inc. Sec. Litig.*,
388 F. Supp. 2d 1170 (S.D. Cal. 2005) ....................................................................................8

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999), *abrogated on other grounds*,
*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) .........................................10, 11

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...................................................................................7

*In re Supreme Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ..................................................................................................12

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996)..................................................................................................14

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002), *abrogated on other grounds*,
  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ................................................11, 13

*Lipton v. PathoGenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)..........................................................................................10, 12

*Lu v. Align Tech., Inc.*,
  2019 WL 5579520 (N.D. Cal. Oct. 29, 2019)......................................................................2, 3

*McCasland v. FormFactor, Inc.*,
  2009 WL 2086168 (N.D. Cal. July 14, 2009)........................................................................14

*McGovney v. Aerohive Networks, Inc.*,
  367 F. Supp. 3d 1038 (N.D. Cal. 2019) ...................................................................................4

*Middlesex Retirement System v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) .................................................................................14

*No. 84 Employer-Teamster Joint Council-Pension Trust Fund v. America West
  Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)..................................................................................................11

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*,
  759 F.3d 1051(9th Cir. 2014)...........................................................................................10, 14

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)...................................................................................................8

*Puccio v. Standard Ins. Co.*,
  2013 WL 1411155 (N.D. Cal. Apr. 8, 2013) .........................................................................13

*Roberti v. OSI Systems Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .........................................................................9

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001)..................................................................................................11

*Rubke v. Capitol Bancorp, Ltd.*,
  551 F.3d 1156 (9th Cir. 2009)...................................................................................................6

*Scandlon v. Blue Coat Sys., Inc.*,
  2013 WL 5313168 (N.D. Cal. Sept. 23, 2013)........................................................................14

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................................................3

*South Ferry LP # 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) ...............................................................................10

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..................................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................................15

*Welgus v. Trinet Grp., Inc.*,
   2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ...........................................................................13

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ........................................................................................9

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp. 2d 1102 (N.D. Cal. 2003) ....................................................................................7

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) ....................................................................................8

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)...................................................................................................15

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "¶" or "Complaint" | Consolidated Amended Complaint, filed September 9, 2019, ECF No. 102 |
| "MTD" | Defendants' Notice of Motion and Motion to Dismiss Consolidated Amended Complaint, filed October 24, 2019, ECF No. 108 |
| "Opp." | Plaintiff's Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint, filed December 9, 2019, ECF No. 111 |
| "Ex." | Exhibits attached to the Declaration of Ignacio E. Salceda in Support of Defendants' Motion to Dismiss Consolidated Amended Consolidated, filed October 24, 2019, ECF No. 108-1 |
| "Opp. Ex." | Exhibits attached to the Declaration of Shannon L. Hopkins in support of the Opp., filed December 9, 2019, ECF No. 111-1 |
| "Supp. Ex." | Exhibit attached to the Supplemental Declaration of Ignacio E. Salceda in Support of Defendants' Motion to Dismiss Consolidated Amended Consolidated, filed concurrently |

**INTRODUCTION**

The Opposition is unable to address the fatal defects in the Complaint.  In fact, Plaintiffs have abandoned many of their allegations.  Plaintiffs now concede that Nutanix never missed its revenue guidance for Q2FY19, that sales and marketing expenses have no impact on the gross margin calculation, and Nutanix was not "dependent" on Dell nor did it lose a significant amount of sales from Dell (which remained consistent throughout the Class Period).  Plaintiffs also do not dispute that Nutanix disclosed its rising sales and marketing spend every quarter.  In fact, Plaintiffs have failed to show that Nutanix did anything other than exactly what the law requires.  After disclosing that its Q2FY19 performance had exceeded its prior guidance on every metric, Nutanix also disclosed that it had recently discovered imbalances in its lead generation spending and, for the first time, gave guidance for Q3FY19 that reflected the impact of those imbalances.

Unable to dispute Nutanix's statements, Plaintiffs attempt to rewrite them (and their Complaint), and having apparently abandoned their claims, they search for new ones.  Courts in this District have repeatedly rejected such efforts, holding that plaintiffs cannot manufacture facts sufficient to satisfy the stringent requirements of the Reform Act for falsity and scienter.

The Opposition also seeks to ignore Nutanix's two fundamental business transformations, which is not surprising given Nutanix's clear and repeated disclosures about the impact these shifts would have on its financial results as well as the risks inherent in those transformations.  That Nutanix ultimately found that some of its decisions did not turn out as it had desired does not mean that its statements were false, let alone made with scienter.

At no point do Plaintiffs present facts that show that any Defendant did not believe the truth of the statements he made.  Nor does any Confidential Witness ("CW") or internal report support such an assertion.  Instead, the bulk of the Opposition's scienter arguments are devoted to claiming that Defendants, by virtue of their "hands-on" management, would have known of unspecified facts which contradicted their public statements.  The Ninth Circuit and this District have repeatedly held such allegations are insufficient.

Plaintiffs' attempt to rely on stock sale allegations also fails, as they cannot avoid the fact that Mr. Pandey sold less than 1% of his holdings and that both he and Mr. Williams held more

shares at the end of the Class Period than at the beginning.  These facts *negate* an inference of scienter.  The Complaint should be dismissed.

## ARGUMENT

### I.   THE OPPOSITION CONFIRMS THAT PLAINTIFFS HAVE FAILED TO PLEAD A FALSE STATEMENT

Plaintiffs seek to shirk their obligations under the Reform Act by claiming it is a "factual dispute" whether Nutanix sufficiently disclosed the risks in its business model transitions.  Plaintiffs cannot selectively "ignore[] the actual content of Defendants' statements and draw[] 'unwarranted inferences' that the Court cannot accept." *Lu v. Align Tech., Inc.*, 2019 WL 5579520, at *5 (N.D. Cal. Oct. 29, 2019).  To meet the Reform Act's "exacting requirements," Plaintiffs "must account for the entirety of the statements on which they rely, and not simply invoke selective quoting to make their claims." *Id.* at *6 (citation omitted).  Plaintiffs' allegations are unsupported by specific facts and ignore Nutanix's detailed disclosures.  MTD at 10-16.  The Opposition mischaracterizes and glosses over the actual language of the challenged statements while failing to plead the specific facts required to satisfy the Reform Act.

#### A.   Plaintiffs Fail to Plead with Particularity Any Material Misrepresentations or Omissions Regarding Nutanix's Investments in Sales and Marketing.

The Complaint was predicated upon the allegation that Nutanix missed its guidance for Q2FY19 by 15%.  MTD at 9.  Unable to refute that Nutanix had another record quarter in Q2, exceeding guidance, this claim disappeared in the Opposition.  Also at the core of the Complaint was the allegation that Nutanix misrepresented its investment in sales and marketing to improve its reported gross margin.  *Id.* at 10.  The Motion made clear that such expenses have no impact on gross margin and Plaintiffs have abandoned this claim.  *Id.* at 10-11.  Similarly, the metrics substantiating Nutanix's investment in sales and marketing are undisputed – the amount spent *increased* each quarter from $145 million in Q1FY18 to $246 million in Q3FY19.  MTD at 10.[1]

---

[1] Plaintiffs allege that the Motion relied on "misleading aggregate sales and marketing expense figures."  Opp. at 2.  But they do not explain how these figures from SEC filings are "misleading" nor do they allege that they were false.

Unable to dispute this, Plaintiffs re-write Nutanix's statements.  Plaintiffs conflate the words "lead generation" with "marketing program," "sales and marketing investment," "marketing activities," and "marketing efforts".  *See e.g.*, Opp. at 9-10.  Courts have repeatedly rejected such re-writing of defendants' statements.  *See e.g.*, *Align*, 2019 WL 5579520, at *6 (stating plaintiffs cannot selectively ignore defendant's disclosures and "cherry-pick[]" portions while ignoring others); *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 558 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993) (securities litigation "is not a game of 'edit to win.'").

For example, the Complaint cites the statement: "we have continually increased our marketing activities related to brand awareness, promotions, trade shows, and partner programs." ¶ 193.  The Opposition replaces this phrase with "lead generation."  Opp. at 11.  Similarly, citing to no statement, Plaintiffs declare that "Defendants here specifically stated that lead generation spending was 'increasing.'"  *Id.*  Yet, *the Opposition does not point to a single challenged statement about Nutanix's investment in lead generation, yet alone one that is false or misleading.*[2]  Indeed, the Opposition's 77-page Exhibit A, which regurgitates the Complaint and serves to evade the Court's page limitation, is devoid of any statement by Defendants about "lead generation."  Plaintiffs cannot re-write Defendants' statements in order to make them "false."[3]

Plaintiffs also admit that lead generation is merely one component of many of Nutanix's marketing efforts, Opp. at 9, all of which are geared to increase sales.  Plaintiffs do not dispute that these sales and marketing investments, in fact, increased every quarter during the Class Period.  MTD at 10.  Although Plaintiffs assert lead generation is the "most critical component of marketing," (Opp. at 10), they cannot point to a single source that supports this inference.

---

[2] Plaintiffs claim (Opp. at 10) that *Shenwick v. Twitter*, *Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017), is "instructive" in evaluating whether Defendants' statements about sales and marketing were misleading.  They are wrong.  There, Twitter specifically *disclosed and relied upon* the metric cited by plaintiffs (the relationship of daily to monthly users).  282 F. Supp. 3d at 1128-29.  For that reason, the Court found the omission of these metrics actionable.  *Id.* at 1140. Nothing even close to that is alleged here, as Nutanix has never disclosed its expenditures on lead generation.

[3] Plaintiffs agree that Nutanix did not have a duty to disclose the amount spent on lead generation.  Opp. at 11 n.4; *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (alleged omission is not actionable if it was not disclosed).

Plaintiffs also cannot dispute Nutanix's consistent disclosures regarding its sales hiring. MTD at 11-12.  Nutanix repeatedly updated the market on its efforts to meet its aggressive internal hiring goals (including when it fell short of those goals).  *Id.* at 11.  Every quarter, Nutanix compared its sales and marketing headcount to the previous year's quarter and these disclosures showed a consistent uptick in headcount each quarter.  MTD at 5.

Unable to dispute any of this, Plaintiffs rely instead on CW statements concerning a supposed hiring freeze and understaffing.  Opp. at 16-17.  But, even if credited, these claims are unsupported by any required facts showing that these low-level CWs were in a position to know anything beyond their discrete area of Nutanix's organization.  MTD at 12.  Plaintiffs provide no specificity about these issues, fail to connect them to any impact on Nutanix's business, and point to no internal report or corroborated facts outside their "'shared opinion.'"  *Id.*  As Judge Koh held recently in dismissing a complaint alleging similar allegations that a company was "'understaffed,'" the claims fail to "quantify the actual staffing problems, which makes it difficult to understand...whether that actually had an impact on revenue." *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056-58 (N.D. Cal. 2019).  The same applies here. Plaintiffs' unsupported allegations do not show any of Defendants' statements were false.

**B.     Plaintiffs Fail to Plead with Particularity Any Material Misrepresentations about Nutanix's Relationship with Dell.**

The lynchpin of Plaintiffs' allegations about Dell is that Nutanix's business depended on Dell and suffered from an unspecified loss of sales leads.  The Motion showed that this was doubly and demonstrably wrong.  In FY17, Dell accounted for only 10% of Nutanix's revenue; in FY19 it was 7%.  MTD at 14.[4]  In addition, Plaintiffs do not dispute that revenue from other sources grew from $761.3 million to $1.15 billion (over 33%) over this period.  *Id.* (Ex. 4 at 8; Ex. 25 at 11).  This belies the claim that Nutanix's business was dependent on Dell.  And

---

[4] The Motion also highlighted that, since its IPO, Nutanix repeatedly cautioned that Dell was both an OEM partner and competitor.  MTD at 14.  Nutanix also specifically stated that shifting industry dynamics with its OEM partners could adversely affect sales.  *Id.*  Plaintiffs ignore these disclosures and argue that they were issued when "the risk had already materialized [when] … the pipeline was in trouble by April 2018[.]"  Opp. at 12-14.  Considering Nutanix's IPO was in September 2016, it is temporally impossible for Plaintiffs to make this argument.

contrary to the claim that Dell business was "drying up" (¶ 122), revenues from Dell remained steady from $84.6 million in FY17 to $86.5 million in FY19.  MTD at 14.[5]

Unable to argue that there were no sales attributable to Dell, the Opposition reframes that assertion and alleges that "Dell was not providing Nutanix any new sales leads in calendars 2018 and 2019[.]" Opp. at 11.  Plaintiffs summarily claim this without any factual support.  Opp. at 5, 11; ¶ 119.[6]  The Opposition also fails to cite any figures quantifying how many sales leads Dell provided, how those changed over time, or how an alleged loss of leads affected Nutanix's business.  In fact, the Complaint and Opposition admit that Nutanix's customer base *increased* over the Class Period.  Opp. Ex. C; ¶ 184.  If Nutanix was as reliant on new sales leads from Dell as Plaintiffs claim, it defies logic that Nutanix was able achieve this growth, along with over $190 million in Dell sales in FY18 and FY19 combined.  Opp. at 13; MTD at 14.

In an attempt to support their claim that Dell was not providing Nutanix with new sales leads, but that Nutanix told investors the opposite, Plaintiffs misrepresent the questions and answers in two earnings calls.  Opp. at 11.  As can be seen, not a single question or answer related to sales leads generally or sales leads from any OEM partner, including Dell.

**November 30, 2017 Earnings Call.**  Plaintiffs rewrite a question asked of Mr. Pandey, claiming an analyst asked "whether the transition away from hardware would increase business with Dell[.]" Opp. at 11.  The actual question, well over a year before the quarter at issue, was: "does deemphasizing hardware increase your chances of new partnerships? Or even the chance that partners like Dell will increase their commitment to selling your solution versus their own?" Ex. 13 at 19.  Mr. Pandey responded: "I think, definitely it reduces friction in the sales motion,

---

[5] Plaintiffs' reliance on CW1 for the bare assertions that "Dell was Nutanix's 'largest OEM by far' and Dell accounted for 'a huge chunk of revenue' for Nutanix," (¶ 88), cannot overcome these undisputed figures.  *See* MTD at 14.  Plaintiffs also fail to explain how a single employee in the Midwest region could translate their discrete local knowledge to Nutanix's entire sales organization and multi-faceted global relationship with Dell.  Opp. at 13.

[6] The only support Plaintiffs cite for this claim is that CW1 recalled that Mr. Pandey stated at an All-Hands meeting that "Dell alliance partners employed by Nutanix discussed that Dell was not providing any new leads[.]" ¶ 174.  There is no statement attributed to any Defendant that *Dell* was not providing any new sales leads to Nutanix, only a vague and unsubstantiated allegation attributed to amorphous "Dell alliance partners." *Id.*

both for our sellers and the OEM sellers themselves…. So—but absolutely, we expect friction to go down." *Id*.[7]  Nothing in this statement relates to Dell sales leads in FY18 or FY19.

**November 27, 2018 Earnings Call**.  Plaintiffs claim that an analyst asked "whether there had 'been any changes' in the competitive environment[.]" Opp. at 11.  The actual question was "the competitive landscape evolving, you know looking out over the next 12 to 24 months, has there been any change currently and who do you view as actually your most formidable competitors going forward?" Ex. 17 at 11; ¶ 269.  Mr. Pandey replied "So, in terms of the competitive landscape, nothing has changed in the *last quarter or so*."  Ex. 17 at 11; ¶ 269 (emphasis added).  Mr. Pandey did not utter *a word* about sales leads (from Dell or anyone else).  Plaintiffs mischaracterization of these statements cannot salvage their claim.  Opp. at 11.  Plaintiffs also ignore the fact that Mr. Pandey's statements only related to one quarter in 2018.  *Id.*  Further, in the fiscal year this statement was made, Dell sales were $104 million (Opp. at 13) and only 9% of Nutanix's revenue; and revenue from other sources had only continued to grow.  Ex. 4 at 8, 51; MTD at 14.

In sum, Plaintiffs cannot show how Mr. Pandey's statements can be construed as discussing new sales leads from Dell.  Opp. at 11.  Nutanix never disclosed the number of leads it expected or received from any partner or OEM, including Dell, and Plaintiffs have not articulated any obligation to do so.  Plaintiffs have also failed to quantify any impact on revenue from Nutanix's disclosed competition with Dell.[8]  Plaintiffs can only resort to unsupported speculation that Dell was violating its OEM agreement but cannot articulate any of the terms of that agreement, how it was breached, or how that alleged breach hurt Nutanix's business or renders any of Nutanix's statements regarding Dell false or misleading.  Opp. at 12-13.

---

[7] Further, as the words "I think" and "we expect" suggest, these were quintessential opinion statements, with the latter being forward-looking as well.  For Defendants to face liability for allegedly "misleading opinions, not statements of fact", Plaintiffs must show that such statement was "objectively and subjectively" false when made. *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009).

[8] The Motion explained that Nutanix did not miss its revenue guidance for Q2FY19.  MTD at 9.  The Opposition abandoned that claim, but selectively ignores Nutanix's disclosures and alleges "Nutanix revised guidance." Opp. at 12.  Nutanix did not.  *See* MTD at 6-7.

Ultimately, Plaintiffs cannot rewrite the past:  Nutanix simply was not "dependent" on Dell and sales didn't "dry[] up."  MTD at 14.[9]

### C.   Plaintiffs Fail to Plead with Particularity Any Material Misrepresentations about Nutanix's Sales Growth.

#### 1.   General Statements About Optimism Are Inactionable.

To the extent that Plaintiffs argue that optimistic language such as "strong" "demand" is misleading (*see e.g.* Opp. at 15-17) that argument fails as a matter of law on grounds that such language is inactionable puffery.  *See, e.g.*, *In re LeapFrog Enters., Inc. Sec. Litig.,* 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) ("we feel very positive" and "are pleased with our progress" are "soft statements or loose predictions that do not give rise to a securities fraud claim").  Courts routinely have found similar statements to be non-actionable puffery.  MTD at 13-14; *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (statements regarding "strong" demand non-actionable puffery).

#### 2.   There Were No Misrepresentations Related to Pull Ins.

With the Complaint's foundational arguments refuted, the Opposition detours to an isolated allegation that for two quarters in 2018, a total of $3.8 million of orders were "pull[ed] in."  ¶ 145.  This claim is not accompanied by a claim of any improperly recognized revenue. The sole support is CW1, a low level employee with insight only into a specific Midwest region. ¶ 50.  There are no details how CW1 received this figure, why it was relevant to their position, or the number of deals that were involved.  More fundamentally, Courts in this District "have almost uniformly rejected the idea that allegations of [pulling in sales] are sufficient to plead a securities fraud violation."  *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1114 (N.D. Cal. 2003). "[T]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course."  *Splash*, 160 F. Supp. 2d at 1076 (citation omitted).  Plaintiffs do not allege that any pull ins were unusual, represented a significant portion of the sales for the quarter,

---

[9] Contrary to the Opposition (Opp. at 13), the Complaint does not contain any allegation from CWs 3, 5, or 6 regarding the Dell relationship or sales leads.  CW4's only contribution is that "friends" at VMware had been told to promote their own products.  ¶ 118.  This does not show that any of Defendants' statements were false or misleading.  MTD at 14-15.

or materially changed Nutanix's financials. Indeed, Nutanix's revenue for the first two quarters of FY18 was $562.3 million. Ex. 1 at 26; Ex. 2 at 34. Even if Plaintiffs' allegation is credited, $3.8 million of orders is well under 1% of revenue and in no way material to Nutanix's business. *See In re Remec Inc. Sec. Litig.*, 388 F. Supp. 2d 1170, 1176 n.1 (S.D. Cal. 2005) (allegations of less than 1% of improperly recognized revenue not material). Plaintiffs also fail to articulate how immaterial pull ins had any impact for the quarter at issue, Q3FY19 (a full year afterwards).

### 3.    Alleged Product Quality Issues Are Inactionable.

As demonstrated in the Motion, non-particularized and unsubstantiated allegations about product quality deterioration are insufficient to show that Defendants' statements about Nutanix's growth and demand were false. MTD at 11-13. The Opposition suffers from the same deficiencies as the Complaint and relies solely on the vague statements of a single CW who was not employed during the majority of the relevant period. Opp. at 17-18; MTD at 13. CW6 makes no attempt to square their theory with any specific facts, figures, or records, let alone explain its impact on Nutanix's business or statements. Plaintiffs also fail to explain why their theory is inconsistent with the idea that Nutanix saw growing demand for its software and subscription services. MTD at 13; *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012) ("the CWs' conclusory statements that initial feedback regarding [a newly released product] was negative, 'poor,' or that an unspecified number of users found it 'ineffective,' do not contradict [defendant's] optimistic statements"). Indeed, software and subscription service revenue continued to grow each quarter year-over-year. MTD at 13.

### D.    The Forward-Looking Statements Are Protected by the Safe Harbor.

Plaintiffs argue that several of the forward-looking statements are not protected by the Safe Harbor because they are "not forward-looking or are 'mixed' statements." Opp. at 14. This misreads both the law and the statements. Statements must be "examined as a whole" and are protected by the Safe Harbor even if they include elements of present-tense facts. *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014). Predictions of growth are inherently forward-looking and fall within the ambit of the Safe Harbor. MTD at 16. *LeapFrog*, 527 F. Supp. 2d at 1045-46 ("Forward-looking statements include financial projections, future

management plans and objectives, [and] statements of future economic performance").[10] Because each of the forward-looking statements were accompanied by meaningful, cautionary disclosures – which Plaintiffs do not dispute – they are protected by the Safe Harbor.

More generally, Plaintiffs do not challenge any of Nutanix's reported figures for revenue, the number of customers, or its sales and marketing expenditures. Opp. at 14. Plaintiffs claim Nutanix should have disclosed how these numbers would change in the future. *Id*. at 10. As a matter of law, the disclosure of historical results does not imply those results will continue. "Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998). Nutanix was not obliged to say more.

## II. PLAINTIFFS HAVE FAILED TO PLEAD FACTS SHOWING A STRONG INFERENCE OF SCIENTER

The Court need not address scienter where Plaintiffs fail to plead any actionable statement. *See, e.g.*, *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *20 (N.D. Cal. Feb. 12, 2015). Nevertheless, Plaintiffs have not come close to pleading facts raising the required strong inference of scienter. MTD at 17-25.

### A. Plaintiffs' Confidential Witness Allegations Fail to Set Forth Particularized Facts Supporting a Strong Inference of Scienter.

Plaintiffs do not cite to a single CW in support of their scienter arguments in their Opposition. Opp. at 18-25. Only one CW had any contact with Messrs. Pandey or Williams. MTD at 18. A CWs mere presence in a Company-wide meeting with thousands of employees does not give them sufficient contact with Defendants. Far from proving such tenuous contact is enough, general statements allegedly heard by a CW at an "all-hands meeting[]" are insufficient to raise a strong, if any, inference of scienter. *Bao v. SolarCity Corp.*, 2016 WL 54133, at *6

---

[10] The cases upon which Plaintiffs rely for this proposition are distinguishable. For example, in *Roberti v. OSI Systems Inc.*, the Court did not analyze any of the statements defendants argued were forward looking but rather found that defendants' SOX certifications were false because the complaint contained detailed "allegations of accounting fraud" and thus plaintiffs adequately alleged that defendants' "financial reports" were false. 2015 WL 1985562, at *9-10 (C.D. Cal. Feb. 27, 2015). Here, Plaintiffs do not challenge the accuracy of Nutanix's financial reports.

(N.D. Cal. Jan. 5, 2016).  For this reason, the Court should disregard the statements of the remaining CWs when evaluating Plaintiffs' allegations.  *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at \*20 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).

### B.   Plaintiffs Fail to Allege that Any Internal Company Reports or Meetings Support An Inference of Scienter.

Despite Plaintiffs' invocation that Messrs. Pandey and Williams had access to and received internal sales and pipeline reports, Opp. at 19; ¶ 170, the allegation is devoid of any facts about what these reports contained, and simply implies, without support, that they contained negative information.  The Ninth Circuit has made clear that allegations regarding internal reports are insufficient where Plaintiffs fail to specify the contents of such reports.  *In re Silicon Graphics, Inc. Sec. Litig. (SGI)*, 183 F.3d 970, 984 (9th Cir. 1999) (finding that when plaintiffs rely on purported internal reports, they must plead their "contents, who prepared them, [and] which officers reviewed them"); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002) (allegations that defendants "could regularly track ... sales data" were insufficient because they lacked hard numbers or other "specific information").[11]  Plaintiffs also do not specify "how the contents [or reports] contradicted defendants' public statements." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).  Plaintiffs fare no better with their reliance on Messrs. Pandey and Williams's presence at quarterly All-Hands meetings. Opp. at 19.  These vague and generalized descriptions of every day corporate life are devoid of any substance that gives rise to an inference of scienter.  MTD at 19.

### C.   The Stock Sales Do Not Raise an Inference of Scienter.

Plaintiffs attempt to rely on stock sales to meet their heavy burden to raise a strong inference of scienter, but these allegations actually rebut such an inference. MTD at 21-24.  The Ninth Circuit has held there are three factors to consider when evaluating stock sales: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the

---

[11] Plaintiffs' cases, such as *South Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009), are inapplicable here. In *S. Ferry*, plaintiffs pleaded "actual knowledge" because defendant admitted that he "had all of the information necessary." *Id.*  Plaintiffs here plead no such thing.

sales were consistent with the insider's prior trading history." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (citation omitted); MTD at 21. The Opposition meanders through the first two with miscalculations and irrelevant facts and fails to address the lack of trading history. Opp. at 22-25. Review of the three factors shows Plaintiffs fall short of what is required.

First, the amount of stock Messrs. Pandey and Williams sold is not suspicious. The Motion showed that Mr. Pandey's sales amounted to less than one percent of his total holdings. MTD at 22-23. Unable to dispute this, and contrary to Ninth Circuit authority, Plaintiffs' seek to exclude Mr. Pandey's holdings of Class B common stock and vested options. Opp. 22-24. There is no support to exclude his Class B holdings, and the Ninth Circuit has long held that it "see[s] no reason to distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately. Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone." *SGI*, 183 F.3d at 986-87 (footnote omitted). That Mr. Pandey retained over *99 percent* of his holdings rebuts any inference of scienter. As for Mr. Williams, his sales from exercised options represented 24.73% and 28.79% of his then available holdings. MTD at 23. The Ninth Circuit has held that even much larger percentages do not indicate scienter. MTD at 23-24.[12] Nor do Plaintiffs dispute that Mr. Williams held significantly more Nutanix stock at the end of the Class Period, including 31,250 shares from his December 2018 exercise of vested options, where Mr. Williams *held* the resulting shares. *See* Ex. 21; MTD at 23-24. These actions rebut an inference of scienter. *Applestein v. Medivation, Inc.*, 2011 WL 3651149, at *8 (N.D. Cal. Aug. 18, 2011) (finding that holding more stock at the end of a class period than at the beginning "strongly rebuts an inference of scienter"). Unable to dispute any of this, Plaintiffs point to the ratio of proceeds from stock sales to Messrs. Pandey and Williams's salaries, but that is not a

[12] Even taking Plaintiffs' incorrect calculations on their face (35.2% for Mr. Pandey and 25-29% for Mr. Williams), these amounts are below what the Ninth Circuit has found to be suspicious. *See* MTD at 23-24. Plaintiffs' reliance on *No. 84 Employer-Teamster Joint Council-Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), is unavailing. There, "[m]ost of the individuals sold 100% of their shares, with the lowest percentage being 88%." *Id.* at 939. The sales do not come near those percentages. Moreover, the Ninth Circuit cautioned that "large numbers and percentages do not necessarily create a strong inference of fraud[.]" *Id.* (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002)).

factor under any Ninth Circuit authority.  Opp. at 22 (citing *In re Supreme Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 278 (3d Cir. 2006)).   Moreover, Plaintiffs' argument ignores the fact Mr. Pandey founded Nutanix and has commensurate holdings, and that it is commonplace for executives to be primarily compensated with equity.

Second, there was nothing suspicious about the timing of Defendants' sales.  Plaintiffs do not dispute the key fact that all of Mr. Pandey's challenged sales were made pursuant to a 10b5-1 trading plan.[13]  Opp. at 23.  Both Messrs. Pandey and Williams's sales followed public earnings announcements, as is commonplace.  MTD at 23-24.  Further, neither Mr. Pandey's sales in the first month of an eighteen month class period nor Mr. Williams's two options exercises were sold at (or even near) the high point of Nutanix's stock price during the Class Period.  *Id.*  This timing undermines an inference of scienter.

Third, there is nothing about Defendants' trading history that raises a strong inference of scienter, where, as here, they were "forbidden to trade" for a substantial period leading up to the Class Period.  *See e.g.*, *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) ("since Defendants entered into lock-up agreements before and after the secondary public offering, they lack a meaningful trading history, which weighs against a finding of scienter").  Here, Defendants were prevented from trading after Nutanix's September 29, 2016 IPO due to a 180 day lock up period expiring on March 29, 2017, only eight months before the start of the expansive 18-month Class Period.  Supp. Ex. 26 at 158.  Therefore, both Messrs. Pandey and Williams lack a meaningful trading history which precludes a strong inference of scienter.

**D.    The Corporate Motive Allegations Are Insufficient.**

In an attempt to allege a corporate motive, Plaintiffs assert Nutanix was motivated to inflate its stock to launch new products and make acquisitions.  Opp. at 25.  Courts routinely reject such generalized assertions that could apply to "virtually every company in the United States."  *Lipton*, 284 F.3d at 1038 (citation omitted); *see* MTD at 24-25.  Plaintiffs also argue

---

[13] Courts have found that 10b5-1 plans, even if adopted or amended during the class period, negate an inference of scienter.  *See e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 2010 WL 4117561, at *11 (N.D. Cal. Oct. 19, 2010) (no inference of scienter when defendant retained a majority of shares, even if a trading plan was amended during class period).

that Nutanix's convertible note offering in January 2018, over a year before the quarter at issue, is indicative of scienter. Opp. at 25.[14] Such motive has been rejected by the Ninth Circuit as insufficient. *Anderson v. Peregrine Pharm., Inc.*, 654 F. App'x 281, 281 (9th Cir. 2016) ("we decline, as we have in the past, to find the Defendants' attempts at securing capital during the putative Class Period to support an inference of scienter.") (citation omitted). In *Vantive*, the Ninth Circuit rejected similar motive allegations, where plaintiffs alleged that defendants inflated the stock value so the company could issue fewer shares in acquisitions. 283 F.3d at 1097. *See* MTD at 25 (citing cases rejecting stock-based acquisitions as sufficient).

Moreover, Plaintiffs' contention that Nutanix made acquisitions to increase cash flow and ensure compliance with the "Rule of 40" is irrelevant and illogical. Opp. at 25. Plaintiffs have failed to show that these acquisitions in fact increased cash flow. Further, the "Rule of 40" is not a GAAP financial measure, companies are not required to comply with it, and there is no penalty for violating it. Plaintiffs generically assert that Nutanix, like any corporation, wanted to look appealing to investors. Thus, Plaintiffs' assertion that this motive was "unique" and stronger than a "generic motive" is speculative and conclusory. *See* MTD at 24-25.

### E. Defendants Did Not Make Any "Admissions" of Scienter.

Plaintiffs attempt to argue that statements at the end of the Class Period constitute admissions of earlier knowledge of falsity. Opp. at 18.[15] Defendants made no such admission. Mr. Williams's statement that Nutanix eventually concluded that its prior assumptions about lead generation efficiencies based upon past performance were not realized, is not an admission that any prior statements were false or misleading. Ex. 18. Courts have repeatedly rejected attempts

[14] Plaintiffs reliance on *In re MannKind Securities Actions*, 835 F. Supp. 2d 797 (C.D. Cal. 2011) is misplaced. There, the court did not find the public offering as indicative of scienter but rather that the company had a contractual *obligation* to maintain a certain stock price. *Id.* at 803. That is a much more concrete and stronger motivation than using stock in an acquisition.

[15] Plaintiffs also assert that "Defendants were aware of the impact that diverting investment away from lead generation would have on Nutanix's pipeline" as it "had utilized the same strategy in the past." Opp. at 20-21. Plaintiffs rely on ¶ 328 for the allegation that Defendants had to increase "lead generation spending by 75%" in 2017. The Complaint contains no such specific metrics. The Court cannot consider new facts asserted in the Opposition. *Puccio v. Standard Ins. Co.*, 2013 WL 1411155, at *7 (N.D. Cal. Apr. 8, 2013). Even if true, "Plaintiff's allegations establish, at best, bad judgment, which is not enough to create a strong inference of scienter." *Welgus v. Trinet Grp., Inc.*, 2017 WL 167708, at *11 (N.D. Cal. Jan. 17, 2017).

to frame such statements as "admissions" of falsity or scienter.  *See e.g.*, *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 5313168, at *3 (N.D. Cal. Sept. 23, 2013) (end of class period statement that poor sales execution and operational mistakes hurt sales "was in no way, shape or form, an 'admission' that prior statements had been knowingly false"); *see In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930 (9th Cir. 1996). The cases cited in the Opposition also do not support any inference of scienter. *See* Opp. at 18-19.  For example, in *Middlesex Retirement System v. Quest Software Inc.*, the Court held that plaintiffs had pled a strong inference of scienter based primarily on the sheer magnitude of the company's restatement ($150 million) due to backdated stock options and the defendants' positions at the company when the misstated financials issued. 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007).  There are no such allegations here.

### F.     The Core Operations Inference is Inapposite.

Plaintiffs' invocation of the "[c]ore [o]perations" inference is unavailing.  Opp. at 21-22. The core operations doctrine applies only in rare circumstances not present here.  Plaintiffs are unable to identify, as they must, what specific information contradicting the challenged statements was actually available to specific individuals at specific times.  *See Intuitive Surgical*, 2012 WL 1868874, at *19.  Plaintiffs' generic assertions of involvement in Nutanix's day-to-day operations fail to demonstrate each individual defendant's "actual" exposure to specific allegedly contradictory information at the time the statements were made.  *See, e.g.*, *McCasland v. FormFactor, Inc.*, 2009 WL 2086168, at *6 (N.D. Cal. July 14, 2009) (complaint failed to "(1) identify any specific information that was either received or communicated by any defendant, that (2) contradicts any public statement at the time it was made.").  Plaintiffs assume there is contradictory information but provide no support for their assumption.  They are unable to point to what exactly Defendants were aware of that contradicts any of their statements.  In addition, the allegations fall far short of describing circumstances so "rare" that it would be "absurd" not to impute scienter.  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

### G.     Considered Holistically, the Only Plausible Inference Is Nonculpable.

Plaintiffs allegations also fail to establish scienter when considered holistically.  Under a holistic review, the scienter allegations "must still be at least as compelling as an alternative

innocent explanation." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009). Here the most compelling explanation is an innocent one: That Defendants were optimistic about Nutanix's growth and its prospects for executing its business model transitions. MTD at 25. And Defendants had reason to believe so. Nutanix's performance throughout the Class Period (and beyond) was impressive with Nutanix exceeding Q2 guidance on every metric. Defendants coupled their optimism with repeated and detailed warnings of the risks associated with its complicated business model transitions and regularly updated investors about the challenges faced and its progress meeting those challenges. The failure perceived by the Plaintiffs to accurately predict business trends – specifically Nutanix's lead generation investment assumptions and its ability to meet its own aggressive hiring targets in a competitive job market – is simply not fraud. Finally, Plaintiffs also still fail to offer any explanation or motive as to why any Defendant would purposefully shift a "few tens of millions" of dollars away from lead generation spending only to personally suffer a quarter of a billion dollars in losses. MTD at 23. The incongruity of the theory shows how far Plaintiffs are from raising a "cogent," let alone a "compelling" inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Here, the Opposition's abandonment of Plaintiffs' original claims, and its conclusory allegations and attempts to re-write Nutanix's actual statements show that the Complaint is no more than a lawsuit in search of a claim.[16]

## CONCLUSION

Defendants respectfully request that the Complaint be dismissed in its entirety.

Dated: January 14, 2020                   WILSON SONSINI GOODRICH & ROSATI
                                          Professional Corporation

                                          By:      /s/  *Boris Feldman*
                                                      Boris Feldman

                                          *Attorneys for Defendants*

---

[16] Because Plaintiffs fail to allege an underlying violation of the 1934 Act, they thus fail to state a Section 20(a) claim. MTD at 25.