**Pages 1 - 16**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

IN RE NUTANIX, INC. SECURITIES )   **NO. C 19-01651 WHO**
LITIGATION.                 )
_____ )

San Francisco, California
Wednesday, February 12, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Lead Plaintiff Shimon Hedvat, Plaintiff City of Miami Fire
Fighters' and Police Officers' Retirement Trust, and the Class:

                LEVI & KORSINSKY, LLP
                1111 Summer Street, Suite 403
                Stamford, Connecticut 06905
        BY:  **SHANNON L. HOPKINS, ATTORNEY AT LAW**
            **GREGORY M. POTREPKA, ATTORNEY AT LAW**

For Defendant Nutanix, Inc.:
                WILSON, SONSINI, GOODRICH & ROSATI
                650 Page Mill Road
                Palo Alto, California  94304
        BY:  **BORIS FELDMAN, ATTORNEY AT LAW**
            **IGNACIO E. SALCEDA, ATTORNEY AT LAW**

REPORTED BY:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
           Official Reporter, CSR No. 7445

**Wednesday - February 12, 2020**                                    **2:34 p.m.**

**P R O C E E D I N G S**

---o0o---

THE CLERK:  Calling Case C 19-1651, Scheller versus Nutanix.

Counsel, please state your appearances.

MS. HOPKINS:  Good afternoon, Your Honor.  Shannon Hopkins with Levi & Korsinsky for the plaintiffs.

THE COURT:  Welcome.

MR. POTREPKA:  Good afternoon, Your Honor.  Gregory Potrepka from Levi & Korsinsky for the plaintiffs.

MR. FELDMAN:  Good afternoon, Your Honor.  Boris Feldman and Ignacio Salceda for the defendants.

THE COURT:  Welcome.

MR. SALCEDA:  Good afternoon, Your Honor.

THE COURT:  All right.  Let me tell you what I'm inclined to do, which is to dismiss with leave to amend.  And let me tell you the problems that I see that I'd like you to solve.

It's unclear to me how the plaintiffs distinguish lead generation spending from sales and marketing and sales hiring; and because of that, it's unclear how and whether the statements that you're relying on are false.

The statement from that JPMorgan report on the strength of the pipeline, I believe, comes from a partner of Nutanix and

not Nutanix itself, and so I then need to know who said it and why it would be attributable to Nutanix.

The allegations regarding the hiring freeze lack specificity, particularly given turnover and increasing headcount.  And it's not clear how the Confidential Witnesses 1 and 7 knew about the company policy itself as opposed to what may have been going on in their individual areas.  How long were the freezes?  How did they affect -- who did they affect?

The statements that Nutanix made regarding Dell and the competitive landscape were accompanied with warnings regarding adverse impacts down the road.  And so it seems to me that the failure to provide full information isn't the same thing as a misleading statement, and that's the way that I understand those statements so far.

Statements regarding product quality, I think, seemed mostly puffery to me; so I didn't understand how they would fall into the misleading category.

And then the pull-in scheme is not unusual in and of itself.  I realize that it can be a cause of action, but it did not appear to be a material amount of sales; and it, to me, needs more detail in order to state a claim.

And once you get over those hurdles for allegations, I think there are issues regarding scienter.  There's not a lot of information regarding Pandey and Williams' actual knowledge. The stock sales themselves, you can't interpret anything from,

PROCEEDINGS

particularly from Pandey.

So there are all of those things.  They may well be able to be solved on amendment, but those were my concerns.

And you can point me now to things that I should have paid more attention to and didn't and then address the rest later.

**MS. HOPKINS:**  Sure, Your Honor.

So if it would be okay with Your Honor, I read all your transcripts, that you can't escape a hearing without another brief, but this is --

**THE COURT:**  It's true.

**MS. HOPKINS:**  This is, like, a five-page -- just a summary that -- a couple of things I think we could have hit a little bit clearer in our brief that might help Your Honor.

**THE COURT:**  Hand it on up, please.

(Document handed up to the Court.)

**MR. FELDMAN:**  Are we doing reply briefs now, sur-reply briefs?

**THE COURT:**  Mr. Feldman, just sit down.  I don't want to --

(Laughter.)

**THE COURT:**  But, yes, if you'd like to, you just go right ahead.

**MR. FELDMAN:**  No, no.  I thought this was --

**THE COURT:**  Go ahead.

**MS. HOPKINS:**  So, Your Honor, I think what's very

important here -- let's talk, I guess, about the first point Your Honor made about lead generation and sales and marketing.

We're not challenging sales and marketing.  Lead generation, as the defendants have admitted in their filings, is a key component of marketing.  It's the activities that are done to educate new customers.  And the defendants -- the company and the defendants, who signed the SEC filings, made, on this first page, this statement here, where they listed various activities that they said they were increasing during the class period.

If you look down below, a reasonable investor, Your Honor, would have understood these to be lead generation activities.

If you look at the J&P Securities, they cite pipeline generation activities, including branding campaigns, which is exactly brand awareness, exactly what types of activities, in the statement, the defendants said they were increasing.

At the end of the class period, they made an admission that they had consciously decided, during the planning process, which was at the beginning of fiscal 2018, to keep lead generation flat.  They were not increasing it.

They said here, throughout the class period, they were increasing these activities over and over again.  These activities were understood by analysts as being lead generation activities.  That statement is false by admission, Your Honor.

**THE COURT:**  Okay.  Well, so one thing that would help

me, there was no place --

MS. HOPKINS:  Yeah.

THE COURT:  I kept looking through to find somebody who would define for me specifically what "lead generation" was --

MS. HOPKINS:  Mm-hmm.

THE COURT:  -- and then why it wouldn't be completely tied to things like the number of people that you have doing marketing and the other marketing and sales activities.

So it would be helpful if you -- if what you're doing is defining it as these pipeline generation activities, for example, that you're showing me --

MS. HOPKINS:  Yep.

THE COURT:  -- in J&P's, put that in bold somewhere so that I can then track it and see where the falsity comes from.

MS. HOPKINS:  Right, because I think at the end of the class period, there's no question that the defendants came out and said -- they didn't just say, "Oh, gee, we didn't spend enough."  They said, "We made a decision at the beginning of Fiscal Year 2018" -- which was July of 2017; our class period starts in November -- "to keep lead generation flat for fiscal 2018, and then we did it again in 2019."

So they admitted they kept it flat, and they kept telling people, "We're increasing.  We're increasing these activities."

"These activities" were understood by analysts as lead

generation activities.  Lead generation, they admit, is a key component to pipeline.

This here could have been clearer in our brief, Your Honor.  And it's in our complaint that the analyst community understood these exact activities that they said they were increasing throughout the class period were lead generation activities.  And they weren't doing that.

THE COURT:  What were the other things they were doing with their sales and marketing money?

MS. HOPKINS:  What were the other things they were doing?

THE COURT:  Yeah.  What was it that -- if this was the key component to profitability, what's the deal with not spending money on it?

MS. HOPKINS:  Your Honor, we're not saying they spent no money.  We're not saying they weren't spending money on lead generation.

THE COURT:  But what were they doing with the other money?  I'm just curious, because --

MS. HOPKINS:  Well, they said --

THE COURT:  -- the actual evidence that is in the complaint talks about increased --

MS. HOPKINS:  Right.

THE COURT:  -- sales and marketing; so it's confusing to me.

That's something you're just going to have to distinguish for me in the amended complaint.

**MS. HOPKINS:** They said they were diverting the spending to developing new products, to engineering.

And they knew that this was going to happen because they did the exact same thing in 2016.

And they said, "We woke up and realized we had to do this demand generation thing, and we" --

They had to increase their lead generation spend in Fiscal 2017 by 75 percent, nearly double what they did before. So they knew this was going to happen. They did it again.

The money -- this company was at a pivotal time. It was changing from a hardware/software -- right? -- to a subscription-only software-based model. It was critical for them.

Taking these statements in context, the way investors would have done so, a reasonable investor would have looked at this. This company, it was critical for them, if they were going to grow, as they said they were going to repeatedly -- they repeatedly touted growth goals; they were going to grow the customer base and hit this $3 billion revenue target by 2021 -- it was critical for them to educate new customers.

Investors understood that that's -- when they said they were increasing marketing -- and sales and marketing and then giving examples of lead generation activities, investors

understood that, as this analyst did, that they were increasing their lead generation.  And they weren't.  They were diverting that critical spending to their new products because they were years behind getting onto the public cloud with their competitors.

If Your Honor looks at the second slide, along these same lines, here they talk about analyzing their spending plans.

(Reading):

"Our strong growth in spending will be completely self-funded by our free cash flow.  Our ramped rep sales productivity has increased sequentially."

They define sales productivity as lead generation, spending, and sales hiring.  So to say, in August of 2018, that you're increasing your spending when you said at the end of the class period you kept it flat is false, Your Honor.  "We kept our lead generation spending flat."  That's what they said. Here, they're telling people they're increasing their spending. It's false.  And the reason that they had to drop their forecast going forward, Your Honor, is because they kept it flat and the pipeline dried up.

So they can't both be true.  Their end-of-class-period admission and this statement cannot both be true.

THE COURT:  Okay.

MS. HOPKINS:  The third slide, Your Honor, is another

statement specifically about broadening lead generation activities.  Again, at the end of the class period, they admitted they had not done that; they kept spending flat.

THE COURT:  Okay.  So you understand my point, I think, here, which is that you need to differentiate what spending it is you're talking about, I think, in this complaint and how it was false; that when they were talking about sales and marketing, what they were really talking about was lead generation and that their statements about that were false.

MS. HOPKINS:  Yeah.  And I understand your point about that category.  But the statement in Slide 2 is directly about spending on lead generation.  That statement is -- there's no sales and marketing in that statement.  That statement is directly about lead generation spending.

So I understand your point about the increase in sales and marketing statements, but the other ones, I think, are directly on point.

I don't know that I'll change Your Honor's mind about the Dell statements here, but Your Honor mentioned the Dell warnings.  We have confidential witnesses who, we allege in the complaint, described the specific parts of the Dell OEM agreement that Dell was violating because it was not providing Nutanix with new leads.

Nutanix had historically received about 40 percent of sales leads from Dell.  Dell had stopped providing any new

leads by January of 2018 because it was favoring its own product and violating the OEM agreement.

So to tell investors that nothing has changed with Dell, they've navigated, you know, the competition well and there's been no difference here, is untrue because -- and those warnings aren't enough to protect them because those warnings are not specific.  They're just saying, "Well, it could happen."

It did happen.  It had happened.  They were getting no new sales leads.  Those warnings are not specific to that.  It's just a hypothetical "could happen," but it had happened and they knew it.

So I -- you know, I disagree with Your Honor that those warnings are sufficient to protect them from their statements that nothing has changed with Dell over the last year or two.

**THE COURT:**  Okay.

**MS. HOPKINS:**  And then, finally, with the sales (reading):

"We have significantly increased our sales and marketing personnel which grew by 40 percent."

This here is a statement, Your Honor, that the defendants, again, at the end of the class period, admitted:  For the past several quarters, we have not been hitting our sales hiring goals, and we were understaffed for the first half of the fiscal year, the last six months.

So to say you have significantly increased your sales and marketing is misleading.  While maybe literally true that they increased by 40 percent, to not tell investors that you had been missing your goals for six or more months and you're understaffed -- and these were the people who are supposed to be generating your pipeline and selling your product -- is misleading by omission, regardless.

I mean, these admissions at the end of the class period, Your Honor, I think are very critical here.  They didn't just say, "Oh, we just realized it."  They said, "No, we knew about this for months and months."  And there are several cases that have held that defendant's statements about specific things they had known for months supports scienter.

**THE COURT:**  Okay.

All right.  Mr. Feldman, do you want to respond to this?

**MR. FELDMAN:**  May it please the Court, I'm happy to accept the tentative and sit down.

**THE COURT:**  No.  I want you to deal with this.

**MR. FELDMAN:**  Okay.  So you've identified the --

I'm sorry.  Are you through?

**MS. HOPKINS:**  Yes.

**MR. FELDMAN:**  Okay.  You've identified the sleight of hand going on here, which is an attempt to take statements about sales and marketing and say, oh, that must have meant lead generation.

If you recall from the plaintiffs' opposition brief, there was a 77-page attachment identifying the false statements. Column Number 1 -- maybe it's Column A -- is the statements.

So just to make sure, before I came, I did a search in it for the phrase "lead generation," and it doesn't appear until the end of the class period initially, when the company made the announcement at the end of February and they said, "We're going to up our spending on lead generation."

In the preceding pages, there's no statement during the class period by the company saying, "We've upped our lead generation spending."

So where the plaintiffs address that -- and it's right what you honed in on -- it's in the opposition brief at page 9. If I can quote them, quote (reading):

"Nutanix stated in the 2018 10-K that its 'marketing program' includes lead generation activities and 'the majority of our sales and marketing investment is used to educate our end customers about the benefits of our solution,' e.g., lead generation.  Paragraphs 80 to 81, D.Ex. 4 at 43."

So that part I read you, "e.g., lead generation," it's not in the quotes.

So then, as Warner Wolf used to say, let's go to the videotape.  They had two citations:  complaint, paragraphs 80

and 81.  So I looked at their complaint.  It does not allege in paragraphs 80 or 81 that Nutanix ever said lead generation constitutes the majority of sales and marketing.

I then went to the 10-K, the annual report.

They said, look at Defendant's Exhibit 4 at 43.  It states (reading):

> "The majority of our sales and marketing investment is used to educate our end customers about the benefits of our solution, particularly as we continue to pursue large enterprises and mission critical workloads."

It does not equate that to lead generation.

The notion that we heard repeatedly from counsel -- about every time they said they were increasing spending on sales and marketing, that was lead generation -- the company never said that.  And when they attribute it to the company, their own citations don't support it.

In fact, plaintiffs' whole theory here -- maybe they'll stick with it on the next round -- is that Nutanix cut spending on sales and marketing to inflate gross margin.  That's the theory of the case.

The problem for them is twofold.  One, sales and marketing does not enter into gross margin.  That's in Exhibit 4, our 10-K, at pages 44, 46, 50, 51, 54.  It shows that in calculating gross margin, it does not include sales and

marketing.  So the theory doesn't make sense.

In addition, if you look at sales and marketing expenditures throughout the very elongated class period now, they increased every quarter from Q1 '18 through Q3 '19.  Each quarter, sales and marketing expenses for Nutanix:  145 million to 151, to 170, to 183, to 197, to 214, to 246 million in Q3 of '19.

So it doesn't matter if a particular former employee said, "Well, they didn't spend enough on my leads" or "I couldn't get more headcount."  The fact is, the critical failure here is to equate sales and marketing with lead generation, and that's what Your Honor pointed out.

Thank you.

**THE COURT:**  All right.  So that's really the thing to focus on next time around.

And I'll take a look at these when I get off the bench.  I'll get an order out as soon as I can.  And we'll be back here again, I suspect, sometime in the future when you all have agreed on what a good briefing schedule is.

**MR. FELDMAN:**  Thank you, Your Honor.

**THE COURT:**  Thank you very much.

Are you just waiting for me, Mr. Feldman?

**MR. FELDMAN:**  I'm waiting for you.  You're the one in the black dress.  I'm waiting for you.

**THE COURT:**  Mr. Feldman was in the first trial that I

had here when I got on the Bench, like within a month.

So it's always a pleasure.

**MS. HOPKINS:**  Actually, Your Honor --

**MR. FELDMAN:**  Good to see you.

**MS. HOPKINS:**  -- one quick thing.

We have a status conference for next week.

**THE COURT:**  So we should just push it off and get together once we know what the complaint's going to look like.

**MS. HOPKINS:**  Okay.

**MR. FELDMAN:**  Thank you.

**THE COURT:**  Great.  Thanks a lot.

**MR. SALCEDA:**  Thank you, Your Honor.

(Proceedings adjourned at 2:54 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Friday, February 22, 2020


_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court