UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RYAN SCHELLER, et al.,

    Plaintiffs,

    v.

NUTANIX, INC., et al.,

    Defendants.

Case No. 19-cv-01651-WHO

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Plaintiffs Shimon Hedvat and the City of Miami Firefighters' and Police Officers' Retirement Trust (collectively, "Plaintiffs") bring this putative class action against Nutanix, Inc., Dheeraj Pandey, and Duston M. Williams (collectively, "Nutanix"). Plaintiffs assert claims on behalf of all persons that purchased Nutanix securities between November 30, 2017 and May 30, 2019 (the "Class Period"), alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. I find that plaintiffs' allegations fail to allege that Nutanix's public statements were false or misleading, and that their allegations of scienter are insufficient. For these reasons, I GRANT Nutanix's motion to dismiss WITH LEAVE TO AMEND.

## BACKGROUND

Nutanix is a publicly traded enterprise cloud platform provider. Compl. ¶ 42. Defendant Pandey co-founded Nutanix in 2009 and has served as its Chief Executive Officer and Chairman of the Board since 2016. *Id.* ¶¶ 42-43. Defendant Williams has been the Chief Financial Officer of Nutanix since before the beginning of the Class Period. *Id.* ¶ 44. Nutanix is known for pioneering hyper-converged infrastructure software ("HCI") that combines data center computing into a single machine. *Id.* ¶ 2. Its customers traditionally have been able to purchase HCI to use on a variety of hardware platforms, pre-installed on Nutanix hardware, or pre-installed on

hardware sold by original equipment manufacturers ("OEMs") that partner with Nutanix. *Id.* ¶ 3. Nutanix's OEM partners include Dell Inc. ("Dell"), International Business Machines Corporation, Lenovo Group Ltd., and Fujitsu Technology Solutions GmbH. *Id.* ¶ 58. Dell was its largest and most important OEM. *Id.* ¶ 5. Prior to and throughout the Class Period, its main competitor in the HCI market was VMware, which was acquired by Dell in 2016. *Id.* ¶ 67.

Beginning in the first quarter of fiscal year ("FY") 2018, Nutanix began to transition its business to focus on software-only products (as opposed to the hardware and software products it was selling), and to a subscription-based model (as opposed to its prior model based on licensing). *Id.* ¶ 68. Also beginning in 2018, Nutanix began introducing several cloud-based products and acquired certain assets in pursuit of this goal. *Id.* ¶¶ 69-79.

Plaintiffs first filed this action on March 29, 2019, and filed an amended complaint ("Complaint" or "Compl.") on September 9, 2019. Dkt. Nos. 1, 102. In the Complaint, plaintiffs identify multiple allegedly false statements made by Nutanix in SEC filings, press releases, investor conference calls, a blog post, and a public report that they contend were false, misleading, or that omitted critical information. These broadly relate to Nutanix's (i) investments in lead generation; (ii) institution of secret hiring freezes of sales personnel; (iii) deteriorating relationship with Dell; (iv) declining product quality; and (v) practice of "pulling in" orders in order to conceal its declining sales pipeline.

In support of their allegations, plaintiffs cite statements from seven confidential witnesses ("CWs"). CW1 was a Commercial Account Manager for the Midwest region at Nutanix from December 2016 to January 2019. Compl. ¶ 50. CW2 was a Nutanix executive in Worldwide Support Business Operations from February 2016 to late 2016 and an executive of the Company's Customer Success program from late 2016 until March 2018. *Id.* ¶ 51. CW3 was a former Nutanix Commercial Account Manager from May 2018 to July 2019. *Id.* ¶ 52. CW4 was the Director of Digital Marketing at Nutanix from January 2018 until May 2019. *Id.* ¶ 53. CW5 was a Nutanix Global Account Manager from December 2017 to June 2019. *Id.* ¶ 54. CW6 was a Nutanix Senior Product Manager from June 2018 to June 2019. *Id.* ¶ 55. CW7 was a Nutanix Account Manager from September 2015 to July 2017 and a Nutanix Global Account Manager

2

from August 2017 to August 2018.  *Id.* ¶ 56.

Nutanix filed a motion to dismiss the Complaint and a Request for Judicial Notice on October 24, 2019.  Dkt. Nos. 108, 109.  Plaintiffs filed an opposition on December 9, 2019.  Dkt. Nos. 111, 112.  Nutanix filed a Reply on January 14, 2020.  Dkt. No. 114.  I heard the matter on February 12, 2020.  Dkt. No. 118.

**LEGAL STANDARD**

**I.      PLEADING STANDARD PURSUANT TO RULE 12(B)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## II.     PLEADING REQUIREMENTS IN SECURITIES FRAUD ACTIONS

Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b).  Securities and Exchange Commission Rule 10b-5, promulgated under the authority of Section 10(b), in turn provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

The basic elements of a Rule 10b-5 claim are: (i) a material misrepresentation or omission of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) a transaction and loss causation, and (v) economic loss.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud claims must "plead with particularity both falsity and scienter," the same standard as Federal Rule of Civil Procedure 9(b).  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  With respect to falsity, "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  Even if a plaintiff is able to satisfy all six elements of a Section 10(b) violation, the defendant may still be protected by the "safe harbor" provision of the PSLRA, under which "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (emphasis in original).

4

**DISCUSSION**

## I.  FALSE OR MISLEADING STATEMENTS OR OMISSIONS

The securities laws prohibit only misleading and untrue statements, not statements that are incomplete.  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "Often, a statement will not mislead even if it is incomplete or does not include all relevant facts," although a company's statements can be misleading if they fail to provide context for statements in a way that "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Id.*  In addition, "[s]tatements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citations omitted).

If a plaintiff relies upon a CW to show the falsity of the statements alleged, the CW must be described with sufficient particularity to establish his reliability and personal knowledge, and the statements reported by the CW must be indicative of scienter.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  Where factual information as to falsity is lacking, a complaint must adequately establish that the "confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," and that "the witnesses in question have personal knowledge of the events they report."  *Id.* (citations omitted).

### A.    Statements regarding investments in sales and marketing and sales hiring

Plaintiffs claim that Nutanix misrepresented its investment in sales and marketing by failing to accurately report its flat "lead generation" spending and its sales hiring freeze.

#### 1.    Investments in "lead generation"

The Complaint identifies only one statement that pertains explicitly to lead generation spending.  Nutanix's 2018 10-K stated that "we work closely with our technology partners through co-marketing and lead-generation activities in an effort to broaden our marketing reach and help us win new customers and retain existing ones."  Compl. ¶¶ 253.  The remainder of plaintiffs'

United States District Court
Northern District of California

allegations rely on more general positive statements, such as "we expect continued strong top line growth in the remainder of fiscal 2018," which they claim indicates that Nutanix was investing in sales and marketing "to build a pipeline that would support continued future sales growth." *Id.* ¶ 179.

The central statements that plaintiffs allege to be false or misleading as they relate to growth in sales and marketing include:  (i) in a November 2017 conference call that "I wouldn't look too much into" lower amounts of "new customers that came into [Nutanix's] installed base" and that "we added a decent amount of customers," Compl. ¶ 184; (ii) in Form 10-Qs from December 2017, March 2018, June 2018, and December 2018 that Nutanix "continue[d] to invest heavily" in sales and marketing, was "investing aggressively in sales enablement and co-marketing with our partners [that] will extend and improve our engagement with a broad set of end-customers," and continued to "penetrate and expand in global markets through increased sales and marketing activities," *id.* ¶¶ 190-91, 195, 209-210, 214, 233-38, 259, 274-76, 279; (iii) in a May 2018 conference call that software-only products had not negatively impacted customer growth, *id.* ¶¶ 227-228; (iv) in an August 2018 conference call that Nutanix saw "strong growth in spending," *id.* ¶ 245; and (v) in a 2018 Form 10-K that "[t]he increase in product revenue . . . reflects increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities."  *Id.* ¶ 195.

In order to show how such broad statements were misleading, plaintiffs point to Nutanix's general representations regarding its pipeline and customer growth.  The Complaint asserts that "[a]ccording to Defendant Pandey, when analyzing sales productivity, the key 'inputs are salespeople and pipeline spend, the demand gen spend.'"  *Id.* ¶ 86.  The size of the sales and marketing group is also "essential" to the ability to grow Nutanix's pipeline. *Id.* ¶ 85.  Nutanix's 2018 10-K states that "key elements of" Nutanix's growth included "[i]nvest[ments] to acquire new end customers," that "[w]e intend to grow our base of end customers by increasing our investment in sales and marketing, leveraging our network of channel partners and OEMs," and that "we work closely with our technology partners through comarketing and lead-generation

activities in an effort to broaden our marketing reach and help us win new customers and retain existing ones." *Id.* ¶¶ 235, 252-53.  Plaintiffs also point to a portion of the 10-K that is not included in the Complaint, which asserts that "[t]he majority of our sales and marketing investment is used to educate our end customers about the benefits of our solution."  Oppo. 9; Dkt. No. 108-2 at 95.

Plaintiffs contend that at the same time, "unbeknownst to investors, Nutanix secretly decided as part of the Company's 'planning process' not to invest in lead generation in fiscal 2018 and, instead, keep spending flat while the Company reallocated funds budgeted for lead generation to engineering." *Id.* ¶ 6.  Nutanix did not disclose this to investors, but "falsely told the market throughout the Class Period that Nutanix was continuing to invest in marketing and lead generation activities to facilitate continued 'strong' growth." *Id.* ¶ 93.  CW2 stated that Nutanix "'overinvested' in R&D." *Id.* ¶ 95.  CW3 and CW4 "confirmed Nutanix did not increase critical lead spending in fiscal 2018 or the first quarter of fiscal 2019," "recalled that spending on lead generation appeared to be non-existent," and stated that the funding allocated to digital marketing decreased or stayed flat until Q2 2019. *Id.* ¶¶ 96-97.

Plaintiffs further allege that Nutanix acknowledged its inadequate lead spending in February 2019, when it reported "inadequate marketing spending for pipeline generation and slower than expected sales hiring" and "some imbalances in [Nutanix's] lead generation spending that were beginning to impact our sales pipeline." *Id.* ¶¶ 288, 291.  At that time, defendant Williams stated that lead generation, "a key component to building pipeline," was reallocated in fiscal year 2018 to "other priorities." *Id.* ¶ 292.  The amount of spending shifted from lead generation "is not an insignificant amount," but "a few tens of millions" of dollars. *Id.*

Plaintiffs state that "Defendants also falsely claimed Nutanix did not see any issues with its lead generation spend or sales pipeline until Q2 fiscal 2019," and "assured investors that the lack of lead generation spending only 'pushed things a quarter or two'" when in fact Nutanix's pipeline had been depleted since 2017. *Id.* ¶¶ 308-309.  Defendant Pandey stated that "in fiscal 2017 we had increased lead generation spend by 75% over the prior year," which "drove strong pipeline generation of fiscal 2017 and fiscal 2018, as well as improved efficiencies within the lead

1    generation spend during fiscal 2018." *Id.* ¶ 308.  Nutanix also stated that "we made a decision at

2    that point that we figured those efficiencies would not only continue, but increase in FY 2019."

3    *Id.* ¶ 309.

4            Nutanix argues that its investments in sales and marketing did in fact increase throughout

5    the Class Period and that, contrary to the allegations in the Complaint, such investments would

6    have no impact on gross margin.  Mot. 10-11.  Plaintiffs do not dispute this, but argue that sales

7    and marketing expenses as a percentage of sales were 50% and 51% in 2017 and 2018.  Oppo. 11.[1]

8    However, the crux of plaintiffs' claim is not whether sales and marketing expenses increased on

9    the whole, but whether "a reasonable investor would have understood statements that Nutanix was

10   'increasing' marketing activities to mean Nutanix was also increasing the most critical component

11   of marketing—lead generation—when, in fact, this was not true."  Oppo. 9-10.

12           Plaintiffs' arguments with respect to lead generation fail for lack of specificity.  Plaintiffs

13   appear to argue that Nutanix misled investors by failing to invest in activities that would result in

14   leads for new customers, or a "pipeline," and that Nutanix suggested that it was increasing its

15   customer base when that was not in fact true.  However, plaintiffs do not allege that Nutanix made

16   any false statements about new customer growth; in fact, the Complaint includes statements that

17   indicate that the public was aware of slowing new customer growth starting in November 2017.

18   *See* Compl. ¶¶ 184, 227.  Further, plaintiffs have not identified any specific misleading statements

19   made by Nutanix regarding leads or pipeline, but instead argue that various facially true

20   statements regarding a variety of sales and marketing activities were in fact misleading due to its

21   later admission that it kept "lead generation" flat.

22           Critically, plaintiffs fail to define "lead generation" or the related concept of "pipeline," or

23   to explain how these terms differ from the umbrella of "sales and marketing."  It is apparent that

24   "lead generation" is not synonymous with all sales and marketing activities, both because

25

26   _____

27   [1] Plaintiffs contend that whether these expenses actually increased is a factual dispute that is
     inappropriate at this stage.  Oppo. 11.  However, Nutanix has cited the relevant portions of the
     SEC filings that Plaintiff cites in the Complaint, which are properly considered in ruling on a Rule
28   12(b)(6) motion under the doctrine of incorporation by reference.  I need not rely on the remaining
     documents contained in Nutanix's request for judicial notice.  Accordingly, it is DENIED as moot.

United States District Court
Northern District of California

plaintiffs do not dispute that Nutanix increased sales and marketing spending on the whole, and because plaintiffs concede that lead generation is a narrower subset of such activities. *See* Oppo. 10. There is no dispute that spending on sales and marketing in fact increased during the Class Period. Thus, plaintiffs' argument rests upon a definition of "lead generation" that is significantly narrower than "sales and marketing."

However, in arguing that Nutanix's statements were false, plaintiffs seem to interpret the term "lead generation" so broadly as to be practically indistinguishable from "sales and marketing." For example, plaintiffs equate lead generation with "marketing activities related to brand awareness, promotions, trade shows and partner programs." Compl. ¶¶ 193, 212, 236, 255, 277; Oppo. 11. It is not clear what "sales and marketing" spending would encompass that is *not* lead generation if all these types of activities fall within plaintiffs' conception of lead generation. At oral argument, plaintiffs were unable to provide an explanation of sales and marketing activities that were not lead generation other than engineering, which is clearly not within the ambit of sales and marketing. Dkt. No. 118 at 6:3-9:5. Moreover, plaintiffs do not allege that Nutanix did not actually increase spending on these particular activities. Plaintiffs also point to Nutanix's stated plans to "[e]educat[e] . . . end customers" about the benefits of Nutanix's products and "grow our base of end customers" as misleading, but activities regarding "end customers" do not necessarily logically relate to lead generation.

In addition, plaintiffs have not adequately identified how a reasonable investor would conclude that Nutanix's statements about increasing spending on sales and marketing referred to an increase on spending on lead generation in particular. Conclusory statements that investors would have understood Nutanix's statements to pertain to lead generation do not suffice. None of the alleged statements suggest that sales and marketing expenditures are primarily allocated to lead generation, especially in the context of Nutanix's decision to shift its business model away from hardware and non-subscription sales. Plaintiffs have not explained how the sole statement made by Nutanix discussing "lead generation" in the 2018 10-K is false or misleading. There, Nutanix described working with technology partners on lead generation activities, which is not the same as spending sales and marketing funds on lead generation.

United States District Court
Northern District of California

1      In order to state a claim that Nutanix falsely stated that it was increasing lead generation,

2 plaintiffs must first identify what investors would have understood "lead generation" or "pipeline"

3 generation to be, and distinguish this activity from Nutanix's broader spending on "sales and

4 marketing."  In addition, they must show how reasonable investors would have been misled by

5 Nutanix's representations about "lead generation."  For example, to the extent that plaintiffs

6 contend that lead generation is comprised of activities such as digital marketing or brand

7 awareness, they must allege how an investor would understand these activities to be different from

8 "sales and marketing" more broadly, and that Nutanix in fact decreased spending on such

9 activities, despite statements to the contrary.  Further, plaintiffs must allege how Nutanix's

10 statements were false in light of the fact that it increased spending on "sales and marketing" during

11 the Class Period.  Similarly, to the extent that plaintiffs claim that "lead generation" is

12 synonymous with "pipeline generation," they must so allege and explain that reasonable investors

13 would view those terms as the same thing.

14      Lastly, a J.P Morgan report from February 2019 quoted a Nutanix partner as stating that

15 "[pipeline is] definitely fairly strong to where we were last year." Compl. ¶ 285.  This is

16 potentially an actionable statement given plaintiffs' allegations that Defendants knew at the time

17 that the pipeline was not strong.  However, the statement comes from a J.P. Morgan report quoting

18 one of "a few key partners in Nutanix's ecosystem." *Id.*  The Complaint fails to adequately

19 specify who made the allegedly false statement in accordance with Rule 9(b); it does not appear

20 that this statement can be properly attributed to Nutanix.  In order to state a claim based upon this

21 statement, plaintiffs must explain with specificity who made it and how it was attributable to

22 Nutanix, in what context it was made, and how the statement was false, including what investors

23 would have understood "pipeline" to mean.

24         **2.     Investments in hiring sales and marketing personnel**

25      Next, plaintiffs claim that "during calendar 2018 Defendants instituted hiring freezes of

26 key sales personnel needed to generate sales leads and close customer deals" but made misleading

27 statements to the contrary.  Compl. ¶ 18.  The Complaint contains many alleged statements made

28 in fiscal reports and SEC filings that Nutanix was increasing hiring, including: (i) a statement in a

November 2017 conference call that "a lot of hiring" was going on, *id.* ¶ 182; (ii) statements in each of the four Form 10-Qs that "[w]e have significantly increased our sales and marketing personnel, which grew by [between 30 and 40%]" in the preceding year, that it was "continuing to build out our global [sales and marketing] teams," that "[w]e intend to continue to grow our global sales and marketing team to acquire new end-customers and to increase sales to existing end-customers," that "we may have significant headcount increases in the future," and that "[o]ur employee headcount increased significantly since our inception, and we may have significant headcount increases in the future," *id.* ¶¶ 192-95, 209-212, 233-37, 274-78; (iii) statements in a March 2018 conference call that "[w]e have a full-court press on hiring in the second half for the fiscal year to try to make up this headcount shortfall" and that "we are big on hiring," *id.* ¶¶ 202-203; (iv) a statement in a May 2018 press release that "[w]e had strong success in our hiring in the quarter that positions us to deliver on our future growth plans," *id.* ¶ 220; (v) statements in a May 2018 conference call that "we executed this [hiring] full-court press flawlessly and ended up hiring more new employees in Q3 than in any previous quarter by a wide margin" and "we ramped hiring to support our growth plans," *id.* ¶¶ 224-25; (vi) a statement in an August 2019 conference call that "our ramped rep sales productivity has increased sequentially for the last three six-month periods," *id.* ¶ 245; (vii) statements in the 2018 10-K that "we may have significant headcount increases in the future," that "[s]ales and marketing expense increased . . . due primarily to higher personnel-related costs," and that "[w]e have significantly increased our sales and marketing personnel, which grew by approximately 42% from July 31, 2017 to July 31, 2018." *Id.* ¶¶ 254-257.

Plaintiffs assert that these statements were false when made because Nutanix was losing salespeople and had instituted hiring freezes. According to CW1 and CW7, "Nutanix implemented hiring freezes of all sales personnel during the Class Period." *Id.* ¶ 136. CW2 and CW7 recalled that "a large number of sales and other personnel left the Company in 2018." *Id.* ¶ 134. CW6 and CW7 described "chronic" and "systemic" turnover in employees. *Id.* CW5 stated that Nutanix did not invest in the development of the appropriate number of global account employees. *Id.* ¶ 137. According to plaintiffs, in the February 2019 press release Nutanix

11

admitted that it had experienced "slower than expected sales hiring." *Id.* ¶ 288.  In a February

2019 conference call, it further stated that it was planning to reallocate expenditures "away from

non-sales hiring." *Id.* ¶ 294.  In a May 2019 press release, Nutanix stated that it needed to

"increas[e] our focus on sales hiring and execution" and "we're going to work on sales hiring."

*Id.* ¶¶ 321-22.

Nutanix asserts that these statements were not false because Nutanix added over 60 new

sales teams in Q3 2018 and reported increasing sales and marketing headcount year over year

every quarter, which is reflected in the same documents plaintiff cites in the Complaint.  Mot. 10.

Nutanix also points to several statements where Nutanix disclosed that it had encountered

challenges in its sales hiring.  *Id.* at 11.  Plaintiffs do not dispute these statements.  In light of the

fact that Nutanix in fact increased its headcount, its statements to that effect are not rendered false

by difficulties in sales turnover.  Employee retention and new hiring are separate issues, and a

company may experience high turnover while still increasing headcount.  Further, several of these

statements, such as "we are big on hiring" and "a lot of hiring [is going on]," are vague and

amount to non-actionable puffery.

If properly pleaded, plaintiffs' allegations as to an undisclosed hiring freeze could

demonstrate the falsity of certain of Nutanix's statements about hiring.  But the only factual

allegation in the Complaint to support this contention is that "[a]ccording to CW1 and CW7,

Nutanix implemented hiring freezes of all sales personnel during the Class Period." *Id.* ¶ 136.

This is inadequate for several reasons.  First, this statement contradicts Nutanix's undisputed

disclosures that it increased headcounts of sales and marketing personnel, especially in light of

plaintiffs' allegations of high turnover.  Second, plaintiffs fail to provide any details about these

hiring freezes, such as how many there were, how long they lasted, how often they were instituted,

how many employees they affected, or what locations they covered.  Third, plaintiffs have not

adequately pleaded how each CW would have personal knowledge of Nutanix's hiring.  Both

CWs were account managers; CW1 allegedly reported to "to a district manager responsible for

managing customer relationships," while CW7 was "responsible for managing relationships with

customers for between twenty and fifty accounts across many types of customers." *Id.* ¶¶ 50, 56.

1    There are no allegations that either CW was responsible for hiring any employees, let alone would

2    have personal knowledge of Nutanix's broader hiring policy. *Zucco*, 552 F.3d at 995.  The CW

3    allegations are insufficient, on their own, to allege a hiring freeze.  For these reasons, plaintiffs'

4    allegations fail to state that Nutanix made any actionable misrepresentations or omissions with

5    respect to its hiring.

6         **B.    Statements Regarding Dell Relationship and Leads**

7         Plaintiffs claim that Nutanix concealed its deteriorating relationship with Dell, including

8    that Dell was no longer providing Nutanix with any new sales leads, and misleadingly indicated

9    that the relationship was still profitable.  According to the Complaint, Nutanix stated: (i) in a

10   November 2017 conference call that deemphasizing hardware emphasis "definitely [] reduces

11   friction in the sales motion, both for our sellers and the OEM sellers themselves," and "absolutely,

12   we expect the friction to go down," *id.* ¶ 186; (ii) in each Form 10-Q and in its 2018 Form 10-K

13   that "our OEM partners may be less willing to partner with us as an OEM or otherwise as such

14   shifts [in industry operations] occur," and that "Dell may be more likely to promote and sell its

15   own solutions . . . or cease selling or promoting our products entirely," *id.* ¶¶ 197, 216, 240, 262,

16   281; (iii) in a March 2018 conference call that Dell was getting closer to VMware "[b]ut . . . to get

17   close to another operating system would be a smart strategy," *id.* ¶ 205; (iv) in its 2018 10-K that

18   "[w]e plan to continue to strengthen and expand our network of channel and OEM partners to

19   increase sales to both new and existing end customers" and "[w]e believe that increasing channel

20   leverage by investing aggressively in sales enablement and comarketing with our partners will

21   extend and improve our engagement with a broad set of end customers," *id.* ¶¶ 258; and (v) in a

22   November 2018 conference call that "in terms of the competitive landscape, nothing has changed

23   in the last quarter or so," and that although Dell was closer to VMware, "we have navigated

24   competition waters well." *Id.* ¶ 269.

25        Plaintiffs contend that each of Nutanix's statements was false because at the time it was

26   made, Nutanix knew that the relationship with Dell had already deteriorated and that Dell was

27   increasingly favoring VMware.  Around the summer of 2017, Dell began promoting VMware over

28   Nutanix's products, in violation of Nutanix's OEM agreement with Dell. *Id.* ¶ 114.  According to

United States District Court
Northern District of California

1    CW1, in January 2018 Dell changed its compensation structure to reward its personnel for

2    promoting VMware over Nutanix products, and at some point that year stopped compensating

3    them at all for Nutanix sales.  *Id.* ¶ 117.  By January 2018, Dell stopped providing any new leads

4    to Nutanix.  *Id.* ¶¶ 119, 124.  Plaintiffs further state that "on March 1, 2018, Nutanix announced

5    that it would no longer be breaking out sales from Dell in its financial reporting." *Id.* ¶ 11.

6          As Nutanix points out, each of the allegedly misleading statements was accompanied by a

7    statement that "[a] shift in our relationships with our OEM partners could adversely affect our

8    results of operations," and "[i]f Dell decides to sell its own solutions over our products, that could

9    adversely impact our OEM sales and harm our business, operating results and prospects, and our

10   stock price could decline." *See*, e.g, *id.* ¶ 197; Mot. 14.  Nutanix further argues that the percentage

11   of total revenue attributable to Dell was only 10% in fiscal year 2017, and revenues from Dell

12   remained steady with a slight increase from fiscal years 2017 to 2019, although it acknowledges

13   that Dell's percentage contribution to Nutanix's revenue declined from 10% to 7% over this

14   period.  Mot. 14.  Nutanix also states that none of its allegedly false statements mentions sales

15   leads from Dell, nor do any of the statements suggest that Nutanix's relationship with Dell was

16   improving.  Reply 5.  Plaintiffs counter that "Dell sales decreased from $104 million in FY2018 to

17   $86.5 million in FY2019."  Oppo. 13.

18         Plaintiffs' assertion of falsity hinges on Nutanix's relationship with Dell and its failure to

19   provide new leads to Nutanix.  However, most of the statements it points to pertain to the

20   competitive landscape generally and refer to multiple OEMs, and not just Dell, and are not

21   specifically alleged to be false or misleading.  The statements that do mention Dell recognized that

22   there was a possibility that Dell would sell its own products and move away from Nutanix.

23   Plaintiffs' argument that Nutanix's statements were misleading because the relationship had

24   already deteriorated is not persuasive.  As they acknowledge, Nutanix did maintain its relationship

25   with Dell throughout the Class Period and continued to receive sales from existing customers from

26   Dell.  Oppo. 13.  In addition, Nutanix's failure to provide full information about the relationship

27   with Dell is not actionable in and of itself.  *See Brody*, 280 F.3d at 1006-07 (press releases that

28   provided information about stock repurchase program and stated that it had received "expressions

14

of interest" from potential acquirers, but not mentioning possible takeover of company and actual proposals were not misleading).

Moreover, each of the above statements except for the November 2018 conference call is forward-looking, contains expressions of subjective belief, and is accompanied by detailed cautionary language about the risks of the relationship with Dell and changing market conditions. Such cautionary language renders these statements protected by the safe harbor provision of the PSLRA. *Quality*, 865 F.3d at 1141, 44. In addition, these statements contain non-actionable puffery, such as "absolutely we expect the friction to go down" and "we have navigated competition waters well." Reasonable investors would understand how to evaluate such "optimism of corporate executives." *Intuitive*, 759 F.3d at 1060. Accordingly, plaintiffs' argument that any discussions of Dell were misleading unless accompanied by a full disclosure of the relationship, even if they were accompanied by cautionary language, does not comport with the PSLRA.

### C.     Statements regarding product quality

Plaintiffs allege that Nutanix made several false statements regarding its strong product quality even as it "disregarded" its core HCI technology and experienced "quality issues," such as the lack of "one click upgrades." Oppo. 17. First, in a March 2018 press release Nutanix stated that "the strength of our large deal execution and record number of new customers prove that we are reducing friction for our customers and providing them with a consumer-grade experience that is unmatched." *Id.* ¶ 200. Second, in a May 2018 press release it stated that "[o]ur continued industry-leading Net Promoter Score proves that a relentless focus on our customers drives our continued success," and that "[d]emand for our solutions remains strong." *Id.* ¶ 220. Third, in a November 2018 press release, Nutanix stated that "[o]ur results this quarter prove that our core business continues to grow strongly and put us on a solid path to meet our goal of at least $3 billion in software and support billings by 2021." *Id.* ¶ 265. Finally, in a November 2018 blog post defendant Pandey stated that "we have been so successful at adding Nutanix Core customers" who represent "the foundation of our business in the near-term and are what will enable us to deliver on our goal of at least $3b in software and support billings by 2021." *Id.* ¶ 271.

Plaintiffs contend that Nutanix admitted its problem with product quality in May 2019, when defendant Pandey stated that the shortfall over the prior six months was due to, among other things, "product quality." Oppo. 17; Compl. ¶ 113. In addition, CW6 stated that HCI product quality was "not what it used to be" in June 2018 and that the Customer Support Group was receiving complaints from customers regarding the quality of Nutanix's new and existing HCI products, resulting in a decreased Net Promoter Score starting in the third quarter of FY 2018. Compl. ¶¶ 101, 104-106.

I am not persuaded by plaintiffs' arguments. First, many of these statements do not explicitly relate to product quality, but instead discuss customer demand and an increased customer base. Second, most of these statements—"consumer-grade experience that is unmatched," "a relentless focus on our customers," and "[d]emand for our solutions remains strong,"—amount to non-actionable puffery. *Intuitive*, 759 F.3d at 1060. Third, plaintiffs fail to allege with specificity how each of these statements was misleading. Nutanix never represented that its Net Promoter Score was increasing, and plaintiffs have alleged only that began it decreasing in the third quarter of 2018. The portions of the statements that represent that Nutanix was aggressively adding new customers, such as that touting a "record number of new customers," would potentially be actionable if they were false. However, plaintiffs have not specifically alleged that Nutanix did not add new customers in the Class Period, but merely that the pipeline was "drying up." *See* Part A. In order to adequately allege that Nutanix made misleading statements regarding product quality, plaintiffs must allege with specificity how each alleged statement was false or misleading at the time it was made, and hot it was not mere puffery.

Accordingly, I do not find that the Complaint has adequately pleaded that Nutanix's statements regarding product quality were false.

**D.      Undisclosed "pull-in" scheme**

Plaintiffs allege that Nutanix failed to disclose that it had instructed salespeople to "pull in" sales from future quarters in order to compensate for "Nutanix's empty pipeline." Oppo. 15. By "pulling in" sales, Nutanix was allegedly able to conceal its prior false statements about lead generation spending, sales hiring, its relationship with Dell, and its product quality issues until

16

mid-2019.  *Id.*  Plaintiffs further argue that "[b]y putting Nutanix's success at issue, Defendants had [a] duty to disclose they were only able to meet forecasts by engaging in the undisclosed and unsustainable practice of pulling-in future sales."  *Id.*  For example, in the August 2018 press release Nutanix stated that "[t]he company's strong achievement of 78 percent non-GAAP gross margin, the best in our history, is the direct result of our successful execution toward a software-defined business model," Compl. ¶ 243, and in an August 2018 conference call it stated that "[w]e delivered record performance in several areas, including delivering non-GAAP gross margins of nearly 78% and growing our deferred revenue balance by 71% for the -- from the prior year."  *Id.* ¶ 247.  In a November 2018 conference call, Nutanix stated in response to a question about decreased software billings that "we came off a really strong Q3, a really strong Q4 into a seasonally soft Q1 so that we had guided $370 million to $390 million of total billings and obviously we came in at roughly $384 million, so close to the top end of that range.  So, it was kind of as expected there and the pieces kind of fell off as they did."  *Id.* ¶ 267.

According to the Complaint, CW1 stated that throughout his employment and especially in 2018, Nutanix regularly "pulled in" sales orders from future periods in order to meet projected sales for the current quarter.  *Id.* ¶¶ 143-45.  CW2 also stated that Nutanix pulled in sales.  *Id.* ¶ 146.  CW1 recalled that by April or May 2018, it was "'very obvious' that Nutanix's pipeline was drying up and in trouble."  *Id.* ¶ 147.  In addition, "during CW1's employment it was routinely communicated by upper management 'loud and clear' that Nutanix needed more revenue and senior sales management would be reviewing every prospective deal that had been entered into the Salesforce.com system to report on what deals could be pulled in," and "throughout calendar year 2018, the need for revenue was 'presented as a pending disaster every quarter.'" *Id.* ¶¶ 148-49.  In addition, Nutanix began offering customers steep discounts on its products.  *Id.* ¶ 150-51.

With regard to the "pull-in" scheme, plaintiffs' allegations are generally that all of the above statements and all statements that "put[] Nutanix's success at issue" were rendered misleading by Nutanix's failure to disclose this scheme.  Nutanix counters that there is nothing inherently improper in pressing for sales to be made earlier than they otherwise would, and that "Plaintiffs do not allege that any pull ins were unusual, represented a significant portion of the

1   sales for the quarter, or materially changed Nutanix's financials."  Reply 7-8.  In addition, it states

2   that the alleged $3.8 million of orders "is well under 1% of revenue and in no way material to

3   Nutanix's business."  *Id.* at 8.

4          Nutanix is correct that in this circuit, allegations of a pull-in scheme that amount to

5   "speculation made in hindsight" are disfavored.  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293,

6   1298 (9th Cir. 1998); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1114 (N.D. Cal.

7   2003).  However, that does not mean that a plaintiff may never plausibly plead a securities fraud

8   claim involving an undisclosed "pull-in" scheme.  As plaintiffs point out, courts in this circuit

9   have recently found such claims to be well-pleaded.  *Murphy v. Precision Castparts Corporation*,

10  No. 3:16-cv-00521-SB, 2017 WL 3084274, at *8-9 (D. Or. June 27, 2017), *report and*

11  *recommendation adopted sub nom. Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB,

12  2017 WL 3610523 (D. Or. Aug. 22, 2017).

13         Here, however, I am not persuaded that plaintiffs have adequately alleged a "pull-in"

14  scheme sufficient to support their securities fraud claims.  The Complaint relies almost entirely on

15  CW1 to plead the existence of the scheme.  As discussed, CW1 was an account manager that

16  reported to a direct manager responsible for managing customer relationships and selling Nutanix

17  products to existing customers.  *Id.* ¶ 50.  As such, his or her personal knowledge of a pull-in

18  scheme would be limited.  Moreover, the Complaint fails to provide any specific details of the

19  pull-in scheme, such as what types of sales were pulled in (e.g., software sales or hardware sales),

20  the types of customers, or the dollar amounts involved, aside from the allegation of $3.8 million

21  pulled in in the first two quarters of 2018.  *See In re Int'l Rectifier Corp. Sec. Litig.*, No. 07-cv-

22  02544-JFWVBKX, 2008 WL 4555794, at *18 (C.D. Cal. May 23, 2008) (scheme of pulling-in

23  based on CW testimony was not adequate where it did not allege specific transactions, customers,

24  times, or dollar amounts); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1011-12 (N.D.

25  Cal. 2008) (same).  In *Murphy*, which plaintiffs rely on, the plaintiff pleaded a pull-in scheme in

26  the context of overt representations that the company could sustain organic growth based on

27  increased demand for its products, and the fact that the pull-in strategy directly contradicted a

28  disclosed inventory policy.  *Murphy*, 2017 WL 3084274, at *8-9.  Plaintiffs' non-specific

*United States District Court*
*Northern District of California*

18

1    allegations that are based almost entirely upon the statements of one confidential witness with

2    limited personal knowledge do not adequately allege a fraudulent pull-in scheme under the law of

3    this circuit.

4         In addition, case law is clear that the pull-in allegations here do not suffice to establish

5    scienter, as the only relevant contact any CW had with the defendants was at quarterly "All-Hands

6    meetings." *In re Cisco Sys. Inc. Sec. Litig.*, No. 11-cv-1568 SBA, 2013 WL 1402788, at *11

7    (N.D. Cal. Mar. 29, 2013) (scienter inadequately alleged where CW alleged scheme of channel

8    stuffing but did not allege that any CW had direct contact with individual defendants).  For these

9    reasons, plaintiffs' allegations related to the pull-in scheme are insufficient.  In order to plead an

10   actionable pull-in scheme, plaintiffs must plead adequate facts demonstrating that the CW would

11   have personal knowledge of the scheme and knowledge of scienter, as well as adequate details of

12   the scheme and how it rendered Nutanix's statements false or misleading.

## II.    SCIENTER

14        "Under the PSLRA, Plaintiffs must state with particularity facts giving rise to a strong

15   inference that the defendant acted with the required state of mind," which can be either intentional

16   or reckless.  *Quality*, 865 F.3d at 1144 (citation omitted).  If a complaint relies upon a CW to

17   establish scienter, it must establish that "those statements which are reported by confidential

18   witnesses with sufficient reliability and personal knowledge must themselves be indicative of

19   scienter." *Zucco*, 552 F.3d at 995.  Scienter is established if, when the allegations are accepted as

20   true, an inference of scienter is at least as strong as any opposing inference.  *Quality*, 865 F.3d at

21   1144.

22        Plaintiffs allege that the individual defendants knew or acted recklessly with respect to

23   each of the categories of false statements because (i) they later admitted that the statements were

24   false, (ii) their actions contrasted sharply with the company's actions in prior years and their past

25   statements regarding the importance of lead generation; (iii) according to CWs, issues with

26   Nutanix's pipeline and product quality were discussed at meetings where individual defendants

27   were present; (iv) according to CWs, the defendants had access to Salesforce and Clari reports

28   showing the decline in pipeline; (v) according to CWs, defendant Pandey was a very "hands on"

United States District Court
Northern District of California

CEO; and (vi) several members of Nutanix's executive leadership left the company immediately after "the truth was revealed."  Compl. ¶¶ 327-61.  Further, the defendants were motivated to inflate Nutanix's stock price because Pandey and Williams profited from stock sales during the Class Period, *id.* ¶¶ 362-376, and because they used the company's stock in order to make several acquisitions of new technology during the Class Period.  *Id.* ¶¶ 377-387.

Nutanix alleges that the CW statements are insufficient to plead scienter with respect to any of the defendants.  Mot. 17-18.  It further argues that general descriptions of regular corporate meetings and mere access to Salesforce and Clari cannot support allegations of knowledge.  *Id.* 19.  In addition, it states that the Complaint does not provide adequate specificity regarding Pandey's "hands-on" role to plead scienter, and executive departures alone cannot support a strong inference of scienter.  *Id.* at 20-21.  Finally, it disputes plaintiffs' characterizations of the defendants' stock sales, arguing that the stock sales did not occur at the peak stock price during the Class Period, that the percentage of the stock sales was small for each defendant, and that each defendant sustained significant losses in the value of his holdings.  *Id.* at 21-24.

First, I note that plaintiffs' allegations that the defendants' after-the-fact statements that they decided to re-allocate funding from lead generation to development do not support an allegation that the defendants understood each of their statements was false at the time they made them.  Plaintiffs point to "Defendants' past practice," Oppo. 20-21, but cite only one statement in which Nutanix discussed a slowdown in demand spending, attributing it to "issues with China and oil crisis and Brexit."  Compl. ¶ 351.  This one-off statement describing a different time period does not support an inference that defendants, in a distinguishable context, knew that their various statements were false at the time they made them.

Second, plaintiffs' scienter allegations regarding the CWs are not adequate.  Plaintiffs assert that only CW1, CW5, and CW6 had direct contact with the defendants.  Oppo. 19.  CW1 and CW6 had contact with the defendants only at quarterly "All-hands meetings," Compl. ¶¶ 112, 115, while CW5 "regularly met with Defendant Pandey about this witnesses' pipeline relating to new customers and sales leads for Global accounts."  *Id.* ¶ 167.  Unlike in *Quality*, no CW here was an executive; instead, they were lower-level account and/or sales managers.  Merely being

20

present at quarterly "all-hands" meetings does not demonstrate the requisite personal knowledge to establish scienter with respect to the individual defendants; plaintiffs must allege further information that CW1 and CW6 had personal knowledge with respect to falsity of the specific statements at issue. *Intuitive*, 759 F.3d at 1063 (scienter based on CW statements not adequate where they did not have first-hand knowledge). Similarly, the allegations with respect to CW5 are insufficiently specific to indicate that defendant Pandey was aware of the material falsity of particular statements that he made.

Next, the Complaint does not contain any allegations that either defendant actually knew that the pipeline was drying up, but provides only vague statements that pipeline was discussed with the defendants. Similarly, while the Complaint alleges that the declining pipeline and problems generating new leads were discussed at the all-hands meetings attended by both individual defendants, it does not provide any specific information about any particular meeting or the content of what was discussed. Further, plaintiffs allege that both defendants had access to Salesforce and Clari reports regarding the declining pipeline, but do not allege that defendants regularly monitored these reports. Unlike in *Quality*, which plaintiffs rely upon, there are also no allegations that Nutanix made any public representations that it was monitoring those reports to estimate revenues. 865 F.3d at 1146. These allegations fail to properly allege scienter.

In addition, the departures of four individuals, Nutanix's head of European sales, Chief Product Development Officer, Vice President of Global Channel Sales, and Chief Revenue Officer—none of whom are defendants—cannot alone support an inference of scienter. Compl. ¶¶ 358-61. Plaintiffs allege only that these individuals resigned (not that they were terminated), and that one liquidated his Nutanix stock upon his departure. They include no other facts that would indicate that such departures lead to an inference, let alone a strong inference, of scienter. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-cv-06039-WHO, 2013 WL 6441843, at *14 (N.D. Cal. Dec. 9, 2013).

Finally, the allegations regarding the individual defendants' stock sales do not demonstrate motive or a strong inference of scienter. Plaintiffs assert that no defendant had ever previously sold stock before the Class Period. Oppo. 22-25. But Nutanix's IPO occurred in September 2016,

and Pandey and Williams were subject to a 180-day lock-up period that did not expire until March 29, 2017, less than one year before the beginning of the Class Period.  Therefore, the fact that neither individual had previously sold stock is not suspicious.  Plaintiffs further contend that each defendant's stock sales far exceeded his annual salary.  Although in some instances this might suggest motive, as Nutanix notes, it is common for executives to be paid primarily in equity where the company is not yet public.

Pandey sold his stocks in November 2017, the first month of the Class Period, at a price far closer to the price at the beginning of the Class Period than at its height.  Compl. ¶¶ 366-67. Williams sold his stock in the middle of the Class Period, in May and June of 2018, which was near the height of the stock price.  *Id.* ¶¶ 369-71.  The timing of Pandey's stock sales is certainly not suspicious.  While the timing of Williams's stock sale is potentially suspicious, it cannot alone support a motive to capitalize on the stock price given that the earliest date he was able to sell was March 2017, especially given the losses he ultimately sustained through his retained shares. Plaintiffs claim that Pandey had less stock at the end of the Class Period than the beginning. Oppo. 23.  Yet they do not dispute that Pandey sold only .6% of his total holdings (35.2% of his common stock holdings), that Williams sold 25-29% of his common stock holdings (51.4% of his vested and exercisable stock holdings), and that both defendants lost more money in their retained shares throughout the Class Period than they made in their stock sales.  Mot. 22-24; Oppo. 22-24. In the face of these undisputed allegations, plaintiffs' claims as to Williams' allegedly suspicious sales fail to provide an inference of scienter.

For these reasons, the Complaint does not plead facts that would collectively support a strong inference of scienter as to any of the allegedly misleading statements.

**CONCLUSION**

For the above reasons, Nutanix's motion to dismiss is GRANTED with leave to amend.

**IT IS SO ORDERED.**

Dated: March 9, 2020



William H. Orrick
United States District Judge