**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted pro hac vice)
Stephanie A. Bartone (admitted pro hac vice)
Gregory Potrepka (admitted pro hac vice)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: sbartone@zlk.com
Email: gpotrepka@zlk.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

*Attorneys for Lead Plaintiff Shimon Hedvat,*
  *Plaintiff City of Miami Fire Fighters' and*
  *Police Officers' Retirement Trust, and the Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | Master File No. 3:19-cv-01651-WHO |
| | **CLASS ACTION** |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| | Hearing Date: August 12, 2020 |
| | Time: 2:00 P.M. |
| | Courtroom: 2 |
| | Hon. William H. Orrick |

# **TABLE OF CONTENTS**

COUNTERSTATEMENT OF THE ISSUES (CIVIL L.R. 7-4(A)(3)) ............................................... VIII

INTRODUCTION ................................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................................4

    I.     DEFENDANTS SECRETLY REALLOCATE SPENDING AWAY FROM CRITICAL LEAD GENERATION CAUSING SALES LEADS AND THE PIPELINE TO PLUMMET ...................................................................................................................................4

    II.    DEFENDANTS LEARN THAT NUTANIX'S PIPELINE IS SHRINKING THROUGHOUT THE CLASS PERIOD FROM REPORTS AND MEETINGS ..............5

    III.   NUTANIX'S SALES EXECUTION IS FURTHER HAMPERED BY SEVERE SALESFORCE TURNOVER AND INADEQUATE RESOURCES ...............................6

    IV.   NUTANIX ADDRESSES ITS DWINDLING PIPELINE AND REVENUE THROUGH MANIPULATIVE PULL-IN TRANSACTIONS .............................................................8

ARGUMENT ......................................................................................................................................9

    I.     THE SAC ALLEGES FALSE AND MISLEADING STATEMENTS .............................9

        A.    MISSTATEMENTS REGARDING LEAD GENERATION ................................9

        B.    MISSTATEMENTS REGARDING DEFENDANTS' UNDISCLOSED PULL-IN SCHEME ...............................................................................................................11

        C.    MISSTATEMENTS REGARDING NEW CUSTOMERS .................................13

        D.    MISSTATEMENTS REGARDING SALESFORCE HIRING AND PRODUCTIVITY ......................................................................................................14

    II.    THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER .................................17

CONCLUSION ..................................................................................................................................25

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. 2018) ................................................................. 10, 13

4

5

*Backe v. Novatel Wireless, Inc.*,
  607 F. Supp. 2d 1145 (S.D. Cal 2009) ................................................................. 15

6

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ........................................................................... 9, 15

7

8

*Brendon v. Allegiant Travel Co.*,
  2019 WL 4255051 (D. Nev. 2019) ........................................................................ 24

9

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. 2014) ................................................................. 3, 18

10

11

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................................... 23

12

*City of Miami Gen. Emples.' & Sanitation Emples.' Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................................... 10

13

14

*Coble v. Broadvision Inc.*,
  2002 WL 31093589 (N.D. Cal. 2002) ................................................................... 17

15

*Cutler v. Kirchner*,
  696 Fed. Appx. 809 (9th Cir. 2017) ...................................................................... 16

16

17

*Emps.' Ret. Sys. Of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ................................................................................. 20

18

*Evanston Police Pension Fund v. McKesson Corp.*,
  2019 WL 5587311 (N.D. Cal. 2019) ..................................................................... 24

19

20

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. 2016) ..................................................................... 23

21

*Glazer Capital Mgmt, LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ............................................................................... 23

22

23

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................................. 17

24

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ................................................................... 15

25

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. 2018) ..................................................................... 15

26

27

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) ............................................................. 16, 21

28

iii

**Master File No. 3:19-cv-01651-WHO**

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. 2014) .................................................................... 17, 20, 23

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ............................................................................. 23

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. 2017) ................................................................................ 15

*In re BofI Holdings Inc. Sec. Litig.*,
  2017 WL 5973340 (S.D. Cal. 2017) ................................................................................ 25

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ............................................................................. 13

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................................... 19

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ............................................................................. 17, 19, 25

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. 2018) ..................................................................... 21, 22, 23

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. 2018) ................................................................................ 16

*In re Gilead Scis. Litig.*,
  2009 U.S. Dist. LEXIS 95072 (N.D. Cal. 2009) .............................................................. 22

*In re Hall, Kinion & Assocs. Inc. Sec. Litig.*,
  2000 WL 1639503 (N.D. Cal. 2000) ............................................................................... 21

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................................. 14

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) ............................................................................... 25

*In re Intuitive Surgical Secs. Litig.*,
  2014 WL 7146215 (N.D. Cal. 2014) .......................................................................... 20, 22

*In re JDS Uniphase Corp. Sec. Litig.*,
  2005 WL 43463 (N.D. Cal., 2005) ................................................................................... 18

*In re Lattice Semiconductor Corp. Sec. Litig.*,
  2006 WL 538756 (D. Or. 2006) ....................................................................................... 22

*In re MannKind Secs. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ............................................................................. 24

*In re Quality Sys. Sec. Litig.*,
  865 F.3d 113 (9th Cir. 2017) ........................................................................... 10, 13, 16, 20

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. 2013) .......................................................................... 13, 24

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

*In re Snap Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. 2018)......................................................................... 16

*In re SupportSoft Sec. Litig.*,
  2005 WL 3113082 (N.D. Cal. 2005) ......................................................................... 11

*In re Taleo Corp. Sec. Litig.*,
  2010 WL 597987 (N.D. Cal. 2010) ........................................................................... 23

*In re Terayon Commc'ns. Sys., Inc.*,
  2002 WL 989480 (N.D. Cal. 2002) ........................................................................... 25

*In re Tesla, Inc. Sec. Litig.*,
  2020 WL 1873441 (N.D. Cal. 2020) ......................................................................... 10

*In re Twitter, Inc. Sec. Litig.*,
  2020 U.S. Dist. LEXIS 86978 (N.D. Cal. 2020) ....................................................... 13

*In re Urban Outfitters, Inc. Secs. Litig.*,
  103 F. Supp. 3d 645 (E.D. Pa. 2015) ........................................................................ 23

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ................................................................................... 21

*In re VeriFone Holdings, Inc., Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ..................................................................................... 17

*In re Vocera Comms., Inc. Sec. Litig.*,
  2015 WL 603208 (N.D. Cal. 2015) ........................................................................... 11

*In re Zillow Grp., Inc. Sec. Litig.*,
  2019 WL 1755293 (W.D. Wash. 2019) ..................................................................... 17

*In re Zynga Inc. Secs. Litig.*,
  2015 WL 138227 (N.D. Cal. 2015) ........................................................................... 20

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ...................................................................................... 23

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  2018 WL 4181954 (N.D. Cal. 2018) ......................................................................... 21

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ....................................................................................... 9

*Lipton v. PathoGenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ................................................................................... 21

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................................... 17

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..................................................................................... 15

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..................................................................................... 25

*McGovney v. Aerohive Networks, Inc.*,
  367 F. Supp. 3d 1038 (N.D. Cal. 2019) .................................................................... 17

*Middlesex Ret. Sys.v. Quest Software, Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) .................................................................... 18

*Murphy v. Precision Castparts Corp.*,
  2017 U.S. Dist. Lexis 99431 (D. Or. 2017) .............................................................. 19

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. 2017) ...................................................................... 11, 12

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3610523 (D. Or. 2017) .............................................................................. 11

*Nozak v. N. Dynasty, Minerals Ltd.*,
  2020 WL 2300539 (9th Cir. 2020) ............................................................................ 24

*Petrie v. Elec. Game Card, Inc.*,
  761 F.3d 959 (9th Cir. 2014) ...................................................................................... 9

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  2016 WL 5818590 (S.D.N.Y. 2016) .......................................................................... 14

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. 2020) .......................................................................... 25

*Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ...................................................................... 20, 22, 24

*Prodanova v. H.C. Wainwright & Co.*, LLC,
  2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) .......................................................... 16

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ..................................................................................... 23

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. 2017) ........................................................................... 20

*Roberti v. OSI Systems, Inc.*,
  2015 WL 1985562 (C.D. Cal 2015) ........................................................................... 16

*S. Ferry LP # 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................................... 18, 23

*Scandlon v. Blue Coat Sys., Inc.*,
  2013 WL 5313168 (N.D. Cal. 2013) .......................................................................... 18

*Shankar v. Imperva, Inc.*,
  2016 WL 2851859 (N.D. Cal. 2016) .......................................................................... 16

*Shenwick v. Twitter*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................... 10, 24

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ................................................................................... 15

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................................................. 24

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
551 U.S. 308 (2007) ........................................................................................................... 17

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................................. 18

*Wojtunik v. Kealy*,
394 F. Supp. 2d 1149 (D. Ariz. 2005) ................................................................................ 19

*Wozniak v. Align Tech., Inc.*,
850 F. Supp. 2d 1029 (N.D. Cal. 2012) ............................................................................. 24

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ............................................................................................. 25

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## COUNTERSTATEMENT OF THE ISSUES (CIVIL L.R. 7-4(a)(3))[1]

1.      Have Defendants met their burden to demonstrate that the Second Amended Complaint for Violations of the Federal Securities Laws does not plausibly state a securities fraud claim under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder?

2.      Have Defendants met their burden to demonstrate that the Second Amended Complaint for Violations of the Federal Securities Laws does not plausibly allege a claim for "controlling person" liability under Section 20(a) of the Exchange Act?

---

[1] "¶_" are references to the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC"). ECF 124. Unless otherwise noted, terms defined  in the SAC and used herein shall have the same meaning, emphasis is added, internal quotations and citations are omitted. "CAC" means the Consolidated Amended Complaint. ECF 102. "DB" means Defendants' motion to dismiss the SAC. ECF 125. "Ex. A" refers to Plaintiffs' Exhibit A to the Declaration of Shannon L. Hopkins in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint filed herewith. "D.Ex." refers to Defendants' motion's exhibits. References to "Order" are to the Court's Order Granting Defendants Motion to Dismiss. ECF 121.

## INTRODUCTION

This case presents a classic case of securities fraud—because Defendants admitted to it.

At the start of the Class Period, Nutanix trailed competitors in getting a public cloud product to market. This was critical because competitors such as VMware and Amazon Web Services had launched their public cloud products years ago and Nutanix was losing market share. Indeed, analysts recognized that Nutanix's "long-run success" was dependent on launching its public cloud product, Xi, which was still in development due to setbacks from engineering and software issues.

To fix the engineering issues plaguing Xi, Defendants admittedly "***made a decision***" in the "***planning process***" for FY2018 and FY2019 to keep critical lead generation spending "***flat***" and reallocated these funds to research and development ("R&D"). Lead generation activities are the main component of marketing and are necessary to generate new sales leads and, eventually, customers. Such activities include digital marketing, brand awareness, promotions, trade shows and customer events and meetings.

Defendants' decision not to invest in lead generation had an almost immediate negative effect on Nutanix's sales pipeline—the series of stages a prospective customer goes through (and that Defendants closely tracked) as they progress from a new sales lead to a purchasing customer. Nutanix needs approximately three times the amount of its sales forecasts in the pipeline to meet forecasts. According to CWs, by early 2018, the Company's pipeline was depleted 20-30% below its target.

Defendants concealed Nutanix's declining pipeline from investors throughout the Class Period by instructing sales personnel to surreptitiously "pull-in" sales from ***existing*** customers scheduled for future quarters to meet quarterly sales forecasts. Defendants then mislabeled these sales in their public statements as sales to "***brand new***" customers to falsely portray that Nutanix was maintaining a healthy pipeline by adding *new* customers. CWs confirmed that by the summer of 2018, 80% of Nutanix's sales actually came from 15% of existing customers.

Meanwhile, despite keeping lead generation spending flat, Defendants falsely told investors that Nutanix had continually "***increased***" spending on "marketing activities related to brand awareness, promotions, trade shows and partner programs" (*i.e.*, lead generation activities), which had resulted in increased "brand new" customers and "demand" every quarter and that the Company's sales growth was attributable to "successfully executing" Nutanix's "business model."

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

CWs confirmed that as a result of sales personnel being unable to meet unrealistic sales quotas due to a depleted pipeline and insufficient resources, demoralized sales personnel left the Company in droves after being employed for only six to twelve months. This is well below the industry average of competitors like VmWare whose sales attrition was around two years. As a result of significant salesforce attrition, Nutanix was unable to keep up with internal sales hiring goals needed to execute on the Company's growth plan. CWs recalled that Nutanix could not hire salespeople fast enough to replace those who left. Yet throughout the Class Period, Defendants told investors that Nutanix had "significantly increased our sales and marketing personnel" and "had strong success in our hiring in the quarter." Because Nutanix often discussed its sales hiring in relation to internal hiring goals, Defendants' statements touting the Company's hiring created the false impression that Nutanix was on track to meet hiring goals when, in fact, Nutanix was persistently behind due to undisclosed salesforce attrition.

Nutanix's salesforce attrition exacerbated its already suffering pipeline. According to Defendants, it takes a salesperson nearly one year to fully ramp up. Thus, because salespeople were leaving after six to twelve months of employment, a large majority were never fully productive. At Nutanix's annual August 2018 Sales Kickoff Meeting ("SKO") in Las Vegas attended by Pandey, Williams and the entire sales organization, the Director of Revenue, Lou Attanasio, and Senior VP of American Sales, Sherri Lautenbach, *announced on stage* that only **50%** of Nutanix's salesforce met their FY2018 quotas and thus the pipeline was "way too low" and depleted by about 25-30%—facts that were concealed from the public. Attanasio announced that Nutanix was implementing a daily "call blitz" program to increase sales to existing customers and replenish the pipeline. These extreme measures were too little too late and unsuccessful.

The truth was revealed starting on February 28, 2019 when Defendants disclosed that Nutanix "miss[ed] our pipeline targets" because "during our planning process" for FY2018 and FY2019, they "kept lead generation spend flat" and diverted such funds to R&D, rendering their Class Period statements that Nutanix was "increasing" spending on lead generation activities and adding "brand new" customers false when made. Defendants further admitted that "the past few quarters" Nutanix had "not kept pace with our bullish sales hiring goals" and thus "pipeline development" was negatively impacted "by a shortage of sales reps in the first half of the fiscal year," rendering Defendants' statements touting sales hiring false. Defendants' admissions are of the "I knew it all along" variety. *Browning v. Amyris, Inc.*, 2014 WL 1285175

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

1    (N.D. Cal. 2014) (Orrick, J.).

2    Defendants knew the pipeline was declining from reviewing daily pipeline reports in Nutanix's

3    internal Salesforce.com system which, according to CWs, showed by March or April 2018 the pipeline was

4    20-30% below internal targets. Pandey and Williams also attended quarterly revenue meetings with CW8, a

5    former executive level *Director* of Business Operations and Project Management and Services, during which

6    they discussed Nutanix's declining revenue, that the pipeline was depleted by 20-30%, and Nutanix was

7    pulling in revenue with "backlog." Defendants also attended internal Company All-Hands meetings and the

8    SKO where fellow executives discussed Nutanix's pipeline and sales attrition issues in their presence.

9    Defendants' entire motion focuses on what Plaintiffs removed from the CAC (rather than what they

10   added to the SAC directly addressing the Court's concerns), arguing against the falsity of statements

11   Plaintiffs no longer challenge, and ignoring scienter allegations from new executive level CWs who are

12   alleged to have had *direct contact with Defendants*. Defendants say Plaintiffs fail to explain how a reasonable

13   investor would understand Defendants' statements about increased "marketing activities" were misleading.

14   But Plaintiffs now allege that Nutanix publicly disclosed lead generation activities included "digital

15   marketing," "brand awareness, promotions" and "customer events" and "meetings." Analysts understood

16   these same activities ("CIO events, digital marketing, branding campaigns, and seminars") were lead

17   generation. Thus, Plaintiffs adequately allege a reasonable investor would have understood statements that

18   Nutanix was "increasing" its "marketing activities" related to "brand awareness, promotions, trade shows

19   and partner programs" referred to lead generation. Defendants also claim Plaintiffs fail to allege any CWs

20   had direct contact with them and do not allege what specific information Defendants had demonstrating the

21   pipeline was declining. But Plaintiffs' new allegations include: CW8's direct contact with Pandey and

22   Williams during quarterly revenue meetings in 2018 discussing declining revenues and pipeline, requiring

23   Nutanix to "pull-in" backlog; that Pandey accessed pipeline reports on a daily basis from Salesforce.com

24   through a computer dashboard created especially for him; and that a *Senior Director* told CW7 that Nutanix

25   overstated revenue growth by 30% in FY2018 through its pull-in scheme.

26   Defendants' failure to address these new allegations, among many others in the SAC that directly

27   address the Court's concerns, is fatal to their motion. Accordingly, the SAC fully addresses the Court's

28   concerns and Defendants' motion should be denied.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**FACTUAL BACKGROUND**

I.    **DEFENDANTS SECRETLY REALLOCATE SPENDING AWAY FROM CRITICAL LEAD GENERATION CAUSING SALES LEADS AND THE PIPELINE TO PLUMMET**

Nutanix provides computing solutions, including its "core" HCI technology. ¶67. By calendar 2018, the majority of Nutanix's customers had migrated to a public cloud model. ¶¶72. Market analysts therefore found it "critical to Nutanix's long-run success" for it to enter the public cloud space in order to remain competitive. *Id.* By the start of the Class Period, however, Nutanix was still unable to bring Xi to market due to engineering and software issues, causing Nutanix to lose market share to competitor products. ¶¶73, 77. To address the engineering issues plaguing Xi, Defendants covertly "made a decision" to reallocate spending during the "planning process" for FY2018 and FY2019, away from "lead generation" to R&D to focus on Xi. ¶¶84 n.12, 94 n.17, 324, 339.[2]

Lead generation is admittedly "***key***" to Nutanix's growth and success. ¶¶86, 116. Thus, Defendants touted every quarter that Nutanix "increased our marketing activities related to brand awareness, promotions, trade shows and partner programs" (*e.g.*, lead generation activities). ¶¶224, 248, 276, 297, 308. Investors understood these activities to be "lead generation" because Defendants disclosed that lead generation included activities such as "digital marketing," "web traffic" activities, "meetings" and other "events." ¶88. Indeed, analyst JMP Securities understood lead generation included "CIO events, digital marketing, branding campaigns, and seminars." ¶94; *c.f.*, Order at 9. CWs confirmed lead generation comprised "the majority," or about 70%, of Nutanix's marketing expense, with the remaining third comprised of travel and salaries.[3] ¶¶86, 212; *C.f.*, Order at 9.

As a product seller, failing to invest in lead generation decimated Nutanix's sales pipeline and sales productivity. Sales productivity is understood by the market to be the conversion rate of sales leads into revenue. ¶82-84. Pandey admitted the two "key" "inputs [of sales productivity] are ***salespeople*** and ***pipeline spend, the demand gen spend***." ¶84. By keeping lead generation "flat," Defendants stifled Nutanix's pipeline development, sales productivity, and ultimately "bookings, billings, and revenue." ¶116. Defendants knew their decision to keep lead generation flat would negatively impact the pipeline from their recent

---

[2] Reasonable investors understood "lead" generation as being synonymous with "demand" or "pipeline" because Defendants used them interchangeably, sometimes in the same sentence. *See* ¶84.

[3] Defendants do not dispute that lead generation falls within "marketing" and not "sales." DB17.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

experience cutting critical lead generation spending in 2016. ¶327. According to Pandey, Nutanix slashed spending in 2016, resulting in a "slow year" until Defendants "woke up" and had to increase spending by 75% to replenish the pipeline. ¶¶326-27. CW4 confirmed lead generation spending for Digital Marketing remained flat from 3QFY2018 through 2QFY2019 before Defendants increased it more than **three-fold** in January 2019. ¶¶120, 150. CWs 1, 3, 5, and 9 confirmed lead generation spending was insufficient, and even "non-existent," resulting in fewer sales leads. ¶¶121-24.

## II.   DEFENDANTS LEARN THAT NUTANIX'S PIPELINE IS SHRINKING THROUGHOUT THE CLASS PERIOD FROM REPORTS AND MEETINGS

Defendants scrutinized Nutanix's pipeline throughout the Class Period. CWs 1, 2, 3, 5, 7, 8 and 11 stated that the pipeline was tracked in a "pipeline" report on Nutanix's internal Salesforce.com system, which reported information about every point in the sales cycle for all customers (new and existing), for all deals (confirmed and "prospective"), their status (*i.e.*, discovery stage, proof of concept, etc.), and the percentage of likelihood that a deal would close and when. ¶¶97-98. The pipeline report was the first dashboard visible when logging onto Salesforce.com, and employees considered Salesforce.com the "source of truth" and "bible" for pipeline reporting. ¶¶99-100. Defendants do not dispute that Salesforce.com data provided the basis for Nutanix's public forecasts. ¶109.

The decline in Nutanix's pipeline caused by Defendants' inadequate lead generation spend manifested early in the Class Period. Multiple CWs confirmed the Salesforce.com pipeline report showed pipeline levels approximately 30% below Company targets by March or April of 2018. ¶192. Pandey and Williams were aware of the pipeline decline through their review of, and access to, up-to-the-minute data in the pipeline reports, which they could generate on a Company-level, by region, or by salesperson. ¶200-01. Pandey accessed a dashboard created just for him on his computer daily. ¶202. Thus, the SAC alleges Pandey's actual review of the Salesforce pipeline report, not "mere access" to it. *Id.*; Order at 20. These facts are consistent with analysts' understanding that Pandey was very "active [] in the sales process." ¶¶337.

Every quarter Pandey, Williams, CW8 and other executives attended revenue meetings to discuss Nutanix's revenue, pipeline, and how pipeline deficiencies would be addressed by pulling in "backlog." ¶209. CW8 recalled that the declining pipeline was discussed during the Q2 and Q3 FY2018 revenue meetings. *Id.* Additionally, CW1 recalled that during every quarterly All-Hands meeting in FY2018 and the

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

first half of FY2019, which were attended by Pandey and Williams, sales personnel warned that there were insufficient new leads in Salesforce.com and that the opportunities that did exist were of insufficient monetary value to meet Nutanix's goals. ¶207. CW1 recounted that Defendants attended the August 2018 SKO with all of Nutanix's salesforce where Attanasio and Lautenbach announced on stage that only *50%* of the salesforce met their FY2018 quotas and thus the pipeline was "way too low" because it was depleted by about 25-30%. ¶¶194, 204. Thus, Defendants were aware in real time that the Company's decision to keep lead generation spending flat had caused a material decline in the pipeline of at least 25-30%.

### III. NUTANIX'S SALES EXECUTION IS FURTHER HAMPERED BY SEVERE SALESFORCE TURNOVER AND INADEQUATE RESOURCES

As with lead generation, Nutanix also concealed significant headwinds affecting its other "key" productivity "input"—salespeople.

***Nutanix Siphons Resources Away from Acquiring "Brand New" Customers To Focus on Sales to Existing Customers that were Less Expensive to Obtain.*** Nutanix's sales teams are divided into several groups, each differentiated by the size of its targets. ¶110. These groups include: Enterprise and Global accounts (which target large entities such as Fortune 500 companies), and Commercial accounts (which target medium and smaller firms). *Id.* During the Class Period, a single customer could be counted multiple times in the "total end customer count" that Defendants reported to investors because Nutanix defined "end customers" to include a single organization's "separate divisions, segments or subsidiaries." ¶123. This gave the misleading impression that Nutanix was adding more new customers than it actually was and allowed Defendants to mask the Company's collapsing pipeline by simply taking in more business from ***existing*** customers and misrepresenting such deals as ***new*** customers. *Id.*

Sales to existing customers were less expensive to pursue because the customer was already educated on Nutanix products. ¶112. To increase existing customer sales, CWs 1, 5, and 12 confirmed Nutanix redirected resources away from new accounts by restricting financial support, insufficiently staffing new accounts, and providing existing Enterprise customers with first priority at marketing events. These actions led to missed quotas, customer frustration, and lost sales. ¶¶129, 131-35. As a result of these actions, CWs confirmed that by summer 2018, 80% of Nutanix's sales came from 15% of customers who were mainly *existing* accounts, rather than new leads, further exacerbating the pipeline decline. ¶124.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Pandey and Williams knew the number of customers that were genuinely *new* during the Class Period because they admittedly closely monitored customer growth by reporting on Nutanix's "end customer" count in quarterly press releases and earnings calls, and their compensation was tied to a "New Customer Adds" metric that focused on "new" "logos." ¶126. Defendants took affirmative steps to conceal the declining "brand new clients" (¶242) and pipeline by flatly denying in response to analyst questions that new customer growth was declining. *E.g.*, ¶¶220, 266, 269.

***Massive Attrition and "Under-spend[ing]" on Sales Personnel Amplify the Declining Pipeline.*** Although Defendants touted they "significantly ***increased***" the number of "sales and marketing personnel" every quarter (*e.g.*, ¶227), CWs confirmed Nutanix suffered from salesforce turnover well above the industry average at every level Company-wide, from management down to sales engineers. ¶¶142-43, 147. A major cause of attrition in the Class Period was the unattainable sales quotas Nutanix assigned its sales teams. ¶¶151, 160. Sales quotas were proposed by Attanasio (Director of Revenue) and Lautenbach (Senior VP of American Sales), approved by Pandey, and distributed after the annual SKO. ¶152. Quotas came from the "top-down" and largely ignored what salespeople were actually forecasting based on "market dynamics" and "realistic targets." ¶¶ 153, 156. Further, despite transitioning to a software model early in the Class Period, sales quotas were still based on old metrics that included a hardware component for which salespeople would not receive credit. ¶¶157, 159. CWs confirmed that sales teams were largely unsuccessful in meeting their quotas throughout the Class Period. ¶¶153-160. For example, senior management told CW11 that only 30-40% of salespersons for the entire Company met their quotas during CW11's tenure, and that only 27% met quotas for the prior quarter ending January 31, 2019. ¶156. Every salesperson in the TOLA region missed their quotas from October 2018 through July 2019. ¶159. The Commercial Northwest missed quotas for six consecutive quarters—yet, Nutanix continually raised quotas every quarter. ¶155.

Demoralized salespeople who could not meet unrealistic quotas quarter after quarter left Nutanix in droves throughout the Class Period. CWs 1 and 2 confirmed attrition was so bad Nutanix could not hire salespeople fast enough to replace those who had left and that attrition impacted 20-50% of the Class Period salesforce. ¶146. CW7 recalled turnover of "two generations" of salespersons and three different Bay Area VPs in this witness's limited tenure. ¶147. CW9 observed many Director-level (and above) departures. ¶148. According to CW1, Attanasio addressed sales attrition at every quarterly All-Hands meeting during CW1's

tenure, stating the number of open sales positions and that Nutanix was not filling them fast enough. ¶145. Defendants knew of these issues (having attended every All-Hands meeting) as further evidenced by Pandey's admission that the Company failed to meet hiring goals "over the **past few quarters**[.]" *Id.*, ¶323.

Nutanix's cycle of attrition and (attempted) replacement occurred while the Company was rolling out scores of new products. According to Nutanix's quarterly statements, salespersons did not become "fully ramped" to sell Nutanix's expansive inventory until "around the time of the start of their fourth quarter." *E.g.*, ¶227. Thus, even when Nutanix hired new salespersons, they were never fully productive because they frequently left after six to twelve months of employment. ¶¶142-43.

## IV. NUTANIX ADDRESSES ITS DWINDLING PIPELINE AND REVENUE THROUGH MANIPULATIVE PULL-IN TRANSACTIONS

As a result of fewer new sales leads, Nutanix struggled to meet forecasts. CWs from three of Nutanix's five sales regions confirmed that it was a Companywide practice to pull-in sales each quarter during the Class Period. ¶174. Pull-in sales advance future orders to the present quarter. However, without an expanding pipeline of customers (which Nutanix lacked), the scheme cannibalizes future sales and the Company's existing customers become "over-procured." ¶173. Nutanix pulled-in sales for both hardware and software products, and for every customer (Commercial, Global, Enterprise). ¶175.

CW1 stated that prior to each quarter end, sales representatives in CW1's region received an email from the Regional VP, copying Attanasio or Lautenbach, requesting that they collectively pull in between $3.5 to $12 million in sales per quarter, and for two quarters in FY18 it would have been *impossible* for the Company to hit its guidance without pulling in $3.8 million in CW1's region. ¶177. At the end of each quarter in FY18, the entire sales organization received an email, copying Pandey, encouraging representatives to "get creative" and bring any potential deal that could be pulled-in to quarterly War Room meetings that Pandey attended. ¶178. CW8 corroborated CW1, stating Nutanix's SVP of Sales determined the amount of quarterly revenue to be pulled in and ***Pandey approved the amount***. ¶179.

CW7 received a telephone call in August 2018 from a *Senior Director* of Consulting Services with whom CW7 had previously worked, stating that Nutanix's projections were based on a "shell game" and the Company's actual growth for FY2018 was only about 10%, as compared to the reported 40%, because 30% of the reported growth was accomplished by pulling in sales. ¶181. This Senior Director expressed concern

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

that Nutanix was going to "run out of that backlog" to meet quarterly forecasts. *Id.* CW8 participated with Pandey and Williams in quarterly revenue meetings in 2018 during which they confirmed revenue was declining and Nutanix had to pull-in in revenue through "backlog." ¶209.

Defendants' "shell game" eventually caught up to them when, on February 28, 2019, Defendants announced Nutanix would be forced to lower its sales forecasts for the next quarter due to a severely depleted pipeline and insufficiently staffed sales force. On May 30, 2019, Defendants announced that Nutanix had missed revenue and billing targets due to continuing sales execution issues that were far worse than what Defendants had previously represented. Upon the news, the Company's stock price significantly declined causing investors to suffer damage.

## ARGUMENT[4]

Defendants' Motion challenges only Plaintiffs' falsity and scienter allegations. Despite Defendants' requests to the contrary, the Court must accept the SAC's allegations as true and construe inferences in Plaintiffs' favor. *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 966 (9th Cir. 2014).

## I. THE SAC ALLEGES FALSE AND MISLEADING STATEMENTS

Statements are misleading when they "give a reasonable investor the impression of a state of affairs that" materially differs "from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Once defendants choose to tout positive information" they cannot do so misleadingly—they must also disclose "adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018).

### A. MISSTATEMENTS REGARDING LEAD GENERATION

Every quarter throughout the Class Period, Defendants falsely represented that Nutanix "continually *increased* our marketing activities related to brand awareness, promotions, trade shows and partner programs," i.e., lead generation activities. ¶¶224, 248, 276, 297, 308. Plaintiffs did not "conjure their own definition" of lead generation activities. DB17.[5] Rather, the "marketing activities" described in Defendants'

---

[4] For the Court's convenience, Plaintiffs submit the accompanying chart that demonstrates the falsity and scienter of each misstatement alleged in the SAC. *See* Ex. A.

[5] Defendants' contention that the SAC has not made "clear what marketing activities" are excluded from lead generation is false. DB17. Plaintiffs unequivocally allege marketing expense includes three main components, lead generation, "salaries and travel," with lead generation comprising the majority. ¶212.

false statements are exactly the types of activities Defendants admit constituted the "lead" generation component of marketing spend. ¶88, n.13 (Pandey stating lead generation includes "digital, through web, traffic, through executed campaigns, through channel leverage activities"). Reasonable investors, including analysts, understood as much. ¶94 (JMP Securities stating "pipeline generation activities" included "CIO events, digital marketing, branding campaigns, and seminars"); *Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1139, n.23 (N.D. Cal. 2017) (where "plausibly allege[d] that reasonable investors **did** interpret" a metric's "growth" to include growth of a key subset, "omission was therefore misleading."). Defendants' statements were false because they admittedly decided "during the planning process" for FY18 and FY19 to keep "lead generation spend **flat**"—not to "**increase**" it. ¶324; *see In re Quality Sys. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (touting metrics as "growing, compared to previous quarters" actionable where "created an impression of a state of affairs that" materially differed from reality); *City of Miami Gen. Emples.' & Sanitation Emples.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1039-40 (N.D. Cal. 2018) (misleading to represent growing "inventory investments" when investment in a critical subset was "negligible"); *Azar v. Yelp, Inc.*, 2018 WL 6182756, *11, *17 (N.D. Cal. 2018) (statements actionable where "inconsistent with any awareness Defendants had" of adverse trend as later disclosed).

Defendants incorrectly refer to the alleged false statements as merely discussing increased "marketing activities" (DB17), while ignoring the remainder of the sentence referring to the specific types of marketing activities Nutanix was purportedly increasing (e.g., brand awareness, promotions, trade shows and partner programs). This was no mistake. Realizing Plaintiffs have satisfied the Court's concerns (Order at 8-10) by explaining the enumerated activities are types of lead generation and the market understood them as such, Defendants cut off the sentence so they can point to the increase in overall Sales and Marketing Expense reported in Nutanix's financial statements to demonstrate their statements are true. DB18. This tactic fails. Defendants concede lead generation is "**one part** of [Nutanix's] marketing expense" and that Nutanix's "[s]ales and marketing expense consists primarily of personnel costs." DB17, 18, n.23-24. If personnel costs comprise the majority of Sales and Marketing Expense, and lead generation is one component of marketing, investors could not have learned from the Company's financial statements, alone, that the lead generation was kept flat. *In re Tesla, Inc. Sec. Litig.*, 2020 WL 1873441, *14 (N.D. Cal. 2020) ("even a literally true statement can be misleading and thus actionable under the securities laws.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**B.**     **MISSTATEMENTS REGARDING DEFENDANTS' UNDISCLOSED PULL-IN SCHEME**

Plaintiffs' SAC addresses the Court's concerns related to Defendants' pull-in scheme. The SAC supports CW1's allegations with corroborating witnesses from three of five sales regions—CWs 7, 8, 11 (¶¶174, 179-83, 188)—and alleges the basis for CW1's actual knowledge. ¶176, ¶178 (quarter-end emails from Regional VP of Sales asking salespersons to collectively pull in $3.8-$12 million per region and emails CC-ing Pandey commanding the "entire sales organization" to "get creative" and bring forward deals that could be pulled-in). CW8 corroborated that Pandey directed the pull-ins as CW8 personally met with Pandey every quarter to discuss revenue, the pipeline, and pulling in revenue with "backlog." ¶209. The SAC also alleges the types of sales pulled in (hardware and software), the types of customers (all customers as "no deal was considered too small"), the breadth of the practice ("entire sales organization") and demonstrated the materiality of the scheme by showing it occurred Company-wide, ranged between $3.8-$12 million per region per quarter and allowed Nutanix to overstate revenue growth for FY2018 by 30%. ¶¶175-78, 181.

Ninth Circuit courts consistently hold allegations like those above alleging revenue manipulations through pull-in schemes "to be well-pleaded." Order at 18; *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8-9 (D. Or. 2017), *report and recommendation adopted sub nom. Murphy v. Precision Castparts Corp.*, 2017 WL 3610523 (D. Or. 2017)); *In re SupportSoft Sec. Litig.*, 2005 WL 3113082 (N.D. Cal. 2005); *In re Vocera Comms., Inc. Sec. Litig.*, 2015 WL 603208 (N.D. Cal. 2015) (motion to dismiss denied because pull-in scheme acted as an "artifice[] to pump up quarterly sales figures"). *SupportSoft* is instructive. There, shareholders argued, like Plaintiffs here, that "[t]o mask the fact that defendants' business was generating less revenue than expected, defendants decided to . . . cannibaliz[e] its future revenue stream" to meet its quarterly guidance. 2005 WL 3113082, *1. The *SupportSoft* court held the defendants' tactics to increase present revenue at the expense of future revenue were a "conscious decision to conceal the fact that SupportSoft's business was not performing as well as expected." *Id.*, *6. Accordingly, the defendants' positive statements in light of this behavior were actionable because such statements "failed to disclose—and, in fact, helped affirmatively disguise—the fact that SupportSoft's business was suffering." *Id.*

Like *SupportSoft*, Nutanix' revenue fell short "every quarter" in the Class Period from a depleted pipeline caused by undisclosed lead generation underinvestment and salesforce attrition. ¶¶185,192-93. In

fact, it was "very obvious" that the pipeline (which was closely monitored by Defendants through Salesforce.com pipeline reports and discussions at quarterly meetings with CW8) was approximately 30% below target by March or April 2018. ¶192, 197-211. Employees described Defendants' scheme as "a shell game" and averred that pulling in "backlog" accounted for 20-30% of the Company's reported growth. ¶181.

Defendants' pull-in scheme was not sustainable as the Company's pipeline had dried up by early 2018, rendering their Class period statements touting *increased* revenue and customer growth abjectly false. ¶¶230, 254, 282, 302, 314; ¶261 (falsely touting growth in "demand for our solutions" as well as "billings" and "revenue" from "software and support" and misattributing such growth to "successfully executing" Nutanix's "business model"); ¶238 (falsely touting growth in Company's "new" customer total); ¶¶220, 238, 291, 242-43 (misrepresenting "*brand new*" customer growth, which was only possible through pulling-in existing customers' sales). Contrary to these statements, Nutanix obtained Class Period revenue and growth through Defendants' deceptive pull-in sales, *not* "organic growth based on increased demand for its products." Order at 18.[6] The pull-in scheme allowed Nutanix to mask its pipeline deficiencies and lack of "new" customers by pulling-in sales from existing "end" customers.

Defendants, again ignoring the SAC's new allegations, assert that "Plaintiffs continue to rely primarily on statements made by CW1." DB23. Defendants ignore that CWs 7, 8 and 11 confirmed the pull-in practice (¶174), that Pandey directed it (¶177-79) and the CWs' accounts demonstrate materiality. ¶177 (CW1 stating quarterly pull-ins ranged from $3.5-$12 million per region); ¶181 (CW7 stating 30% of annual FY2017 growth resulted from pull-ins). Defendants' claim that CW1's estimation of pulled-in sales has "no foundation" (DB23 n.39) ignores that CW1 personally received emails requesting that CW1 and other salespeople in CW1's region pull-in specified dollar amounts of future sales. ¶177. CW1 was in a position to know these facts because CW1 was an email recipient and employed in the region for which CW1 recites the number of sales reps. Thus, CW1's statements are not speculation or hearsay—they are based on CW1's

---

[6] In *Murphy*, a change in inventory policy by the defendants' largest customer, Rolls-Royce, meant that PCC suffered a significant order reduction. 2017 WL 3084274, *3. As this Court observed, the change exacerbated PCC's desperate financial condition as it continued to rely on a pull-in scheme during the Class Period. Order at 18. The SAC is on all fours. Plaintiffs allege that a change in sales policy by Nutanix's most important customer (Dell), resulted in the loss of significant sales leads for Nutanix and exacerbated the Company's quarterly revenue shortfalls. ¶¶165-72.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

1    personal knowledge. At the pleading stage, the Court must accept these allegations as true.[7]

2    ### C.   MISSTATEMENTS REGARDING NEW CUSTOMERS

3            To conceal Nutanix's lack of genuine "new" customers, in every Class Period quarterly press release,

4    Defendants touted the Company's "increased" "total end-customer count." ¶¶230, 254, 282, 302, 314.

5    Defendants then represented in quarterly earnings calls immediately following the press releases that those

6    same "total end-customers" were "***new*** customers." *See* ¶237 (touting "record number of new customers");

7    ¶242-43 ("over 1,000 new clients, ***brand new*** clients in F18Q2"); ¶269 ("renewed" and "accelerat[ed]"

8    "focus" on "new  customer[s]"); ¶291 (annual growth of "over 3,600 new customers" and quarterly growth

9    of "approximately 1,000 new customers"). In reality, these were not "new" customers, they were sales to

10   ***existing*** customers' "divisions, segments, or subsidiaries."[8] As CWs 1 and 5 confirmed, by mid-2018, 80%

11   of Nutanix's sales were to 15% of the Company's *existing* customers. ¶124.

12           Defendants' statements gave the false impression that the end customers added during the quarter

13   were "***brand*** new" accounts that were increasing the Company's pipeline when, in reality, Nutanix was

14   simply double counting sales to ***existing*** customers as new customers. ¶123-24. *In re Twitter, Inc. Sec. Litig.*,

15   2020 U.S. Dist. LEXIS 86978, *32 (N.D. Cal. 2020) ("statements…can become, through their context and

16   manner of presentation, devices which mislead investors"); *Quality Sys.*, 865 F.3d at 1144 (statements

17   touting particular metric false where CWs recounted contradictory non-public facts); *In re Questcor Sec.*

18   *Litig.*, 2013 WL 5486762, *14 (C.D. Cal. 2013) (defendant touting success must "disclose information

19   concerning the source of its success"). Defendants' statements placating analyst inquiry about new customers

20   were equally false. ¶¶220, 271 (dismissing concern about "new customer" growth based on seasonality);

21   ¶269 (dismissing analyst inquiry as to whether Nutanix had a "change in focus" away from its "new customer

22   footprint"). *Azar*, 2018 WL 6182756, *11 (attributing "slowdown…to the election and vacation time"

23

---

24   [7] Defendants' cite to *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008), to rebut

25   falsity is inapt. DB23-24. "[O]nly scienter" was at issue in *Connetics*, and the plaintiffs did not allege
     the admissions, meetings (including pull-in meetings), and reports (including pull-in emails) alleged

26   here. *Id.* at 1012. Further, it defies reason to infer that Defendants' direction to the *entire* salesforce to
     pull in deals for the *entire* Class Period, for *every* type of product, would diminish the materiality of

27   Defendants' manipulation rather than support it.

28   [8] Thus, Defendants' assertion "Plaintiffs do not allege that any Nutanix disclosures about new customers
     were false[,]" DB21, is categorically untrue. That is exactly what Plaintiffs allege.

created misleading "impression that these were one-off aberrations rather than…a systemic problem….").

Defendants erroneously contend their statements were not false because the market was purportedly aware new customer growth was "slowing," based upon a single analyst question on the first day of the Class Period. DB21, 22 ("It also looks like the number of new customers that came into your installed base was lower"). Glaringly absent from Defendants' motion is Pandey's response explicitly ***denying*** customer growth was declining ("I wouldn't look too much into that. Q1 is always a little softer from a customer perspective"), and reassuring investors that "Q2 will pop up naturally." ¶220. Defendants' efforts to utilize analysts' questions as proof of what "the public was aware of" should not be countenanced when Defendants "attempted to suppress public knowledge" with their misleading answers. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1037 (S.D. Cal. 2005).

Moreover, Defendants' claim that investors could not be confused because the number of total "end" customers reported in Nutanix's press release matched the total "new" customers stated on the earnings call (DB22, n.34) ignores that Defendants have defined these two concepts differently yet referred to them as the same thing. Defendants cannot have it both ways. Finally, Plaintiffs do not plead fraud by hindsight by relying on Defendants' end of Class Period admission as the basis of falsity. DB22. Rather, falsity is based upon Defendants' knowledge from Salesforce.com pipeline reports and internal meetings that the pipeline and "brand new" customer growth was declining.

### D.   MISSTATEMENTS REGARDING SALESFORCE HIRING AND PRODUCTIVITY

Defendants admitted in the first corrective disclosure that Nutanix had "a shortage of sales reps" for "the first half of the fiscal year" and that "over the past few quarters, we have not kept pace with our bullish sales hiring goals." ¶¶228, 324.[9] CWs confirmed Nutanix did not make enough sales hires to meet the Company's internal hiring and growth goals—a fact communicated by the head of sales ***in the presence of Pandey and Williams*** at every quarterly All-Hands meeting. ¶¶135, 145-46.

Yet in every quarterly SEC filing during the Class Period, Defendants touted that Nutanix had "significantly increased our sales and marketing personnel" by percentages ranging from 30% to 40% and

---

[9] *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590,*5 (S.D.N.Y. 2016) (admitted existence of a problem at one time supports an inference in plaintiffs' favor it was present months earlier).

that sales teams productivity was "ramping up." ¶¶227, 251, 279, 299, 311. Defendants also represented during earnings calls that "[w]e *had strong success in our hiring* in the quarter" and "we *executed* this full-court press [on sales hiring] *flawlessly.*" ¶¶261, 266.[10] By "choosing to speak" of sales hiring often in comparison to Nutanix's internal hiring goals (DB20), Defendants had a duty to disclose the Company was not keeping pace with its hiring. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009).

Moreover, Defendants' statements created the false impression that Nutanix was on track to meet the Company's internal sales hiring goals needed to achieve revenue growth forecasts when, in fact, Nutanix was behind and sales productivity suffered due to massive undisclosed salesforce attrition. Defendants' statements are actionable because they falsely presented a "state of affairs" differing from one that "actually exist[ed]." *Berson*, 527 F.3d at 985; *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980 (S.D. Cal. 2017) (representations defendants made "significant" investment in "new personnel" and "beef[ed] up...compliance teams" actionable where CWs confirmed compliance department "understaffed"); *Backe v. Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1159 (S.D. Cal 2009) (statement defendant had "*strong* demand" actionable where untrue); *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (touting conversion initiative as "very *successful*" "misrepresented management's view.").[11]

Disruption in Nutanix's salesforce and inadequate lead generation spending also rendered Defendants' statements regarding "record sales productivity" and "strong growth in spending" related to an "increase[]" in "ramped rep sales productivity" false and misleading. ¶¶236, 287.  Defendants do not challenge Williams' August 30, 2018 statement regarding "strong growth in spending" (¶287) as Nutanix admits lead generation spending was kept flat and Nutanix had not kept pace with its hiring goals "for the past few quarters" (e.g., at the same time of Williams' statement).[12]

---

[10] Because they were declarative, Defendants' puffery argument for ¶266 fails. DB24; *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, *7 (N.D. Cal. 2018) ("there is a difference between enthusiastic statements" and "statements that are anchored in misrepresentations of existing facts"); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 844-46 (S.D.N.Y. 2019) (claim that "execution" was "*flawless*" not puffery because "a reasonable investor" could infer "that zero significant obstacles had occurred").

[11] The SAC's bolstered detail and specificity strengthens Plaintiffs' claim that Nutanix's omitted sales productivity decline and attrition issues are actually highly *interrelated* to Defendants' misleading pronouncements regarding "increased" hiring, not "separate issues" as the Court found with respect to the CAC. Order at 12. In fact, Defendants concede the SAC is more fulsome than the CAC. DB19 n. 29.

[12] To the extent Defendants' "spending plans" were referring to the lead (or demand or pipeline)

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Defendants' hypothetical risk disclosures that transitioning to larger deals "*may* take longer" for Nutanix's sales team to be productive and "*may* also be an impact" to "overall productivity[,]" were misleading when Defendants knew Nutanix's sales productivity was deteriorating. ¶¶227, 251, 279, 299, 311; *Cutler v. Kirchner*, 696 Fed. Appx. 809, 813 (9th Cir. 2017) (statement false where it "disclosed a risk in the abstract but omitted the fact that it had already…come to fruition); *In re Snap Sec. Litig.*, 2018 WL 2972528, *6 (C.D. Cal. 2018) (same). Similarly, Defendants' argument that these statements are forward-looking fails. Defendants ignore that Plaintiffs are properly challenging an omitted state of affairs that existed at the time of the statements, and Defendants' present tense contention that Nutanix was experiencing "*continued* improvement." *Quality Sys.*, 865 F.3d at 1142 ("mixed" statements are not protected by the safe harbor); *Roberti v. OSI Systems, Inc.*, 2015 WL 1985562, **8-9 (C.D. Cal 2015) ("should also *continue* to generate revenues" unprotected); *Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, *12 (C.D. Cal. 2018) (safe harbor is inapplicable to omissions).[13]

Defendants' effort to cherry-pick speculative Class Period risk disclosures, or statements that are deceptively tepid (such that they understate the "degree of intensity and credibility sufficient to effectively counter-balance" the undisclosed Company-wide productivity issues and admitted "under-spend"),[14] with the goal of marshaling a truth-on-the-market affirmative defense, fails. *See Shankar v. Imperva, Inc.*, 2016 WL 2851859, **7-8 (N.D. Cal. 2016). Such argument is premature. *Id*.

Defendants incorrectly argue that the CWs were not in a position to know the fact alleged. DB19.[15]

---

generation component of "sales productivity," the statement was still false because Nutanix had no lead generation spending "growth"—lead generation expenditure was flat.

[13] Relatedly the PSLRA safe harbor does not apply to "the same language" repeated in periodic SEC reports. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, *11 (M.D. Ga. 2018).

[14] Defendants purport they "disclosed" challenges related to "sales hiring" but each example given was simultaneously tempered and negated by conflicting speech. *Compare* DB20 (November 2017 "Nutanix came in 'a little under hiring'"), *with* D.Ex.19 at 13("There's a lot of things going on, lot of hiring"); DB20 (contradicting March 2018 under hiring with "full-court press"); *compare* DB20 (May 2019 "Nutanix 'had fallen behind in our hiring'"), *with* ¶266 ("we executed this full-court press flawlessly"); *compare* DB20 (November 2018 acknowledging "fewer headcount additions"), *with* ¶287 (touting "strong growth in spending"). Defendants' purported warnings about "retaining" employees were pure speculation. DB20 ("*If* we are unable to…maintain sufficient numbers of effective sales personnel…."). Moreover, *no such purported warnings were disclosed after May 2018*.

[15] Defendants' cases are inapposite. DB10 n. 11, DB19 nn. 28-29. *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 943-45 (N.D. Cal. 2010) (CWs offered hindsight, whereas the SAC's CWs 1, 5, 8 recounted information relayed to Defendants in real time through meetings and reports); *Coble v.*

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

But the SAC alleges the CW's title, dates of employment, job duties, the person(s) to whom they reported or interacted with, and avenues that provided Defendants with the same information that such CWs possessed (internal reports Defendants reviewed and meetings they attended). *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005) (sufficient to allege job description, responsibilities, title, and to whom CW spoke); *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, *5 (W.D. Wash. 2019) (CWs credited where averments "consistent and interlocking"). This is sufficient to state a claim.

## II. THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER

To plead a strong inference of scienter Plaintiffs need only show "that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights Ltd.,* 551 U.S. 308, 314 (2007). Although Defendants here "*actually knew*" they were making false statements, such a showing is not required. *In re VeriFone Holdings, Inc., Sec. Litig.,* 704 F.3d 694, 708 (9th Cir. 2012) (emphasis in original). Recklessness is sufficient. *Lloyd v. CVB Fin. Corp.,* 811 F.3d 1200, 1208 (9th Cir. 2016) (defendants "on notice of facts" supporting recklessness). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Hatamian v. Advanced Micro Devices, Inc.,* 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). The scienter analysis requires facts be "**taken collectively**." *Tellabs,* 551 U.S. at 310. A scienter inference is "strong" if it is "at least as likely" as opposing inferences. *Id.* at 324, 328-29. "[T]he tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.,* 2014 WL 12585809,*8 (C.D. Cal. 2014).

**Defendants' End of Class Period Admissions Support Scienter:** Defendants made several critical end of Class Period admissions conceding they ***knew all along*** their Class Period statements were false when made. *First*, Defendants admitted they personally decided before the start of the Class Period to keep lead generation spending flat for FY2018 and FY2019, despite that "lead generation spending is a ***key*** component

---

*Broadvision Inc.*, 2002 WL 31093589, **11-12 (N.D. Cal. 2002) (unlike here, the CW was only identified as a "former employee," not alleged to be employed at the relevant time or alleged to know the relevant facts); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (no allegations "that quantify the actual staffing problems," and show problem "actually had an impact on revenue," unlike the SAC which alleges: the percent of attrition (¶142), the average duration of tenure (¶143), the duration to fully ramp new hires (e.g., ¶227), allegations showing Pandey and Williams knew Nutanix was not fulling "x" positions (¶145), and admissions that poor "sales hiring" affected revenue(¶320)).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

to building pipeline," and "reallocated" it to R&D. ¶117.[16] The lead generation underspend was admittedly "not an insignificant amount" and in the "few tens of millions." ¶¶120-21. Defendants also admitted that "over the past few quarters" they missed internal sales hiring goals (¶356) and Nutanix "over-rotated" toward "the existing customer base" and "under-spen[t] by several million dollars" on "new customers." ¶¶125, 356.

Defendants' admissions confirm their knowledge of events and circumstances then-existing that were in stark contrast with their simultaneous representations that Nutanix "increased" lead generation activities, "significantly increased our sales and marketing personnel" and was purportedly adding record numbers of "brand new" customers. ¶¶161, 261, 291, 311, 357, 392.[17] *S. Ferry LP # 2 v. Killinger,* 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (finding scienter where defendant admitted "we did not complete integration…because we *decided* at the time" on a course of action inconsistent with their statements); *Browning,* 2014 WL 1285175,*20 (Orrick, J.) (admissions "similar to 'I knew it all along'" support scienter).

Defendants stated that by "***December of this last year [2018], we realized that we actually have a pipeline problem***" (¶317), again, admitting they knew of the pipeline "problem" *months prior to the corrective disclosure*. Admissions, as here, contradicting earlier misstatements support scienter. *Thomas v. Magnachip Semiconductor Corp.,* 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016); *Middlesex Ret. Sys.v. Quest Software, Inc.,* 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("a later statement may suggest that a defendant had…knowledge of the falsity of his statement," where "inconsistent with the earlier statement"); *In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 43463, at *3, *9 (N.D. Cal., 2005) ("later admi[ssion]" defendant knew of "financial difficulty" demonstrated scienter).

**That Defendants' Directed the Acts that Contradicted Their Public Statements, Supports Scienter:** As the "chief operating decision maker[s]" of Nutanix, Pandey and Williams were aware of Nutanix's flat lead generation spend because they were responsible for allocating and approving such

---

[16] Defendants are incorrect that Pandey's related statement regarding the importance of sales productivity (¶402) pertained to bookings growth. DB15. In context, Pandey stated that "add[ing]" to the prior comment by Williams on rep productivity, "productivity is still a derived variable, Alex, it's not a real input. The inputs are salespeople and pipeline spend, the demand gen spend . . . ." ¶ 329.

[17] Thus, this is not a case like *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 5313168 (N.D. Cal. 2013) (DB14 n.18) where the admission was that the company had just come to realize the negative impact. Rather, Defendants admitted to knowing lead generation spending was flat prior to making their statements that the spending was increasing.

resources. ¶¶43, 45. Pandey and Williams conceded that "during [the] planning process" for FY2018 and FY 2019 they "made a decision" to keep "lead generation spend *flat*" and reallocate those funds to Xi. ¶117 (emphasis added). In spite of this deliberate decision, Defendants consistently touted throughout the Class Period that they "continually *increased* our marketing activities related to brand awareness, promotions, trade shows and partner programs." ¶¶ 224, 248, 276, 296, 308.[18]

Defendants were aware of the impact from "flat" lead generation on the pipeline because they also directed pull-ins to boost revenue. CW8 confirmed that Pandey approved the amount of sales that needed to be pulled in each quarter to meet sales targets through "backlog." CW1 stated that Pandey was on emails and participated in War Room meetings strategizing about which deals to pull in. ¶¶178-79, 208. Despite directing millions of dollars' worth of pull ins to compensate for a lack of sales (¶177), Pandey continued to provide a contrary, rosy outlook for Nutanix's customer growth and pipeline. Courts in the Ninth Circuit have found a strong inference of scienter where "top executives actually directed" the practice that rendered public statements misleading, as here. *Daou Sys. Inc.,* 411 F.3d at 1023; *Murphy v. Precision Castparts Corp.,* 2017 U.S. Dist. Lexis 99431, at *48 (D. Or. 2017) (knowledge of sales issues and directives to employ aggressive pull-in sales practices demonstrate defendants' public statements to investors were misleading); *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1167 (D. Ariz. 2005) (finding a "strong inference" of scienter where defendants "personally directed" the fraudulent activity).

**Internal Reports Support Scienter:** Seven CWs, in multiple geographic locations Company-wide, spanning various levels within the Company confirmed that Defendants had access to and that Pandey personally monitored Salesforce.com pipeline reports. ¶¶97-98. *See In re Countrywide Fin. Corp. Sec. Litig.,* 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (strong inference of scienter where, as here, CWs "spanned levels of [the company's] hierarchy and geographic origin, where the accounts remained consistent over time."). Pandey viewed the pipeline reports in Salesforce.com every day and was well known as the single-highest user of Salesforce. ¶201. A dashboard was specifically created on Pandey's computer to allow him access. ¶202.[19] ¶¶100, 201-02. Pandey and Williams were present at every quarterly All-Hands meeting

---

[18] That the "decision" was made in the "planning process" *prior to FY 2018 and 2019* confirms that Defendants "understood each of their statements was false at the time they made them." DB14 n. 18.

[19] While Defendants attempt to discredit CW8 by stating CW8 recalled revenue decreasing in 2018 when it purportedly increased (DB7), they ignore the numerous allegations corroborating that Nutanix's

where the declining pipeline was discussed, including that there were not enough new leads in the pipeline. ¶207.[20] CWs 1, 3, and 8 confirmed that Salesforce.com showed evidence of the pipeline declining in 2017 and that by April or May 2018 it was "pretty dry," including showing the pipeline was at least 20-30% below target. ¶¶204-05, 366. Accordingly, that Defendants accessed and monitored Salesforce.com alerting them to Nutanix's declining pipeline supports an inference of scienter. *See In re Zynga Inc. Secs. Litig.,* 2015 WL 138227*, at *21 (N.D. Cal. 2015) (finding a strong inference of scienter where CWs describe daily reports on the company's numbers and the plaintiffs allege that the officers "obsessively tracked" the numbers); *Quality Sys.,* 865 F.3d at 1145 (finding a strong inference of scienter where "reports and sales forecasts **through the Salesforce software**" showed trends "available to executives"). Further, Defendants' bonuses in FY 2019 were tied to the number of new logos "pulled in" each quarter. ¶¶386-90. Reports falling "within [a defendant's] bailiwick," provide a "compelling" inference of scienter. *Amgen,* 2014 WL 12585809, *12.

Defendants' demand that Plaintiffs plead every report's specific contents in exacting detail (DB8-9), is not required. *In re Intuitive Surgical Secs. Litig.,* 2014 WL 7146215, *5 (N.D. Cal. 2014) ("The Ninth Circuit does not appear to require the contents of the report to be alleged"); *Robb v. Fitbit Inc.,* 2017 WL 219673, at *8 (N.D. Cal. 2017) (same); *Emps.' Ret. Sys. Of Gov't of the V.I. v. Blanford,* 794 F.3d 297, 301, 307 (2d Cir. 2015) (crediting witness allegations and reversing dismissal based on lacking specificity). Still, Plaintiffs allege sufficient detail about the reports that remedies any of the Court's previous concerns (Order at 21), including details concerning the subject matter of the reports (sales and pipeline), the data therein (customer, deal status, and deal value), specific statistics (*i.e.,* pipeline 20-30% below target), trends evident through the report (i.e. a declining pipeline), and the specific dates such information was available.[21]

---

revenue was, in fact, decreasing (*see, e.g.,* ¶185) and thus the pull ins were used to inflate revenue. *See, e.g.,* ¶176, 180-82. Thus, CW8's account is exactly in line with the true facts at Nutanix.

[20] That Defendants discussed the information in Salesforce.com, had desktop dashboards created for Pandey, and Pandey specifically called out inaccurate information in Salesforce.com to CW8 demonstrates Defendants accessed and regularly monitored the program. Further, that Pandey was known as the highest user is credited by the fact that CW8 was tasked with managing and improving Salesforce.com, and was therefore in a position to speak on the matter, as well as by corroborating allegations of multiple CWs that senior management had extraordinary involvement due to the severity of the revenue and pipeline issues. *See* ¶¶184, 199, 203. Accordingly, these corroborating details go beyond mere speculation and unreliable hearsay as Defendants claim. DB at 8.

[21] The cases Defendants rely on are inapposite, as they are so lacking in specificity that they fail to even mention the name of the report at issue. DB at 9, citing *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**Regular Meetings Supports Scienter:** In addition to internal reports, Defendants attended regular meetings discussing the declining pipeline and salesforce attrition, including:

- Quarterly Revenue Meetings: Pandey and Williams attended quarterly revenue meetings with CW8 in FY2018 discussing Nutanix's declining revenue and "backlog" (i.e., pull ins). ¶¶209, 372. These discussions are contrary to Defendants' public statements (DB9) regarding "growth" in revenue and demand. *See, e.g.,* ¶261 (demand was "strong," resulting in "67 percent growth in software and support billings and 55 percent growth in software and support revenue.").

- August 2018 SKO: Pandey and Williams attended the SKO with CW1 and the salesforce, where it was discussed that half of Nutanix's salesforce did not meet their quotas for FY2018 and the pipeline had declined, prompting the implementation of a new program to increase sales. ¶¶194-95, 373.[22] Defendants argue that internally missed sales quotas and the implementation of a new program do not demonstrate falsity. DB10. Here, the missed sales quotas are evidence of scienter as they were explicitly linked to Nutanix's pipeline problems (¶194).[23]

- War Room Meetings: Pandey participated in quarterly War Room meetings that discussed deals that could be pulled. ¶¶178, 208. While Defendants challenge CW1's knowledge as to the War Room meetings (DB9), CW1 was on the emails to Pandey about pull ins to be discussed at the War Room meeting (¶178), Pandey was the one who approved pull in amounts (¶178), and Pandey's participation and involvement in pull-ins at the War Room meetings was discussed on stage at the SKO meeting, when Pandey himself was in attendance (¶208).

- Quarterly All-Hands Meetings: CW1, who participated in these meetings,[24] stated that Pandey and Williams attended every meeting (¶370) and the lack of new leads in Salesforce.com and salesforce attrition in 2018 were discussed. ¶¶144-45, 206-08, 369.

---

(9th Cir. 2002) (conclusory assertion that defendants had access to internal data insufficient where no internal report or its contents were identified); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) (allegation of negative report without further details insufficient).

[22] The fact that CW1 attended the SKO, alleged the specific date and location of the meeting and recalled Defendants attended, Attanasio (who reports directly to Pandey) speaking, and the content is sufficient to credit that Defendants were present, had knowledge of, and participated in those discussions. Any additional conduct that Defendants demand (DB10) is not required to draw an inference of scienter. *See In re Extreme Networks, Inc. Sec. Litig.,* 2018 WL 1411129, at *28 (N.D. Cal. 2018) (scienter inferred by attendance at meetings without allegation of defendants' discussion). Further, unlike in *In re Accuray Inc. Sec. Litig.*, 757 F. Supp. 2d 936 (N.D. Cal. 2010) (DB10 n. 11), where the witnesses did not observe or interact with the defendants, CW1 observed Defendants at the SKO meeting where they were told about unmet sales quotas.

[23] Defendants cases are inapposite. DB10-11. In *In re Hall, Kinion & Assocs. Inc. Sec. Litig.*, 2000 WL 1639503 (N.D. Cal. 2000), the company still "well exceeded the public projection" despite missing internal projections. In *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954 (N.D. Cal. 2018), positive forecasts about "Uber's driverless car efforts" were "disconnected" from the fraudulent activity, that car technology was being misappropriated. Here, by contrast, the sales quotas were directly linked to a drying pipeline and directly contradicted Defendants' statements.

[24] Defendants argue that CW1 has no "personal knowledge" of these meetings or Defendants' attendance. DB10. That is absurd given that CW1 personally attended the meetings, recalled Defendants

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Since Defendants "personally attended meetings" where pertinent issues were discussed, scienter is satisfied. *Extreme Networks,* 2018 WL 1411129, at *28; *Intuitive Surgical,* 2014 WL 7146215, at *5; *In re Lattice Semiconductor Corp. Sec. Litig.,* 2006 WL 538756, at *14-15 (D. Or. 2006) (defendants' attendance at monthly and quarterly meetings and receipt of daily and weekly reports supported strong inference of scienter). Scienter may also be found where, as here, an employee avers first-hand accounts of discussions at meetings a defendant attended, even if that employee is low-level. *Extreme Networks,* 2018 WL 1411129, at **5, 25 (crediting sales manager who attended meetings with executives); *In re Gilead Scis. Litig.*, 2009 U.S. Dist. LEXIS 95072, at *10-12 (N.D. Cal. 2009) (crediting manager who attended weekly meetings with defendant). Such allegations are sufficient despite a CW having no direct conversations with the defendant. *Extreme Networks,* 2018 WL 1411129, at *28 (crediting inference where CW had no communications with defendant other than what was discussed at meetings).[25]

Defendants ignore the new allegations in the SAC and claim there is no specificity as to what was discussed at any of the above meetings. DB9. Not so. The SAC alleges CW accounts, Company-wide, including CW8 who was a ***Director*** and had direct contact with Defendants. The SAC also alleges specific details discussed at the meetings such as the percentage decline in the pipeline, concerns over the lack of sales leads, unreasonable sales quotas and the percentage of missed quotas, the number of unfilled sales positions, and pull-in strategies.  These allegations demonstrate first-hand accounts that Defendants knew the pipeline was drying up, sales were declining, and the demand spend was flat.

**Defendants' Past Practice Supports Scienter:** Defendants were aware of the negative impact diverting investment away from lead generation would have on Nutanix's pipeline, and ultimately sales, because they unsuccessfully utilized the same strategy in 2017. ¶116. That Defendants analogized this prior reduction in demand spending to the 2018-2019 reduction ***in their corrective disclosure*** underscores the

---

being present, and recalled first-hand the topics discussed, including topics Pandey directly spoke about.
[25] Plaintiffs' CW accounts go beyond those in *Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (Order at 21), where only one witness, who was at the company a mere three months, observed that hospitals in one state were "cutting back" but failed to provide further details or whether this occurred elsewhere, and failed to link this observation to the defendants. Here, by contrast multiple CWs recall exactly what was discussed at the meetings, that the discussions concerned Company-wide issues, the timing of the meetings within the Class Period (every quarter), and that the Defendants were present for such discussions.

**Master File No. 3:19-cv-01651-WHO**

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

1    similarity between the two instances and establishes a pattern that supports a strong inference of scienter.[25]

2    *Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*

3    *Act 345 Police & Fire Retirement System v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (that defendants

4    made statements "[i]n the wake of a crisis that has the potential to repeat itself" evidenced scienter).

5          **Pandey's Active Participation/Core Operations Supports Scienter:** Multiple CWs confirm

6    Pandey was "very hands-on" and regularly monitored internal reports, discussed Salesforce.com pipeline

7    reports directly with CW8, regularly attended customer sales pitches and received detailed pipeline briefing

8    from individuals like CWs 5 and 8. ¶¶100, 198-99, 201, 396. Even market analysts were aware of Pandey's

9    close involvement, noting Pandey was "active []in the sales process." ¶¶337, 395. Pandey's hands-on

10   management and close involvement in daily operations supports scienter. *Extreme Networks,* 2018 WL

11   1411129, at *28 ("personal conversations" demonstrate hands-on management style).

12         That Pandey frequently responded to analyst questions with detailed statistics on new customers and

13   changes in hiring and sales personnel of which he would have had to inform himself prior to speaking (¶392)

14   supports scienter. *See Glazer Capital Mgmt, LP v. Magistri,* 549 F.3d 736, 746 (9th Cir. 2008) ("specific

15   admissions from top executives that they are involved in every detail of the company and that they monitored

16   portions of the company's database are factors in favor of inferring scienter…"); *Amgen,* 2014 WL

17   12585809, at *12 (similar);[26] *c.f. S. Ferry LP # 2 v. Killinger,* 687 F. Supp. 2d at 1248, 1259 (confident

18   responses "in the face of direct questioning" from analysts supported scienter); *In re Urban Outfitters, Inc.*

19   *Secs. Litig.,* 103 F. Supp. 3d 645, 653 (E.D. Pa. 2015) (citing *Institutional Investors Grp. v. Avaya, Inc.*, 564

20   F.3d 242, 270 n.43(3d Cir. 2009) (omissions in response to analyst questions evidenced scienter)).

21

22   [25] The reason for Defendants' prior decision to cut back on spending (Order at 20) is of no import.
23   Rather, it is the knowledge of the impact that is relevant.

24   [26] Defendants' cases (DB11 & n.13) are inapposite as none involved facts where, as here, the CEO
     admitted to monitoring sales trends, Defendants monitored reports showing sales declines, and
     Defendants had meetings discussing pipeline decline. *In re Autodesk, Inc. Sec. Litig*., 132 F. Supp. 2d
25   833 (N.D. Cal. 2000) (no CWs alleged to show basis of knowledge); *Fadia v. FireEye, Inc.,* 2016 WL
     6679806 (N.D. Cal. 2016) (explaining that "Plaintiffs needed to have provided information about
26   precisely what was said by the parties in these meetings, which facts the Defendants were exposed to,
     and why this exposure supports an inference of scienter."); *In re Taleo Corp. Sec. Litig.*, 2010 WL
27   597987 (N.D. Cal. 2010) (recognizing "specific admissions from top executives that they are involved
     in every detail of the company and that they monitored portions of the company's database, are factors
28   in favor of inferring scienter in light of improper accounting reports.").

The lead generation spend was also admittedly a "key component" for Nutanix. ¶402. On these facts, it would be "absurd" for Defendants to claim lack of knowledge. *See Brendon v. Allegiant Travel Co.,* 2019 WL 4255051, at *7 (D. Nev. 2019) ("absurd" to suggest no knowledge where the "10-Ks (signed by [defendants]) stated that management closely supervises all maintenance functions" and defendants "responded to at least one [analyst question]…suggesting they were familiar with the…issues."); *Shenwick,* 282 F. Supp. 3d at 1146 ("absurd for [defendants] not to have been aware of adverse DAU trends" where DAU was "integral" to the company's growth and "monitored closely"); *Evanston Police Pension Fund v. McKesson Corp.,* 2019 WL 5587311, at *11 (N.D. Cal. 2019) (where defendants touted "intimate knowledge" of generic drug pricing, "it was at least deliberately reckless not to investigate the accuracy of their statements"); *Questcor,* 2013 WL 5486762, at *19 (same).[27]

**Motive to Inflate Stock to Conduct Public Offerings and Make Acquisitions:** As industry demand switched to cloud-based programs, Nutanix needed additional funds to engineer and launch Xi to compete (¶416), which were ultimately obtained through the January 2018 public offering that raised net proceeds of $564.2 million while Nutanix stock was artificially inflated. ¶415. Where, as here, defendants' conduct a public offering to obtain much-needed capital, it is probative of motive. *In re MannKind Secs. Actions,* 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011).

Defendants were also motivated to artificially inflate Nutanix's stock to finance the acquisitions of Netsil and Frame, two cloud-based companies, in March and August of 2018, respectively. ¶417. Not only were these acquisitions critical for Nutanix to compete against VMware, but they enabled Nutanix to remain compliant with the Rule of 40. ¶409. Williams frequently boasted about Nutanix's compliance with the Rule of 40 and, had these acquisitions not occurred primarily through stock, Nutanix's cash flow would have

---

[27] Defendants' cases (DB 11-12) do not disagree, as they all recognize core operations contributes to an inference of scienter where, as here, the SAC specifies the information Defendants had. *Nozak v. N. Dynasty, Minerals Ltd.*, 2020 WL 2300539 (9th Cir. 2020) (plaintiffs only alleged "general awareness" of day to day business); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) (core operations *alone* insufficient for scienter); *Police Retirement Sys. of St. Louis* , 759 F.3d at 1062 (core operations may support inference when alleged with other allegations, when it "suggest[s] that defendants had actual access to the disputed information," or when "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge"); *Wozniak v. Align Tech., Inc.,* 850 F. Supp. 2d 1029 (N.D. Cal. 2012) (failed to allege facts that defendants had access to that were inconsistent with their general, optimistic statements).

violated the Rule of 40 to a larger, and more obvious, extent than it already did in the Class Period. ¶¶411-12 (Rule of 40 score of 39 in 2018, and less than 1 in 2019).[28] Further, just weeks before the Frame acquisition, Defendants' bonuses were changed to include a bonus for keeping the Company compliant with the Rule of 40. ¶389. While Defendants discount this fact (DB12-14), they ignore that their unique bonus structure placed significant emphasis on the Rule of 40 and made it certain that Defendants knew about Nutanix's Rule of 40 compliance at the time of the acquisitions. Such a motive is unique to Defendants and stronger than the "generic motive" Defendants claim (DB13).[29] *Daou Sys. Inc.,* 411 F.3d, at 1023-24 (stock funded acquisitions probative of scienter); *In re Terayon Commc'ns. Sys., Inc.,* 2002 WL 989480, at *10 (N.D. Cal. 2002) (same).[30]

## CONCLUSION

For the reasons discussed herein, Plaintiffs respectfully request the Court deny Defendants' motion to dismiss.[31]

---

[28] Defendants rhetorically ask why Nutanix would not have spent "a little bit more" on lead generation when it had cash on hand. DB12. Defendants purposely overlook both Williams' admission that the reallocated sum was "not an insignificant amount" (¶324), and the SAC's allegations that Defendants ***chose not to*** spend cash because the Rule of 40 was uniquely scrutinized in Nutanix's industry, and Nutanix was not compliant.¶¶409-413. That Defendants chose to gamble that Nutanix would recover through manipulative pull-ins is not a defense to scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821 (S.D.N.Y. 2020) (finding scienter in pull-in scheme case because "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.") (*citing Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

[29] *Autodesk*, 132 F. Supp. at 833 is irrelevant because the court found the alleged motive to use stock as currency was insufficient because there were no additional facts alleged evidencing knowledge.

[30] The departures of four executives immediately following the corrective disclosures (¶¶398-401) supports scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("resignations, terminations, and other allegations of corporate reshuffling may…be indicative of scienter"). Three of four executives had been at the Company for just over a year. ¶¶ 398-99. Lautenbach and Attanasio were dismissed shortly before the first corrective disclosure, with Lautenbach's departure admittedly in order to "improve our sales execution" and Attanasio liquidating his entire holdings upon leaving. ¶¶398-99. Foreman resigned a week prior to Nutanix reporting another disastrous quarter, while Potti resigned the day of the second corrective disclosure, May 30, 2019. ¶¶400-01.

[31] Because Plaintiffs plausibly allege primary violations, the control person claim should be sustained. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014). If the Court dismisses any portion of the SAC, Plaintiffs request leave to amend. *In re BofI Holdings Inc. Sec. Litig.*, 2017 WL 5973340, *10 (S.D. Cal. 2017) (granting leave to file third amended complaint).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Respectfully submitted,

DATED: June 26, 2020

**LEVI & KORSINSKY, LLP**

 _/s/ Shannon L. Hopkins_
Shannon L. Hopkins (admitted *pro hac vice*)
Stephanie A. Bartone (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: sbartone@zlk.com
Email: gpotrepka@zlk.com

Adam M. Apton (SBM 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

*Lead Counsel for Plaintiffs and the Class*

**Master File No. 3:19-cv-01651-WHO**
PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT