IGNACIO E. SALCEDA, State Bar No. 164017
LAURA G. AMADON, State Bar No. 321524
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100
Email: isalceda@wsgr.com
        lamadon@wsgr.com

*Attorneys for Defendants*
*Nutanix, Inc., Dheeraj Pandey, and Duston M.*
*Williams*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | CASE NO.:  3:19-cv-01651-WHO |
| | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| | Date: August 12, 2020 |
| | Time: 2:00 p.m. |
| | Courtroom: 2 |
| | Hon. William H. Orrick |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

ARGUMENT ....................................................................................................................1

I.   PLAINTIFFS STILL FAIL TO PLEAD PARTICULAR FACTS RAISING A
     STRONG INFERENCE OF SCIENTER ..............................................................1

     A.   Plaintiffs' Confidential Witness Allegations Do Not Support Scienter .................2

     B.   Plaintiffs' Internal Reports Allegations Do Not Support Scienter .........................2

     C.   Plaintiffs' Internal Meetings Allegations Do Not Support Scienter.......................3

     D.   The "Hands on CEO" and Core Operations Theories Are Inapposite ...................5

     E.   The SAC's Generic Corporate Motive Allegations Are Insufficient.....................6

     F.   Defendants Did Not Make Any "Admissions" of Scienter....................................8

II.  PLAINTIFFS STILL FAIL TO PLEAD FALSITY ..............................................9

     A.   Plaintiffs Still Fail to Identify Any Misstatements About Nutanix's
          "Marketing Activities" ......................................................................................9

     B.   Plaintiffs Still Fail to Identify Any Misstatements About Nutanix's
          Investments in Hiring Sales and Marketing Personnel .........................................10

     C.   Plaintiffs Still Fail to Plead with Particularity Any Material
          Misrepresentations About Nutanix's Growth .......................................................11

     D.   General Statements of Optimism Are Not Actionable..........................................14

     E.   The Forward-Looking Statements Are Protected Under the Safe Harbor ............14

CONCLUSION ..................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Peregrine Pharm., Inc.*,
654 F. App'x 281 (9th Cir. 2016) ....................................................................................... 7

*Bao v. SolarCity Corp.*,
2016 WL 4192177 (N.D. Cal. Aug. 9, 2016), *aff'd sub nom.*
*Webb v. SolarCity Corp.,* 884 F.3d 844 (9th Cir. 2018) ...................................................... 7

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) .............................................................................. 12

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ................................................................... 8

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ............................................................................................... 3

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................................ 4

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) ................................................................................ 3

*In re Cisco Sys., Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ................................................................. 14

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .......................................................................................... 15

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................................ 7

*In re Extreme Networks, Inc. Sec. Litig.*,
2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ................................................................... 4

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ................................................................. 14

*In re ICN Pharm., Inc., Sec. Litig.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................................................ 13

*In re Intuitive Surgical Sec. Litig.*,
2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) .................................................................... 3

*In re MannKind Securities Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................................ 6

*In re Quality Systems, Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017), *cert. dismissed*, 139 S. Ct. 589 (2018) .......................... 15

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ............................................................................................ 7

*In re Siebel Sys., Inc. Sec. Litig.*,
   2005 WL 3555718 (N.D. Cal. Dec. 28, 2005), *aff'd sub nom. Wollrab v. Siebel Sys., Inc.*, 261 F. App'x 60 (9th Cir. 2007) ............................................................. 3

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) .......................................................................... 13

*In re SupportSoft, Inc. Sec. Litig.*,
   2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ................................................................. 13

*In re Terayon Commc'ns Sys., Inc. Sec. Litig.*,
   2002 WL 989480 (N.D. Cal. Mar. 29, 2002) ..................................................................... 7

*In re Versant Object Tech. Corp.*,
   2001 WL 34065027 (N.D. Cal. Dec. 4, 2001) ................................................................... 4

*Lipton v. PathoGenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ........................................................................................... 6

*Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................................ 9

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. Dec. 17, 2019) ...................................................................... 13

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ................................................................................... 1, 8, 15

*Paciga v. Invuity Inc.*,
   2018 WL 7286503 (N.D. Cal. Sept. 26, 2018) ................................................................ 14

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..................................................................................... 2, 15

*Robb v. Fitbit Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ...................................................................... 3

*Roberti v. OSI Systems, Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .................................................................. 14

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ............................................. 11

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ............................................................................................. 6

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ......................................................................................... 13

*Yourish v. Cal. Amplifier*,
   191 F.3d 983 (9th Cir. 1999) ............................................................................................. 8

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).................................................................................................. 3, 6, 10

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "¶" or "SAC" | Second Amended Complaint for Violations of the Federal Securities Laws, filed April 17, 2020, ECF No. 124 |
| "CAC" | Consolidated Amended Complaint, filed September 9, 2019, ECF No. 102 |
| "MTD" | Defendants' Notice of Motion and Motion to Dismiss The Second Amended Complaint, filed May 22, 2020, ECF No. 125 |
| "Opp." | Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss The Second Amended Complaint, filed June 26, 2020, ECF No. 127 |
| "Ex." | Exhibits attached to the Declaration of Ignacio E. Salceda in Support of Defendants' Motion to Dismiss The Second Amended Complaint, filed May 22, 2020, ECF No. 125-1 |
| "Order" | Order Granting Defendants' Motion to Dismiss, filed March 9, 2020, ECF No. 121 |

**INTRODUCTION**

Just as Plaintiffs' prior and current complaints sought to run away from Nutanix's actual disclosures to investors, the Opposition seeks to run away not only from those but from the very allegations of the SAC itself. As discussed below, many of Plaintiffs' supposed "facts" are nowhere alleged in the SAC. Despite Plaintiffs' efforts, they cannot convert the unspecific speculations of CWs with little or no contact with the Individual Defendants into the kind of specific facts that the Reform Act requires to plead falsity and scienter.

In a nutshell, Plaintiffs' allegations are founded on nothing more than assumptions and conclusions that are insufficient under the Reform Act. The crux of this case is that Defendants ultimately concluded, in hindsight, that Nutanix should have spent more on lead generation. At no point did Defendants mislead the market about what Nutanix was doing. On the contrary, its detailed disclosures put investors on notice about the challenges Nutanix faced as it transitioned its business model and from extraordinary competition for talented salespeople. This is the antithesis of fraud. Indeed, the hodgepodge of "motives" Plaintiffs suggest are devoid of substance and have been rejected many times in the Ninth Circuit.

The Court dismissed the prior complaint and explained what Plaintiffs needed to do to satisfy the Reform Act. They have not done so. The Court should dismiss with prejudice.

**ARGUMENT**

**I.     PLAINTIFFS STILL FAIL TO PLEAD PARTICULAR FACTS RAISING A STRONG INFERENCE OF SCIENTER**

As the Ninth Circuit recently reiterated, to survive dismissal a complaint must allege that defendants acted "intentionally or with deliberate recklessness," which is "'an ***extreme*** departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so ***obvious*** that the actor must have been aware of it.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). The SAC falls far from that exacting standard. Indeed, and contrary to Plaintiffs' contentions (Opp. at 17-25), the Court has already rejected Plaintiffs' allegations as deficient. Plaintiffs' few new allegations do not salvage the complaint.

DEFENDANTS' REPLY MEM. ISO MOTION TO
DISMISS SECOND AMENDED COMPLAINT
CASE: 3:19-CV-01651-WHO

1

### A.   Plaintiffs' Confidential Witness Allegations Do Not Support Scienter

The Opposition confirms that Plaintiffs' scienter argument, that the Individual Defendants were supposedly aware of a declining sales pipeline, centers on CW1 and CW8.  Opp. at 19-22. But neither CW has personal knowledge of the state of mind of Messrs. Pandey and Williams. *See* MTD at 6-7.  With regard to CW1, Plaintiffs ignore the Court's instruction and continue to rely on this low-level regional sales representative who had no contact with the Individual Defendants outside of "all-hands" meetings and who the Court found lacked personal knowledge. Order at 21.  Indeed, CW1's allegations about War Room meetings cannot be credited as he is not alleged to have even been present at those meetings.  *See* ¶¶ 178, 208; Order at 20-21 (citing *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (scienter based on CW statements not adequate where they did not have firsthand knowledge)).[1]  Although Plaintiffs attempt to give CW8 a promotion from a director level in a non-sales organization role (¶ 57) to an "executive level" (Opp. at 3, 5), Plaintiffs are silent in response to this central issue:  CW8 has no firsthand knowledge and he is not alleged to have reported to Mr. Pandey, and had very limited contact with him.  MTD at 7; *see* Opp. at 17-25.  Moreover, CW8's reliability is questionable given his admitted recollection that Nutanix's revenue was declining in 2018 (¶ 209), when it is undisputed that revenue had actually increased.  *See* MTD at 7 (citing Ex. 10 at 44).[2]

### B.   Plaintiffs' Internal Reports Allegations Do Not Support Scienter

Plaintiffs' argument that internal reports support scienter misses the point.  *See* Opp. at 19-20.  *First*, it is irrelevant that seven low-level and non-executive CWs, only two of whom allegedly had ***any*** contact with the Individual Defendants, and all of whom lack firsthand knowledge, allegedly "confirmed that Defendants had access to and that Pandey personally

---

[1] The allegations of CWs 2-7 and 9-12 are also inadequate.  MTD at 6-7.  Though Plaintiffs claim that Mr. Pandey had knowledge of a declining pipeline based on meetings with CW5, those meetings were limited to *CW5's* discrete pipeline, and CW5's reporting structure make clear his responsibilities were limited to the Northeastern region.  ¶¶ 54, 199, 396.

[2] Plaintiffs' attempt to rehabilitate CW8's reliability falls flat, Opp. at 19-20 n.19, as his supposed claim about declining revenue is nonsensical.  CW8's purported account of quarterly meetings does not include any mention of pull-ins or their alleged impact on revenue.  ¶ 209.

monitored Salesforce.com pipeline reports." Opp. at 19; *see* MTD at 6-7 (citing Order at 21); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (discounting allegations of CWs who "were simply not positioned to know the information alleged"); *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *8 (N.D. Cal. Dec. 28, 2005) (court should assess whether CWs "'speak[] from personal knowledge, or merely regurgitat[e] gossip and innuendo'"), *aff'd sub nom. Wollrab v. Siebel Sys., Inc.*, 261 F. App'x 60 (9th Cir. 2007).[3] *Second*, **none** of the CWs provide detail of the specific contents of any internal reports that the Individual Defendants are alleged to have **actually** reviewed. *See* MTD at 7-9. It is not even clear from the SAC that the low-level CWs had access to and reviewed the same reports that the highest-level Company leaders are alleged to have accessed. *See id.*[4] *Third*, Plaintiffs do not specify "how the contents [of reports] contradicted defendants' public statements." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).

**C.     Plaintiffs' Internal Meetings Allegations Do Not Support Scienter**

The Opposition does nothing to save Plaintiffs' internal meetings allegations. Plaintiffs parrot the list of meetings alleged in the SAC with no explanation of how the meetings demonstrate Defendants' knowledge of falsity of any particular statement at the time made. Opp. at 21-22. Plaintiffs still fail to sufficiently allege "specific information about any particular

---

[3] The Opposition makes several assertions about internal reports not supported by the SAC. For example, Plaintiffs claim that "Pandey specifically called out inaccurate information in Salesforce.com to CW8" (Opp. at 20 n.20) and "discussed Salesforce.com pipeline reports directly with CW8" (Opp. at 23). Neither assertion is alleged in the SAC. Moreover, though Plaintiffs argue that one of CW8's responsibilities was "managing and improving Netsuite and Salesforce.com systems" (¶ 57; Opp. at 20 n.20), the SAC contains no allegation that Mr. Pandey was in touch with CW8 in this role or that CW8 had access to any statistics of Mr. Pandey's Salesforce usage and/or what, if anything, Mr. Pandey reviewed. Given CW8's alleged responsibilities, it is surprising that CW8 cannot definitively allege the contents of Salesforce, claiming only that it "*would have reflected*" certain information. *See* ¶¶ 57, 205 (emphasis added); MTD at 8-9.

[4] The cases cited in the Opposition (Opp. at 20) are readily distinguishable. *See In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215, at *5 (N.D. Cal. Dec. 15, 2014) (the CW "ha[d] the requisite personal knowledge to assert that the individual Defendants received specific information"); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017) ("CW1 personally generated the reports documenting failures with the devices and presented the reports to [the] COO[.]"); *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (CWs with personal knowledge detailed defendants' concealment of inventory).

meeting," including whether the Individual Defendants were actually present and "the content of what was discussed," and thus "fail to properly allege scienter." Order at 20-21.

**Quarterly Revenue Meetings.** Plaintiffs claim that quarterly revenue meetings occurred in "FY2018 discussing Nutanix's declining revenue and 'backlog' (i.e., pull ins)." Opp. at 21 (citing ¶¶ 209, 372). However, CW8's actual SAC allegations never reference a specific date, quarter, or year these meetings took place. ¶¶ 209, 372. Allegations of non-specific quarterly meetings that "*would have*" addressed certain topics, without any description of a specific meeting or its actual content are insufficient to establish scienter. *Id.*; *see In re Versant Object Tech. Corp.*, 2001 WL 34065027, at *6 (N.D. Cal. Dec. 4, 2001) (pleading regular meetings were held is insufficient "[a]bsent allegations about the contents and timing of specific meetings").

**August 2018 SKO.** Plaintiffs rely on CW1's account that at the August 2018 SKO low sales and pipeline decline were discussed. Opp. at 21.[5] But CW1 does not sufficiently plead that the Individual Defendants were present at or participated in these discussions. ¶ 194. The allegations make clear that the SKO was not a meeting at all, but rather a Las Vegas sales kickoff event featuring speakers on stage. *See id*. Absent allegations that the Individual Defendants were actually in attendance or participated in the alleged presentation, there is no basis to assume they personally had knowledge of information purportedly discussed.[6]

**War Room Meetings.** Plaintiffs allege that "deals that could be pulled [in]" were discussed at War Room meetings attended by Mr. Pandey. Opp. at 21. But again, Plaintiffs do not allege that any of the CWs were present at these meetings or have personal knowledge of what was discussed. The Opposition claims CW1 was on "emails to Pandey about pull ins to be discussed at the War Room meeting" (Opp. at 21 (citing ¶ 178)), but this allegation is *nowhere* to

---

[5] No other CW, not even sales personnel, corroborates CW1's allegations. MTD at 10 n.10.

[6] Plaintiffs' reliance on *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *28 (N.D. Cal. Mar. 21, 2018) is misplaced. There, the CW "personally observed [an individual defendant] admit to the Company's global sales force that the integration plan was still 'to be determined' or 'TBD'" in direct contrast to his public statements. *Id*. at *26-27. Moreover, the CW specifically alleged that another defendant was not only present at the global sales conference but he "observed [the other defendant] tell employees that management's integration plan was 'TBD,' and thus not complete." *Id*. at *28. Such specificity is exactly what is missing from the SAC. *See* MTD at 9-11 (citing *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010)).

be found in the SAC – and in any event, the allegation remains devoid of the necessary facts to support any inference of wrongdoing.  Plaintiffs conjure another allegation not in the SAC by claiming that Mr. Pandey's "participation and involvement in pull-ins at the War Room meetings was discussed on stage at the SKO meeting[.]" Opp. at 21 (citing ¶ 208).  In fact, the SAC asserts only that Mr. Nair mentioned Mr. Pandey **attended** War Room meetings, **not** his "participation and involvement in pull-ins" at these meetings.  *Compare* Opp. at 21 (citing ¶ 208) *with* ¶ 208.  Finally, Plaintiffs claim that there were mass emails to the entire sales organization to "get creative" (¶ 178), means nothing.  There is no allegation these emails referenced pull-ins, much less that anything untoward occurred.[7]

**Quarterly "All-Hands" Meetings.**  Plaintiffs' allegations related to quarterly all-hands meetings similarly fail for lack of specificity.  CW1 does not refer to any specific meeting but merely states meetings generally discussed the need to hire more salespeople and to increase the number of leads.  ¶¶ 144-145, 206-208, 369-370.  These generic allegations do not support a strong inference of scienter.  *See* Order at 20-21.

Although Plaintiffs' internal meetings allegations are insufficient and should be disregarded, **even if** Plaintiffs had sufficiently alleged the Individual Defendants attended these meetings **and** the need to increase sales was discussed, they would not demonstrate "that either defendant actually knew that the pipeline was drying up[.]"  *See* Order at 21.  Plaintiffs fail to allege that any meeting addressed reallocation of lead generation spending as the cause for alleged decreased pipeline.  In fact, Plaintiffs' own allegations confirm that Nutanix sought to increase lead generation through new programs such as "daily 'call blitz's[.]'" ¶ 195.

**D.      The "Hands on CEO" and Core Operations Theories Are Inapposite**

Plaintiffs' reliance on the "core operations" inference is misplaced.  Opp. at 23-24.  As Defendants' explained (*see* MTD at 11-12), it is an exception to the general rule that "'corporate management's general awareness of the day-to-day workings of the company's business does not

---

[7] CW8 alleges Mr. Pandey approved the amount of pull-ins (¶¶ 179, 376), but CW8 lacks personal knowledge, does not allege pull-ins were discussed in any meeting he attended or email exchange he had with Mr. Pandey, and is unreliable.  *See supra* at 2; MTD at 6-7.  Moreover, Plaintiffs' pull-in allegations are deficient.  *See infra* at 12-14.

establish scienter'" absent allegations of "'specific information conveyed to management and related to the fraud[.]'" *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

The problem for Plaintiffs is that the core "facts" supposedly known – that the sales pipeline was declining as a result of decisions regarding lead generation spending – are not alleged with any particularity whatsoever. *See supra* at 2-5. The SAC contains no specific facts regarding what any of the purported data in the Salesforce.com reports said at any given time, much less that any such data was in fact reviewed by the Individual Defendants. Moreover, Plaintiffs are unable to identify, as they must, what specific information contradicting any challenged statements was actually known to Messrs. Pandey and Williams. The core operations inference does nothing to fill that void. *See Zucco*, 552 F.3d at 1000 ("[A]llegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter (through the use of the Access databases), and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient").

Plaintiffs' reliance on the theory that Mr. Pandey is a "hands-on" executive is equally faulty. Courts have long held that being a "hands-on" executive is not probative of scienter, and, in fact, those allegations were rejected by the Court. Order at 20-21; MTD at 11 & n.13.

### E.    The SAC's Generic Corporate Motive Allegations Are Insufficient

As in the CAC, Plaintiffs assert that Nutanix was motivated to inflate its stock to launch new products, make acquisitions, and fund operations. Opp. at 24. Courts routinely reject such generalized assertions that could apply to "'virtually every company in the United States[.]'" *Lipton*, 284 F.3d at 1038; *see* MTD at 12-14 (citing cases). Plaintiffs also argue that Nutanix's convertible note offering in January 2018, over a year before the quarter at issue, is indicative of scienter. Opp. at 24.[8] Again, such motives have been rejected by the Ninth Circuit as

---

[8] Plaintiffs' reliance on *In re MannKind Securities Actions*, 835 F. Supp. 2d 797 (C.D. Cal. 2011) is misplaced. Opp. at 24. There, the court did not find the public offering indicative of scienter but rather that the company had a contractual *obligation* to maintain a certain stock price. 835 F. Supp. 2d at 803.

insufficient.  *See, e.g.*, *Anderson v. Peregrine Pharm., Inc.*, 654 F. App'x 281, 281 (9th Cir. 2016) ("[W]e decline, as we have in the past, to find the Defendants' attempts at securing capital during the putative Class Period to support an inference of scienter.").

The contention that Nutanix made acquisitions to ensure compliance with the "Rule of 40" and to increase cash flow is irrelevant and illogical.  Opp. at 24; MTD at 13-14.[9]  Indeed, Plaintiffs do not allege (and could not) that any acquisitions increased cash flow or was undertaken for that purpose.  Further, the "Rule of 40" is not a GAAP measure, companies are not required to report their results under the Rule of 40 framework or otherwise comply with it, and there is no penalty for violating it.  It is not enough for Plaintiffs to assert that Nutanix, like all corporations, wanted to look appealing to investors, in this instance with the Rule of 40.  ¶¶ 409-410.  *See* MTD at 13-14.[10]  As Judge Freeman summarized in rejecting general scienter allegations, "taken as a whole, the allegations paint a picture of leadership that, like all leadership, wants its company to turn a profit. . . . [I]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'"  *Bao v. SolarCity Corp.*, 2016 WL 4192177, at \*9 (N.D. Cal. Aug. 9, 2016), *aff'd sub nom. Webb v. SolarCity Corp.,* 884 F.3d 844 (9th Cir. 2018).

Finally, as Defendants noted, Plaintiffs' theory of fraud does not make sense.  MTD at 12. Why would Defendants proceed with a strategy they knew was doomed, when they could have

---

[9] Plaintiffs' authority does not support their position.  In *In re Daou Sys., Inc. Sec. Litig.*, the Court explained that "corporate acquisitions alone would not likely demonstrate defendants' scienter" and found strong evidence of scienter only because the acquisition allegations were combined with additional claims, including "specific allegations of deliberate accounting misfeasance[.]"  411 F.3d 1006, 1024 (9th Cir. 2005).  In *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, unique company-specific circumstances immediately precipitated the company's need to engage in a stock-funded acquisition and motivated the defendants to inflate stock prices.  2002 WL 989480, at \*11 (N.D. Cal. Mar. 29, 2002).  Such facts are in direct contrast to Plaintiffs' allegation that Nutanix wanted to meet a generally desirable industry metric to appeal to investors.

[10] The Individual Defendants' bonuses did not place a "significant emphasis" on the Rule of 40 as Plaintiffs claim.  Opp. at 25; *see* MTD at 13-14.  The Rule of 40 was tied to a mere 15% of the bonuses.  MTD at 13-14 (Mr. Pandey stood to gain at most $75,000 in bonus tied to the Rule of 40 or 0.019% of the value of his stock).  Plaintiffs fail to address that such bonus metrics are insufficient to establish fraudulent intent.  *See* MTD at 14 (citing *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012)).

DEFENDANTS' REPLY MEM. ISO MOTION TO                    7
DISMISS SECOND AMENDED COMPLAINT
CASE: 3:19-CV-01651-WHO

spent a little more on lead generation?  Plaintiffs' suggestion that Nutanix chose to "gamble" (Opp. at 25, n.28) simply layers speculation on top of the absence of a concrete motive.  In affirming dismissal of a securities complaint recently, the Ninth Circuit said that a court should not indulge theories of scienter that "do[] not resonate in common experience.  And the PSLRA neither allows nor requires us to check our disbelief at the door." *Endologix*, 962 F.3d at 415.  In that case, as here, plaintiff did not allege a concrete motive for defendants to supposedly inflate the stock price "and then face the inevitable fallout once [the product's] . . . problem was revealed." *Id*.  There, as here, plaintiffs did not allege suspicious stock sales and ultimately the scienter "theory does not make a whole lot of sense." *Id*.  The same holds here.

### F.        Defendants Did Not Make Any "Admissions" of Scienter

Again ignoring the Court's Order, Plaintiffs claim that statements at the end of the Class Period constitute admissions of earlier knowledge of falsity.  Opp. at 17-18.  The Court examined the same allegations and held that "defendants' after-the-fact statements that they decided to re-allocate funding from lead generation to development do not support an allegation that the defendants understood each of their statements was false at the time they made them."  Order at 20.[11]  Plaintiffs provide no reason for the Court to depart from that holding.  *See also Browning v. Amyris, Inc.*, 2014 WL 1285175, at \*20 (N.D. Cal. Mar. 24, 2014) (J. Orrick) ("there is nothing [in defendants' end-of-class period statements] that shows that the defendants acted with scienter" as none of the statements is "similar to 'I knew it all along.'") (dismissing complaint) (quoting *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999)).  Here, there is nothing in Defendants' statements to even suggest that they "admitted" making any false statements.[12]

[11] Plaintiffs also ignore the Court's rejection of the *same* argument that "Defendants were aware of the negative impact of diverting investment away from lead generation on Nutanix's pipeline" as Nutanix had previously "utilized the same strategy[.]"  Opp. at 22-23.  As the Court held, Defendants' 2016 reduction in lead generation spending was in a "distinguishable context." Order at 20; *see also* MTD at 15 & n.19.  Likewise, Plaintiffs ignore the Court's rejection of their *same* argument about executive departures.  Opp. at 25 n.30.  Plaintiffs provide no reason to alter that finding.  *See* Order at 21; MTD at 15.

[12] Plaintiffs continue to take Mr. Pandey's Q2 FY2019 earnings call comments out of context. *Compare* Opp. at 18 n.16 *and* SAC ¶ 402, *with* Ex. 21 at 12-13.  This supposed "admission" does not support a claim that Defendants *knew* that keeping lead generation spending flat would result in the outcomes that transpired.

## II.   PLAINTIFFS STILL FAIL TO PLEAD FALSITY

### A.   Plaintiffs Still Fail to Identify Any Misstatements About Nutanix's "Marketing Activities"

Plaintiffs are unable to (i) adequately allege specific facts demonstrating Nutanix's actual statements about its growth and increasing "marketing activities" were false, or (ii) address the deficiencies identified by the Court.  MTD at 16-18.  As a result, the Opposition continues Plaintiffs' well-worn method of ignoring Nutanix's statements and re-writing them in search of a claim.  Opp. at 9-10.[13]  This tactic is one "that the Court cannot accept." *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019).

Plaintiffs again conflate Nutanix's clear definition of its overall marketing program with lead and demand generation, even though those were only one part of the efforts.  Opp. at 9; MTD at 17.[14]  Similarly, as recognized by the Court, Plaintiffs fail to "allege that Nutanix did not actually increase spending" on "marketing activities related to brand awareness, promotions, trade shows and partner program."  Order at 9 (citation omitted); MTD at 17-18.  Plaintiffs also ignore the impact of the "improved efficiencies within the lead generation spend" Nutanix experienced in FY 2018 on its ability to execute its expansive marketing program.  ¶¶ 324, 326, 336, 338-339.

Instead, Plaintiffs cling to the notion that investors understood Nutanix's statements about "marketing activities" to mean only "lead generation activities" because of two after-the-fact statements they take out of context.  Opp. at 4 (citing ¶ 88) (citing February 28, 2019 earnings call, March 20, 2019 Investor Day).[15]  In fact, the question Mr. Pandey answered clearly belies

---

[13] Plaintiffs erroneously claim the Motion "cut off the sentence" "referring to the specific types of marketing activities Nutanix was purportedly increasing (e.g., brand awareness, promotions, trade shows and partner programs)."  Opp. at 10.  Plaintiffs ignored the second bullet in the Motion at page 17 where Defendants clearly enumerated Nutanix's complete statement, directly quoting the SAC.  MTD at 17.

[14] The Opposition, like Plaintiffs' prior opposition, attaches a 70-plus page Exhibit A, which merely regurgitates the SAC.  Once again, Exhibit A does not reference a single challenged statement Defendants made about lead generation until the February 28, 2019 disclosure.

[15] In fact, the one analyst report cited by Plaintiffs is also a response to Nutanix's first mention of lead generation spending and serves as a clear indication that the market never equated increased sales and marketing investment with spending on lead generation or increased marketing activities. *See, e.g.*, ¶ 88 (citing March 1, 2019 JMP Securities report).

any claim that "a reasonable investor would conclude that Nutanix's statements about increasing spending on sales and marketing referred to an increase on spending on lead generation in particular." Order at 9; Ex. 21 at 16 (analyst asking "what exactly do you mean by spending on lead generation?").

The Opposition does not even attempt to reconcile the SAC's deficient low-level CW allegations that "lead generation [activities] comprise[e] approximately 70% of total marketing expense" with its concession that Nutanix's investment in all of sales and marketing was disclosed as a "collective line item in the financial statements" and that those expenditures rose dramatically during the Class Period. ¶ 212; MTD at 18 (citing ¶ 212); Opp. at 9-10. Plaintiffs also continue to ignore that Nutanix disclosed that "sales and marketing expense consists primarily of personnel costs" and make the baseless claim that "lead generation compris[es] the majority." MTD at 18 n.24; Opp. at 9 n.5. Finally, Plaintiffs cannot identify any duty to disclose the granular details of how much Nutanix spent on subparts of its marketing program or how the lack of any such disclosure made any statements false or misleading. *See* MTD at 18.

**B.      Plaintiffs Still Fail to Identify Any Misstatements About Nutanix's Investments in Hiring Sales and Marketing Personnel**

Plaintiffs challenge the same statements about hiring found by the Court not to be actionable. MTD 18. Plaintiffs claim to have "bolstered" the SAC with details about attrition and sales productivity (Opp. at 15 n.11) but the Court has already considered and rejected similar CW allegations. MTD at 18-19. The Opposition fails to respond to the multiple deficiencies and limitations of the CWs and claims that pleading job titles, responsibilities, and speculation about "avenues" of information available to Defendants "is sufficient to state a claim." Opp. at 17. It is not. As *Zucco* held, even where plaintiff adequately alleged CW job titles and responsibilities, a complaint that fails to allege with particularity that the CWs "were in a position to be personally knowledgeable of the information alleged" must be dismissed. 552 F.3d at 996.

With these unsupported allegations of attrition and sales productivity refuted, Plaintiffs for the first time now allege that "[b]y 'choosing to speak' of sales hiring often in comparison to Nutanix's internal hiring goals . . . , Defendants had a duty to disclose the Company was not

keeping pace with its hiring." Opp. at 15.[16] Aside from the fact that there is no such duty, this allegation is undone by Nutanix's repeated disclosures regarding the challenges it faced in sales hiring and how it was not able to meet its targets. *See, e.g.*, MTD at 20; Ex. 19 at 13 (Mr. Williams: Nutanix came in "a little underhiring."); CAC ¶ 202 (Mr. Williams: Nutanix "ha[s] a full-court press on hiring in the second half for the fiscal year to try to make up this headcount shortfall."); SAC ¶ 266 (Mr. Williams: Nutanix "had fallen behind in our hiring" the last quarter and was still "not yet at our planned headcount[.]"). Plaintiffs also cannot overlook Nutanix's consistent disclosures regarding the challenges it faced attracting and retaining salespeople in a highly competitive job market. MTD at 20-21. Plaintiffs now allege that "no such purported warnings were disclosed after May 2018." Opp. at 16 n.14. Although Plaintiffs may wish to ignore these warnings, Nutanix consistently made these disclosures throughout the Class Period, including in June and December 2018. MTD at 20 (citing Ex. 8 at 54-55, Ex. 13 at 53).[17]

### C. Plaintiffs Still Fail to Plead with Particularity Any Material Misrepresentations About Nutanix's Growth

**The Allegations About Nutanix's Customers Are Insufficient.** Having abandoned the SAC's attempt to show that Nutanix's statements about increased product revenue and demand are actionable, Plaintiffs now claim they gave "the false impression that Nutanix was adding ***new*** customers." *Compare* Opp. at 13-15, *with* ¶¶ 234, 258, 285, 305, 318. Plaintiffs' sole remaining allegation is that "Nutanix was simply double counting sales to existing customers as new customers" when it consistently reported "total end customers" at the end of each quarter. Opp. at

---

[16] Plaintiffs rely on *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) to support this assertion. Yet the Ninth Circuit did not find any such duty. Instead the Court evaluated plaintiffs' scienter allegations and found that the complaint had sufficiently alleged that at the time defendants vaguely spoke about the risks of product liability actions, and attributed growth to a drug's positive results, executives had knowledge that their customers had safety concerns and a product liability suit had been filed. *Id.* at 1181. Here, Plaintiffs do not come close to adequately alleging falsity, let alone scienter.

[17] The Opposition also ignores Nutanix's repeated disclosures about factors other than attrition that ***would*** impact sales productivity. MTD at 20; *see also* Ex. 13 at 53 ("We ***anticipate*** that the sales cycles associated with major accounts ***will*** be longer . . . which ***will*** increase the time it ***will*** take our new global account managers to be fully productive.") (emphasis added).

13.[18]  This assertion defies both logic and Nutanix's actual statements.  MTD at 22.

Every quarter, Nutanix disclosed "the total number" of customers on an earnings call, which exactly matched the "[t]otal end customers" figure in the contemporaneous press release. MTD at 21-22.  Indeed, both statements reflected the same increase every quarter during the Class Period.  *Id.*[19]  Nutanix also always accompanied these disclosures with a consistent definition of how it counted end-customers.  *Id.* at 21 n.32.  Despite Plaintiffs' attempt to obfuscate Nutanix's clear statements, it makes no sense to assume that the market made any other inference.  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) ("A statement is misleading only if a reasonable investor, reading [it] fairly and in context, would be misled").  The Opposition similarly ignores the Court's reasoning and doubles down on the very statement recognized by the Court as an "indicat[ion] that the public was aware of slowing new customer growth starting in November 2017."  Order at 8; *see also* ¶ 220.

Finally, the Opposition claims that "falsity is based upon Defendants' knowledge from Salesforce.com pipeline reports and internal meetings that the pipeline and 'brand new' customer growth was declining."  Opp. at 14.  This conclusion is devoid of any particularized facts and corroborating details showing the statements about customer growth were false or misleading when made.  Plaintiffs also ignore Nutanix's consistent disclosures about the importance of both acquiring new and retaining existing customers, and that Nutanix viewed increasing sales to existing end customers "as critical drivers of our success."  MTD at 22; Opp. at 13-14.

**The "Pull-in" Allegations Fail.**  The Opposition's reliance on CW1 and inapposite case law fails to remedy the SAC's deficient pull-in allegations, which are unaccompanied by any claim of improperly recognized revenue.  Opp. at 11-13.  Plaintiffs still offer no basis to conclude that CW1's position as a low-level regional account manager afforded anything but "limited

[18] Plaintiffs' only support for this assertion is a conclusory statement from CW1 and CW5 copied from the CAC.  *Compare* CAC ¶ 97, *with* SAC ¶ 124 (alleging that 80% of Nutanix's sales were to 15% of the Company's existing customers).

[19] As acknowledged in the SAC, Nutanix disclosed the quarterly increase and total number of Global 2000 companies as customers.  *See, e.g.*, ¶¶ 237, 291; *see also* Ex. 4 at 26; Ex. 8 at 33. These consistent disclosures belie any claim that Nutanix's customer base was not growing.

personal knowledge." Order at 18-19; MTD at 23. Plaintiffs try to revive their dismissed allegations with CW1's revised statements which are so nonspecific and speculative as to be meaningless. Opp. at 11-12; MTD at 23. Contrary to the Opposition's claims, none of the other CWs corroborate CW1's "new allegations" and "estimation." Opp. at 11-13; MTD at 23.[20] The SAC fails to provide the specific details required by the Reform Act and the Court. Order at 18[21]; *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (rejecting generalized pull-in allegations lacking details as to "'specific shipments, specific customers, specific times, or specific dollar amounts.'"). Moreover, "there is nothing inherently improper in pressing for sales to be made earlier than in the normal course." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (citation omitted); *see* ¶ 186.

Plaintiffs claim that *In re SupportSoft, Inc. Sec. Litig.*, 2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) is "instructive" in evaluating whether they adequately allege a pull-in scheme. Opp. at 11-12. They are wrong. Apart from the fact that *SupportSoft* did not concern pull-ins, in that case the business was allegedly suffering even before the class period, "it took three quarters for SupportSoft to meet the guidance it had announced for the third quarter of 2004" and the Court found "indication[s] that SupportSoft's business . . . has never fully recovered." 2005 WL 3113082, at *5 n.6. Nutanix reported record quarters throughout the Class Period, refuting the Opposition's baseless assertion that "Nutanix' revenue fell short 'every quarter' in the Class Period." *Compare, e.g.*, MTD at 3 (Nutanix reported Q2FY19 revenue of $335.4 million,

---

[20] There is no corroboration of CW1's conclusory allegations that: (i) all types of sales, for all customers, throughout the entire Company, for the entire Class Period were pulled-in; or (ii) all sales representatives in every region were sent emails encouraging them to pull-in an unspecified "'x' amount of revenue." *Compare* Opp. at 11 (citing ¶¶ 174, 179-183, 188) *with* ¶¶ 174, 179-183, 188. The Opposition claims that CW8 "personally met with Pandey every quarter to discuss . . . pulling in revenue[.]" Opp. at 11 (citing ¶ 209). But the SAC says no such thing. In sum, there are no specific facts alleged to support any allegations of pull-ins.

[21] The Opposition faults Defendants for noting the case cited in the Order. Opp. at 13 n.8. Plaintiffs' rejection of applicable case law and continued reliance on *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274 (D. Or. Dec. 17, 2019) which this Court already considered, demonstrates the failure to acknowledge that uncorroborated pull-in allegations are viewed with skepticism in the Ninth Circuit. Order at 18 (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998)).

surpassing its public guidance for the quarter), *with* Opp. at 11.[22]

### D.    General Statements of Optimism Are Not Actionable

The Opposition does not dispute that certain of Defendants' statements are non-actionable puffery. *Compare* Opp. at 15 n.10, *with* MTD at 24 (citing statements). Indeed, courts, including the Ninth Circuit and this Court, routinely find similar statements not actionable. MTD at 24 (citing cases). As to the one remaining statement of optimism, ¶ 266 ("we executed this full-court press flawlessly"), Plaintiffs allege that it is actionable because it is "declarative." Opp. at 15 n. 10. But Plaintiffs ignore Mr. Williams stated in the same breath, that Nutanix was still "not yet at our planned headcount[.]" ¶ 266. Even without that context, this statement is of the kind that courts have held to be inactionable. *Paciga v. Invuity Inc.*, 2018 WL 7286503, at *5 (N.D. Cal. Sept. 26, 2018) (finding "[r]egardless of the ultimate veracity of the company's enthusiasm" statements about "the Company's ability to execute," "excellent progress and success" and "hitting on both cylinders" are non-actionable); *In re Cisco Sys., Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) ("hitting on all cylinders" non actionable).

### E.    The Forward-Looking Statements Are Protected Under the Safe Harbor

Plaintiffs do not dispute that Nutanix's predictions about growth (*see, e.g.*, ¶ 261) are shielded by the Safe Harbor, but they attempt to avoid the Safe Harbor by ignoring both case law and the statements themselves. Opp. at 16.[23] Plaintiffs try to transform Nutanix's statement that it "***expect[s] continuing*** improvement over the coming quarters" into a "present tense contention that Nutanix was ***experiencing 'continued*** improvement.'" *Compare* ¶¶ 227, 251, 279, 299, and 311, *with* Opp. at 16 (emphasis added). Even considering Plaintiffs' revision, the Ninth Circuit has made clear that statements must be "examined as a whole" and are protected by the Safe

---

[22] The Opposition cites to ¶¶ 185, 192-193, but the SAC alleges no such thing.

[23] Plaintiffs' authorities are inapposite. *See Roberti v. OSI Sys, Inc.*, 2015 WL 1985562, at *8-9 (C.D. Cal. Feb. 27, 2015) (finding statement that a contract "should also continue to generate revenues" unprotected because defendants allegedly knew they were not in compliance with the contract and disclosing this would likely lead to cancellation); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *11-12 (M.D. Ga. Mar. 23, 2018) (finding "warn[ing] of the specific risks that Plaintiff alleges existed" shielded by the safe harbor as compared to boilerplate language that "disclosed nothing to indicate even potential weaknesses").

Harbor even if they include elements of present-tense facts. *Intuitive Surgical*, 759 F.3d at 1059. Plaintiffs' argument that Nutanix's cautionary statements were insufficient because "Defendants knew Nutanix's sales productivity was deteriorating" (Opp. at 16), has also been rejected by the Ninth Circuit. *In re Cutera Sec. Litig*, 610 F.3d 1103, 1108, 1111 (9th Cir. 2010).[24]

Finally, to the extent Plaintiffs argue that Nutanix's detailed warnings are insufficient because they were prominently repeated in SEC filings, they misstate Ninth Circuit law. Courts have found similar, and indeed less detailed, warnings sufficient to invoke the protections of the safe-harbor. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1059; *Cutera*, 610 F.3d at 1112. Even if the cautionary statements could somehow be deemed insufficient, Plaintiffs still have not alleged actual knowledge. MTD at 24; *see also supra* Section I.[25]

## CONCLUSION

Despite the benefit of the Court's detailed Order, Plaintiffs failed to fix the deficiencies in their complaint. As the Ninth Circuit recently noted, "[w]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." *Endologix*, 962 F.3d at 420. *See* MTD at 25 & n.42. Defendants request that the SAC be dismissed with prejudice.

Dated: July 20, 2020      WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:     /s/ *Ignacio E. Salceda*
Ignacio E. Salceda

*Attorneys for Defendants*

---

[24] *In re Quality Systems, Inc. Sec. Litig.* does not support Plaintiffs. There, defendants offered a "concrete description of the past and present state of" "specific aspects of" their "operation"— including, for example, "reassuring investors that 'everything was going fine' with FDA approval when the company knew FDA approval would never come[.]" 865 F.3d 1130, 1143 (9th Cir. 2017). Further, the CWs were exceptionally well-positioned (a member of the board of directors and COO, among other high-level executives), the CEO sold 87% of his holdings and admitted the company would be forced to change its business model. *Id*. at 1145-46. Nutanix's forward looking statements and the SAC's low-level CWs and lack of stock sales allegations comes nowhere close to such claims.

[25] Because the SAC does not state a predicate violation of Section 10(b) or Rule 10b-5, the Section 20(a) claim fails. MTD at 24 n.41.