**Pages 1 - 12**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

IN RE NUTANIX, INC. SECURITIES )
LITIGATION                      )   **No. C 19-1651 WHO**
_____)
                                    San Francisco, California
                                    Wednesday, August 12, 2020


**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:   (via Zoom Video Conferencing)

For Lead Plaintiff Shimon Hedvat, Plaintiff City of Miami Fire
Fighters' and Police Officers' Retirement Trust, and the Class
                        LEVI & KORSINSKY, LLP
                        1111 Summer Street, Suite 403
                        Stamford, Connecticut 06905
                BY:  **SHANNON L. HOPKINS, ESQ.**
                     **GREGORY POTREPKA, ESQ.**

For Defendants Nutanix, Inc., Dheeraj Pandey, and Duston M.
Williams:
                        WILSON SONSINI GOODRICH & ROSATI
                        650 Page Mill Road
                        Palo Alto, California 94304-1050
                BY:  **IGNACIO E. SALCEDA, ESQ.**


Reported By:    Katherine Powell Sullivan, CSR #5812, CRR, RMR
                Official Reporter - U.S. District Court

**Wednesday - August 12, 2020**                              **2:18 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  Case number 19-1651, Scheller versus Nutanix, Incorporated.

Counsel, if you would please state your appearance for the record.

**MS. HOPKINS:**  Hi.  Good afternoon, Your Honor. Shannon Hopkins, with Levi & Korsinsky, for the plaintiffs.

**MR. SALCEDA:**  Good afternoon, Your Honor.  Ignacio Salceda, Wilson Sonsini, on behalf of defendants.  And my -- two of my clients, Mr. Wall and Ms. Huang, are also on the line.

**THE COURT:**  Great.  Good afternoon to everybody.

So I am -- I'm inclined to grant the motion to dismiss again.

With respect to the false and misleading statements -- and where I'm actually going to get to, Ms. Hopkins, is scienter, but with respect to the false and misleading statements, I think, again, the lead generation, although it's defined now -- well, isn't mentioned in the allegedly false statements.  And Nutanix did increase spending on sales and marketing generally. Pull-in is -- that practice by itself isn't fraudulent.

I do think the statements in March of 2018 could be misleading, given the alleged concern regarding pipeline of new

customers.  And claims regarding record sales productivity and strong hiring success could also be misleading.

But I don't see allegations of a strong inference of scienter.  There isn't any factual support for the allegation that Pandey accessed the Salesforce data every day or was a significant Salesforce user.  CW8's contacts with Pandey weren't described and CW1 didn't have any.

And Nutanix made several legitimate changes to business operations, accurately reported end customers and new ones and the number of employees hired.  So I think those things just cut very strongly against the inference.

So that's -- that's my concern at this point.  I'm -- I'm on the fence.  And I'd like to hear from you with respect to amendment, but why don't you take --

**MS. HOPKINS:**  Your Honor, with respect to the pull-in scheme that we were just talking about on the record sales, CW8's interaction -- CW8 was the director of -- director of business operations and project management, and he was in charge of business operations, developing forecasts and financial plans, and managing Salesforce.com.

And he met -- we describe in the complaint, he met every quarter with the defendants to discuss revenue.  He discussed the fact that revenue was declining in 2018 and the fact that even though revenue was declining that it wasn't declining as much because they had the backlog that could be pulled in.

So I think CW8's interactions with Pandey are described -- and Williams are described sufficiently here to discuss when these meetings occurred, which was quarterly, who they met with, the defendants, what was discussed.

In addition, CW8, being the person that maintained Salesforce.com, was in a position to understand who was accessing -- using the report, who was accessing it, and how often they were accessing it.  That was part of his job.

So CW8 does have personal knowledge of all of these things.  CW8 is a director-level person.  So I think, you know, with respect to that, CW8 has that personal knowledge, and we have sufficiently described those interactions.

In addition, Your Honor, every quarter the defendants reported about the customers.  And in order to do that, they've got to know what -- what the status of the pipeline is, what new customers have come in and what new customers -- existing sales versus new customers.  They have to inform themselves of that.

They spoke about that every quarter in the press releases.  They spoke about it at the conference calls every quarter.  The analysts asked questions.  They were clearly very interested in this because it directly, basically, talks about the pipeline.

You're talking about new customers, you're talking about your pipeline every quarter.  And so analysts were very, very interested.  And defendants -- there's lots of case law out

there.

Defendants did not come out and say "We monitor new customers," but by the fact that they reported in detail every quarter the precise number of customers, in addition to answering numerous analysts' questions on calls about this, shows that they knew.

You know-- excuse me, Your Honor.

So defendants' scienter is also demonstrated not only from CW8 but from their own statements speaking in detail about the new customers.

So I think all of those things, especially when taken collectively, Your Honor, as the Court obviously knows it's required to do here, more than sufficiently alleges scienter with respect to the pull-in scheme.

**THE COURT:**  All right.  Mr. Salceda.

**MR. SALCEDA:**  Thank you, Your Honor.

Very briefly.  I think we're -- we're back again.  We were here several months ago in the complaint.  Although they rejiggered things, it's still lacking the needed specificity.

Getting to the key point about scienter, I urge the Court re-review the Ninth Circuit's most recent decision on this, which is the *Endologix* case.

And in that case, which was decided a little over a month ago, the Court examined an instance where the scienter allegations didn't make any sense.  And it's very reminiscent

of the allegations here.

And that court, in examining the CW applications, cited the same cases that this court examined before in granting the prior motion to dismiss, the *Zucco* case, *Intuitive Surgical*, et cetera.

Finally, I want to talk very briefly about whether leave to amend should be further granted.

The Ninth Circuit in that case said where the plaintiff has had a chance to amend before, the Court's discretion to deny to plead to amend is particularly broad.

And in so doing, I think it reinforced the point, particularly applicable here, where the plaintiffs had the benefit of Your Honor's detailed order analyzing all of their allegations and granting the motion to dismiss.

And with respect to pull-ins, we've seen these things before.  They don't have the details necessary.  The cases which have found pull-in allegations sufficient are, in a word, egregious.

There's one where a chairman of the board described the company's activities, his own company's activities, as a Ponzi scheme.

So they don't come anywhere near this, and the allegations don't come close to raising the required strong inferences Your Honor just noted.

There are no allegations of stock sales.  The allegations

of corporate motive, wanting to inflate the stock for use of acquisitions, again, standard, any company.

The Rule 40 allegation, it makes -- it -- a $40,000 bonus or $45,000 bonus in this context makes no sense.  And there's no allegation that there's any wrongdoing here really.

So I think that Your Honor is right in granting the motion to dismiss, and I'd urge Your Honor to do so without leave to amend this time.  Plaintiffs have had plenty of opportunity and the benefit of Your Honor's instruction, and they haven't met the standard.

**THE COURT:**  Thank you.

Ms. Hopkins, you get the last words here.

**MS. HOPKINS:**  Yes, I just want to respond to a couple of things and just point out one other thing, Your Honor.

Defendants never addressed this allegation in our complaint; it's paragraph 317.  They stated in a June 5th, 2019, William Blair Growth Stock Conference that, quote:

"And then in December of this last year we realized that we actually have a pipeline problem that we've not focused on enough."

Defendants knew, at a minimum, Your Honor, that they had a -- they admitted they had a pipeline problem as of December. We obviously allege that they knew about this the whole time because of the meetings we talked about, the Salesforce.com reports, CW8's allegations.  These things were discussed.

Defendants don't mention that in their motion to dismiss. We raised it on opposition.  They didn't even address it on reply.  That's a clear admission that they knew at the time they made their December statements.

So the things Your Honor mentioned earlier about the customer growth and things like that, they've admitted that they knew in December.  "We realized that we actually have a pipeline problem," Your Honor.  So, at a minimum, they've admitted actual knowledge as of December 2018.  So I wanted to point that out.

And, in addition, with the *Endologix* case, every defendant I've seen lately loves to cite that case.  This is not a situation where plaintiffs are alleging defendants engaged in a business practice they knew was doomed to fail.

Plaintiffs allege that Nutanix had a public cloud product it wanted to take to market, and it couldn't do that because it was plagued with engineering and software issues.

And in order to be able to devote the resources it needed, it took a gamble that what was in the pipeline at the time and the existing customer base would be sufficient to get Nutanix through a few quarters while they diverted extra money to get this cloud product to the market.

Nutanix was admittedly losing market share to other vendors like Amazon Web Services and VMware.  They had to do this.  Analysts recognized it was critical to the company's

long-term success to get this product to market.

So this is not a situation where they engaged in this long-term business strategy that was doomed to fail.  This was a temporary solution for them, hoping that they could -- gambling they could, you know, ride it out with the existing pipeline and customer base.  That didn't -- that didn't happen here.

They -- they -- the pipe obviously declined.  They admitted at the end of the year that they had -- at the planning stage had decided to keep lead generation spending flat.

So they knew all along that they did this.  They hoped it would work out long enough to get their product to the market because they knew they were losing market share.  And that didn't happen.  So this is not anything like *Endologix*, Your Honor.

With respect to corporate motive, that's our centerpiece, obviously, motive here.  And motive is not required, as Your Honor knows.  We have actual knowledge allegations here.

Defendants had access to the SalesForce.com report.  CW8 is in a position and knows and stated that Pandey did, in fact, access the Salesforce.com reports.

Analysts commented about how Pandey was a very hands-on manager, so it wasn't surprising he took over operations at the end of the class period.  So it is equally, I would suggest,

more plausible that what CW8 is saying is correct.

Pandey was the single highest user.  Even the analyst community commented how involved he was in the sales process. So to suggest that Pandey never looked at these reports when CW8 was the one maintaining SalesForce.com and met with Pandey every quarter where they specifically talked about the declining revenue in 2018 and the backlog that could fill that is -- is -- is more than sufficient.

And with respect to the corporate motive, our corporate motive is not just a general, oh, you know, they needed money so they engaged in an offering.  This is -- so they -- they used stock to acquire companies.  That's not what we allege here.

We allege that if they didn't get a public cloud product to market, they were going to lose more market share and they were going to be in serious, serious trouble.

So, in order to be able to keep the cash high and maintain the rule of authority while getting these acquisitions to bring the cloud product to market, they had to -- to use the stock price to acquire these companies.

This is not just some general motive where there's no other information or allegations.

THE COURT:  So, Ms. Hopkins, I will go back when this is over and review, again, the complaint, and particularly the issues that you've raised with respect to CW8 and Mr. Pandey.

And I understand that you're -- you believe that you have far exceeded the hurdle that you need with respect to this motion to dismiss.

I guess my question to you is, if I disagree with you, at the end of the day, and stick with my tentative, is there anything more that you know that you would be able to allege that -- to address the concerns that I've pointed out?

**MS. HOPKINS:**  At this particular moment, there's nothing more that I know, but, you know, I am in contact, obviously, with former employees of the company that would probably give me additional information if I was requesting it.

Unfortunately, we're amending our complaint in the middle of COVID, and people were busy dealing with that.  So, you know, that -- but, you know, I could definitely do that with respect to CW8.

But, Your Honor, like I said, I think -- and that, especially coupled with, you know, the December admission that we have pipeline problems, I think, is -- is -- I don't see how you get any more scienter than we knew we had the problem at the time we made these statements.

**THE COURT:**  All right.  Mr. Salceda, did you want to say anything in response to --

**MR. SALCEDA:**  Yeah.  Obviously, December of 2018 is the last quarter of the class period.  It's halfway through the last quarter of the class period, the initial class period.

And, by the way, remember the company met its guidance for that quarter, for the January 2019 quarter. So we don't -- this was a missed quarter case without a missed quarter.

But beyond that, I think that Ms. Hopkins' response to your question about further leave to amend spoke volumes. Plaintiffs have had multiple opportunities and the Court's guidance. They can't identify anything else they would allege.

So we would urge the Court to dismiss at this time with prejudice. Thank you.

**THE COURT:** All right. Well, thank you, both, for your argument, and I will be getting out an order relatively soon.

**MS. HOPKINS:** Thank you, Your Honor.

**MR. SALCEDA:** Thank you.

**THE COURT:** Thank you.

(At 2:33 p.m. the proceedings were adjourned.)

- - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, August 28, 2020

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter