UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RYAN SCHELLER, et al.,

    Plaintiffs,

v.

NUTANIX, INC., et al.,

    Defendants.

Case No. 19-cv-01651-WHO

**ORDER REGARDING MOTION TO DISMISS**

Re: Dkt. No. 125

    Plaintiffs Ryan Scheller, Bristol County Retirement System, Joseph S. Maroun, and the City of Miami Fire Fighters and Police Officers Retirement Trust (collectively, "Plaintiffs") bring this putative class action against Nutanix, Inc., Dheeraj Pandey, and Duston M. Williams (collectively, "Nutanix"). Nutanix again moves to dismiss Plaintiffs' Second Amended Complaint, which suffers from many of the same deficiencies as their prior complaint. Most of the statements that Plaintiffs allege were false were facially true, and Plaintiffs have not adequately stated why a reasonable investor would have been misled by such statements. However, Plaintiffs have adequately alleged falsity and scienter for a few statements regarding new customer growth and sales productivity, as described further below. Accordingly, Nutanix's Motion to Dismiss is DENIED.

## BACKGROUND

    Plaintiffs first filed this action on March 29, 2019, and filed an amended complaint on September 9, 2019. Dkt. Nos. 1, 102. I granted Nutanix's motion to dismiss the amended complaint, finding that Plaintiffs failed to adequately allege the falsity of Nutanix's statements or that it acted with the requisite scienter. Dkt. No. 121 ("Order"). Plaintiffs filed a Second Amended Complaint ("SAC") on April 17, 2020. Dkt. No. 124 ("SAC"). The SAC involves most of the same allegations, which are set forth in detail in my earlier Order. However, it also includes

bolstered facts to support Plaintiffs' assertions, including more statements from confidential witnesses ("CWs").

Plaintiffs' central claims are that Nutanix made several "misrepresentations and omissions intended to conceal from investors Nutanix's rapidly declining sales pipeline and revenue." SAC ¶ 2. Although many of Plaintiffs' allegations are interrelated, they generally involve statements regarding: (i) Nutanix's investment in "lead generation," (ii) an undisclosed "pull-in" scheme, (iii) Nutanix's new customer growth, and (iv) Nutanix's sales hiring and productivity. Together, these misrepresentations concealed a "massive decline in sales productivity—the rate at which a sales representative is able to turn sales leads in the pipeline into revenue—which, in turn, caused revenue to decline." *Id.* ¶ 14.

First, Plaintiffs again point to several of Nutanix's statements related to sales and marketing and "lead generation" that they allege were misleading: (i) in Form 10-Qs from December 2017, March 2018, June 2018, and December 2018 that it "continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs," that "[t]he increase in product revenue . . . reflects increased domestic and international demand," and that Nutanix continued to "penetrate and expand in global markets through increased sales and marketing activities," e.g., *id.* ¶¶ 9, 118, 224, 230, 248, 254, 276, 308, 314; (ii) in a May 2018 press release that "[d]emand for our solutions remains strong" and that there was "continued growth in our software and support billings," *id.* ¶ 261; (iii) in an August 2018 conference call that Nutanix saw "strong growth in spending," *id.* ¶ 287; and (iv) in a 2018 Form 10-K that "we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs," and that an "increase in product revenue reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities," *id.* ¶¶ 296, 302. Plaintiffs also assert that Nutanix made further misrepresentations in a February 28, 2019 conference call, when Pandey stated that an increase in lead generation spending "drove strong pipeline generation" that he did not see any issues with its lead generation until Q2 2019, and that the lack of lead generation spending pushed things only "a quarter or two." *Id.* ¶¶ 338-39.

2

Second, Plaintiffs assert that Nutanix hid its declining pipeline by "pulling in" sales from existing customers that were expected to close in the next quarter. *Id.* ¶ 15. It continued to do this until February 2019, when the company's existing customers were "over procured" and there were no new sales to pull in. *Id.* ¶ 16. Plaintiffs assert that several CWs (CW1, CW2, CW7, CW8, and CW 11) confirmed this practice, which occurred throughout the Class Period and for all types of customers. *Id.* ¶¶ 173-75.

Third, Nutanix also made several alleged misrepresentations regarding new customers and its pipeline: (i) in a November 2017 conference call that "I wouldn't look too much into" lower amounts of "new customers that came into [Nutanix's] installed base" and that "we added a decent amount of customers," *id.* ¶ 220; (ii) in a March 2018 conference call that it "experienced record sales productivity in the quarter," "add[ed] a record number of new customers," "increase[ed] our number of Global 2000 or G2K customers by 34 in the quarter," and had made a "huge contribution to overall mid market customer acquisition," *id.* ¶¶ 236-238; (iii) in a March 2018 investor "Analyst Day" that it achieved a milestone of "over 1,000 new clients, brand-new clients in the last quarter," *id.* ¶ 242; (iv) in a May 2018 conference call that "we've actually had a renewed focus with the channel on new customer logos," that it was "really excited about what's happening in the channel with the pipeline for new logos," and that the company's shift to software-only products may have negatively impacted smaller new customer growth, *id.* ¶¶ 269, 271; (v) in an August 2018 conference call that it "added over 3,600 new customers," saw "year-over-year growth accelerated from the previous year," "added approximately 1,000 new customers," and added "approximately 40 in Q4 2018," *id.* ¶ 291; and (vi) in its Form 10-Qs and 2018 Form 10-K that "[o]ur total end customer count increased." *Id.* ¶¶ 230, 254, 282, 302, 314.

Fourth, Plaintiffs allege that Nutanix made several misstatements regarding its sales hiring and productivity. These include: (i) statements in its Form 10-Qs and 2018 10-K that "[w]e have significantly increased our sales and marketing personnel, which grew by [between 30 and 40%]" in the preceding year, that global sales team members "are in the process of ramping up," and that it "expect[ed] continuing improvement over the coming quarters," *id.* ¶¶ 227, 251, 279, 299, 311; (ii) a statement in a May 2018 press release that "[w]e had strong success in our hiring in the

3

quarter that positions us to deliver on our future growth plans," *id.* ¶ 261; (iii) statements in a May 2018 conference call that "we executed this [hiring] full-court press flawlessly and ended up hiring more new employees in Q3 than in any previous quarter by a wide margin" and "we added over 60 new sales teams, which is critical to our planned growth for future periods," *id.* ¶ 266; and (iv) in the August 2018 conference call that it had "ramped rep sales productivity" that had increased sequentially for the last three six-month periods, *id.* ¶ 287.

Nutanix moved to dismiss the SAC on May 22, 2020, arguing that Plaintiffs failed to cure any of the deficiencies identified in the Order. Dkt. No. 125 ("Mot."). Plaintiffs filed an opposition on June 26, 2020, Dkt. No. 127 ("Oppo.") and to which Nutanix replied. Dkt. No. 129 ("Reply").

**LEGAL STANDARD**

**I.     PLEADING STANDARD PURSUANT TO RULE 12(B)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured

4

by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## II.   PLEADING REQUIREMENTS IN SECURITIES FRAUD ACTIONS

Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). Securities and Exchange Commission Rule 10b-5, promulgated under the authority of Section 10(b), in turn provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The basic elements of a Rule 10b-5 claim are: (i) a material misrepresentation or omission of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) a transaction and loss causation, and (v) economic loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud claims must "plead with particularity both falsity and scienter," the same standard as Federal Rule of Civil Procedure 9(b). *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). With respect to falsity, "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Even if a plaintiff is able to satisfy all six elements of a Section 10(b) violation, the defendant may still be protected by the "safe harbor" provision of the

5

PSLRA, under which "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (emphasis in original).

## DISCUSSION

### I. FALSE OR MISLEADING STATEMENTS OR OMISSIONS

#### A. Misstatements regarding Nutanix's investment in "lead generation"

In my prior Order, I found that Plaintiffs failed to adequately assert that Nutanix's statements related to lead generation were false because they were facially true statements about sales and marketing more generally. Order at 5-6. I found that Plaintiffs failed to define "lead generation" or "pipeline" or to explain how these terms differed from the larger umbrella of "sales and marketing. *Id.* at 8. I also held that they failed to show how reasonable investors would have been misled by Nutanix's statements regarding lead generation spending. *Id.* at 9.

In the SAC, Plaintiffs describe "lead generation" as "the process of identifying and cultivating potential customers to purchase a business's products or services." SAC ¶ 3. Plaintiffs argue that "marketing" expense includes "three main components": lead generation, salaries, and travel. Oppo. 9. Lead generation comprises approximately 70% of marketing expense. SAC ¶ 212. "Lead generation" activities include "'digital marketing,' activities 'through web traffic,' 'executed campaigns,' 'brand awareness, promotions, trade shows and partner programs,' and 'all sorts of events' and 'meetings.'" *Id.* ¶¶ 3, 88. In addition, analysts understood that lead generation activities included "CIO events, digital marketing, branding campaigns, and seminars." *Id.* ¶ 88. CW4 recalled that lead generation activities were performed by Nutanix's Digital Marketing, Events, Program Teams, Account-Based Marketing, and Public Relations groups. *Id.* ¶ 89.

According to Plaintiffs, lead generation is key to creating a sales pipeline by generating sales leads, and lead generation spending is a critical component to building pipeline. *Id.* ¶¶ 3, 82-84. The ability to turn a sales lead into revenue is called "sales productivity." *Id.* ¶ 84. The key inputs of sales productivity are "salespeople and pipeline spend, the demand gen spend [e.g., lead

generation]." *Id.* Plaintiffs argue that by failing to invest in lead generation activities, Nutanix "decimated" its sales pipeline and sales productivity. Oppo. 4.

The SAC contains multiple allegations that persuasively allege that Nutanix was not investing adequate resources into lead generation or new customer growth. The problem with Plaintiffs' allegations, however, is that they do not demonstrate that Nutanix's statements at the time were false. Plaintiffs focus on the term "lead generation" because that is the term that Nutanix admitted that it kept flat in its February 2019 statement. But as I noted before, the allegedly false statements do not mention lead generation specifically.

Once again, the dispute between the parties concerns the definition of "lead generation" as opposed to "sales and marketing" and "marketing" more specifically. There is no dispute that Nutanix in fact increased spending on "sales and marketing." Similarly, there does not appear to be any dispute that Nutanix increased "marketing" spending. Plaintiffs instead contend that lead generation spending differs from marketing spending, asserting that lead generation is the main component of marketing, but that marketing also includes salaries and travel. *See* Oppo. 9-10. However, Plaintiffs do not allege how or why investors would understand that "marketing" included separate components of lead generation, salaries, and travel, and point to no public statements to that effect. Moreover, their characterization of "lead generation" as pleaded is extremely broad and still unclear. *See* SAC ¶¶ 91 ("lead generation activities at Nutanix included any activity designed to land a new customer or sell additional products to existing customers," and "included advertising, trade shows, direct mailings, events, digital marketing, branding campaigns, and conferences or seminars"), 93 ("lead generation activities [] include 'all sorts of events' and 'meetings.'"). Thus, I find that Nutanix's statements would be false only to the extent that the company did not increase spending on marketing, or on "activities related to brand awareness, promotions, trade shows and partner programs."

Plaintiffs do not assert that Nutanix did not increase spending for these particular marketing activities or marketing more generally, nor do they dispute Nutanix's assertions that these statements are not facially untrue. *See* Mot. at 17-18. In addition, publicly-filed statements cited by both parties suggest that investors would have understood lead generation to be separate

7

from marketing. These state that Nutanix considered "demand generation activities" to be a subset of marketing activities, separate from online advertising, corporate events, and social media programs. Dkt. No. 125-2[1] at 175. In addition, they assert that "sales and marketing" expenses primarily included personnel costs. *Id.* at 44. Plaintiffs argue that "[i]f personnel costs comprise the majority of Sales and Marketing Expense, and lead generation is one component of marketing, investors could not have learned from the Company's financial statements, alone, that lead generation was kept flat." Oppo. 10. Even if this is true, Plaintiffs have not identified any representations by Nutanix regarding lead generation as distinct from marketing.

Accordingly, Plaintiffs' allegations fail to provide a specific statement by Nutanix that led investors to believe that it was increasing spending on lead generation (whether understood as "marketing" expenses or expenses for a smaller subset of "brand awareness, promotions, trade shows and partner programs") when, in fact, it was not. Instead, Plaintiffs again use Defendants' February 28, 2019 statement that lead generation was kept flat to argue that its prior statement, which do not use the term "lead generation," were false. This cannot furnish the basis for a fraud claim pursuant to the "exacting requirements" of the PSLRA. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

### B. Misstatements regarding undisclosed "pull-in scheme"

The SAC states that Nutanix "pulled in" sales from existing customers that were supposed to close in the next quarter into the current quarter. SAC ¶ 15. Plaintiffs assert that in light of this "pull-in scheme," Nutanix's statements regarding continued customer growth and sales productivity were false. They rely primarily upon CWs from three of Nutanix's five sales regions. CW1 stated that every quarter prior to quarter end, he or she received an email from the Regional VP of sales copying the Director of Revenue or the Senior VP of American Sales, which encouraged salespeople to pull in specified amounts of revenue (between $100,000 and $300,000)

---

[1] I rely on materials that are cited in the SAC under the doctrine of incorporation by reference. Nutanix's request for judicial notice, Dkt. No. 126, is otherwise DENIED as moot. Plaintiffs oppose Nutanix's request, asserting that incorporation by reference is inappropriate and that the documents cannot be relied upon for their truth. Dkt. No. 128. However, I do not rely upon the documents for their factual truth, but to place Plaintiffs' allegations in context and evaluate the plausibility of their claims. *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1043 (N.D. Cal. 2019).

8

so that the company could achieve its sales target. *Id.* ¶ 176-77. For two quarters in FY 2018, CW1's manager said that the company was "significantly behind" on its revenue goals and that it would be necessary to pull in $3.8 million in orders. *Id.* ¶ 177. CW8 stated that Nutanix "routinely" pulled in sales throughout his or her employment. *Id.* ¶ 179. This witness stated that the Director of Revenue and the Senior VP of Sales determined the amount of sales needed to be pulled in. *Id.* CW7 received a phone call from a Senior Director of Consulting Services, who told the witness that Nutanix was making sales projections based on a "shell game" and that the company would run out of the backlog they were using to meet sales projections. *Id.* ¶ 181. CW2 and CW11 also experienced pull ins. *Id.* ¶¶ 180, 182. In addition, two CWs reported that Nutanix would offer products at serious discounts or at no cost in order to entice customers to close deals early. *Id.* ¶ 188.

A "pull-in" practice is not by itself fraudulent. *See Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017 WL 4865559, at *7 (N.D. Cal. Oct. 27, 2017) ("Though lead plaintiff need not prove its case at this juncture, it must make some showing, grounded in fact, that these pull-ins were the result of an impropriety, or were otherwise misleading."). Plaintiffs recognize that Nutanix regularly pulled in accounts each quarter, including before the Class Period. SAC ¶ 377. This undercuts their contention that Nutanix's pull-in practice was misleading. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1114 (N.D. Cal. 2003) (noting that "there may [] be other legitimate reasons for attempting to achieve sales earlier"). Rather, according to Plaintiffs, Nutanix's undisclosed practice of pulling in sales renders Nutanix's statements false because Nutanix knew that eventually the pipeline would dry up. The pull-in scheme allegedly concealed this declining pipeline until the point at which the practice could no longer be sustained. Therefore, Plaintiffs' challenge to Nutanix's pull-in "scheme" is effectively the same as its allegations regarding new customers and its dwindling pipeline. I find that Nutanix's practice of pulling-in sales leads each quarter by itself does not support a finding of falsity. Instead, the relevant question is whether Nutanix's statements regarding its new customers were misleading in light of the dwindling pipeline.

### C. Misstatements regarding new customers and pipeline

Plaintiffs allege that Nutanix "gave the false impression that the end customers added during the quarter were 'brand new' accounts that were increasing the Company's pipeline when, in reality, Nutanix was simply double counting sales to existing customers as new customers." Oppo. 13 (emphasis removed). Thus, Nutanix conflated new customers and end-customers to create the impression that the company was growing its new customer base. *Id.* at 14; SAC ¶ 123. Plaintiffs also assert that Nutanix made several statements regarding new leads and growth that were misleading in light of the fact that the company's "pipeline deficiencies." Oppo. 12. They also contend that Nutanix falsely dismissed concern about lack of new customer growth based upon seasonality. *Id.* at 13.

The SAC alleges that Nutanix's pipeline was tracked in Salesforce.com, which reported information about customer leads, whether a customer was potentially interested in buying from Nutanix, whether it had previously purchased from Nutanix and the likelihood that a deal would close and when. *See* SAC ¶¶ 97-98. The first "dashboard" that Nutanix employees see when they log into Salesforce.com is this pipeline report. *Id.* ¶ 99. Nutanix also used a system called Clari to track the sales pipeline and its "health" based on information extracted from Salesforce.com. *Id.* ¶ 101.

According to CW3, by May 2018 there were not many sales leads and the leads were "pretty dry." *Id.* ¶ 121. CW5 stated that most of Nutanix's sales were driven from existing accounts. *Id.* ¶ 122. By the summer of FY 2018, approximately 80% of Nutanix's sales came from 15% of its customers, which were mainly existing accounts. *Id.* ¶ 124. Similarly, Nutanix began focusing on existing larger "Enterprise" customers, at the expense of "Commercial" customers. *Id.* ¶¶ 128-29. According to CW1 and CW8, by spring of 2018 the pipeline was at least 25-30% below Nutanix's targets. *Id.* ¶ 192. CW3 confirmed that the pipeline was "pretty dry," *id.*, and CW11, who participated in weekly calls with salespeople from CW11's region, stated that by November 2019, the pipeline "would have looked bad." *Id.* ¶ 193.

CW1 also attended a 2018 sales kickoff meeting, where Nutanix's Chief Revenue Officer Louis Attanasio stated that only 50% of the sales force had made their quota for FY2018 and that

by August 2018 the funnel was "way too low." *Id.* ¶ 194. After this meeting, programs were implemented by which salespeople were assigned existing accounts to sell add-on products. *Id.* ¶ 195. CW1, CW3, and CW8 stated that Nutanix's pipeline reports would have reflected the company's declining pipeline. *Id.* ¶ 204. CW1 states that by April or May of 2018 it would have been "'pretty obvious' from the pipeline reports that Nutanix's pipeline was drying up and in trouble because it was clear there were not as many good leads coming in that would create opportunities to close sales and the forecast was much smaller." *Id.*

Further, according to CWs the decrease in sales pipeline, including the lack of new sales leads from Dell, was discussed at All-Hands meetings in 2018 attended by Pandey and Williams. *Id.* ¶ 206. At these meetings, account managers expressed concerns about the lack of sales leads and difficulty in closing deals. *Id.* ¶ 207. CW8 attended quarterly meetings with the individual defendants and other executives, during which declining pipeline and the fact that "Nutanix had a backlog" was discussed. *Id.* ¶ 209.

Nutanix asserts that its statements about new customers were not false, that every quarter it reported on the exact number of purported new customers, and that it accurately reported on its total end-customers each quarter. Mot. 21-22. It points to publicly-filed documents to argue that it "always accompanied these disclosures with a consistent definition of how it counted end-customers." Reply 12; *see also* Dkt. No. 125-2 at 11.

Plaintiffs do not allege that Nutanix's statements were numerically inaccurate. For example, they do not dispute the truth of Nutanix's statement at the March 2018 conference call that the company added a "record number of new customers," or that Nutanix's counts of end-customers was accurate. *See* SAC ¶ 239. Instead, as with many of its other claims, they allege that Nutanix created a misleading impression because (i) it was only able to report a record number of "new" customers because of its undisclosed pull-in scheme, and (ii) Nutanix's pipeline was decreasing. *Id.*

I am not persuaded that Nutanix's statements regarding "end customers" were false. Plaintiffs have not adequately alleged that a reasonable investor would have conflated the terms "end customers" and "new customers." Similarly, Plaintiffs have not alleged that Nutanix's

11

statements regarding the number of specific customers added were false or misleading. I also find that Plaintiffs have not alleged sufficient facts to support the falsity of Nutanix's November 2017 statements regarding new customers, because the allegations reflect that Nutanix's pipeline was "drying up" after this point, in mid-2018 at the earliest. In addition, Plaintiffs have not explained why Nutanix's focus on existing or "Enterprise" customers, as opposed to new and smaller customers, would necessarily lead to a declining pipeline or loss of sales.

However, I find that Plaintiffs have adequately alleged that Nutanix's statements in March 2018 that it "add[ed] a record number of new customers," and had made a "huge contribution to overall mid-market customer acquisition" were materially misleading in light of the alleged concerns throughout the company regarding the company's pipeline of new customers. For the same reasons, Plaintiffs have sufficiently alleged that Nutanix's statements in the May 2018 conference call that "we've actually had a renewed focus with the [new customer] channel on new customer logos" and that it was "really excited about what's happening in the channel with the pipeline for new logos" were misleading. *See* SAC ¶¶ 269, 271. The facts included in the SAC described above could lead a reasonable investor to conclude that Nutanix's pipeline for new customers was robust when, in fact, it was facing a significant decline.

### D.   Misstatements regarding sales hiring and productivity

Lastly, Plaintiffs assert that Nutanix made misleading representations that its sales hiring and productivity had increased, when this was not true. They point to statements each quarter that Nutanix had "significantly increased our sales and marketing personnel," that sales productivity was "ramping up," that Nutanix "had strong success in [its] hiring," and that it executed hiring plans "flawlessly." *See* Oppo. 14-15; SAC ¶ 12. They assert that Nutanix created the false impression that it was on track to meet its internal sales hiring goals needed to achieve revenue growth forecasts. Oppo. 15; SAC ¶ 12. Relatedly, Nutanix also made false statements regarding sales productivity, stating that it saw "record sales productivity," a "strong growth in spending," and "ramped rep sales productivity." Oppo. 15.

In reality, Plaintiffs assert that Nutanix was experiencing strong attrition in its sales personnel, failing to meet internal revenue goals, and experiencing "general disorganization."

SAC ¶ 115. Sales representatives were leaving the company "in droves," typically after only one year of employment, because they were demoralized by unachievable sales quotas and the lack of resources provided to close deals. *Id.* ¶ 12. According to CW11, the entire company achieved only 30%-40% of their sales quotas during the witness's employment. *Id.* ¶ 156. "Senior management" told CW11 that only 27% of the salesforce had made its quota for the prior quarter. *Id.* This was significant because new sales hires require "significant training," and it usually takes about one year for a new hire to become fully productive. *Id.* ¶ 107.

As discussed in my prior Order, Nutanix's statements regarding numeric increases in sales and marketing personnel hired were facially true. Again, Plaintiffs have not adequately alleged how a reasonable investor would have been misled by these statements regarding hiring into believing that Nutanix's retention and sales productivity also increased. However, I find that Plaintiffs have adequately asserted the falsity of Nutanix's claims that it experienced "record sales productivity," had executed hiring plans "flawlessly," "had strong success in our hiring . . . that positions us to deliver on our future growth plans," and had "ramped rep sales productivity." These statements were misleading to a reasonable investor in light of Plaintiffs' allegations that Nutanix's sales force was experiencing high levels of attrition, sales people were unable to meet quotas, and sales productivity was in fact poor. Accordingly, Nutanix has adequately alleged that these statements were false.

## II.     SCIENTER

Because not all of the alleged statements were false, I address scienter only with respect to those regarding new customers and sales productivity that I are misleading. In order for these statements to have been made with the requisite scienter, Plaintiffs must show that the statements were made either intentionally or with deliberate recklessness, or "a degree of recklessness that strongly suggests actual intent." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008).

The crux of Plaintiffs' argument with respect to scienter is that Nutanix acted recklessly.[2]

---

[2] Plaintiffs also assert that Nutanix actually knew that it was making false statements, but provides no argument or citation to the SAC to support this assertion. *See* Oppo. 17.

13

Many of Plaintiffs' allegations and arguments regarding scienter are substantially the same as those I addressed and rejected in my prior Order. For example, Plaintiffs again argue that Nutanix's statements at the end of the Class Period statements establish scienter. *See* Oppo. 17-18. I have already rejected that argument, and Plaintiffs have not provided any new information that would alter that conclusion. Order 20. Pandey's statement that he realized the company had a pipeline problem in December of 2018 does not establish knowledge prior to that date and I do not find that his subsequent statements were false or misleading. *See* SAC ¶ 317. In addition, I have already ruled that Nutanix's statements regarding their experiences in 2017 do not support scienter. *See* Oppo. 22-23; Order 20. Finally, I again am not persuaded by Plaintiffs' argument that Nutanix's public offering to obtain capital is probative of motive. *See* Oppo. 24. Plaintiffs admit that the Nutanix's acquisitions were motivated in large part "to catch up with the competition" by acquiring two cloud-based companies. SAC ¶ 404. Plaintiffs fail to coherently allege how these acquisitions, or Nutanix's attempts to abide by the "Rule of 40," establish a motive to make misleading statements regarding new customers or sales productivity. Therefore, these allegations do not provide an inference of motive.

Plaintiffs have provided new facts with regard to some of their scienter allegations. With respect to the misleading statements regarding new customers, the SAC alleges additional information that the individual defendants had reviewed Salesforce.com pipeline reports. Oppo. 19. The company created these pipeline reports in Salesforce.com, which was the first "dashboard" that employees saw when logging in. According to CW1 and CW8, Pandey had a dashboard specifically created for him, reviewed the pipeline reports every day, and was "widely known" as the single-highest user of Salesforce.com in the company. *Id.* ¶¶ 18, 201-202. In addition, Pandey and Williams were present at quarterly All-Hands meetings where the declining pipeline was discussed. Oppo. at 19-20.

CW1 is a former Nutanix Commercial Account Manager for the Midwest region. *See* SAC ¶ 50. CW1 is not alleged to have had any contact with Pandey or Williams. CW8 is a former Director of Business Operations and Project Management and Services who was responsible for leading the globally disbursed program management and business operations team. *Id.* ¶ 57.

14

CW8's only alleged contact with Pandey or Williams was during quarterly meetings. *Id.* ¶ 209. These allegations do not establish personal knowledge that Pandey accessed Salesforce every day or was the single highest user of Salesforce in the company.[3] *See* SAC ¶ 201.

However, the facts plausibly allege that Pandey was regularly kept apprised of Nutanix's pipeline, whether through Salesforce.com or otherwise, such that he was at least deliberately reckless as to the fact that the pipeline was declining and the statements made regarding customer growth misleading. Plaintiffs allege that according to analysts, Pandey was "active . . . in the sales process." SAC ¶ 395. CW5 "regularly met with Defendant Pandey about this witnesses' pipeline relating to new customers and sales leads for Global Accounts." *Id.* ¶ 396. CW5 personally met with Pandey and Williams to discuss the status of prospective customers and stated that Pandey would have similarly accompanied other sales personnel to visit non-Global accounts." *Id.* ¶ 199. CW5 also described the sales pipeline at Nutanix as a "never-ending drill" and stated that sales quotas were "unrealistically high." *Id.* ¶¶ 153, 203.

According to CW1, the declining revenue, dwindling pipeline, lack of new sales leads, and sales attrition problems were discussed at All-Hands meetings. SAC ¶¶ 206-07. At one meeting, Pandey noted the loss of sales leads from Dell, a large source of revenue for Nutanix. *Id.* ¶¶ 165, 206. CW8 also stated that CW8 attended quarterly meetings with Pandey and Williams where "they discussed revenue targets." *Id.* ¶ 209. In addition, Plaintiffs allege that in August 2018, CW1 attended an annual sales kickoff meeting, which was also attended by Pandey, Williams, and other executives. *Id.* ¶ 194. At this meeting Attanasio told the entire Nutanix sales organization that only 50% of the salesforce had made their quota for FY 2018. *Id.*

Although this is a close question, all of these allegations together support an inference of scienter that is "at least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues &*

---

[3] At the hearing, Plaintiffs stated that CW8 was the person who maintained Salesforce.com. However, this description of CW8 conflicts with the allegations in the SAC, which recite that CW8 was a Director of Business Operations and Project Management and Services and led "the globally disbursed program management and business operations team." SAC ¶ 57. And despite Plaintiffs' allegations that Pandey was "widely known" as the highest user of Salesforce.com in the company, none of the other ten CWs corroborated this account. Thus, Plaintiffs' scienter allegations based on Pandey's Salesforce use give little weight to a finding of knowledge.

*Rights, Ltd.,* 551 U.S. 308, 326 (2007). An opposing inference—that the individual defendants were ignorant of the declining pipeline even as they discussed this pipeline with investors—is implausible in light of the allegations from multiple CWs, including several that met with the defendants, that throughout the company that the pipeline was "in trouble" or "drying up."

*In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017) ("*Quality*") is instructive. In that case, the defendants made similar overly optimistic statements regarding the company's sales growth and pipeline. *Id.* at 1137–38. The court found that plaintiffs had established scienter because the complaint included "multiple statements from confidential witnesses with personal knowledge of QSI's declining sales during the Class Period;" statements that sales reports were available to executives and reflected declining sales; a statement from one CW with personal knowledge that these reports were automatically delivered to the management team; and allegations that the executives were in the habit of "continually monitor[ing] the Company's revenues and earnings." *Id.* at 1145. The court also noted that the executives themselves represented to investors the state of the pipelines and one executive made a suspicious stock sale. *Id.* at 1145–46.

Unlike *Quality*, here there are no allegations from witnesses with personal knowledge that executives in fact regularly accessed Salesforce.com. But there are sufficient allegations throughout the SAC, including from three CWs with personal knowledge, that the pipeline was very important to Nutanix and was in decline at the time that Nutanix made the allegedly misleading statements. SAC ¶ 270. Moreover, several CWs described meetings with Pandey and/or Williams in which sales and pipeline was discussed. Although Plaintiffs do not specifically allege that *problems* with the pipeline were discussed, this fact can be inferred from the remaining allegations in the SAC, which allege widespread concerns about Nutanix's pipeline. Plaintiffs also allege that Pandey was a very "hands-on" CEO according to CW1 and CW5. While CW1 lacks personal knowledge of Pandey's management style, CW5 asserts in detail that CW5 "regularly" met with Pandey. Two other witnesses describe quarterly meetings where Pandey was present in which the decrease in the sales pipeline was discussed. *Id.* ¶¶ 206, 209. CW1 also described quarterly "War Room" meetings held by Pandey in which sales and deals to be pulled in

were discussed. *Id.* ¶ 178. These allegations support a strong inference that Pandey knew, or at least was reckless as to the fact that Nutanix's pipeline was declining substantially. Further, like in *Quality*, the individual defendants spoke regularly to investors and analysts about the sales pipeline and reported new customers, including the exact number of new customers added. *See*, e.g., *id.* ¶¶ 237-38, 242, 269, 291.

Finally, Plaintiffs also assert that the individual defendants' bonuses were tied to the number of new customer adds. SAC ¶ 387. Neither defendant achieved their target of new customer adds in FY 2018 or FY 2019, although the defendants came close in FY 2018. *Id.* ¶¶ 387-89. This too supports an inference that the individual defendants were aware of the new customers in Nutanix's pipeline, or the lack thereof.

For the same reasons discussed above, Plaintiffs have established scienter with respect to Nutanix's statements regarding sales productivity. The SAC asserts that Nutanix's pipeline and revenue growth are dependent upon effective sales productivity. *Id.* ¶¶ 82-85. CW1 asserts that at All-Hands meetings, employees discussed sales attrition problems, issues in closing deals, and the need to hire more salespeople. *Id.* ¶¶ 206-08.

I do not find that Plaintiffs adequately alleged scienter with respect to Nutanix's statements regarding hiring (e.g., that it executed hiring plans "flawlessly" and "had strong success in our hiring . . . that positions us to deliver on our future growth plans"). Plaintiffs' scienter allegations as to these statements are limited to general statements regarding sales attrition at All-Hands meetings. Given the distinction between hiring and attrition as discussed in my prior order, it is at least equally plausible that the defendants did not understand that their facially true statements regarding hiring were misleading.

Accordingly, Plaintiffs have adequately stated a claim with respect to the above statements regarding Nutanix's new customer growth and sales productivity.

**CONCLUSION**

For the above reasons, Nutanix's motion to dismiss is DENIED. A Case Management Conference is set for October 27, 2020 at 2 p.m. The parties shall file a Joint Case Management Statement on October 20, 2020.

**IT IS SO ORDERED.**

Dated: September 11, 2020

William H. Orrick
United States District Judge