Benjamin Heikali SBN 307466
Email: bheikali@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885

Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice* pending)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: rgonnello@faruqilaw.com
      klenahan@faruqilaw.com
*Attorneys for Proposed Lead Plaintiff Frank H. May*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | Case No. 3:19-cv-01651-WHO<br><br>**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**<br><br><u>**CLASS ACTION**</u><br>Judge:  Hon. William H. Orrick<br>Date: April 28, 2021<br>Time: 2:00 p.m.<br>Courtroom: 2 – 17th Floor |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.     THE L&K GROUP IS INADEQUATE AND AYTPICAL TO REPRESENT THE CLASS ...................................................................................................................... 4

     A.     The L&K Group Is Inadequate Because They Are A Lawyer-Driven Hodgepodge Of Unrelated Investors ........................................................ 4

     B.     The L&K Group Is Subject To A Unique Defense Due To Their Selection Of Counsel .............................................................................................. 8

     C.     The L&K Group's Members Should Not Be Evaluated Individually .................. 11

     D.     The L&K Group's Members Are Inadequate And Atypical Even If Evaluated Individually ........................................................................................ 12

        1.     The Norton Trust Is Subject To Unique Defenses Concerning Its Reliance ............................................................................................... 12

        2.     Flores And Miami Are Inadequate And Atypical ..................................... 14

II.     MAY SHOULD BE APPOINTED LEAD PLAINTIFF .................................................. 15

     A.     May Has The Largest Financial Interest In The Litigation ................................... 15

     B.     May's Motion Should Be Granted Priority As He Was An Original Lead Plaintiff Movant ............................................................................................. 15

CONCLUSION .................................................................................................................. 17

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS
NO. 3:19-cv-01651-WHO**

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Allergan PLC Sec. Litig.*,
    2020 WL 8620082 (S.D.N.Y. Dec. 7, 2020) ...............................................................16

*Andrada v. Atherogenics, Inc.*,
    2005 WL 912359 (S.D.N.Y. Apr. 19, 2005)................................................................14

*Arciaga v. Barrett Business Services, Inc.*,
    2015 WL 791768 (W.D. Wash. Feb. 25, 2015)..........................................................8

*Aronson v. McKesson HBOC, Inc.*,
    79 F. Supp. 2d 1146 (N.D. Cal. 1999) ...................................................................4, 5

*Ballan v. Upjohn Co.*,
    159 F.R.D. 473 (W.D. Mich. 1994)..........................................................................14

*In re BankAmerica Corp. Sec. Litig.*,
    263 F.3d 795 (8th Cir. 2001) ..................................................................................7

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).............................................................................................13, 14

*Beck v. Maximum, Inc.*,
    457 F.3d 291 (3d Cir. 2006)......................................................................................12

*Bodri v. GoPro, Inc.*,
    2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) .......................................................4, 6

*Bowman v. Legato Sys., Inc.*,
    195 F.R.D. 655 (N.D. Cal. 2000)..............................................................................5

*Buettgen v. Harless*,
    263 F.R.D. 378 (N.D. Tex. 2009) .............................................................................12

*Carson v. Clarent Corp.*,
    2001 WL 1782712 (N.D. Cal. Dec. 14, 2001)..........................................................16

*In re Cavanaugh*,
    306 F.3d 726 (9th Cir. 2002) .......................................................................1, 2, 12, 15

*Chana Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
    270 F.R.D. 150 (S.D.N.Y. 2010) ..............................................................................10

*City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*,
    2021 WL 396343 (S.D.N.Y. Feb. 4, 2021)...............................................................15

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

*Crihfield v. CytRx Corp.*,
2016 WL 10587938 (C.D. Cal. Oct. 26, 2016)......................................................................6

*In re Critical Path, Inc. Sec. Litig.*,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) (Orrick, J.) ....................................................11, 13, 17

*Culver v. City of Milwaukee*,
277 F.3d 908 (7th Cir. 2002) ........................................................................................8

*In re Diamond Foods, Inc. Sec. Litig.*,
281 F.R.D. 405 (N.D. Cal. 2012).................................................................................9

*Faris v. Longtop Financial Tech. Ltd.*,
2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011)...............................................................14

*Frias v. Dendreon Corp.*,
835 F. Supp. 2d 1067 (W.D. Wash. 2011)...................................................................4

*Gutman v. Sillerman*,
2015 WL 13791788 (S.D.N.Y. Dec. 8, 2015) .............................................................8

*Haideri v. Jumei Int'l Holding Ltd.*,
2020 WL 5291872 (N.D. Cal. Sept. 4, 2020) ..............................................................4

*Hufnagle v. Rino Int'l Corp.*,
2011 WL 710676 (C.D. Cal. Feb. 16, 2011)................................................................4

*Isaacs v. Musk*,
2018 WL 6182753 (N.D. Cal. Nov. 27, 2018) ............................................................6

*Jonathan Tan v. NIO Inc.*,
2020 WL 1031489 (E.D.N.Y. Mar. 3, 2020)...............................................................7

*Kinney v. Capstone Turbine Corp.*,
2016 WL 5341948 (C.D. Cal. Feb. 29, 2016)..............................................................4

*Markette v. Xoma*,
2016 WL 2902286 (N.D. Cal. May 13, 2016)..............................................................6

*Miller v. Ventro Corp.*,
2001 WL 34497752 (N.D. Cal. Nov. 28, 2001) .......................................................4, 5

*In re Neopharm, Inc. Sec. Litig.*,
2004 WL 742084 (N.D. Ill. Apr. 7, 2004) .................................................................16

*In re Netflix, Inc., Sec. Litig.*,
2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ...................................................4, 11, 13

*In re Network Assocs. Sec. Litig.*,
76 F. Supp. 2d 1017 (N.D. Cal. 1999) ...............................................................5, 9, 10

iii

*In re NYSE Specialists Sec. Litig.*,
  240 F.R.D. 128 (S.D.N.Y. 2007) ................................................................................16

*In re Petrobras Sec. Litig.*,
  104 F. Supp. 3d 618 (S.D.N.Y. 2015) ......................................................................8, 11

*Randall v. Fifth Street Finance Corp.*,
  2016 WL 462479 (S.D.N.Y. Feb. 1, 2016) ..................................................................8

*Reliable Money Order, Inc. v. McKnight Sales Co.*,
  704 F.3d 489 (7th Cir. 2013) ....................................................................................10

*Richardson v. TVIA, Inc.*,
  2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) ..............................................................2

*Sabbagh v. Cell Therapeutics, Inc.*,
  2010 WL 3064427 (W.D. Wash. Aug. 2, 2010) ...........................................................5

*Serafimov v. Netopia, Inc.*,
  2004 WL 7334061 (N.D. Cal. Dec. 3, 2004) ..............................................................12

*Skwortz v. Crayfish Co.*,
  2001 WL 1160745 (S.D.N.Y. Sep. 28, 2001) .............................................................16

*In re SLM Corp. Sec. Litig.*,
  258 F.R.D. 112 (S.D.N.Y. 2009) ...............................................................................17

*Sweet v. Pfizer*,
  232 F.R.D. 360 (C.D. Cal. 2005) .................................................................................8

*In re Telxon Corp. Sec. Litig.*,
  67 F. Supp. 2d 803 (N.D. Ohio 1999) ........................................................................16

*In re Tezos Sec. Litig.*,
  2019 WL 2183448 (N.D. Cal. Apr. 8, 2019) ..............................................................16

*Tsirekidze v. Syntax-Brillian Corp.*,
  2008 WL 942273 (D. Ariz. Apr. 7, 2008) ..................................................................12

**Statutes**

15 U.S.C. § 78u-4(a)(3)(A)(i)(II) ...............................................................................11

15 U.S.C. §§ 78u-4(a)(3)(A)(i)(II), (a)(3)(B)(iii)(I)(aa) ...............................................16

15 U.S.C. § 78u-4(a)(3)(B)(i) ......................................................................................4

15 U.S.C. § 78u-4(a)(3)(B)(iii) .....................................................................................1

**Other Authorities**

Cal. R. Prof. Conduct 1.7 ........................................................................................................7

Fed. R. Civ. P. 23(g)(4) .........................................................................................................10

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

Frank H. May ("May") respectfully submits this memorandum of law pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), in opposition to competing motions seeking appointment as Lead Plaintiff for the above-captioned action, and in further support of his motion.[1]  ECF Nos. 182-182-5.

**INTRODUCTION**

Five motions for appointment as Lead Plaintiff and approval of Lead Counsel were filed by the following putative Class members:  (1) May, represented by the Faruqi Firm; (2) the self-styled Nutanix Investor Group ("L&K Group" or "Group"), consisting of the Norton Family Living Trust UAD 11/15/2002 ("Norton Trust" or "Trust"), Jose Flores ("Flores"), and the City of Miami Firefighters' and Police Officers' Retirement Trust ("Miami"), represented by Levi & Korsinsky LLP ("L&K") and Wolf Popper LLP; (3) California Ironworkers Field Pension Trust ("California"), represented by Robbins Geller Rudman & Dowd LLP; (4) City of Birmingham Retirement and Relief System ("Birmingham"), represented by Saxena White P.A.; and (5) Bristol County Retirement System ("Bristol County"), represented by Labaton Sucharow LLP and Thornton Law Firm LLP.[2]

The PSLRA establishes a rebuttable presumption in favor of appointing as lead plaintiff the putative class member who: (1) either files the complaint or a timely motion—or in this case, in response to a court order; (2) establishes that the class member has the "largest financial interest in the litigation; and (3) makes a *prima facie* showing that the class member satisfies Rule 23's requirements for class representatives.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii).

"The statutory process is sequential:  The Court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical."  *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002).

---

[1]   Unless otherwise noted, all internal citations and quotations are omitted, and all emphases are added.

[2]   Bristol County filed a non-opposition to competing motions on April 5, 2021.  *See* ECF No. 192.

1

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

In determining which potential lead plaintiff possesses the "largest financial interest" in the litigation, courts typically weigh four factors, with the greatest weight being afforded to the approximate "losses suffered[.]"  *See Richardson v. TVIA, Inc.*, 2007 WL 1129344, at *3-4 (N.D. Cal. Apr. 16, 2007).  After the Court identifies the movant with the largest financial stake in the case, the Court must then determine whether that plaintiff "satisfies the other statutory requirements[,]" in particular "those of 'typicality' and 'adequacy'" under Fed. R. Civ. P. 23(a). *Cavanaugh*, 306 F.3d at 730, 732.

The remaining movants assert the following losses in the Action:

| Movant | LIFO Losses |
| --- | --- |
| **L&K Group** | |
| Norton Trust | $2,566,489.87 |
| Flores | $343,888.23 |
| Miami | $197,447.19 |
| May | $743,104.83 |
| California | $705,690.95 |
| Birmingham | $420,538.00 |

*See* ECF Nos. 178-2 (L&K Group's losses); ECF No.182-3 (May's losses); ECF No. 185-2 (California's losses); ECF No. 175-2 (Birmingham's losses).

Although the L&K Group purports to possess the largest financial interest in the litigation, they are only able to do so by improperly aggregating their individual losses.  *See* ECF Nos. 177-178-3.  Additionally, the L&K Group is inadequate because it is a lawyer-driven amalgamation of unrelated investors grouped together solely for the purpose of keeping its counsel, L&K, in the Lead Counsel position.  Indeed, L&K failed in its initial attempt to foist Flores and Miami into the Lead Plaintiff role in order to retain its position as Lead Counsel after the former Court-appointed Lead Plaintiff, Shimon Hedvat ("Hedvat") withdrew before Hedvat had to sit for a deposition or respond to discovery.  Having realized that neither Flores nor Miami had sufficient losses to claim the largest financial interest in the litigation, L&K now seeks to

2

maintain control over the action by grouping unrelated investors Flores and Miami with yet another unrelated investor, the Norton Trust.  The Group has proffered no reason why three Lead Plaintiffs and two law firms (L&K and "additional counsel" Wolf Popper LLP) are necessary to prosecute this case, particularly considering that the Group maintains that L&K has been serving the Class well as sole Lead Counsel.  Given that the PSLRA was enacted to end lawyer-driven litigation rather than encourage it, gamesmanship of this nature should not be condoned.

And because the L&K Group moved as a unit—not individually—its members should not be considered individually.  Even assuming, *arguendo*, that its members were considered as individual movants, none of its members are suitable to lead the case.  While the Norton Trust claims the largest individual losses of any movant, it is subject to a unique defense of non-reliance because all of its losses are based on stock that was not acquired at the market price, an essential prerequisite to invoking the fraud-on-the-market presumption.  Presumably, L&K did not seek to have the Norton Trust appointed as sole Lead Plaintiff, even though it claims **millions** more in losses than the remaining Group members or any of the original lead plaintiff movants,[3] because L&K is well aware of this very issue.  In any event, the Norton Trust is additionally inadequate because its chosen counsel appears to have made numerous misrepresentations concerning the circumstances and timing of former Lead Plaintiff Hedvat's withdrawal.  Flores and Miami are also inadequate for this reason, as well as other reasons discussed below.

With the L&K Group disqualified, May is entitled to invoke the PSLRA's "most adequate plaintiff" presumption because May possesses the next largest financial interest of the remaining movants and has made a *prima facie* showing of his adequacy and typicality.  No proof exists to rebut May's presumption.  Furthermore, as a movant who timely sought appointment as Lead Plaintiff originally, May is entitled to a preference over those movants who did not.  Therefore, May should be appointed Lead Plaintiff in the action and his selection of the Faruqi Firm as Lead Counsel should be approved.

---

[3]    *See* ECF No. 69 at 3 (May's lead plaintiff opposition brief from the original lead plaintiff contest, listing the movants' respective losses).

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

**ARGUMENT**

**I.    THE L&K GROUP IS INADEQUATE AND AYTPICAL TO REPRESENT THE CLASS**

**A.    The L&K Group Is Inadequate Because They Are A Lawyer-Driven Hodgepodge Of Unrelated Investors**

The L&K Group is inadequate because it is a lawyer-driven group of unrelated investors. One of the primary purposes of the PSLRA "was to prevent lawyer-driven litigation." *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1152 (N.D. Cal. 1999). Although the PSLRA permits the appointment of a group as lead plaintiff, *see* 15 U.S.C. § 78u-4(a)(3)(B)(i), courts are divided over whether and under what circumstances to allow the aggregation of investors as a group when appointing lead plaintiffs. Courts in this Circuit frequently find that plaintiffs without any existing relationship cannot aggregate their financial stakes. *See Haideri v. Jumei Int'l Holding Ltd.*, 2020 WL 5291872, at *3-5 (N.D. Cal. Sept. 4, 2020) (finding that "courts have often looked with skepticism at 'artificial groups,' *i.e.*, groups made up of persons or entities that did not have a pre-litigation relationship[,]" and rejecting such a group); *Bodri v. GoPro, Inc.*, 2016 WL 1718217, at *4 (N.D. Cal. Apr. 28, 2016) (finding group inadequate because "[t]o allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff"); *In re Netflix, Inc., Sec. Litig.*, 2012 WL 1496171, at *4 (N.D. Cal. Apr. 27, 2012) ("[T]he courts of this circuit uniformly refuse to aggregate the losses of individual investors with no apparent connection to each other aside from their counsel."); *see also Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1073 (W.D. Wash. 2011) ("The emerging majority position looks askance at the appointment of a group of unrelated persons as lead plaintiff."); *Hufnagle v. Rino Int'l Corp.*, 2011 WL 710676, at *2 (C.D. Cal. Feb. 16, 2011).

Some courts have permitted a small group of unrelated investors to serve as lead plaintiffs but those courts "require[] the group to justify and explain its composition and structure in terms of adequacy to represent the class." *Kinney v. Capstone Turbine Corp.*, 2016 WL 5341948, at *2 (C.D. Cal. Feb. 29, 2016); *Miller v. Ventro Corp.*, 2001 WL 34497752, at *8 (N.D. Cal. Nov. 28, 2001) ("This flexible approach fulfills the intent of the PSLRA to appoint the person or persons most capable of adequately representing the interests of class members. It

4

achieves the goal of preventing lawyers from directing the litigation by forcing the group to justify its existence and explain its structure, particularly its control over the litigation.").  In those courts, the group must "present evidence with respect to its formation, its operational structure, or whether the members of the group had ever communicated with one another about their roles." *Sabbagh v. Cell Therapeutics, Inc.*, 2010 WL 3064427, at *5 (W.D. Wash. Aug. 2, 2010).  Thus, courts require evidence which "provide[s] appropriate information about its members, structure, and intended functioning" to prove *inter alia* that the group will work cohesively.  *Miller*, 2001 WL 34497752, at *8.

The position most consistent with the policy goals of the PSLRA is a bright-line rule that prevents a group of unrelated individuals from being appointed lead plaintiffs.  Indeed, the reasoning of the courts that prohibit unrelated groups from serving as lead plaintiff is based directly on Congress's policy goals: "[t]he whole point of the reform [act] was to install a lead plaintiff with substantive decision making ability and authority" to control the course of litigation and "[a] mass of unrelated investors could not" act as "a unified decisionmaker" with "internal coherency[.]"  *In re Network Assocs. Sec. Litig.*, 76 F. Supp. 2d 1017, 1024 (N.D. Cal. 1999); *Bowman v. Legato Sys., Inc.*, 195 F.R.D. 655, 658 (N.D. Cal. 2000) ("The Reform Act was intended to create a new model for securities fraud litigation, under which the district court would appoint a strong lead plaintiff who would actively manage the litigation on behalf of the class.  Given this purpose, many district courts have rejected lead plaintiff applications from large, lawyer-solicited aggregations of shareholders or from subsets of such aggregations."); *Aronson*, 79 F. Supp. 2d at 1153-54 (adopting the view that the PSLRA "forbids aggregation of unrelated plaintiffs").

Flores, Miami, and the Norton Trust's grouping is clearly attorney-engineered for the sole purpose of aggregating their claims to obtain the presumptive lead plaintiff status over May and other putative class members.  Brazenly attempting to manufacture a prior connection between Miami and Flores where none exists, the Group's motion states that Miami and Flores have a "pre-existing relationship" because they "previously sought appointment together as lead plaintiff."  *See* ECF No. 177 at 2.  They are referring, of course, to the Motion to Withdraw as

Lead Plaintiff and Substitute Lead Plaintiff ("Substitution Motion"), ECF No. 161, in which their counsel L&K attempted to shoehorn Flores and Miami into the Lead Plaintiff role for the purpose of maintaining the firm's position as Lead Counsel.  This "relationship" obviously does not predate this litigation, and counsel's glibness only serves to underscore the fact that the Group is precisely the type of attorney-driven group of unrelated investors that courts reject as inadequate.  *See Markette v. Xoma*, 2016 WL 2902286, at *9 (N.D. Cal. May 13, 2016) (rejecting group "created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel" as inadequate); *GoPro*, 2016 WL 1718217, at *4 (finding group of previously unrelated investors inadequate as it was apparently made "for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff"); *Crihfield v. CytRx Corp.*, 2016 WL 10587938, at *4 (C.D. Cal. Oct. 26, 2016) (rejecting group and appointing individual movant with largest financial interest).

Although the L&K Group has filed a joint declaration, ECF No. 178-3 ("Joint Declaration"), the Joint Declaration corroborates the fact that it is the Group's lawyers who are steering the ship.  *See Crihfield*, 2016 WL 10587938, at *4 (rejecting group which submitted joint declaration as lawyer-driven).  For one thing, there is no explanation as to how two retail investors, Flores and the Norton Trust, and an institution, Miami, who are based in California, Washington, and Florida, respectively, came together to seek appointment as Lead Plaintiff. ECF No. 178-3 at ¶¶2-4.  Their silence is no mistake—they were plainly introduced by counsel and did not admit it because courts often reject such lawyer-driven groupings.  *See, e.g., Isaacs v. Musk*, 2018 WL 6182753, at *3 (N.D. Cal. Nov. 27, 2018) (rejecting proposed lead plaintiff group where the joint "declaration reflects that the [group] members are unrelated and were introduced to one another by their lawyers (even if at their request)" and there was "nothing concrete" to back up the group's claim that its members would "be able to work together well, efficiently, and so forth[]").

Furthermore, the Group's purported method of resolving disputes is inappropriate and antithetical to the policies underlying the PSLRA.  They state that in the event they "are unable to reach a unanimous decision" "regarding litigation decisions" they would "present [their]

6

respective positions to a qualified independent arbitrator who has previously served as a state or federal judge and to be bound by any decisions made by the arbitrator." ECF No. 178-3 at ¶19. In other words, they would delegate to a third party—an arbitrator—the decision-making power that Congress bestowed on the Court-appointed Lead Plaintiff and saddle the putative Class with needless arbitration fees in the process. *See Jonathan Tan v. NIO Inc.*, 2020 WL 1031489, at *4 n.6 (E.D.N.Y. Mar. 3, 2020) (declining to appoint as lead plaintiff an unrelated group represented by L&K and another law firm, and noting that the group's proposal to have an arbitrator resolve their disputes contemplates "side litigation" that "would necessarily create inefficiencies in the prosecution of the action were the [] Group appointed lead plaintiff"); *cf. In re BankAmerica Corp. Sec. Litig.*, 263 F.3d 795, 801 (8th Cir. 2001) ("[T]he lead plaintiff provisions of the PSLRA create significant federal rights that previously did not exist[,]" giving the court-appointed lead plaintiff "the right to steer litigation"). Nor is it clear as a practical matter how that arrangement would work given that there are times when litigation decisions need to be made quickly, and presumably each of the three Group members would need to submit their respective positions to the arbitrator with sufficient time for the arbitrator to analyze and rule on the dispute. And, of course, how could the Group's counsel represent each Group member in the dispute when at least some of the Group members would be taking contradictory positions? *See* Cal. R. Prof. Conduct 1.7.

Additionally, the fact that the Norton Trust purportedly has a significantly larger financial interest than Flores and Miami combined, yet is willing to either compromise on decisions with them or outsource the decision-making power vested in the Lead Plaintiff to a third-party arbitrator, demonstrates that the Norton Trust is inadequate because it is willing to abandon the rights that Congress granted specifically to the Lead Plaintiff. *See BankAmerica*, 263 F.3d at 801. The Trust clearly let its lawyers convince it to cede control of the case to two investors with a smaller stake in the case—and occasionally an arbitrator with no stake at all—even though the PSLRA enacted a presumption favoring class members like the Trust who supposedly possesses the largest financial interest in the case.

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

Notably absent from the Joint Declaration is any explanation as to why two law firms— proposed lead counsel L&K and "additional counsel" Wolf Popper—need to be retained.  There is no attempt to explain why Wolf Popper is there at all, or what its specific responsibilities would be.  Rather, the Group's motion cryptically states that Wolf Popper will be involved as "additional counsel to the Class under [L&K's] supervision[,]" and that it is a law firm with experience in securities class actions that has successfully worked with L&K in the past.  *Id.* at 13.[4]  What is even more unclear is why additional counsel is necessary if, as the Group's motion represents, L&K has demonstrated its adequacy to serve as Lead Counsel based on its conduct to date in its role as sole Lead Counsel in this litigation.  *See* ECF No. 177 at 13-14; *Arciaga v. Barrett Business Services, Inc.*, 2015 WL 791768, at *3 (W.D. Wash. Feb. 25, 2015) (declining to appoint group of unrelated investors and expressing "concern" over the group's request to appoint "two law firms to be co-lead counsel"); *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015) (rejecting group which failed to adequately explain presence of second law firm).  Thus, the Joint Declaration does nothing to counter the fact that the L&K Group is improperly lawyer driven.

**B.      The L&K Group Is Subject To A Unique Defense Due To Their Selection Of Counsel**

The conduct of the L&K Group's counsel ***in this litigation*** is relevant to determining the L&K's Group's adequacy because "the performance of the class lawyer is inseparable from that of the class representative."  *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002).  Thus, in situations where proposed lead counsel has acted improperly in the case, both counsel and the proposed lead plaintiff are inadequate.  *See, e.g., Gutman v. Sillerman*, 2015 WL 13791788, at *3 (S.D.N.Y. Dec. 8, 2015) (rejecting lead plaintiff movant as inadequate where counsel engaged in "chicanery"); *accord Sweet v. Pfizer*, 232 F.R.D. 360, 371 (C.D. Cal. 2005) (finding plaintiff

---

4      At least one other court has viewed the "additional counsel" arrangement with suspicion. *See, e.g., Randall v. Fifth Street Finance Corp.*, 2016 WL 462479, at *1 n.2 (S.D.N.Y. Feb. 1, 2016) (expressing confusing over a lead plaintiff motion that proposed L&K as lead counsel but listed another law firm as "additional counsel," stating that "[i]t is unclear what this designation means").

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

inadequate where counsel failed to comply with multiple orders and Local Rules). Indeed, "[a] lead plaintiff is a fiduciary for the investor class. No decision by the lead plaintiff is more important than the selection of class counsel." *In re Diamond Foods, Inc. Sec. Litig.*, 281 F.R.D. 405, 413 (N.D. Cal. 2012).

The L&K Group's counsel, L&K, previously represented Hedvat, the former Lead Plaintiff who withdrew. As May argued during the original round of lead plaintiff briefing, L&K misled investors by issuing misleading advertisements to solicit class members. ECF No. 69 at 4, 9-12. For example, L&K included a form on its website titled, "Nutanix, Inc. Loss Form" which misleadingly resembles a claim form that one would fill out to receive settlement proceeds. *Id.* at 11-12. The form states, "See If You *Qualify* For Monetary Reward." *See* ECF No. 69 (May's original lead plaintiff opposition brief) at 11; ECF No. 69-8 (L&K's "Nutanix, Inc. Loss Form," attached as Ex. G to May's original lead plaintiff opposition brief). By inviting investors to see if they "qualify" for money when no settlement class has been certified, L&K's Loss Form looks "much like [a] claim form[]," and is therefore misleading because investors "could easily have thought that they needed to sign up to participate at all." *Network Assoc.*, 76 F. Supp. 2d at 1032. May also raised these issues during the Lead Plaintiff hearing. *See* ECF No. 96 (Tr. of Lead Plaintiff hearing). In response, the Court asked questions of Hedvat's counsel, and based on those representations, the Court rejected May's arguments. *See id.* at 7:21-8:2. Tellingly, when the time came for those representations to be vetted during discovery, Hedvat suddenly realized—nearly a year into the COVID-19 pandemic—that a pandemic was raging and that he could no longer serve as Lead Plaintiff as a consequence. *See* ECF No. 161, Substitution Motion, at 2; ECF No. 167 (Defendants' opposition to the Substitution Motion) at 3.

Hedvat's briefing on the Substitution Motion raised more questions than it answered concerning the timing and circumstances of Hedvat's withdrawal. As Defendants pointed out, it appears that L&K inappropriately delayed withdrawing Hedvat as Lead Plaintiff to develop and

9

pursue a plan to ensure that L&K could retain the Lead Counsel role. *See* ECF No. 170[5] at 4. Although L&K sought to assure the Court that Hedvat was actively involved in the action until his decision to withdraw, the timeline of its purported communications with Hedvat indicates otherwise. ECF No. 170 at 2-3. Notably, it appears that the action proceeded without Hedvat's involvement for nearly 6 months. *See id.* Additionally, L&K represented that Hedvat did not inform Lead Counsel that he wanted to withdraw as Lead Plaintiff until January 27, 2021, but this is inconsistent with the declaration that Miami filed with its Substitution Motion, which was executed six days earlier and states that Miami understood "Hedvat is no longer able to serve as Lead Plaintiff[.]" *See id.* at 4. Furthermore, the drafting of the lengthy Substitution Motion, which was filed the same day L&K purportedly learned that Hedvat wished to withdraw, took significant time to put together, further casting doubt upon L&K's explanation. *See* ECF No. 169 at 13 (reply memorandum in further support of Substitution Motion, stating that "Hedvat did not request to be withdrawn as the lead plaintiff until January 27, 2021 and Lead Counsel filed a motion to withdraw Hedvat that same day[]").

The misrepresentations May raised during the original lead plaintiff motions and those Defendants recently noted raise serious questions about L&K's honesty and candor in this action. Courts must consider the honesty and integrity of putative class counsel because they will stand in a fiduciary relationship with the class. *See* Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class."); *Chana Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160 (S.D.N.Y. 2010) ("In considering whether the proposed class counsels are adequate, the Court may consider the honesty and integrity of the putative class counsel[.]"); *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 (7th Cir. 2013) ("[W]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class"); *cf. Network Assocs.*, 76 F. Supp. 2d at 1021-27 (rejecting lead plaintiff group assembled through misleading

---

[5]    ECF No. 170 is Defendants' Response To Lead Counsel's Offer To Produce Correspondence With Lead Plaintiff For *In Camera* Review; Request For Order That Lead Plaintiff Attend Hearing.

solicitations).  If L&K is to continue as Lead Counsel, their conduct in this Action is relevant to their adequacy and will undoubtedly be subject to discovery from Defendants, who have already sought additional information about the circumstances of Hedvat's withdrawal.  *See generally* ECF No. 170.

In any event, regardless of why Hedvat withdrew and the actual circumstances surrounding Hedvat's withdrawal, the L&K Group will be subject to unique defenses concerning their counsel's adequacy that no other class members will be subject to based on L&K's actions in this litigation.  *See In re Netflix*, 2012 WL 1496171, at *5 (There is no need to prove the defense, only "to show a degree of likelihood that a unique defense might play a significant role at trial.").  Thus, the L&K Group and its counsel are subject to unique defenses that disqualify them from leading this action.

**C.    The L&K Group's Members Should Not Be Evaluated Individually**

To the extent the L&K Group argues that its members' losses should be evaluated individually, this argument should be rejected.  The L&K Group hints that it may raise this argument down the line.  *See* ECF No. 177 at 9 n.8 (stating, in a footnote in the L&K Group's lead plaintiff opening brief, that the Court "may select a member of the [Group]" if it "prefers appointing a sole lead plaintiff"); ECF No. 178-3, Joint Declaration, at ¶22 (similar).  The PSLRA, however, requires those seeking lead plaintiff appointment to file a motion with the court, *see* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), and this Court ordered that motions for lead plaintiff be filed within 21 days of its order on the Substitution Motion, *see* ECF No. 171 at 5.  None of the L&K Group members moved separately as individuals.  Thus, the L&K Group's motion either succeeds or fails as a group, and its member's individual losses should not be considered individually.

Courts faced with requests to disaggregate a group often reject them.  *See, e.g., In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1111 (N.D. Cal. 2001) (Orrick, J.) (declining to allow an individual group member to serve as lead plaintiff individually, finding that it failed to establish its adequacy or typicality under the PSLRA because it had not sought lead plaintiff status as an individual); *Petrobras*, 104 F. Supp. 3d at 624 n.4 (declining to

11

evaluate individually a group member with "the largest individual financial interest in the litigation" because "it at no time sought to serve as individual lead plaintiff[]"); *Tsirekidze v. Syntax-Brillian Corp.*, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) ("The [] Group moved for lead plaintiff as a group and will be evaluated as such.").

Furthermore, the L&K Group's suggestion that it can be disaggregated serves to confirm that the Group lacks the necessary cohesion to serve as Lead Plaintiff and is lawyer driven, raising additional concerns about its members' adequacy to represent the class. *See Tsirekidze*, 2008 WL 942273, at *4 ("The willingness to abandon the group only suggests how loosely it was put together."); *Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009) (finding that the "[group's] motion [was] undermined by the group's invitation to the Court to hand-pick one of its constituents to serve as lead plaintiff if the Court deem[ed] the [group] inappropriate.").

**D.    The L&K Group's Members Are Inadequate And Atypical Even If Evaluated Individually**

Even assuming, *arguendo*, that it was appropriate to consider the L&K Group's members individually, none of them are suitable to represent the putative class for the reasons explained below.

**1.    The Norton Trust Is Subject To Unique Defenses Concerning Its Reliance**

Pursuant to the PSLRA's statutory sequence, the Norton Trust would be the next putative class member examined after the Group itself, as the Trust claims $2,566,489.87 in LIFO losses. *See* ECF No. 178-2 at 2-4 (the Norton Trust's loss chart); *Cavanaugh*, 306 F.3d at 732 ("The statutory process is sequential:  The Court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical.").

The presence of a unique defense renders a movant both atypical and inadequate to represent the class. *See Serafimov v. Netopia, Inc.*, 2004 WL 7334061, at *5 (N.D. Cal. Dec. 3, 2004); *accord Beck v. Maximum, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006) ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense

12

that is likely to become a major focus of the litigation."). "There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial." *See In re Netflix*, 2012 WL 1496171, at *5.

The Trust is subject to a unique defense because it will not be able to invoke the fraud-on-the-market presumption of reliance as **all of the Trust's losses** are predicated on Nutanix stock acquisitions that were made at nonmarket prices; indeed the acquisition prices do not fall within the historical price range for Nutanix stock on the days at issue. *Compare* ECF No. 178-2 at 2-4 (the Norton Trust's loss chart, showing that Nutanix acquired the shares at $55 per share in October 2018), *with* Yahoo! Finance, Nutanix[6] (setting forth historical stock prices for Nutanix shares during October 2018 that are all below $55 per share).

Under the fraud-on-the-market presumption of reliance—an element of the class's claim under Section 10(b) of the Exchange Act—"[a]n investor who buys or sells stock **at the price set by the market** does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). "The fraud-on-the-market theory . . . is central to securities actions." *Critical Path*, 156 F. Supp. 2d at 1110-11. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248.

All of the Norton Trust's stock acquisitions were made pursuant to strike prices set by the put option contracts that the Trust previously sold—not the then-prevailing market prices for Nutanix stock on the days that the Trust acquired the stock. *See* ECF No. 178-2 at 2, 4 (evidencing that the prices of the Trust's stock acquisitions and the acquisition dates thereof match the strike prices and assignment dates of the puts assigned). In other words, the Norton

---

[6]   The October 2018 Nutanix stock prices can be found here: https://finance.yahoo.com/quote/NTNX/history?period1=1538352000&period2=1540944000&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

Trust's decision to acquire those shares at the price they paid was not linked to the then-prevailing market prices. "Any showing that severs the link between the alleged misrepresentations and . . . [the] decision to trade at a fair market price" is sufficient to rebut the fraud-on-the-market presumption. *Basic Inc.*, 485 U.S. at 248. In *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 480-81 (W.D. Mich. 1994), for instance, the plaintiff acquired 1,000 out of his 1,200 shares pursuant to the strike prices in put option contracts months later. The court concluded that these acquisitions, *inter alia*, raised questions "as to whether plaintiff was in fact relying on the market price" and presented "an arguable defense unique to plaintiff." *Id.* at 481. Similarly, the Norton Trust's stock acquisitions at non-market prices present a defense unique to the Trust.

For that matter, numerous courts have found options investors atypical because "factual issues specific to [the options investor] in determining the precise value of the options—*e.g.*, the maturity, volatility of the price of the [company's] stock, the level of short term interest rates, and the competitive structure of the market in which the options are traded—would likely threaten to become the focus of the litigation." *Andrada v. Atherogenics, Inc.*, 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (rejecting options investor as "potentially subject to unique defenses" and collecting cases).

### 2.    Flores And Miami Are Inadequate And Atypical

Even if Flores and Miami possessed larger financial interests than May (they do not), they cannot be appointed lead plaintiff because they are inadequate. As an initial matter, their willingness to partner with the Norton Trust despite its unique defense, *see supra* §I.D.1, casts doubt on their adequacy to lead the case. *See Faris v. Longtop Financial Tech. Ltd.*, 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011) (group members' willingness to partner with an investor with a unique defense "raises questions about the adequacy of the entire group[]"). They are additionally inadequate and atypical due to their choice of counsel and the unique defenses they will be subject to as a result. *See supra* §I.B.

Flores is further inadequate because he now uses a different methodology to calculate his financial interest than the retained share methodology that he touted both in the Substitution Motion and in his original lead plaintiff motion. That is, in the Substitution Motion, Flores

14

calculated his financial interest in the litigation under the "retained share method" using the class period that was in place during the original lead plaintiff motions (Mar. 2, 2018 through Feb. 28, 2019). *See* ECF No. 161 at 8 n.4, 9-10. Yet, Flores and the rest of the L&K Group members now abandon the retained share method in favor of the last-in, first-out ("LIFO") methodology. *See* ECF No. 178-2 at 8 (L&K Group's loss chart listing Group members' financial interests under "*Dura* LIFO Loss" and "LIFO Loss"). They do this because, as May pointed out in his opposition to the Substitution Motion, Flores has **zero losses** and lacks any financial interest in the litigation based on the retained share methodology during the operative Class Period—*i.e.*, Mar. 1, 2018 through May 30, 2019. *See* ECF No. 168 at 2. Flores' transparent gamesmanship in changing his method of calculation based on his realization that he cannot win under his original methodology, and May's critique thereof, renders him inadequate to represent the putative class. *Cf. City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*, 2021 WL 396343, at *4 (S.D.N.Y. Feb. 4, 2021) ("Presenting new methodologies . . . only in opposition, after the PSLRA deadline for moving to be appointed lead Plaintiff has closed, is the type of opportunism that is generally unfavored in appointing lead plaintiffs.").

## II.    MAY SHOULD BE APPOINTED LEAD PLAINTIFF

### A.    May Has The Largest Financial Interest In The Litigation

As per the PSLRA's statutory sequential process, May possesses the largest financial interest in the litigation because the L&K Group is inadequate and atypical for the reasons described above. *See Cavanaugh*, 306 F.3d at 732. May has made a *prima facie* showing of his adequacy and typicality, and there is no proof that rebuts it. *See* ECF Nos. 182-182-5. Therefore, May is entitled to be appointed Lead Plaintiff.

### B.    May's Motion Should Be Granted Priority As He Was An Original Lead Plaintiff Movant

May's motion should be granted priority over the other movants because he timely sought appointment during the original lead plaintiff motion process in this action, and possesses the largest losses of any of the original lead plaintiff movants who now seek appointment pursuant to the Court's order on the Substitution Motion.

The PSLRA requires lead plaintiff movants to have filed a motion "***not later than 60 days after the date on which the [statutorily required notice for the first-filed action was] published[,]***" in order to invoke "the most adequate plaintiff" presumption.  15 U.S.C. §§ 78u-4(a)(3)(A)(i)(II), (a)(3)(B)(iii)(I)(aa).  Courts have enforced this deadline strictly.  *See In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 142 (S.D.N.Y. 2007) ("[C]ourts have strictly construed this time limitation and found those motions for appointment as lead plaintiff filed outside of the sixty-day window to generally be time-barred.") (collecting cases); *see also Carson v. Clarent Corp.*, 2001 WL 1782712, at *2 (N.D. Cal. Dec. 14, 2001) (rejecting motion filed two weeks late); *Skwortz v. Crayfish Co.*, 2001 WL 1160745, at *5 (S.D.N.Y. Sep. 28, 2001) (holding PSLRA's 60-day motion deadline is "mandatory" while rejecting party's motion filed one day late); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999) ("The PSLRA is unequivocal and allows for no exceptions. All motions for lead plaintiff must be filed within sixty (60) days of the published notice for the first-filed action.").

Indeed, some courts have found they "must apply the guidelines of the PSLRA in appointing a lead plaintiff, whether it is an initial lead plaintiff or thereafter."  *In re Neopharm, Inc. Sec. Litig.*, 2004 WL 742084, at *3 (N.D. Ill. Apr. 7, 2004).  Consequently, courts which have had to revisit the lead plaintiff process have prioritized plaintiffs who filed timely motions originally.  For example, the court in *In re Allergan PLC Sec. Litig.* recently appointed as lead plaintiff the "only current applicant that filed a motion for lead plaintiff status within the sixty-day statutory window" after the previously appointed lead plaintiff was found to be an inadequate class representative.  2020 WL 8620082, at *2 (S.D.N.Y. Dec. 7, 2020).  In coming to this conclusion, the *Allergan* court cited to a case from this district—*In re Tezos Sec. Litig.*, 2019 WL 2183448 (N.D. Cal. Apr. 8, 2019).  *See id.*  In *Tezos*, the court rejected the withdrawing lead plaintiff's attempt to substitute an individual who had not initially moved for lead plaintiff, found that timely lead plaintiff applications should be considered "before moving beyond the noticed pool," and appointed as the new lead plaintiff the party that came in second in the original round of lead plaintiff motions.  *See id.* (citing *Tezos*, 2019 WL 2183448, at *3).  Other courts have given original lead plaintiff movants a preference when faced with similar

16

situations.  *See, e.g., In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 117 n.2 (S.D.N.Y. 2009).

In this Action, counsel for the first-filed plaintiff Ryan Scheller published the statutory notice on March 29, 2019, meaning that lead plaintiff motions need to be filed by May 28, 2019 to be timely under the PSLRA.  *See* ECF No. 37 (May's original lead plaintiff motion) at 7.  May filed his original lead plaintiff motion that day.  *See* ECF No. 37.  The L&K Group and California, however, did not file lead plaintiff motions until more than a year after the PSLRA's deadline expired on May 28, 2019; thus their motions do not satisfy the PSLRA's timeliness requirement, and they are therefore inadequate.  *See* ECF Nos. 177-78, 184-85.

While Birmingham filed a timely original motion, *see* ECF No. 19 it has a smaller financial interest than May and is therefore not entitled to the most adequate plaintiff presumption.  *See* ECF No. 175-2 (Birmingham's loss chart, showing losses of $420,538).  Flores, who also has a smaller financial interest than May, filed a timely original motion as an individual, but not as part of the L&K Group he moves with now, and is inadequate for the reasons explained above.  *See* ECF No. 32 (Flores original motion); *supra* §I; *cf. Critical Path*, 156 F. Supp. 2d at  1111 ("Thomson-CSF was not presented as a prospective lead plaintiff on its own, however, and its moving papers do not demonstrate why it would be a suitable lead plaintiff even if its group were to be rejected.").

**CONCLUSION**

For the foregoing reasons, May respectfully requests that the Court: (1) appoint May as Lead Plaintiff for the Action; (2) approve his selection of the Faruqi Firm as Lead Counsel; and (3) grant such other relief as the Court may deem just and proper.

Dated:  April 5, 2021                                    Respectfully submitted,

By: /s/ *Richard W. Gonnello*
Richard W. Gonnello

**FARUQI & FARUQI, LLP**
Benjamin Heikali SBN 307466
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
Email: bheikali@faruqilaw.com

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS**
**NO. 3:19-cv-01651-WHO**

**FARUQI & FARUQI, LLP**
Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice* pending)
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: rgonnello@faruqilaw.com
        klenahan@faruqilaw.com

*Attorneys for Proposed Lead Plaintiff Frank H. May and Proposed Lead Counsel for the putative Class*

**FRANK H. MAY'S RESPONSE TO COMPETING LEAD PLAINTIFF MOTIONS
NO. 3:19-cv-01651-WHO**

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

By:    */s/ Richard W. Gonnello*
Richard W. Gonnello