**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone:     (858) 997-0860
Facsimile:      (858) 369-0096

[Additional Counsel Listed On
Signature Page]

*Counsel for Proposed Lead Plaintiff City of*
*Birmingham Retirement and Relief System*
*and Proposed Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | No. 3:19-cv-01651-WHO<br><br>CLASS ACTION<br><br>**CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COMPETING MOTIONS FOR LEAD PLAINTIFF APPOINTMENT**<br><br>DATE: April 28, 2021<br>TIME: 2:00 p.m.<br>COURTROOM: 2 – 17th Floor<br>JUDGE: William H. Orrick |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 2

    A.   Birmingham Is The "Most Adequate Plaintiff" And Should Be Appointed
        Lead Plaintiff ............................................................................................... 2

        1.   The Court Should Limit Its Analysis To Applicants That Timely
            Moved For Appointment Within The PSLRA's Initial 60-Day
            Notice Period ................................................................................. 3

        2.   Birmingham Has The Largest Financial Interest Of Any Qualified
            Applicant ........................................................................................ 5

        3.   Birmingham Is An Ideal Lead Plaintiff.......................................... 7

    B.   The Other "Latecomer" Movants Are Not The "Most Adequate Plaintiff" .......... 8

        1.   Nutanix Investor Group Is An Improper Aggregation That Is
            Inadequate And Subject To Unique Defenses ............................... 9

        2.   Frank May Cannot Serve As Lead Plaintiff As A Day Trader As
            Well As A "Net Seller" And "Net Gainer" .................................... 13

        3.   California Ironworkers Should Not Be Considered Given its Late
            Application ..................................................................................... 15

        4.   Bristol County Does Not Have the Largest Financial Interest And
            Has Withdrawn .............................................................................. 16

III.  CONCLUSION ................................................................................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Applestein v. Medivation, Inc.*,
2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) ................................................................ 12, 14

*Arciaga v. Barrett Business Services, Inc.*,
2015 WL 791768 (W.D. Wash. 2015) ................................................................................ 11

*Bodri v. Gopro, Inc.*,
2016 WL 1718217 (N.D. Cal. Oct. 7, 2019) .................................................................... 6, 10

*Born v. Quad/Graphics, Inc.*,
2020 WL 994427 (S.D.N.Y. Mar 2, 2020) .......................................................................... 15

*Borteanu v. Nikola Corp.*,
2020 WL 7392795 (D. Ariz. Dec. 15, 2020) ...................................................................... 13

*Deering v. Galena Biopharma, Inc.*,
2014 WL 4954398 (D. Or. Oct. 3, 2014) ............................................................................ 15

*Eichenholtz v. Verifone Holdings, Inc.*,
2008 WL 3925289 (N.D. Cal. Aug. 22, 2008) ............................................................... 10, 11

*Endress v. Gentiva Health Servs., Inc.*,
276 F.R.D. 62 (E.D.N.Y. 2011) ........................................................................................... 4

*Ferreira v. Funko, Inc.*,
2020 WL 3246328 (C.D. Cal. June 11, 2020) .................................................................... 15

*Gelt Trading Ltd. v. Co-Diagnostics Inc.*,
2021 WL 913934 (D. Utah Mar. 10, 2021) ........................................................................ 13

*Haideri v. Jumei Int'l Holding Ltd.*,
2020 WL 5291872, (N.D. Cal. Sept. 4, 2020) .................................................................... 10

*Hurst v. Enphase Energy, Inc.*,
2020 WL 7025085 (N.D. Cal. Nov. 30, 2020) .................................................................... 13

*In re Allergan PLC Sec. Litig.*,
2020 WL 8620082 (S.D.N.Y. Dec. 7, 2020) ................................................................ passim

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) ................................................................................................ 7

*In re Gentiva Sec. Litig.*,
281 F.R.D. 108 (E.D.N.Y. 2012) ........................................................................................ 15

*In re Imax Sec. Litig.*,
2011 WL 1487090 (S.D.N.Y. Apr. 15, 2011)................................................................................ 9

*In re McKesson HBOC, Inc. Sec. Litig.*,
97 F.Supp.2d 993 (N.D. Cal. 1999) ........................................................................................... 7

*In re MicroStrategy Inc. Sec. Litig.*,
110 F. Supp. 2d 427 (E.D. Va. 2000).................................................................................... 4, 9

*In re Network Assocs., Inc., Sec. Litig.*,
76 F. Supp. 2d 1017 (N. D. Cal. 1999) .................................................................................. 10

*In re NYSE Specialists Sec. Litig.*,
240 F.R.D. 128 (S.D.N.Y. 2007) .............................................................................................. 4

*In re Olsten Corp. Sec. Litig.*,
3 F. Supp. 2d 286 (E.D.N.Y. 1998) .......................................................................................... 6

*In re Portal Software, Inc. Sec. Litig.*,
2005 WL 8179740 (N.D. Cal. Mar. 9, 2005)............................................................................ 5

*In re SLM Corp. Sec. Litig.*,
258 F.R.D. 112 (S.D.N.Y. 2009) .............................................................................................. 3

*In re Stitch Fix, Inc., Sec. Litig.*,
393 F. Supp. 3d 833 (N.D. Cal. 2019) ............................................................................... 10, 12

*In re Tezos Sec. Litig.*,
2019 WL 2183448 (N.D. Cal. Apr. 8, 2019) ................................................................... passim

*Morrison v. National Australia Bank*,
561 U.S. 247 (2010) ................................................................................................................. 9

*Nakamura v. BRF S.A.*,
2018 WL 3217412 (S.D.N.Y. July 2, 2018) ...................................................................... 11, 15

*Perlmutter v. Intuitive Surgical, Inc.*,
2011 WL 566814 (N.D. Cal. Feb. 15, 2011)......................................................................... 7, 14

*Pino v. Cardone Cap., LLC*,
2020 WL 7585839 (C.D. Cal. Dec. 18, 2020) ........................................................................ 11

*Reese v. Malone*,
2015 WL 1526567 (W.D. Wash. 2015) .................................................................................... 9

*Shenwick v. Twitter, Inc.*,
2016 WL 10672428 (N.D. Cal. Dec. 22, 2016) ........................................................................ 7

*Tsirekidze v. Syntax-Brillian Corp.*,
2008 WL 942273 (D. Ariz. Apr. 7, 2008)........................................................................... 12, 14

*Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefit Funds v.*
  *Brixmor Prop. Grp., Inc.,*
    2016 WL 11648466 (S.D.N.Y. Nov. 29, 2016) .......................................................................... 14

*Xianglin Shi v. Sina Corp.,*
    2005 WL 1561438 (S.D.N.Y. July 1, 2005) ............................................................................ 15

*Zhu v. UCBH Holdings, Inc.,*
    682 F. Supp. 2d 1049 (N.D. Cal. 2010) .................................................................................... 3

**STATUTES**

15 U.S.C. §78u-4(a) ..................................................................................................... 1, 2, 6, 17

**OTHER AUTHORITIES**

Cornerstone Research, Securities Class Action Settlements-2019 Review and Analysis,
    www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2019
    Review-and-Analysis.pdf ........................................................................................................... 5

Stanford Law School, Securities Class Action Clearinghouse, Top Ten Plaintiffs Firms,
    https://securities.stanford.edu/top-ten.html?filter=plaintiff_firm ............................................. 16

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO

## I.   INTRODUCTION

In its March 1, 2021 Order ("March 1 Order"), this Court re-opened the Lead Plaintiff process and left open the possibility for 21 days that another Class member could step in and seek appointment as the new Lead Plaintiff to replace an individual investor who had withdrawn for personal reasons. ECF No. 171.  Pursuant to that Order, the City of Birmingham Retirement and Relief System ("Birmingham") moved for appointment as the new Lead Plaintiff (ECF No. 174) and now files this opposition to the applications of the other movants.

Birmingham should be appointed as the new Lead Plaintiff because it has the largest financial interest of any qualified movant that originally applied for Lead Plaintiff appointment in accordance with the PSLRA's 60-day notice period, and its adequacy and typicality cannot seriously be questioned.  Indeed, as a sophisticated institutional investor with a substantial financial stake in the litigation, Birmingham is precisely the type of representative plaintiff that Congress envisioned when it enacted the lead plaintiff provisions of the PSLRA. Moreover, Birmingham has significant relevant experience serving as a lead plaintiff in securities and shareholder litigation, which will further benefit the Class.

The plain language of the PSLRA as well as the substantial weight of authority in this District and across the nation holds that the court should prioritize movants that timely sought lead plaintiff status with the PSLRA's initial 60-day notice period, and consider new applicants *only* where an original movant is "unavailable or unwilling to take the lead" or "when there is no opposition from other class members." 15 U.S.C. § 78u-4(a)(3)(A)(i)(II) (requiring that "any member of the purported class" interested in serving as lead plaintiff file a motion "not later than 60 days after notice [of the pendency of the action] is published"); *see In re Tezos Sec. Litig.*, 2019 WL 2183448, at *3 (N.D. Cal. Apr. 8, 2019) (Seeborg, J.) (collecting cases holding that where lead plaintiff process is re-opened, the court must "consider timely applicants before moving beyond the noticed pool"); *In re Allergan PLC Sec. Litig.*, 2020 WL 8620082, at *2 (S.D.N.Y. Dec. 7,

2020) (noting "preference for allowing only those who had originally applied to be considered").

Notably, Birmingham was one of eight Class members that originally and timely sought appointment as Lead Plaintiff within the PSLRA's initial 60-day notice period. ECF No. 19. At that time, and after reviewing the competing motions and supporting papers, Birmingham filed a notice of non-opposition to the appointment of competing applicants that asserted a larger financial interest but stated that in the event that the Court determines that other movants are incapable or inadequate to represent the class in this litigation, "Birmingham remains willing and able to serve as lead plaintiff or as a named class representative." ECF No. 66.

Birmingham remains both available and willing to serve as the Lead Plaintiff. Birmingham has the largest financial interest of any qualified applicant at this time, and its appointment will provide the Class with immediate, concrete, and meaningful benefits. As a sophisticated institutional investor with a substantial financial stake in the claims, Birmingham is not only the paradigmatic lead plaintiff envisioned by Congress, but Birmingham also has extensive experience and a track record of success serving as lead plaintiff in this District and in courts throughout the nation, which should allow for a seamless transition in case prosecution and provide continuity of leadership for the Class.

## II.   ARGUMENT

### A.   Birmingham Is The "Most Adequate Plaintiff" And Should Be Appointed Lead Plaintiff

Birmingham respectfully submits that it should be appointed Lead Plaintiff because it is the movant "most capable of adequately representing the interests of class members" that also timely moved for appointment within the PSLRA's initial 60-day notice period. 15 U.S.C. §§ 78u-4(a)(3)(A)(i), 4(a)(3)(B). In addition, Birmingham is a sophisticated institutional investor with extensive experience serving as a lead plaintiff in securities and shareholder litigation, which makes Birmingham ideally suited to assume leadership under the circumstances presented here.

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO

**1.      The Court Should Limit Its Analysis To
Applicants That Timely Moved For Appointment
Within The PSLRA's Initial 60-Day Notice Period**

There is no reason here for the Court to "look further afield" from the original pool of movants in selecting a new Lead Plaintiff. *See In re Allergan*, 2020 WL 8620082, at *2. This is because "[t]he PSLRA does not contemplate any sort of lead-plaintiff proceedings beyond the very earliest stages of the litigation," indicating that "Congress contemplated invoking the PSLRA's lead plaintiff process only once – at the very beginning of the suit." *In re Tezos*, 2019 WL 2183448, at *2 (internal marks and quotation omitted). Thus, when faced with the need to replace a lead plaintiff, courts "prioritize applicants who moved within the initial sixty-day period over those who did not." *In re Allergan*, 2020 WL 8620082, at *1.

Accordingly, the Court should limit its analysis to the three applicants that timely moved for appointment within the PSLRA's initial 60-day notice period: Birmingham, Frank May ("May"), and Bristol County Retirement System ("Bristol County"). Where the withdrawal or removal of a lead plaintiff requires the court to select a new lead plaintiff, courts overwhelmingly prioritize class members that timely sought lead plaintiff appointment at the outset of the litigation. *See In re Tezos*, 2019 WL 2183448, at *3-4 (collecting cases holding that in selecting a replacement lead plaintiff, courts "consider timely applicants before moving beyond the noticed pool" and only do so where the original movants are "unavailable or unwilling to take the lead" or "there is no opposition from other class members"); *Zhu v. UCBH Holdings, Inc.*, 682 F. Supp. 2d 1049, 1053 (N.D. Cal. 2010) (White, J.) ("[T]he plain language of the [PSLRA] precludes consideration of a financial loss asserted for the first time in…any pleading… filed after the sixty (60) day window has closed."); *In re Allergan*, 2020 WL 8620082 at *2 ("Because I choose to grant the application of the one and only contender that initially and timely sought lead plaintiff status, it is not necessary to address the other arguments propounded … for why particular latecomers might otherwise be disqualified from serving."); *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116-18, 117 n.2

3

(S.D.N.Y. 2009) (appointing new lead plaintiff exclusively from the pool of movants who had applied within the initial 60-day period and refusing to consider a class member that did not timely apply in accordance with the PSLRA); *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 134 (S.D.N.Y. 2007) (strictly construing the 60-day limit in appointing new lead plaintiff after original lead plaintiff withdrew); *Endress v. Gentiva Health Servs., Inc.*, 276 F.R.D. 62, 63 (E.D.N.Y. 2011) (refusing to consider replacement lead plaintiff "who does not satisfy the letter of the PSLRA's requirements); *In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 433 (E.D. Va. 2000) ("A motion filed after the sixty-day period by a person who has not filed a complaint ... is untimely, and may not, except perhaps in rare circumstances, be considered by a court.").

The court's recent decision in *In re Allergan PLC Securities Litigation* is instructive. There, as here, (1) the class period had been extended before the court re-opened the lead plaintiff process; and (2) the court permitted any putative class member to submit an application seeking appointment as the new lead plaintiff. *In re Allergan*, 2020 WL 8620082, at *1. To determine which applicant was the most adequate lead plaintiff, Chief Judge Colleen McMahon of the Southern District of New York conducted a thorough analysis of the relevant case law and concluded that, except in rare circumstances, the court should limit its consideration in selecting a new lead plaintiff to class members that timely filed a motion for lead plaintiff status within the 60-day statutory window. As a result, the *Allergan* court granted the application of the "one and only contender that initially and timely sought lead plaintiff status." *Id* at *2-3. The court did so even though the class period had been extended subsequent to the initial lead plaintiff determination and the winning movant had substantially lower losses than its competitors in the extended class period, noting that the three "latecomers" failed to "offer any explanation – let alone a satisfactory explanation for why [they] did not make a timely application to be lead plaintiff." *Id.* (appointing institutional investor with

$753,097 in losses that timely filed a lead plaintiff application within the PSLRA's 60-day window over three "new applicants," including one with over $32 million in losses).

The logic of *Allergan* and the abundant case law cited above is consistent with the PSLRA and makes good practical sense.  In securities litigation, "plaintiffs often amend their initial complaints to capture longer alleged class periods."[1] If the lead plaintiff process were re-opened and new applicants considered every time the class period changed, the PSLRA's lead plaintiff process would be turned on its head, the court would be swamped with repetitive motions for lead plaintiff appointment, and the class would be prejudiced by delays, inefficiencies, and other negative effects resulting from changes in leadership.  *See In re Portal Software, Inc. Sec. Litig.*, 2005 WL 8179740 at *4 (N.D. Cal. Mar. 9, 2005) ("It would turn securities litigation into a game of snakes and ladders to hold that any time a new plaintiff is added, the action must 'go back to square one' and recommence the PSLRA lead plaintiff process.").   There are no "rare circumstances" here to depart from this established policy and persuasive precedent.  *See In re Allergan*, 2020 WL 8620082, at *2.  As discussed below, the Class Period was extended by a mere three months; the competing movants all assert a financial interest in the initial class period; and Birmingham continues to have a significant financial stake in the litigation – the largest of all qualified movants – and remains ready and willing to serve as the Lead Plaintiff.

### 2.    Birmingham Has The Largest Financial Interest Of Any Qualified Applicant

As this Court stated in its March 1 Order, in making its determination of the movant with the largest financial interest, "courts typically consider the *Lax-Olsten* factors, which include: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the

---

[1] *See* Cornerstone Research, Securities Class Action Settlements-2019 Review and Analysis, available at www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2019-Review-and-Analysis.pdf (noting that "plaintiffs often amend their initial complaints to capture longer alleged class periods").

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO

approximate losses suffered during the class period." *See* ECF No. 171 at 4 (citing *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)).

Here, Birmingham has the largest financial interest of any qualified movant seeking Lead Plaintiff status, which makes it the "most adequate plaintiff." 15 U.S.C. §78u-4(a)(3)(B)(iii). Specifically, Birmingham (1) purchased 22,285 shares of Nutanix common stock; (2) purchased 18,346 net shares of Nutanix common stock; (3) expended $867,120 in net funds; and (4) suffered losses of approximately $420,538 under a last-in, first-out ("LIFO") accounting basis in connection with its purchases of Nutanix shares.[2] As provided below, the approximate loss suffered by Birmingham, and its financial interest under the other *Lax-Olsten* factors, is easily the largest of any institutional investor that originally moved for lead plaintiff appointment under the PSLRA's initial 60-day notice period.

**Operative Extended Class Period**

| Movant | Shares Purchased | Net Shares Purchased | Net Funds Expended | LIFO Gain/(Loss) | FIFO Gain/(Loss) |
|---|---|---|---|---|---|
| Birmingham | 22,285 | 18,346 | $867,120 | ($420,538) | ($420,538) |
| Bristol County | 8,150 | 7,800 | $304,423 | ($118,082) | ($118,082) |

**Initial Class Period**

| Client | Shares Purchased | Net Shares Purchased | Net Funds Expended | LIFO Gain/(Loss) | FIFO Gain/(Loss) |
|---|---|---|---|---|---|
| Birmingham | 22,285 | 18,346 | $544,333 | ($146,912) | ($146,912) |
| Bristol County | 6,230 | 6,230 | $250,542 | ($10,160) | ($10,160) |

Notably, Birmingham's losses are nearly ***three times larger*** under the extended Class Period compared to the initial class period, and ***all*** of Birmingham's losses were incurred on shares retained through the end of the extended Class Period. This alleviates the concern that apparently

---

[2] LIFO is the prevailing share accounting methodology utilized by courts in the Ninth Circuit when determining a lead plaintiff movant's estimated loss. *See Bodri v. Gopro, Inc.*, 2016 WL 1718217, at *3 (N.D. Cal. Oct. 7, 2019) (Tigar, J.).

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO

animated the Court's decision to re-open the Lead Plaintiff process to new applicants. *See* ECF No. 171 at 4 (noting that one of the proposed replacement co-lead plaintiffs had "zero financial losses" in the operative extended class period under his own "retained shares" methodology). As for the sole remaining applicant who originally sought Lead Plaintiff appointment, the same infirmities that doomed May's original application doom his present application. As discussed below, May is a quintessential day trader that is also a "net seller" and a "net gainer"—which both undermine his financial interest and subject May to a variety of unique defenses that render him incapable of adequately representing the Class. *See infra* at Part II.B.2.

Accordingly, Birmingham is the "most adequate plaintiff" and should be appointed as the new Lead Plaintiff. *See In re Tezos*, 2019 WL 2183448, at *3 (appointing "the only existing sequential plaintiff with financial interests in the case who is willing to take the lead and timely applied for lead plaintiff") (citing *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002)).

### 3. Birmingham Is An Ideal Lead Plaintiff

Birmingham is precisely the type of representative plaintiff that Congress envisioned when it enacted the lead plaintiff provisions of the PSLRA – a sophisticated institutional investor with a substantial financial interest in the litigation and the resources, experience, and incentive to vigorously represent the Class and oversee Lead Counsel's prosecution of the case against Defendants. *See Shenwick v. Twitter, Inc.*, 2016 WL 10672428, at *2 (N.D. Cal. Dec. 22, 2016) (Tigar, J.) ("Congress intended that the lead plaintiff provision would encourage institutional investors to take a more active role in securities class action lawsuits[.]"); *Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at *13 (N.D. Cal. Feb. 15, 2011) (Koh, J.) ("This decision to appoint…, an institutional investor, also comports with the PSLRA's goal to increase the likelihood that institutional investors would serve as lead plaintiffs."). Courts in this District recognize the value of sophisticated investors leading securities class actions, and regularly appoint institutional investors to that role. *See In re McKesson HBOC, Inc. Sec. Litig.*, 97 F.Supp.2d 993, 997 (N.D.

Cal. 1999) (Whyte, J.) ("Congressional drafters focused on their desire to have institutional investors take charge of securities litigation, rather than on how to determine the 'greatest financial interest.'").

Moreover, in stepping up to assume leadership at a relatively advanced stage of the proceedings, Birmingham can draw on its deep experience serving as lead plaintiff to enable a seamless transition in case prosecution and maximize the Class ability to secure a successful resolution of their claims. As set forth in its moving papers, Birmingham has extensive relevant experience and a track record of success serving as lead or co-lead plaintiff in securities and shareholder litigation in this District and throughout the nation. *See* ECF No. 174 at 9-10. This includes a historic recovery achieved in this District approximately one year ago. *See In re Wells Fargo & Co. S'holder Derivative Litig.,* No. 4:16-cv-05541-JST, ECF Nos. 70 & 312 (N.D. Cal.) (Tigar, J.) (appointing Birmingham as co-lead plaintiffs and Saxena White as co-lead counsel because, among other things, they "demonstrated a superior ability to move this litigation forward effectively and efficiently, and to otherwise best serve the interests of plaintiffs," and approving historic settlement in shareholder derivative litigation as "an excellent result for the shareholders" after three years of hard-fought litigation).[3]  Birmingham's status as a sophisticated institutional investor, demonstrated capabilities serving as lead plaintiff, and clean trading history in Nutanix common stock should also obviate the need for any further re-opening of the lead plaintiff process in this litigation again.

**B.      The Other "Latecomer" Movants Are Not The "Most Adequate Plaintiff"**

The other movants who applied for lead plaintiff status are not the "most adequate plaintiff" and thus, should not be appointed as Lead Plaintiff.

---

[3] In the *Wells Fargo* case (and other lead plaintiff appointments), Birmingham prosecuted the cases through the motion to dismiss stage, conducted extensive discovery including review of millions of pages of documents produced by defendants and third parties, consulted with experts, and otherwise prepared and steered the case for trial. *See In re Wells Fargo*, No. 4:16-cv-05541-JST, ECF No. 277 at 11, 21.

As discussed above and further below, there is nothing remarkable about this case that supports departing from the substantial weight of authority favoring limiting the court's analysis in selecting a substitute lead plaintiff to only those applicants who timely filed a motion for appointment within the PSLRA's initial 60-day notice period. As in *Tezos*, the "latecomers" here cannot demonstrate "why the adequacy purposes of the PSLRA should be ignored for a plaintiff who failed to apply within the allotted time period for the lead plaintiff appointment altogether." *In re Tezos*, 2019 WL 2183448 at *3 n.1; *see also In re Allergan*, 2020 WL 8620082, at *2 ("No 'rare circumstances' are present here."); *In re MicroStrategy*, 110 F. Supp. 2d at 433 (E.D. Va. 2000) ("A motion filed after the sixty-day period by a person who has not filed a complaint ... is untimely, and may not, except perhaps in rare circumstances, be considered by a court.").[4]

Notwithstanding, Birmingham analyzes each movant, in turn, in order of largest claimed financial interest.

### 1. Nutanix Investor Group Is An Improper Aggregation That Is Inadequate And Subject To Unique Defenses

The "Nutanix Investor Group" did not originally move as a group within the PSLRA's initial 60-day notice period, and thus its motion should not be considered. Other than Mr. Flores, the remaining members of the group sat idly by during the initial stage of the proceedings and "failed to apply for appointment within the allotted time period for lead plaintiff appointment

---

[4] *Reese v. Malone*, 2015 WL 1526567 (W.D. Wash. 2015) provides an example of the "rare circumstances" when a court **might** choose to not give priority to initial movants. There, the previously appointed lead plaintiffs lost standing to pursue their claims following the Supreme Court's seminal decision in *Morrison v. National Australia Bank*, 561 U.S. 247 (2010) and subsequent rulings in the case. *Id.* at *3. The elimination of an entire class of securities from the litigation necessitated the court's consideration of new applicants. *See id.* (noting that the initial lead plaintiff notice "did not result in a stampede of applicants); *see also In re Imax Sec. Litig.*, 2011 WL 1487090 (S.D.N.Y. Apr. 15, 2011) (re-opening lead plaintiff process after the Second Circuit held that an investment advisor lacked Article III standing to bring a securities fraud claim on behalf of its clients, but then rejecting the new applicants and appointing as lead plaintiff an entity that had been assigned the subject claims). No such "rare circumstances" exist here.

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO

altogether." *In re Tezos*, 2019 WL 2183448 at \*3, n.1.  Even if the Court were to consider the group's application, the Nutanix Investor Group suffers from multiple disabling flaws that render it an inadequate lead plaintiff.

First, the "Nutanix Investor Group" was cobbled together by their counsel, Levi & Korsinsky LLP and Wolf Popper LLP, in a last-ditch attempt to retain control of the litigation after Levi & Korsinsky's client, Mr. Hedvat, withdrew as the Lead Plaintiff and the Court rejected the firms' attempt to substitute certain of their other clients as the new Lead Plaintiff and appoint themselves as the Co-Lead Counsel for the Class.  *See* ECF No. 171.  As Judge Donato recently concluded, "the clear consensus in our district is that a group of investors who had no pre-existing relationship with one another, and whose relationship and group status were forged only by a lawyer, is not appropriate to be lead plaintiff."  *In re Stitch Fix, Inc., Sec. Litig.,* 393 F. Supp. 3d 833, 835 (N.D. Cal. 2019) (Donato, J.); *see Bodri v. Gopro, Inc.*, 2016 WL 1718217, at \*4 (N.D. Cal. Apr. 28, 2016) (Tigar, J.) (rejecting "amalgamation of previously unrelated individuals" where the group was made "for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff"); *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at \*7 (N.D. Cal. Aug. 22, 2008) (Patel, J.) ("[C]ourts have uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff."); *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1026 (N. D. Cal. 1999) (Alsup, J.) ("To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff.").[5]

---

[5] Notably, the Nutanix Investor Group is the ***only*** group among all the Lead Plaintiff applicants, and the ***only*** applicant to propose multiple lead counsel.  *See Haideri v. Jumei Int'l Holding Ltd.,* 2020 WL 5291872, (N.D. Cal. Sept. 4, 2020) (Chen, J.) (rejecting group of unrelated individual

*Footnote continued on next page.*

Second, courts routinely reject groups that have no pre-existing relationship due to concerns that the group will be able to effective and efficiently oversee the litigation. *See Eichenholtz*, 2008 WL 3925289, at *9 (rejecting group that submitted a joint declaration asserting plans to communicate regularly and exercise joint decision-making because "the declaration does not state any preexisting relationships, nor does it clarify how the group will tackle the massive coordination and strategic issues that are certain to arise in this litigation"). Here, the Nutanix Investor Group's joint declaration raises more questions than it answers. For example, the joint declaration requires that the three-member group reach "unanimous decision[s]" with any disputes presented "to a qualified independent arbitrator who has previously served as a state or federal judge." ECF No. 178-3 at ¶19. The dual requirements of unanimity in decision-making with disputes submitted for arbitral determination threaten all manner of delays, inefficiencies, and conflicts that could prejudice the Class. They also raise a host of unanswered questions, such as who pays for the arbitration—the group members, their counsel, or the Class? Will the individual group members be separately represented in the arbitration, and if so, who is responsible for paying their fees and costs? Is the arbitration confidential, or will Class members be able to access the proceedings? *See Arciaga,* 2015 WL 791768, at *3 (rejecting "loosely connected" group "formed only for the purposes of this litigation, and subject to confidential rules of engagement"); *Nakamura v. BRF S.A.,* 2018 WL 3217412 (S.D.N.Y. July 2, 2018) (rejecting group's joint declaration and appointing Birmingham as lead plaintiff). In contrast, Birmingham's appointment as Lead Plaintiff brings no such concerns.

Third, the Nutanix Investor Group is subject to unique defenses that render it incapable of

investors with largest aggregated losses as largest individual loss, and appointing single institutional investor movant); *Pino v. Cardone Cap., LLC,* 2020 WL 7585839, at *5 (C.D. Cal. Dec. 18, 2020) (rejecting "co-lead plaintiffs and counsel structure" due to concern that it may "complicate the coordination of … litigation" and there was "no demonstrable need for one than one law firm to represent the class") (internal quotation marks and citations omitted); *Arciaga v. Barrett Business Services, Inc.* 2015 WL 791768 at *3 (W.D. Wash. 2015) (request for co-lead counsel "raises the concern the group is less likely to be in control of the litigation").

BIRMINGHAM'S OPPOSITION TO COMPETING MOTIONS FOR LEAD PLAINTIFF APPOINTMENT CASE NO. 3:19-CV-01651-WHO

adequately representing the Class. In particular, John P. Norton, on behalf of the Norton Family Living Trust UAD 11/14/2002 ("Norton"), claims the largest financial interest by far of any member of the Nutanix Investor Group. Notably, Norton was added to the group only after the Court denied Levi & Korsinsky and Wolf Popper's attempt to hand-pick their own choice of substitute "Co-Lead Plaintiffs." ECF No. 171. However, Norton's certification (ECF No. 178-2) indicates that he was purely an options trader whose only losses on "purchases" of Nutanix shares resulted from forced covers of put options when the market price of Nutanix common stock fell below the $55 options strike price, the buyer exercised the options, and Norton was forced to purchase 100,000 shares to satisfy his obligations under the contract. All of these "purchases," or forced covers, of Nutanix shares were not open market transactions and the prices Norton paid were outside of the day's ordinary trading range.[6] Moreover, prior to his sale of put options, Norton also sold call options, which were essentially a short position betting that the Company's stock price would decline or at least remain below the strike price. These short bets were not insignificant. In five of the trades, Norton sold call options in blocks ranging from 39,000 shares to 200,000 shares. In total, Norton realized $330,646 in gains on his sales of call options. *See* ECF No. 178-3 at 5.

Norton's options trading, coupled with his disparate options trading strategies, clearly render the Nutanix Investor Group subject to unique defenses and unsuitable to serve as Lead Plaintiff.[7] *See In re Stitch Fix,* 393 F.Supp.3d 833, 836 (N.D. Cal. 2019) (Donato, J.) (rejecting movant who only traded in put options and did not purchase or sale common stock); *Applestein v.*

---

[6] ECF No. 178-2 at 2-5; *see also* Declaration of David R. Kaplan in support of Birmingham's Memorandum Of Points And Authorities In Opposition To The Competing Motions For Lead Plaintiff Appointment, at 1 & Ex. B (demonstrating that Norton's asserted purchase prices range from 24% to 37% higher than the intraday high price on the subject trading date).

[7] Nor should the Court consider breaking apart the Nutanix Investor Group to appoint a member other than May as the new Lead Plaintiff. *See Tsirekidze v. Syntax-Brillian Corp.,* 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) (declining to consider individual constituent of group as lead plaintiff candidate because the group "moved for lead plaintiff as a group and will be evaluated as such").

*Medivation, Inc.*, 2010 WL 3749406, at *4 (N.D. Cal. Sept. 20, 2010) (Patel, J.) (holding "because [movant] traded only in options, the court holds that [movant] should not be appointed"); *Gelt Trading Ltd. v. Co-Diagnostics Inc.,* 2021 WL 913934, at *5 (D. Utah Mar. 10, 2021) (rejecting "only movant who purchased options rather than stock" and noting "[c]ourts have recognized that comparing damage calculations for purchasers of stock and purchasers of options is like comparing apples to oranges") (internal marks and quotation omitted).

### 2. Frank May Cannot Serve As Lead Plaintiff As A Day Trader As Well As A "Net Seller" And "Net Gainer"

Frank May is clearly unfit to serve as Lead Plaintiff as a quintessential day trader who is also a "net seller" and a "net gainer."

May engaged in an extraordinary amount of in-and-out trades during the Class Period. May's certification lists 600 trades over a period of just over three months, with as many as 67 trades in a single day. *See* ECF No. 182-2 at 3-15. Much of May's trading occurred in blocks of purchases, followed by sales of the same amounts on the same day—often just hours apart. In one representative example, on February 14, 2019, May purchased 4,000 shares in four 1,000-share blocks at a cost of $214,776, then sold these blocks the same day for proceeds of $216,452. *Id.* at 8. May's status as a day trader would subject the Class to a variety of unique defenses, including a trading strategy that relied on the stock's short-term volatility as opposed to whether the market price reflected all material public information about the Company, including Defendants' false statements and omissions that form the basis of the claims in this litigation. *See Hurst v. Enphase Energy, Inc.*, 2020 WL 7025085, at *8 (N.D. Cal. Nov. 30, 2020) (Freeman, J.) (disqualifying day trader movants where the Court had "serious concerns about their vulnerability to a defense that they were trading in response to information other than the alleged misstatements and omissions made."); *Borteanu v. Nikola Corp.*, 2020 WL 7392795, at *6 (D. Ariz. Dec. 15, 2020) (day trader disqualified when doubts about his adequacy were raised by trading that "seems to show he did not

rely on [company's] false statements"); *Tsirekidze*, 2008 WL 942273, at *4 (finding day trading "belies any true reliance on company reports or even on the integrity of the stock price itself").

By contrast, courts express a strong preference for movants, such as Birmingham, with clean trading patterns who made their investments before the corrective disclosures and continued to retain their positions as of the class period end. *See Applestein*, 2010 WL 3749406, at *3 (finding atypical a movant who made as many as 44 trades in a single day, and a total of 407 trades over 644 days, and appointing institutional investor with the "cleanest transaction history" of the movants). Here, ***all*** of Birmingham's $420,538 in losses were incurred on shares purchased before the two corrective disclosures and held through the end the Class Period.

Even if the Court credits May's claimed loss amount (which it should not for the reasons discussed above), an analysis of the other *Lax-Olsten* factors provides "a more objective assessment" that significantly undermines May's purported financial interest and "overwhelming favor[s]" Birmingham. *See Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefit Funds v. Brixmor Prop. Grp., Inc.,* 2016 WL 11648466, at *2 (S.D.N.Y. Nov. 29, 2016) (noting that "shares purchased, net shares purchased, and funds expended are static markers set in stone during the class period, whereas losses suffered may be subject to future changes in the price per share"). In particular, May was a significant "net seller" and "net gainer" in Nutanix stock during the Class Period. May sold 55,000 more shares of Nutanix stock than he purchased during the Class Period, realizing approximately $1.2 million in net proceeds.[8] ECF No. 182-3 at 13. May's status as a net seller and net gainer effectively disqualifies him from serving as the Lead Plaintiff and ends the inquiry. *See Perlmutter*, 2011 WL 566814, at *8-9 (collecting cases concluding that a net seller who is also a net gainer should not be appointed because it "arguably

---

[8] Specifically, May purchased 537,735 shares during the Class Period at a total cost of $21,864,899, and sold 592,735 shares for total proceeds of $23,064,829. ECF No. 182-3 at 13. This equates to 55,000 in net shares sold and $1,199,930 in net proceeds.

profits more from the fraud than suffers from it"); *Deering v. Galena Biopharma, Inc.*, 2014 WL 4954398, at \*11 (D. Or. Oct. 3, 2014) ("[C]ourts around the country consistently have rejected applications for lead plaintiff made by net sellers and net gainers …."); *see also Ferreira v. Funko, Inc.*, 2020 WL 3246328, at \*7 (C.D. Cal. June 11, 2020) (net seller's "claim to the largest financial interest [was] beset with flaws" and emphasizing that its failure to account for net gains "wastes the Court's time").

In stark contrast, Birmingham not only has a sizable loss, it is also a "net purchaser" and a "net loser," eliminating any hypothetical concerns that Birmingham profited from the fraud.[9] *See Born v. Quad/Graphics, Inc.*, 2020 WL 994427, at \*2 (S.D.N.Y. Mar 2, 2020) (disqualifying net seller and net gainer movant and appointing institutional investor that "comes with no such risks").

### 3.   California Ironworkers Should Not Be Considered Given its Late Application

California Ironworkers Field Pension Trust ("California Ironworkers") did not file a motion within the PSLRA's initial 60-day notice period and thus its motion should not be considered. *See supra* Part II.A.1.

Significantly, California Ironworkers cannot claim any prejudice if its application is not considered. Despite having a six-figure loss of approximately $120,000 under the initial class period – as well as 29,500 net shares purchased, and over $1.25 million in net funds expended – California Ironworkers sat on its hands and did not seek lead plaintiff status within the PSLRA's statutory framework. California Ironworkers may attempt to excuse its untimely application by

---

[9] Even if this Court were to determine that May is qualified (which he clearly is not) and give credence to his claimed loss of $743,104 (which it should not), courts often appoint an institutional investor over an individual investor with larger losses, particular where, as here, there are serious questions about the individual investor's adequacy to serve as lead plaintiff. *See In re Gentiva Sec. Litig.,* 281 F.R.D. 108, 113 (E.D.N.Y. 2012) ("This preference [for institutional investors] has been determinative in other cases, even when an institutional investor has a slightly lower loss than another potential lead plaintiff."); *Xianglin Shi v. Sina Corp.,* 2005 WL 1561438, at \*5 (S.D.N.Y. July 1, 2005) (appointing institutional investors as lead plaintiff over individuals even though institutions' loss was only 30% of the individuals' loss); *Nakamura,* 2018 WL 3217412 (denying group's motion and appointing Birmingham as lead plaintiff even though Birmingham's loss was smaller than the group's loss).

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO

arguing that its financial interest grew under the extended Class Period. However, the same could be said for any Class member (including Birmingham) that continued to hold its shares through the end of the Class Period. *See In re Allergan*, 2020 WL 8620082, at *2 (rejecting new lead plaintiff applicants that failed to offer "any explanation – let alone a satisfactory explanation – for why it did not make a timely application to be lead plaintiff"). Further, California Ironworkers is represented by one the most prominent securities class action firms and prolific filers of securities class actions in the plaintiffs' bar, which presumably apprised California Ironworkers of its rights throughout the pendency of the litigation.[10]

Moreover, it appears that California Ironworkers has limited experience serving as a lead plaintiff in a securities class action and has not sought a lead plaintiff appointment in over a decade. This lack of recent experience is troubling on multiple levels. First, California Ironworkers seeks to step in and assume leadership of a case that is well past the pleading stage and in the merits phase of the litigation. In this particular circumstance, however, the Class would greatly benefit from the leadership of an investor that has more recent experience serving as lead plaintiff in securities litigation. Second, assuming the Court were to approve California Ironworkers' selection of Lead Counsel, California Ironworkers would be tasked with overseeing, on behalf of the Class, one of the largest and most prolific securities class actions firms in the plaintiffs' bar. These factors, coupled with California Ironworkers' prior apathy in seeking a leadership role in this case, raise questions about its suitability to step in and assume the reins of this litigation, ensure a continuity of leadership, and effectively safeguard the interests of the Class.

### 4. Bristol County Does Not Have the Largest Financial Interest And Has Withdrawn

Although Bristol County originally moved for lead plaintiff during the 60-day deadline and

---

[10] *See* Stanford Law School, Securities Class Action Clearinghouse, Top Ten Plaintiffs Firms (listing Robbins Gellar Rudman & Dowd as filing or being appointed lead counsel in over 700 securities class actions, the second highest total of any firm in the country), *available at* https://securities.stanford.edu/top-ten.html?filter=plaintiff_firm.

is an institutional investor (ECF No. 35), it cannot rebut the presumption that "the most adequate plaintiff" is the movant that "has the largest financial interest in the relief sought by the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I). As demonstrated by its motion (ECF No. 176), Bristol County suffered an approximate loss that was just one-quarter the amount of Birmingham's loss, and it also registers well below Birmingham under the other relevant financial interest metrics, including all *Lax-Olsten* factors. *See supra* at 6. Apparently recognizing Birmingham's significantly larger financial interest, Bristol County has filed a statement of non-opposition to Birmingham's motion and the other competing motions for appointment as lead plaintiff. ECF No. 192.

## III.    CONCLUSION

For the foregoing reasons, Birmingham respectfully requests that this Court: (1) appoint Birmingham as Lead Plaintiff; (2) approve its selection of Saxena White to serve as Lead Counsel for the Class; and (3) grant such other and further relief as the Court may deem just and proper.

Dated:  April 5, 2021

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ David R. Kaplan*
David R Kaplan (SBN 230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

Maya Saxena
msaxena@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

Steven B. Singer
Kyla Grant
ssinger@saxenawhite.com
kgrant@saxenawhite.com

10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 216-2220

*Counsel for Proposed Lead Plaintiff City of
Birmingham Retirement and Relief System and
Proposed Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2021, I was authorized to electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ David R. Kaplan

BIRMINGHAM'S OPPOSITION TO COMPETING
MOTIONS FOR LEAD PLAINTIFF APPOINTMENT
CASE NO. 3:19-CV-01651-WHO