ROBBINS GELLER RUDMAN
    & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
        – and –
DANIELLE S. MYERS (259916)
TRICIA L. McCORMICK (199239)
MICHAEL ALBERT (301120)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
tmccormick@rgrdlaw.com
malbert@rgrdlaw.com

[Proposed] Lead Counsel for [Proposed] Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re NUTANIX, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) | Case No. 3:19-cv-01651-WHO<br><br>CLASS ACTION<br><br>CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS |
| This Document Relates To:<br><br>    ALL ACTIONS. | | |

DATE:      Wednesday, April 28, 2021
TIME:       2:00 p.m.
CTRM:      2, 17th Floor
JUDGE:     Hon. William H. Orrick

4819-6296-5220.v1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................................1

II. STATEMENT OF ISSUE TO BE DECIDED..................................................................2

III. RELEVANT BACKGROUND ........................................................................................2

    A.  Mr. Hedvat's Appointment Over Mr. May's Adequacy Challenge........................2

    B.  The Silence Behind LK's First Group Effort.........................................................3

    C.  LK's Second Attempt to Form a Group..................................................................4

    D.  Norton Joins the LK Group....................................................................................5

    E.  LK's Third Try Is Not a Charm .............................................................................6

IV. ARGUMENT ...................................................................................................................7

    A.  The LK Group and Its Members Suffer from Multiple Independently-Disqualifying Deficiencies that Preclude Them from Satisfying Rule 23..............8

        1.  The LK Group Is an Archetypal Lawyer-Driven Amalgamation, Formed Solely to Achieve the Largest Financial Interest Designation ...............................................................................................8

        2.  The Court Should Decline the LK Group's Invitation to Break Up the Group and Appoint Its Members Individually...................................10

        3.  Norton Is an Atypical Trader Whose Financial Interest Emanates Entirely from Private (Non-Open-Market) Transactions..........................12

    B.  Mr. May Cannot Qualify for the PSLRA's "Most Adequate Plaintiff" Presumption ..........................................................................................................15

        1.  Mr. May Is a Net Seller and Net Gainer ...................................................16

        2.  Mr. May Has Submitted a False PSLRA Certification to This Court ........................................................................................................18

    C.  The Pension Trust Is the First Movant that Has a Sufficient Financial Interest that Also Satisfies the Rule 23 Requirements...........................................20

    D.  The Competing Motions Should Be Denied Because None of the Other Movants Have the Largest Financial Interest .......................................................21

V.  CONCLUSION...............................................................................................................21

**TABLE OF AUTHORITIES**

**Page**

CASES

*Abouzied v. Applied Optoelectronics, Inc.*,
2018 WL 539362 (S.D. Tex. Jan. 22, 2018) ........................................................................11

*Andrada v. Atherogenics, Inc.*,
2005 WL 912359 (S.D.N.Y. Apr. 19, 2005) .........................................................................13

*Apple v. LJ Int'l Inc.*,
2008 WL 11343371 (C.D. Cal. Feb. 8, 2008) .......................................................................11

*Applestein v. Medivation Inc*,
2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) .................................................................12, 13

*Bodri v. Gopro, Inc.*,
2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) ....................................................................9, 10

*Born v. Quad/Graphics, Inc.*,
2020 WL 994427 (S.D.N.Y. Mar. 2, 2020) ................................................................2, 16, 17

*Bowman v. Legato Sys., Inc.*,
195 F.R.D. 655 (N.D. Cal. 2000)..........................................................................................11

*Buettgen v. Harless*,
263 F.R.D. 378 (N.D. Tex. 2009) .........................................................................................11

*City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.*,
2017 WL 6028213 (N.D. Ohio Dec. 5, 2017) ......................................................................18

*Deering v. Galena Biopharma, Inc.*,
2014 WL 4954398 (D. Or. Oct. 3, 2014).............................................................................17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................... *passim*

*Eichenholtz v. Verifone Holdings, Inc.*,
2008 WL 3925289 (N.D. Cal. Aug. 22, 2008) ...................................................................1, 8

*Emerson v. Mut. Fund Series Tr.*,
393 F. Supp. 3d 220 (E.D.N.Y. 2019) ..................................................................................14

*Frank v. Dana Corp.*,
237 F.R.D. 171 (N.D. Ohio 2006) ........................................................................................17

**Page**

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
2021 WL 913934 (D. Utah Mar. 10, 2021) ...............................................................................13, 14

*Haideri v. Jumei Int'l Holding Ltd.*,
2020 WL 5291872 (N.D. Cal. Sept. 4, 2020) ........................................................................8

*Hodges v. Immersion Corp.*,
2009 WL 5125917 (N.D. Cal. Dec. 21, 2009) .....................................................................17

*In re Allergan PLC Sec. Litig.*,
2020 WL 5796763 (S.D.N.Y. Sept. 29, 2020)......................................................................12

*In re Bausch & Lomb Inc. Sec. Litig.*,
244 F.R.D. 169 (W.D.N.Y. 2007)..................................................................................16, 17

*In re Boeing Co. Aircraft Sec. Litig.*,
2020 WL 476658 (N.D. Ill. Jan. 28, 2020) .........................................................................19

*In re Cable & Wireless, PLC Sec. Litig.*,
217 F.R.D. 372 (E.D. Va. 2003) ........................................................................................18

*In re Cardinal Health, Inc. Sec. Litig.*,
No. 2:04-cv-00575-ALM (S.D. Ohio) ................................................................................20

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) .................................................................................... *passim*

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001).............................................................................................8, 13

*In re Cloudera, Inc. Sec. Litig.*,
2019 WL 6842021 (N.D. Cal. Dec. 16, 2019) ......................................................................8

*In re Comdisco Sec. Litig.*,
150 F. Supp. 2d 943 (N.D. Ill. 2001) ..................................................................................18

*In re Critical Path, Inc. Sec. Litig.*,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) .........................................................................13, 14

*In re Doral Fin. Corp. Sec. Litig.*,
414 F. Supp. 2d 398 (S.D.N.Y. 2006)...................................................................................9

*In re Elan Corp. Sec. Litig.*,
2009 WL 1321167 (S.D.N.Y. May 11, 2009) .....................................................................13

**Page**

*In re Enron Corp., Sec. Litig.*,
206 F.R.D. 427 (S.D. Tex. 2002)....................................................................................9, 11

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009)...........................................................................................14

*In re Level 3 Commcn's, Inc. Sec. Litig.*,
2009 WL 10684924 (D. Colo. May 4, 2009)........................................................................11

*In re Network Assocs., Inc., Sec. Litig.*,
76 F. Supp. 2d 1023 (N.D. Cal. 1999) ................................................................9, 11, 14, 21

*In re Olsten Corp. Sec. Litig.*,
3 F. Supp. 2d 286 (E.D.N.Y. 1998) .......................................................................................15

*In re Organogenesis Sec. Litig.*,
241 F.R.D. 397 (D. Mass. 2007).............................................................................................18

*In re Stitch Fix, Inc. Sec. Litig.*,
393 F. Supp. 3d 833 (N.D. Cal. 2019) ............................................................................1, 8, 12

*Isaacs v. Musk*,
2018 WL 6182753 (N.D. Cal. Nov. 27, 2018) ............................................................9, 10, 11

*Khunt v. Alibaba Grp. Holding Ltd.*,
102 F. Supp. 3d 523 (S.D.N.Y. 2015)......................................................................................9

*Li Hong Cheng v. Canada Goose Holdings Inc.*,
2019 WL 6617981 (S.D.N.Y. Dec. 5, 2019) .........................................................................20

*Lloyd v. CVS Fin. Corp.*,
2011 WL 13128303 (C.D. Cal. Jan. 21, 2011) .......................................................................8

*Micholle v. Ophthotech Corp.*,
2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018) .......................................................................13

*Mullen v. Wells Fargo & Co.*,
2021 WL 965344 (N.D. Cal. Mar. 15, 2021)...........................................................................8

*Pardi v. Tricida, Inc.*,
No. 5:21-cv-00076-LHK (N.D. Cal. Apr. 2, 2021) .................................................................8

*Perlmutter v. Intuitive Surgical, Inc.*,
2011 WL 566814 (N.D. Cal. Feb. 15, 2011) .................................................................15, 17

**Page**

*Plaut v. Goldman Sachs Grp., Inc.*,
   2019 WL 4512774 (S.D.N.Y. Sept. 19, 2019).................................................................................20

*Ross v. Abercrombie & Fitch Co.*,
   2007 WL 895073 (S.D. Ohio Mar. 22, 2007)..................................................................................11

*Takata v. Riot Blockchain, Inc.*,
   2018 WL 5801379 (D.N.J. Nov. 6, 2018) .......................................................................................11

*Tan v. NIO Inc.*,
   2020 WL 1031489 (E.D.N.Y. Mar. 3, 2020).....................................................................................10

*Tomaszewski v. Trevena, Inc.*,
   2019 WL 2288267 (E.D. Pa. May 29, 2019)....................................................................................19

*Tsirekidze v. Syntax-Brillian Corp.*,
   2008 WL 942273 (D. Ariz. Apr. 7, 2008) .......................................................................................11

*Weisz v. Calpine Corp.*,
   2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ..............................................................................18

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78u-4(a)(3)(B)...............................................................................................................................1
   §78u-4(a)(3)(B)(i) ...........................................................................................................................8
   §78u-4(a)(3)(B)(iii)(I)......................................................................................................................1
   §78u-4(a)(3)(B)(iii)(I)(cc)...............................................................................................................20
   §78u-4(a)(3)(B)(iii)(II) ...................................................................................................................21

Federal Rules of Civil Procedure
   Rule 23 ..................................................................................................................... *passim*

## I.    INTRODUCTION

Five motions were filed by investors seeking appointment as lead plaintiff.  *See* ECF Nos. 174, 176, 177, 182, 184.[1]  The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides that the "court shall adopt a presumption that the most adequate plaintiff" is the person that: (1) "has the largest financial interest in the relief sought by the class"; ***and*** (2) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. §78u-4(a)(3)(B)(iii)(I).  Of the five movants, only the Pension Trust satisfies ***both*** prongs of the PSLRA's requirements.

Despite claiming the largest financial interest of the competing movants, the LK Group cannot be appointed lead plaintiff because, as the courts in this District now nearly universally recognize, the "group" is comprised of class members "who had no pre-existing relationship with one another, and whose relationship and group status were forged only by [its] lawyer[s]."  *In re Stitch Fix, Inc. Sec. Litig.*, 393 F. Supp. 3d 833, 835 (N.D. Cal. 2019).  Indeed, "ignoring the basis of the group formation and appointing a group of unrelated investors," like the LK Group here, "undercuts the primary purpose of the PSLRA: to eliminate lawyer-driven litigation."  *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *8 (N.D. Cal. Aug. 22, 2008); §IV.A., *infra*.

By contrast, the Pension Trust suffered a substantial loss of more than $700,000, all of which is compensable under the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).  Moreover, the Pension Fund retained all of the 41,800 shares it purchased during the Class Period through both alleged corrective disclosures, and it is neither a net gainer nor a net seller.  *See* ECF No. 96 at 4:6-8 (this Court considering losses "using either LIFO or Dura or retained shares").  As such, the Pension Trust is entitled to the PSLRA's "most adequate plaintiff" presumption.  15 U.S.C. §78u-4(a)(3)(B).

---

[1]    The movants are: (1) California Ironworkers Field Pension Trust (the "Pension Trust"); (2) John P. Norton, on behalf of the Norton Family Living Trust UAD 11/15/2002 ("Norton"), Jose Flores, and City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami,") (collectively, the "LK Group"); (3) Frank H. May; (4) City of Birmingham Retirement and Relief System ("Birmingham"); and (5) Bristol County Retirement System ("Bristol").  Unless otherwise noted herein, all emphasis is added and citations are omitted.

Mr. May cannot be appointed lead plaintiff either, as only $410,000 of his claimed $743,000 loss is compensable under *Dura*. Equally important, it is impossible for the Court to ascertain what Mr. May's actual financial interest is as he has submitted irreconcilable and conflicting data in his two sworn PSLRA Certifications. S*ee* ¶IV.B.2., *infra*. If Mr. May's latest PSLRA Certification is to be believed, in addition to claiming a significantly smaller financial interest than the Pension Trust under both the *Dura* and retained shares ("RSM") methods, May cannot be appointed lead plaintiff because he is both a "net seller" and "net gainer" by virtue of having sold tens of thousands more shares during the Class Period than he purchased, and having received roughly $1.2 million more from his Class Period sales of Nutanix, Inc. shares than he expended purchasing Nutanix shares during the Class Period. Courts recognize that movants that are **both** net sellers **and** net gainers are "effectively disqualifie[d]" from serving as lead plaintiff because they are atypical and subject to the unique defense that they benefited from the fraud. *Born v. Quad/Graphics, Inc*., 2020 WL 994427, at *2 (S.D.N.Y. Mar. 2, 2020).

The remaining movants – Birmingham and Bristol – also have significantly smaller financial interests than that of the Pension Trust under any metric and their motions should be denied.

## II.    STATEMENT OF ISSUE TO BE DECIDED

1. Whether the Court should deny the competing motions and grant the Pension Trust's motion for appointment as lead plaintiff.

## III.   RELEVANT BACKGROUND

### A.    Mr. Hedvat's Appointment Over Mr. May's Adequacy Challenge

Eight lead plaintiff motions were filed when this case was commenced in 2019. *See* ECF Nos. 17, 19, 22, 26, 32, 35, 37, 47. Movant Shimon Hedvat claimed the largest financial interest. Mr. Hedvat also asserted his compliance with Rule 23, assuring the Court that he possessed a "significant and compelling interest in prosecuting the Actions" that would enable him to "vigorously pursue the interests of the Class." ECF Nos. 22 at 8; 23-1. Mr. May challenged Mr. Hedvat's overall fitness to lead the case on the basis that Hedvat's proposed lead counsel Levi & Korsinsky, LLP ("LK") and LK's agents used manipulative and misleading advertising practices

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD
PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                    - 2 -
4819-6296-5220.v1

to solicit lead plaintiff candidates who were unfit to serve as fiduciaries to absent class members. *See* ECF No. 69 at 9-13.[2]  On July 10, 2019, the Court rejected Mr. May's challenge as insufficient to prove unethical conduct in this case.  *See* ECF No. 87.  The Court appointed Mr. Hedvat as lead plaintiff and approved his selection of LK as lead counsel.

### B.    The Silence Behind LK's First Group Effort

Mr. May has been proven to be prescient as Mr. Hedvat's "significant and compelling interest in prosecuting the Action[]," seemingly dissipated after his lawyers were placed in control of the litigation.  Although LK maintains that Mr. Hedvat "participated in this lawsuit through the pleadings and into discovery," defendants point out that Hedvat's involvement in the case was "practically non-existent."  *Compare* ECF No. 161 at 3 *with* ECF No. 170 at 2.[3]

Almost immediately after Mr. Hedvat's appointment as lead plaintiff, LK strategically added Miami.  Miami and Mr. Hedvat then purportedly prosecuted this case together for the 18 months preceding Hedvat's eventual withdrawal.  *See* ECF No. 161 at 1.  Conspicuously absent from the record, however, is any evidence of the existence of protocols implemented by LK, Mr. Hedvat, and Miami to jointly and cooperatively oversee the litigation for those 18 months. To wit:

- How many calls or video conferences were organized with both Miami and Mr. Hedvat in the 18 months they prosecuted the case "together"?

- How many calls or video conferences were actually held with both Miami and Mr. Hedvat in the 18 months they prosecuted the case "together"?

[2]    One example Mr. May directed the Court to was LK's use of shill law firms (Klein Law Firm and the Law Offices of Vincent Wong) to publish press releases inviting class members to contact the shill firm (controlled by LK) regarding lead plaintiff appointment.  *See* ECF No. 69 at 9-13. The use of shill firms enables LK to evade the limits publishers place on the number of press releases any single firm can publish regarding a case, Mr. May argued.  *Id*. at 10.  Notably, LK did not deny being in control of two of these firms' press releases.  *See* ECF No. 96 at 6:17-22 ("We assist some of these firms in getting their press releases to market looking for the clients that Congress said we are supposed to look for after they passed the PSLRA.  We do not – we do not have any signed agreement with these firms that violate any ethical canon in this case or any other case.").

[3]    Defendants have also suggested that Mr. Hedvat did not authorize the filing of the Second Amended Complaint.  *See* ECF No. 170 at 1-2 ("An associate at Levi & Korsinsky, Ms. Muller, sent Mr. Hedvat copies of the draft and as-filed Second Amended Complaint.  Apparently, Mr. Hedvat did not respond to either message.").

- How many emails were exchanged between Miami and Mr. Hedvat during the 18 months they prosecuted the case "together"?

- Were there any direct communications whatsoever, at any point in time, between Miami and Mr. Hedvat?

### C.    LK's Second Attempt to Form a Group

On January 27, 2021, Mr. Hedvat sought the Court's permission to withdraw as the lead plaintiff. *See* ECF No. 161. Mr. Hedvat's motion was accompanied by Miami and Mr. Flores' request to be substituted into the leadership of this case together with LK and Flores' counsel, Wolf Popper LLP. *Id.* The assortment of permutations offered by LK to the Court included: (1) Mr. Flores would serve as the sole lead plaintiff (*see* ECF No. 162-2 at ¶15); (2) Miami would serve as the sole lead plaintiff (*see* ECF No. 162-3 at ¶21); (3) Flores and Miami would serve as co-lead plaintiffs (*see* ECF No. 162-2 at ¶¶14-15); and (4) Flores would serve as sole lead plaintiff with Miami serving as an additional named plaintiff (*see* ECF No. 162-3 at ¶21). What Miami and Mr. Flores' motion did ***not*** explain was how their group came together or ***why*** it was necessary for Miami and Flores to come together at all. The lack of evidence in this regard leads to the inescapable conclusion that LK sought out Mr. Flores so that it could aggregate his losses together with Miami's losses in order to build a larger collective loss than that of Mr. May – the lead plaintiff movant with the next greatest loss during the initial briefing – thereby allowing LK to retain control of the case under ***any*** of its four proposals.

On March 1, 2021, the Court rejected the motion to substitute and ordered any interested class members to file a lead plaintiff motion no later than March 22, 2021. *See* ECF No. 171. In the three weeks between the Court's Order and the renewed lead plaintiff deadline, LK and the two shill firms identified by Mr. May went to work again publishing dozens of press releases in an effort to induce additional class members to contact them regarding lead plaintiff status. "Jakubowitz Law" and "The Gross Law Firm," two ***other*** firms with nearly identical modus operandi to the Klein Law Firm (one of the two firms which LK did not dispute an affiliation with, *see* n.2, *supra*) similarly flooded the newswires with one press release after another linking investors to websites with names such as securitiesclasslaw.com or ***claimyourlosses.com***, devoid of even a single attorney's full name or the name of a single case in which that firm (or any of its

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                                    - 4 -
4819-6296-5220.v1

attorneys) have participated, urging investors to sign up to be contacted for lead plaintiff appointment.

### D.    Norton Joins the LK Group

On March 22, 2021, Miami, Mr. Flores, LK, and Wolf Popper added a new member to their group, Norton. Norton claims to have suffered *Dura* losses of over $2.38 million. *See* ECF No. 178-2 at 8. Unlike any other lead plaintiff movant currently before the Court, however, Norton traded almost exclusively in options during the Class Period. *See* ECF No. 178-1. In fact, the only other Nutanix securities that Norton transacted in or owned during the Class Period are 100,000 shares of common stock that Norton was ***contractually obligated to purchase*** because Norton had sold put options on August 27, 2018:

| | Transaction Type | Quantity | Security | Price ($) | Cost/Proceeds ($) |
|---|---|---|---|---|---|
| 8/27/2018 | SO | (1000) | PUT NTNX 10/19/2018 55 NTNX | 2.80 | ($280,000.00) |
| 10/2/2018 | Assignment | 443 | PUT NTNX 10/19/2018 55 NTNX | 0.00 | $0.00 |
| 10/4/2018 | Assignment | 25 | PUT NTNX 10/19/2018 55 NTNX | 0.00 | $0.00 |
| 10/8/2018 | Assignment | 39 | PUT NTNX 10/19/2018 55 NTNX | 0.00 | $0.00 |
| 10/10/2018 | Assignment | 14 | PUT NTNX 10/19/2018 55 NTNX | 0.00 | $0.00 |
| 10/12/2018 | Assignment | 28 | PUT NTNX 10/19/2018 55 NTNX | 0.00 | $0.00 |
| 10/19/2018 | Assignment | 451 | PUT NTNX 10/19/2018 55 NTNX | 0.00 | $0.00 |

Stock

**Client Name**

Norton Family Living Trust
UAD 11/15/2002

| Date of Transaction | Transaction Type | Quantity | Price per Security |
|---|---|---|---|
| 10/2/2018 | P | 44,300 | $ 55.00 |
| 10/4/2018 | P | 2,500 | $ 55.00 |
| 10/8/2018 | P | 3,900 | $ 55.00 |
| 10/10/2018 | P | 1,400 | $ 55.00 |
| 10/12/2018 | P | 2,800 | $ 55.00 |
| 10/19/2018 | P | 45,100 | $ 55.00 |

As illustrated above, on August 27, 2018, Norton sold 1,000 put contracts which granted the counterparties to these contracts the right to sell Norton 100,000 shares of Nutanix stock at $55 per share, on or before October 19, 2018. During that seven-week period between August 27 and October 19, Nutanix shares fell to prices of $38-$42 per share and Norton's ***contractual obligation*** to assume the 100,000 Nutanix shares at $55 per share was triggered.[4]

---

[4]    Norton does not allege that any decline in Nutanix's share price between August and October 2018 was fraud related.

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                          - 5 -
4819-6296-5220.v1

### E.     LK's Third Try Is Not a Charm

On March 22, 2021, five lead plaintiff motions were filed pursuant to the Court's Order reopening the lead plaintiff process.  Like Mr. Hedvat's lead plaintiff motion in 2019, the third iteration of the LK Group claims the largest financial interest out of the competing movants.  Also like Mr. Hedvat's lead plaintiff motion, the LK Group's motion claims that this reconstituted group "has a significant and compelling  interest in prosecuting the Action" that will enable them to "vigorously pursue the interests of the Class."  ECF No. 177 at 16.  Finally, while this latest iteration of the LK Group purports to be moving the court to serve as lead plaintiff as "a small, cohesive group of three investors," (*id.* at 2), like Miami and Mr. Flores's motion to substitute, it too hedges its bets, offering the Court a smorgasbord of leadership permutations that would ensure LK's continued control of the case, including: (1) Mr. Flores to serve as sole lead plaintiff; (2) Miami to serve as sole lead plaintiff; and (3) Norton to serve as sole lead plaintiff.[5]

Recognizing that Mr. Flores, Miami, and LK all previously made representations to the Court regarding how the class would be best served by Flores and Miami's joint involvement (ECF No. 170), including Miami's understanding that the PSLRA "was intended to encourage institutional investors with large losses to manage and direct securities fraud class actions" (ECF No. 162-3 at ¶5), the LK Group is forced to concede that no single one of its members can ensure "full and adequate representation of the Class:"

> 22.  We are committed to serving jointly as lead plaintiff and to seeing this Action through to its conclusion as the Nutanix Investor Group.  However, we recognize that each member of the Nutanix Investor Group has a significant financial interest at stake, will act adequately serve [sic] as lead plaintiff, is motivated to maximize the recovery against Defendants, and has retained qualified counsel to prosecute this Action.  Therefore, in the event the Court prefers to select one investor to serve as sole lead plaintiff, we request the Court consider us individually and support each other's motion for appointment as lead plaintiff in an individual capacity.  ***To ensure full and adequate representation of the Class, we each intend to seek appointment as a class representative at the class certification stage in the event the Court appoints one of us to serve as sole lead plaintiff***.

ECF No. 178-3 at ¶22.

---

[5]   *See* ECF No. 177 at 14 ("the Nutanix Investor Group respectfully requests that this Court . . . appoint ***a member*** of its group as lead plaintiff"); ECF No 178-3 at ¶22 ("we . . . support each other's motion for appointment as lead plaintiff in an individual capacity").

And in yet another unexplained departure from the position it took two months earlier that the class would be best served by the approval of LK *and* Wolf Popper to serve as co-lead counsel to the class, LK now argues that the class would be better served if LK is appointed as sole lead counsel and Wolf Popper is given the assisting role of "additional counsel."[6]

## IV.    ARGUMENT

"The 'most capable plaintiff' – and hence the lead plaintiff – is the one who has the greatest financial stake in the outcome of the case, *so long as* he meets the requirements of Rule 23." *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).  To identify the presumptively most adequate plaintiff, "the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Id.* at 730. "It must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id*. (emphasis in original).  "If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff." *Id.*  If, however, "the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23." *Id.*

---

[6]    The confusion regarding the vacillating arrangements between the two law firms appears to be shared by the members of the LK Group who make contradictory statements under oath as to who they believe their proposed lead counsel is. *Compare* ECF No. 178-3 at ¶21 ("We agree to monitor and ensure that *Levi & Korsinsky and Wolf Popper* prosecute this litigation in a zealous and efficient manner as *lead counsel* under our supervision . . . .") *with id.* at ¶¶5-6 (expressing intent for LK to serve as sole lead counsel).

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                        - 7 -
4819-6296-5220.v1

**A.    The LK Group and Its Members Suffer from Multiple Independently-Disqualifying Deficiencies that Preclude Them from Satisfying Rule 23**

**1.    The LK Group Is an Archetypal Lawyer-Driven Amalgamation, Formed Solely to Achieve the Largest Financial Interest Designation**

The PSLRA was enacted to end perceived abuses in federal securities fraud class actions by eliminating the "race to the courthouse" as the method for selecting lead plaintiffs. *Cavanaugh*, 306 F.3d at 729. To that end, the PSLRA instructs courts to appoint a lead plaintiff whom it "determines to be most capable of adequately representing the interests of class members." §78u-4(a)(3)(B)(i); *see also Lloyd v. CVB Fin. Corp.*, 2011 WL 13128303, at \*5 (C.D. Cal. Jan. 21, 2011) (explaining that the intent of Congress in passing the PSLRA was "'to eliminate figurehead plaintiffs who exercise no meaningful supervision of the litigation'").

In determining whether to appoint a group, as opposed to a single investor, as lead plaintiff pursuant to the PSLRA, courts are to consider the genesis of the group. Specifically, the Judges of this Court have recognized that if "'the movant "group" with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that "group" could not be counted on to monitor counsel in a sufficient manner.'" *In re Cloudera, Inc. Sec. Litig.*, 2019 WL 6842021 at \*6 (N.D. Cal. Dec. 16, 2019) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 266 at 267 (3d Cir. 2001)). Although the LK Group claims a larger financial interest than the Pension Trust, it is a disparate group of unrelated strangers and entities that have been amalgamated by LK solely to retain control of this litigation.

While the PSLRA contemplates the appointment of a group, Judges in this District "'have uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff.'" *In re Cloudera*, 2019 WL 6842021, at \*6 (quoting *Eichenholtz*, 2008 WL 3925289, at \*7-\*9); *see also Pardi v. Tricida, Inc.*, No. 5:21-cv-00076-LHK, ECF No. 65 (N.D. Cal. Apr. 2, 2021); *Mullen v. Wells Fargo & Co.*, 2021 WL 965344, at \*4 (N.D. Cal. Mar. 15, 2021); *Haideri v. Jumei Int'l Holding Ltd.*, 2020 WL 5291872, at \*3 (N.D. Cal. Sept. 4, 2020); *Stitch Fix*, 393 F. Supp. 3d at

835; *Isaacs v. Musk*, 2018 WL 6182753, at *3 (N.D. Cal. Nov. 27, 2018); *Bodri v. Gopro, Inc*., 2016 WL 1718217, at *4 (N.D. Cal. Apr. 28, 2016); *see generally In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1023, 1025 (N.D. Cal. 1999) ("It seems clear that Congress intended a single, strong lead plaintiff to control counsel and the litigation.  No reference whatsoever was made in the [PSLRA litigation history] to multiple, unrelated individuals at the helm.").

The LK Group's Joint Declaration confirms that the members of the group ***have no relationship that pre-exists this litigation*** and were, in fact, brought together by counsel.  The LK Group's Joint Declaration does not even attempt to explain: (1) how Mr. Flores and Miami ever learned of Norton's existence; or (2) how – after just a single conference call with counsel – Flores and Miami decided to: (a) include Norton in the group; (b) jettison their prior plans to work in a two-lead plaintiff, two-lead counsel group; and (c) support Norton's appointment as the ***sole*** lead plaintiff, effectively abandoning their earlier representations about the importance of having an institutional investor serve as a lead plaintiff.  *See* ECF No 178-3.

When examined on its own, the Joint Declaration suggests that there is "no clear or persuasive reason why [these movants] have joined together." *In re Enron Corp., Sec. Litig*., 206 F.R.D. 427, 455 (S.D. Tex. 2002).   However, when examined in the context of this case (particularly LK's previous attempt to create a group to surpass Mr. May's financial interest), it is undeniable that Norton, Miami, and Mr. Flores are a "lawyer-created group of unrelated investors who were cobbled together 'in the hope of thereby becoming the biggest loser for PSLRA purposes.'" *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 534 (S.D.N.Y. 2015); *In re Doral Fin. Corp. Sec. Litig*., 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006) ("Nothing before this Court indicates that these random cumulations of plaintiffs are anything more than an effort to achieve the highest possible 'financial interest' figure to be chosen . . . .  I reject this approach as essentially inconsistent with the intention of the PSLRA.").

The LK Group's mechanism to jointly oversee the litigation and resolve disagreements amongst group members and with their counsel further demonstrates the group's ***in***adequacy.  Offering no credible details, the LK Group's members make aspirational statements and offer platitudes about their intent to "prosecute this litigation against Defendants in a vigorous manner,"

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                                                - 9 -
4819-6296-5220.v1

their ability to "engage in joint decision-making" and how they "fully expect to reach unanimous decisions regarding litigation decisions." ECF No. 178-3 at ¶¶16-17, 19. In fact, the Joint Declaration "reflects that the [group] members are unrelated and were introduced to one another by their lawyers." *Isaacs*, 2018 WL 6182753, at *3 ("although the members suggest they will be able to work together well, efficiently, and so forth, there is nothing concrete to back that up," especially considering "the members participated in only one joint call prior to filing the motion for appointment"). Moreover, the LK Group completely fails to address the lack of any evidence in the record that a joint decision-making process took place (or even a *single* joint call) when Mr. Hedvat and Miami were leading this litigation. Given that there is no indication that Mr. Hedvat and Miami did this during the 18 months they were charged with leading the case, there is simply no reason to believe that the newest formulation of the LK Group will function any differently. Accordingly, the Court should not deviate from the well-established body of case law in this District rejecting artificial groups.[7]

In fact, the appointment of the LK Group as lead plaintiff "'would allow and encourage lawyers to" *continue* directing the litigation. *Bodri*, 2016 WL 1718217, at *4. Granting the LK Group's motion would be antithetical to the PSLRA and it should be denied in its entirety.

### 2. The Court Should Decline the LK Group's Invitation to Break Up the Group and Appoint Its Members Individually

Recognizing that courts are loathe to appoint artificial groups as lead plaintiff, the LK Group gives the Court a series of options to re-appoint LK as lead counsel by appointing *any* of

---

[7] Similarly, the only mechanism offered by the LK Group for resolving *any* disagreements or difference in opinion between its members – however minor –would be to present their views to a "qualified independent arbitrator who has previously served as a state or federal judge and to be bound by any decisions made by the arbitrator." ECF No. 178-3 at ¶19. Aside from transferring decision-making powers *from* the lead plaintiff (where it belongs) *to* a class-funded arbitrator, this provision is in plain contravention of this Court's admonition to LK at the outset of this case that it would "hold Levi and Korsinsky responsible for litigating this case in the *leanest and most efficient manner*." ECF No 96 at 7:24-8:1. Moreover, in refusing to appoint a group assembled by LK with the same dispute-resolution protocol, a New York federal court recently observed that "the side litigation contemplated by this provision would necessarily create inefficiencies in the prosecution of the action were the [Group] appointed lead plaintiff." *Tan v. NIO Inc.*, 2020 WL 1031489, at *4 n.6 (E.D.N.Y. Mar. 3, 2020).

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                                                                    - 10 -
4819-6296-5220.v1

its members individually.  *See* ECF No. 178-3 at ¶22.  There are several problems with this approach.

Norton's unequivocal - and in the case of Miami and Mr. Flores, ***repeated*** and unequivocal - "willingness to abandon the group" so long as LK gets to remain in the role of lead counsel "only suggests how loosely [the LK Group] was put together." *Tsirekidze v. Syntax-Brillian Corp.*, 2008 WL 942273, at \*4 (D. Ariz. Apr. 7, 2008).  Indeed, this offer to the Court by the LK Group should "hardly persuade the Court that they, as opposed to counsel, would be directing this litigation." *Apple v. LJ Int'l Inc.*, 2008 WL 11343371, at \*4 (C.D. Cal. Feb. 8, 2008); *Takata v. Riot Blockchain, Inc.*, 2018 WL 5801379, at \*5 n.5 (D.N.J. Nov. 6, 2018) (noting that "offer to break apart the group and request Lee as lead plaintiff does not assuage the Court's concerns that the attorneys, and not the plaintiffs, have initiated Lee Movants' efforts").[8]

The LK Group freely admits – likely as a result of the positions it has taken in this litigation about the importance of Mr. Flores and Miami's continued involvement – that no single one of its members can ensure "full and adequate representation of the Class," without all three of its members serving as class representatives.  *See* ECF No 178-3 at ¶22; §III.E., *supra*.  This should alarm the Court because it was Mr. Hedvat's inability to provide "full and adequate representation" that imposed upon the Court and the class the reopening of lead plaintiff proceedings.  Going down this road again is not just a recipe for disaster, it is illustrative of the LK Group's fundamental misunderstanding that the "grouping [of] Lead Plaintiffs is not to balance out each other's

---

[8]    *Isaacs*, 2018 WL 6182753, at \*3 (N.D. Cal. Nov. 27, 2018) ("The Court acknowledges TIG's suggestion that the group may be broken apart if the Court has concerns about any specific member.  But that suggests that the group is artificial and should not have been brought in the first place."); *Abouzied v. Applied Optoelectronics, Inc.*, 2018 WL 539362, at \*5 (S.D. Tex. Jan. 22, 2018) ("courts view with suspicion the hand-picking of group members to serve as sole-lead plaintiff"); *Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009) ("[T]he Buettgen Group's motion is undermined by the group's invitation to the Court to hand-pick one of its constituents to serve as lead plaintiff if the Court deems the Buettgen Group inappropriate."); *see also In re Level 3 Commcn's, Inc. Sec. Litig.*, 2009 WL 10684924, at \*5 (D. Colo. May 4, 2009) ("courts confronted by a request to appoint only one individual out of an otherwise inadequate group in order to salvage lead plaintiff status have declined to do so and, instead, considered the qualifications of the movant with the next largest financial interest"); *Ross v. Abercrombie & Fitch Co.*, 2007 WL 895073, at \*4 (S.D. Ohio Mar. 22, 2007) ("There is no requirement in the [PSLRA] that the Court realign a proposed group to cure a deficiency in adequacy of representation.").

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                                                  - 11 -
4819-6296-5220.v1

deficiencies." *Enron*, 206 F.R.D. at 457; *Network Assocs.*, 76 F.Supp. 2d at 1024 ("The whole point of the [PSLRA] was to install a lead plaintiff with substantive decisionmaking ability and authority."); *Bowman v. Legato Sys., Inc.*, 195 F.R.D. 655, 658 (N.D. Cal. 2000) ("The Reform Act was intended to create a new model for securities fraud litigation, under which the district court would appoint a strong lead plaintiff who would actively manage the litigation on behalf of the class.").[9]

### 3. Norton Is an Atypical Trader Whose Financial Interest Emanates Entirely from Private (Non-Open-Market) Transactions.

There is another reason that Norton (the only member of the LK Group that claims a larger individual interest than the Pension Trust) cannot be appointed as lead plaintiff. Norton engaged in a highly unusual pattern of trading options contracts during the Class Period and the entirety of Norton's claimed losses are based on 100,000 shares that Norton was contractually obligated to purchase at $55 per share in October 2018. That is, Norton was ***contractually obligated*** to "purchase" these shares at ***predetermined prices negotiated without regard to reliance on the integrity of the market***. This makes Norton atypical of the class that Norton seeks to represent. *See Stitch Fix*, 393 F. Supp. 3d at 836 (declining to appoint movant whose losses were entirely due to selling put options during the class period); *Applestein v. Medivation Inc.*, 2010 WL 3749406, at \*4 (N.D. Cal. Sept. 20, 2010) (where lead plaintiff movant traded ***only*** in "contracts for securities, not the securities themselves," the lead plaintiff movant "should not be appointed");

---

[9] The LK Group's candidacy is further belied by the distraction that discovery into the timing and circumstances of Mr. Hedvat's withdrawal will continue to cause at the class certification stage and beyond if the Group, its members, and/or its counsel are appointed as lead. Defendants have already expressed their intent to seek discovery into the circumstances and timing of Mr. Hedvat's withdrawal, as well as the scope and timing of LK's disclosure to the parties and the Court regarding Hedvat's (in)activity in the case. ECF Nos. 167, 170. Defendants will argue that while the Court denied the request because Mr. Hedvat, Miami, and LK were all relieved of their leadership duties, reappointing the LK Group provides a legitimate basis to renew defendants' request for this class certification-related discovery. Beyond subjecting the class to the expense and uncertainty, defendants will seize upon the threat of this discovery to the LK Group's continued leadership of this case in order to attempt to induce an undersized settlement. *In re Allergan PLC Sec. Litig.*, 2020 WL 5796763, at \*7 (S.D.N.Y. Sept. 29, 2020) (denying class certification and reopening the lead plaintiff/lead counsel process after lead plaintiff "and its lawyers devised a secret workaround to [the Court's lead plaintiff] ruling").

*Micholle v. Ophthotech Corp.*, 2018 WL 1307285, at *9 (S.D.N.Y. Mar. 13, 2018) (declining to appoint movants who traded "almost exclusively in put and call options," finding that their trading made them "atypical plaintiffs"); *Andrada v. Atherogenics, Inc.*, 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (finding options trader atypical and inadequate for lead plaintiff purposes, and noting absence of cases "in which an option holder was deemed to be an appropriate lead plaintiff for an entire securities fraud class action").

Because Norton's entire financial interest emanates from the shares that were assigned to Norton as a result of the contractual obligation Norton incurred from trading options, at a negotiated price, Norton's appointment would "introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity, volatility, and interest rates, and he could subject the class to unique defenses, causing unnecessary conflict." *In re Elan Corp. Sec. Litig.*, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009). The nature of "options trading and the information [] used to make investment decisions [in connection therewith] could become the focus of the litigation, distracting from the central issue: did [Nutanix] commit a fraud on the market?" *Medivation*, 2010 WL 3749406, at *4.

These issues surrounding options recently caused the court in *Co-Diagnostics* to find that regardless of whether an options trader would otherwise be entitled to the PSLRA's most adequate plaintiff presumption, the options trader was precluded from being appointed lead plaintiff because he was subject to unique defenses regarding both damages and loss causation that precluded his appointment. *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2021 WL 913934, at *5 (D. Utah Mar. 10, 2021). The court found that using the typical factors to compare the losses of lead plaintiff movants did not work for options traders because comparing stock losses and options losses was "like 'comparing apples to oranges.'" *Id.* So too here, as it was Norton's contractual obligation – not the alleged fraud or reliance on the integrity of the market – that compelled Norton to purchase 100,000 shares at $55 per share on days when those shares were trading on the open market at $38-42 per share. This only serves to illustrate that Norton's circumstances are "'markedly different'" from open market purchasers of Nutanix securities during the Class Period. *See, e.g.*, *Cendant*, 264 F.3d at 265; *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110–11

(N.D. Cal. 2001) ("Appointing as lead plaintiff one who acquired its shares in a private transaction invites lengthy litigation both at the class certification stage and thereafter of whether that plaintiff is subject to unique defenses.  Certainly the Court should not appoint as lead plaintiff one whose appointment will invite scrutiny of the details of a private transaction."); *Network Assocs.*, 76 F. Supp. 2d at 1029-30 ("the lion's share of KBC's acquisition of Network securities was not in open-market transactions but via a merger. . . .  KBC, unfortunately, would be encumbered with the unique question whether it acquired its Network shares on better terms than the investing public and not fully in reliance on the market price.").  That Norton's losses come exclusively from Norton's contractually-assigned shares, make Norton "subject to unique defenses that render [Norton] incapable of adequately representing the proposed class." *Co-Diagnostics*, 2021 WL 913934, at *5.  "Thus, even if [Norton] could satisfy the Rule 23 requirements and claim the statutory lead plaintiff presumption, that presumption would be rebutted." *Id.*

The atypicality of Norton's trading pattern is exacerbated by the fact that from October 30, 2018 through the end of the Class Period, Norton's transactions consisted ***entirely*** of selling call options. *See* ECF No. 178-1 at 3-4.  "Selling call options is functionally similar to selling a stock short – both involve betting that the stock's price will fall rather than rise." *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 533 (N.D. Cal. 2009) (certifying class represented by investor who made one sale of call options but "at all times, plaintiff had a net 'long' position in LDK, meaning that he would have benefitted from a price rise and suffered losses from a price drop"); *cf. Critical Path*, 156 F. Supp. 2d at 1109 ("It is a poor choice to appoint a class representative who engaged in a trading practice premised on the belief the stock would fall.").  Unlike the investor who Judge Alsup found typical and adequate in *LDK Solar*, Norton did ***not*** have a net long position at all times during the Class Period.  In fact, half of Norton's December 28, 2018 sale of 2,000 call option contracts with a strike price of $50 and an expiration date of January 19, 2019 was uncovered. *See Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 229 (E.D.N.Y. 2019) ("A 'naked' or 'uncovered' call, on the other hand, occurs when an investor writes a call option without owning the asset subject to the option. . . . .  [I]f the strike price exceeds the purchase price, the writer is subject to potentially unlimited losses . . . .").

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO
4819-6296-5220.v1

- 14 -

On these facts, Mr. Norton's atypical trading pattern renders Norton atypical of the class Norton seeks to represent, either as a member of the LK Group or individually.[10]

### B.   Mr. May Cannot Qualify for the PSLRA's "Most Adequate Plaintiff" Presumption

The Ninth Circuit has not specified how to calculate which plaintiff has the "largest financial interest."  Rather, "the district court . . . may select accounting methods that are both rational and consistently applied." *Cavanaugh*, 306 F.3d at 730 n.4; *see also Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at *3 (N.D. Cal. Feb. 15, 2011) (discussing various methods used in the Ninth Circuit).  In the March 1, 2021 Order reopening the lead plaintiff process, the Court noted that "[i]n assessing which class member has the 'largest financial interest' courts typically consider the *Lax-Olsten* factors, which include: '(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period.'" ECF No. 171 at 4 (quoting *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)). With respect to the most important factor (approximate loss), the Court has previously referenced but did not select between LIFO, *Dura*, and RSM.  *See* ECF No. 96 at 4:7-8; *cf.* ECF No. 171 at 4 (this Court declining to appoint Mr. Flores as the lead plaintiff in part because he "would have zero financial losses using the 'retained shares' methodology used in his original application").[11]

| Movant | Lax #1 | | Lax #2 | | | Lax #3 |
| | Shares Purchased | Shares Sold | Net Shares Purchased **(Sold)** | Funds Expended | Funds Received | Net Funds Expended **(Received)** |
|---|---|---|---|---|---|---|
| Pension Trust | 41,800 | 0 | 41,800 | $1,715,538 | 0 | $1,715,538 |

[10]   At best, the Court should view John Norton's counsel-drafted statement that "[he] held a bullish view on the value of Nutanix's common stock and believed that the price would appreciate over time" as an implicit acknowledgement of Norton's problematic trading pattern.  ECF No. 178-3, ¶4.

[11]   As the Court has already received considerable briefing on the merits of employing each method, the Pension Trust will not rehash those arguments here.  *See* ECF Nos. 68, 74, 75, 161, 167.  The Pension Trust will simply note that Mr. May's previous argument that it is premature to employ the *Dura* method at the case's inception had merit in 2019 when the case was commenced but is no longer applicable as the litigation has already advanced beyond the pleading stage.  If anything, given that the contours of the case are significantly more defined than they were at the outset of a litigation when lead plaintiffs are typically appointed, applying the *Dura* method may be especially warranted under these circumstances.

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO
4819-6296-5220.v1

- 15 -

| Birmingham | 22,285 | 3,939 | 18,346 | $1,079,746 | $212,625 | $867,120 |
| Bristol | 8,150 | 350 | 7,800 | $319,120 | $14,700 | $304,420 |
| Frank H. May | 537,735 | 592,735 | (55,000) | $21.87 million | $23.06 million | ($1,199,930) |

**Lax #4**

| Movant | Claimed Dura Loss | LIFO Loss | "Net Shares" Retained (ECF No. 171)[12] |
| --- | --- | --- | --- |
| Pension Trust | $705,690 | $705,690 | 41,800 |
| Frank H. May | $409,621 | $743,104 | − 55,000 |
| Birmingham | N/A | $420,539 | 18,346 |
| Bristol | N/A | $118,082 | 7,800 |

As shown in the above tables, the Pension Trust has the largest financial interest under *Dura* and RSM. However, even if the Court adopts LIFO, the Pension Trust is still the presumptive lead plaintiff because of Mr. May's status as both a net seller and net gainer, as well as the fact that Mr. May has submitted dueling PSLRA Certifications which contradict one another.

**1.    Mr. May Is a Net Seller and Net Gainer**

Mr. May cannot be considered for lead plaintiff because he is a "net seller" and "net gainer" by virtue of having sold more shares during the Class Period than he purchased, and having benefited *more* from selling his Nutanix shares at artificially inflated prices than he spent purchasing Nutanix shares during the Class Period.

Courts overwhelmingly hold that net sellers *and* net gainers – such as Mr. May – are precluded from being appointed as lead plaintiff. *See Born*, 2020 WL 994427, at *2 ("Anklis is a 'net seller' and 'net gainer' during the *Born* class period, meaning that he sold more shares than he purchased and earned more in proceeds than he spent – a fact Anklis does not contest. . . . That status effectively disqualifies Anklis . . . ."); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173 (W.D.N.Y. 2007) ("Courts have consistently rejected applications for lead plaintiff status

[12]    Illustrating why courts are hesitant to appoint net sellers and net gainers, Mr. May sold more shares than he purchased during the Class Period so applying the RSM to May as the Court did to Mr. Flores in its March 1, 2021 Order using his net shares purchased during the Class Period (Lax factor #2) would result in May sustaining a gain on his investment. Regardless, of the precise method that RSM is calculated (which has been the subject of dispute between Mr. Flores and Mr. May), the Pension Trust's RSM loss is significantly greater than that of May, Birmingham, or Bristol. *See* ECF Nos. 74 at 6; 75 at 7-9; 168 at 2.

made by 'net sellers' and 'net gainers' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices.").

A helpful explanation as to the rationale behind rejecting net sellers and net gainers comes from Judge Koh in *Perlmutter*, 2011 WL 566814, at *9, where a lead plaintiff movant was challenged on the basis that he was a net seller and net gainer during the class period. The movant in *Perlmutter* argued that although he sold more shares during the class period and reaped more in proceeds from his sales than he expended from purchases, he still suffered an overall loss on his class period purchases in the defendant company's stock (just as Mr. May did). *Id.* Judge Koh rejected his argument, explaining that "[t]he purpose of isolating the calculation of net sales and net gains to the Class Period is to determine whether a party potentially benefitted from the fraud." *Id.* (citing Magistrate Judge Payson's opinion from *Bausch & Lomb*). Judge Koh further noted:

> This is not the same as determining whether a party lost or earned money trading in a particular stock. As alleged in the complaint, Defendants' fraud artificially inflated Intuitive's stock price during the Class Period. Thus, when Marcus purchased Intuitive stock prior to the Class Period, he purchased it at fair market value. When he sold it during the Class Period, however, he sold it at fraudulently inflated prices. As a result, instead of being injured by the fraud on these sales, Marcus actually benefitted from the fraud.

*Id.*

In looking at Mr. May's transactions, clearly more money was received during the Class Period from selling shares than he spent purchasing shares. Consequently, Mr. May's status as a net seller and net gainer "weighs against [his] appointment as the lead plaintiff." *Id.*[13]

---

[13] Courts around the country are in accord. *See Deering v. Galena Biopharma, Inc.*, 2014 WL 4954398, at *11 (D. Or. Oct. 3, 2014) (observing that "courts around the country consistently have rejected applications for lead plaintiff made by net sellers and net gainers, recognizing the difficulty of proving damages at trial"); *Frank v. Dana Corp.*, 237 F.R.D. 171, 172 (N.D. Ohio 2006) ("Because parties which are net sellers and net gainers, with respect to the relevant securities transactions during the Class Period, may have more trouble proving damages at trial, courts frequently reject their applications to serve as lead plaintiffs."); *Hodges v. Immersion Corp.*, 2009 WL 5125917, at *2 (N.D. Cal. Dec. 21, 2009) ("A 'net seller's' motion for appointment as lead plaintiff is properly denied where the net seller obtained a 'net gain' from its sales occurring in the putative class period."); *City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.*, 2017 WL 6028213, at *2 (N.D. Ohio Dec. 5, 2017) ("The thought is that a plaintiff who sells during the class period has benefitted from the fraudulently inflated price of the stock while shareholders who hold on to their stock throughout the class period are left holding the bag when the fraud is revealed and the price of the stock drops."); *Weisz v. Calpine Corp.*, 2002 WL 32818827, at *7 (N.D. Cal. Aug. 19, 2002) (removing from consideration applicant for lead plaintiff that sold more shares than it purchased during class period because it was "apparent that

## 2. Mr. May Has Submitted a False PSLRA Certification to This Court

Mr. May's inability to meet the PSLRA's adequacy requirement is cemented by the fact that one of the two sworn Certifications he submitted to this Court is inaccurate. Immediately upon comparing the first pages of the Schedule As attached to Mr. May's sworn PSLRA Certifications, it is apparent that he *either* omitted certain trades in his 2019 PSLRA Certification (and failed to inform the Court about it for 18 months) *or* that he improperly included someone else's trades on his 2021 PSLRA Certification:

Case 3:19-cv-01651-WHO    Document 182-2    Filed 03/22/21    Page 3 of 15

| Transaction (Purchase or Sale) | Trade Date | Quantity | Price Per Share |
|---|---|---|---|
| Purchase | 03/23/2018 | 2,000 | $51.7660 |
| Sale | 04/12/2018 | (2,000) | $53.2000 |
| Purchase | 04/13/2018 | 1,000 | $52.7630 |
| Sale | 04/17/2018 | (1,000) | $55.5000 |
| Purchase | 04/24/2018 | 1,000 | $54.1162 |
| Purchase | 04/25/2018 | 500 | $51.1132 |
| Sale | 05/04/2018 | (500) | $54.0000 |
| Sale | 05/07/2018 | (1,000) | $55.8468 |
| Purchase | 05/14/2018 | 1,000 | $57.4500 |
| Purchase | 05/15/2018 | 500 | $56.3124 |
| Purchase | 05/25/2018 | 2,000 | $52.6736 |
| Purchase | 05/29/2018 | 500 | $51.6365 |
| Purchase | 07/24/2018 | 13 | $53.1300 |
| Purchase | 07/24/2018 | 200 | $53.1290 |
| Purchase | 07/24/2018 | 787 | $53.1070 |
| Purchase | 07/27/2018 | 2,000 | $51.3311 |
| Purchase | 08/20/2018 | 1,000 | $52.3770 |
| Sale | 08/21/2018 | (100) | $54.1883 |

* * *

[applicant] may have actually profited, not suffered losses, as a result of the allegedly artificially inflated stock price"); *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 401 (D. Mass. 2007) ("Where Class Period sales exceed purchases, there is a very real possibility that Lead Plaintiff Madigan actually benefitted from the allegedly inflated price during the Class Period."); *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378 (E.D. Va. 2003) ("[t]he fact that [the movant] sold more shares than it purchased during the class period 'undermines [the movant's] contention that it has the largest financial interest in the case.'"); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 946 (N.D. Ill. 2001) (plaintiff who sold more shares than it purchased during class period was "totally out of the running for designation as lead plaintiff").

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS - 3:19-cv-01651-WHO    - 18 -
4819-6296-5220.v1

| Transaction (Purchase or Sale) | Trade Date | Quantity | Price Per Share |
|---|---|---|---|
| Purchase | 03/23/2018 | 2,000 | $51.7660 |
| Sale | 04/12/2018 | (2,000) | $53.200 |
| Purchase | 04/13/2018 | 1,000 | $52.7630 |
| Sale | 04/17/2018 | (1,000) | $55.500 |
| Purchase | 04/24/2018 | 1,000 | $54.1162 |
| Purchase | 04/25/2018 | 500 | $51.1132 |
| Sale | 05/04/2018 | (500) | $54.00 |
| Sale | 05/07/2018 | (1,000) | $55.8468 |
| Purchase | 05/14/2018 | 1,000 | $57.4500 |
| Purchase | 05/15/2018 | 500 | $56.3124 |
| Purchase | 05/25/2018 | 2,000 | $52.6736 |
| Purchase | 05/29/2018 | 500 | $51.6365 |
| Purchase | 08/20/2018 | 1,000 | $52.3770 |
| Sale | 08/21/2018 | (100) | $54.1883 |

*Compare* ECF No. 182-2 (2021 PSLRA sworn Certification listing all Mr. May's transactions in Nutanix securities between 11/30/2017-5/20/2019, and listing transactions on 7/24/2018 or 7/27/2018 which ***do not*** appear in 2019 Certification) *with* ECF No. 37-3 (2019 PSLRA sworn Certification listing all May's transactions in Nutanix common stock between 3/2/2018-2/28/2019, but omitting any transactions on 7/24/2018 or 7/27/2018).

It is particularly noteworthy that Mr. May has argued ***in this case*** that submitting a false PSLRA Certification amounts to *prima facie* evidence of ***in***adequacy. *See* ECF No. 69 at 5. ("Hedvat's Sworn Certification Lists Erroneous Trades"). Mr. May spilled considerable ink vigorously advocating for Mr. Hedvat's disqualification for what May (incorrectly) thought was a mistake in Hedvat's Certification. *Id.* Mr. May went on to recount the intent of Congress in passing the PSLRA and recited the well-established case law supporting the principle that such movants cannot be counted on by courts to serve as lead plaintiffs. *See, e.g.*, *id.* at 6 (certification errors should "'cause[] the Court to doubt whether [movant] possesses the necessary adequacy and sophistication to be lead plaintiff'") (quoting *Tomaszewski v. Trevena, Inc.*, 2019 WL 2288267, at *4 (E.D. Pa. May 29, 2019)). Following Mr. May's briefing on this issue to the Court, the case law has become more definitive that a lead plaintiff movant who submits a false PSLRA certification should not be appointed lead plaintiff. *See In re Boeing Co. Aircraft Sec. Litig.*, 2020 WL 476658, at *5 (N.D. Ill. Jan. 28, 2020) ("One of two things happened here: either the Wangs

reviewed the loss charts and neglected to correct them despite errors that should have been obvious to them based on their own trading, or they didn't review the loss charts at all.  Under either scenario, their failure to discover these obvious errors independently warrants a determination that the Wangs will not be adequate representatives of the class."); *Li Hong Cheng v. Canada Goose Holdings Inc.*, 2019 WL 6617981, at *6 (S.D.N.Y. Dec. 5, 2019) ("'certification errors in [applicant's] submissions'" """"render [him] inadequate to serve as lead plaintiff under Rule 23's adequacy requirement"""); *Plaut v. Goldman Sachs Grp., Inc.*, 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019) (finding applicant inadequate in light of inadvertent clerical errors in PSLRA certification even though the errors understated the actual losses suffered by the movant).[14]

Accordingly, Mr. May cannot trigger the PSLRA presumption and his motion should be denied.

### C.    The Pension Trust Is the First Movant that Has a Sufficient Financial Interest that Also Satisfies the Rule 23 Requirements

Because the Pension Trust possesses the greatest financial interest out of any of the qualified movants, the next question is whether it "otherwise satisfies the requirements of Rule 23."  15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(cc).  At this stage, the Rule 23 determination is limited to typicality and adequacy.  *Cavanaugh*, 306 F.3d at 730.  There is no question that the Pension Trust is both a typical and adequate member of the putative class here.  *See* ECF No. 184 at 3-6.  As a California-based institutional investor with a substantial financial incentive to diligently direct the litigation and prior experience serving as a lead plaintiff, the Pension Trust is the paradigmatic candidate Congress contemplated in passing the PSLRA.  *See In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio) (Pension Trust recovered $600 million for investors more than a decade ago in what remains the largest securities class action recovery in Sixth Circuit

---

[14]   Like Mr. May, Mr. Flores also had conflicting representations between his 2019 and 2021 PSLRA Certifications.  *Compare* ECF No. 33-2 (Mr. Flores' May 28, 2019 PSLRA Certification purporting to set forth under penalty of perjury all of Flores' transactions in Nutanix common stock between 3/2/2018-2/28/2019, but omitting any transactions on 3/19/2018, 4/12/2018, 4/24/2018, and 5/4/2018) *with* ECF No. 178-1 (Flores' March 22, 2021 PSLRA Certification purporting to set forth under penalty of perjury all of Flores' transactions in Nutanix securities between 11/30/2017-5/20/2019, and listing transactions on 3/19/2018, 4/12/2018, 4/24/2018, and 5/4/2018 which do not appear in 2019 Certification).

history.); *Network Assocs.*, 76 F. Supp. 2d at 1020 (recognizing that "Congress expected that the lead plaintiff would normally be an institutional investor with a large stake in the outcome" that "would then monitor, manage and control the litigation, making, as is the case in ordinary cases, litigation decisions on resource allocation and settlement, with, of course, the advice of, but not the prerogative of, class counsel"). Thus, by satisfying each of the PSLRA requirements, the Pension Trust is entitled to the presumption that it is the most adequate plaintiff.

To rebut the presumption in favor of the Pension Trust's appointment as lead plaintiff, the PSLRA requires the other movants to submit "proof" that the Pension Trust "will not fairly and adequately protect the interests of the class," or "is subject to unique defenses." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II). None exists. Because none of the competing movants can rebut the presumption that the Pension Trust is the most adequate plaintiff, the other motions should be denied.

**D.    The Competing Motions Should Be Denied Because None of the Other Movants Have the Largest Financial Interest**

Birmingham and Bristol both claim smaller financial interests than the Pension Trust. *See* ECF Nos. 176-3, 175-2. Thus, pursuant to the PSLRA's sequential process, the Court is to consider their motions "if and only if [the Pension Trust] is found inadequate or atypical." *Cavanaugh*, 306 F.3d at 732. Because the Pension Trust is "both willing to serve and satisfies the requirements of Rule 23," however, Birmingham and Bristol's motions should be denied. *Id*. at 730.

**V.    CONCLUSION**

Only the Pension Trust satisfies all of the PSLRA's requirements. As such, its motion should be granted and the competing motions denied.

DATED: April 5, 2021                              Respectfully submitted,

                                                 ROBBINS GELLER RUDMAN
                                                   & DOWD LLP

                                                     s/ Michael Albert
                                                 MICHAEL ALBERT

CALIFORNIA IRONWORKERS FIELD PENSION TRUST'S OPPOSITION TO COMPETING LEAD
PLAINTIFF MOTIONS - 3:19-cv-01651-WHO                                    - 21 -
4819-6296-5220.v1

DANIELLE S. MYERS
TRICIA L. McCORMICK
MICHAEL ALBERT
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
tmcormick@rgrdlaw.com
malbert@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

[Proposed] Lead Counsel for [Proposed] Lead
Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 5, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Michael Albert
MICHAEL ALBERT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  malbert@rgrdlaw.com

4819-6296-5220.v1

# Mailing Information for a Case 3:19-cv-01651-WHO Scheller v. Nutanix, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Laura G. Amadon**
  lamadon@wsgr.com,vshreve@wsgr.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Stephanie A. Bartone**
  sbartone@zlk.com,files@zlk.com,shalliday@zlk.com

- **David Bricker**
  dbricker@tenlaw.com

- **Robert C. Finkel**
  RFinkel@wolfpopper.com,cdunleavy@wolfpopper.com

- **Richard W. Gonnello**
  rgonnello@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,ealdo@faruqilaw.com,rglezakos@faruqilaw.com,ecf@faruqilaw.com,tpeter@faruqilaw.com

- **Shannon L Hopkins**
  shopkins@zlk.com,mkeating@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **John T. Jasnoch**
  jjasnoch@scott-scott.com,scott-scott@ecf.courtdrive.com,efile@scott-scott.com

- **David Reuven Lev Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Nancy A. Kulesa**
  nkulesa@bfalaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Katherine M. Lenahan**
  klenahan@faruqilaw.com

- **Nina F. Locker**
  nlocker@wsgr.com,lkoontz@wsgr.com,calendar@wsgr.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Francis P. McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kristina M Mentone**
  kmentone@zlk.com,files@zlk.com,shalliday@zlk.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Gregory Mark Nespole**
  gnespole@zlk.com,ecf@zlk.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,tcrockett@pomla

- **Aidan Chowning Poppler**
  cpoppler@bermantabacco.com,sfservice@bermantabacco.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com,charles-linehan-8383@ecf.pacerpro.com

- **Gregory M Potrepka**
  gpotrepka@zlk.com,files@zlk.com,shalliday@zlk.com

- **Andrew W. Rocco**
  arocco@zlk.com,files@zlk.com,shalliday@zlk.com

- **Joshua Wolf Ruthizer**
  jruthizer@wolfpopper.com,cdunleavy@wolfpopper.com

- **Ignacio Evaristo Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com

- **Shane Palmesano Sanders**
  ssanders@robbinsllp.com,notice@robbinsllp.com

- **Evan L Seite**
  eseite@wsgr.com,vhernandez@wsgr.com

- **James Matthew Wagstaffe**
  wagstaffe@wvbrlaw.com,johnson@wvbrlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)