Benjamin Heikali SBN 307466
Email: bheikali@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885

Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: rgonnello@faruqilaw.com
          klenahan@faruqilaw.com
*Attorneys for Proposed Lead Plaintiff Frank H. May*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | Case No. 3:19-cv-01651-WHO |
| | **FRANK H. MAY'S REPLY IN SUPPORT OF HIS LEAD PLAINTIFF MOTION** |
| | **CLASS ACTION** |
| | Judge:  Hon. William H. Orrick |
| | Date: April 28, 2021 |
| | Time: 2:00 p.m. |
| | Courtroom: 2 – 17th Floor |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.    THE L&K GROUP'S OPPOSITION DOES NOT SAVE ITS MOTION ........................ 4

II.   WITH THE L&K GROUP DISQUALIFIED, MAY IS ENTITLED TO THE MOST
      ADEQUATE PLAINTIFF PRESUMPTION ...................................................... 5

III.  COMPETING MOVANTS HAVE NOT REBUTTED THE PRESUMPTION OF
      MAY'S ADEQUACY AND TYPICALITY ........................................................ 8

      A.    May Is Not A Day Trader ............................................................... 8

      B.    May Is Not Subject To A Unique Defense As A Net Seller/Gainer ........................ 9

      C.    Inadvertent Errors That *Understated* May's Losses In His Prior Lead Plaintiff
            Certification Do Not Render Him Inadequate ....................................... 10

IV.   BIRMINGHAM IS NOT ENTITLED TO A PREFERENCE OVER MAY AS AN
      INSTITUTIONAL INVESTOR ...................................................................... 11

CONCLUSION.................................................................................................................. 12

**FRANK H. MAY'S REPLY IN SUPPORT OF HIS LEAD PLAINTIFF MOTION**
**NO. 3:19-cv-01651-WHO**

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Bodri v. GoPro, Inc.*,
　2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) ............................................................................5

*In re Boeing Co. Aircraft Sec. Litig.*,
　2019 WL 6052399 (N.D. Ill. Nov. 15, 2019) ...........................................................................11

*In re Boeing Co. Aircraft Sec. Litig.*,
　2020 WL 476658 (N.D. Ill. Jan. 28, 2020) .........................................................................10, 11

*In re Cavanaugh*,
　306 F.3d 726 (9th Cir. 2002) ....................................................................................................12

*Cook v. Allergan plc*,
　2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) ........................................................................6, 7

*Daimler AG v. A-Z Wheels LLC*,
　2018 WL 3413863 (S.D. Cal. Apr. 23, 2018) .............................................................................7

*Dura Pharms, Inc. v. Broudo*,
　544 U.S. 336 (2005) ............................................................................................................ *passim*

*Fialkov v. Celladon Corp.*,
　2015 WL 11658717 (S.D. Cal. Dec. 9, 2015) .............................................................................7

*Li Hong Cheng v. Canada Goose Holdings, Inc.*,
　2019 WL 6617981 (S.D.N.Y. Dec. 5, 2019) ............................................................................11

*Markette v. Xoma Corp.*,
　2016 WL 2902286 (N.D. Cal. May 13, 2016) .............................................................................6

*In re Molycorp, Inc. Sec. Litig.*,
　2012 WL 13013602 (D. Colo. May 29, 2012) ..........................................................................8, 9

*Nicolow v. Hewlett Packard Co.*,
　2013 WL 792642 (N.D. Cal. Mar. 4, 2013) ................................................................................5

*Perlmutter v. Intuitive Surgical, Inc.*,
　2011 WL 566814 (N.D. Cal. Feb. 15, 2011) ...........................................................................7, 8

*Plaut v. Goldman Sachs Group., Inc.*,
　2019 WL 4512774 (S.D.N.Y. Sept. 19, 2019) ..........................................................................11

*Prefontaine v. Research in Motion Ltd.*,
　2012 WL 104770 (S.D.N.Y. Jan. 5, 2012) .................................................................................9

*Richardson v. TVIA, Inc.*,
2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) ...........................................................................10

*In re Schering-Plough Corp. Sec. Litig.*,
2003 WL 25547564 (D.N.J. Oct. 10, 2003)...............................................................................10

*Schueneman v. Arena Pharms., Inc.*,
2011 WL 3475380 (S.D. Cal. Aug. 8, 2011) .........................................................................9, 11

*Serafimov v. Netopia, Inc.*,
2004 WL 7334061 (N.D. Cal. Dec. 3, 2004) ..............................................................................9

*In re Solar City Corp. Sec. Litig.*,
2017 WL 363274 (N.D. Cal. Jan. 25, 2017) ........................................................................10, 11

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)........................................................................................................7

*In re Watchguard Secs. Litig.*,
2005 U.S. Dist. LEXIS 40923 (W.D. Wash. July 13, 2005) ......................................................6

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007)....................................................................................7

*In re Zynga Inc. Secs. Litig.*,
2013 WL 257161 (N.D. Cal. Jan. 23, 2013) ..............................................................................9

**Statutes**

15 U.S.C. §78u-4(a)(3)(B)(iii) .....................................................................................................2

**Other Authorities**

FINRA Rule 4210(f)(8)(b)(i) ........................................................................................................9

**FRANK H. MAY'S REPLY IN SUPPORT OF HIS LEAD PLAINTIFF MOTION
NO. 3:19-cv-01651-WHO**

Frank H. May ("May") respectfully submits this reply memorandum of law pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), in further support of his motion for appointment as Lead Plaintiff and approval of his selection of Faruqi & Faruqi, LLP (the "Faruqi Firm") as Lead Counsel.[1]  ECF Nos. 182-182-5.

**INTRODUCTION**

Four movants continue to seek appointment as Lead Plaintiff for the above-captioned action (the "Action"): (1) May, represented by the Faruqi Firm; (2) the self-styled Nutanix Investor Group ("L&K Group" or "Group"), consisting of the Norton Family Living Trust UAD 11/15/2002 ("Norton Trust" or "Trust"), Jose Flores ("Flores"), and the City of Miami Firefighters' and Police Officers' Retirement Trust ("Miami"), represented by Levi & Korsinsky LLP ("L&K") and Wolf Popper LLP; (3) California Ironworkers Field Pension Trust ("California"), represented by Robbins Geller Rudman & Dowd LLP; and (4) City of Birmingham Retirement and Relief System ("Birmingham"), represented by Saxena White P.A.

Although the L&K Group claims to have the largest financial interest in the litigation, they are only able to do so by improperly aggregating their individual losses, and they are otherwise inadequate and atypical to represent the class because: (1) they are a lawyer-driven amalgamation of unrelated investors grouped together solely to keep their counsel, L&K, in the Lead Counsel position; and (2) they are subject to a unique defense due to their selection of counsel, whose conduct in this litigation raises serious questions about its honesty.  *See* ECF No. 194, May Opp.,[2] at 8-12.  The L&K Group's opposition to competing Lead Plaintiff motions does nothing to assuage these concerns.

Even if evaluated individually—which they should not be—the Group's members are each inadequate and atypical to serve as Lead Plaintiff.  The only member who claims larger

---

[1]    Unless otherwise noted, all internal citations and quotations are omitted, and all emphases are added.  All references to "Substitution Motion" are to the Motion to Withdraw as Lead Plaintiff and Substitute Lead Plaintiff, ECF No. 161.

[2]    "May Opp." refers to May's Response To Competing Lead Plaintiff Motions, filed on April 5, 2021.  ECF No. 194.

1

losses than May, the Norton Trust, is subject to a unique defense of non-reliance because its claimed losses are based on Nutanix shares purchased in a private transaction at a nonmarket price; and thus the Trust cannot invoke the fraud-on-the-market presumption. *See* ECF No. 194 (May's opposition) at 12-14. The Norton Trust is additionally inadequate and atypical due to its choice of counsel—as are Group members Flores and Miami, who are also not suitable to serve the Class for the additional reasons explained in May's opposition. *See id*. at 14-15.

May is therefore entitled to invoke the PSLRA's "most adequate plaintiff presumption" because he possesses the next largest financial interest in the Action after the L&K Group and has made a *prima facie* showing of his adequacy and typicality. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii). Further, as the only movant who timely moved for Lead Plaintiff originally *and* opposed L&K's attempt to replace Lead Plaintiff Shimon Hedvat ("Hedvat") with L&K's handpicked substitutes, May is entitled to a preference over the other movants.

Although the presumption in favor of May is a rebuttable one, it can only be rebutted with *evidence*—not speculation—that May is inadequate or atypical. The competing movants have presented no such evidence.

Instead, they make various arguments aimed at reducing May's financial interest and argue that May is atypical of other class members because he is a "day-trader," a net seller, and a net gainer. California additionally argues that May is inadequate because his original lead plaintiff certification contains minor, inadvertent errors. And Birmingham, which claims approximately *$322,363 less* in losses than May, argues that its status as an institutional investor entitles it to a preference over May. All of these arguments fail.

First, while courts typically consider the four "Olsten-Lax" factors to determine who has the largest financial interest (total shares purchased, net shares purchased, net funds expended, and approximate losses suffered), the great weight of authority places the most emphasis on a movant's approximate losses as measured by the last-in first-out ("LIFO") matching methodology when determining each movant's financial interest. While California appears to concede that May has the largest LIFO loss, it notes that it is ahead of May under the retained

shares method ("RSM").  The RSM, however, is an improper method of determining movants' financial interest where, as here, multiple corrective disclosures are alleged.

Second, to the extent the L&K Group and California seek to reduce May's financial interest in accordance with the Supreme Court's loss causation decision in *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336 (2005), it is premature at this stage of the litigation to calculate the portion of an investor's losses that are recoverable as damages under *Dura* without expert testimony and a fully developed record.  Further, it is unclear how the L&K Group calculated May's purported "Dura-LIFO Loss," which appears to be a methodology of its own creation, and May's *Dura* Losses are larger anyway.

Third, May is not a day-trader because he did not close out his positions in Nutanix stock each day.  Even if he had, day traders are frequently appointed as lead plaintiffs.

Fourth, the argument that May is a net seller and net gainer does not rebut the presumption in his favor.  Any gains he made with respect to sales of shares purchased before the Class Period are irrelevant because, like all other Class members, May is seeking to recover losses on shares purchased *during* the Class Period.  As May has recoverable losses (*i.e.*, damages), his status as a net seller is no bar to his appointment as Lead Plaintiff.

Fifth, the accidental omission of four trades out of hundreds on May's original certification is not the type of error that renders May atypical or inadequate.  As the omission understated his losses, there was clearly no intent to deceive the court or the parties.  Disqualifying May based on a mistake of this nature and magnitude is unwarranted.

Sixth, Birmingham's argument that it is entitled to a preference over May because Birmingham is an institutional investor is contrary to the law in the Ninth Circuit.  Moreover, the notion that Birmingham would somehow be a better advocate for the Class than May is particularly unconvincing given that May—not Birmingham—was the only movant who opposed Hedvat's Substitution Motion.  In fact, Birmingham chose not to oppose Hedvat's Substitution Motion, despite being served with a copy of it, presumably because Birmingham thought the relief requested should have been granted.

Accordingly, May respectfully requests the Court to grant May's motion in its entirety.

3

**ARGUMENT**

**I.      THE L&K GROUP'S OPPOSITION DOES NOT SAVE ITS MOTION**

As explained at length in May's opposition brief, the L&K Group is inadequate and atypical to represent the Class.  *See* ECF No. 194 at 4-15.  Other movants agree.  *See* ECF No. 196 at 7-15 (California's opposition); ECF No. 195 at 9-13 (Birmingham's opposition).  Neither the Group's opposition to competing Lead Plaintiff motions nor its supplemental declaration does anything to assuage the concerns about the Group's adequacy and typicality that have been raised.  For example, they waited until their opposition brief to request explicitly what they previously hinted at—that the Court appoint one of the Group's members as Lead Plaintiff if the Court finds that only a single investor should serve—and audaciously describe this request as "further evidence" of the Group's "cohesiveness."  ECF No. 193 at 8.  As May and other movants noted in their oppositions, a willingness to discard the Group is inconsistent with a group's cohesion, and many courts agree.  *See, e.g.*, ECF No. 194 (May's opposition) at 11-15; ECF No. 196 (California's opposition) at 10-14.

The L&K Group attempts to justify their grouping by suggesting that they are not a lawyer-driven group because one of their members, the Norton Trust, has the largest losses "relative to any other movant."  ECF No. 193 at 5-6.  As May previously explained, this does not save the Group's motion because the Norton Trust is itself inadequate and atypical.  First, the Trust is subject to a unique defense of nonreliance because the Trust is an options investor whose losses are predicated solely on acquisitions of Nutanix stock at nonmarket prices.  *See* ECF No. 194 at 12-14.  Second, the Trust is subject to a unique defense based on its choice of counsel, whose honesty and candor in this litigation are in serious doubt due to, *inter alia*, misrepresentations concerning the timing and circumstances of prior Lead Plaintiff Hedvat's withdrawal.  *See id.* at 8-11.  Third, the L&K Group did not know which class members would seek appointment as Lead Plaintiff *at the time the Group filed its motion*.  Consequently, L&K decided to hedge its bets by creating the Group and attempting—at least initially—to aggregate their respective financial interests.

4

In any event, the authorities the L&K Group cites which permitted groups of unrelated investors to aggregate their financial interests are inapposite. *See* ECF No. 193 at 5-6. None of these cases involved a group of unrelated investors who were cobbled together by counsel who had unsuccessfully attempted to retain its role after the prior court-appointed Lead Plaintiff withdrew. Nor did any of these cases involve a situation where that same counsel made misrepresentations to the court regarding the timing and circumstances of the former Lead Plaintiff's withdrawal. In this context, L&K's efforts to game the PSLRA's procedures are painfully transparent.

## II.   WITH THE L&K GROUP DISQUALIFIED, MAY IS ENTITLED TO THE MOST ADEQUATE PLAINTIFF PRESUMPTION

With the L&K Group disqualified, the Lead Plaintiff inquiry next focuses on May, who suffered losses of approximately $742,900.95 on his Class Period purchases and therefore possesses the largest financial interest of the remaining movants. *See* ECF No. 194 at 2 (May's opposition, setting forth a chart of movants' respective losses); *see also* Ex. A (revised loss chart, explained in note 5, *infra*).

The competing movants' attacks on May's financial interest fail. Courts have typically considered the 'Olsten-Lax' factors to determine who has the largest financial interest: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period." ECF No. 171 at 4 (order denying Substitution Motion). While it is true that May is behind the other movants in two of the *Olsten-Lax* factors (net shares purchased and net funds expended), he is ahead of all of them under the most important factor: approximate losses suffered. *See* ECF No. 196, at 15-16 (California's opposition, comparing the movants by factor); ECF No. 194 at 2 (May's opposition, setting forth a chart of movants' respective LIFO losses); *Bodri v. GoPro, Inc.*, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016) (The "weight of authority puts the most emphasis on the competing movants' estimated losses, using a last in, first out ('LIFO') methodology." ); *Nicolow v. Hewlett Packard Co.*, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013) (same).

To the extent California argues that the retained shares method, or RSM, is the appropriate method of measuring financial interest in this action, California is incorrect.  As May explained in his opposition to the Substitution Motion, the RSM is improper based on the claims the Court sustained, which include two corrective disclosures on February 28, 2019 and May 30, 2019.  *See* ECF No. 168 at 2-3; *Markette v. Xoma Corp.*, 2016 WL 2902286, at *5 (N.D. Cal. May 13, 2016) (explaining that the retained share method "will most accurately calculate net loss where there are not multiple partial disclosures that reveal the purported fraud during the class period[]").

Additionally, to the extent California and the L&K Group argue that "*Dura*" losses are the appropriate measure of financial interest, they are incorrect.  Presumably, this method is meant to calculate the movant's losses in accordance with the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  It is premature, however, at this stage to calculate the portion of an investor's losses that are recoverable as damages under *Dura.  Dura* merely held that, at the pleading stage, a conclusory allegation that "the price on the date of the purchase was inflated because of the misrepresentation" was insufficient to meet the loss causation element of a claim under §10(b) of the Exchange Act.  544 U.S. 336 at 342-43.  The Supreme Court reasoned that a "tangle of factors" affect the market price of a security; thus "the most logic alone permits . . . is that the higher purchase price will sometimes play a role in bringing about a future loss." *Id.* at 343.  The Supreme Court "***did not suggest that a court should guess about the effect of [] as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue.***" *In re Watchguard Secs. Litig.*, 2005 U.S. Dist. LEXIS 40923, at *15 n.6 (W.D. Wash. July 13, 2005).

The impracticality of applying a *Dura* analysis at this stage further renders its application inappropriate considering that establishing recoverable losses pursuant to *Dura* requires expert evidence that "the fraud premium[3] was removed from the price of the stock by way of the

---

[3]     The "fraud premium" is the amount by which the stock is inflated because of the alleged misrepresentations or omissions. *See Cook v. Allergan plc*, 2019 WL 1510894, at *3 n.3 (S.D.N.Y. Mar. 21, 2019).

6

efficient market's reaction to a corrective disclosure that was responsive to the misstatement or omission that created the fraud premium in the first instance." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1264 (N.D. Okla. 2007); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259-60 (2d Cir. 2016) (noting that experts "provide testimony on loss causation and/or damages in securities-fraud cases"). Courts are therefore wary of using a *Dura* analysis when appointing a lead plaintiff. *See, e.g., Cook,* 2019 WL 1510894, at *3 ("the appropriateness of employing *Dura* analysis at the lead plaintiff stage is subject to considerable dispute"); *Fialkov v. Celladon Corp.*, 2015 WL 11658717, at *5 (S.D. Cal. Dec. 9, 2015) ("the *Dura*-loss analysis advanced by [movant] does not appear to be the majority view of financial interest analysis adopted by courts in this district or this circuit[]").[4]

Further, it is entirely unclear how the L&K Group arrived at its calculation of $162,259 as May's loss figure under the Group's *sui generis* "Dura-LIFO" method. *See* ECF No. 193 at 5 (listing a "Dura LIFO Loss" total without showing how, exactly, they arrived at those numbers). The L&K Group's failure to "abide by the injunction of the arithmetic teacher"—*i.e.*, to "show [their] work"—only confirms that conducting a *Dura* analysis is premature. *Daimler AG v. A-Z Wheels LLC*, 2018 WL 3413863, at *1 (S.D. Cal. Apr. 23, 2018); *see also Cook*, 2019 WL 1510894, at *3 (rejecting movant's "convoluted [*Dura*] loss calculation methodology at the expense of BRS' considerably more straightforward calculations"). From what can be gleaned from the footnote in their opposition brief, ECF No. 193 at 5 n.9, it appears that this calculation involves some kind of offsetting of gains on May's purchases. *Dura*, however, sets forth no such requirement. Courts that conduct a *Dura* analysis at the lead plaintiff stage are concerned with excluding *losses* on stock purchased during the class period but sold before a corrective disclosure—*i.e*, in-and-out trades. *See Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814,

---

[4] Citing no authority, California argues that applying the "*Dura* method" makes sense at this stage because "the contours of the case are significantly more defined than they were at the outset of a litigation when the lead plaintiffs are typically appointed." *See* ECF No. 196 at 15 n.11. While there is some superficial appeal to California's argument, discovery is ongoing, no deadline has been set for filing a class certification motion, and amendments are still possible. *See* ECF No. 173 at 2. As the precise "contours" of the case remain uncertain, any *Dura* analysis is premature at this time.

**FRANK H. MAY'S REPLY IN SUPPORT OF HIS LEAD PLAINTIFF MOTION
NO. 3:19-cv-01651-WHO**

at *4 (N.D. Cal. Feb. 15, 2011) ("In determining the financial interests of potential lead plaintiffs, some district courts decided, in light of *Dura*, not to consider **losses** resulting from stock trades that occurred prior to any disclosure of the defendants' fraud.").  Tellingly, the L&K Group's own loss chart purports to calculate their own "Dura-LIFO loss" by "[d]isregarding **losses** not attributable to the alleged fraud from intra-class period sales matched to intra-class period purchases[.]"  ECF No. 178-2 at 8.  The Group's chart says nothing about gains.  When losses from May's in-and-out trades during the Class Period are excluded (*i.e.*, losses from in-and-out trades between the two alleged corrective disclosures), May's losses total $743,497.62, not $162,259.[5]

## III.   COMPETING MOVANTS HAVE NOT REBUTTED THE PRESUMPTION OF MAY'S ADEQUACY AND TYPICALITY

### A.   May Is Not A Day Trader

Competing movants attempt to characterize and disqualify May as a high-volume day trader.  All conspicuously fail to provide a definition of what constitutes a "day trader."  A day trader is defined as an investor who buys and subsequently sells stock within the same trading day, such that all positions will usually be closed before the market close of the trading day.  *See* Day Trading, Wikipedia, https://en.wikipedia.org/wiki/Day_trading (explaining the definition of a day trader); *see also In re Molycorp, Inc. Sec. Litig.*, 2012 WL 13013602, at *3 n.3 (D. Colo.

---

[5]   May's original loss chart mistakenly set forth his "*Dura* Loss" at $409,621.45.  ECF No. 182-3 at 13.  This calculation was incorrect because it excluded losses May suffered on shares he sold on the last day of the Class Period, May 30, 2019.  The sale in question, however, occurred after the market closed that day—and more importantly **after the corrective disclosure occurred**. Consequently, the losses May suffered on that sale are attributable to Defendants' fraud under *Dura*.  *See* ECF No. 124 at ¶343 (stating that the second partial disclosure came after market close on May 30, 2019).  That these shares were sold after the corrective news came out on May 30, 2019 is clear from the sale price listed on May's loss chart—$27—which is less than the trading day's low of $32.51 that day.  *Compare* ECF No. 182-3 at 13, *with* Yahoo! Finance, Nutanix (setting forth historical stock prices for Nutanix shares on May 30, 2019 that show the day's low was $32.51), *available at* https://finance.yahoo.com/quote/NTNX.  A revised loss chart reflecting this corrected figure is submitted herewith as Exhibit A, attached to the accompanying Declaration of Richard W. Gonnello.  This correction slightly changed May's LIFO losses, as well as the number of net shares he purchased and the net funds he expended. *Compare* Ex. A at 13, *with* ECF No. 182-3 at 13 (May's loss chart filed Mar. 22, 2021).

May 29, 2012) ("A day trader takes positions . . . and liquidates them before the close of the same trading day."); FINRA Rule 4210(f)(8)(b)(i) ("The term 'day trading' means the purchasing and selling or the selling and purchasing of the same security on the same day in a margin account . . ."). May, by contrast, purchased and held Nutanix shares over multiple days on many occasions during the Class Period. *See* ECF No. 182-2 (May's certification listing his Class Period transactions). Consequently, he is not a day trader.

Even if May were a day-trader—which he was not—it is well established that "a plaintiff's status as a purported day trader is not enough in and of itself to rebut the presumption of adequacy." *Schueneman v. Arena Pharms., Inc.*, 2011 WL 3475380, at *7 (S.D. Cal. Aug. 8, 2011). "[T]he Ninth Circuit has held that day traders suffer as do other traders under [the] fraud-on-the-market theory. . . . [and] [m]any district courts that have considered the issue or surveyed case law have largely concluded that day traders may serve as class representatives." *Serafimov v. Netopia, Inc.*, 2004 WL 7334061, at *5 (N.D. Cal. Dec. 3, 2004); *In re Zynga Inc. Secs. Litig.*, 2013 WL 257161, at *2 (N.D. Cal. Jan. 23, 2013) (finding that whether or not movant was a day trader to be "inconsequential to his request to be appointed lead plaintiff" and appointing him as lead plaintiff). Indeed, common sense dictates that "day and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts." *Prefontaine v. Research in Motion Ltd.,* 2012 WL 104770, at *4 (S.D.N.Y. Jan. 5, 2012). Accordingly, this is not a valid basis upon which to disqualify May as the presumptive Lead Plaintiff.

**B.    May Is Not Subject To A Unique Defense As A Net Seller/Gainer**

Competing movants argue that May is a "net seller" and a "net gainer" because he sold more shares than he purchased during the Class Period and received more money from selling his shares during the Class Period than he spent purchasing his shares. This does not subject May to a unique defense. May did not include losses or gains on his pre-Class Period purchases of shares that were sold during the Class Period because they are irrelevant. Like other Class Members, May is seeking to recover damages based on Nutanix stock ***purchased*** during the Class Period that was artificially inflated by Defendants' fraud. Any losses or "gains made with

9

respect to the *sale* of shares purchased *before* the Class Period are irrelevant[.]" *In re Schering-Plough Corp. Sec. Litig.*, 2003 WL 25547564, at *9 (D.N.J. Oct. 10, 2003) (rejecting argument, at the class certification stage, that a "net seller" who incurred losses during the class period would not adequately represent the class, explaining that the "Section 10(b) claim is based on losses that resulted from *purchases* of Schering-Plough stock made *during* the Class Period[]").

Furthermore, May is not a net gainer as he suffered sizeable *losses*. Indeed, while some movants dispute the *amount* of *Dura* losses May suffered, none dispute that May suffered losses that can support a damages claim consistent with the loss causation principles set forth in *Dura*. Accordingly, May is qualified to serve as Lead Plaintiff. *See Richardson v. TVIA, Inc.*, 2007 WL 1129344, at *3 (N.D. Cal. Apr. 16, 2007) ("In cases involving net sellers who are also net losers, . . . courts have held that a movant should have no trouble proving damages and, therefore, is qualified to serve as lead plaintiff.").

### C.     Inadvertent Errors That *Understated* May's Losses In His Prior Lead Plaintiff Certification Do Not Render Him Inadequate

California argues that May "submitted a false PSLRA certification" because the certification he submitted with his original lead plaintiff motion in 2019 did not contain four trades from July 2018 that appear in the certification that he submitted with his current motion. *See* ECF No. 196 at 18-19. The omission of the four trades from the 2019 certification was inadvertent and was only discovered when preparing May's certification for the present motion. When the four trades are added to the loss calculation May submitted with his original motion, his losses increase by $15,107.10. As a result, the omission of these four trades *understated* May's financial interest in the litigation, and no movant has made any argument to the contrary.

Most courts have found that "minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement." *In re Solar City Corp. Sec. Litig.*, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) (collecting cases).[6] While errors in claimed

---

[6]     May's accidental omission of just four trades out of hundreds is not the kind of "obvious error" at issue in *In re Boeing Co. Aircraft Sec. Litig.*, 2020 WL 476658, at *2, 5 (N.D. Ill. Jan. 28, 2020), where the Wang Family provided trading records with its motion for *reconsideration* of the court's denial of its lead plaintiff motion that revealed *$7.5 million* in sales that were

10

losses may render a proposed class representative inadequate if there is "evidence of bad faith or intent to deceive the court or the parties[,]" this error was not made in bad faith. *Id.* Indeed, because this error was made in the context of May seeking to be appointed lead plaintiff, who is "presumptively, the plaintiff with the largest financial interest in the litigation—[May] would have benefited from increasing the claimed amount rather than decreasing it, as occurred here." *Id.* Thus, the inadvertent error is not the type of error that would render May an atypical or inadequate class representative.[7] *See, e.g., Schueneman v. Arena Pharms., Inc.*, 2011 WL 3475380, at *6 (S.D. Cal. Aug. 8, 2011) (finding inaccurate purchase prices set forth on movant's lead plaintiff certification did not render movant inadequate where "there is no showing that [movant] acted in bad faith[]").

## IV. BIRMINGHAM IS NOT ENTITLED TO A PREFERENCE OVER MAY AS AN INSTITUTIONAL INVESTOR

While some courts who have had to revisit the lead plaintiff process have prioritized plaintiffs who filed timely original motions, these courts nonetheless applied the PSLRA's rules for appointing a lead plaintiff. *See* ECF No. 194 at 15-17 (May's opposition, discussing relevant case law).

Under the PSLRA, the process of considering lead plaintiffs "is sequential: The court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest

---

omitted from its prior loss chart. The Wang Family's motion had originally been denied because "their application raised concerns about the bona fides of their trading history and because it failed to make a *prima facie* showing of adequacy"—*i.e.*, they provided no plausible explanation as to how they could have sunk $40 million into Boeing stock in a two month period; they resisted providing information about their financial status; and they sought a protective order in state court to enjoin a competing movant's investigation into their financial means after the federal court refused the Wang Family's prior attempt to curb the investigation. *See id.* at *2, 6; *In re Boeing Co. Aircraft Sec. Litig.*, 2019 WL 6052399 (N.D. Ill. Nov. 15, 2019) (original lead plaintiff decision).

[7] *Li Hong Cheng v. Canada Goose Holdings, Inc.*, 2019 WL 6617981, at *6 n.7 (S.D.N.Y. Dec. 5, 2019) is inapposite because the certification error at issue did not involve the accidental omission of four trades out of hundreds that understated the movant's losses, but a failure to disclose that the movant previously sought appointment as lead plaintiff in a prior action. *Plaut v. Goldman Sachs Group., Inc.*, 2019 WL 4512774, at *4 (S.D.N.Y. Sept. 19, 2019) is an outlier. As noted above, most courts find that minor certification errors that understate a movant's losses do not render a movant inadequate.

**FRANK H. MAY'S REPLY IN SUPPORT OF HIS LEAD PLAINTIFF MOTION
NO. 3:19-cv-01651-WHO**

financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical." *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002).  The *Cavanaugh* court cautioned that "a straightforward application of the statutory scheme . . . provides no occasion for comparing plaintiffs with each other ***on any basis other than their financial stake in the case*** . . . So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job." *Id.*

With losses of $742,900.95,[8] there can be no question that original movant May has a significantly larger financial interest in the litigation than original movant Birmingham, which claims just $420,538 in losses.  *See* ECF No. 195, Birmingham's opposition, at 6.   May has the largest financial interest and is adequate and typical of other class members.  The inquiry stops there.

Birmingham's argument that the Court should appoint it because an institutional investor would make a better lead plaintiff than May is therefore contrary to binding precedent in this Circuit.[9]  It is also contrary to the facts.  Although Birmingham was served with a copy of Hedvat's Substitution Motion, it was May—not Birmingham—who opposed L&K's improper attempt to retain control of this case and sought to have the lead plaintiff process re-opened to protect the putative class's interests.  *See* ECF No. 168.  It would make no sense for Birmingham, who was content with that outcome, to be given a preference over May or any other Class member under these circumstances.

**CONCLUSION**

For the foregoing reasons, May respectfully requests that the Court: (1) appoint May as Lead Plaintiff for the Action; (2) approve his selection of the Faruqi Firm as Lead Counsel; and

---

[8]    This loss number slightly less than the $743,104.83 May submitted with his motion due to the corrections mentioned in note 5 above as a result of the accidental exclusion of losses on shares held through the corrective disclosure on May 30, 2019 but sold after market close. *Compare* ECF No. 182-3 at 13, *with* Ex. A at 13.

[9]    Birmingham's authority is out-of-circuit and contrary to the Ninth Circuit's decision in *Cavanaugh.  See* ECF No. 195 at 15 & n.9 (citing only authority from the S.D.N.Y. and E.D.N.Y. in support of this supposed institutional preference).

12

(3) grant such other relief as the Court may deem just and proper.

Dated:  April 12, 2021                                    Respectfully submitted,

By: /s/ *Richard W. Gonnello*
                        Richard W. Gonnello

**FARUQI & FARUQI, LLP**
Benjamin Heikali SBN 307466
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
Email: bheikali@faruqilaw.com

**FARUQI & FARUQI, LLP**
Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice*)
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: rgonnello@faruqilaw.com
                        klenahan@faruqilaw.com

*Attorneys for Proposed Lead Plaintiff Frank H. May and Proposed Lead Counsel for the putative Class*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

By:    */s/ Richard W. Gonnello*
Richard W. Gonnello

**CERTIFICATE OF SERVICE**