**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

RYAN SCHELLER, on behalf of )
himself and all others )
similarly situated; et al., )
)
   Plaintiffs, )
)
 VS. )   **NO. C 19-01651 WHO**
)
NUTANIX, INC.; DHEERAJ PANDEY; )
AND DUSTON M. WILLIAMS, )
)
   Defendants. )
_____ )

San Francisco, California
Thursday, April 28, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs Shimon Hedvat, City of Miami Firefighters' and
Police Officers' Retirement Trust, and Lead Counsel for the
Class:
     LEVI & KORSINSKY LLP
     1111 Summer Street - Suite 403
     Stamford, Connecticut  06905
   **BY:  SHANNON L. HOPKINS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
    Official Reporter

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)

For Plaintiff Nutanix Investor Group and Movant Jose Flores:
                         WOLF POPPER LLP
                         845 Third Avenue - 12th Floor
                         New York, New York  10022
           BY:  **JOSHUA W. RUTHIZER, ATTORNEY AT LAW**


For Proposed Lead Plaintiff Frank H. May:
                         FARUQI & FARUQI LLP
                         685 Third Avenue - 26th Floor
                         New York, New York  10017
           BY:  **RICHARD W. GONNLLO, ATTORNEY AT LAW**
                **KATHERINE M. LENAHAN, ATTORNEY AT LAW**


For Movant California Ironworkers Field Pension Trust:
                         ROBBINS, GELLER, RUDMAN & DOWD LLP
                         655 West Broadway - Suite 1900
                         San Diego, California  92101
           BY:  **MICHAEL ALBERT, ATTORNEY AT LAW**


For Movant City of Birmingham Relief and Retirement System:
                         SAXENA WHITE P.A.
                         12750 High Bluff Drive - Suite 475
                         San Diego, California  92130
           BY:  **DAVID R.L. KAPLAN, ATTORNEY AT LAW**

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)

For Defendants:

WILSON, SONSINI, GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California  94304
BY:  **NINA F. LOCKER, ATTORNEY AT LAW**
**IGNACIO E. SALCEDA, ATTORNEY AT LAW**

Also Present:        **John Norton, Nutanix Investor Group**

**Thursday - April 28, 2021**                    **2:00 p.m.**

**P R O C E E D I N G S**

**---oOo---**

THE CLERK:  So we are set to begin, then, in Case Number 19-1651, Scheller vs. Nutanix, Incorporated.

Counsel, if you would please state your appearance for the record.

MS. HOPKINS:  Good afternoon, Your Honor.  This is Shannon Hopkins with Levi & Korsinsky; and I have with me John Norton, who is a member of the Nutanix Investor Group, in the gallery should Your Honor wish to address him.

MR. GONNELLO:  Richard Gonnello on behalf of Frank May, and with me is Katherine Lenahan.

MR. ALBERT:  Good afternoon, Your Honor.  My name is Michael Albert.  I'm from Robbins, Geller, Rudman & Dowd, and I represent the California Ironworkers Field Pension Trust.

MR. KAPLAN:  Good afternoon, Your Honor.  David Kaplan of Saxena White on behalf of City of Birmingham Retirement and Relief System.

MR. RUTHIZER:  Good afternoon, Your Honor.  Joshua Ruthizer of Wolf Popper on behalf of the Nutanix Investor Group and movant Jose Flores.

MS. LOCKER:  And good afternoon, Your Honor.  Nina Locker from Wilson, Sonsini, Goodrich & Rosati on behalf of Nutanix and Messrs. Pandey and Williams; and with me is my

partner Ignacio Salceda also on behalf of Nutanix and Messrs. Pandey and Williams.

　　　　　**MR. SALCEDA:**  Good afternoon, Your Honor.

　　　　　**THE COURT:**  Great.  Good afternoon to all of you. Welcome.

So I'm inclined to appoint the Nutanix Investor Group as lead plaintiff.  It was in my discretion to open up the application process especially given the change of the relevant class period since the last selection, so I don't -- I'm not stuck with just the original applicants.  And under any method -- LIFO, *Dura*, retained shares -- the Nutanix Investor Group has the largest financial interest.  Indeed, Mr. Norton has the largest by himself.  They're sophisticated.  They have a plan regarding communication and how to settle disputes, and they're a balanced group.

And I don't think that -- the sale of put option contracts, such as Mr. Norton's, relies on market price and he bought his stock due to the contract and suffered injury.  He also sold call options but they offset just a fraction of his injury, and Flores and the Miami F&P suffered six-figure *Dura* losses, so I think each is typical and adequate.  And then following along they selected Levi & Korsinsky and Wolf Popper, and so I would be inclined to appoint them as well.

So I'm happy to hear argument against that.  I don't know who would like to address that.

**MR. ALBERT:** I would, Your Honor. Again my name is Michael Albert and I represent the California Ironworkers Field Pension Trust.

**THE COURT:** Mr. Albert, do you have video capability where you are? You don't have to have it but if you do, I'd love to see your face.

**MR. ALBERT:** Oh, I absolutely do. I'm not sure why it's not working.

**THE CLERK:** There may be a camera icon to the lower left-hand bottom of your screen there.

**MR. ALBERT:** No. We've done these before and --

**THE COURT:** Okay. It's not necessary. So go ahead, Mr. Albert.

**MR. ALBERT:** Your Honor, I'm not going to rehash the points we made in our briefing concerning the body of law from judges of this court that have declined to consider the appointment of unrelated groups; but even if Your Honor takes the more permissive view, as it seems that's what you're inclined to do, there's no -- nothing in their pleadings or their declarations shows that they can satisfy even a more relaxed standard.

The group's supposed showing is just a regurgitation of the exact sorts of platitudes and aspirational statements that have been rejected in *Cloudera* by Judge Koh where there there were two group members. They were both sophisticated

institutional --

**THE COURT:**  Now I've lost you completely, Mr. Albert.

**MR. ALBERT:**  Hello, Your Honor.  Do you hear me?

**THE COURT:**  Now I can hear you.

**MR. ALBERT:**  Oh, great.

**THE COURT:**  So why don't you take it from near the top.

**MR. ALBERT:**  I was just saying, Your Honor, that the group showing is just a regurgitation of the exact sorts of platitudes and aspirational statements that Judge Koh rejected in *Cloudera*, and there you had two group members who were both sophisticated institutional investors and they both served as plaintiffs together in a previous securities litigation; Judge Donato in Stitch Fix; or Judge Chen in the *Jumei* case, and that's J-U-M-E-I.

Your Honor need not look past their dispute resolution method to see how unwieldy this group is.  Your Honor, they propose to take any disagreement between these three members, no matter how small that disagreement is, to a mediator who must be a former federal or state court judge.

I mean, Your Honor, litigation requires decisions to be made on short notice.  The class shouldn't be paying $2 million to JAMS because Mr. Flores wants Wolf Popper to take a deposition, whereas Mr. Martin wants Levi & Korsinsky to take a deposition.  This is the exact method of dispute resolution

that was rejected in the *NIO* case.

What does make this group unique, Your Honor, and the situation unique is the stage of the litigation at which you're appointing the lead plaintiff.

When courts appoint lead plaintiffs, as they always -- almost always do at the outset of the case, all the Court has to go on to determine whether the movant with the claimed largest financial interest like the group here satisfies Rule 23 is, as *Cavanaugh* says, quote, "the presumptive lead plaintiffs' complaint and sworn certification."

That's not the case here, Your Honor, because you have the benefit of 18 months of record evidence of one of the group's members, Miami, and the group's lead counsel attempting to litigate this case as a group, and that evidence, I'd suggest, Your Honor, warrants against their appointment.

For example, Miami and the now withdrawn Mr. Hedvat, they litigated this case for well over a year.  Mr. Hedvat abruptly withdrew.  According to lead counsel, Mr. Hedvat was active during the pleading stage and into discovery, yet there's no evidence that lead counsel was able to facilitate any of the plan that you referenced, Your Honor, with respect to that group.

And we made the argument in our opposition brief that there's no evidence of, like, a single direct communication, Your Honor, one e-mail or one call, between Miami and

Mr. Hedvat and there's simply no response to that.  It's just implausible, I'd suggest, to believe that these protocols for jointly litigating the case would automatically start working now.

And I don't think it should be lost on the Court that this is now the third reconfiguration of the group, Your Honor. First there was Miami and Mr. Hedvat, and we all know how that turned out.  Then the musical chairs continued with Miami, which, by the way, has the smallest loss of anyone here today and which was never appointed by Your Honor to serve as the lead plaintiff, bootstrapping with Mr. Flores in an attempt to end-run the PSLRA's lead plaintiff provision just three months ago when they tried to substitute themselves in as lead plaintiffs by transparently building a loss that would exceed Mr. May's losses.

Your Honor, this is a classic example of the lawyers picking their plaintiffs, which is exactly what the PSLRA was designed to avoid.  This time when the music stopped and the lights came back on, we got Mr. Norton.

And, Your Honor, I'd say the dead giveaway of the lawyer-driven nature of this group is the members seeming indifference to which one of them gets appointed just as long as one of them gets appointed, which would, of course, mean the approval of their lead counsel.

And they make -- they take such drastic positions in their

declaration that it leaves little room for debate as to why the group was formed.  The most glaring example of this, Your Honor, is Mr. Norton's representation to you that he would put his full support behind you appointing Mr. Flores as the sole lead plaintiff, and that's Docket Number 178-3 at paragraph 22.

Not only is Mr. Norton's claimed financial interest more than six times bigger than Mr. Flores', but Mr. Flores has submitted a false certification to this Court that he has still not explained.  And, by the way, Mr. Flores is also the movant that Your Honor has found, arguably, has no financial interest whatsoever.

It begs the question:  Why does Mr. Norton agree to not only dilute his decision-making power but to forfeit it entirely by endorsing Mr. Flores' appointment and placing the class in a perilous position?

Again, Your Honor, it seems like you've made up your mind and in preparing for this hearing I read all your cases and, you know, I know you're often inclined to -- you're not inclined to deviate from appointing the member who claims the largest loss; but I would just suggest that the smorgasbord of options that have been offered to you, it's the same thing. It's lawyers picking the plaintiff rather than vice versa, and I think the class here deserves better than that.

**THE COURT:**  Thank you, Mr. Albert.

Anybody else want to argue against the Nutanix Investor Group?

**MR. KAPLAN:**  Yes, Your Honor.  This is Dave Kaplan from Saxena White.

**THE COURT:**  Go ahead.

**MR. KAPLAN:**  So we agree with the arguments made by Mr. Albert just now regarding the Nutanix Investor Group being clearly a group cobbled together by its lawyers at Levi & Korsinsky to retain control of the case and also with the arguments regarding Mr. Norton who was clearly added so that the group would have significant losses to exceed Mr. May, and that he's an options trader and that there's a legion of cases rejecting options traders as suitable candidates, including because of their damages comparisons between options traders and common stock traders.

Many courts have said it's like comparing apples to oranges.  Options pricing involves different factors, such as the volatility of the underlying company, the duration of an expiration date of the option itself, interest rates, as well as a number of other considerations; and for these reasons, as well as others, options traders are routinely rejected as suitable lead plaintiff applicants by the courts, and those cases are collected in the briefs.

But I would like to just focus the Court's attention on a different issue but also a reason why the Nutanix Investor

Group is unqualified to serve as the new lead plaintiff in this case and also why California Ironworkers Pension Trust is unqualified to serve, and that's because it didn't timely apply for appointment within the PSLRA 60-day notice period.

That's the first statutory factor under the PSLRA, and courts have categorically held -- have held in categorical terms that in order to be considered as a lead plaintiff, a candidate must either file a complaint or move for appointment within that period.

And in *Cavanaugh* the Ninth Circuit talked about how that's a significant element of this statute and it prevents a race to the courthouse and provides ample opportunity for putative class members to receive notice of the suit and decide whether to move for an appointment.

And here the Nutanix Investor Group, two of its three members did not timely apply for appointment and, therefore, are just -- they're untimely under the statute itself.

And in *Cavanaugh* the Ninth Circuit also warned district courts not to go off the statutory track, the simple three-step sequential process provided by the PSLRA, in selecting a lead plaintiff even if the district court believed that it would better serve the legislative goals, and the very first step in that process is timely moving for appointment.

And I would just submit to Your Honor if the Court were to read no other case in evaluating its decision here, if the

Court has not yet already done so, to look at the recent decision in the *Allergan Securities Litigation*.  It was issued just months ago by the chief judge of the Southern District of New York, the Honorable Colleen McMahon, and it relies heavily on precedent from this district, the Northern District of California, as well as the Southern District of New York, as well as other courts across the country that, when faced with a question of having to select a substitute lead plaintiff and having reopened the process and allowing all putative class members, whether they originally moved for appointment within the 60-day period or failed to do so, after having made that decision, like the Court has done so here, when assessed with the question how to weigh movants that complied with the statute versus those that did not, the *Allergan* court held very clearly that there's no reason to look further afield than the movants that originally complied with the statute if they have a financial -- a significant financial interest in the case, their adequacy and typicality have not been rebutted, and they remain ready and willing to serve.

And in *Allergan* I would just point out that one of the new movants that failed to comply with the statute had over $32 million in losses compared to one of the -- the original movant, who Judge McMahon ultimately selected as the replacement lead plaintiff, who had under a million dollars in losses but complied with the statute.

And in that case Judge McMahon cited Judge Seeborg's decision in the *Tezos Securities Litigation*, that was a 2019 case, that also held very clearly that the court -- if you fail to comply with that first element of the statute and seek appointment within 60 days, then you're not a proper applicant and the court does not look beyond -- and would only look beyond movants that timely applied in the event that there were no available movants in considering that originally applied when selecting a replacement lead candidate or there was no opposition from other class members.

In *Allergan* Judge McMahon noted it would only be in rare circumstances where the Court would ever select or even consider the applications of a movant that failed to comply with this first statutory step when it had in front of it movants that did comply with the statute, sought appointment, were otherwise adequate and typical -- typical under Rule 23, and continued to have a significant financial interest in the case.

And that's exactly the circumstance that the Court finds itself in now.  We believe the Court properly opened the lead plaintiff process because there was not a competing motion for appointment when Mr. Hedvat attempted to substitute Mr. Flores. Mr. May did not seek appointment.  No other class member sought appointment at that procedural posture.  So the Court properly determined that it would briefly reopen the lead plaintiff

process and allow any putative class member to apply for appointment.

However, now the Court -- it's very clear the Court has before it both applicants who complied with the statute and those that did not and we would submit, Your Honor, that the choice is -- it's a very clear choice here.  There's two of the four remaining movants, Mr. May and the City of Birmingham, both complied with the statute and in applying the sequential analysis that *Cavanaugh*, the Ninth Circuit, directs the district court to apply, the Court should focus its analysis and begin with just Mr. May and the City of Birmingham.

And in doing so, the Court will -- we believe the Court will find that the City of Birmingham clearly has the larger financial interest for a variety of reasons, most principally Mr. May is effectively disqualified from serving as a lead plaintiff as both a net seller and a net gainer.  He's also engaged in an extreme amount of in-and-out transactions including on the very same day, including the very first day after the corrective -- the first corrective disclosure in this case on February 28th, 2019, revealed the truth, the stock price plummeted 33 percent.

But then the very next trading day, March 1st, Mr. May engaged in 11 separate purchase transactions and in 9 separate sale transactions each for thousands of shares at the exact -- at similar prices, the very definition of a day trader, which

belies -- which defendants will clearly argue belie any reliance on the defendants' statements as well as the integrity of their market price.

There's also the issue of he submitted inconsistent certifications adding thousands of shares that were not included in his original certification.  He submitted an eleventh-hour loss chart on his reply brief that attempts to address this fatal net seller/net gainer issue but still concedes he's still a net seller/net gainer.  He attempts to nearly double his *Dura* losses.

But really the threshold issue we would submit for Your Honor to consider and that's front and center now but was not front and center at the time the Court decided to reopen the lead plaintiff process, is simply the question, okay, now the Court has before it movants that complied with the PSLRA, Mr. May and Mr. Birmingham, and those that did not by failing to meet this most basic threshold statutory factor of timely seeking appointment and where does the Court begin its analysis; and we submit, Your Honor, that the Court should begin its analysis with movants that complied with the statute versus those that did not.

**THE COURT:**  All right.  Thank you, Mr. Kaplan.

Mr. Gonnello, do you want to reply to that?

**MR. GONNELLO:**  Yes.  I will try to address points that haven't been raised already to keep things simpler.

With respect to the Norton trust, there is an issue regarding not the sale of the put contracts but the acquisition of the stock.  It is a key issue because there is a distinction between selling the puts at whatever the market price may have been for the put contract versus acquiring the shares of Nutanix stock at a subsequent time period at nonmarket prices.

And this is an important distinction because, as you know, the fraud on the market presumption is essential to these securities fraud class actions in order to get a class certified.  And the Supreme Court said in *Basic vs. Levinson* that "Any" -- and I'll quote it and then I'll specify the part I'm talking about, but it says, quote (reading):

"Any showing that severs the link between the alleged misrepresentation and either the price received or paid by the plaintiff or his decision to trade at fair market price will be sufficient to rebut the presumption of reliance."

Now, all of the Norton trust losses are attributable to the shares that were acquired at nonmarket prices.  So I don't even know that there's a need to rebut the presumption because I don't think you can establish it because he didn't purchase those shares at market prices.  They were purchased at the strike prices of the puts.  And the put sales, they may have been at market prices -- I don't know; it's largely irrelevant -- but with respect to the shares that were

acquired, none of those shares were acquired at market prices.

And we've cited the *Upjohn* case out of Michigan where a court rejected a movant precisely for this argument and, indeed, that's one of the reasons presumably why many courts reject options investors as being atypical to represent the class.

So I would ask the Court to take a closer look at that issue, although I realize the Court has already considered it.

One minor point to clarify.  This joint declaration that was submitted by the Nutanix Investor Group, it's not that they're going to present any disputes to a mediator; they're going to present it to an arbitrator.  So there's going to be an arbitrator who decides what the class is going to do in any issue where they can't come to a unanimous decision such that the arbitrator, who has no financial stake in this case, is going to be making decisions for the class.

And that's antithetical to what Congress intended when it enacted the PSLRA because obviously they wanted to put a lead plaintiff in charge who would control the case and it would be based on who had the largest financial stake in the case, and here we're going to have an arbitrator deciding these things.

And one issue with respect to the arbitrator that was not addressed by the group in its reply brief is this arrangement creates a conflict because lead counsel is going to an arbitrator and presenting the positions of each three members

of the group.  That's obviously a conflict because the only reason you're going to an arbitrator is because you have a disagreement as to your positions.  So the decisions that will be made will not even be made with adequate representations with respect to the arbitration.

I'm happy to answer any other questions that the Court may have about any of the movants, Mr. May, but I think that the papers largely address these issues so I thank the Court for its time.

**THE COURT:**  All right.  Thank you.

So who is going to respond?  Ms. Hopkins?

**MS. HOPKINS:**  Yes, Your Honor.  Thank you.

Where to begin?  With respect to -- I'll start with the group issue, Your Honor.  The PSLRA explicitly states that groups are permitted to move for lead plaintiff so long as they demonstrate they're typical and adequate.

As Your Honor has stated at the outset, the Nutanix Investor Group has demonstrated that.  The Nutanix Investor Group has submitted a 10-page very detailed declaration, a supplemental declaration, and Mr. Norton himself has also provided an additional declaration.

The declaration that the Nutanix Investor Group has provided details in painstaking detail who the members are, where they're from, their sophistication, the years investing, the degrees they have, their experience in overseeing attorneys

in the case of Mr. Norton in connection with his business.

They've laid out their understanding of their duties in this case. They've laid out their plan to litigate the case together. They have demonstrated an ability to get on the phone very quickly in videoconference at a moment's notice to convene about this case.

They presented extensive evidence of both their sophistication and adequacy to serve as a lead plaintiff and have demonstrated their ability to work together in this case by convening on numerous calls and submitting joint declarations explaining what was discussed in their plan hearing.

Counsel has commented about their mechanism for resolving disputes. Your Honor, there has to be obviously some mechanism if there is a dispute. In my experience, I've never seen that arise but certainly you want to plan for such an event.

As set forth in other cases, including the *Aqua Metals* case here in the Northern District and the *CVR* case that we cited, courts have found that an arbitration is, in fact -- in a situation of deadlocks in fact, quote, "is the sort of concrete commitment and plans for cooperation that have been found to be positive indications that a group will act cohesively."

The group got together and decided what mechanism they would all be comfortable with to resolve disputes and came up

with this decision.

So courts have found that this is appropriate and, in fact, shows a commitment to cooperation to have a plan in place should they not be able to reach a resolution.  So that's -- to me, Your Honor, that's really a nonissue and shows, in fact, the opposite of what counsel is arguing here.

And I'd like to point out, Your Honor, this is not a situation where Mr. Norton was brought in simply to aggregate losses.  Mr. Norton alone has a larger loss than all the other movants combined.

Mr. Norton stated, as he stated multiple times in his joint declaration and subsequent declarations, has specific reasons for including Miami and for including Mr. Flores. Miami has been involved in this case for nearly two years actively litigating this case.  No one complained then when Miami joined the case.  Miami has aggressively litigated this case, we have moved past the motion to dismiss, and has significant institutional knowledge, in addition to Miami's experience as a sophisticated institutional investor overseeing cases just like this.

Mr. Flores was included in the group because Mr. Norton valued Mr. Flores' industry experience.  He has a degree in computer science.  He's currently in the industry of software engineering.  It would be a very -- a real asset to the case here given that Nutanix is a cloud-computing company and does

exactly what -- or very similar to what Mr. Flores does.

So these three group members, as Your Honor recognized at the outset today, are a well-balanced group and have come together because Mr. Norton, who has the largest loss, thought it would be in the best interests of the class to work together with them for these different reasons. The group is a small cohesive group and has already demonstrated their ability to work together.

With respect to Mr. Norton's options transactions, as Your Honor recognized at the outset here, Mr. Norton purchased the -- I'm sorry -- sold the put options based on the market price and relying on the market price of the optioned security and the strike price contained in the contract. He relied on the market the same way common stockholders rely on the market. We have cited numerous cases that have found options -- those transacting in options similar to here were typical and adequate.

Mr. Norton acquired the stock in October and has continued to hold that stock and that long position as we sit here today, Your Honor. So Mr. Norton relied on the securities price. He stated that in his declaration, yet he purchased -- he sold the put options on an exchange at the market price. That's exactly what a common stockholder does. The option is a very common security that's traded.

So the notion that Mr. Norton was not relying on the

market price here is just plain wrong.  So, as I said, we cited numerous cases to that effect.

With respect to the other arguments, I think, you know, Your Honor has considered the other arguments here regarding, you know, the -- Your Honor has already considered whether the original movant is required.  Your Honor reopened the lead plaintiff process because the class period was extended so I think Your Honor has already addressed that argument.

So unless Your Honor has any other questions for me or Mr. Norton, who's in the gallery, that concludes my presentation.

**THE COURT:**  All right.  Fine.  Thank you.

Any last words from any of the arguers?  Mr. Gonnello, I'll start with you.

**MR. GONNELLO:**  Yes, one quick thing.

All of the cases regarding arbitration provisions that have been inserted in these joint declarations for the use of an arbitrator, none of those cases have addressed the issue of the conflict that it presents.  This is a new argument.  It's an issue of first impression.  No court has decided it.

And we've also cited a case, the *Tan vs. The NIO Corporation* -- or *NIO, Inc.*, case where the court looked at this arbitration provision and used it as evidence of inadequacy.  So the courts are split on this; and with respect to the conflict issue, it is entirely novel and no court has

addressed it.

I'd also like to point out that it's very telling that in this lengthy declaration that was submitted and even in these multiple declarations that have been submitted by the investor group, they fail to say how they came together.

And one of the factors that courts look to, even with the minority courts who appoint groups of unrelated investors, they still look at things like how the group was formed. They've refused to disclose that, although it's obvious that they were put together by their lawyers. They should just say it. I mean, at this point what's the difference?

But that's evidence that the group is formed at the behest of the lawyers and it renders each of those members inadequate as a result.

I have nothing else to add. Thank you, Your Honor.

**THE COURT:** Thank you.

Mr. Kaplan, did you want to add anything?

**MR. KAPLAN:** I did.

This notion that Mr. Norton wasn't added to have the largest -- so that the group would have the largest losses when aggregated is simply ludicrous. This is a situation where counsel knew the landscape and had two of the existing group members in place and they -- and the aggregated losses or financial interest of those group members, which it attempted to retain control of the case with, Mr. Flores and Miami, were

not enough to beat Mr. May on a reopened proceeding putting aside those net seller and net gainer issues I mentioned. So it had to add Norton in order to beat Mr. May.

It saw the landscape. The landscape was in front of it. It was in front of it from the prior substitution briefing and the original lead plaintiff briefing; and it knew that if it didn't add another investor with significant losses or claimed asserted losses, it would lose -- it would not have the largest financial interest.

So this idea that Norton wasn't aggregated -- added to the group by the lawyers to retain control of the case, it's just -- it defies belief.

And, you know, Your Honor, in the recent *Stitch Fix* decision, the court came to the conclusion that the clear consensus -- and this is a 2019 decision in the Northern District of California -- is that a group of investors who had no preexisting relationship -- and I'm reading from the brief -- and with one another and whose only relationship in the group's status were forged only by a lawyer is not appropriate to be a lead plaintiff.

And just as to this issue of whether the Court previously addressed this issue of movants that timely filed for lead plaintiff in accordance with the PSLRA versus those that did not, Your Honor's March 1st order didn't address that issue. It just decided to reopen the lead plaintiff process just like

the court did in *Allergan* without knowing who had applied.

So this is --

**THE COURT:**  No, no.  I think Ms. Hopkins was just referring to what I said at the beginning of the hearing.

**MR. KAPLAN:**  Oh, okay.  Yeah, I certainly don't want to put words in her mouth; but I just wanted to make very clear that no court -- if this Court were to hold that after reopening the lead plaintiff process a movant had failed to comply with the PSLRA by timely filing a complaint or moving for appointment was on equal footing with another movant, another putative class member who did comply with the PSLRA, it would be the first court to ever make such a holding and it would be flatly inconsistent with the decision in *Allergan*, which also reopened the class period after -- reopened the lead plaintiff process after --

**THE COURT:**  You have made this point, Mr. Kaplan. Thank you.

**MR. KAPLAN:**  Thank you.

**THE COURT:**  All right.  Mr. Albert, did you want to say anything further?

**MR. ALBERT:**  I did, Your Honor.  I just want to make one quick point, and it's about Mr. Norton's options.

Ms. Hopkins right now and in the group's reply brief they cite extensive case law to support a point that's not in dispute, that the sales of put options are made in the open

market and in reliance on the integrity of the market.

I just want to be really clear, that's not what's at issue. What is at issue and what's not -- what hasn't been addressed at all today or in the reply brief and what makes Mr. Norton atypical is the fact that the entirety of his financial interests, all of his losses, are on the 100,000 shares that he was contractually obligated to purchase in a private nonopen market transaction at prices that were up to $18 per share higher than the prices -- than the market prices on those days.

And if they want to say, Your Honor, that the assignment of those 100,000 shares isn't the relevant transaction but it's, rather, the sale of the put option contract, I will remind Mr. Norton and the Court that this case is pled on behalf of, quote, "purchasers or acquirers of Nutanix securities," not sellers of Nutanix securities.

In fact, the very first filing that the group's counsel made in this case, and this is Docket Number 22, Your Honor, they took issue with another movant who was an option seller -- I'm sorry -- an options trader proposing a class definition that would include sellers. They said, and I'm quoting from Docket Number 22 at Footnote 4, Your Honor, quote (reading):

"Movant does not believe that sellers of Nutanix securities during the class period should be included."

And, Your Honor, one final point is that the group's reply

brief relies -- they pretty much cite for half a page the *Scientific-Atlanta* case, and in that case the class was defined -- explicitly the class definition included put option sellers.

They can't have it both ways, Your Honor.  Either Mr. Norton's losses stem from his sales of puts, in which case he was purposely excluded from the putative class by the operative complaint, or Mr. Norton's losses stem from him getting assigned 100,000 shares pursuant to a private nonopen market transaction at prices that were entirely divorced from where the stock was trading those days.

THE COURT:  All right.  Thank you.

Ms. Hopkins, do you want -- I'll give you the last word if you want to respond to any of those comments.

MS. HOPKINS:  Thank you, Your Honor.

With respect to I guess the options argument that was just being made, this argument is being first raised here at argument and hasn't been raised at all in any of the papers so -- I respectfully submit, Your Honor, so I consider it being raised for the first time at the hearing.

But, nonetheless, Mr. Norton's investment decision occurred at the time that he sold the put and he relied on the market price of the put and the straight price of the put when he made the -- when he made -- when he sold the puts.  He relied on available -- not only the available information in

the market but the price of Nutanix stock, which is the underlying securities stock option.  That's the investment decision that was made.

And as the *Scientific-Atlanta* case points out, once those shares were put to him, he was placed in the shoes quite directly of the stockholder at the time -- purchasing the stock at an inflated price.  It does not change the fact that the stock had to be purchased at an inflated price here.

And so Mr. Albert's argument is just incorrect here, and we've cited numerous cases before Your Honor that Your Honor has seen where courts have found that sellers of put options are typical and adequate.

So I would respectfully submit he made his investment decision in reliance on the market and, therefore, he's typical and adequate.

With respect to the arbitration thing, I really think that's -- it's a nonissue here, but I just want to address the point of a conflict.

There is no conflict.  The group got together and decided this -- if there is -- if there is a dispute, this is how we want to address it and we're all comfortable addressing it in this manner.

So there is no conflict here.  And, again, courts, we cited in our brief, have found this is a responsible thing for a group to do and it's prudent for a group to do to have a plan

to address disputes as here.

**THE COURT:**  I'm not sure that that addresses Mr. Gonnello's point, which is that in some way the issue has to be presented to the arbitrator, it would be presented by the lawyer in his theory of this, and that it would be presented in a way that was helpful to somebody and wasn't to another sort of as a matter of course.  I think that's the essence of the conflict argument.

**MS. HOPKINS:**  Well, but, I mean, again, there's nothing in here that says the lawyer is presenting the arguments to the arbitrator.  Each client or each investor has agreed that that's how they want to handle it, and they could certainly present their views on things.  There's nothing in here that says that they can't or that the lawyer would be taking a position adverse to any one of them or that they couldn't, you know, get -- have another counsel if they wanted to if the issue arose.  I've never seen this happen in all my time doing these cases, Your Honor.

And, again, the courts have found this is the sort of concrete commitment and plan for cooperation that is found to be a positive indication that a group will act reasonably.

They put a plan in place here.  This is what they chose to do.  So, you know, I disagree that you can just assume that the lawyer is going to have to take one person's side.  That's not what would occur.

**THE COURT:**  All right.  Thank you all for your argument.  I will go back and work a little more on this, and then I'll try and get an order out as soon as I can.

Thank you for your argument.

**ALL:**  Thank you, Your Honor.

(Proceedings adjourned at 2:38 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Sunday, May 2, 2021

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter