UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN SCHELLER, et al.,<br><br>       Plaintiffs,<br><br>      v.<br><br>NUTANIX, INC., et al.,<br><br>       Defendants. | Case No.  19-cv-01651-WHO<br><br>**ORDER APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL**<br><br>Re: 174, 176, 177, 182, 184 |

This case is a putative class action brought against defendants Nutanix, Inc., Chief Executive Officer Dheeraj Pandey, and Chief Financial Officer Duston M. William (collectively "Nutanix") that alleges violations of federal securities law from March 1, 2018 through May 30, 2019 (the "Class Period") on behalf of "all other persons similarly situated who purchased or otherwise acquired Nutanix securities" (the "Class").  On March 1, 2021, I granted the withdrawal of the former lead plaintiff, Shimon Hedvat, and reopened the lead plaintiff application process. Dkt. No. 171 ("March 1 Order").  Four applicants now move for appointment as lead plaintiff. For the reasons set forth below, the motion to appoint California Ironworkers Field Pension Trust as lead plaintiff is GRANTED.  The request to appoint Robbins Geller Rudman & Dowd LLP is also GRANTED.

## BACKGROUND

In March 2019, eight class members filed applications to serve as lead plaintiff in this action.  On July 10, 2019, I appointed Shimon Hedvat as lead plaintiff, concluding that he held the largest financial interest out of the applicants and was the most adequate lead plaintiff under the Private Securities Litigation Reform Act ("PSLRA").  I also appointed his selected counsel, Levi & Korsinsky, LLP ("Levi & Korsinsky") as lead counsel.  Then, on March 1, 2021, I granted the withdrawal of Hedvat as lead plaintiff and ordered that any putative class member interested in

1    serving as the new lead plaintiff in this action may file an application within 21 days.  March 1

2    Order at 4–5.

3         Five applicants subsequently filed applications; one, Bristol County Retirement System,

4    withdrew its application.  Dkt. No. 192.  The remaining four applicants seeking appointment as

5    lead plaintiff are (i) the City of Birmingham Relief and Retirement System ("Birmingham"), (ii)

6    Frank May ("May"), (iii) the California Ironworkers Field Pension Trust ("Pension Trust"), and

7    (iv) the Nutanix Investor Group, composed of John P. Norton, on behalf of the Norton Family

8    Living Trust ("Norton"), Jose Flores ("Flores"), and the City of Miami Fire Fighters and Police

9    Officers Retirement Trust ("Miami F&P").

10                              **LEGAL STANDARD**

11   **I.    APPOINTMENT OF LEAD PLAINTIFF**

12        Under the PSLRA, courts shall, from among competing movants, "appoint as lead plaintiff

13   the member or members of the purported plaintiff class that the court determines to be most

14   capable of adequately representing the interests of class members [(the "most adequate plaintiff")]."

15   15 U.S.C. § 78u-4(a)(3)(B)(i).  In making this determination, "the court shall adopt a presumption

16   that the most adequate plaintiff in any private action arising under this chapter is the person or

17   group of persons that—(aa) has either filed the complaint or made a motion in response to a notice

18   under subparagraph (A)(i); (bb) in the determination of the court, has the largest financial interest

19   in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the

20   Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  This presumption,

21   however, may be rebutted—and may "only" be rebutted—"upon proof by a member of the

22   purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and

23   adequately protect the interests of the class; or (bb) is subject to unique defenses that render such

24   plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

25        The Ninth Circuit has been clear that the PSLRA does not permit "the district court [to] engage

26   in a wide-ranging comparison to determine which plaintiff is best suited to represent the class."  *In re*

27   *Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).  Instead, "the lead plaintiff . . . is the one who has the

28   greatest financial stake in the outcome of the case, so long as he meets the requirements of Rule 23."

United States District Court
Northern District of California

1  *Id.*  In this multi-step inquiry, "the district court must compare the financial stakes of the various

2  plaintiffs and determine which one has the most to gain from the lawsuit."  *Id.* at 730.  "It must then

3  focus its attention on *that* plaintiff and determine, based on the information he has provided in his

4  pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of

5  'typicality' and 'adequacy.'"  *Id.*

6  **II.     SELECTION OF LEAD COUNSEL**

7         The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of

8  the court, select and retain counsel to represent the class."  U.S.C. § 78u-4(a)(3)(B)(v).  But

9  "[w]hile the appointment of counsel is made subject to the approval of the court, the [PSLRA]

10  clearly leaves the choice of class counsel in the hands of the lead plaintiff."  *Cavanaugh*, 306 F.3d

11  at 734.  "[I]f the lead plaintiff has made a reasonable choice of counsel, the district court should

12  generally defer to that choice."  *Cohen v. U.S. Dist. Ct. for N. Dist. of California*, 586 F.3d 703,

13  712 (9th Cir. 2009).

14  **DISCUSSION**

15  **I.      APPOINTMENT OF LEAD PLAINTIFF**

16         **A.     Notice**

17         Four applicants seek the position of lead plaintiff in this action, but Birmingham and May

18  argue that I should only consider the original movants, themselves, who sought appointment as the

19  lead plaintiff within the PSLRA's initial 60-day notice period.  Dkt. No. 195 at 3–5, 8–9

20  ("Birmingham Opp."); Dkt. No. 194 at 16–17 ("May Opp.").  Under the PSLRA, one of the

21  factors required to be considered the most adequate plaintiff is either filing the complaint or

22  making a motion in response to a notice "not later than 60 days after the date on which the notice

23  is published . . . to serve as lead plaintiff of the purported class."  15 U.S.C. § 78u-

24  4(a)(3)(B)(iii)(I).  But the PSLRA "does not contemplate any sort of lead-plaintiff proceedings

25  beyond the very earliest stages of the litigation." *In re Portal Software, Inc. Sec. Litig.*, No.

26  03-CV-5138-VRW, 2005 WL 8179740, at *3 (N.D. Cal. Mar. 9, 2005).  The PSLRA "is entirely

27  silent on the proper procedure for substituting a new lead plaintiff when the previously certified

28  one withdraws."  *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 120 (S.D.N.Y. 2002).  The

United States District Court
Northern District of California

1    Ninth Circuit has held that reopening the lead plaintiff application process after finding that a lead

2    plaintiff is an inadequate class representative is "consistent with the district court's *continuing*

3    duty to see that a class is adequately represented by counsel." *Z-Seven Fund, Inc. v. Motorcar*

4    *Parts & Accessories*, 231 F.3d 1215, 1219 (9th Cir. 2000) (emphasis in original).

5            Courts in the Ninth Circuit have different approaches to substituting a new lead plaintiff.

6    Some do not reopen the process at all and appoint the next most adequate plaintiff from the group

7    of original movants. *See In re Tezos Sec. Litig.*, No. 17-CV-06779-RS, 2019 WL 2183448, at *1

8    (N.D. Cal. Apr. 8, 2019) (denying the motion to reopen the PSLRA process and appointing an

9    original movant as lead plaintiff). Others reopen the application process but order the plaintiffs to

10   publish another notice and decide who the lead plaintiff is based on those that timely respond to

11   the new notice. *See In re Cloudera, Inc. Sec. Litig.*, No. 19-CV-03221-LHK, 2020 WL 1288362,

12   at *3 (N.D. Cal. Mar. 18, 2020) (requiring plaintiffs to issue a new notice after amendments were

13   made to the complaint). And others reopen the application process without issuing a new notice

14   and allow non-original movants to be lead plaintiff. *See In re Snap Inc. Sec. Litig.*, 394 F. Supp.

15   3d 1156, 1159 (C.D. Cal. 2019) (allowing 21 days for any party to move for lead plaintiff after

16   withdrawal of lead plaintiff); *In re Snap Inc. Sec. Litig.*, 2019 WL 2223800, at *4 (C.D. Cal. Apr.

17   1, 2019) (appointing a group of non-original movants as lead plaintiff).

18           Birmingham and May rely on *Tezos* and a line of cases in the Southern District of New

19   York to argue that I should prioritize it and May as original movants over other movants.

20   Specifically, Birmingham points to *In re Allergan PLC Sec. Litig.*, 2020 WL 8620082, at *1

21   (S.D.N.Y. Dec. 7, 2020), where the court prioritized an applicant who had moved within the initial

22   60-day period even though the applicant did not have the largest financial interest. After

23   concluding that its former lead plaintiff was inadequate because its law firm had violated the

24   "court's clear directive that there be just one lead class counsel and [the lead plaintiff] had

25   acquiesced in that maneuver" the court suggested that the former lead plaintiff could prosecute its

26   claim individually but also noted "it may be that some other putative class member will step up

27   and seek to replace BRS as lead plaintiff" and left open the possibility for 30 days. *In re Allergan*

28   *PLC Sec. Litig.*, 2020 WL 5796763, at *9 (S.D.N.Y. Sept. 29, 2020). The *Allergan* court noted

that in the Southern District of New York, courts often use a "rare circumstances" test where a "motion filed after the sixty-day period by a person who has not filed a complaint . . . is untimely, and may not, except perhaps in rare circumstances, be considered by a court." *In re Allergan*, 2020 WL 8620082, at *2. The *Allergan* court also noted that a court in this district had found the line of Southern District cases persuasive. *Id.* (referencing *Tezos*, 2019 WL 2183448, at *3).

Both *Allergan* and *Tezos* are distinguishable. In *Tezos*, the court had refused to reopen the lead plaintiff process when it appointed an original movant as lead plaintiff. *See Tezos*, 2019 WL 2183448, at *2–*3. And in *Allergan*, the court had merely suggested the possibility of another putative class member moving to replace the lead plaintiff. *Allergan*, 2020 WL 5796763, at *9. But in this case, I reopened the lead plaintiff application process to any new applicant, including non-original movants. March 1 Order at 3–5. Indeed, I considered the same arguments Birmingham asserts now in my prior order where I noted that, "Some courts appoint the next most adequate class member from the original group of applicants, while others re-open the application process and accept *new* applications." *Id.* (emphasis added). I concluded that the latter process— re-opening the process and accepting new applications—was most appropriate because the Class Period had changed and therefore altered the "largest financial interest" calculus.[1] *Id.* Moreover, the first round of lead plaintiff motions had been filed before Nutanix's second corrective disclosure took place on May 30, 2019, which is another reason to consider non-original movants for lead plaintiff.

I am not obligated to prioritize Birmingham and May. Even the *Allergan* court held that, because the "PSLRA does not contemplate any sort of lead-plaintiff proceedings beyond the very earliest stages of the litigation," the process of substituting the lead plaintiff is "left to the discretion of the district court." *Allergan*, 2020 WL 8620082, at *1 (internal quotation marks and citations omitted). Birmingham warns that if I were to consider both an original movant and

---

[1] Birmingham also argues that the *Allergan* case is persuasive because it is factually analogous. According to Birmingham, the class period in *Allergan* had also "been extended before the court re-opened the lead plaintiff process." Birmingham Opp. at 4. But that is not the reason why the *Allergan* court re-opened the process and it also does not counter the fact that I ordered new applicants to apply here, whereas the *Allergan* court did not.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   another movant on equal footing after reopening the lead plaintiff process, I "would be the first

2   court to ever make such a holding." Dkt. No. 212 ("April 28, 2021 Hearing") at 26. This is not

3   true. Courts have evaluated original and new movants together after reopening the lead plaintiff

4   process. *See, e.g.*, *Cloudera*, 2020 WL 1288362, at *3; *In re STEC Inc.*, 2010 WL 11469019, at

5   *2 (C.D. Cal. July 14, 2010) (refusing to find a non-original movant's application to be

6   procedurally defective). To be sure, these cases often involve the issuance of a new notice. But

7   even where there was no new notice issued, like the case here, a court in this circuit has evaluated

8   and appointed a non-original movant as lead plaintiff. *Snap*, 2019 WL 2223800, at *4. Moreover,

9   all of the courts in the cases that Birmingham and May rely on emphasize a court's discretion in

10  determining how to substitute a lead plaintiff. Accordingly, I will examine all four applicants'

11  arguments to determine who is the most adequate plaintiff.

12        **B.     Financial Interest**

13        The applicant with the largest financial interest is the presumptive lead plaintiff.

14  *Cavanaugh*, 306 F.3d at 729. The four contenders dispute which accounting method I should use to

15  determine who has the largest financial interest. As I have previously explained, "[i]n assessing

16  which class member has the 'largest financial interest' courts typically consider the *Lax-Olsten* factors,

17  which include: (1) the number of shares purchased during the class period; (2) the number of net

18  shares purchased during the class period; (3) the total net funds expended during the class period; and

19  (4) the approximate losses suffered during the class period." March 1 Order at 2.

20        The applicants assert three different methods to calculate the last factor, the approximate losses

21  suffered during the Class Period: (1) the last-in-first-out ("LIFO") methodology; (3) the *Dura* LIFO

22  methodology; and (3) the retained shares method. The LIFO method matches a movant's first share sold

23  with its most recent share purchased to determine losses. The *Dura* LIFO method utilizes the LIFO

24  method but removes the losses from securities bought and sold before the corrective disclosure occurred

25  when calculating approximate losses. *See Dura Pharm.*, *Inc. v. Broudo*, 544 U.S. 336, 338 (2005).

26  Finally, the retained shares method looks at the shares purchased during the class period and retained at

27  the end of the class period, to calculate the total net loss on those securities alone.

28        The Ninth Circuit has not yet held by what method should be performed to calculate the

6

approximate losses suffered during the class period.  It has held that "the court may select accounting methods that are both rational and consistently applied."  *Id.* at 730 n.4.  Most courts in this district use the LIFO method to calculate a movant's estimated losses.  *See Bodri v. Gopro, Inc.*, No. 16-CV-00232-JST, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016) (internal alteration and citations omitted); *accord Ali v. Intel Corp.*, No. 18-CV-00507-YGR, 2018 WL 2412111, at *2 n.7 (N.D. Cal. May 29, 2018); *Nicolow v. Hewlett Packard Co.*, No. 12-CV-05980-CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013); *Bruce v. Suntech Power Holdings Co.*, No. 12-CV-04061-RS, 2012 WL 5927985, at *2 (N.D. Cal. Nov. 13, 2012); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 11-CV-04003-LHK, 2012 WL 78780, at *4 (N.D. Cal. Jan. 9, 2012).

Under any method, however, the applicant with the largest financial interest is the Nutanix Investor Group, composed of Norton, Flores, and Miami F&P.  Under the LIFO method, the Nutanix Investor Group lost $3,102,825, which is approximately $2.36 million more than the applicant next in line, May, who lost $743,104.[2]  *See* Dkt. No. 177 ("NIG Mot.") at 9; May Opp. at 2.  Pension Trust lost $705,690 and Birmingham lost $420,538 under the LIFO method.  Dkt. No. 184 ("Pension Trust Mot.") at 3; Dkt. No. 174 ("Birmingham Mot.") at 5.  Accordingly, the Nutanix Investor group is the presumptive lead plaintiff because it has the largest financial interest.

## C.   Typicality and Adequacy

I now turn to whether the Nutanix Investor Group "satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'"  *Cavanaugh*, 306 F.3d at 729.  "The named plaintiff's representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 969–70 (9th Cir. 2019) (internal quotation marks and citations omitted).  "To determine whether the representation meets [the adequacy] standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and

---

[2] Under the *Dura* LIFO method, the Nutanix Investor Group lost $2,905,663.77, which is approximately $2.2 million more than the applicant with the second greatest loss, the Pension Trust.  *See* Dkt. No. 193 ("NIG Opp.") at 5.  Under the retained shares method, the Nutanix Investor Group retained 112,750 shares, which is significantly more than the 41,800 shares retained by the class member with the second largest number of shares, the Pension Trust.  *See* NIG Opp. at 4; Pension Trust Opp. at 15.

United States District Court
Northern District of California

1  (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the

2  class?"  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

3              **1.      Nutanix Investor Group**

4          The other applicants assert that the Nutanix Investor Group, specifically its member

5  Norton, is atypical and subject to unique defenses because Norton is a put options seller and

6  therefore not a part of the Class, which only includes those "who purchased or otherwise acquired

7  Nutanix securities."  Dkt. No. 124 ("Second Amended Complaint (SAC)") at 1.

8          The applicants contend that as a put options seller, Norton did not obtain any Nutanix

9  shares based on market price and instead obtained the shares because he was contractually

10 obligated to do so under the put options contracts.  The only Nutanix securities that Norton

11 transacted in or owned during the Class Period are 100,000 shares of common stock that Norton

12 was contractually obligated to purchase in October 2018 because Norton had sold put options on

13 August 27, 2018.  *See* Dkt. No. 178-1, Ex. 1 at 3 ("Norton Transactions"); Dkt. No. 196 ("Pension

14 Trust Opp.") at 5.  As a result, Norton would not be able to prove the fraud-on-the-market

15 presumption of reliance, an element of the Class's claim under Section 10(b) of the Exchange Act.

16 May Opp. 13–14; Pension Trust Opp. at 12–14; Birmingham Opp. at 11–13.  This theory

17 presumes that class members indirectly relied upon Nutanix's misrepresentations and omissions if

18 the members relied on the integrity of the market price, because the price was artificially inflated

19 due to Nutanix's misrepresentations and omissions.  SAC ¶¶ 429–34.  Therefore, the applicants

20 assert that Norton would be subject to unique defenses regarding damages and loss causation.

21         Courts have held that the sale of put option contracts relies on market price.  As Norton

22 asserts, in *In re Tesla, Inc. Sec. Litig.*, No. 18-CV-04865-EMC, 2018 WL 6609569, at *3 (N.D.

23 Cal. Dec. 17, 2018), a court in this district explained that, while an investor "who *purchases* a put

24 option expects that the underlying stock will decrease in value," an investor "who *sells* a put

25 option," like Norton, "expects that the value of the underlying stock will rise."  (emphasis in

26 original).  "In this respect, a seller of a put option is like a buyer of common stock – *i.e.*, both

27 transact with the expectation that the price of the stock will increase."  *Id.*; *see also In re*

28 *Sci.-Atlanta, Inc. Securities Litigation* 571 F. Supp. 2d 1315, 1330 (N.D. Ga. 2007) (finding a put

United States District Court
Northern District of California

8

option seller "generally profits only when a stock maintains or increases its value" and so the

seller "generally relies—in like fashion to a stock purchaser—on the integrity of the price of the

underlying stock . . . therefore, where a put options seller demonstrates market efficiency in the

underlying security, he is generally entitled to rely on the fraud on the market theory.").

Norton asserts that "in making [his] investment decisions concerning Nutanix securities,

[he] relied upon the then-current market prices of Nutanix's securities" when he sold the put

options contracts in August 2018, during the Class Period, because he expected that the shares

would increase in value.[3]  *See* Joint Decl. NIG ¶ 4; Dkt. No. 201 at 9 ("NIG Reply").  Put

differently, Norton relied on the market price when selling the put contracts.

However, because Norton asserts that he relied on the market price by selling the put

contracts, this removes him from the Class, which only includes those "who purchased or

otherwise acquired Nutanix securities."  SAC at 1.  Nearly all of the cases that Norton relies on to

show that a put options seller can adequately represent a class explicitly include options sellers in

the class definition.  *See* NIG Reply at 10–11.[4]  In its supplemental briefing, Norton relies on four

other cases to assert that put options sellers can be lead plaintiffs despite the class definition not

explicitly including options sellers.  *See* Dkt. No. 217 ("NIG Supp. Brief") at 2–4.  But these too

---

[3] Norton's put options contracts included a buyer's right to sell the shares at the strike price of $55 to Norton.  NIG Reply at 8–11.  Buyers exercise their options in put contracts when the market price falls below the strike price in order to make a profit from the difference in price.  For example, in October 2018, when the market price fell to around $38–$42, the buyer(s) assigned the options and Norton was contractually obligated to purchase 100,000 Nutanix shares at $55. Pension Trust Opp. at 5.  Therefore, Norton's expectation in selling the put contracts was that the market price would appreciate above the strike price of $55 because then a buyer would not exercise the option and Norton would pocket the premium the buyer paid for the contract. Otherwise, Norton would not sell the put contracts.

[4] *See, e.g.*, *In re Tesla, Inc. Sec. Litig.*, No. 18-CV-04865-EMC, 2018 WL 6609569, at *3 (N.D. Cal. Dec. 17, 2018) (investors trading in options were part of the class); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014) (class definition explicitly included put options sellers); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117 (D.N.J. Jan. 30, 2013) (same); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260 (N.D. Ala. 2009) (class definition included those who had purchased or otherwise acquired options); *Tolan v. Computervision Corp.*, 696 F. Supp. 771 (D .Mass. 1988) (class consisted of those who transacted in stock and put and call options); *Moskowitz v. Lopp*, 128 F.R.D. 624 (E.D. Pa. 1989) (same); *In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 124 (S.D.N.Y. 2001) (class later amended to include put options sellers).  In *In re Priceline.com Inc.*, 236 F.R.D. 89, 100 (D. Conn. 2006), there was no challenge to the adequacy of the put options seller based on the class definition.

United States District Court
Northern District of California

are distinguishable.  In two of the cases, the plaintiffs later amended the class definitions to explicitly include options sellers.  *See Lifschitz v. Hexion Specialty Chemicals, Inc.*, 1:08-cv-06394 (S.D.N.Y. Feb. 17, 2009); *Hall v. Medicis Pharm. Corp.*, 2009 WL 648626 (D. Ariz. Mar. 11, 2009).  Norton's third case, *Hochschuler v. G. D. Searle & Co.*, 82 F.R.D. 339 (N.D. Ill. 1978), was decided a decade before the Supreme Court's decision in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which established the fraud-on-the-market presumption of reliance.  Finally, in *Hoexter v. Simmons*, 140 F.R.D. 416, 420–21 (D. Ariz. 1991), the court declined to exclude put sellers from the class at that stage of litigation but noted that "they may require separate treatment as a subclass at some point in the litigation."  The court did not find that sellers of put options were typical and adequate to represent the class.  *Id.*

Accordingly, I find that Norton is atypical and inadequate to be lead plaintiff because he can only assert fraud-on-market reliance on his sale of put options, but options sellers are excluded from the Class.  Because Norton's financial interest is the reason why the Nutanix Investor Group has the largest financial interest, I will move on to the next applicant.[5]

## 2.    May

May is the next applicant with the largest financial interest.  The other applicants assert that May is subject to unique defenses as a "net seller" and "net gainer."[6]  Courts have generally declined to appoint net sellers and net gainers as lead plaintiffs.  Net purchasers, as opposed to net sellers, "have a greater interest in a securities lawsuit because a net purchaser was induced by the fraud to purchase shares and has been left 'holding the bag' when the fraud is eventually revealed."  *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2011 WL 566814, at

---

[5] Under the LIFO method, Norton's financial interest is $2,566,490, Flores's financial interest is $343,888, and Miami F&P's financial interest is $197,447.  *See* NIG Mot. at 9.

[6] Birmingham and Pension Trust also assert that May is inadequate because he allegedly submitted a false PSLRA certification.  Dkt. No. 200 ("Birmingham Reply") at 8–9; Pension Trust Opp. at 18–20.  But May clarifies that the omission of the four trades from the 2019 certification was inadvertent and that the omission understated May's losses.  May Reply at 10–11.  Accordingly, the error was not made in bad faith and would not render May atypical or inadequate.  *See Schueneman v. Arena Pharms., Inc.*, 2011 WL 3475380, at *6 (S.D. Cal. Aug. 8, 2011) (finding that the errors in movant's certification, which were reasonable and not made in bad faith, did not render movant inadequate).

United States District Court
Northern District of California

1    *8–9 (N.D. Cal. Feb. 15, 2011).  "In contrast, a net seller arguably profits more from the fraud

2    than suffers from it."  *Id.*  But if a net seller is also a net loser, courts have held that such "a

3    movant should have no trouble proving damages and, therefore, is qualified to serve as lead

4    plaintiff."  *Richardson v. TVIA, Inc.*, No. 06-CV-06304-RMW, 2007 WL 1129344, at *3 (N.D.

5    Cal. Apr. 16, 2007) (collecting cases).

6            In this case, May purchased 537,735 shares during the Class Period but sold 592,735

7    shares, meaning he sold 55,000 more shares than he purchased during the Class Period.  *See* Dkt.

8    No. 182-3 at 13.  He expended $21,864,898 but received $23,064,829, meaning he gained

9    $1,199,931 during the Class Period.  *Id.*  These facts show that May is a net seller and a net gainer.

10           May does not dispute that it is improper for a net gainer to serve as lead plaintiff in a

11   securities fraud class action.  Instead, he argues that he is not a "net gainer" because he has

12   "suffered sizeable losses."  Dkt. No. 204 ("May Reply") at 9–10.  Although May has suffered

13   $743,104 in losses, in assessing which class member has the largest financial interest, I must consider

14   the rest of the *Lax-Olsten* factors:  (1) the number of shares purchased during the class period; (2) the

15   number of net shares purchased during the class period; and (3) the total net funds expended during the

16   class period.  The fact that he gained approximately $1.2 million from the sale of Nutanix shares

17   during the Class Period undermines his assertion that he "suffered sizeable losses."

18            May also asserts that "any losses or gains on his pre-Class Period purchases of shares that

19   were sold during the Class Period" are irrelevant because like "other Class Members, May is

20   seeking to recover damages based on Nutanix stock purchased during the Class Period that was

21   artificially inflated by Defendants' fraud."  *Id.* (emphasis omitted).  May relies on *In re

22   Schering-Plough Corp. Sec. Litig.*, 2003 WL 25547564, at *9 (D.N.J. Oct. 10, 2003), where the

23   court explained that any losses or gains incurred from purchases made before the class period were

24   irrelevant and, therefore, found that a "net seller" could adequately represent the class.  But this

25   single case is unpersuasive in light of the general precedent finding that net gainers cannot

26   adequately represent a class.  *See In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173–74

27   (W.D.N.Y.2007) (collecting cases).

28            Notably, May's argument "ignores the purpose of the net seller and net gainer inquires,"

United States District Court
Northern District of California

11

which is to "determine whether a party potentially benefitted from the fraud." *Perlmutter*, 2011 WL 566814, at *8. For example, in *Perlmutter*, the court found that a movant who had sold 18,500 more shares during the class period than he purchased and gained $2.3 million in class period transactions qualified as a net seller and net gainer. *Id.* There, the court explained that when the movant purchased the stock at issue prior to the class period, he purchased it at fair market value. *Id.* at 9. But when the movant sold it during the class period, he sold it at fraudulently inflated prices because the complaint alleged that the defendants' fraud artificially inflated the stock price during the class period. *Id.* Likewise, the SAC here alleges that Nutanix's fraud artificially inflated its stock price during the Class Period. SAC ¶ 420. When May sold the Nutanix shares that he purchased before the Class Period, during the Class Period, this makes it more likely that he benefited from the fraud. Therefore, May cannot adequately represent the Class because he is a net seller and a net gainer during the Class Period and, therefore, subject to unique defenses.[7]

### 3. Pension Trust

Then, the next movant with the largest financial interest is Pension Trust with $705,690 in losses. Pension Trust Mot. at 3. None of the other applicants contest the adequacy or typicality of Pension Trust. Moreover, as an institutional investor, Pension Trust is the prototypical lead plaintiff whose participation Congress sought to encourage when it enacted the PSLRA. *Cavanaugh*, 306 F.3d at 731. Accordingly, Pension Trust is the most adequate plaintiff to represent the Class.

## II.    SELECTION OF LEAD COUNSEL

Pension Trust has selected Robbins Geller Rudman & Dowd LLP as its counsel. That selection is entitled to substantial deference. *Cohen*, 586 F.3d at 712. The firm has been appointed lead counsel in hundreds of securities class actions, including in this District. Pension Trust Mot. at 5; Birmingham Opp. at 16 n. 10. A number of courts have found the firm qualified to conduct these

---

[7] Because I find that May is disqualified from being lead plaintiff because he is a net seller and a net gainer, I will not address Birmingham's argument that May is a day trader and therefore inadequate. *See* Birmingham Reply at 8.

actions.  *See In re LendingClub Sec. Litig.*, No. 3:16-cv-02627-WHA (N.D. Cal. July 20, 2018) (finalizing $125 million securities fraud class action settlement, a recovery that ranks among the top ten largest securities fraud class action recoveries in the district).  Robbins Geller Rudman & Dowd LLP is APPROVED as lead counsel.

### CONCLUSION

For the reasons stated above, the Pension Trust is APPOINTED lead plaintiff under the PSLRA.  Its selection of Robbins Geller Rudman & Dowd LLP as lead counsel is APPROVED.

**IT IS SO ORDERED.**

Dated:  June 10, 2021



William H. Orrick
United States District Judge

United States District Court
Northern District of California