NINA F. LOCKER, State Bar No. 123838
IGNACIO E. SALCEDA, State Bar No. 164017
EVAN L. SEITE, State Bar No. 274641
BETTY CHANG ROWE, State Bar No. 214068
LAURA G. AMADON, State Bar No. 321524
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   (650) 493-9300
Facsimile:   (650) 565-5100
Email:        nlocker@wsgr.com
              isalceda@wsgr.com
              eseite@wsgr.com
              browe@wsgr.com
              lamadon@wsgr.com

*Attorneys for Defendants Nutanix, Inc.,
Dheeraj Pandey, and Duston M. Williams*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO.:  3:19-cv-01651-WHO

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS UNDER FED. R. CIV. P. 12(c)**

Hearing Date: September 14, 2022
Time: 2:00 p.m.
Courtroom: 2
Hon. William H. Orrick

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION .................................................................................... 1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(**a**)(3)) ........................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF RELEVANT FACTS .................................................................................. 4

      A.     Nutanix's Business ............................................................................................ 4

      B.     Events Leading to the Securities Class Action .............................................. 4

      C.     The Securities Class Action ............................................................................ 6

ARGUMENT ............................................................................................................................. 8

I.    THE APPLICABLE LEGAL STANDARDS ................................................................ 8

II.   THE SAC FAILS TO PLEAD LOSS CAUSATION BASED ON THE MAY 30, 2019 EARNINGS ANNOUNCEMENT AS A MATTER OF LAW ................................ 9

      A.     The Alleged "Truth" Was Revealed In Nutanix's February 28, 2019 Earnings Announcement ................................................................................... 9

      B.     The May 30, 2019 Earnings Announcement Is Not A "Corrective Disclosure" Because It Did Not Reveal New Information Regarding The Alleged Fraud ................................................................................................... 12

           1.     The 3Q'19 Earnings Miss Does Not Constitute New Information and is Insufficient to Plead Loss Causation .............................................. 14

           2.     Plaintiffs' Characterizations of the Alleged Scope and Magnitude of the Disclosed Sales Pipeline and Productivity Issues Do Not Constitute New Information and are Insufficient to Plead Loss Causation ..................................................................................................... 16

CONCLUSION ....................................................................................................................... 19

**TABLE OF AUTHORITIES**

**CASES**

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 2937483 (N.D. Cal. May 20, 2016) ..................................................................... 13

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ................................................................ 17, 18

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014) ................................................................................................. 17

*Chavez v. United States*,
683 F.3d 1102 (9th Cir. 2012) ............................................................................................... 9

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014) ................................................................................. 14, 15, 17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................................... 8, 14

*Dworkin v. Hustler Magazine Inc.*,
867 F.2d 1188 (9th Cir. 1989) ............................................................................................... 9

*Evanston Police Pension Fund v. McKesson Corp.*,
2021 WL 4902420 (N.D. Cal. Oct. 21, 2021) ..................................................................... 12

*In re Barclays Bank PLC Sec. Litig.*,
756 F. App'x 41 (2d Cir. 2018) ............................................................................................ 11

*In re Bofl Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 71 (2021) ................................ 8, 12

*In re Boston Sci. Corp. Sec. Litig.*,
708 F. Supp. 2d 110 (D. Mass. 2010), *aff'd sub nom. Mississippi Public
Emps.' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5 (1st Cir. 2011) .......................... 16

*In re Leapfrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................................................... 17

*In re Maximus, Inc. Sec. Litig.*,
2018 WL 4076359 (E.D. Va. Aug. 27, 2018), *aff'd sub nom. Amalgamated
Bank v. Maximus, Inc.*, 771 F. App'x 238 (4th Cir. 2019) ................................................. 15

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ..................................................................... 17

*In re Nektar Therapeutics Sec. Litig.*,
2022 WL 1573821 (9th Cir. May 19, 2021) ............................................................. 2, 8, 12

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ................................................................................................. 17

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ........................................................................................ 12, 14

*Landmark Equity Fund, II, LLC v. Arias*,
   2015 WL 5882321 (E.D. Cal. Oct. 5, 2015) ................................................................. 9

*Lopes v. Fitbit, Inc.*,
   2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *aff'd*,
   848 F. App'x 278 (9th Cir. 2021)....................................................... 12, 14, 15, 16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008).................................................................. 12

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013)................................................................. 13

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018).................................................................. 8, 14

*Nelson v. City of Irvine*,
   143 F.3d 1196 (9th Cir. 1998)................................................................... 9

*Oregon Public Employees Retirement Fund v. Apollo Group, Inc.*,
   774 F.3d 598 (9th Cir. 2014)..................................................................... 8

*Rok v. Identiv, Inc*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .......................................................... 12

*Rosner v. Star Gas Partners, L.P.*,
   344 F. App'x 642 (2d Cir. 2009)................................................................. 15

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
   499 F. Supp. 3d 49 (D. Del. 2020), *appeal docketed*,
   No. 20-3427 (3d Cir. 2020)...................................................................... 16

*Summit Media LLC v. City of Los Angeles*,
   530 F. Supp. 2d 1084 (C.D. Cal. 2008)............................................................. 9

*United States v. 14.02 Acres*,
   547 F.3d 943 (9th Cir. 2008)..................................................................... 9

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021)........................................................... 8, 11, 14

**STATUTES**

15 U.S.C. § 78u-4(b)(4) .............................................................................. 8

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on September 14, 2022 at 2:00 p.m., before The Honorable William H. Orrick, United States District Court, Courtroom 2, 17th Floor, at 450 Golden Gate Avenue, San Francisco, California, Nutanix, Inc. ("Nutanix" or "Company"), Dheeraj Pandey, and Duston M. Williams (collectively, "Defendants") will move for an order entering partial judgment on the pleadings that, as a matter of law, Plaintiffs' Second Amended Complaint ("SAC" or "¶") fails to state a claim, pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4(a) *et seq.*, and Fed. R. Civ. P. 9(b) and 12(c), based on an alleged second corrective disclosure.  This Motion is based on this Notice of Motion and Motion; Defendants' Memorandum of Points and Authorities; Defendants' Request for Judicial Notice; the Declaration of Betty Chang Rowe ("Rowe Decl.") and accompanying exhibits ("Ex."); and other matters before the Court.

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))**

Whether the remaining allegations in the Second Amended Complaint fail to plead loss causation, an essential element of a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 thereunder, with respect to the alleged second corrective disclosure?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This securities action is a tale of two alleged corrective disclosures.  The first, Nutanix's February 28, 2019 earnings announcement, disclosed the very facts Plaintiffs claim were fraudulently concealed.  The second, Nutanix's May 30, 2019 earnings announcement, disclosed no new facts about the alleged fraud that were not previously disclosed to the market.  Under these circumstances, the May 2019 announcement does not constitute a corrective disclosure as a matter of law.  Therefore, Plaintiffs' Second Amended Complaint fails to plead loss causation, a necessary element of their Section 10(b) claims, based on that announcement.  Accordingly, Defendants are entitled to judgment on the pleadings on this issue.

Plaintiffs themselves allege that in February 2019, when Nutanix announced its Q2'19

results and provided guidance for Q3'19 (which was lower than analyst expectations), Defendants "came clean" (¶ 22) and revealed "the truth" to investors.  SAC at p. 78.  By Plaintiffs' own allegations, Nutanix disclosed in February 2019 the very facts Plaintiffs claim had been fraudulently concealed during the alleged Class Period:  Nutanix's allegedly declining sales pipeline and poor sales productivity that were caused by the Company's "***underspending*** on lead generation and ***under hiring*** sales personnel[.]" ¶ 320; *see, e.g.*, ¶¶ 2, 4, 7-9, 12-14, 20-22.  The revelations were complete; in Plaintiffs' own words, they were "[i]n direct contradiction of Defendants' Class Period statements[.]" ¶ 320.  Thus, the February 2019 announcement corrected the alleged fraudulent omissions and broke any chain of causation between the alleged omissions and any of Plaintiffs' claimed losses based on the later May 30, 2019 announcement.

Plaintiffs' allegations that Nutanix's May 30, 2019 announcement, which disclosed that the Company missed its guidance for Q3'19 by a very small amount, was a second corrective disclosure fail as a matter of law.  As the Ninth Circuit reaffirmed just last week, a corrective disclosure "must by definition reveal <u>*new information*</u>" regarding "<u>*the very facts*</u> about which the defendant [purportedly] lied." *In re Nektar Therapeutics Sec. Litig.*, 2022 WL 1573821, at \*6-7 (9th Cir. May 19, 2021) (citation omitted).[1]  Nowhere does the SAC allege that the May 2019 announcement revealed any additional information about Nutanix's sales pipeline or productivity that had not previously been disclosed to the market.  Rather, the SAC merely alleges that the May announcement somehow revealed that Nutanix's sales pipeline and productivity issues were "far from over" (¶ 346) and "far worse" (¶ 28) than expected.  These vague allegations do not plead new *facts* and are insufficient to plead loss causation as a matter of law for several independent reasons, each of which is dispositive.

<u>First</u>, where, as here, an earnings miss is alleged to be due to matters previously disclosed to the market, loss causation does not exist as a matter of law.

<u>Second</u>, third party opinions regarding facts in the public domain do not constitute a corrective disclosure. Plaintiffs' "far worse" allegations—which merely parrot analyst opinions—

---

[1] All emphasis that are added to quoted material appear in underlined italics in this brief.

do not allege *facts*. The opinions are nothing more than negative characterizations of facts otherwise in the marketplace (*i.e.*, gloss on public information), and do not constitute a corrective disclosure as a matter of law.

Third, Plaintiffs offer no particularized factual allegations regarding the respects in which Nutanix's alleged pipeline and sales productivity issues were purportedly "far worse" in May 2019 than previously represented. Their sole allegation in this respect—that the sales pipeline and productivity issues "were far from over" (¶ 346)—does not withstand scrutiny. In Nutanix's February 2019 announcement, Defendants *expressly* disclosed that the Company's remedial actions would "*take a couple of quarters to show meaningful results*" and would "set[] [the Company] up *into FY'20* [which did not begin until August 1, 2019] to have a pretty good year." ¶ 324; Ex. 1 at 8, 16; *see* Ex. 1 at 5 (Nutanix expected the positive impacts from the changes it made would occur "*over the coming quarters*."). In Nutanix's May 2019 announcement, Defendants reiterated their belief that the Company's corrective actions "will drive improved business *into FY'20, as these changes take a couple of quarters to show results*." Ex. 3 at 5. Therefore, the market already knew in February 2019 that the sales pipeline and productivity issues would take time to resolve. That information was not new in May 2019.

Finally, Plaintiffs' loss causation allegations fail to satisfy Rule 9(b)'s heightened particularly standard. For example, in the May 2019 announcement, Nutanix reported substantial *improvements* in its sales pipeline (40% growth quarter-over-quarter sales) and sales hiring (addition of over 50 sales representatives) in Q3'19. *See* Ex. 3 at 8, 12. Nutanix also specifically identified other non-fraud related factors as headwinds that negatively impacted Q3'19 financial performance. In light of these disclosures, Plaintiffs fail to plead, as they must, particularized facts to support loss causation, including that the alleged fraud-related issues were a substantial cause of their losses.

For each of these reasons, Defendants are entitled to judgment on the pleadings that the SAC fails to plead loss causation based on the May 30, 2019 announcement as a matter of law.

# STATEMENT OF RELEVANT FACTS

## A.    Nutanix's Business

Nutanix is a leading cloud computing software company headquartered in San Jose, California, and is known for pioneering its core hyper-converged infrastructure ("HCI") software technology.  ¶¶ 1, 42.  Mr. Pandey co-founded the Company and served as the Company's Chief Executive Officer and Chairman of the Board of Nutanix during the alleged Class Period.  ¶ 43. Mr. Williams served as the Company's Chief Financial Officer during the alleged Class Period. ¶ 44.  Nutanix common stock (NTNX) trades on NASDAQ, "an efficient market."  ¶ 42.

## B.    Events Leading to the Securities Class Action

**Nutanix's February 28, 2019 Announcement of Q2'19 Results and Sales Pipeline and Sales Hiring Issues.**  On February 28, 2019, Nutanix reported its results for Q2'19.[2]  Revenue for the quarter, $335.4 million, exceeded Nutanix's guidance range of $325 to $335 million, and quarterly billings of $413.4 million met guidance.  Ex. 4; Ex. 1 at 7; Ex. 11.  Although Nutanix achieved its guidance and delivered solid results in Q2'19, the Company issued guidance for Q3'19 that was lower than analyst expectations.  ¶¶ 20, 320; Ex. 1 at 8-9.  Nutanix explained that it recently identified "imbalances in our lead generation spending that were beginning to impact our sales pipeline."  ¶ 323; Ex. 1 at 8.  Nutanix further disclosed that it "reallocated some of [its] lead generation spending to other priorities" in fiscal year 2018, resulting in "flat" lead generation spending, and "again reallocated capital away from lead generation spend during our planning process" for fiscal year 2019.  ¶ 20; Ex. 1 at 8; *see* Ex. 1 at 10.

Nutanix also informed investors that "pipeline targets were further impacted by a shortage of sales rep[resentatives] in the first half of the fiscal year [2019], resulting in an underspend by several million dollars."  Ex. 1 at 8.  Nutanix explained that "over the past few quarters, [it had] not kept pace with our bullish sales hiring goals," which "play[ed] a role in our sales pipeline development."  *Id.* at 5.

---

[2] Nutanix's fiscal year runs from August 1 to July 31.  Q1 begins on August 1 and ends on October 31; Q2 begins on November 1 and ends on January 31; Q3 begins on February 1 and ends on April 30; and Q4 begins on May 1 and ends on July 31.

Defendants told the market that Nutanix had made adjustments to address these issues, including "taking actions to reallocate capital back to lead generation spending, while at the same time dialing back on non-sales hiring," and making leadership changes to improve its sales execution in the Americas region. Ex. 1 at 5, 8, 10; *see id.* at 12 ("we've added a little headcount" and "upped lead generation spend" in the current quarter). The positive impact of the remedial measures, however, was expected to take time. Throughout the earnings call, Defendants explicitly cautioned investors that the remedial measures would "*take a couple of quarters to show meaningful results*" (*id.* at 8) and that the positive impacts would only be seen "*over the coming quarters.*" *Id.* at 5; *see id.* at 16 ("[i]t takes a while [for pipeline improvements] to flush through the funnel").[3] In fact, Defendants stated that Nutanix expected "improve[ment in] pipeline build *into Q4*" that hopefully would "leave [Nutanix] in a solid position as [it] enter[s] FY'20." *Id.* at 9; *see id*. at 16.

In addition to revealing these sales issues, Nutanix announced Q3'19 guidance that "reflect[ed] the impact of inadequate marketing spending for pipeline generation and slower than expected sales hiring." Ex. 4; *see* Ex. 1 at 5, 9; Ex. 1 at 14 (Q3'19 guidance is "a reflection of not having enough pipeline generated in the [second] quarter"). As mentioned above, this guidance was below analyst expectations (¶ 320), and Nutanix's stock price fell 32.7% following the February 28, 2019 disclosure. ¶ 330. Plaintiffs claim that the February 2019 announcement was the first of two corrective disclosures. ¶ 20.

**Nutanix's May 30, 2019 Announcement of Q3'19 Results.** On May 30, 2019, Nutanix reported its results for Q3'19. Nutanix delivered better-than-expected gross margins and earnings per share and strong growth in subscription revenues. Ex. 3 at 5. Mr. Pandey informed investors that the transition from Nutanix's license model to its subscription model was ahead of schedule and that its pipeline and sales hiring had improved. *Id.* Mr. Williams reported that the sales pipeline increased 40% during third quarter from the previous quarter, which "was the highest

---

[3] During its Investor Day three weeks later, Nutanix reiterated that there was "real work" to be done following Q2'19, Q3'19 was "going to be a tough and somewhat messy quarter," and that although its adjustments to improve sales pipelines showed "signs of improvement," those adjustments were "going to take a few quarters to flush through[.]" Ex. 2 at 12, 42.

sequential growth in pipeline generation" in "well over 5 years[.]" *Id.* at 8.  Mr. Williams also disclosed the addition of over 50 sales representatives during third quarter, "which [was] a big improvement from the prior quarter."  *Id*. at 12.

Although Nutanix's "field execution [was] improving in terms of pipeline and sales hiring" (Ex. 3 at 5; *see id.* at 9), Mr. Pandey reiterated the same anticipated time horizon for progress: "As we noted in both our Q2 earnings call and at our Investor Day in March, we continue to believe our actions to address this will drive improved business *into FY '20, as these changes take a couple of quarters to show results*."  *Id*. at 5; *see id.* at 7 ("[m]uch needs to be done in the coming quarters as [Nutanix] flush[es] through [its] pipeline and sales execution issues"); *id.* at 11 (adjustments to sales execution issues "will take a couple of quarters to flush").

In addition, Nutanix disclosed that 3Q'19 revenue of $287.6 million missed its guidance by $2.4 million (less than one percent) and billings of $346 million fell short of the guidance range by $14 million (approximately 3.8 percent).  Exs. 4, 5.  Nutanix explained that its revenue and billings performance was negatively impacted by faster than expected transition away from hardware and faster than expected transition to its subscription-based model, which resulted in lower revenue and billings in Q3'19.[4]  Ex. 3 at 8-9.  Following the May 30, 2019 disclosure, the price of Nutanix stock declined.  ¶ 348.  Plaintiffs allege that the May 30, 2019 announcement was a "second corrective disclosure."  ¶ 424.

### C.    The Securities Class Action

This consolidated securities class action was filed on March 29, 2019, on the heels of Nutanix's February 28, 2019 earnings announcement.  ECF No. 1.  The operative complaint, the SAC, alleged that 27 statements made in Nutanix's earnings calls, press releases, SEC filings, and website regarding Nutanix's marketing activities, sales personnel, customer growth and product

---

[4]As explained during the earnings call, Nutanix's ongoing transition to software-only sales occurred ahead of schedule, resulting in shipments of $8 million less in hardware revenue and billings than Nutanix expected. Ex. 3 at 8.  The transition to subscription, also ahead of schedule, reduced Nutanix's upfront revenue because subscription deals generally had a higher rate of deferred revenue than life-of-device license deals.  *Id.*  That ongoing transition also compressed revenue and billings because the subscriptions that customers were purchasing often had shorter terms than the life-of-device license and therefore, had a lower initial dollar value.  *Id.*

demand were false or misleading in violation of Section 10(b) of the Exchange Act.  ECF No. 124. In September 2020, the Court granted in part and denied in part Defendants' motion to dismiss the SAC, dismissing claims based on 21 statements.  ECF No. 140.  Only six statements remain in the case.  They fall into two categories: (1) statements about new customer pipeline (March 1, 2018 Q2'18 and May 30, 2018 Q3'18 earnings calls); and (2) statements about sales productivity (Q2'18 and August 30, 2018 Q4'18 earnings calls).  *Id.* at 10-13.

As relevant to the remaining statements, Plaintiffs' theory of fraud is that during the alleged Class Period, Defendants fraudulently concealed that Nutanix's sales pipeline was declining and that its sales productivity was poor as a result from Nutanix's secret "cutting" of funds for lead generation activities in 2018 and 2019 and "woefully inadequate" sales hiring.  ¶¶ 2, 4, 7, 13; *see* ECF No. 140 at 12-13, 15.  Plaintiffs allege that "the truth" was revealed in two disclosures. Plaintiffs first aver that Defendants "came clean" on February 28, 2019 (¶ 22), disclosing, "[i]n direct contradiction of Defendants' Class Period statements that Nutanix was increasing its investment in lead generation activities and keeping up with sales hiring goals," that "Nutanix had actually been ***underspending*** on lead generation and ***under hiring*** sales personnel[.]" ¶ 320 (emphasis in original).  This announcement purportedly "shocked the market." *Id.*

Plaintiffs claim that Nutanix's May 30, 2019 announcement was a second corrective disclosure, which revealed that the "continuing sales execution issues were far worse than what Defendants had previously represented on February 28, 2019" (¶ 28) and that "the Company's troubles relating to underspending on sales hiring and lead generation were far from over[.]"  ¶ 346; *see* ¶ 424 (May 2019 disclosure revealed "that Nutanix missed revenue and billing targets to a nature and extent greater than let onto after the end of Q2 2019, due to the Company's continued insufficient sales pipeline issues.").

Notably, the SAC expressly invokes the fraud-on-the-market doctrine and alleges that "[a]t all times, the market for the Company's stock was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's stock."  ¶ 429.

**ARGUMENT**

**I.      THE APPLICABLE LEGAL STANDARDS**

The Reform Act expressly imposes on a plaintiff the burden of proving the loss causation element of a Section 10(b) claim, that the alleged misrepresentations proximately "caused the loss for which the plaintiff seeks to recover[.]" 15 U.S.C. § 78u-4(b)(4); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-46 (2005) (loss causation is "a causal connection between the material misrepresentation and the loss").  To show loss causation attendant to a decline in the stock price, a plaintiff must "trac[e] the loss back to *the very facts* about which the defendant lied."  *Nektar*, 2022 WL 1573821, at *6 (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018)).  That is because "it is the underlying facts concealed by fraud that affect the stock price."  *First Solar*, 881 F.3d at 754; *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) ("the nature of a fraud is that it conceals 'underlying facts that affect the stock price.'") (citation omitted).

The loss causation requirement serves "an important securities law objective" by ensuring that federal securities actions do "*not* . . . provide investors with broad insurance against market losses[.]" *Dura*, 544 U.S. at 345; *see In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (the "securities laws do not protect against ordinary investment losses"), *cert. denied*, 142 S. Ct. 71 (2021).  Declines in stock price are common and are not indicative of fraud.  A "lower [stock] price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events[.]" *Dura*, 544 U.S. at 343.  Thus, the element of loss causation—which a plaintiff must plead under Rule 9(b)'s heightened "particularity" standard (*Oregon Public Employees Retirement Fund v. Apollo Group, Inc.*, 774 F.3d 598, 605 (9th Cir. 2014))—ensures that Section 10(b) actions do not become investor insurance.  *See Dura*, 544 U.S. at 347-48 (warning that allowing a plaintiff to forego the loss causation requirement "would tend to transform a private securities action into a partial downside insurance policy.").

Plaintiffs' theory of loss causation based on Nutanix's May 30, 2019 earnings

announcement fails as a matter of law.[5]  As shown below, the May 2019 announcement was not a corrective disclosure.  Thus, any losses Plaintiffs allegedly suffered as the result of the stock price decline following that announcement are not recoverable as a matter of law.  Accordingly, partial judgment on the pleadings in favor of Defendants is warranted.  *See Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998) (a Rule 12(c) motion "is properly granted when, taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law."); *see also Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).[6]

**II.    THE SAC FAILS TO PLEAD LOSS CAUSATION BASED ON THE MAY 30, 2019 EARNINGS ANNOUNCEMENT AS A MATTER OF LAW**

Nutanix's May 30, 2019 announcement is not a corrective disclosure because (1) the alleged fraud was revealed in the February 2019 announcement, and (2) the May 2019 announcement revealed no new facts regarding the alleged fraud that were unknown to the market.

**A.    The Alleged "Truth" Was Revealed In Nutanix's February 28, 2019 Earnings Announcement**

Plaintiffs allege that "the truth" was first revealed on February 28, 2019, when, "*[i]n direct contradiction* of Defendants' Class Period statements," Defendants "announced that Nutanix had actually been ***underspending*** on lead generation and ***under hiring*** sales personnel[.]" ¶ 320.  Nutanix's February 28, 2019 earnings announcement informed the market of the following "previously undisclosed" (¶ 330) facts:

***Lead Generation Spending***

- Nutanix "identified some imbalances in [its] lead generation spending that were beginning to impact our sales pipeline." ¶ 323; Ex. 1 at 5.

---

[5] Although this motion is directed at Nutanix's May 30, 2019 disclosure, Defendants reserve their right to later argue that the February 28, 2019 disclosure did not cause all or a portion of Plaintiffs' alleged losses.

[6] "Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6)[.]" *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).  In considering a Rule 12(c) motion, the court may consider materials subject to judicial notice under Federal Rule of Evidence 201 without converting the motion into one for summary judgment. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008).  The court also may consider documents attached to or incorporated by reference in the operative complaint. *Summit Media LLC v. City of Los Angeles*, 530 F. Supp. 2d 1084, 1096 (C.D. Cal. 2008); *Landmark Equity Fund, II, LLC v. Arias*, 2015 WL 5882321, at *3 (E.D. Cal. Oct. 5, 2015).

- Nutanix "missed" internal "pipeline targets" because it "reallocated some of [its] lead generation spending to other priorities" in FY18 and "again reallocated capital away from lead generation spend[ing] during [the] planning process" in FY19. ¶ 20; Ex. 1 at 8; *see* Ex. 1 at 10.

### *Sales Hiring and Productivity*

- "[O]ver the past few quarters, [Nutanix had] not kept pace with . . . bullish sales hiring goals" which "play[ed] a role in [its] sales pipeline development." ¶ 323; Ex. 1 at 5.

- Nutanix's pipeline targets were negatively "impacted by a shortage of sales reps in the first half of [FY19], resulting in an under-spend by several million dollars." ¶ 324; Ex. 1 at 8.

### *Q3'19 Guidance*

- Nutanix's "third quarter guidance reflect[ed] the impact of inadequate marketing spending for pipeline generation and slower than expected sales hiring[.]" ¶ 322; Ex. 4.

- Regarding Nutanix's "guidance for Q3," "we expect significant impact from an imbalance in lead generation spending earlier in the year and slower-than-expected sales hiring." Ex. 1 at 9.

- Q3'19 guidance was "a reflection of not having enough pipeline generated in the [second] quarter." Ex. 1 at 14.

### *Adjustments Made by Nutanix*

- Nutanix had begun "taking actions to reallocate capital back to lead generation spending, while at the same time, dialing back on non-sales hiring. We have continued these actions into Q3." ¶ 324; Ex. 1 at 8.

- "[A]ll [of] this shifting of spend[ing] back to lead generation is not an insignificant amount, the magnitude of the shift is in a few tens of millions." ¶¶ 120, 324, 352; Ex. 1 at 8.

- In Q3, Nutanix has "reallocate[d] more dollars to demand gen[eration] and some away from nonsales hiring" and will "repeat that in Q4[.]" Ex. 1 at 10.

- Nutanix "added a little headcount" and "upped lead generation spend" in the current quarter. Ex. 1 at 12.

- Nutanix was "in the process of addressing a few opportunities to improve our sales execution in the America region," including leadership changes. ¶¶ 26, 323; Ex. 1 at 5.

### *Expected Time Horizon for Progress*

- Although Nutanix started making sales adjustments, "we expect it will take a couple of quarters to show meaningful results." ¶ 324; Ex. 1 at 8.

- Nutanix "expect[s] to see increasing traction in [its] sales pipeline over the coming quarters." Ex. 1 at 5.

DEFS.' RULE 12(C) MOT. FOR PARTIAL JUDGMT
ON PLEADINGS; CASE NO. 3:19-CV-01651-WHO

-10-

- Regarding the lead generation spending reallocation, "[i]t takes a while to flush through the funnel, but we would expect to see some pretty good progress going into Q4 and then, hopefully, setting us up into FY '20 to have a pretty good year." Ex. 1 at 16.

- "[W]e believe that our actions to address these factors [imbalance in lead generations spending and slower than expected sales hiring], combined with better sales execution, will drive improved pipeline build into Q4, which we expect to leave us in a solid position as we enter FY '20." Ex. 1 at 9.

These allegations establish that Nutanix's February 28, 2019 announcement revealed the very facts that Plaintiffs allege were fraudulently concealed:  inadequate spending of lead generation and inadequate sales hiring that negatively impacted Nutanix's sales pipeline and sales productivity. *See* ¶¶ 20-21, 320.  These revelations were complete as they were "[i]n direct contradiction of Defendants' Class Period statements[.]" ¶ 320; ¶ 22 (alleging that Defendants "came clean" on February 28, 2019).

Because the February 28, 2019 announcement disclosed precisely the facts that Plaintiffs contend had been concealed, Plaintiffs cannot plead that the May 30, 2019 announcement was a corrective disclosure as a matter of law. *Wochos v. Tesla* compels this conclusion. In *Tesla*, the Ninth Circuit found that plaintiffs were "wrong to focus on the asserted impact of a later November 2, 2017 article" to attempt to plead loss causation where the alleged falsity "had already been revealed by the *Wall Street Journal* article in October" 2017.  *Tesla*, 985 F.3d at 1198, n.4 (affirming dismissal of Section 10(b) claims; plaintiffs cannot allege loss causation based on the November 2017 article); *see In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 49 (2d Cir. 2018) (because the disclosure was fully corrective, "we need not consider whether additional allegedly corrective information may have emerged at a later date.").  Stated differently, once a disclosure was made correcting a misrepresentation or omission (*i.e.*, the February 2019 announcement), such corrective disclosure "broke any chain of causation that might have existed connecting any failure to report [sales pipeline and sales productivity issues] . . . and any losses [Plaintiffs] may have suffered after" that corrective disclosure. *Barclay*, 756 F. App'x at 51.

Under *Tesla* and *Barclays*, the ample February 28, 2019 disclosures specified above end the loss causation inquiry.  No further analysis is required with respect to the alleged second disclosure.  In any event, such analysis establishes that Plaintiffs fail to plead loss causation based

on the May 30, 2019 announcement, as shown below.

**B.    The May 30, 2019 Earnings Announcement Is Not A "Corrective Disclosure" Because It Did Not Reveal New Information Regarding The Alleged Fraud**

The Ninth Circuit recently reaffirmed the principle that a corrective disclosure "*must* by definition *reveal new information* to the market that has not yet been incorporated into the stock price." *Nektar*, 2022 WL 1573821, at *7 (quoting *Bofl*, 977 F.3d at 794); *see Evanston Police Pension Fund v. McKesson Corp.*, 2021 WL 4902420, at *5 (N.D. Cal. Oct. 21, 2021) (stating that "[a] corrective disclosure must somehow provide 'new information' to the market" and finding that alleged articles describing a government investigation into possible price fixing by generic drug manufacturers were not a second corrective disclosure where, *inter alia*, the articles did not mention the defendant and the market already knew that drug price inflation had ended); *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020) ("This alleged corrective disclosure cannot serve as a basis for loss causation because it offered 'no new information' to the market"), *aff'd*, 848 F. App'x 278 (9th Cir. 2021) (citation omitted); *Rok v. Identiv, Inc*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) (finding that defendant's SEC filings announcing and discussing an internal investigation of allegations in a filed complaint did not support loss causation because "'corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time'" and the SEC filings "added no new information" about the complaint or internal investigation) (citation omitted).

Moreover, the Ninth Circuit has long held that the new factual information must be about "those particular practices" "that the plaintiff contends were fraudulent[.]" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010); *see Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (pleading loss causation requires allegations that "the market learned of and reacted to [the alleged] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally."). Just last week, the Ninth Circuit held that the plaintiffs failed to plead loss causation because their allegations regarding the purported corrective disclosure, disappointing clinical test results, failed to "trace[] their losses 'back to the very facts about which the defendant lied,'" *i.e.*, allegedly false earlier test results. *Nektar*, 2022 WL

1573821, at *7 (citation omitted) (affirming dismissal of Section 10(b) claim; plaintiffs' allegations suggested that disappointing test results from a more recent study, "not any revelation of earlier falsehoods, caused [the company's] share price to plunge."). The new information thus must tie "back to the very facts" in the actual alleged misrepresentation and not to some other negative information about the company.

Importantly, the "new information" requirement of loss causation is moored in the fraud-on-the-market theory underlying Section 10(b) actions such as this one. As this Court has explained, "[n]ew information is critical to demonstrating loss causation because it is assumed that the 'market price of shares traded on well-developed markets reflects all publicly available information[.]'" *Bonanno v. Cellular Biomedicine Grp., Inc.* (*Bonanno I*), 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (Orrick, J.) (citation omitted). That is, any information released to the public "is immediately digested and incorporated into the price of a security" (*Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013)), as Plaintiffs admit with regard to Nutanix stock. *See* ¶ 429. Thus, in this fraud-on-the-market case, the market promptly digested and incorporated into the price of Nutanix stock the alleged "truth" regarding Nutanix's sales pipeline and sales productivity upon their revelation in Nutanix's February 28, 2019 announcement. *See* ¶¶ 23, 330 (alleging Nutanix stock price decline). Accordingly, to be "corrective" of the alleged fraud, the May 30, 2019 announcement must, but did not, reveal new factual information regarding Nutanix's alleged declining sales pipeline and poor sales productivity that was then unknown to the market.

Notably, nowhere does the SAC specifically allege that information in the May 2019 announcement regarding the alleged fraud was "new." Rather, the totality of Plaintiffs' allegations is that the May 2019 announcement revealed an earnings miss which supposedly made apparent the scope and magnitude of the disclosed sales pipeline and productivity issues. Plaintiffs allege, "on May 30, 2019, Defendants revealed that Nutanix had missed revenue and billing targets *due to continuing sales execution issues that were far worse* than what *Defendants had previously represented on February 28, 2019*." ¶ 28; *see* ¶ 346 (alleging that Mr. Pandey "admitted that the Company's troubles relating to underspending on sales hiring and lead generation were far from

over");[7] ¶ 424 (the May 2019 announcement disclosed "that Nutanix missed revenue and billing targets to a nature and extent greater than let onto after the end of Q2 2019, due to the Company's continued insufficient sales pipeline issues."); ¶ 343 (the market learned on May 30, 2019 that Nutanix "failed to meet its revenue targets as a result of these issues."). Neither the earnings miss nor Plaintiffs' characterization of the scope and magnitude of the sales pipeline and productivity issues constitute new information that corrected the challenged statements and thus, neither are sufficient to plead loss causation.

1.      The 3Q'19 Earnings Miss Does Not Constitute New Information and is Insufficient to Plead Loss Causation

"[A]n earnings miss alone is insufficient to establish loss causation." *Oracle*, 627 F.3d at 394 (affirming dismissal of Section 10(b) claim; disclosure of an earnings miss was not a corrective disclosure). In *Oracle*, the Ninth Circuit rejected plaintiffs' argument that "they should be able to prove loss causation by showing that the market reacted to the purported 'impact' of the alleged fraud – the earnings miss[.]" *Id.* at 392. Rather, the market must react "to those particular [allegedly fraudulent] acts themselves" (*id.*) because "it is the underlying facts concealed by fraud that affect the stock price." *First Solar*, 881 F.3d at 754; *see Tesla*, 985 F.3d at 1197 (loss causation "focuses on whether a loss can be attributed to 'the very facts about which the defendant lied,'" not the impact thereof) (citation omitted); *accord Dura*, 544 U.S. at 343 ("To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires.").

Thus, numerous courts have held that a disclosure revealing a miss in guidance or lower guidance is not a corrective disclosure where, as here, the facts underlying the negative news were already in the marketplace. *See, e.g.*, *Fitbit*, 2020 WL 1465932, at *12-13 (granting dismissal of Section 10(b) claim; defendant's press release lowering guidance did not support loss causation); *Dalberth v. Xerox Corp.*, 766 F.3d 172, 181, 188 (2d Cir. 2014) (defendant's press release

---

[7] Mr. Pandey made no such admission. Instead, he stated, "As you may recall our guidance last quarter was less than expected as we needed to rebuild our pipeline by doubling down on lead generation and increasing our focus on sales hiring and execution, especially in the Americas." ¶ 346. This statement does not refer to the expected duration of the sales issues disclosed in February 2019. *See id.*; Ex. 3 at 5.

announcing an anticipated guidance miss due to, *inter alia*, the "ongoing impact of" the corporate restructuring was not a corrective disclosure "because the market had access to numerous disclosures about sales disruptions and operational difficulties suffered as a result of the U.S. restructuring" and thus, the press release did not reveal "'some then-undisclosed fact with regard to the specific misrepresentations alleged.'") (citation omitted); *In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *16-18 (E.D. Va. Aug. 27, 2018) (various disclosures revealing disappointing earnings and performance related to previously disclosed risks did not constitute corrective disclosures), *aff'd sub nom. Amalgamated Bank v. Maximus, Inc.*, 771 F. App'x 238 (4th Cir. 2019); *accord Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 644 (2d Cir. 2009) (defendant's earlier disclosure of a net customer loss "defeat[ed] the claim that the [later] announcement [disclosing an expected earnings decline] 'belatedly revealed' that [defendant] suffered high customer attrition principally related to" defendant's business improvement plan);

*Lopes v. Fitbit* is particularly instructive. There, plaintiffs attempted, but failed, to plead loss causation through a series of negative disclosures regarding Fitbit's financial health. 2020 WL 1465932, at *12. Fitbit disclosed a "flattening demand" for its products when it provided revised financial guidance for its fourth quarter in November 2016, and again in December 2016 when it commented on performance. *Id.* at *9-10, *12. In January 2017, Fitbit issued a press release (the final alleged corrective disclosure) again lowering its guidance range for the fourth quarter due to disappointing results caused by "'weaker than expected demand' and 'higher than expected inventory levels.'" *Id.* at *12. Judge Tigar rejected plaintiffs' contention that the January 2017 press release was a corrective disclosure because "[t]he only new information that this press release included were results which did not live up to Fitbit's revised guidance." *Id.* "Because Defendants had already disclosed the flattening demand which served as the basis for these results, the press release 'added no new information' to the market which was 'publicly revealed for the first time.'" *Id.* (citation omitted). The Ninth Circuit affirmed.

This case is on all fours with *Fitbit*. Like the January 2017 press release in *Fitbit*, the May 30, 2019 announcement revealed that Nutanix's 3Q19 results "did not live up to" its guidance for that quarter. *See Fitbit*, 2020 WL 1465932, at *12. Because Defendants "had already disclosed"

the lead generation spending, sales pipeline and sales hiring issues "which served as the [alleged] basis for these [3Q19] results," the May 2019 announcement "'added no new information' to the market which was 'publicly revealed for the first time.'" *Id.* (citation omitted).  The May 30, 2019 announcement thus is not a corrective disclosure.  *See also SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70-71 (D. Del. 2020) (disclosure that a master lease was not a "true lease" did not support loss causation because the structure of the sale-leaseback arrangement had already been disclosed), *appeal docketed*, No. 20-3427 (3d Cir. 2020); *In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 128-129 (D. Mass. 2010) (disclosure of a product recall did not establish loss causation where the market already was informed of the facts underlying the recall), *aff'd sub nom. Mississippi Public Emps.' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5 (1st Cir. 2011).  Simply stated, Plaintiffs cannot plead loss causation based on the disclosure of a new development (*i.e.*, an earnings miss) that allegedly resulted from information already in the public domain.

2.    Plaintiffs' Characterizations of the Alleged Scope and Magnitude of the Disclosed Sales Pipeline and Productivity Issues Do Not Constitute New Information and are Insufficient to Plead Loss Causation

Plaintiffs' scant allegations that the May 30, 2019 announcement revealed that the sales pipeline and productivity issues were "far from over" (¶ 346) and "far worse" (¶ 28) than previously disclosed in February 2019 do not constitute new facts correcting the challenged statements.  These allegations suffer from several fatal defects, each of which independently defeats loss causation.

First, Plaintiffs' allegations, largely based on commentary in analyst reports,[8] do not plead *facts*.  Rather, they merely present opinions regarding the alleged scope and magnitude of the disclosed sales pipeline and productivity issues.  Such allegations are insufficient to plead loss causation because "[a] negative journalistic characterization of previously disclosed facts does not

---

[8] *See* ¶ 30 (following Nutanix's May 30, 2019 announcement, "William Blair analyst Jason Ader described Nutanix's situation as 'definitely worse than we expected,' while Raymond James analyst Simon Leopold reported, "we think it could take several quarters for Nutanix to return to double digit year-over-year growth'. . . . Moreover, Piper Jaffray analyst Andrew Nowinski reported 'it is clear that this model is unsustainable, requiring massive amounts of spending just to support modest revenue growth, which we believe is attributable to competition.'"); *see also* ¶ 350.

constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *see Dalberth*, 766 F.3d at 181, 188 (same; analyst report did not constitute a corrective disclosure); *In re Nektar Therapeutics*, 2020 WL 3962004, at *18 (N.D. Cal. July 13, 2020) ("the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure") (citation omitted); *Bonanno v. Cellular Biomedicine Grp., Inc.* (*Bonanno II*), 2016 WL 4585753, at *4 (N.D. Cal. Sept. 2, 2016) (Orrick, J.) (dismissing Section 10(b) claim for failure to plead loss causation; blogger's report "is simply an individual's summary and comments on publicly available facts"); *accord In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051 (N.D. Cal. 2007) (dismissing Section 10(b) clam; analyst merely "'repackaged' defendants' statements in 'vague and impressionistic terms'").

In the *Bonanno* case, plaintiffs argued that a blogger report "revealed new facts because it disclosed the full scope and nature of" defendant's alleged fraudulent concealment of a stock promotion campaign. *Bonanno II*, 2016 WL 4585753, at *4. This Court rejected that contention, finding that because the blogger report "only collected and opined on already public information, it does not constitute disclosure of 'the truth' as required for a corrective disclosure." *Id.* at *5. Similarly, the analyst commentary relied on by Plaintiffs merely "opined on already public information." They "do no more than provide a gloss on public information" and are insufficient to support loss causation. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) (purported corrective disclosures consisting of analyst reports downgrading company's stock did not establish loss causation) (citation omitted).

Second, the only identified respect in which the sales issues were allegedly "far worse" in May 2019 is the suggestion that they were "far from over[.]" ¶ 346. These allegations are insufficient to plead new information about the alleged fraud because the market knew—well before the May 2019 earnings announcement—that Nutanix's pipeline and sales productivity issues would take time to resolve.

Specifically, at the February 2019 earnings call, Mr. Pandey expressly informed investors that Nutanix would not see immediate results from the changes it had implemented but, rather, that

the positive impacts would occur "*over the coming quarters*." Ex. 1 at 5.  Similarly, Mr. Williams stated that the adjustments would "*take a couple of quarters to show meaningful results*" (¶ 324; Ex. 1 at 8), including *into the fourth quarter and the beginning of FY 2020.  See* Ex. 1 at 16 ("It takes a while to flush through the funnel, but we would expect to see some pretty good progress going into Q4 and then . . . setting us up into FY '20); *id*. at 9 (expecting "improved pipeline build into Q4" and being "in a solid position as we enter FY '20.").[9]

During the May 2019 earnings call, Nutanix reiterated the same time horizon: "As we noted in both our Q2 earnings call and at our Investor Day in March, we continue to believe our actions to address this will drive improved business *into FY '20, as these changes take a couple of quarters to show results*."  Ex. 3 at 5; *see id.* at 7 ("[m]uch needs to be done in the coming quarters as [Nutanix] flush[es] through [its] pipeline and sales execution issues"); *id.* at 11 (adjustments to sales execution issues "will take a couple of quarters to flush").  The May announcement added no additional information that was not otherwise known to the market.  In fact, analyst reports cited in the SAC show that after the February 2019 announcement, the market understood that Nutanix's remedial measures would not be a quick fix and expected it would be *at least four quarters* for Nutanix to work through the sales pipeline and productivity issues.[10]  The May 30, 2019 announcement therefore provided no new facts about the alleged fraud for loss causation purposes.

Third, Plaintiffs fail to plead with particularity facts supporting their loss causation allegations, including that the fraud-related issues "were a substantial cause of [Nutanix] stock's decline" from the May 30, 2019 announcement.  *Bonanno II*, 2016 WL 4585753, at *4, *6-7 (dismissing Section 10(b) claims without leave to amend; loss causation allegations failed to satisfy Rule 9(b)'s heightened pleading standard since they, *inter alia*, did "not adequately

---

[9] At its Investor Day just a few weeks later in March, Nutanix reiterated the same time horizon discussed in February.  Mr. Williams stated that "Q3 is going to be a tough and somewhat messy quarter" and that it would take "a few quarters" for signs of improvement.  Ex. 2 at 12, 42.

[10] For example, a Wells Fargo analyst expected Nutanix "shares to remain range bound" because "the productivity ramp of new sales hires take[s] time (*4-8+ quarters*)[.]" ¶ 331; Ex. 6 at 1; *see* Ex. 7 at 2 (Jefferies analyst's "Base Case" scenario assumed that Nutanix could "rebuild pipeline *within four quarters*").

DEFS.' RULE 12(C) MOT. FOR PARTIAL JUDGMT
ON PLEADINGS; CASE NO. 3:19-CV-01651-WHO
                                        -18-

differentiate the 'disclosure' of" the alleged fraud "from multiple other negative accusations" in the alleged corrective disclosure).  For example, during the May 2019 earnings call, Nutanix reported substantial progress as a result of the remedial actions taken, such as a *40% growth* in its *sales pipeline* quarter-over-quarter, which "was the highest sequential growth in pipeline generation" in "well over 5 years" (Ex. 3 at 8), and the *addition of over 50 sales representatives*, "which [was] a big improvement from the prior quarter."  *Id*. at 12.  Nutanix also reported other factors that created headwinds and negatively impacted Q3'19 results, such as Nutanix's better-than-expected transition to the subscription model and perceived increased competition.[11]  In light of these (and other) disclosures, Plaintiffs' bald allegations regarding the May 2019 announcement do not and cannot plead loss causation.

In sum, each of the above flaws is fatal to Plaintiffs and establishes that Nutanix's May 30, 2019 announcement is not a corrective disclosure.  Accordingly, the SAC fails to plead loss causation based thereon as a matter of law.

## CONCLUSION

For the forgoing reasons, Defendants respectfully request that the Court grant their motion and enter partial judgment on the pleadings under Rule 12(c) in their favor on the ground that the SAC fails to plead loss causation based on Nutanix's May 30, 2019 announcement.

Dated:  May 27, 2022

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Nina F. Locker*
       Nina F. Locker

*Attorneys for Defendants Nutanix, Inc., Dheeraj Pandey, and Duston M. Williams*

---

[11] *See* Ex. 3 at 7-8 (Defendants explained during the 3Q'19 earnings call that Nutanix's better-than-expected transition to the subscription model resulted in less recognized revenue than under the licensing model); Ex. 8 at 1 (opining that "a faster-than-expected transition to a subscription business model" and "increased competition" were factors that negatively impacted 3Q'19 performance); Ex. 9 at 1 (similar); Ex. 10 at 1 (downgrading Nutanix stock due to "continued execution issues, partially attributable to increasing competition" and identifying "competition" as the reason for analyst's belief that Nutanix's "model is unsustainable").