NINA F. LOCKER, State Bar No. 123838
IGNACIO E. SALCEDA, State Bar No. 164017
EVAN L. SEITE, State Bar No. 274641
BETTY CHANG ROWE, State Bar No. 214068
LAURA G. AMADON, State Bar No. 321524
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   (650) 493-9300
Facsimile:   (650) 565-5100
Email:       nlocker@wsgr.com
             isalceda@wsgr.com
             eseite@wsgr.com
             browe@wsgr.com
             lamadon@wsgr.com

*Attorneys for Defendants Nutanix, Inc.,
Dheeraj Pandey, and Duston M. Williams*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | ) CASE NO.:  3:19-cv-01651-WHO<br>)<br>) **DEFENDANTS' REPLY IN**<br>) **SUPPORT OF MOTION FOR**<br>) **PARTIAL JUDGMENT ON THE**<br>) **PLEADINGS UNDER FED. R. CIV.**<br>) **P. 12(c)**<br>)<br>) Hearing Date: September 14, 2022<br>) Time: 2:00 p.m.<br>) Courtroom: 2<br>) Hon. William H. Orrick<br>)<br>)<br>) |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     PLAINTIFFS FAIL TO SHOW THAT NUTANIX'S MAY 30, 2019 ANNOUNCEMENT DISCLOSED "NEW INFORMATION" ABOUT THE VERY FACTS ALLEGEDLY MISREPRESENTED OR CONCEALED ........................2

II.    PLAINTIFFS' "REASSURANCES" ARGUMENT IS WITHOUT MERIT ...................4

III.   PLAINTIFFS' "SCOPE," "SEVERITY," "MAGNITUDE" MANTRA DOES NOT SUPPORT LOSS CAUSATION .......................................................................6

       A.    Plaintiffs' Unpled "Alternative" Loss Causation Theory Fails..............................6

       B.    The Subsequent Disclosure of a Guidance Miss Arising From Previously Disclosed Facts Does Not Support Loss Causation .................................................9

IV.    PLAINTIFFS' ATTEMPT TO CREATE A FACTUAL ISSUE FAILS ........................12

V.     PLAINTIFFS' REMAINING AUTHORITIES ARE INAPPOSITE .............................13

CONCLUSION ....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonanno v. Cellular Biomedicine Group, Inc. (Bonanno II)*,
  2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ............................................................ 12, 13, 14

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014) ................................................................................................ 2, 10

*Emps.' Ret. Sys. of the Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
  2020 WL 3026536 (D.N.J. June 5, 2020) .................................................................................. 9

*In re Barclays Bank PLC Sec. Litig.*,
  756 F. App'x 41 (2d Cir. 2018) ..................................................................................... 2, 8, 10

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 71 (2021) ......................................... 12

*In re Boston Sci. Corp. Sec. Litig.*,
  708 F. Supp. 2d 110 (D. Mass. 2010), *aff'd sub nom. Miss. Public Emps.' Ret.*
  *Sys. v. Boston Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011) ........................................................ 2, 10

*In re Facebook, Inc. Sec. Litig.*,
  2021 WL 6000058 (N.D. Cal. Dec. 20, 2021), *appeal docketed*, No. 22-15077
  (9th Cir. Jan. 19, 2022) ........................................................................................................... 15

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .......................................................................................... 14, 15

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
  639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................................................... 15

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .............................................................................................*passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ....................................................................................... 4, 11, 12

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ................................................................................................... 15

*In re Splunk Inc. Sec. Litig.*,
  2022 WL 2525735 (N.D. Cal. Mar. 21, 2022) ..................................................................... 8, 15

*In re VeriSign, Inc., Deriv. Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) ..................................................................................... 4

*Karinski v. Stamps.com, Inc.*,
  2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .............................................................................. 7

*Karth v. Keryx Biopharmaceuticals, Inc.*,
    334 F.R.D. 7 (D. Mass. 2019), *aff'd*, 6 F.4th 123 (1st Cir. 2021)..........................................8

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014).........................................................................................7, 13

*Lopes v. Fitbit, Inc.*,
    2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278
    (9th Cir. 2021) ..................................................................................................2, 10, 13

*Magro v. Freeport-McMoran Inc.*,
    2018 WL 3725781 (D. Ariz. Aug. 3, 2018) ......................................................................4

*Mauss v. NuVasive, Inc.*,
    2016 WL 3681831 (S.D. Cal. July 12, 2016).....................................................................4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008)......................................................................................7, 13

*Miller v. Thane Int'l, Inc.*,
    615 F.3d 1095 (9th Cir. 2010)........................................................................................11

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018)............................................................................1, 6, 7, 8

*N.Y. Hotel Trades Council & Hotel Ass'n of New York City, Inc. Pension Fund v.
    Impax Labs, Inc.*,
    843 F. App'x 27 (9th Cir. 2021)........................................................................................9

*Newton v. Parker Drilling Mgmt. Servs., Inc.*,
    2020 WL 1972572 (C.D. Cal. Jan. 29, 2020)....................................................................2

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) ...........................................................................6

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ..........................................................................................4

*Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indust., Inc*,
    564 F. Supp. 3d 1272 (N.D. Ga. 2021) ............................................................................5

*SLF Holdings, LLC, v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del.), *appeal docketed*, No. 20-3427
    (3d Cir. 2020) ..................................................................................................2, 10, 12

*Washtenaw Co. Employees' Ret. Sys. v. Walgreens Co.*,
    2019 WL 4597518 (N.D. Ill. Sept. 23, 2019)...............................................................13, 14

*Waters v. GE Co.*,
    2010 WL 3910303 (S.D.N.Y. Sept. 28, 2010), *aff'd sub nom. GE Investors v.
    GE Co.*, 447 F. App'x 229 (2d Cir. 2011).....................................................................11, 12

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021)...................................................................................8, 11, 13

**Other Authorities**

Fed. R. Civ. P. 12(h)(2) ................................................................................................................. 2

**INTRODUCTION**[1]

Plaintiffs concede that Nutanix's February 2019 disclosures revealed that the Company was experiencing "significant pipeline problems" as a result of insufficient lead generation spending and a shortage of sales reps. Opposition ("Opp.") at 4. Plaintiffs' own allegations admit that with these disclosures, Nutanix "***came clean***" (¶ 22),[2] that these disclosures revealed "***the truth***" (¶ 20) and that the disclosures were "***[i]n direct contradiction of Defendants' Class Period statements***." ¶ 320. Nothing more is required to break the chain of loss causation. Plaintiffs are thus foreclosed in their attempt to establish loss causation based on the second alleged corrective disclosure in May 2019.

In addition, Plaintiffs concede, as they must, that in order to establish loss causation based on Nutanix's May 2019 announcement, they are required to allege facts showing that the announcement revealed "new information" about Nutanix's sales pipeline and sales productivity issues—the "very facts" Nutanix allegedly misrepresented. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838-39 (9th Cir. 2022). Plaintiffs' Opposition fails to identify any such new facts. And Plaintiffs' assertion that Nutanix provided false assurances during the February 2019 disclosures—assurances that Plaintiffs claim were somehow corrected in May 2019—is easily refuted by the very disclosures themselves.

Left with no new facts or false assurances on which to rely, Plaintiffs attempt to invoke a new "alternative"—and unpled—earnings miss theory under the Ninth Circuit decision in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018). Opp. at 11. They do so by chanting their mantra throughout the Opposition that Nutanix's May 2019 announcement of its Q3'19 guidance shortfall revealed the "scope," "magnitude," and "impact" of Nutanix's already disclosed pipeline and productivity issues. However, Plaintiffs do not cite a ***single case*** that supports the proposition that an earnings miss that ***follows full revelation of the truth*** can support loss causation. That they do not is unsurprising because, again, once the "very facts" that

---

[1] Capitalized terms not otherwise defined in this brief shall have the same meanings as in Defendants' Opening Brief (ECF No. 270) ("Mem.").

[2] All emphasis that are added to quoted material appear in underlined bold italics in this brief.

are alleged to have been concealed are revealed, the chain of loss causation is broken. Plaintiffs fail to meaningfully distinguish a single one of the legion of cases that Defendants cited—including *Lopes v. Fitbit*, *Dalberth v. Xerox*, *Boston Scientific*, *In re Barclays*, and *SLF Holdings* (Mem. at 14-16 (citing authorities))—applying this principle and holding that disclosure of an earnings miss, disappointing financial results, or any other negative event merely reflecting the scope, impact, or magnitude of previously disclosed facts that corrected the challenged statements cannot support loss causation. Plaintiffs' half-hearted (and sometimes non-existent) efforts to distinguish those decisions underscore the fatal flaws in their new, unpled "alternative" theory.

Finally, Plaintiffs' suggestion that their loss causation theory should not be disposed of now because it raises factual issues is refuted by numerous decisions in the Ninth Circuit and this District that confirm that loss causation can be, and has been, addressed at the pleading stage. This is particularly true where, here, Plaintiffs' own allegations foreclose their theory as a matter of law. Judgment on the pleadings should be granted.

## ARGUMENT[3]

### I. PLAINTIFFS FAIL TO SHOW THAT NUTANIX'S MAY 30, 2019 ANNOUNCEMENT DISCLOSED "NEW INFORMATION" ABOUT THE VERY FACTS ALLEGEDLY MISREPRESENTED OR CONCEALED

The crux of Plaintiffs' claim is that Nutanix's Class Period statements were false and misleading because Nutanix concealed that its sales pipeline was declining and that its sales force was experiencing high levels of attrition. Opp. at 1. On February 28, 2019, Nutanix told the market that: (i) its lower-than-expected guidance for Q3'19 was a result of insufficient lead generation spending, which "significant[ly] impacted" its sales pipeline, as well as slower-than-expected sales hiring; (ii) Nutanix was reallocating money to lead generation and sales hiring to "drive improved pipeline build"; and (iii) it would take a couple of quarters to see any meaningful

---

[3] Contrary to Plaintiffs' procedural quibble (Opp. at 1-2), Defendants' Rule 12(c) motion based on loss causation is proper under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(h)(2); *see, e.g.*, *Newton v. Parker Drilling Mgmt. Servs., Inc.*, 2020 WL 1972572, at \*3 (C.D. Cal. Jan. 29, 2020) ("While Defendants could have made these arguments . . . in their previous Motion to Dismiss . . . a 12(c) motion is not prohibited[.]"). In addition, while Plaintiffs complain about the timing of Defendants' Rule 12(c) motion (Opp. at 1-2), they do not suggest that they have been prejudiced in any fashion by that timing.

results from these corrective actions and that it would not be in a solid position until FY20 (*i.e.*, after Q4'19).  Mem. at 9-11.  Plaintiffs' own allegations concede that Nutanix "***came clean***" with these disclosures (¶ 22), and that these disclosures were "***[i]n direct contradiction*** of Defendants' Class Period statements" (¶ 320) and revealed "***the truth***" about the challenged statements.  ¶ 20, SAC at p.78.  Plaintiffs also concede that immediately following this revelation of "the truth," Nutanix's stock price "dropped" 32.7% on "exceptionally heavy trading volume."  ¶¶ 23, 330.

Plaintiffs acknowledge that to establish that Nutanix's May 30, 2019 earnings announcement is a corrective disclosure, they must show that the announcement revealed "new information" regarding "the very facts" Nutanix allegedly misrepresented or concealed.  *Nektar*, 34 F.4th at 838-39.  According to Plaintiffs, the May 2019 announcement revealed the following "new information":  (i) that Nutanix needed to "rebuild" its sales pipeline; and (ii) that the previously disclosed problems regarding Nutanix's sales pipeline and productivity "would have a negative impact on the fourth quarter of 2019."  Opp. at 4, 8.  Nutanix's February and May 2019 disclosures refute this argument.

In an attempt to manufacture "new information," Plaintiffs pluck the word "rebuild" out of context from Mr. Pandey's statement during the May 2019 earnings call, claiming that it was the first time that Nutanix revealed it needed to "rebuild" its sales pipeline.  *Id.*  Far from disclosing new information, Mr. Pandey was, in fact, reminding the market of what Nutanix had disclosed the previous quarter:  "***As you may recall our guidance last quarter*** was less than expected ***as we needed to rebuild our pipeline*** by doubling down on lead generation and increasing our focus on sales hiring and execution[.]"  ¶ 346.  Indeed, on the February 28, 2019 conference call, Nutanix clearly disclosed that it was reallocating capital back to lead generation spending to "build[] pipeline."  ¶ 324.  Nutanix also clearly advised on February 28, 2019 that it would not be in a solid position until FY 2020—*i.e.*, ***after*** Q4'19.  *See* Ex. 1 at 5, 9, 16 (Nutanix expected to see "increasing traction in [its] sales pipeline over the coming quarters" from corrective actions aimed at "driv[ing] improved pipeline build" to hopefully, "leave [it] in a solid position as [it] enter[s] FY '20[20].");  *see also* ¶ 324 ("expect it to take a couple of quarters to show meaningful results").  Thus, by May 2019, the market was already aware that Nutanix was rebuilding its sales pipeline

and expected that the pipeline and productivity issues it had disclosed would continue to have some impact on Q4'19.[4]

## II.   PLAINTIFFS' "REASSURANCES" ARGUMENT IS WITHOUT MERIT

Plaintiffs also assert that they can establish loss causation based on the May 2019 earnings announcement because the market did not "appreciat[e] the true extent of the pipeline and productivity problems" following the February 2019 disclosures.  Opp. at 10.  According to Plaintiffs, in February 2019, Nutanix "downplayed" the extent of its sales pipeline and productivity issues by providing "reassurances" that it had already taken corrective action and that such action was already having a positive impact.  *See id.* at 7 ("Defendants downplayed the severity of the pipeline problems, claimed increases to spending and hiring were already having a positive impact," and were "doubling down on driving further business from within our large existing enterprise customer base.").  Not so.

---

[4] Stretching for a shred of concrete "new information," Plaintiffs claim that Nutanix's announcement of the resignation of Mr. Potti, its Chief Product Development Officer, on May 30, 2019 supports loss causation.  Opp. at 8-9, n.8.  This too fails.  Plaintiffs' allegations reveal nothing more than that Mr. Potti resigned.  *See* ¶¶ 351, 401.  Plaintiffs' own authority confirms that the resignation of an executive officer "does not in and of itself constitute a corrective disclosure." *Public Emps.' Ret. Sys. of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014). Plaintiffs do not attribute the stock price decline following the May earnings call to Mr. Potti's resignation (*see* ¶ 348 (attributing decline to representations regarding sales pipeline and sales hiring)) and do not allege that the resignation of Mr. Potti, a *products* officer, had anything to do with the alleged fraud involving *sales* pipeline and productivity, which was revealed three months earlier in February 2019.  Under those circumstances, the announcement of the resignation of an officer or director is insufficient to plead loss causation.  *See, e.g.*, *In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007) (the announcement of resignations of two directors was "meaningless for purposes of showing loss causation" where announcement occurred weeks after the revelation of fraud and did not indicate that the resignations were due to involvement in the fraud); *Magro v. Freeport-McMoran Inc.*, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018) (disclosure of a director's and subsidiary's president's resignations were not corrective because the "resignations do not even establish an inference of wrongdoing"); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) ("the facts were known a year before the resignation, and the resignation did not add to the public knowledge any new material fact" about the fraudulent transaction).

Although *Amedisys* considered the executive resignation announcement in "totality" with four other disclosures—some of which too, on their own, did not constitute a corrective disclosure—to find that all five disclosures together "culminate[d] in a corrective disclosure" (769 F.3d at 324), that analysis was conducted under the lax Rule 8(a) pleading standard and is inconsistent with the Ninth Circuit's requirement that a plaintiff plead with particularity under Rule 9(b) "new information" about the "very facts" alleged misrepresented or omitted.  *Nektar*, 34 F.4th at 838-39.  *Mauss v. NuVasive, Inc.*, 2016 WL 3681831 (S.D. Cal. July 12, 2016), relied on *Amedisys* without any analysis, has not been followed by any court for the proposition proposed by Plaintiffs.

Far from "downplaying" the sales pipeline and productivity problems or providing "reassurances," Nutanix's February 2019 disclosure emphasized the seriousness of the issues the Company faced, noting that "all this shifting of spend[ing] back to lead generation *is not an insignificant amount. The magnitude of the shift is in the few tens of million.*" ¶¶ 120, 324, 352. Indeed, Plaintiffs' Opposition concedes that the February 2019 disclosures revealed Nutanix had "*significant* pipeline problems." Opp. at 4. Moreover, Plaintiffs do *not* claim that Nutanix failed to implement the corrective actions it said it had already taken (*i.e.*, increase lead generation spending and sales hiring efforts) or that such efforts had *not*, as Mr. Pandey stated, "already show[ed] early positive signs at the top of the [sales] funnel[.]" ¶ 323. Indeed, Plaintiffs do not contest that by the end of the very next quarter, Nutanix's sales pipeline had grown 40% quarter-over-quarter or that Nutanix had added over 50 sales representatives. Ex. 3 at 12; Mem. at 19. Instead, Plaintiffs claim that Nutanix's February 2019 disclosure falsely reassured the market that the sales pipeline and productivity issues would not negatively impact Nutanix's financial performance in Q4'19. *See* Opp. at 7, 10. But, as previously discussed, that claim is baseless: Nutanix disclosed in February that its corrective actions would take several quarters to show any meaningful results and that it would not be on solid ground until it entered FY20 (*i.e.*, after Q4'19). *See supra* Section I; Mem. at 17-18.

Because Nutanix did not offer any reassurances regarding the state of its sales pipeline or productivity in February 2019, the decisions on which Plaintiffs rely in support of their "reassurances" argument are easily distinguished and indeed underscore the flaws in their position. For example, in *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indust., Inc.*—which was decided under the permissive Rule 8 pleading standard inapplicable in the Ninth Circuit—the court considered three potential corrective disclosures, each of which involved disappointing financial results. 564 F. Supp. 3d 1272, 1306-07 (N.D. Ga. 2021). In concluding that loss causation was supported by the third corrective disclosure which admitted that the company's excess inventory problems "would persist," the court specifically found that the first two corrective disclosures included false assurances. *Id.* at 1285, 1307. In the first, "the [company] took great pains to assure investors that [its excess inventory problem] was a temporary blip that would soon pass." *Id.* at 1284. In the

second, the company assured investors that it had "put the[] 'temporary' problems behind [it]" and that the "problems rightsizing the inventory were over[.]" *Id.* at 1285.

Likewise, in *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, once the truth began to emerge through partial corrective disclosures, the company was alleged to have attempted to halt further stock price declines by "falsely assur[ing] investors" that demand for products remained "strong" and the company "would meet the previously-forecasted growth levels." 411 F. Supp. 2d 1172, 1177-78 (N.D. Cal. 2005). The court held that the plaintiffs adequately alleged loss causation where the company's disclosure of subsequent earnings: (i) revealed that performance would fall short of the company's false assurances; and (ii) provided additional new information—*i.e.*, that earnings would decline over the next quarter, ongoing inventory problems, and the imposition of a hiring freeze and the cutting back of new financing commitments—that further revealed the "truth" regarding the subject matter of the challenged statements. *Id.* Here, unlike in *Cisco*, Nutanix neither assured investors that it would achieve Q3'19 guidance nor did the May 2019 disclosure reveal anything new about the statements Plaintiffs challenge.

## III. PLAINTIFFS' "SCOPE," "SEVERITY," "MAGNITUDE" MANTRA DOES NOT SUPPORT LOSS CAUSATION

Plaintiffs also argue that that May 2019 earnings announcement supports loss causation because Nutanix's announcement that it missed its Q3'19 guidance revealed the "scope, severity, and financial impact" and "magnitude" of sales pipeline and productivity issues that were previously disclosed in February. Opp. at 2, 8-9. Plaintiffs offer this argument as an "alternative to pleading corrective disclosures" (Opp. at 11; *see id.* at 6), which tacitly concedes that Plaintiffs are unable show loss causation under the revelation-of-fraud theory pled in the SAC. Plaintiffs claim that this "alternative" loss causation theory is supported by *First Solar*. *Id.* Plaintiffs' eleventh-hour unpled theory does not save their deficient loss causation allegations.

### A. Plaintiffs' Unpled "Alternative" Loss Causation Theory Fails

As an initial matter, Plaintiffs may not proceed under a *First Solar* earnings miss theory of loss causation because the SAC clearly pleads only a revelation-of-fraud theory. *See ¶¶* 20, 320-

343, 421, 424; *see also id.* at p.78 (loss causation section of the SAC titled "**THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES**").  As the Ninth Circuit made clear in *First Solar* and in numerous other decisions, "[w]hen plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or prove the facts ***relevant to their theory***."  *First Solar*, 881 F.3d at 754; *see Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1059, 1063 (9th Cir. 2008) (plaintiffs failed to plead loss causation where their complaint relied on a revelation of the fraud theory but the complaint failed to allege that the two announcements revealed "the fraudulent activity that [plaintiffs] contend[] forced down the stock"); *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (noting that the plaintiff alleged loss causation based on the theory that the fraud "was ***revealed to the market through a series of 'partial disclosures'***" and, accordingly, was required to "plausibly allege that the defendant's fraud ***was 'revealed to the market*** and caused the resulting losses'") (citation omitted); *see also Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at \*17 (C.D. Cal. Jan. 17, 2020) (cited by Plaintiffs) (assessing plaintiff's loss causation allegations "relevant to their theory") (citation omitted).[5]  Plaintiffs' allegations must rise or fall on the theory pled in the SAC.

Even if the Court were to indulge Plaintiffs' unpled theory of loss causation under *First Solar*, such a theory would fail as a matter of law here.  Under *First Solar*, a plaintiff may, in certain circumstances, prove loss causation based on the announcement of an earnings miss even if the market is otherwise unaware of the facts underlying the alleged fraud.  881 F.3d at 754.  However, Plaintiffs have not cited a single case that supports the proposition that loss causation can be based on an announcement of an earnings miss ***that follows a previous revelation of the truth***.  It cannot.  Once investors have the information necessary to deem a challenged statement

---

[5] The *Karinski* court held that two alleged corrective disclosures established loss causation where, unlike here, each corrected a different challenged statement.  2020 WL 281716, at \*17-18.  The first corrective disclosure, which revealed that USPS was terminating its exclusive agreement with the company, corrected the alleged misstatement that the company had a strong partnership with USPS.  *Id.* at \*13, \*17.  The second corrective disclosure, which revealed that USPS was making changes to its agreements with third party resellers, corrected the alleged misstatement denying that USPS had sent a letter to participants in the company's reseller program with potential changes.  *Id.* at \*5, \*17.  *Karinski* is therefore distinguishable.  *Karinski* does not, as Plaintiffs claim, stand for the proposition that "a second disclosure that reveals the magnitude of problems are larger than revealed by an initial disclosure can support loss causation."  Opp. at 9.

false, the causal chain for purposes of loss causation is broken. *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 51 (2d Cir. 2018) (revelation of the truth "***broke any chain of causation*** that might have existed" between the alleged misstatements or concealment and "any losses [Plaintiffs] may have suffered [there]after"); *Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 21 (D. Mass. 2019) (granting judgment on pleadings; "the disclosure to the market of those key facts nearly six months prior to the subsequent market reaction ***breaks the casual chain*** for purposes of [plaintiff's] fraud on the market theory"), *aff'd*, 6 F.4th 123 (1st Cir. 2021); *see also, e.g.*, *First Solar*, 881 F.3d at 754 ("it is the underlying facts ***concealed*** by fraud that affect the stock price"); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) ("[T]he nature of a fraud is that it conceals 'underlying facts that affect the stock price.'") (citation omitted).

Plaintiffs rely primarily on *In re Splunk Inc. Sec. Litig.*, 2022 WL 2525735 (N.D. Cal. Mar. 21, 2022), for the proposition that "disclosures regarding a company's missed financial guidance, followed by a stock price decline, [are] sufficient to allege loss causation." Opp. at 9. Plaintiffs mischaracterize *Splunk*. There, the company announced a significant earnings miss for Q3 on December 2. *Splunk*, 2022 WL 2525735, at *2. The next day, on December 3, the company disclosed the reasons for the miss: the company's suspension of marketing investments, a sales layoff, and a hiring freeze. *Id.* at *2-3. In allowing plaintiffs to proceed on a loss causation theory based on the missed earnings announcement on December 2, the court first noted that the plaintiffs were not proceeding on a revelation-of-fraud theory of loss causation but, rather, under the earnings-miss-disclosure theory discussed in *First Solar*. *Id.* at *21 and nn.10, 11. The court went on to find that "a decline in the price of Splunk's stock was caused by an earnings miss for Q3 2020, which, in turn, was caused by ***the undisclosed actions*** regarding which Defendants allegedly mislead investors, namely the suspension in marketing investments, the hiring freeze . . . and the layoff" of sales personnel. *Id.* at *20. Thus, the alleged fraud in *Splunk* had ***not been disclosed by the time the market learned of the earnings miss***. Under those circumstances, the court held that that "a decline in the company's stock price following the revelation of an earnings miss that was caused by the alleged fraud" was sufficient to plead loss causation "under the earnings miss disclosure theory discussed in *First Solar*." *Id.* at *21.

Plaintiffs claim that *Emps.' Ret. Sys. of the Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536 (D.N.J. June 5, 2020), held that the mere "revelation of missed revenue expectations and revised guidance [is] sufficient to plead loss causation." Opp. at 9, n.9. It did not. There, the company announced that it missed its quarterly revenue guidance and revised its full year guidance, specifically attributing the miss and lowered guidance to IT infrastructure problems and sub-standard vendor performance—facts that were inconsistent with representations made during the class period. *Conduent*, 2020 WL 3026536, at \*1-2, \*9. Unlike this case, the earnings miss announcement in *Conduent* revealed for the first time the concealed facts that corrected the defendants' prior alleged misstatements.

*N.Y. Hotel Trades Council & Hotel Ass'n of New York City, Inc. Pension Fund v. Impax Labs, Inc.*, 843 F. App'x 27 (9th Cir. 2021), upon which Plaintiffs rely (Opp. at 9), likewise is inapplicable because it too did not involve a prior revelation of the truth. There, plaintiffs alleged that two earnings misses, which defendants falsely attributed to competition, were due to the company's concession of market share pursuant to an illegal price-fixing conspiracy. *Impax*, 843 F. App'x at 31. The court found that the allegations supported loss causation because they "trace[d] the loss back to the very facts about which the defendant lied"—the alleged price-fixing scheme that ***had not yet been disclosed***. *Id*. (citation omitted).

In short, none of Plaintiffs' cases support their contention that the May 2019 announcement supports loss causation under their "alternative," and unpled, earnings miss theory. In contrast to *Splunk*, *Conduent*, and *Impax*, Plaintiffs' own allegations concede that the February 2019 announcement revealed ***precisely*** that which Plaintiffs allege was concealed months ***before*** the Q3'19 earnings miss announcement in May 2019. Those fatal allegations render untenable Plaintiffs' loss causation arguments based on the May 2019 announcement as a matter of law.

**B.      The Subsequent Disclosure of a Guidance Miss Arising From Previously Disclosed Facts Does Not Support Loss Causation**

Plaintiffs' inability to cite a single case to support their "alternative" theory of loss causation is not surprising given the litany of decisions, including those cited in Defendants' opening brief, that consistently hold that a subsequent disclosure of poor financial performance

(*e.g.*, a guidance miss or lower guidance) following the revelation of the truth does not support loss causation as a matter of law.  *See* Mem. at 14-16 (discussing, *e.g.*, *Lopes v. Fitbit, Inc.*, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021); *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014); *In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110 (D. Mass. 2010), *aff'd sub nom. Miss. Public Emps.' Ret. Sys. v. Boston Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011); *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41 (2d Cir. 2018); *SLF Holdings, LLC, v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70-71 (D. Del.), *appeal docketed*, No. 20-3427 (3d Cir. 2020)).  Plaintiffs attempt to distinguish many of these cases on the ground that the market was already aware of the underlying relevant facts,[6] but that observation is no distinction at all:  this case also involves market awareness of the relevant facts prior to the earnings miss announcement.  And Plaintiffs completely mischaracterize *Fitbit*, which is directly on point.

Plaintiffs claim that unlike *Fitbit*, this case involves "reassurances that the problems were being corrected" (Opp. at 16), yet as discussed previously, Plaintiffs do not allege that any of the purported assurances were false.  They were not.  *See supra* Section II.  Plaintiffs also claim that unlike *Fitbit*, Nutanix's February 2019 announcement was accompanied by "overstated guidance."  Opp. at 16.  A cursory review of *Fitbit* demonstrates the falsity of this assertion:  the disclosure that was held not be corrective specifically *lowered* the company's previously issued guidance to reflect "results which did not live up to" that guidance.  *Fitbit*, 2020 WL 1465932, at *12.  Just like in *Fitbit*, Nutanix's May 2019 disclosure announced that its results did not live up to previously issued guidance (*i.e.*, the Q3'19 guidance issued in February 2019).  And, just as in *Fitbit*, Plaintiffs did not challenge Nutanix's guidance for Q3'19 as a false or misleading statement.  *Fitbit* thus is on all fours with this case and compels the conclusion that Nutanix's May 2019 announcement does not support loss causation as a matter of law.

Numerous additional cases further support this result and stand for the proposition that

---

[6] *E.g.*, Opp. at 17, n.16 (arguing that in *Barclays*, "the subject of the alleged omissions was actually disclosed to the public"; in *Boston Scientific*, "the market was aware of [the] complaints regarding a product prior to its recall"; in *Maximus*, the "information about a particular contract were revealed prior to any alleged corrective disclosures").  Plaintiffs do not even attempt to distinguish *SLF*, 499 F. Supp. 3d at 70-71.

once investors have the facts necessary to deem a challenged statement false, subsequent events arising from those now disclosed facts do not support loss causation. *See, e.g.*, *Tesla*, 985 F.3d at 1186, 1198 (disclosures that Tesla was experiencing significant production delays and would not meet its end-of-year production goals did not support loss causation because earlier "article disclosed precisely the fact that Plaintiffs contend had been misrepresented—*viz.*, that automatic production had not started in July"); *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1105 (9th Cir. 2010) (finding that once the misstatement was corrected, subsequent stock price declines coinciding with the release of poor financial results were not recoverable, even though the company disclosed "additional information" about the now-corrected facts, and declining to credit allegations that later losses were the "expected consequences" of the previously-corrected misstatement); *Omnicom*, 597 F.3d at 513-14 (disclosure of a director's resignation did not support loss causation because "the facts were known a year before the resignation" and the resignation "did not add to the public knowledge any new material fact" about the alleged fraudulent transaction); *Waters v. GE Co.*, 2010 WL 3910303, at \*9 (S.D.N.Y. Sept. 28, 2010) (disclosure of the discounted price of an equity offering did not support loss causation where the existence of the equity offering, which defendants allegedly concealed, was revealed prior to the disclosure of the discounted price), *aff'd sub nom. GE Investors v. GE Co.*, 447 F. App'x 229 (2d Cir. 2011). These decisions reflect and apply the incontrovertible proposition that the revelation of the truth breaks any chain of loss causation that might have existed between the alleged misstatement or omission and a plaintiff's alleged losses. *See* Mem. at 11 (cases cited); *supra* at 8. Thus, the fact that Plaintiffs allege that Nutanix's May 2019 announcement disclosed that it missed Q3'19 guidance due to previously disclosed sales pipeline and productivity issues does not establish loss causation: once the truth is revealed, a later announcement of poor results caused by that truth does not support loss causation.

In sum, Plaintiffs fail to plead any new information in the May 2019 announcement regarding the alleged misstatements and omissions. As a result, neither Plaintiffs' revelation-of-fraud corrective disclosure theory of loss causation nor their unpled alternative theory has any

basis in fact.[7]  Judgment on the pleadings is warranted.  *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (plaintiff must provide "the court 'some assurance that the [loss causation] theory has a basis in fact.'"), *cert. denied*, 142 S. Ct. 71 (2021) (citation omitted).

## IV.    PLAINTIFFS' ATTEMPT TO CREATE A FACTUAL ISSUE FAILS

Plaintiffs' last-ditch effort to avoid dismissal by claiming that Defendants' motion raises factual issues fails.  Defendants' motion does not raise any factual issues.  It is based exclusively on Nutanix's public disclosures and Plaintiffs' ***own allegations*** showing that the February 2019 announcement revealed the very facts Plaintiffs allege were fraudulently concealed.  *See* Mem. at 9-12.  First, contrary to Plaintiffs' assertion, Defendants cited analyst reports following the May 2019 announcement, not to show market reaction (Opp. at 12), but solely to refute Plaintiffs' reliance on those reports ***as the alleged factual basis*** for Plaintiffs' loss causation theory.[8] Plaintiffs do not offer any response to Defendants' showing that analyst commentary was nothing more than opinion and gloss on previously disclosed facts and therefore, insufficient to support loss causation.  Mem. at 16-17 (cases cited).  Nor do they distinguish *Bonanno v. Cellular Biomedicine Group, Inc. (Bonanno II)*, in which this Court rejected plaintiff's argument that the third-party report "revealed new facts" because it disclosed the "full scope and nature of" the alleged fraud, finding that the report was "simply an individual's summary and comments on publicly available facts."  2016 WL 4585753, at *4 (N.D. Cal. Sept. 2, 2016) (Orrick, J.).[9]

Second, Plaintiffs' assertion that loss causation is not suitable for adjudication on a

---

[7] To the extent that Plaintiffs are attempting to advance yet another alternative, unpled theory of materialization of risk (*see* Opp. at 6, 11), the Ninth Circuit has never adopted that theory. *See Nektar*, 34 F.4th at 838, n.6 (the court "has never expressly adopted" "a 'zone of risk theory'" and "[w]e have continued to require securities fraud plaintiffs to allege that the defendant lied about 'the very facts' causing the plaintiffs' losses").  In any event, there is no loss causation under that theory where, as here, the alleged underlying causes of the risk that materialized have already been disclosed.  *See SLF*, 499 F. Supp. 3d at 70-71; *Omnicom*, 597 F.3d at 514; *Waters*, 2010 WL 3910303, at *9.

[8] *Compare* ¶¶ 28, 346 (the May announcement revealed that the sales pipeline and sales productivity issues were "far worse" and "far from over"), *with* ¶ 30 (analyst described Nutanix's situation as "definitely worse than we expected" and other analysts' comments).

[9] Plaintiffs' claim that, unlike *Bonanno II*, their loss causation allegations are "not premised on anyone collecting, reporting, or opining on already public information" (Opp. at 16) rings hollow where Plaintiffs' "far worse" allegations *are* based on analysts "reporting" and "opining" on already public information on Nutanix's financial results for Q3'19.  *See* ¶¶ 28, 30, 346.

dismissal motion (Opp. at 8) has been refuted by the Ninth Circuit many times over. *See, e.g.*, *Nektar*, 34 F.4th at 838 (affirming dismissal of Section 10(b) claims on motion to dismiss, Plaintiffs "failed to allege loss causation" as a matter of law); *Tesla*, 985 F.3d at 1198 (affirming dismissal of Section 10(b) claims on motion to dismiss where plaintiffs "failed to show that they can adequately plead loss causation"); *see also Loos*, 762 F.3d at 887; *Metzler*, 540 F.3d at 1065; *Fitbit*, 2020 WL 1465932 at *12; *Bonanno II*, 2016 WL 4585753, at *4.

Finally, although Defendants are confident that the evidence will show that the missed guidance for Q3'19 revenue and billings was due to the impact of Nutanix's better-than-expected progress in transitioning to a subscription-based business model (which resulted in less upfront revenue under term-based licenses compared to life-of-device licenses) and selling $8 million less in hardware as part of Nutanix's then-ongoing transition from hardware to software-only sales, that does not create any factual issue. Mem. at 18-19 and n.11. For purposes of this motion, Defendants assume the truth of Plaintiffs' allegation that the sales pipeline and productivity issues contributed to the Q3'19 guidance miss. Nevertheless, that miss occurred after the disclosure of those issues and thus the correction of the challenged statements during the February 2019 earnings announcement. It therefore is insufficient to support loss causation as a matter of law for the reasons stated above.

## V.    PLAINTIFFS' REMAINING AUTHORITIES ARE INAPPOSITE

Plaintiffs cite to a handful of additional decisions, each of which is inapposite. For example, Plaintiffs rely on *Washtenaw Co. Emps.' Ret. Sys. v. Walgreens Co.*, 2019 WL 4597518 (N.D. Ill. Sept. 23, 2019), for the proposition that loss causation is "adequately alleged based on a disclosure that 'provided the full magnitude or scope of the FY earnings shortfall and reasons for the shortfall.'" *E.g.*, Opp. at 9, n.9. Plaintiffs' reliance on *Walgreens* is misplaced. There, the plaintiff challenged defendants' forecast that FY 2016 adjusted earnings would be between $9 and $9.5 billion. *Walgreens*, 2019 WL 4597518, at *1, *4. Walgreens subsequently withdrew that earnings target. *Id.* at *2. One month later, Walgreens disclosed that the "new" FY 2016 earnings target was $7.2 billion—$1.8 to $2.3 billion less than the original target. *Id.* at *2, *7. Defendants unsuccessfully argued that the withdrawal of the target foreclosed a finding of loss causation based

on the later disclosure of the new target. *Id.* at \*7-8. However, Walgreens's second disclosure provided new information that directly corrected the challenged statement, *i.e.*, that the FY 2016 forecast was overstated by $1.8-$2.3 billion. *Id.* at \*8. Here, none of the statements Plaintiffs challenge contained any quantitative forecast, much less a forecast for Q3'19. Opp. at 5 n.5. Thus, the May 2019 announcement of Q3'19 results did not correct any prior misstatement that Plaintiffs challenge. Rather, the May 2019 announcement merely revealed that Nutanix missed its Q3'19 guidance, the *only* quantitative prediction provided by Nutanix for Q3'19 and one that Plaintiffs chose—for good reason—not to challenge.

Plaintiffs rely on *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1053 (9th Cir. 2008), for the proposition that a second disclosure that reveals that the magnitude of problems that are larger than revealed by an initial disclosure can support loss causation. Opp. at 9. However, that is not what *Gilead* held. In *Gilead*, the Ninth Circuit concluded that a company's disclosure of its improper drug labelling was a corrective disclosure even though the same information had been disclosed three months earlier in a publicly available FDA warning letter. 536 F.3d at 1058. As this Court explained, the Ninth Circuit's holding was based on the rationale "that the public could not appreciate the significance of the [FDA] Warning Letter" about the company's off-label marketing of a HIV drug "because of its technical and medical substance." *Bonanno II*, 2016 WL 4585753, at \*5. Thus, *Gilead* simply stands for the proposition that market underappreciation of a disclosure may be inferred in certain circumstances where the disclosure is complex, "technical," or "medical" in substance such that it would have been difficult for the average investor to understand. *See id.* (rejecting plaintiffs' market underappreciation argument; plaintiffs "have not alleged that the substance of [the fraudulent] promotional activities would have been difficult to process or understand by the average investor"). Here, the February 2019 revelation—that Nutanix spent too little on lead generation and fell short of its sales hiring goals—was neither complex nor technical (and obviously not medical) such that it would be difficult for the market to understand.[10]

---

[10] That *Gilead* bears no semblance to the facts of this case and is completely inapposite is further illustrated by the fact that *Gilead* stands for the proposition that "it may be possible to prove loss causation even where the market reaction and loss occur some time after an initial

(continued...)

Finally, Plaintiffs rely on *Splunk* to claim that "[a] theory of loss causation predicated on the revelation of an earnings miss is not defeated if some information about the matters that caused the earnings miss was made public prior to the earnings miss and the plaintiff alleges facts that raise the inference that the market did not understand the significance of that information at the time it was made public." Opp. at 10 (quoting *Splunk*, 2022 WL 2525735, at *22). This aspect of *Splunk* is readily distinguishable. There, defendants argued that the relevant truth—*i.e.*, the company's suspension of marketing investments and a sales layoff and hiring freeze—was revealed six months before the alleged corrective disclosures because the company stated that it had "kind of" put a freeze on hiring and disclosed "high-level information" about its sales and marketing expenditure in the company's SEC filings. *Splunk*, 2022 WL 2525735, at *22. The court rejected that argument, finding that "reasonable minds could differ" as to whether the disclosures "sufficiently revealed the matters that Defendants allegedly concealed." *Id.* The court thus held that the plaintiff's allegations raised the reasonable inference that investors failed to appreciate the matters until the alleged corrective disclosures. *Id.* Here, there is no doubt that Nutanix's February 2019 announcement revealed "the matters that Defendants allegedly concealed": Plaintiffs squarely allege that Nutanix "came clean" (¶ 22) in the February 2019 disclosures and that these disclosures were "[i]n direct contradiction" of the alleged misstatements (¶ 320), revealed "the truth" and "shocked" the market. ¶¶ 20, 320, 325.

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendants' Opening Brief ("Mem."), Defendants respectfully request that the Court grant their motion and enter partial judgment on the pleadings under Rule 12(c) in their favor on the ground that the SAC fails to plead loss causation based on Nutanix's May 30, 2019 announcement.

---

public disclosure of the fraud." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 n.7 (9th Cir. 2010); *see In re Facebook, Inc. Sec. Litig.*, 2021 WL 6000058, at *7 (N.D. Cal. Dec. 20, 2021) (describing *Gilead* as "allowing a delayed market reaction where the falsity of the alleged misstatements was revealed months later"), *appeal docketed*, No. 22-15077 (9th Cir. Jan. 19, 2022); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) ("There is no bright-line requiring an immediate market reaction," citing *Gilead*, 536 F.3d at 1057-58). This case, however, does not involve a delayed market reaction; Nutanix's stock price dropped immediately after the February 2019 disclosure. ¶¶ 23, 330.

Dated:  August 3, 2022

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  /s/ *Nina F. Locker*
          Nina F. Locker

*Attorneys for Defendants*