ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
KENNETH J. BLACK (291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
kennyb@rgrdlaw.com
      – and –
JAMES E. BARZ
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re NUTANIX, INC. SECURITIES LITIGATION | Case No. 3:19-cv-01651-WHO<br>Case No. 3:21-cv-04080-WHO |
| JOHN P. NORTON, ON BEHALF OF THE NORTON FAMILY LIVING TRUST UAD 11/15/2002, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NUTANIX, INC., DHEERAJ PANDEY, and DUSTON M. WILLIAMS,<br><br>Defendants. | CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS** |

4878-9417-4535

# TABLE OF CONTENTS

**Page**

COUNTER-STATEMENT OF THE ISSUES (CIVIL L.R. 7-4(**a**)(3)) ..........................................1

I.      INTRODUCTION ..............................................................................................................2

II.     FACTUAL BACKGROUND ...............................................................................................5

III.    ARGUMENT ....................................................................................................................10

      A.      Plaintiffs' Adequately Allege False and Misleading Statements...........................10

            1.      Misstatements Regarding New Customers and Pipeline ...........................11

            2.      Misstatements Regarding Sales Productivity and Sales Force Hiring .......................................................................................................19

            3.      Misstatements Regarding Demand ............................................................24

            4.      Misstatements Regarding Lead Generation Spending...............................27

            5.      Misstatements Regarding the Transition to a Software-Defined Business Model.......................................................................................28

      B.      Plaintiffs Allege a Strong Inference of Scienter ....................................................29

            1.      Previously Upheld Statements ..................................................................30

            2.      Previously Dismissed and Newly Added Hiring Statements....................34

            3.      Previously Dismissed and Newly Added Statements Regarding Demand, Lead Generation Spending, and the Transition to a Software-Defined Business Model ...........................................................35

IV.     CONCLUSION.................................................................................................................35

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- i -

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                                        **Page**

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ......................................................................................................10

*Constr. Workers Pension Tr. Fun[d] – Lake Cnty. v. Genoptix, Inc.*,
    No. 10cv2502-CAB (DHB), 2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ....................18, 24

*Fosbre v. Las Vegas Sands Corp.*,
    No. 2:10-cv-00765-APG-GWF, 2017 WL 55878 (D. Nev. Jan. 3, 2017) *aff'd sub
    nom. Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*,
    732 F. App'x 543 (9th Cir. 2018) .................................................................................................31

*Garcia v. City of Napa*,
    No. C-13-03886 EDL, 2014 WL 342085 (N.D. Cal. Jan. 28, 2014) .......................................14

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019).........................................................................................21

*Hefler v. Wells Fargo & Co.*,
    No. 16-cv-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .....................................21

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
    958 F. Supp. 2d 1065 (D. Minn. 2013).......................................................................................29

*In re Akorn, Inc. Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ..........................................................................................29

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014).............................................................................34

*In re BioMarin Pharm. Inc. Sec. Litig.*,
    No. 3:20-cv-06719-WHO, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022)................................29

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ......................................................................................................31

*In re Dropbox Sec. Litig.*,
    No. 19-cv-06348-BLF, 2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)....................................19

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ..........................................................................................35

*In re Merit Med. Sys., Inc., Sec. Litig.*,
    No. 8:19-02326 DOC, 2021 WL 1258590 (C.D. Cal. Mar. 16, 2021) ....................................23

*In re Plantronics, Inc. Sec. Litig.*,
    No. 19-cv-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ....................................26

**Page**

*In re Nutanix, Inc. Securities Litigation,*
   No. 3:19-cv-01651-WHO (N.D. Cal.) ..................................................................................1

*In re Quality Sys., Inc. Sec. Litig.*
   865 F.3d 1130 (9th Cir. 2017) .............................................................................16, 17, 24

*In re Splunk Inc. Sec. Litig.,*
   592 F. Supp. 3d 919 (N.D. Cal. 2022) ............................................................................23, 28

*In re Stratosphere Corp. Sec. Litig.,*
   1 F. Supp. 2d 1096 (D. Nev. 1998)...................................................................................30, 31

*In re SupportSoft Sec. Litig.,*
   No. C 04-5222 SI, 2005 WL 3113082 (N.D. Cal. Nov. 21, 2005).........................................26

*In re Twitter, Inc. Sec. Litig.,*
   No. 16-cv-05314-JST, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ...................................18

*In re Verifone Sec. Litig.,*
   11 F.3d 865 (9th Cir. 1993) ..............................................................................................18

*In re Vocera Commc'n, Inc. Sec. Litig.,*
   No. C-13-3567 EMC, 2015 WL 603208 (N.D. Cal. Feb. 11, 2015) ......................................26

*In re Worlds of Wonder Sec. Litig.,*
   35 F.3d 1407 (9th Cir. 1994) .............................................................................................31

*Institutional Inv. Grp. v. Avaya Inc.,*
   564 F.3d 242 (3d Cir. 2009)...............................................................................................29

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.,*
   No. 17-cv-05558-HSG, 2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ................................31

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988 (9th Cir. 2018) ..............................................................................................11

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.,*
   39 F.4th 1092 (9th Cir. 2022) ........................................................................................16, 18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
   513 F.3d 702 (7th Cir. 2008) ..............................................................................................32

*Miller v. Thane Int'l, Inc.,*
   519 F.3d 879 (9th Cir. 2008) ........................................................................................17, 18

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- iii -

**Page**

*Monachelli v. Hortonworks, Inc.*,
225 F. Supp. 3d 1045 (N.D. Cal. 2016) .............................................................18, 19

*Murphy v. Precision Castparts Corp.*,
No. 3:16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017)...........................24, 25, 26

*Norton Family Living Trust v. Nutanix, Inc.*,
No. 3:21-cv-04080-WHO (N.D. Cal.) ...................................................................1

*Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*,
841 F.2d 918 (9th Cir. 1988) ..............................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
__ U.S. __, 135 S. Ct. 1318 (2015)......................................................................17

*Petrie v. Elec. Game Card, Inc.*,
761 F.3d 959 (9th Cir. 2014) ....................................................................10, 14, 22

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
No. 1:16-cv-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ...............................32

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ..............................................................................16

*Ramirez v. Cnty. of San Bernardino*,
806 F.3d 1002 (9th Cir. 2015) ...............................................................................4

*S. Ferry LP # 2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)..............................................................29

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016)  ....................................................................17, 18, 28

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
No. 1:12-cv-00993, 2022 WL 3572474 (M.D. Pa. Aug. 18, 2022)........................................30

*Smilovits v. First Solar, Inc.*,
No. CV-12-00555-PHX-DGC, 2012 WL 6574410 (D. Ariz. Dec. 17, 2012).........................33

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017)..................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................14, 22, 29, 34

|                                                                                           | **Page** |

*Zamani v. Carnes*,
    491 F.3d 990 (9th Cir. 2007) ........................................................................................10, 14

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ............................................................................................................................1, 35
    §78t(a) ............................................................................................................................1, 35

United States District Court for the Northern District of California
    Civil Local Rule 10-1.......................................................................................................1, 4

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- v -

**COUNTER-STATEMENT OF THE ISSUES (CIVIL L.R. 7-4(a)(3))**[1]

1.      Have Defendants Nutanix, Inc. ("Nutanix" or "Company"), Dheeraj Pandey ("Pandey"), and Duston M. Williams ("Williams") (collectively, "Defendants") met their burden to seek reconsideration of the Court's prior denial of their motion to dismiss as to certain previously upheld statements under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder?

2.      Have Defendants met their burden to demonstrate that the Complaints do not plausibly state a securities fraud claim as to certain previously dismissed and newly added statements under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder?

3.      Have Defendants met their burden to demonstrate that the Complaints do not plausibly allege a claim for "controlling person" liability under Section 20(a) of the Exchange Act?

---

[1] "¶" and "Ex." are references to paragraphs and exhibits of both the Third Amended Complaint for Violations of the Federal Securities Laws filed in the *In re Nutanix, Inc. Securities Litigation*, No. 3:19-cv-01651-WHO ("*Nutanix* Action") [ECF 281-3] ("TAC"), and the Revised First Amended Complaint for Violations of the Federal Securities Laws filed in the related case *Norton Family Living Trust v. Nutanix, Inc.*, No. 3:21-cv-04080-WHO ("*Norton* Action") [ECF 94-3] ("RFAC" and, together with the TAC, "Complaints").  Unless otherwise noted, terms defined  in the Complaints and used herein shall have the same  meaning, emphasis is added, internal quotations, citations, and footnotes are omitted.  "SAC" means the Second Amended Complaint for Violations of the Federal Securities Laws filed in the *Nutanix* Action [ECF 124].  "Def. Ex." refers to Defendants' Motion exhibits.

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO                     - 1 -
4878-9417-4535

Plaintiffs California Ironworkers Field Pension Trust, City of Miami Fire Fighters' and Police Officers' Retirement Trust, and John P. Norton ("Norton"), on Behalf of the Norton Family Living Trust UAD 11/15/2002 (collectively, "Plaintiffs"), by and through their counsel, hereby submit this Memorandum of Law in Opposition to Defendants' Omnibus Motion to Dismiss [ECF 292] ("Motion" or "Mot.").

## I.   INTRODUCTION

Due to a shifting competitive landscape and the desire to transition to a new business model focused on software subscriptions, Defendants admittedly made the decision to hold Nutanix's customer pipeline spending flat for FY2018 without telling investors so they could divert resources toward R&D of new software products. Defendants knew that pipeline expenditures were the lifeblood of the Company's pipeline and new customer growth because they learned from their prior 2016 experience that reduced pipeline expenditures resulted in lower growth and fewer customer acquisitions. To hopefully avoid the same fate, Defendants gambled during the Class Period by relying on existing pipeline backlog created through increased pipeline expenditures in FY2017 to reverse course from 2016 with the hope that the transition would be seamless. It was not. As a result of the reduced pipeline expenditures, the transition suffered from negative trends in new customer pipeline growth and sales productivity. These negative trends were compounded by several issues with Nutanix's sales force, including rampant attrition, inadequate hiring, and poor training on the new software products. Defendants concealed these negative trends from investors by misrepresenting the truth and pulling in future sales predicated upon discounts and other inducements and introduced a first-ever rebate program. The combined effect of secretly relying on backlog and pulling in future sales allowed Defendants to falsely maintain the appearance of sustained growth and existing customer demand throughout the Class Period.

With the truth concealed, Nutanix's securities traded at artificially inflated prices. However, at the end of the Class Period, unable to pull in sufficient sales to mask the continued low pipeline growth and sales productivity, Nutanix reported disappointing financial results and was forced to reveal the negative trends over a series of partial disclosures that drove down the stock price, causing investors massive losses.

On September 11, 2020, the Court denied Defendants' motion to dismiss the SAC, in part, holding that the SAC adequately pled false and misleading statements. *See* Order Regarding Motion to Dismiss [ECF 140] ("Order"). Defendants now ask this Court to reconsider that ruling, even though Plaintiffs re-alleged the same allegations from the SAC that the Court found sufficient and pled additional evidence corroborating both falsity and scienter.

As to these previously upheld statements, Defendants argue one document from discovery (not cited in the Complaints) purportedly shows their statements were true because, in their self-serving and made-for-litigation opinion, Nutanix's "sales pipeline was growing significantly and Nutanix's sales productivity was strong throughout FY18[.]" Mot. at 2. But apart from relying on improper evidence to dispute the allegations, Defendants' claims in their present motion that the Company was "growing significantly[,]" enjoying "record levels of sales pipeline and productivity[,]" and posting "solid results" (*see id.* at 2-4) cannot be reconciled with their Class Period ending admissions. Further, Defendants' internal, contemporaneous communications told a much different story of "disturbing" trends in pipeline and sales productivity. Thus, the claims have merit and should proceed.

For example, rather than celebrating record performance, Defendants panicked during the Class Period because new pipeline growth was suffering while Nutanix was converting less pipeline into actual sales due to lagging sales productivity. In addition to the allegations this Court previously found to state a claim, the newly added documents show that Defendants specifically acknowledged, for example: Nutanix "running quite a bit behind [its] pipeline generation target" throughout the Class Period (**Ex. 2**); pipeline "not really going in the right direction" and Nutanix experiencing "a real problem" (*id.*); the "lack of pipeline creation [wa]s showing up in Q3'18" (*id.*); Nutanix was "short on Pipeline . . . very short" (**Ex. 32**); Nutanix had "a serious pipeline issue" (**Ex. 30**); "we all know, based on how we've been tracking and managing pipeline generation, we were materially off target for Q2 [FY2018] generation" (**Ex. 3**); "[o]ur net new customer count has been stagnant over the last several quarters" (**Ex. 36**); "new pipeline generation was short of the goal by ~28%," total pipeline creation was down quarter-over-quarter, and "[n]ew pipeline generation" was "weak" (**Ex. 37**); "[c]urrent spending levels will not get us to our pipe

creation goal . . . [t]his gap exists every quarter" (**Ex. 46**); and we are "behind almost every quarter over past 2 years . . . [t]his is [d]isturbing on every level and makes me really concerned" (**Ex. 27**).

Defendants' internal descriptions of sales productivity were equally negative. Contrary to their glowing public statements (and the Motion), Defendants and Nutanix employees complained: "[o]ur challenges include being short on total pipeline . . . we have reps who have not done ANY, ZERO prospecting in the last few [quarters]" (**Ex. 39**); "[o]nly 50% of ramped reps made their number. This is a disturbing statistic" (**Ex. 16**); Nutanix had a sales rep shortfall and "can't even hire to the current plan" (**Ex. 23**); sales attrition increased 40% and was highest in two years (**Ex. 6**); unramped reps "brought in . . . less" and "productivity was lower as well" (**Ex. 17**); even "new reps" were "lagging . . . in their initial productivity" (**Ex. 18**); and Nutanix's most important division had its "lowest new logo count last quarter [Q2 FY2018] in about 8 quarters" (**Ex. 44**).

Ignoring all this evidence, Defendants seek dismissal by asking this Court to rely almost exclusively on charts they manufactured from select data within a single document outside the Complaints[2] and hold as a matter of law that Nutanix had robust pipeline growth; "strong and consistent sales team growth"; and "strong sales productivity" (Mot. at 1-2, 10-18). But, those factual assertions are contrary to the allegations and evidence and are contested factual matters. Defendants' claims in their Motion cannot be reconciled with the documents added to the Complaints, and are contradicted further by Defendants' Class Period end admissions.

Moreover, such arguments are premature on a motion to dismiss as they involved disputed facts and interpretations of data. For example, ignoring that before the lawsuit they referred to the Company's deficient pipeline and productivity as "disturbing" (**Exs. 16, 27**), Defendants now

---

[2] As explained in Plaintiffs' concurrently filed Opposition to Defendants' Request for Judicial Notice, neither Defendants' manufactured charts nor their extrinsic exhibit to the Motion ("Exhibit 3" or "Def. Ex. 3") should be considered because they are neither attached to nor incorporated into the Complaints. While Exhibit 3 was attached to a *prior* complaint in the *Norton* Action, this is irrelevant because the complaint was superseded by the RFAC and, thus, has no legal effect by operation of unequivocal Ninth Circuit law. *See, e.g.*, *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015); Civil L.R. 10-1. Exhibit 3 is also wholly irrelevant to the TAC because Exhibit 3 was never filed in the *Nutanix* Action. At minimum, the materials Defendants seek to introduce are argument and not matters for judicial notice, and create premature and improper factual disputes of interpretation in light of the Complaints' allegations and attached materials.

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO                           - 4 -
4878-9417-4535

claim that pipeline was actually "strong" based on charts they created referring only to "total" pipeline, which included (worthless) "stale" sales prospects and other "hygiene" concerns (**Ex. 40**).  Defendants ignore that the generation of new pipeline dramatically declined in Q2 FY2018 (just before their first upheld false and misleading statements) by 29% (from $872 million to $765 million) and badly missed internal targets throughout the Class Period.  **Ex. 25** at 45.  These pipeline trends were particularly "disturbing" to Defendants (**Ex. 27**) because, at the same time, Nutanix was converting less of the total pipeline into actual sales because of "lagging" sales productivity (**Ex. 18**).  In short, Defendants cannot dispute the stock dropped when the truth of these negative trends was finally revealed and are relegated to now arguing that the pipeline was actually in great shape because it was increasing on a "total" basis due to the build-up of stale and worthless pipeline.  In truth, while Defendants' factual spin may be appropriate for a jury, it is insufficient to refute their own Class Period descriptions of pipeline trends to obtain judgment as a matter of law.  Thus, there is no basis to reconsider the previously upheld statements.

In addition, the new allegations, based on documents and facts not alleged at the time of the Court's prior dismissal, show the Individual Defendants were specifically aware of, and recklessly disregarded, the undisclosed truth concerning the previously dismissed statements and several newly added statements, which contributed to the false and misleading impression of Nutanix's new customer growth, sales pipeline, lead generation spending, salesforce hiring, demand, and business model transition.  For the reasons set forth herein, the Court should consider the dismissed statements anew, uphold the newly alleged statements, and deny the Motion in full.

## II.    FACTUAL BACKGROUND

Nutanix provides computing solutions, including its "core" HCI technology.  ¶¶76-79.  By calendar 2018, the majority of Nutanix's customers had migrated to the public cloud.  ¶81.  Market analysts therefore found it "critical to Nutanix's long-run success" to enter the public cloud space to remain competitive.  *Id.*  By the start of the Class Period, however, Nutanix was still unable to bring its public cloud product, "Xi," to market due to engineering issues, causing Nutanix to lose market share to competitor products.  ¶¶82-90.  To address the engineering issues plaguing Xi, Defendants covertly "made a decision" to reallocate spending during the "planning

process" for FY2018 and FY2019, away from "lead generation" to R&D to focus on Xi. ¶¶126, 426.[3]

Lead generation is admittedly "*key*" to Nutanix's growth and success. ¶¶93, 125. Thus, Defendants touted every quarter that Nutanix "increased our marketing activities related to brand awareness, promotions, trade shows and partner programs" (*i.e.*, lead generation activities). ¶¶127, 293, 324, 451. Investors understood these activities to be "lead generation" because Defendants disclosed that lead generation included activities such as "digital marketing," "web traffic" activities, "meetings," and other "events." ¶97. Indeed, analyst JMP Securities understood lead generation included "CIO events, digital marketing, branding campaigns, and seminars[.]" ¶295. CWs confirmed lead generation comprised "the majority," or about 70%, of Nutanix's marketing expense, with the remaining third comprised of travel and salaries. ¶282.

As a product seller, failing to adequately invest in lead generation decimated Nutanix's sales pipeline and sales productivity. Sales productivity is understood by the market to be the conversion rate of sales leads into revenue. ¶93. Pandey admitted that the two "key" "inputs [of sales productivity] are salespeople and pipeline spend, the demand gen spend." *Id.* Thus, by keeping lead generation "flat," Defendants stifled Nutanix's pipeline development, sales productivity, and, ultimately, "bookings, billings, and revenue." ¶¶123, 125, 405, 449.

Defendants knew their decision to keep lead generation flat would negatively impact the pipeline from their recent experience cutting critical lead generation spending in 2016. ¶¶408. 488. According to Pandey, Nutanix slashed lead generation spending in 2016, resulting in a "slow year" until Defendants "woke up" and had to increase spending by 75%. *Id.*

Nutanix's pipeline issues caused by Defendants' inadequate lead generation spend manifested early in the Class Period and continued throughout. This is demonstrated by many internal documents, including e-mails to and from Pandey and Williams. *See* §III.A.1, *infra*. Additionally, Pandey and Williams were aware of the pipeline decline through their review of,

---

[3]  Reasonable investors understood "lead" generation as synonymous with "demand" or "pipeline" because Defendants used them interchangeably, sometimes in the same sentence. *See* ¶93 n.12.

and access to, up-to-the-minute data in the pipeline reports, which they could generate on a Company level, by region, or by salesperson. ¶¶269-271. Pandey accessed a dashboard created just for him on his computer daily, and reviewed Salesforce.com pipeline reports. *Id.*

Every quarter Pandey and Williams attended revenue meetings to discuss Nutanix's revenue, pipeline, and how pipeline deficiencies would be addressed by pulling in "backlog." ¶278. CW8 recalled that the declining pipeline was discussed during the Q2 FY2018 and Q3 FY2018 revenue meetings. *Id.* Additionally, CW1 recalled that during every quarterly All-Hands meeting in FY2018 and the first half of FY2019, which were attended by Pandey and Williams, sales personnel warned that there were insufficient new leads in Salesforce.com and that the opportunities that did exist were of insufficient monetary value to meet Nutanix's goals. ¶¶472-474. CW1 recounted that Defendants attended the August 2018 SKO with all of Nutanix's sales force where CRO Attanasio and SVP Lautenbach announced on stage that only *50%* of the sales force met their FY2018 quotas and, thus, the pipeline was "way too low" because it was depleted by about 25-30%. ¶¶213, 273. Thus, Defendants were aware in real time that the Company's decision to keep lead generation spending flat had negatively impacted the pipeline and stifled new customer acquisition.

As with lead generation, Nutanix also concealed significant headwinds affecting its other "key" productivity "input": salespeople. Nutanix's sales teams are divided into several groups, each differentiated by the size of its targets, including Enterprise and Global accounts (large accounts such as Fortune 500 companies) and Commercial accounts (medium and smaller accounts). ¶¶119-120. As discussed below, the sales teams were plagued by severe attrition and inadequate hiring during the Class Period, which reduced the number of more experienced and productive sales representatives, and, in turn, reduced Nutanix's sales productivity. ¶¶151-192.

During the Class Period, an existing customer could be counted multiple times in the "total end customer count" that Defendants reported to investors, which gave the misleading impression that Nutanix was adding more new customers than it actually was. ¶132. Sales to existing customers were less expensive to pursue because the customer was already educated on Nutanix products. ¶121. Therefore, Nutanix redirected resources away from new accounts by restricting

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO                                            - 7 -
4878-9417-4535

financial support, insufficiently staffing new accounts, and providing existing Enterprise customers with first priority at marketing events. ¶¶137-145. These actions led to missed quotas, customer frustration, and lost sales. ¶¶148-151. As a result of these actions, CWs confirmed that by summer 2018, 80% of Nutanix's sales came from 15% of customers who were mainly *existing* accounts, rather than new leads, further exacerbating the pipeline decline. ¶133.

Pandey and Williams knew whether the number of customers were genuinely *new* during the Class Period because they publicly reported on Nutanix's "end customer" count, they sent and received e-mails and documents discussing customer growth, and their compensation was tied to a "New Customer Adds" metric that focused on "new" "logos." ¶135, §III.A.1, *infra*. Defendants took affirmative steps to conceal the declining "brand-new clients" (¶318) and pipeline by flatly denying in response to analyst questions that new customer growth was declining (¶348).

Although Defendants touted they "significantly *increased*" the number of "sales and marketing personnel" every quarter (¶¶296, 327, 356, 379, 391), internal documents and CWs establish that Nutanix suffered exorbitant sales force turnover at every level Company-wide, from management down to sales engineers (¶¶151-175; §III.A.2, *infra*). A major cause of attrition in the Class Period was Nutanix's unattainable sales quotas. ¶¶165-174. Sales quotas were approved by Pandey, came from the "top-down[,]" and largely ignored what salespeople were actually forecasting based on "market dynamics" and "realistic targets." ¶¶166, 170. Further, despite transitioning to a software model early in the Class Period, sales quotas were still based on old metrics that included a hardware component for which salespeople would not receive credit. ¶171. Internal documents and CWs confirmed that Nutanix was largely unsuccessful in meeting sales quotas and targets throughout the Class Period. ¶¶165-174; §III.A.1, *infra*.

Demoralized salespeople who could not meet unrealistic quotas quarter after quarter left Nutanix in droves throughout the Class Period, and the Company was unable to adequately replace them through hiring. This is evidenced by internal Company documents showing rampant attrition and the failure to adequately hire replacement salespeople, CW statements corroborating the same, and Williams' later public admission that the Company failed to meet hiring goals "over the *past few quarters*[.]" ¶¶151, 161-162, 188, 404; §III.A.2, *infra*.

Nutanix's cycle of attrition and (attempted) replacement occurred while it was rolling out scores of new products. According to Nutanix's quarterly statements, salespersons did not become "fully ramped" to sell Nutanix's expansive inventory until "around the time of the start of their fourth quarter[.]" *See, e.g.*, ¶¶296, 327. Thus, even when Nutanix hired new salespersons, they were never fully productive because they frequently left after six-to-twelve months of employment. ¶151. For example, on May 8, 2018, Williams sent an e-mail noting that "new reps in [North America] are lagging a fair amount in their initial productivity" and that ramped representatives accounted for only 53% of the total representatives in the region. **Ex. 18**; ¶180. Similarly, on May 15, 2018, Williams received an e-mail warning that attrition was "impacting our # of ramped reps" and "lower[ing] our ramped reps as a % of active reps." **Ex. 19**; ¶181; *see also* §III.A.2, *infra* (other internal Company documents discussing problems with productivity tied to attrition).

As a result of fewer new sales leads, Nutanix struggled to meet forecasts during the Class Period. Internal Company documents and CWs from three of Nutanix's five sales regions confirmed that it was a Company-wide practice to pull-in sales each quarter. ¶¶241-265; §III.A.3, *infra*. Pull-in sales advance future orders to the present quarter. However, without an expanding pipeline of customers (which Nutanix lacked), their pull-in scheme cannibalized future sales, and existing customers become "over-procured." ¶241. Nutanix pulled-in sales for both hardware and software products, and for every type of customer (Commercial, Global, Enterprise). ¶243. Internal documents show that Defendants' pull-in transactions were anything but normal business as usual and were ***specifically designed to compensate for, and mask reduced demand*** and give investors false impressions of, continued growth. *See infra* n.19.

CW1 stated that prior to each quarter end, sales representatives in CW1's region received an e-mail from the Regional VP, copying Attanasio or Lautenbach, requesting that they collectively pull in between $3.5 to $12 million in sales per quarter, and for two quarters in FY2018 it would have been ***impossible*** for the Company to hit its guidance without pulling in $3.8 million in CW1's region. ¶245. At the end of each quarter in FY2018, the entire sales organization received an e-mail, copying Pandey, encouraging representatives to "get creative" and bring any

potential deal that could be pulled-in to quarterly War Room meetings that Pandey attended. ¶246. CW8 corroborated CW1, stating Nutanix's SVP of Sales determined the amount of quarterly revenue to be pulled in, and ***Pandey approved the amount***. ¶247.

CW7 received a call in August 2018 from a ***Senior Director*** of Consulting Services stating that Nutanix's projections were based on a "shell game[,]" and the Company's actual growth for FY2018 was only about 10%, as compared to the reported 40%, because 30% of the reported growth was accomplished by pulling in sales. ¶249. This Senior Director expressed concern that Nutanix was going to "run out of that backlog" to meet quarterly forecasts. *Id.* CW8 participated with Pandey and Williams in quarterly revenue meetings in 2018 during which they confirmed revenue was declining and Nutanix had to pull-in in revenue through "backlog." ¶278.

Defendants' "shell game" eventually caught up to them when, on February 28, 2019, Defendants issued lower-than-expected forecasts for the next quarter due to a severely depleted pipeline and insufficiently staffed sales force. ¶¶400-413. On May 30, 2019, Defendants announced that Nutanix had missed revenue and billing targets due to continuing sales execution issues that were far worse than what Defendants had previously represented. ¶¶431-438. Upon the news, the Company's stock price significantly declined causing investors to suffer damage. ¶¶414, 440.

## III.   ARGUMENT

Defendants' Motion challenges only Plaintiffs' falsity and scienter allegations.[4] In ruling on the motion, the Court must accept Plaintiffs' allegations as true and construe inferences in Plaintiffs' favor. *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 966 (9th Cir. 2014); Order at 4.

### A.   Plaintiffs' Adequately Allege False and Misleading Statements

Misleading statements "give a reasonable investor the impression of a state of affairs that" materially differs "from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "[O]nce defendants choose to tout positive information" they cannot

---

[4] Defendants thus waived any challenges to the remaining elements and are prohibited from raising them, or any other new challenges, in their reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The . . . court need not consider arguments raised for the first time in a reply brief.").

mislead – they must also disclose "adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018).

### 1. Misstatements Regarding New Customers and Pipeline

In the Order, the Court held Plaintiffs adequately alleged that several statements regarding purported new customer growth were false and misleading due to "concerns throughout the company regarding the company's pipeline of new customers." *Id.* at 12.[5] The numerous internal documents and e-mails attached to the Complaints further corroborate the Order. They show that Defendants were highly concerned about both the growth and quality of the pipeline, including the failure to meet pipeline growth targets throughout the Class Period. For example:

- On November 28, 2017, two days prior to the Class Period, when Defendants falsely assured investors that new customer acquisitions "will pop up naturally" in Q2 FY2018, Williams sent an e-mail to Pandey and others regarding the Company's pipeline generation in Q2 FY2018. Williams stated, "I'm sure you guys are well aware but it appears ***we are running quite a bit behind our pipeline generation target*** for Q2 [FY2018] – hopefully you guys are all over this." **Ex. 2**; ¶¶194, 289.

- On January 3, 2018, after receiving an update that pipeline was well below target and historical average progress for Q2 FY2018, Williams e-mailed Pandey acknowledging that pipeline growth was "***not really going in the right direction***" and that the current "trend . . . is going to become a ***real problem***." **Ex. 2**; ¶195. Pandey asked whether Nutanix needed to "start a war-room" to address the pipeline shortfall. *Id.* That same day, Pandey and Williams received an e-mail stating that Q2 FY2018 pipeline creation was $85 million behind the previous quarter and that the "***[l]ack of pipeline creation is showing up*** in Q3'18 projections[.]" **Ex. 2**; ¶196.

- On January 7, 2018, Attanasio sent an e-mail stating, "One point that you are going to hear a LOT on in the coming days/weeks.. ***WE are short on Pipeline…very short***.. We need EVERY REP focusing on prospecting, building our pipeline.. We do NOT have enough to make our 3rd qtr number…." **Ex. 32**; ¶198.

---

[5] Specifically, the Court found that Plaintiffs adequately alleged the falsity of statements: (1) a March 1, 2018 statement that Nutanix "add[ed] a record number of new customers" in Q2 FY2018 (Order at 12; re-alleged in the Complaints at ¶309); (2) a March 1, 2018 statement regarding Nutanix's "huge contribution to overall mid-market customer acquisition" (Order at 12; ¶315); (3) a May 24, 2018 statement that Nutanix "actually had a renewed focus with the channel on new customer logos" (Order at 12; ¶346); (4) a May 24, 2018 statement that Defendants were "really excited about what's happening in the channel with the pipeline for new logos . . . So there's been, if anything, an acceleration or focus there, from a new customer" (Order at 12; ¶346); and (5) May 24, 2018 statements denying that growth of smaller customers was negatively impacted by the Company's transition to software-only products (Order at 3; ¶348).

- On January 20, 2018, Pandey and Williams received data showing "pipe creation shortfalls" which were described as "a serious pipeline issue." **Ex. 30**; ¶199.

- On February 2, 2018, Williams and Pandey were told that worldwide pipeline creation ended substantially (more than 25%) behind target for Q2 FY2018. **Ex. 34**; ¶201.

- A February 8, 2018 e-mail stated that Nutanix's deficient pipeline generation in Q2 FY2018 "now has the attention of our Board and they (and DP [Pandey]/Duston [Williams]) want us to come to that board meeting on Feb 28 with a deeper dive." **Ex. 3**; ¶202; *see also id.* ("non-G5K, commercial was particularly soft," including "non-G5K New Business . . . down materially Q1 [FY2018] to Q2 [FY2018]"). The e-mail was forwarded to Williams and Pandey the same day. **Ex. 35**; ¶202.

- On February 14, 2018, Pandey and Williams received an e-mail stating, "Our net new customers count has been stagnant *over the last several quarters*." [*i.e.*, before the Class Period even began]. **Ex. 36**; ¶203.

- On February 28, 2018, the day before misstatements regarding New Customer Adds, Pandey was informed that "New" pipeline generation was short of goal, down quarter-over-quarter by about 28%, and "weak" "overall." **Ex. 37** at -286; ¶204.

- On April 16, 2018, Nutanix executives discussed the "[p]roblem" that 46% of the sales pipeline was over 180 days old. *See* **Ex 40**; ¶207 n.32.

- On April 27, 2018, an e-mail was sent to members of the Nutanix sales force stating, "Team, in a meeting today with Dheeraj [Pandey], *there continues to be a concern about Pipeline*. . . . Specifically, *total pipeline*. We are going to have a MUCH more disciplined approach to pipeline, pipeline progression, etc. . . . . Our challenges include being short on total pipeline, *over 40% of our pipeline is now over 180 days old*, we have reps who have not done ANY, ZERO, prospecting in the last few qtrs, making their pipeline unacceptable. . . ." **Ex. 39**; ¶207.

- On May 1, 2018, Pandey observed that Nutanix was "short" in Q3 FY2018 with respect to "results, and Pipeline." **Ex. 41**; ¶208.

- On May 2, 2018, Williams received an e-mail stating that Q3 FY2018 had the worst sequential decline in software bookings in the Company's history. **Ex. 42**; ¶208.

- On July 16, 2018, a Nutanix executive sent an e-mail stating that the Company had a "~$1B Pipeline Gap." **Ex. 46**; ¶211.

- On July 22, 2018, a Nutanix executive observed: "We are now Officially behind *almost every quarter over past 2 years* [*i.e.*, since before the Class Period]. . . *This is Disturbing on every level and makes me really concerned*." **Ex. 27**; ¶212.

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- 12 -

- On August 21, 2018, Pandey and Williams received a pipeline model update for Q1 FY2019, to which Williams responded, "I tried to find something good here but . . . the model . . . is a ***total disaster***." **Ex. 49**; ¶218.[6]

Contrary to Defendants' assertions in their Motion, those pipeline concerns were all expressed during the Class Period before they made their false and misleading statements. The negative trends continued thereafter, for example:

- On October 11, 2018, Williams sent an e-mail to Pandey observing that "[t]he pipeline gap is getting larger week by week . . . ***there seems to be little to no good news with the overall pipeline progress***." **Ex. 56**; ¶223.

- On November 1, 2018, a deck for Pandey's staff meeting stated that Defendants had failed to meet pipeline targets "***the past five quarters***" [*i.e.*, a stretch that began in Q1 FY2018, prior to the Class Period], and were again expected to miss targets in Q2 FY2019. **Ex. 25**; ¶227.[7]

- On November 13, 2018, Williams sent an e-mail to Pandey stating that "there has been NO new customer pipe increase ***since Q1'18*** [*i.e.*, before the Class Period began] for pipe coming into the quarter and pipe created in the quarter – ***it's no surprise that new customer logos / bookings are waning***." **Ex. 29**; ¶228. Regarding pipeline quality, Williams questioned whether "deals are taking longer to close or pipe is just getting 'created' as placeholders." *Id*.

- A November 15, 2018 "Forecast Call Highlights" chart stated that "Everyone is Focused on Pipeline Shortage[.]" **Ex. 21**; ¶228 n.36.

- On December 20, 2018, Williams observed that "[w]e're falling further and further behind" and there is "little pipeline growth occurring." **Ex. 61**; ¶229.[8]

---

[6]    *See also, e.g.*, **Ex. 73**; ¶465 (November 21, 2017 e-mail to Williams stating, "we are headed in the wrong direction" according to two internal models); **Ex. 14**; ¶161 n.27 (February 12-13, 2018 presentation: "Americas North – 2018 QBR" including "Pipeline concerns –Q3/Q4" reflecting $37M pipeline shortfall. "Either way, it's not good."); **Ex. 34**; ¶201 (February 2, 2018 e-mail to Williams and Pandey stating that worldwide pipeline creation ended substantially (more than 25%) behind target for Q2 FY2018); **Ex. 6**; ¶205 (on or about February 17, 2018, Williams received a Q3 FY2018 Forecast Deck showing that Nutanix's pipeline had deteriorated 34% and fallen $187 million behind target); **Ex. 8**; ¶157 (February 18, 2018 presentation including "FY 18 Forecast vs. Prior Years" chart for "Duston Only" reflecting lower FY18 forecasted growth year-over-year for bookings, billings, and revenue).

[7]    Specifically, the deck for Pandey's meeting showed that Defendants missed global pipeline generation growth targets by the following amounts during the Class Period: (1) Q2 FY2018: 24.0% target (from $872M to $1,081M) vs. 12.3% actual (from $872M to $765M); (2) Q3 FY2018: 35.4% target (from $765M to $1,036M) vs. 21.3% actual (from $765M to $928M); (3) Q4 FY2018: 39.5% target (from $928M to $1,295M) vs. 18.0% actual (from $928M to $1,095M); and (4) Q1 FY2019: 18.2% target (from $1,095M to $1,294M) vs. 5.7% actual (from $1,095M to $1,157M). *See* **Ex. 25** at 45.

[8]    In addition to supporting the falsity of the statements upheld by the Court, Plaintiffs' allegations and exhibits support the falsity of several other statements regarding new customers

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO                                                                 - 13 -
4878-9417-4535

Defendants ignore these allegations and exhibits. Tellingly, they address only nine of Plaintiffs' 75 total exhibits, ignoring the remaining 66, and are now precluded from raising new arguments for the first time on reply. *See Zamani*, 491 F.3d at 997. Instead, they rely almost exclusively on one extrinsic exhibit (Exhibit 3) from which they cherry pick data to manufacture charts and argue that their statements were neither false nor misleading. Mot. at 10-14, Def. Ex. 3. Because Plaintiffs' allegations must be taken as true and inferences drawn in Plaintiffs' favor, Defendants cannot rely on alternative facts or interpretations to dispute Plaintiffs' allegations at the motion to dismiss stage. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (courts must "accept all factual allegations . . . as true" and construe all reasonable inferences in plaintiffs' favor); *Petrie*, 761 F.3d at 966 (same). Defendants' attempt to advance their counter-factual narrative is premature and provides no basis for the Court to reconsider its prior ruling in the Order. *See Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 925-26 (9th Cir. 1988) (motions or reconsideration are generally disfavored, and are not the place for parties to make new arguments not raised in their original briefs); *Garcia v. City of Napa*, No. C-13-03886 EDL, 2014 WL 342085, at *1 (N.D. Cal. Jan. 28, 2014) ("Nor is reconsideration to be used to ask the Court to rethink what it has already thought.").

Even if considered, however, Defendants' fact-based argument fails. First, Defendants' argument that "total" pipeline growth was "significant" (Mot. at 11-14) is contradicted by their own Exhibit 3, wherein Defendants selectively include only data through the end of FY2018. It shows that total pipeline growth actually ***declined every quarter*** from Q1 FY2018 to Q4 FY2018

---

that Plaintiffs have newly added to, or re-alleged in, the Complaints. Specifically, the Complaints allege: (1) a November 30, 2017 statement denying problems with new customers: "On the customer account, yes, I wouldn't look too much into that. Q1 is always a little soft from a customer perspective, but we added a decent amount of customers there and Q2 will pop up naturally, which it usually does quite a bit from the Q1 level." (¶289); (2) a March 1, 2018 statement that Nutanix "increased our number of Global 2000 or G2K customers" (¶314); (3) a March 1, 2018 statement that "Customer adds. Yes, I think the channel is definitely kicking in, especially in the mid-market" (¶315); (4) statements repeatedly touting new customer growth on December 13, 2017 and March 1, March 12, March 15, June 12, August 30, and December 10, 2019 (¶¶299, 309, 314, 318-319, 330, 359, 371, 394); and (5) statements downplaying pipeline generation problems on February 28, 2019 (¶¶425-426).

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO                                                    - 14 -
4878-9417-4535

on a year-over-year basis.[9]  Year-over-year pipeline growth *is more meaningful* than sequential pipeline growth because it accounts for Nutanix's seasonal sales trends and thus provides better comparative data.

*Second*, Defendants' focus on "total" pipeline, rather than pipeline *generation*, is misleading because total pipeline includes the stale, unconverted pipeline accumulated from prior quarters, as a result of sales productivity declines, which was less likely to translate to "closed" (*i.e.*, actual) sales than newly generated pipeline.  This lack of pipeline quality is evidenced by internal documents attached to the Complaints, wherein Defendants bemoaned that pipeline "hygiene" was poor and nearly half of the pipeline (46%) was stale.  *See* **Ex. 40**; ¶207 n.32.  Indeed, during a meeting with Pandey on April 27, 2018, Nutanix executives discussed "continue[d] . . . concern about Pipeline.  Specifically total pipeline. . . [O]ver 40% of our pipeline is now over 180 days old[.]"  **Ex. 39**; ¶¶207, 478; *see also* **Exs. 29, 46, 48-49, 59, 75**; ¶¶211, 217-218, 225 n.35, 228, 478 (additional internal documents establishing poor pipeline quality).[10]

*Third*, aside from the quality issues, Defendants missed pipeline generation targets throughout the Class Period.  *See* **Ex. 25** at 45; *supra* n.7 (detailing the quarterly target misses).  This was internally recognized as a major problem by the Company's most senior executives, including Williams and Pandey.  *See* §III.A.1, *supra*.  In addition to missing targets, pipeline generation had a steep sequential decline in Q2 FY2018, the first quarter of the Class Period, when Defendants began to mislead the market regarding purported new customer growth.  *See* **Ex. 25** at 45 (showing a 29% pipeline generation decline from $872 million in Q1 FY2018 to $765 million in Q2 FY2018).  Moreover, Defendants' own Exhibit 3 shows that pipeline generation growth

---

[9]  Specifically: (1) in Q1 FY2018, total pipeline grew 93.73% from Q1 FY2017 ($941M to $1,823M); (2) in Q2 FY2018, total pipeline grew 93.42% from Q1 FY2017 ($1,109M to $2,145M); (3) in Q3 FY2018, total pipeline grew 80.96% from Q3 FY2017 ($1,208M to $2,186M); and (4) in Q4 FY2018, total pipeline grew 59.80% from Q4 FY2017 ($1,582M to $2,528M).  *See* Def. Ex. 3 at 2.

[10] Defendants' Exhibit 3 also supports a lack of quality by showing that Nutanix's win rates as to pipeline generated in FY2018 either declined or remained stagnant (zero growth) in every quarter on a year-over-year basis.  *See* Def. Ex. 3 at 2.

declined in all but one quarter from Q1 FY2018 to Q4 FY2018 on a year-over-year basis, and remained significantly below the pre-Class Period level throughout.[11]

Defendants also claim that alleged statements about new customers are not actionable because they are immaterial puffery and/or opinion statements.  Mot. at 19-21.  In *In re Quality Sys., Inc. Sec. Litig.*, the Ninth Circuit rejected a similar argument when confronted with facts similar to those here.  865 F.3d 1130 (9th Cir. 2017).  The Court held that alleged statements "about the current and past state of QSI's pipeline went beyond 'feel good' optimistic statements. [Defendants] . . . did not just describe the pipeline in subjective or emotive terms.  Rather, they provided a concrete description of the past and present state of the pipeline and growth.  They repeatedly reassured investors during the Class Period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters.  *Id.* at 1144.  Therefore, the statements were actionable because they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Id.*[12] (alterations in original).

Here, as in *Quality*, the challenged statements were all assertions of fact that conveyed specific, material information about purported pipeline and new customer growth (*see supra* nn.5, 8) when, in fact, the pipeline for new customers was suffering in terms of both quality (*e.g.*, "over 40% of our pipeline is now over 180 days") and quantity (*e.g.*, the critical Americas division "had its lowest new logo count last quarter in about 8 quarters," "new logo pipeline" was only 32%

---

[11]  Specifically: (1) in Q1 FY2018, pipeline generation grew 63.39% from Q1 FY2017 ($489M to $799M); (2) in Q2 FY2018, pipeline generation grew 48.28% from Q2 FY2017 ($524M to $777M); (3) in Q3 FY2018, pipeline generation grew 33.00% from Q3 FY2017 ($709M to $943M); and (4) in Q4 FY2018, pipeline generation grew 50.07% from Q4 FY2017 ($717M to $1,076M).  *See* Def. Ex. 3 at 2.

[12]  Defendants' reliance on *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022), to advance their puffery argument is misplaced.  The *Align* standard is the same standard that the Ninth Circuit reiterated in *Quality*.  Similar to *Quality*, *Align* stated that "general statements of optimism made ***against a clearly pessimistic backdrop may form a basis for a securities fraud claim[.]***"  *Id*. at 1099 (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)).  Thus, even if the challenged statements here are viewed as "general statements of optimism," they are actionable because internal documents and e-mails attached to the Complaints, as discussed above, show a "clearly pessimistic backdrop" contradicting those statements, which clearly distinguishes the present case from the conclusion reached in *Align*.

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- 16 -

when Defendants targeted 80%, and "we are not satisfied with this new logo pipeline growth rate"). *See* **Exs. 39, 44-45**; *see also* §III.A.1, *supra* (numerous other internal documents reflecting new customer and pipeline problems). That Defendants repeatedly emphasized and highlighted such statements during ***every*** quarter during the Class Period, often in response to specific analyst questions, further demonstrates that they were material and not puffery. *Quality*, 865 F.3d at 1144.

Further, even if the challenged statements were "opinions" (Mot. at 19-20), they are still actionable based upon the U.S. Supreme Court's clear holding in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318 (2015). As courts in this District have found, "Under *Omnicare*, liability can attach to opinions when . . . there are particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1115 (E.D. Cal. 2017) (citing *Omnicare*, 135 S. Ct. at 1326-27, 1332). Here, Plaintiffs adequately allege particular and material omissions of fact regarding undisclosed problems with Nutanix's new customer growth and sales pipeline (as evidenced by many internal documents, §III.A.1, *supra*) that made Defendants' positive statements on those subjects false and misleading.

Defendants' contention that the alleged statements were not false because they were numerically accurate is equally meritless. Mot. at 14-17. The Court already rejected this argument, holding that the upheld statements "were materially misleading in light of the alleged concerns throughout the company regarding the company's pipeline of new customers." Order at 12. Those alleged concerns are further established by the evidence cited herein. *See* §III.A.1, *supra*. And, as the Ninth Circuit held in *Schueneman v. Arena Pharms., Inc.*, "once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." 840 F.3d 698, 706 (9th Cir. 2016) (alterations in original); s*ee also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("Some statements, although literally accurate, can

become, through their context and manner of presentation, devices which mislead investors.").[13] Here, as the Complaints establish, Nutanix's new customer pipeline suffered from severely deficient growth and quality throughout the Class Period, but Defendants misled investors by failing to disclose this and instead touted positive information on new customer growth.

Defendants also dispute the Order's interpretation of these statements and contend that the upheld statements referred only to **current** new customer counts rather than the **pipeline** for new customers. Mot. at 14, 17. Defendants' argument ignores that one such statement directly referenced the pipeline, misleadingly stating that they were "really excited about what's happening in the channel with the **pipeline** for new logos[.]" Order at 12; ¶346. Defendants miss the point as to the other statements because, as discussed above (and held by this Court), they were misleading by giving investors the impression that new customer growth and demand was robust while failing to disclose then-existing material facts regarding the pipeline growth and quality problems that were known to Defendants at the time. *See Arena Pharms.*, 840 F.3d at 706.[14]

[13]   *See also, e.g.*, *In re Twitter, Inc. Sec. Litig.*, No. 16-cv-05314-JST, 2020 WL 4187915, at *8-10 (N.D. Cal. Apr. 17, 2020) (holding that undisclosed trends showing a declining monthly active user base rendered a statement suggesting a "positive" trend in monthly active users misleading because the undisclosed decline "would have altered the total mix of available information" to investors); *Constr. Workers Pension Tr. Fun[d] – Lake Cnty. v. Genoptix, Inc.*, No. 10cv2502-CAB (DHB), 2013 WL 12123841, at *1, *4-5 (S.D. Cal. Mar. 22, 2013) (sustaining certain statements touting "continued strong demand" where then-existing information showed that "sales representatives from all [of Genoptix's] regions were experiencing declining customer demand and negative sales trends [were] unique to Genoptix").

[14]   Defendants' bullet-point citation to distinguishable cases (Mot. at 15-16) does not alter this Court's prior holding. For example, in *In re Verifone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993), the court dismissed statements allegedly concealing that "future prospects may not be as bright as past performance" because there were no allegations that defendants withheld "financial data or other existing facts from which forecasts are typically derived." *Id.* at 869. In contrast here, Defendants concealed not just vague "future prospects" but existing facts, including that – at that time – the Company had fallen 28% short of pipeline goals and Defendants had recognized they had a "serious pipeline issue," pipeline generation was "weak," pipeline was "not really going in the right direction," and pipeline generation had been "behind almost every quarter of the past 2 years." **Exs. 27, 30, 37**; ¶¶195, 199, 204, 212. Likewise, in *Align*, the court held that a statement regarding the company's "historical growth rate in China over at least the prior year if not longer" did not give a misleading impression that "differ[ed] in a material way from the one that actually exists." 39 F.4th at 1099. But here, Defendants' statements were addressing and concealing then-existing information about the pipeline and new customer growth. As just one example, during the March 2018 Call, when Defendants touted adding "a record number of new customers" in Q2 FY2018, they concealed that, in the same quarter, pipeline generation had declined by $107 million (**Ex. 28** at 8), thereby "giv[ing] a reasonable investor the impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Align*, 39 F.4th at 1099. Defendants' reliance upon *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045 (N.D. Cal.

Finally, all of Defendants' arguments are contradicted by their Class Period ending admissions that the pipeline for new customers was an existing and material problem throughout the Class Period. After Nutanix missed its pipeline target in Q2 FY2019, Defendants issued disappointing guidance for the following quarter, Q3 FY2019, as to revenue, bookings, and billings. ¶¶400-401. Williams attributed this disappointing guidance in part to "the impact of inadequate marketing spending for pipeline generation" ***dating back to Q4 FY2017*** and Nutanix's failure to meet its internal pipeline "targets." ¶¶402, 405. Then, Defendants revealed that Nutanix missed revenue and billings guidance in Q3 FY2019 guidance due to the same pipeline problem, and added that the problem necessitated ***an entire "rebuild" of the pipeline***. ¶¶431-432, 434.[15] Defendants' new, self-serving spin on the facts contrary to these admissions should be rejected.

### 2. Misstatements Regarding Sales Productivity and Sales Force Hiring

In the Order, the Court held that Defendants' Class Period statements regarding "record sales productivity" (March 1, 2018) and increased "ramped rep sales productivity" (August 30, 2018) were adequately alleged to be "misleading to a reasonable investor in light of Plaintiffs' allegations that Nutanix's sales force was experiencing high levels of attrition, sales people were unable to meet quotas and sales productivity was in fact poor." *Id*. at 13; ¶¶313, 368. The Complaints include several new documents supporting the Court's finding, along with the same

---

2016), is also unavailing. The statements at issue there involved unchallenged historical data, general statements of optimism, and internal forecasts of future performance. *Id.* at 1055. In contrast, Plaintiffs allege that the new customer statements at issue were inaccurate because they included sales to existing customers (¶¶131-135), involved specific, material facts rather than puffery *see supra* nn.5, 8), and failed to disclose then-existing problems with new customer growth and the sales pipeline (§III.A.1, *supra*), rather than forecasts of future performance. Finally, *In re Dropbox Sec. Litig.*, No. 19-cv-06348-BLF, 2020 WL 6161502 (N.D. Cal. Oct. 21, 2020), is distinguishable because the court found that "accurate historical data" regarding paid users did not create a misleading impression regarding conversion rates absent "a single factual allegation" about user conversion rates either "directly – or even indirectly." *Id.* at *5, *7. In contrast, here, Defendants' new customer and pipeline statements created a misleading impression about their new customer pipeline, not some other metric that was not connected to the allegations.

[15] Defendants initially challenged these disclosures on loss causation grounds in their Motion for Partial Judgment on the Pleadings under Fed. R. Civ. P. 12(c) [ECF 270], but subsequently withdrew their motion after the TAC was filed [ECF 282], and have now abandoned their loss causation challenge altogether.

CW statements from the SAC. They show that the attrition and productivity issues persisted throughout the Class Period when the alleged statements were made. For example:

- On November 12, 2017, just before the Class Period began, a Nutanix executive expressed "concern[]" over attrition in one of the Company's U.S. regions given that "*the number of reps making goal & contributing to the revenue/margin goal is too low. . . . Only 50% of ramped rep made their number. This is a disturbing statistic.*" **Ex. 16**; ¶179 n.29. He further noted that "[m]y sense of the other areas in the US there is a similar concern the wave is coming." *Id.*; *see also id.* ("Only 12% of un-ramped rep made their number.").

- On January 8, 2018, Williams and Pandey were copied on an e-mail discussing that Nutanix was "currently not performing to" its productivity assumptions. **Ex. 23**; ¶189.

- On February 8, 2018, Williams received an e-mail stating that Nutanix did not have enough sales representatives ("46 heads short") to achieve sales targets for the second half of FY2018, which was expected to hurt sales productivity. **Ex 3**; ¶155.

- On or about February 17, 2018, Williams received a deck showing that attrition of sales representatives had spiked over 40% in Q2 FY2018 (the first quarter of the Class Period), representing the Company's highest quarterly attrition of sales representatives in over two years. **Ex. 6** at 5; ¶156.

- On February 23, 2018, Williams sent an e-mail attaching a presentation to the Nutanix Board (copying Pandey) showing that attrition among sales representatives increased significantly and the percentage of experienced sales representatives had declined significantly in Q2 FY2018. **Ex. 7** at 6, 9; ¶157.

- On April 27, 2018, a Nutanix executive relayed Pandey's concerns about the pipeline and added that "*we have reps who have not done ANY, ZERO, prospecting in the last few qtrs* [*i.e.*, a period beginning prior to the Class Period], making their pipeline unacceptable." **Ex. 39**; ¶207.

- A May 8, 2018 e-mail received by Williams stated that "ramped productivity per rep was 77K lower than what we had planned [in Q3 FY2018]. This drove $10M of bookings shortfall . . . . Unramped reps brought in $16M less than plan. . . . . So two issues are unramped as you mentioned, and also productivity was lower as well." **Ex. 17**; ¶179.

- On May 8, 2018, Williams sent an e-mail noting that "new reps in [North America] *are lagging a fair amount* in their initial productivity" and that ramped representatives accounted for only 53% of the total representatives in the region. **Ex. 18**; ¶180.

- On May 15, 2018, Williams received an e-mail warning that attrition was "impacting our # of ramped reps" and "lower[ing] our ramped reps as a % of active reps." **Ex. 19**; ¶181; *see also id.* (discussing the need to "[i]ncrease[] focus on enablement so that productivity for ramping reps increases").

- In July 2018, as part of the FY2019 planning process, Pandey met with Attanasio and Bill Broderson where Pandey reviewed a presentation stating, "[c]urrent spending levels and **efficiency metrics** leave us with a significant pipeline gap," demonstrating that sales productivity was affecting the pipeline. **Ex. 75**; ¶478.

- According to CW1, at a sales meeting attended by Pandey and Williams in August 2018, Attanasio told the entire sales organization that only 50% of the sales force had made their quota for FY2018 and, thus, the sales pipeline was suffering and in serious trouble. ¶214.

- On October 15, 2018, Williams remarked in an internal e-mail that "*it seems really hard to build a productive sales force with annualized attrition of almost 30%* for quotas carrying reps and 40% for inside sales[.]" **Ex. 20**; ¶182. A Nutanix executive responded, "We need to be more offensive imho - We can't have our top talent leave.. Any thoughts on programs or initiatives to help us would be welcomed." *Id.*

- A February 27, 2019 presentation approved by Pandey stating that there was a "gap to plan" on headcount that had "worsened since Q2'18[,]" meaning the first quarter of the Class Period. **Ex. 24** at 2; ¶191.

Relatedly, the Company's attrition and productivity problems were compounded by hiring problems. Accordingly, the Court found that two statements on May 24, 2018 were adequately alleged to be false and misleading: that Defendants executed the Company's hiring plan "flawlessly" and that the Company experienced "[s]trong success in our hiring." Order at 12-13; ¶¶337, 343.[16] Plaintiffs' amended allegations further support the Court's finding. For example:

- According to CWI, Attanasio stressed that Nutanix was not filling open sales positions fast enough at every one of the Company's quarterly All Hands meeting that took place in FY2018 (which began on August 1, 2017, prior to the Class Period) and FY2019 (until CW1 left the Company in January 2019). ¶187. Williams and Pandey attended all of those meetings. *Id.*

[16] The Court held that although these statements were adequately alleged to be false, the SAC did not adequately allege their scienter. Order at 17. For the reasons discussed in the scienter section below, the Complaints adequately allege a strong inference of scienter as to these statements based on several new documents attached to the Complaints. *See* §III.B.2, *infra*. Further, the Court should reject Defendants' second bite at a "puffery" defense, which it has already rejected . *Compare* Order at 13 ("[t]hese statements were misleading to a reasonable investor"), *with* Mot. at 29 n.24; *see also Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116, at *6-7 (N.D. Cal. Feb. 27, 2018) ("statements about the success of Wells Fargo[]" including a statement regarding "outstanding growth" were actionable because "there is a difference between enthusiastic statements" and "statements that are anchored in misrepresentations of existing facts"); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 844-46 (S.D.N.Y. 2019) (claim that "execution" was "flawless" not puffery because "a reasonable investor" could infer "that zero significant obstacles had occurred").

- A January 8, 2018 e-mail from Williams, copying Pandey, stated, "If we can't even hire to the current [hiring] plan why worry about a [hiring] surge?" **Ex. 23**; ¶189.

- On May 3, 2018, August 3, 2018, November 5, 2018, and February 5, 2019, Williams received Weekly Headcount Reports showing that total headcount and "Sales" headcount were below plan. **Exs. 10-13**; ¶¶159-160.

- A May 15, 2018 e-mail to Williams noted the "hiring shortfall in the past (*q1 & q2 specifically*)" (*i.e.*, the quarter prior to the Class Period and the first quarter of the Class Period) and discussed the need to "[h]ire more reps." **Ex. 19**; ¶181.

- A February 26, 2019 presentation approved by Pandey discussed the Company's "Direct Sales Rep Headcount and Hiring Challenge" throughout the Class Period and acknowledged that "[w]e continue to fall behind on hiring [sales representatives]." **Ex. 24** at 2; ¶191.[17]

Once again, Defendants rely on their manufactured charts from their improper Exhibit 3 in an attempt to dispute the facts and prove that sales productivity was strong and positive during the Class Period. Mot. at 13, 17-18. However, as noted, Defendants are free to make these arguments at trial, but are not entitled to dismissal on them as a matter of law. *See Tellabs*, 551 U.S. at 322-23; *Petrie*, 761 F.3d at 966. Even if considered, these extrinsic materials do not support reconsideration and dismissal of the previously upheld (or even previously dismissed) sales hiring and productivity statements because, as discussed below, they ignore key inputs and metrics and present others that actually support falsity when viewed in context.

*First*, Defendants' arguments ignore their own definition of sales productivity. Pandey made clear that the key "inputs [of sales productivity] are salespeople and pipeline spend, the demand gen spend." ¶93. As discussed above, those inputs were severely deficient and led to poor sales productivity. *See* §§III.A.2, 4, *supra*. Defendants instead now emphasize bookings (Mot. at 12-13), but this does not help them because their own Exhibit 3 shows that bookings per

[17] Based on the new materials attached to the Complaints confirming the negative sales hiring and productivity trends, Plaintiffs re-allege and add several false and misleading statements regarding productivity and hiring, in addition to the statements detailed above that the Court found were adequately alleged to be misleading. *See* ¶¶296, 327, 356, 379, 391 (December 13, 2017, March 15, 2018, June 12, 2018, September 24, 2018, and December 10, 2018 statements touting purported increases in sales and marketing personnel and informing investors that they should "expect continuing improvement over the coming quarters" in productivity); ¶305 (December 18, 2017 statement touting "very rapid[]" growth in "sales and sales teams throughout the world"); ¶343 (May 24, 2018 statement that "[d]uring the quarter, we added over 60 new sales teams, which is critical to our planned growth for future periods").

fully ramped rep and bookings per active rep experienced little to no year-over-year or sequential growth throughout FY2018, and, thus, reflect poor rather than strong productivity. *See* Def. Ex. 3 at 3.

*Second*, Defendants' attempt to cherry-pick data from Exhibit 3 related to sales headcount and terminations fails. Mot. at 3, 12, 18. At best, the data merely shows that sales headcount increased and voluntary terminations decreased at certain times without providing the necessary context. Contrary to Defendants' spin, the allegations and internal documents show that sales hiring, attrition, and productivity were trending poorly throughout the Class Period and recognized as major problems by Williams, Pandey, and other senior executives (*see* §III.A.2, *supra*), thus establishing the false and misleading nature of the alleged statements.[18] Illustrating their selective, self-serving approach, Defendants ignore "involuntary" terminations entirely, thus understating their manufactured attrition percentages. Mot. at 18.

*Third*, Defendants' arguments are again contradicted by their own public statements. After the Class Period, Defendants admitted that productivity, attrition, and hiring were indeed existing and material problems during the Class Period. Specifically, in a series of partial disclosures on February 28 and May 30, 2019, Defendants revealed, *inter alia*, that "***over the past few quarters***, we have not kept pace with our bullish sales hiring goals . . . [which] plays a role in our sales pipeline development"; there was "slower than expected sales hiring"; "our pipeline targets were further impacted by a shortage of sales reps in the first half of the fiscal year"; "guidance last quarter was less than expected as we needed to rebuild our pipeline by . . . increasing our focus on sales hiring and execution, especially in the Americas"; and "substantial sales leadership changes"

---

[18] *See also In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 943 (N.D. Cal. 2022) (sustaining misstatements touting positive sales hiring contrary to then-existing information showing that "[d]efendants had already fired the 'new logo' team responsible for building pipeline" and "implemented a hiring freeze of sales personnel," which "played a role in the company's ultimate failure to build adequate pipeline and meet its growth and revenue targets"); *In re Merit Med. Sys., Inc., Sec. Litig.*, No. 8:19-02326 DOC (ADSx), 2021 WL 1258590, at *8-9 (C.D. Cal. Mar. 16, 2021) (sustaining misstatements where defendants claimed to "maintain[] the sales force" and that "sales continue[d] to grow according to our expectations," despite then-existing facts showing that "over 20% of the sales force quit").

caused sales problems. ¶¶402, 404-405, 434-435, 438. These admissions show that Defendants' fact-based arguments are incorrect and simply manufactured in attempt to support their Motion.

### 3.    Misstatements Regarding Demand

Throughout the Class Period, Defendants regularly stated that the Company's supposedly strong quarterly financial results were the result of "***increased*** domestic and international ***demand*** for our solutions as we ***continued to penetrate and expand in global markets through increased sales and marketing activities***[.]" ¶¶299 (Q1 FY2018), 330 (Q2 FY2018), 359 (Q3 FY2018), 382 (FY2018), 394 (Q1 FY2019). In their Motion, Defendants hardly touch on these alleged misstatements, choosing instead to make only passing reference to "non-actionable puffery," and essentially relying on the Court's first dismissal order. Mot. at 26 (citing ECF 121 at 16).

However, given the evidence set forth in the Complaints that was not previously considered, it is clear Defendants' statements were misleading, and *Quality* is fatal to their desire for dismissal. 865 F.3d at 1143-44. As the Ninth Circuit concluded, "investors do not rely on . . . feel good monikers," but even "general statements of optimism, ***when taken in context***, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Id.* The Ninth Circuit held that even the statement "everything [was] going fine" was actionable securities fraud where the company knew that FDA approval would not come to pass. *Id.* (alterations in original).

Here, Defendants' demand statements were not innocuous (*i.e.*, merely "feel good monikers") but, rather, were specific statements about supposed increased demand due to their supposed (but false) penetration from "sales and marketing activities." In the context of the record now before the Court, Defendants' statements are actionable because they clearly misled investors about the Company's sales productivity and pipeline problems (*see* §§III.A.1-2, *supra*), which were tied to weakening rather than increased demand. *See, e.g.*, *Genoptix*, 2013 WL 12123841, at *4-5 (holding statements such as "these revenues reflect the ***continued strong demand*** for our high-quality service" were actionable where confidential witnesses reported then-existing "adverse trends in demand"); *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017

WL 3084274, at *8-12 (D. Or. June 27, 2017) (positive statements on customer demand were actionable based on allegations of an undisclosed decline in long-term demand).

An additional ground for finding such statements misleading is that Defendants were only able to report their quarterly growth in the face of these negative trends by pulling in sales from future quarters, and even inducing those pull-forwards through customer discounts and other rebates. Defendants' use of these practices during the Class Period is supported by numerous documents as well as CW allegations detailed in the Complaints.[19] These practices were unsustainable and resulted in inorganic, unsustainable demand and growth at the expense of the Company's future. Defendants fail to address the new documents supporting their pull-in scheme and how it was intended to achieve quarterly targets.

Previously the Court dismissed allegations of Nutanix's pull-in scheme as additional support for falsity. Order at 8-9. To be sure, Plaintiffs are ***not*** asking the Court to reconsider its holding that pull-ins are not fraudulent *per se*. Rather, when done to conceal negative trends in sales productivity and pipeline contrary to Defendants' public statements, they can contribute to

[19] *See, e.g.*, **Ex. 16** (November 12, 2017 e-mail stating, "We end up giving away large discounts and precious margin just to hit a sales objective."); **Ex. 62**; ¶257 (January 28, 2018 e-mail stating that, heading into the final 24 hours of Q2 FY2018, "it is clear we still have some work to do. . . . pull in every deal, and every dollar"); **Ex. 63**; ¶258 (January 29, 2018 e-mail copying Pandey regarding the need to "accelerate future sales opportunities where possible to bring them in this quarter"); **Ex, 42**; ¶259 (May 2, 2018 e-mail stating, "We did plenty of aggressive (some ugly) deals and rejected very few of these opportunities"); **Ex. 64**; ¶260 (August 2, 2018 e-mail: "I can appreciate many regions pulled things forward"); **Ex. 51** (August 29, 2018 e-mail observing a "higher pull-in bookings projection"); **Ex. 65**; ¶261 (September 13, 2018 e-mail including Pandey and Williams discussing the use of customer rebates and other incentives to "accelerate opportunities" from future quarters); **Ex. 67**; ¶263 (October 5, 2018 e-mail to Pandey stating, "Our prioritization is – 1. Q2 pull ahead . . . to close in Q1"); **Ex. 58**; ¶225 (October 18, 2018 Pipeline War Room Update stating "Launched pull-in channel program in Americas North and West"; "incent reps to pull in from Q2, etc."; "You CANNOT FORWARD THIS!!! Cannot!!"; "Duston [Williams] did not want this out!"); **Ex. 25** at 6 (November 8, 2018 presentation observing that 9% ($40M) of pipeline bookings goal ($420M) came from pull-ins); **Ex. 60** (November 12, 2018 e-mail to Williams stating: "Every deal is non-standard pricing" (*i.e.*, incentives/discounts); "[m]ost of this is for channel pull-in activities": "paying the channel via this 'one time' incentive . . . [t]hat's not sustainable and creates the wrong behavior in the big picture"); **Ex. 21** (November 15, 2018 presentation stating, "Motivating team to bring deals forward & 'worry about tomorrow, tomorrow'"); **Ex. 69**; ¶265 (February 1, 2019 e-mail discussing "borrow[ing] from future quarter pipeline" to hit "quota targets" and "creating compelling events in the present quarter, which enable the change of the close date from a date in that future quarter to a date in the present quarter"); **Ex. 22**; ¶185 (May 21, 2019 e-mail to Pandey and Williams stating that "we are feeling the pain in . . . uncontrolled discounting"); ¶¶246-247, 277 (CW allegations concerning Pandey's approval of pull-ins and participation in quarterly War Room meetings discussing pull-ins).

the misleading impression of sustainable, organic demand rather than unsustainable sales practices. In *In re Plantronics, Inc. Sec. Litig.*, for example, the plaintiffs alleged that statements regarding purported revenue growth were false because the growth was artificially inflated by unsustainable sales practices. No. 19-cv-07481-JST, 2022 WL 3653333, at *8 (N.D. Cal. Aug. 17, 2022). Judge Tigar agreed, finding that the defendants' "failure to disclose that the positive revenue results they touted were the byproduct of the undisclosed sales practice rendered Defendants' statements misleading, because the statements led investors to believe that the positive revenue results indicated organic growth instead of being the result of unsustainable sales." *Id.*[20]

Here, similar to *Plantronics*, numerous internal documents and CW allegations establish that Nutanix used undisclosed sales practices (pull-ins and abnormal discounts) to create the illusion of organic demand and revenue growth during the Class Period. In reality, such growth was not the result of "demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities[,]" as Defendants claimed (¶¶299, 330, 359, 382, 394), but, rather, was the result of stealing future quarters' planned sales in order to boost the current quarters' sales (*i.e.*, robbing Peter to pay Paul). As cited above, *Plantronics* and other courts within the Ninth Circuit find that similar allegations of demand and revenue growth based on unsustainable sales practices, rather than organic customer demand, are actionable.[21]

---

[20] *See also Murphy*, 2017 WL 3084274, at *8-9 ("Although there is nothing inherently wrong with the practice of aggressively pursuing quarterly results by pulling in sales . . . **such a practice may be misleading** to the extent it creates the impression of a sustainable demand for [a defendant's] products"); *In re Vocera Commc'n, Inc. Sec. Litig.*, No. C-13-3567 EMC, 2015 WL 603208, at *1 (N.D. Cal. Feb. 11, 2015) (falsity adequately alleged where "Defendants were consistently touting the growth of the company to investors as strong, consistent, and in line with the growth pattern of prior years" but in reality relied on "timing artifices to pump up quarterly sales figures"); *In re SupportSoft Sec. Litig.*, No. C 04-5222 SI, 2005 WL 3113082, at *5-6 (N.D. Cal. Nov. 21, 2005) (statements touting growth and performance were actionable because defendants changed software licenses to increase current revenue at the expense of future revenue, which "helped affirmatively disguise – the fact that SupportSoft's business was suffering").

[21] Defendants' attempt to downplay the pull-in amounts by comparing them to the amounts of "[p]ipeline for [f]uture [q]uarters" (Mot. at 22) is contrary to their own internal documents illustrating the significance of the pull-ins to quarterly results. *See supra* n.19.

#### 4.    Misstatements Regarding Lead Generation Spending

As this Court held, the SAC contained "multiple allegations that persuasively allege that Nutanix was not investing adequate resources into lead generation or new customer growth." Order at 7. The Complaints re-allege and bolster the same allegations. ¶¶125-135, 400, 402-403, 405-406, 408-411, 434-435. Despite this lack of spending, Defendants told the market precisely the opposite. On December 18, 2017, Williams stated, "Currently, we've been growing very rapidly as a company and then ***focused on funding that growth*** . . . . ***we're continuing to fund growth***." ¶305. On August 30, 2018, Williams stated, "When we sit back and analyze our spending plans, we take note of the following: our ***strong growth in spending*** will be completely self-funded by our free cash flow[.]" ¶368. As Defendants later admitted, they were not, in fact, "focused on funding that growth," "continuing to fund growth[,]" or seeing "strong growth in spending." ¶¶305, 368. Rather, before the Class Period started, Defendants decided to keep lead generation spending "flat" for the coming fiscal year (2018) and instead reallocate that money to R&D. ¶¶112, 121, 126, 230, 405, 411. Defendants made the same decision to reallocate capital away from lead generation heading into FY2019 as well. *Id*.[22]

Similarly, Defendants told investors throughout the Class Period that they were increasing "marketing activities related to brand awareness, promotions, trade shows and partner programs."[23] While the Court initially dismissed these statements for failing to break out lead generation from marketing, Plaintiffs respectfully submit that the types of marketing activities referenced were lead generation activities, as supported by Defendants' own words and the

---

[22]    *See also* **Ex. 5**; ¶126 n.20 (February 23, 2018, an e-mail to Pandey, copying Williams, showed that "Demand Gen Spend as a % of Bookings" was shrinking since Q4 FY2017); **Ex. 22**; ¶185 (May 21, 2019 e-mail to Pandey and Williams stating, "My unvarnished view is that we have severely under invested in enablement [*i.e.*, pipeline spending], channel and sales operations and we are feeling the pain in lower conversion rates, channel stagnation on deal registration, and uncontrolled discounting." Williams concurred, responding, "Yep.").

[23]    *See* ¶¶293, 324 ("we have continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs" on December 13, 2017 and March 15, 2018); ¶¶376, 294 (similar statements on September 24, 2018 and December 10, 2018); ¶¶299, 330, 353, 359, 382 ("we continue to penetrate and expand in global markets through increased sales and marketing activities" on December 13, 2017 and March 15, 2018, June 12, 2018, and September 24, 2018).

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO                                                    - 27 -
4878-9417-4535

contemporaneous interpretation of market participants. The market understood this from Defendants' public statements linking those activities to lead generation activities. ¶¶97, 102-103; *see also* 2017 Form 10-K filed September 18, 2017, at Item 7, MD&A ("[w]e supplement our sales efforts with our ***marketing program that includes*** . . . ***demand generation activities***"); 2018 Form 10-K filed September 24, 2018, at Item 7, MD&A (same statement). "[O]nce defendants chose to tout positive information to the market [increased marketing activities identified by Defendants as lead generation activities], they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information [the failure to increase lead generation spending] that cuts against the positive information." *Arena Pharms.*, 840 F.3d at 706; *see also Splunk*, 592 F. Supp. 3d at 941 (general statements about "sales and marketing" expenditures did not adequately disclose suspended investments and hiring "that could, and ultimately allegedly did, impact the company's ability to build adequate pipeline and meet its growth and revenue targets").

### 5. Misstatements Regarding the Transition to a Software-Defined Business Model

Plaintiffs adequately allege several other false and misleading statements regarding Nutanix's transition to a new business model focused on software subscriptions. ¶310 (March 1, 2018, "[o]ur shift toward a software-centric strategy ***is on track***"); *id.* (March 1, 2018, a purported rise in billings "demonstrat[ed] our progress as we transition to a software-centric business model"); ¶337 (May 24, 2018, "we are ***successfully executing*** on our transition to a software-defined business model"); ¶365 (similar statement on August 30, 2018); ¶366 (August 30, 2018, "our successful execution toward a software-defined business model").

These statements were misleading because the transition was hurt by Nutanix's undisclosed failure to properly train sales representatives on new products and adjust sales quotas to account for the fact that the new model generated less upfront revenue. ¶¶13-14, 18, 25, 136-151, 177-178. According to CW4, for example, Nutanix's sales teams were inadequately prepared to sell some of Nutanix's products due, in part, to having too many products on the market. Nutanix's sales team was simply "not built to handle the pipeline" and "[g]eneral sales readiness was poor." ¶178. Additionally, CWs 1, 3, 5, and 12, who represented four of the Company's five sales regions,

stated that the Company's sales representatives were given unreasonable sales quotas and insufficient resources, received customer account assignments that did not make sense, and suffered from disorganization. ¶¶136-150. CW11 explained that sales quotas were based on old metrics that pre-dated the software transition and, thus, included a hardware component and a higher projected sales amount. ¶171. As a result, the sales quotas were double what was achievable. ¶172. Consistent with these accounts, Defendants were forced to admit at the end of the Class Period that "friction in the field selling process" of the new subscription offerings reduced the Company's top-line financial results. ¶¶186, 307, 437-438.

Defendants misled investors by repeatedly telling investors that the business transition was on track without disclosing these material issues during the Class Period. *See, e.g.*, *In re BioMarin Pharm. Inc. Sec. Litig.*, No. 3:20-cv-06719-WHO, 2022 WL 164299, at *10-12 (N.D. Cal. Jan. 6, 2022) (statements that defendants were "on track" to launch a new product, despite undisclosed problems with the product that threatened the launch, were actionable); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816-18 (N.D. Ill. 2017) ("on track" statements actionable); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1076 (D. Minn. 2013) (same).

### B.    Plaintiffs Allege a Strong Inference of Scienter

As the Court has already held, Plaintiffs' prior allegations on their own "support an inference of scienter that is at least as strong as any opposing inference." Order at 15 (citing *Tellabs*, 551 U.S. at 326). The Complaints retain all the factual allegations that the Court relied on to find that the SAC adequately alleged scienter, including CW allegations and allegations that Pandey and Williams monitored and attended meetings concerning pipeline and sales productivity, "spoke regularly to investors" about the alleged issues,[24] and were eligible for bonuses tied to new customer additions. Order at 14-17.[25] This alone is fatal to Defendants' scienter argument. *Se.*

---

[24]    *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (confident responses "in the face of direct questioning" from analysts supported scienter); *Institutional Inv. Grp. v. Avaya Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009) ("when a defendant . . . is specifically asked, directly and repeatedly," about issues materially impacting a company, his "flat[] deni[als] . . . evincing certitude" in the face of contradictory evidence are supportive of scienter).

[25]    The Complaints also re-allege other facts supporting a strong inference of scienter, including: (1) Defendants' admissions regarding "flat" lead generation spend, under-hiring, sales execution "chaos" (¶¶448-459); (2) Defendants' orders to pull in sales into earlier quarters (¶¶480-487); (3)

*Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-00993, 2022 WL 3572474, at *60 (M.D. Pa. Aug. 18, 2022) (rejecting request to "revisit" scienter (and falsity) findings when evaluating "re-asserted Exchange Act claims[ ] previously sustained by the Court" on a later motion to dismiss).

Those allegations are only strengthened by the limited documents produced to date confirming more than the Individual Defendants' access to, and reckless disregard of, the negative trends but show they e-mailed each other and discussed the negative trends regarding new customer acquisitions, sales pipeline, attrition, hiring, and sales productivity at the time they made the misleading statements. Defendants largely concede scienter as they devote very little of their brief to it. Rather than arguing that they were unaware of, or not monitoring, pipeline and sales productivity trends, their brief is devoted to trying to convince the Court that business was booming and their statements, therefore, were not misleading. Mot. at 1-2, 10-18. Thus, rather than address the newly added documents, Defendants simply repeat their argument from an extrinsic document that total pipeline was increasing, which fails to refute their knowledge of the negative trends in new customer acquisitions, pipeline growth, and sales productivity. *See* §§III.A.1-2, *supra.*

### 1.    Previously Upheld Statements

***First***, Defendants argue that if the Court accepts their view of the facts that the trends were positive, then it should reconsider its finding that allegations like meetings supported scienter, because those meetings would have related to positive trends rather than concealed negative trends. But, the Court should not credit Defendants' interpretation of documents, when other documents "support the required inference of scienter." *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1109-10 (D. Nev. 1998) ("impermissible" to resolve arguments "regarding the meaning of the financial data" in exhibits to a motion to dismiss, as doing so would improperly draw

---

the fact Nutanix had previously kept lead generation flat in FY2017 (¶¶488-490); (4) executive terminations, including Attanasio (¶¶503-506); and (5) Defendants' motive to inflate their stock to use as currency to fund acquisitions and to conduct public notes offerings (¶¶509-523). The Court previously did not rely on these facts and arguments explicitly in finding a strong inference of scienter. However, to the extent they contributed to the necessary holistic analysis, Plaintiffs reassert and incorporate all previously asserted arguments regarding such facts, as if fully set forth herein. *See* ECF 127 at 17-25.

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- 30 -

"inferences in favor of the Defendants"). Rather, "[o]nce discovery is complete, this Court can consider alternative interpretations in light of the factual context and circumstances revealed through the discovery process." *Id.* at 1110 (sustaining 10(b) claim where plaintiffs obtained documents in a "related bankruptcy proceeding" where "some discovery" supported scienter and other documents "analyzed in isolation" were purportedly exculpatory).

**Second**, by their own admission, Defendants were aware that their decision to keep lead generation spending flat heading into FY2018, then again in FY2019, would negatively impact Nutanix's sales and pipeline because this same thing admittedly happened in FY2016 when Nutanix reduced its lead generation spending, causing a "slow year" until Defendants "woke up" and had to increase spending by 75%. ¶¶409, 488.

**Third**, Defendants' attempt to brush aside the panicked e-mails as nothing more than a "push . . . for better results" is at most a factual dispute for trial, but insufficient for judgment as a matter of law. Mot. at 28.[26] The contemporaneous e-mails and presentations contained in the newly produced documents demonstrate that the Individual Defendants were aware of, and concerned with, the disturbing, negative trends in declining pipeline growth generation and sales productivity – issues that were, in part, the result of inadequate investment in lead generation and due to high levels of attrition. Thus, as the Court correctly foresaw, Defendants' opposing

---

[26] Defendants argue that scienter is not pled because, despite their knowledge of negative information, they had no duty to disclose the information to the investing public. *Id.* But, Defendants' 30-year-old cases are distinguishable because, in those cases, the defendants had already adequately warned of the *very* risks at issue and those risks, unlike here, had not already materialized. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("no duty to disclose the precise extent of the anticipated revenue drop" after warning about expected lower sales); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515-16 (9th Cir. 1991) (no need to disclose "more detailed internal NGEN projections" after adequately disclosing risks in the prospectus). Defendants point to no such warnings here, nor could they. *See Quality*, 865 F.3d at 1146, 1148 (cautionary language "***must accurately convey appropriate, meaningful information***" and "***virtually no cautionary language" accompanying a non-forward looking false statement is adequate "short of an outright admission***"). *Fosbre v. Las Vegas Sands Corp.*, No. 2:10-cv-00765-APG-GWF, 2017 WL 55878, at *5-6 (D. Nev. Jan. 3, 2017) *aff'd sub nom. Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018), is distinguishable because, there unlike here, the defendant "said nothing" on the topic of the internal reports and therefore had no duty to disclose. And, unlike like in *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, Plaintiffs here allege that Defendants' misstatements of contemporaneous facts, as opposed to future projections, were misleading. No. 17-cv-05558-HSG, 2018 WL 4181954, at *7 (N.D. Cal. Aug. 31, 2018) (misstatements were all "positive projections" on Uber's driverless car program).

inference – "that the individual defendants were ignorant of the declining pipeline" at the time of their alleged misstatements – was, and remains, "implausible." Order at 16.

For example, documents produced to date confirm that Williams and Pandey knew of, and were concerned about, Nutanix's slowing new customer acquisitions and depleting sales pipeline due to the FY2018 "planning process" decision to keep lead generation spending flat. From late 2017 through the first half of 2018, Williams and Pandey received report after report showing serious pipeline creation shortfalls, far earlier than "mid-2018." Mot. at 12. Pandey and Williams were also informed that new customer growth had been stagnant for several quarters, dating back to prior to the beginning of the Class Period. ¶203.[27] More than failing to meet "highly ambitious goals" [ECF 292 at 28], these internal documents show an awareness of an unsustainable sales pipeline and lack of new customer growth. Indeed, as detailed above, Pandey and Williams were on numerous e-mails and attended meetings discussing these issues. *See* §III.A.3, *supra*.

Between the March 1, 2018 and May 24, 2018 misleading statements, Williams and Pandey continued to internally express concerns about lead generation and new customer acquisitions, due, in part, to insufficient pipeline creation in the prior quarter. ¶¶206-208. For example, on April 5, 2018, Pandey sent a Slack message to Attanasio expressing his "hunch … that Q3 is looking a bit like a struggle because of pipeline creation in Q2." ¶206. In an April 27, 2018 meeting with Attanasio, Pandey continued to express his "concern about . . . total pipeline," noting that the "challenges include" that "over 40% our pipeline is now over 180 days old." ¶207. On May 1, 2018, Pandey and Williams both acknowledged that the Company continued be "short" on lead generation and sales, with Williams summarizing to the Board that both "[n]ew customer

---

[27] That Defendants chose to gamble that Nutanix would recover through manipulative pull-ins is not a defense to scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-cv-3591-GHW, 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020) (finding scienter in pull-in scheme case because "[t]he fact that a gamble - concealing bad news in the hope that it will be overtaken by good news - fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.") (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

adds" and "[s]ales productivity" "did not work" in Q3 FY2018.  ¶208.  Yet, on May 24, 2018, Williams continued to mislead the market regarding lead generation and new customers adds.

Throughout the Class Period, Pandey and Williams remained aware of, and concerned about, a continually worsening pipeline.  For example, on June 1, 2018, Pandey and Williams were sent an e-mail noting problems with the "new logo pipeline growth rate" and that the "[c]hannel is now at about 32% for new logo pipeline overall contribution" where it should be "at 80%."  ¶210.  On August 21, 2018, after Pandey and Williams received a pipeline model update for Q1 FY2019, Williams responded, "I tried to find something good here but . . . the model . . . is a total disaster."  ¶¶217-218.  That same month, Nutanix's "Pipeline War Room Team" analyzed and reported on data regarding the Company's sales pipeline, sending frequent updates to Williams and Pandey showing abysmal pipeline creation.  ¶¶220-221, 225, 229.  On November 13, 2018, Williams sent an e-mail to Pandey stating that "there has been NO new customer pipe increase since Q1'18 [August 1 to October 31, 2017] for pipe coming into the quarter and pipe created in the quarter – it's no surprise that new customer logos / booking are waning."  ¶228.

These documents confirm what the Court previously found and leave no doubt "that **problems** with the pipeline were discussed."  Order at 15-16.  Defendants trivialize Plaintiffs' allegations as mere out-of-context "snippets" and ask the Court to accept Defendants' counsel's interpretation of the data to find that the statements at issue were not misleading.  This is improper.  *See Smilovits v. First Solar, Inc.*, No. CV-12-00555-PHX-DGC, 2012 WL 6574410, at *7 (D. Ariz. Dec. 17, 2012) ("While Defendants dispute the veracity of many of the allegations, factual disputes about specific, plausible allegations are not sufficient to dismiss a claim.").

***Fourth***, and relatedly, the Court held that Plaintiffs had adequately pled scienter with respect to sales productivity statements because "pipeline and revenue growth are dependent upon effective sales productivity," and Plaintiffs had already established scienter with respect to the pipeline issues. Order at 17.  The newly produced documents enhance Plaintiffs' prior allegations,

removing any doubt that Defendants knew sales productivity was suffering from a lack of experienced sales personnel.

For example, the newly added documents show that as early as January 8, 2018, Williams and Pandey discussed sales staffing issues, with Williams questioning the possibility of a "surge" in hiring when "we can't even hire to the current plan." ¶189. On February 8, 2018, Williams received an e-mail informing him that Nutanix was "46 heads [too] short" to achieve sales targets for the second half of FY2018 – a shortage that was expected to hurt sales productivity. ¶155. Two weeks later, Williams sent an e-mail attaching a presentation to the Nutanix Board (copying Pandey) showing that attrition among sales representatives increased significantly and the percentage of experienced sales representatives had declined significantly in Q2 FY2018. ¶157.

Despite dismal sales productivity, Defendants touted "record sales productivity" and "ramped rep sales productivity[.]" ¶¶313-315, 368, 370. Throughout the Class Period, Williams and Pandey were informed that sales productivity was getting worse, expected to get worse in the future, and was not offset by increased spending. As detailed above, Williams and Pandey were on numerous e-mails and reports discussing these problems. *See* §III.A.2, *supra*.

## 2. Previously Dismissed and Newly Added Hiring Statements

Next, the same documents noted herein provide new support for a strong inference of scienter with respect to misstatements about hiring. The Court previously held that Defendants made materially misleading statements regarding hiring, but that it was "at least equally plausible that the defendants did not understand" that such statements "regarding hiring were misleading." Order at 17.[28] However, Plaintiffs' new allegations, supported by internal documents, show that Defendants themselves linked high attrition to hiring problems and the resulting negative financial performance, undermining any non-culpable explanation for their misleading statements about hiring. *Compare* ¶337 (May 24, 2018 statement regarding "strong success in our hiring . . . that positions us to deliver on our future growth plans"), ¶343 (May 24, 2018 statement that hiring

---

[28]    A complaint will survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and ***at least as compelling*** as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014) ("[T]he tie goes to the Plaintiff.").

went "flawlessly"), *with* ¶189 (January 8, 2018 e-mail noting hiring problems meant Nutanix was not "performing to" "original/current productivity model assumptions"), ¶191 (February 26, 2019 Board presentation showing hiring continually "worsened since Q2'18").

Accordingly, the Complaints' new allegations, taken together with Plaintiffs' previously sustained allegations, adequately allege a strong inference of scienter.

> **3.    Previously Dismissed and Newly Added Statements Regarding Demand, Lead Generation Spending, and the Transition to a Software-Defined Business Model**

The same allegations supporting falsity also support scienter for the previously dismissed and newly added statements regarding demand, lead generation spending, and the transition to a software-defined business model.  Supported by numerous internal documents, CW allegations, and post-Class Period admissions, the allegations establish that Defendants were aware of waning demand masked by Nutanix's pull-in scheme (*see* §III.A.3, *supra*); the cutback on lead generation spending (*see* §III.A.4, *supra*); and problems related to the transition (*see* §III.A.5, *supra*).[29]

## IV.    CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court deny the Motion.

DATED:  December 29, 2022

ROBBINS GELLER RUDMAN
& DOWD LLP

*/s/ Stephen R. Astley*
STEPHEN R. ASTLEY

STEPHEN R. ASTLEY (admitted *pro hac vice*)
ROBERT J. ROBBINS (admitted *pro hac vice*)
ANDREW T. REES (admitted *pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sastley@rgrdlaw.com
rrobbins@rgrdlaw.com
arees@rgrdlaw.com

---

[29]    Because Plaintiffs plausibly allege Defendants' primary violations of Section 10(b), Plaintiffs' Section 20(a) control person claim should be sustained.  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014).

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
KENNETH J. BLACK (291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
kblack@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JAMES E. BARZ (Admitted *pro hac vice*)
FRANK A. RICHTER (Admitted *pro hac vice*)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

*Lead Counsel for Lead Plaintiff California
Ironworkers Field Pension Trust and Plaintiff
City of Miami Fire Fighters' and Police
Officers' Retirement Trust*

LEVI & KORSINSKY, LLP
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT  06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA  94111
Telephone: 415/373-1671
415/484-1294 (fax)
aapton@zlk.com
amccall@zlk.com

*Counsel for Plaintiff John P. Norton, on behalf
of the Norton Family Living Trust UAD
11/15/2002, and Additional Counsel for Plaintiff
City of Miami Fire Fighters' and Police
Officers' Retirement Trust*

PLAINTIFFS' OPPOSITION TO OMNIBUS MOTION TO DISMISS
Case No. 3:19-cv-01651-WHO; Case No. 3:21-cv-04080-WHO
4878-9417-4535

- 36 -