NINA F. LOCKER, State Bar No. 123838
IGNACIO E. SALCEDA, State Bar No. 164017
EVAN L. SEITE, State Bar No. 274641
BETTY CHANG ROWE, State Bar No. 214068
LAURA G. AMADON, State Bar No. 321524
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   (650) 493-9300
Facsimile:   (650) 565-5100
Email:       nlocker@wsgr.com
             isalceda@wsgr.com
             eseite@wsgr.com
             browe@wsgr.com
             lamadon@wsgr.com

*Attorneys for Defendants Nutanix, Inc.,
Dheeraj Pandey, and Duston M. Williams*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NUTANIX, INC. SECURITIES LITIGATION | CASE NO.:  3:19-cv-01651-WHO<br>CASE NO.:  3:21-cv-04080-WHO<br><br>**DEFENDANTS' REPLY IN SUPPORT OF OMNIBUS MOTION TO DISMISS**<br><br>Hearing Date: February 15, 2023<br>Time: 2:00 PM<br>Courtroom: 2<br>Hon. William H. Orrick |
| JOHN P. NORTON, ON BEHALF OF THE NORTON FAMILY LIVING TRUST UAD 11/15/2002, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>NUTANIX, INC., DHEERAJ PANDEY, and DUSTON M. WILLIAMS,<br><br>                Defendants. | |

DEFS.' OMNIBUS REPLY I/S/O MTD
CASE NO. 3:19-CV-01651-WHO
CASE NO. 3:21-CV-04080-WHO

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

I.  PLAINTIFFS ABANDON THEIR CENTRAL THEORY OF FRAUD........................... 1

    A.  Plaintiffs Concede Nutanix's Sales Pipeline Grew Throughout FY18 ................... 1

    B.  Plaintiffs Concede Sales Productivity Was Not in "Massive Decline" in FY18 .............................................................................................................. 5

II.  NONE OF THE CHALLENGED STATEMENTS IS ACTIONABLE ............................. 7

    A.  Nutanix's Accurate Disclosure of New Customers Is Not Actionable ................... 8

    B.  Accurate Disclosures Regarding Sales Productivity Are Inactionable ................. 11

    C.  Nutanix's Opinion and Puffery Statements Should Be Dismissed ....................... 12

    D.  None of the Previously Dismissed Statements Is Actionable ............................... 15

III.  THE NEW "NEGATIVE TRENDS" THEORY DOES NOT PLEAD SCIENTER ........ 18

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar, Inc.*,
2023 WL 155861 (D. Ariz. Jan. 11, 2023)..........................................................................10

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ............................................................. 14, 15

*Construction Workers Pension Tr. Fund v. Genoptix, Inc.*,
2013 WL 12123841 (S.D. Cal. Mar. 22, 2013)....................................................................16

*Costanzo v. DXC Tech. Co.*,
2021 WL 5908385 (N.D. Cal. Dec. 14, 2021) .....................................................................11

*Fosbre v. Las Vegas Sands Corp.*,
2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*
*Pompano Beach Police & Firefighters Ret. Sys. v. Las Vegas Sands Corp.*,
732 F. App'x 543 (9th Cir. 2018) .........................................................................................11

*Hessong v. Pinterest, Inc.*,
2021 WL 4339193 (N.D. Cal. Sept. 23, 2021)........................................................................9

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
958 F. Supp. 2d 1065 (D. Minn. 2013) .................................................................................18

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................................................18

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..........................................................................18

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991)................................................................................................11

*In re Dropbox Sec. Litig.*,
2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) ........................................................................9

*In re Netflix, Inc. Sec. Litig.*,
2005 WL 1562858 (N.D. Cal. June 28, 2005) ........................................................................9

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th. Cir. 2014).............................................................................................19

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022)......................................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017).........................................................................................13, 14

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
836 F. Supp. 2d 1 (D. Mass. 2011), *aff'd*, 669 F.3d 68 (1st Cir. 2012) .............................11

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom.*
   *Weston Family P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022).................................................................................... 19

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)..................................................................................... 11

*Kasilingam v. Stitch Fix, Inc.*,
   2022 WL 10966359 (9th Cir. Oct. 19, 2022) ...................................................... 17

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022)............................................................. 1, 9, 13, 14

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. June 27, 2017).......................................................... 16

*Nelson v. Adams USA, Inc.*,
   529 U.S. 460 (2000) ..................................................................................................... 8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Fund*,
   575 U.S. 175 (2015) ........................................................................................... 13, 15

*Sayce v. Forescout Techs., Inc.*,
   2021 WL 1146031 (N.D. Cal. Mar. 25, 2021) ...................................................... 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................... 15, 16

*Van Noppen v. InnerWorkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) ..................................................................... 11

*West Palm Beach Firefighters' Pen. Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom.*
   *Nat'l Elevator Ind. Pen. Fund v. Conagra Brands, Inc.*,
   2022 WL 1449184 (7th Cir. May 9, 2022) .............................................................. 4

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021).................................................................................. 15

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981, 999 (9th Cir. 2009)............................................................................. 5

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Amadon Decl. | Declaration of Laura G. Amadon in Support of Defendants' Omnibus Motion to Dismiss (ECF No. 292-1)[1] |
| CAC | Consolidated Amended Complaint For Violations of the Federal Securities Laws filed in the *Nutanix* Action (ECF No. 102) |
| City of Miami | City of Miami Fire Fighters' & Police Officers' Retirement Trust |
| CW | Confidential Witness |
| Defendants | Nutanix, Inc., Dheeraj Pandey, Duston M. Williams |
| Ex. | Exhibits attached to the Amadon Declaration or the Supplemental Amadon Declaration |
| FAC | Norton's First Amended Complaint for Violations of the Federal Securities Laws (*Norton* ECF No. 74-4) |
| FY17, FY18, and FY19 | Fiscal years 2017, 2018, and 2019 respectively |
| Levi & Korsinsky | Levi & Korsinsky, LLP |
| Motion or Mot. | Defendants' Omnibus Motion to Dismiss (ECF No. 292) |
| MTD I | Order Granting Defendants' Motion to Dismiss, ECF No. 121 (Mar. 9, 2020) |
| MTD II | Order Regarding Motion to Dismiss, ECF No. 140 (Sept. 11, 2020) |
| Norton | Lead Plaintiff John P. Norton on behalf of the Norton Family Living Trust UAD 11/15/2002 |
| *Norton* Action | The securities class action captioned *John P. Norton on behalf of the Norton Family Living Trust UAD 11/15/2002 v. Nutanix, Inc., et al.*, Case No. 3:21-cv-04080-WHO |
| Nutanix or the Company | Nutanix, Inc. |

---

[1] Unless otherwise noted herein, docket references to "ECF No. __" refer to docket entries for the *Nutanix* Action. References to "*Norton* ECF No. __" refer to docket entries for the *Norton* Action. All emphases that are added to quoted material appear in bold italics in this brief.

| | |
|---|---|
| *Nutanix* Action | The securities class action captioned *In re Nutanix, Inc. Securities Litigation*, Case No. 3:19-cv-01651-WHO |
| Opposition or Opp. | Plaintiffs' Memorandum of Law in Opposition to Defendants' Omnibus Motion to Dismiss (ECF No. 296) |
| Plaintiffs | California Ironworkers Field Pension Trust, City of Miami, and Norton |
| PX | Plaintiffs' Exhibits attached to the TAC and RFAC |
| Q[#]'FY | A single quarter of Nutanix's fiscal year. For example, "Q1'18" refers to the first quarter of Nutanix's fiscal year 2018 ("FY18").  Nutanix's fiscal year runs from August 1 to July 31.  Q1 begins on August 1 and ends on October 31; Q2 begins on November 1 and ends on January 31; Q3 begins on February 1 and ends on April 30; and Q4 begins on May 1 and ends on July 31 |
| RFAC[2] | The Revised First Amended Complaint for Violations of the Federal Securities Laws filed in the *Norton* Action (*Norton* ECF No. 94-3) |
| RJN | Defendants' Request for Judicial Notice in Support of Omnibus Motion to Dismiss Complaints for Violations of the Federal Securities Laws (ECF No. 293) |
| RJN Reply | Defendants' Reply in Further Support of Request for Judicial Notice in Further Support of Omnibus Motion to Dismiss Complaints for Violations of the Federal Securities Laws, filed concurrently |
| SAC | Second Amended Complaint for Violations of the Federal Securities Laws filed in the *Nutanix* Action (ECF No. 124) |
| Supplemental Amadon Declaration | Supplemental Declaration of Laura G. Amadon in Support of Defendants' Omnibus Motion to Dismiss |

---

[2] The RFAC is substantively identical to the TAC.  *E.g.*, Mot. at 1.  Accordingly, and for ease of reference throughout this Reply, Defendants refer to the TAC unless otherwise noted.

TAC or ¶             Third Amended Complaint for Violations of the Federal Securities Laws filed in the *Nutanix* Action (ECF No. 281-3)

**INTRODUCTION**

The first question that this Court must be asking itself is why are Defendants moving yet again to dismiss this action? Isn't this just a motion for reconsideration of the Court's previous ruling? The answer is unequivocally "***no***."

Plaintiffs' Opposition makes clear that they have now ***abandoned*** the theory of fraud on which the Court previously permitted them to proceed—*i.e.*, that Nutanix made positive statements regarding sales pipeline and productivity when both of those metrics were allegedly in massive (and undisclosed) decline. Plaintiffs now concede that sales pipeline and sales productivity were, in fact, growing at the time the challenged statements were made and have adopted a brand-new (and unpled) theory: that Nutanix was experiencing "negative trends" in sales pipeline and productivity when the challenged statements were made. These purported negative trends are declining ***rates of growth*** in pipeline and sales productivity, and missed internal targets for pipeline generation, hiring, and sales quotas. The Complaints must be re-evaluated under this new theory.

Although Plaintiffs attempt to raise a factual dispute at every turn, there are, in fact, no such disputes. For purposes of this Motion, Defendants agree that Nutanix's pipeline and productivity growth rates were declining and that Nutanix was missing internal goals for pipeline generation and productivity. But that does not plead fraud. Given their concession regarding ***actual growth*** in sales pipeline and productivity, the recent Ninth Circuit decision in *Macomb County Employees' Retirement System v. Align Technology, Inc.*, 39 F.4th 1092 (9th Cir. 2022) controls and requires dismissal. There, the Ninth Circuit expressly held that declining growth rates are not a "pessimistic backdrop" that renders optimistic statements misleading. *Id.* at 1099. Moreover, as a matter of black-letter law, Nutanix was not required to disclose its performance to internal pipeline and sales goals. Plaintiffs do not cite a single decision to the contrary.

The TAC and RFAC must be dismissed in their entirety as a matter of law.

**ARGUMENT**

**I.    PLAINTIFFS ABANDON THEIR CENTRAL THEORY OF FRAUD**

**A.    Plaintiffs Concede Nutanix's Sales Pipeline Grew Throughout FY18**

Defendants' Motion showed that Nutanix's total sales pipeline grew significantly

throughout FY18 including in Q2'18 and Q3'18 (*i.e.*, the quarters relevant to the challenged pipeline statements), when Nutanix's sales pipeline grew 79 and 63 percent, respectively. Mot. at 11. In response, Plaintiffs repeatedly claim that to show this, Defendants are inappropriately relying on Exhibit 3, a "Metric Sheet" reflecting Nutanix's historical performance across a number of key financial metrics. Opp. at 3; *see also id.* at 4, 14. Plaintiffs' vociferous objections notwithstanding, it is entirely appropriate for the Court to consider Exhibit 3 for the reasons set forth in Defendants' Motion and RJN papers. *See, e.g.*, Mot. at 9; *see also* RJN at 9.

But Plaintiffs' efforts to avoid Exhibit 3 are a red herring as numerous additional exhibits demonstrate that Nutanix experienced significant sales pipeline growth throughout FY18. *E.g.*, Ex. 13 at 50 (reflecting ***142 percent increase*** in quarterly pipeline generation from Q1'17 to Q1'19 and year-over-year quarterly growth in pipeline generation every quarter); Ex. 15 at 2 (reflecting ***94 percent increase*** in pipeline for future quarters from Q1'18 to Q1'19); *id.* at 4 (reflecting ***$1.1 billion increase*** in pipeline generation from Q3'17 to Q4'18); Ex. 17 at 16 (reflecting, *e.g.*, increases in pipeline in all segments, including ***189 percent growth*** in pipeline for future quarters, from Q1'17 to Q2'18); Ex. 18 at 6 (same); Ex. 19 at NTNX-35300_0001 (reflecting ***1,734.1 percent increase*** in quarterly, partner-initiated (*i.e.*, channel) new logo pipeline from Q1'17 to Q3'18). Each of these exhibits is cited and attached to the TAC, relied upon in Plaintiffs' Opposition, and is—as Plaintiffs concede—properly considered by the Court under the doctrine of incorporation by reference. ECF Nos. 281-4, 281-5, 281-6.[3] And each of the exhibits reflects the same incontrovertible fact, which Plaintiffs do not (and cannot) dispute: that Nutanix's pipeline was not "rapidly declining," "woefully depleted," or "decimate[d]," as alleged in the TAC (*e.g.*, ¶¶ 2, 7, 131), but, rather, ***grew*** in FY18.

Unable to contest that total pipeline grew, Plaintiffs now argue that Defendants' "focus on 'total' pipeline, rather than pipeline *generation*, is misleading because total pipeline includes the stale, unconverted pipeline accumulated from prior quarters[.]" Opp. at 15. The complaints do not make the distinction that the Opposition now adopts—the TAC alleges that total sales pipeline

---

[3] Each of these exhibits was also cited in Defendants' opening Motion. Mot. at 11 n.8 (citing exhibits); *see also, e.g.*, Ex. 14 (reflecting year-over-year total pipeline growth of ***$1.7 billion***, or over ***61 percent***, across all pipeline segments from Q4'17 to Q4'18).

was in freefall in FY18, not new pipeline generation. *E.g.*, ¶ 11 (Nutanix's "sales pipeline was significantly depleted by the beginning of the Class Period . . . and continued to decline thereafter"); ¶ 122 ("Nutanix's pipeline declined throughout the Class Period"); ¶ 311 ("the Company's entire pipeline had been decreasing in FY2018"). Plaintiffs' new theory regarding new pipeline generation does nothing to help them. In fact, Plaintiffs' own exhibit—which is concededly incorporated by reference in the TAC and cited no fewer than *six* times in the Opposition[4]—reflects that Nutanix's quarterly new pipeline generation increased from $479 million in Q1'17 to over $1.15 billion in Q1'19 and experienced a "50% increase . . . from FY'17 to FY'18[.]" Ex. 13 at 50. As that exhibit shows (*see id.*), *new pipeline generation grew significantly* on a year-over-year[5] basis in each quarter of FY18:



Ultimately, the Opposition abandons any claim that Nutanix's sales pipeline, whether

---

[4] RJN Reply at 2-6; Opp. at 5, 13 & n.7, 15, 25 n.19.

[5] Defendants agree with Plaintiffs that "[y]ear-over-year pipeline growth is more meaningful than sequential growth because it accounts for Nutanix's seasonal sales trends and thus provides [a] better comparative." Opp. at 15. Accordingly, Defendants' charts demonstrating pipeline growth were based on year-over-year growth. Mot. at 11. Given the parties' agreement on the superiority of year-over-year growth as the best metric to understand pipeline performance, Plaintiffs' argument that "pipeline generation had a steep [quarter-over-quarter] sequential decline in Q2 FY2018" (Opp. at 15) is of no consequence. This is particularly so in light of Plaintiffs' concession that pipeline generation and total pipeline grew significantly on a year-over-year basis in that quarter. Opp. at 15 n.9, 16 n.11.

measured by total pipeline or new pipeline generation, was in decline and, instead, argues that it was actually Nutanix's quarterly year-over-year pipeline ***growth rates*** that declined throughout FY18. *See* Opp. at 14-15 & n.9 (citing quarterly pipeline growth rates to claim that "total pipeline growth actually declined [in] every quarter from Q1 FY2018 to Q4 FY2018"); *see also id.* at 13 n.7 (conceding that Nutanix's pipeline generation grew approximately $3.7 billion in FY18).

This is a ***profound*** and fatal concession. Even if pipeline growth ***rates*** declined, so long as the rates remained positive—which Plaintiffs concede they did[6]—the overall sales pipeline still ***grew***. *See West Palm Beach Firefighters' Pen. Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 645 (N.D. Ill. 2020) (explaining that a statement regarding "'ongoing growth' is consistent with a declining ***rate*** of growth" where "the growth rate was positive"), *aff'd sub nom. Nat'l Elevator Ind. Pen. Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022) (emphasis in original). Thus, by advancing yet another brand new growth rate theory—which is not mentioned in the TAC—Plaintiffs have conceded that Nutanix's pipeline was growing at the time of the challenged statements, thereby ***abandoning*** the central theory of fraud credited in this Court's previous order. *E.g.*, ¶¶ 273, 462 ("According to CW1, CW3, and CW8, the Salesforce.com pipeline report would have showed Nutanix's sales pipeline ***declining*** prior to and throughout the Class Period."); MTD II at 11-12, 14 (crediting the same allegation); *id.* at 2 (challenged statements concealed a "***rapidly declining*** sales pipeline"); *id.* at 13 ("[t]he facts included in the SAC . . . could lead a reasonable investor to conclude that Nutanix's pipeline for new customers was robust when, in fact, it was facing a ***significant decline***").[7] And, in light of

---

[6] Plaintiffs concede that year-over-year pipeline growth rates remained positive: they did not drop below 33 percent for new pipeline generation in FY18 and 60 percent for starting pipeline. Opp. at 15 n.9, 16 n.11. Plaintiffs erroneously label "starting pipeline," *i.e.*, the amount of pipeline at the outset of any given quarter, as "total pipeline" (Opp. at 15 & n.9 (citing Ex. 3 at 2)), but this error does not change the result, as pipeline growth rates were positive (substantially so) based on any metric. *See also* Opp. at 13 n.7 (summarizing quarterly global pipeline generation growth rates, each of which was positive).

[7] The TAC is rife with now-abandoned allegations regarding pipeline decline. ¶ 2 (referring to "rapidly declining sales pipeline"); ¶ 122 ("Nutanix's pipeline declined throughout the Class Period"); ¶¶ 124-125 (section heading entitled "**Nutanix's Sales Pipeline Declines in FY2018 and FY2019**"); ¶¶ 498-499 (section heading entitled "**Pandey Was Aware That Nutanix's Pipeline Was Materially Declining Throughout the Class Period**"); *see also* ¶¶ 266, 275, 278, 280, 290, 298, 306, 316, 381, 393, 425, 427, 460, 462, 471, 475.

Plaintiffs' concession, the Court should no longer credit the CW allegations of pipeline decline that served as the basis of its prior order. *E.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) (CW allegations not credited where "the [complaint] supplies facts" undercutting their claims); *Sayce v. Forescout Techs., Inc.*, 2021 WL 1146031, at *5 (N.D. Cal. Mar. 25, 2021) ("directly contradicted" CW allegations cannot be credited).

### B.    Plaintiffs Concede Sales Productivity Was Not in "Massive Decline" in FY18

Despite the claim that Nutanix's sales productivity was in "massive decline" when the challenged statements were made (MTD II at 2; ¶ 17), Defendants' Motion showed that Nutanix's sales productivity was, in fact, very strong in FY18:  Nutanix achieved record or near-record post-IPO productivity levels in Q2'18 and Q4'18 (*i.e.*, the quarters relevant to the challenged sales productivity statements); exceeded its public guidance in each quarter of FY18; and substantially achieved Nutanix's ambitious, and undisclosed, internal targets for revenue (Nutanix achieved 97 percent of target), bookings (97 percent of target), and billings (103 percent).  Mot. at 13.

In response, Plaintiffs again argue that Defendants are inappropriately relying on Exhibit 3 to show sales productivity was strong and positive at the time of the challenged statements.  Opp. at 22.  Although it is entirely proper for this Court to consider Exhibit 3, Plaintiffs' objections are largely beside the point.  Nutanix's achievement of record bookings per active and "ramped" sales reps in Q2'18 (*i.e.*, when the first productivity statements were made) is established by exhibits that Plaintiffs concede are subject to the Court's consideration pursuant to the doctrine of incorporation by reference.  Ex. 17 at 8 (reflecting post-IPO record levels of bookings for ramped and total sales reps for EMEA, APAC, and worldwide in Q2'18); Ex. 18 at 4 (same).  Similarly, Defendants do not need Exhibit 3 to show that Nutanix achieved *104 percent* of its internal, undisclosed, and ambitious bookings target for Q4'18 (*i.e.*, when the second productivity statements were made), as well as *100 percent* and *111 percent* of its quarterly revenue and billings internal targets, respectively.[8]  Thus, Nutanix's undisputed (and indisputable) strength in bookings, bookings per rep, billings, and revenue performance in Q2'18 and Q4'18 is properly subject to the

---

[8] *Compare* Ex. 14 (reflecting Q4'18 "Total ISV Bookings" performance), *and* Ex. 21 (reflecting Q4'18 revenue and billings performance), *with* Ex. 17 at 14 (reflecting, *inter alia*, Nutanix's internal projections for ISV bookings, revenue, and billings for Q4'18).

Court's consideration and directly refutes Plaintiffs' claim that Nutanix's sales productivity was in "massive decline" when the challenged statements were made.

As with their sales pipeline claims, Plaintiffs find themselves without any support for their central theory of declining sale productivity, so they attempt misdirection. Specifically, and despite first defining sales productivity as "the conversion rate of sales leads into revenue" (Opp. at 6; *see also* ¶ 93)—*i.e.*, **precisely** the rate that is reflected in Nutanix's key productivity metric, bookings per rep—the Opposition contradicts itself to argue that sales productivity is instead defined by the "key 'inputs'" of sales productivity; namely, "salespeople and pipeline spend." Opp. at 22. Plaintiffs' "input" argument fails *ab initio* because, even assuming Plaintiffs accurately characterize the true state of Nutanix's "key inputs" correctly (and they don't), Plaintiffs **concede** that the "output," *i.e.*, sales productivity itself, **did not decline**. To the contrary, Plaintiffs claim that that bookings per sales rep experienced "little to no" quarterly growth in FY18. Opp. at 23.[9] This too is a remarkable concession: certainly "little to no" growth is a far cry from the "massive decline in sales productivity" alleged in the TAC. ¶ 17; MTD II at 2. It is not even **any** decline.

Plaintiffs' sales productivity "inputs" theory fails regardless. With respect to the first input, salespeople, Plaintiffs' claim that Nutanix was "plagued by severe attrition and inadequate hiring" has no basis in fact. *E.g.*, Opp. at 7. As Defendants' Motion already showed—again, using exhibits that are concededly incorporated in the TAC—voluntary attrition among Nutanix's sales teams was far from "severe." Quarterly attrition in FY18 was exceptionally modest and near flat, trended down from just 3.01 to 1.28 percent, and was outpaced by hiring, which resulted in significant sales team headcount increases each quarter. Mot. at 18 (citing Exs. 20, 23); *see also id.* at 18 n.16 (summarizing modest sales representative attrition).

In response, the Opposition **concedes** that "sales headcount increased and voluntary

---

[9] Plaintiffs' characterization of Nutanix's sales productivity growth is inaccurate. Specifically, far from "little to no" growth, growth was strong during the quarters at issue. Opp. at 23. Nutanix experienced year-over-year growth in bookings per rep of over 31 percent and 11 percent and sequential growth of 25 percent and 23 percent in Q2'18 and Q4'18, respectively (*i.e.*, the quarters in which the challenged productivity statements were made). Ex. 3 at 3; Opp. at 22-23.

terminations decreased,"[10] but nevertheless claims that "sales hiring [and] attrition . . . were trending poorly throughout the Class Period." Opp. at 23. But Plaintiffs do not contest the actual attrition performance numbers set forth in the Motion (nor could they). Instead, they claim that by using voluntary terminations instead of involuntary terminations, the Motion reflects a "selective, self-serving approach." *Id.* This argument is facially meritless. Plaintiffs' ***own allegations*** are expressly based on voluntary terminations, claiming that Nutanix's "chronic attrition problem" is "illustrat[ed]" by "staggering 'Voluntary' terminations in every quarter leading up to and during the Class Period." ¶ 158. Even including "involuntary" terminations, Nutanix's rates of quarterly sales team attrition remained very modest (between 4.1 and 1.86 percent), trended downward, and remained outpaced by hiring. Exs. 20, 23.

With respect to the second input, pipeline, Plaintiffs argue that "Defendants stifled Nutanix's pipeline development" by "keeping lead generation 'flat.'" Opp. at 6. Of course, this claim is foreclosed by Plaintiffs' admission that pipeline ***grew*** throughout FY18. *Supra* pp. 3-4. But Plaintiffs' theory regarding lead generation spending is also refuted by their own exhibits, which reflect that in FY18, Nutanix achieved significant increases in pipeline yield efficiencies— *i.e.*, the amount of pipeline generated per dollar of lead generation spending. Ex. 15 at 9 (chart reflecting an increase in pipeline yield per dollar spent in each quarter of FY18); *see also id.* at 3 (reflecting increased pipeline yield throughout FY18); Ex. 13 at 47 (same). This is entirely consistent with what Nutanix told investors at the end of the Class Period—namely, that in FY18, Nutanix "started to see some pretty good efficiencies [in lead generation spending]" that allowed the Company to "continue[] to perform quite well" despite a "4 quarter period from Q4'17 to Q3'18" when Nutanix "basically kept lead generation spend flat." Ex. 24 at 8, 10.

## II.    NONE OF THE CHALLENGED STATEMENTS IS ACTIONABLE

This Court previously allowed six challenged statements to go forward[11] on the basis that

---

[10] The Opposition attempts to blunt the effect of this concession by claiming that sales head count increased and attrition decreased only at "certain times." Opp. at 23. But Plaintiffs do not, and cannot, identify any time that sales team headcounts ever declined or a time when sales team attrition ever overtook hiring growth, because neither ever occurred.

[11] Plaintiffs claim the Court found that Plaintiffs had adequately alleged the falsity of Mr. Williams' statement opining that he did not believe the shift from a hardware-based model to a

(continued...)

Plaintiffs had adequately alleged that Nutanix concealed a "massive decline in sales productivity" and that Nutanix's sales pipeline "was facing a significant decline" at the time the statements were made.  MTD II at 2, 12.  ***Plaintiffs do not even try to defend these allegations***, and instead pivot to their new theory:  that Nutanix was experiencing undisclosed "negative trends"—a phrase that appears a dozen times in the Opposition and ***not once*** in the TAC.  Opp. at 2, 5, 13, 25, 30, 31.  Those "negative trends" are purportedly declining rates of growth for pipeline, new customers, and sales productivity as well as missed internal, undisclosed targets for sales quotas, hiring, and pipeline generation.  Given this foundational change in the central theory of fraud, Plaintiffs' repeated characterization of Defendants' Motion to Dismiss as a request to reconsider this Court's prior ruling (Opp. at 3, 5, 14, 22 and 30) is disingenuous at best.  Plaintiffs chose to file the TAC, which is subject to a new motion to dismiss.  *E.g.*, *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 461 (2000) (the "opportunity to respond [to an amended complaint], fundamental to due process, is the echo of the opportunity to respond to the original pleadings secured under Rule 12(a)(1)").  Plaintiffs' new theory of fraud drastically alters the context in which the challenged statements were made, requiring the Court to analyze those statements in the new context.

Moreover, although Plaintiffs attempt to avoid dismissal by repeatedly (and inaccurately) claiming that Defendants are raising factual disputes that cannot be resolved until trial (*e.g.*, Opp. at 4 & n.2, 5, 22, 31), there is no meaningful factual dispute regarding the basis of Plaintiffs' "negative trends" argument:  solely for purposes of this pleading-stage motion, Defendants assume that Plaintiffs have adequately alleged that:  (1) Nutanix's pipeline, new customer, and sales productivity growth rates declined; (2) many of Nutanix's sales people did not achieve their quotas; and (3) Nutanix missed its internal targets for pipeline generation and hiring.  But, as explained below, these "facts" do not render ***any*** challenged statements misleading.

### A.    Nutanix's Accurate Disclosure of New Customers Is Not Actionable

Defendants' Motion showed that Nutanix's statement on its Q2'18 earnings call that "Q2 also saw us add a record number of new customers, bringing our total number to 8,870" was an

---

software model was negatively impacting smaller customers.  Opp. at 11 n.5.  That is incorrect; the Court did not find that statement to be actionable.  Plaintiffs also mischaracterize this statement as a "den[ial] . . . that new customer growth was declining."  Opp. at 8.

accurate statement of Nutanix's historical performance. Mot. at 14. In response, Plaintiffs do not dispute that Nutanix added a record number of new customers in Q2'18. Their only argument is that the statement purportedly gave the impression that Nutanix's pipeline was healthy when, instead, it was experiencing "negative trends in new customer pipeline growth[.]" *E.g.*, Opp. at 2.

But Plaintiffs' "negative trends in growth" argument is not based on actual declines in either sales pipeline or new pipeline generation because, as Plaintiffs have now conceded, there were no such declines. Rather, Plaintiffs are pointing to a decline in pipeline ***growth rates***, but this is not an actionable basis on which to claim fraud. As both the Ninth Circuit and this Court have recently recognized, a positive statement regarding overall growth is not rendered misleading simply because growth rates were falling. *Align*, 39 F.4th at 1099 (statements regarding overall growth not misleading where "company's sales were *still growing* . . . albeit at a diminished rate"); *Hessong v. Pinterest, Inc.*, 2021 WL 4339193, at *6 (N.D. Cal. Sept. 23, 2021) (statement that Pinterest "expect[ed] to grow users in . . . the U.S." was not misleading based on allegation "that the growth rate of users in the U.S. was decreasing"). Nutanix's accurate statement about the number of new customers could not have mislead investors regarding a decline in ***growth rates***— as reflected in the below chart, Nutanix disclosed its number of new customers every quarter, which gave investors all the information they needed to calculate growth rates for new customers and determine that it had, in fact, declined before the Q2'18 earnings call. *E.g.*, *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *8 (N.D. Cal. Oct. 21, 2020) (rejecting allegation that Dropbox failed to disclose declining revenue growth rate where "simple arithmetic shows that the rate of [revenue] increase was declining"); *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (similar).

|  | **Q1'17** | **Q2'17** | **Q3'17** | **Q4'17** | **Q1'18** | **Q2'18** |
|---|---|---|---|---|---|---|
| **Total New Customers**[12] | 705 | 909 | 790 | 878 | 763 | 1,057 |
| **YoY Quarterly Growth Rate** | 104.35% | 84.01% | 67.02% | 33.64% | 8.23% | 16.28% |

Given Nutanix's disclosures, it is no surprise that, as this Court previously recognized, the

---

[12] Exs. 7 at 26, 8 at 34, 9 at 44, 25 at 34, 26 at 26, 27 at 24, 28 at 27.

market was aware that new customer growth had slowed starting in November 2017 (*i.e.*, with the announcement of Q1'18 results). MTD I at 8 (citing ECF No. 102 at ¶¶ 184, 227); Ex. 4 at 18 (analyst question on Q1'18 earnings call stating that it "looks like the number of new customers that came into your installed base was lower than the past few quarters")[13]; Ex. 6 at 15-16 (analyst comment on Q3'18 earnings call that "new customer acquisition pace has slowed down . . . and that's been decelerating"). In addition, from Q1'18 forward, Nutanix expressly disclosed that it "anticipate[d] that . . . our revenue growth will slow" and that investors "should not rely on our revenue growth for any prior periods as an indication of future revenue or revenue growth." Ex. 7 at 8, 42. Certainly, a reasonable investor would not infer that sales pipeline or new customers were experiencing ***accelerating*** growth in Q2'18 when Nutanix expressly disclosed in Q1'18 that it was expecting slowed growth in top-line revenue.

Even assuming Nutanix's sales pipeline was declining (it was not) or that its year-over-year rate of growth had declined (it had, but was still positive), Plaintiffs do not dispute that the concepts of ***new customers*** (*i.e.*, customers that closed a transaction in Q2'18) and ***sales pipeline*** (*i.e.*, opportunities might close in the future) are separate and distinct[14] and thus a statement about the former creates no impression regarding the latter. *Cf. City of Pontiac Gen. Emps. Ret. Sys. v. First Solar, Inc.*, 2023 WL 155861, at *9 (D. Ariz. Jan. 11, 2023) (explaining the distinction between "existing share of systems projects (i.e., market share) [and] potential business growth opportunities (i.e., the pipeline)"; "[o]ne relates to the share of existing projects and the other to new opportunities"). Additionally, Plaintiffs do not dispute that accurate statements of historical performance are not actionable as a matter of law. Opp. at 15-16.

---

[13] Plaintiffs challenge Mr. Pandey's response to this question, *i.e.*, that "Q1 is always a little soft from a customer perspective, but we added a decent amount of customers . . . and Q2 will pop up naturally[.]" ¶ 289. This statement is inactionable (Mot. at 21-22), but it was also accurate: as shown here, Nutanix's Q2'18 customers did, in fact, "pop up" following Q1'18.

[14] Plaintiffs' only response regarding the distinction between new customers and pipeline is to point to a ***different statement altogether***, made on a different earnings call months later, that expressly mentioned pipeline. Opp. at 18 ("Defendants' argument ignores that one such statement directly referenced the pipeline, misleadingly stating that they were 'really excited about what's happening in the channel with the ***pipeline*** for new logos.'"). As discussed further herein, that statement is inactionable (*infra* p. 13), but Plaintiffs' argument based on an entirely different statement does not in any way suggest that an accurate statement of new customers implies anything about the pipeline of future customers.

DEFS.' REPLY ISO OMNIBUS MTD                                    -10-
CASE NO. 3:19-CV-01651-WHO
CASE NO. 3:21-CV-04080-WHO

Instead, Plaintiffs' only effort to address the litany of on-point authorities cited in Defendants' Motion (Mot. at 15-16) is to argue that each is distinguishable because Nutanix missed its internal, undisclosed, and highly ambitious pipeline generation targets. Opp. at 18 n.14. But, as Defendants' Motion showed, numerous authorities[15] establish that Nutanix was under no obligation to disclose its internal plans or whether it achieved them, particularly where Nutanix's internal targets were ambitious goals that allowed it to consistently achieve its more modest public guidance. Mot. at 19, 28. Plaintiffs' Opposition does not ***mention*** (much less distinguish) these decisions and does not cite to ***any*** decision requiring disclosure of an internal target or holding that an otherwise accurate statement was rendered misleading due to missed internal targets.

**B.      Accurate Disclosures Regarding Sales Productivity Are Inactionable**

Defendants' Motion showed that its statement on the Q2'18 earnings call that EMEA and APAC sales regions "experienced record sales productivity in the quarter" and the statement on the Q4'18 earnings call that "ramped [*i.e.*, fully productive] rep sales productivity. . . increased sequentially" were both accurate statements describing Nutanix's historical performance. Mot. at 17-18. Further, Defendants' Motion addressed Plaintiffs' anticipated counterarguments—*i.e.*, that the statements were misleading due to purportedly "rampant" attrition and missed quotas—which do not render the statements misleading because sales team attrition was modest and Nutanix was under no obligation to disclose quota attainment (or the lack thereof). *Id.* at 18-19, 27.

---

[15] *See, e.g.*, *Costanzo v. DXC Tech. Co.*, 2021 WL 5908385 (N.D. Cal. Dec. 14, 2021); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922 (N.D. Ill. 2015); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 836 F. Supp. 2d 1 (D. Mass. 2011), *aff'd*, 669 F.3d 68 (1st Cir. 2012). Plaintiffs' Opposition ignores these recent and directly on-point authorities entirely and, instead, claims that Defendants are relying upon "30-year-old cases"—namely, *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1419 (9th Cir. 1994) and *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 515-16 (9th Cir. 1991)—which Plaintiffs attempt to distinguish on the basis that each mentioned warnings in their analysis. Opp. at 31 n.26. This is not a distinction. Nutanix warned that it expected revenue growth to slow and disclosed the information necessary to calculate declining rates of growth in new customers. The holding in *Convergent* that while "Convergent had at its disposal more detailed internal . . . projections" but "was not obliged to disclose [those] internal projections" did not depend on the existence of cautionary language. 948 F.2d at 516. And Plaintiffs' attempt to distinguish *Fosbre v. Las Vegas Sands Corp.* on the basis that the defendant there "said nothing" (Opp. at 31 n.26) about whether "expenditures were meeting internal, undisclosed projections or budgets" is not a distinction but, rather, demonstrates that *Fosbre* is on all fours: ***Nutanix likewise never publicly spoke to its internal projections for pipeline or pipeline generation***. 2017 WL 55878, at *5 (D. Nev. Jan. 3, 2017), *aff'd sub nom. Pompano Beach Police & Firefighters Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018).

DEFS.' REPLY ISO OMNIBUS MTD                                  -11-
CASE NO. 3:19-CV-01651-WHO
CASE NO. 3:21-CV-04080-WHO

In response, Plaintiffs do not claim that the challenged statements were factually inaccurate—in fact, as discussed above, Plaintiffs concede that sales productivity *increased during FY18*, thereby abandoning the central theory that this Court previously credited in finding these statements actionable.  But Plaintiffs double down on their theory that the statements were misleading because "sales teams were plagued by severe attrition and inadequate hiring during the Class Period, which reduced the number of more experienced and productive sales representatives[.]" Opp. at 7.  As explained in the Motion and above, this theory has no basis in fact.  Sales team attrition was modest and downwardly trending throughout FY18 and sales team hiring outpaced attrition—facts established by Plaintiffs' own documents that are concededly incorporated by reference in the TAC.  *Supra* pp. 6-7.[16]

Even if one assumes that attrition and hiring were as poor as Plaintiffs claim (and they weren't), Plaintiffs still have no basis to claim fraud.  That is because Nutanix disclosed the very metric Plaintiffs claim was negatively impacted by the supposed severe attrition and inadequate hiring each quarter:  the ratio of ramped (*i.e.*, fully productive) sales representatives to total sales representatives.  Exs. 7 at 29, 8 at 36, 9 at 47, 25 at 37 (reflecting quarterly disclosure of the ratio of ramped to unramped reps ranged from 57 to 65 percent in FY18); *e.g.*, Opp. at 7, 9, 20, 34 (discussing the impact of hiring and attrition on the percentage of ramped reps).

Finally, Plaintiffs' hiring and sales quota allegations do not render Nutanix's accurate statements regarding sales productivity misleading.  Nutanix specifically disclosed that it had fallen short of its hiring targets, had implemented a plan to remediate that shortfall, and was still not at its planned headcount after having executed that plan.  *Infra* pp. 19-20.  And, as Defendants' Motion explained, sales quotas are motivational tools and, therefore, not indicative of a company's performance.  Mot. at 18-19.  Plaintiffs do not respond and, thus, concede this point.

### C.    Nutanix's Opinion and Puffery Statements Should Be Dismissed

Defendants' Motion showed that the remaining statements that survived dismissal—(1)

---

[16] Plaintiffs also inaccurately represent the attrition among the sales representative subset of sales teams.  As explained in the Motion, Nutanix's sales representative attrition was between 1.28% and 3.01% in FY18.  Mot. at 18 (citing Exs. 20 & 23).  Plaintiffs repeatedly cite a purported "over 40%" spike in attrition in Q2'18 (*e.g.*, Opp. at 4, 20), but the "spike" they reference is an increase in attrition from 4 percent to merely 7.3 percent from Q1'18 to Q2'18.

Mr. Pandey's Q2'18 earnings call statement that he thought Nutanix's channel relationships were a "huge contribution to our overall mid-market acquisition," and (2) Mr. Williams' Q3'18 earnings call statements that Nutanix had a "renewed focus with the channel on new customer logos" and was "really excited about what's happening in the channel with the pipeline for new logos"—were opinion statements subject to the pleading standard set forth in *Omnicare, Inc. v. Laborers District Council Construction Industry Fund*, 575 U.S. 175 (2015) and its progeny (in the case of Mr. Pandey's statement) and quintessential examples of puffery (all three statements). Mot. at 19-21.

In response, Plaintiffs first attempt to rely on *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017) to argue that, as in *Quality Systems*, the challenged statements here "provided a concrete description of the past and present state of the pipeline and growth." Opp. at 16; *Quality Sys.*, 865 F.3d at 1144. That is simply not the case. Defendants showed that the challenged statements here are in an entirely different qualitative league than the statements at issue in *Quality Systems*, which involved repeated concrete assurances that the number and type of prospective sales in the pipeline was unchanged, and even growing, compared to previous quarters. Mot. at 17; *see also, e.g.*, *Quality Sys.*, 865 F.3d at 1143-44, 1147-48 ("[t]here is nothing drying up and there is nothing slowing down" in pipeline; the pipeline "continues to build to record levels"; "there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years"). In fact, as Defendants' Motion showed with citations to numerous authorities, Defendants' statements that they thought channel relationships were a "huge contribution" to mid-market customer acquisition or that Nutanix had a "renewed focus" and "real[] excite[ment]" about activity in the channel are quintessential examples of puffery because they are not subject to objective verification. Mot. at 20-21 (citing authorities). Once again, Plaintiffs' Opposition does not mention or distinguish those authorities.

Next, Plaintiffs argue that under *Quality Systems* and the more recent Ninth Circuit decision in *Align*, "statements of optimism made against a clearly pessimistic backdrop may form a basis for a securities fraud claim." Opp. at 16 n.12 (citation omitted). Plaintiffs fail to appreciate that, in light of their own concessions regarding sales pipeline and productivity growth, *Align* requires dismissal in its entirety. Specifically, in *Align*, Align's year-over-year quarterly customer

growth rates in China had fallen considerably—from "close to 70% to 20-30% in just one quarter"—as a result of "increased competitive pressure and diminished customer demand." 39 F.4th at 1095, 1098 n.1. The plaintiff alleged fraud when, despite the undisclosed decline in growth rates, Align's executives made puffing statements including that China was "a huge market opportunity" and a "great growth market" in which Align was "seeing tremendous growth" and a "market that's growing significantly for [Align]" with "great economics." *Id.* at 1099.

The Ninth Circuit affirmed dismissal, holding that "these . . . statements plainly fit beneath the umbrella of puffery" because they "[a]ll use vague, generically positive terms" that "are not 'objectively verifiable.'" *Id*. (citation omitted). While the court noted that, in certain cases, "'general statements of optimism' made against a clearly pessimistic backdrop 'may form a basis for a securities claim,'" it held that "was not the case" for Align because "[s]ignificantly, . . . the company's sales were *still growing* in China, albeit at a diminished rate[.]" *Id.* (citation omitted). Accordingly, the "feel-good descriptions from Align's executives did not 'affirmatively create an impression of a state of affairs that differed in a material way from the one that actually existed.'" *Id.* (quoting *Quality Sys.*, 865 F.3d at 1144); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *9 (N.D. Cal. Dec. 17, 2019) (Oracle's statement that "we continue to see tremendous growth across our cloud business" not actionable despite declining growth rates in the cloud business; "[b]ecause the fact that Oracle's Cloud Business was growing is not in dispute, [the] characterization of that growth is incapable of 'objective verification' and thus, non-actionable."). Because Plaintiffs concede that sales pipeline, pipeline generation, and productivity all grew, albeit at declining rates throughout FY18, *Align* is on all fours. Growth, albeit at decreasing rates, is not the type of "clearly pessimistic backdrop" that renders "general statements of optimism" misleading under *Quality Systems*. *Align*, 39 F.4th at 1099. The statements Plaintiffs challenge here are thus inactionable as a matter of law.

Finally, Plaintiffs argue that Mr. Pandey's opinion—*i.e.*, that "he th[ought]" Nutanix's approach of looking at the channel "as a customer, not just a partner" had "been a huge contribution to our overall mid-market customer acquisition" (Ex. 5 at 15)—is actionable because Nutanix failed to disclose "problems with Nutanix's new customer growth and sales pipeline." Opp. at 17.

As *Omnicare* emphasized, however, challenging an opinion statement as misleading by omission is "no small task" because opinions are not actionable just because "an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189, 194. Under recent Ninth Circuit precedent interpreting *Omnicare*, the only way in which Mr. Pandey's opinion regarding channel relationships being a "huge contribution" to new customers could potentially be actionable is if the channel relationships were no contribution at all. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196-97 (9th Cir. 2021) (applying *Omnicare*; opinion statement "that 'great progress' was being made on battery production would potentially be an actionable false statement only if, as the district court put it, Tesla had been 'making no progress at all.'"). Plaintiffs' allegations do not come close to meeting this standard: Nutanix accurately reported customer growth in Q2'18 and Plaintiffs do not plead any fact that would suggest that **no portion** of that growth came from Nutanix's relationship with the channel or overall mid-market customer acquisition.

### D.      None of the Previously Dismissed Statements Is Actionable

As explained in the Motion (Mot. at 21-26) and below, none of the challenged statements the Court previously dismissed is actionable.

**Increased Demand Statements.** Plaintiffs challenge Nutanix's statement in various SEC filings that its revenue growth reflected "increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities." ¶¶ 299, 330, 359, 382, 394. As Defendants' Motion explained, the Court previously found these statements inactionable, and they remain so. Mot. at 24-25. The Opposition argues that the statements were misleading because Nutanix "robb[ed] Peter to pay Paul" by depleting pipeline for future quarters through pull-ins fueled by purportedly "unsustainable sales practices" such as discounts and rebates. *See* Opp. at 25-26. To the extent Plaintiffs are relying on alleged discounting or rebate practices to support their claim, that reliance is entirely misplaced: Plaintiffs fail to offer anything to suggest that Nutanix's discounting practices were improper in any way and the "[s]ecurities laws' purpose is not to police customer discounts." *Oracle*, 2019 WL 6877195 at *11 n.7; *see also, e.g., Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 325, 328 (2007) (recognizing that "offering customers discounts as an incentive to buy" is "legitimate").

Moreover, the Court twice previously rejected Plaintiffs' pull-in claims, and Defendants' Motion showed that conclusion remains sound.  Nutanix tracked its pull-in rates (*i.e.*, the win rate for transactions from the pipeline projected to close in future quarters) and the actual rate of pull-ins was exceedingly low and consistent—between 1.77 percent and 2.62 percent in FY18.  Mot. at 22.  Nutanix's pull-ins did not deplete the pipeline for future quarters, as that grew significantly. *Id.*; *see also* Ex. 15 at 2.  Plaintiffs do not dispute this, nor do they cite anything to show that Nutanix's pipeline for future quarters declined due to pull-ins (or anything else), because they cannot.  Instead, Plaintiffs point to snippets from various internal emails referring to pull-ins (Opp. at 25 n.19), but this falls apart upon scrutiny.  ***Just two*** of Plaintiffs' cited documents were from FY18 and none of the documents reflects (or even implicitly suggests) that pull-ins occurred at an unusual rate or depleted future pipeline.[17]  Plaintiffs' authorities do not help them.[18]

**Funding Growth and Marketing Statements.**  Plaintiffs challenge statements regarding

---

[17] Both FY18 documents relate to closing Q2'18 and reflect general encouragement to close deals early in the normal business context of striving for a strong quarter close.  PX63 at NTNX-0073689 ("[w]e have 3 days left in Q2 and it is very important that we execute with our partners to close the quarter strong"); PX62 (similar).  Plaintiffs' Q1'19 documents are similarly innocuous. *E.g.*, PX64 at NTNX-0041757 (Q1'19 email regarding forecast requesting that sales regions "commit some numbers that we are all going to work diligently to commit to"); PX67 at NTNX-0047411 (discussing "working deal by deal with partners to close [Q2 deals] in Q1").  Plaintiffs' documents from Q2'19 post-date any challenged statement and are therefore ***wholly irrelevant***. *E.g.*, PX25 (Ex. 13) at 62 (Q2'19 presentation reflecting the projected win rate for future pipeline (*i.e.*, the pull-in rate) of merely ***2.6 percent***); PX69 at NTNX-0011689 ("[m]any [opportunities] are expected to close today [*i.e.*, the day after Q2'19 close] . . . or Monday – I assume we can all agree that with only slightly earlier urgency those opps could have closed yesterday").

[18] *In re Plantronics, Inc. Securities Litigation*, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) involved the defendants' adoption of a new, abnormally large channel stuffing practice during the class period, *i.e.*, the sale of products to channel partners in the absence of end customer demand. *Id.* at *7-9.  Nutanix's pull-in practices were consistent, modest, and driven by real customer demand.  *E.g.*, MTD II at 9 (Plaintiffs' "recogni[tion] that Nutanix regularly pulled in accounts each quarter, including before the Class Period . . . undercuts their contention that [the] pull-in practice was misleading.").  *Construction Workers Pension Trust Fund v. Genoptix, Inc.*, 2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) involved defendants' after-the fact admission that demand had been in decline over the prior twelve months, a direct conflict with the challenged statements regarding strong demand.  *Id.* at *6.  The Court previously rejected application of *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274 (D. Or. June 27, 2017), because it alleged a "pull-in scheme [in direct contradiction of a disclosed inventory policy] in the context of overt representations that the company could sustain organic growth based on increased demand for its products[.]"  MTD I at 18.  Nothing alleged in the TAC changes that conclusion.

Nutanix's growth in spending (¶¶ 305, 368) and marketing statements (¶¶ 293, 299, 319, 324, 330, 353, 359, 376, 382, 388, 394). Opp. at 27-28. The Court previously dismissed these statements because they "d[id] not mention lead generation specifically" and Plaintiffs "fail[ed] to provide a specific statement by Nutanix that led investors to believe that it was increasing spending on lead generation (whether understood as 'marketing' expenses or expenses for a smaller subset of 'brand awareness, promotions, trade shows and partner programs) when, in fact, it was not." MTD II at 7-8; Mot. at 25. The Ninth Circuit's recent decision in *Kasilingam v. Stitch Fix, Inc.*, 2022 WL 10966359 (9th Cir. Oct. 19, 2022) (Mot. at 23), confirms the Court's rationale. Plaintiffs have offered no reason why any reasonable investor would understand Nutanix's general statements about "funding growth," "strong growth in spending," or marketing spending in general, to refer to lead generation, *i.e.*, a subset of spending. 2022 WL 10966359, at \*1 (statements about "advertising more generally" did not refer to a subset of advertising).

Plaintiffs offer no meaningful response; for example, they cite an internal email in Q3'18 (PX5) to show that Nutanix held demand generation spending relatively constant in Q2'18—a point that is not in dispute—but neglect that the ***same document*** was created in an effort to understand why Nutanix experienced significant "***out-performance***" and "***higher than*** . . . ***expected***" pipeline win rates in Q2'18, *i.e.*, facts cutting directly against Plaintiffs' claims regarding poor sales productivity in that quarter. PX5 at NTNX-0018759; Opp. at 27 n.22.[19] Plaintiffs have given the Court no reason to revisit its previous holding.

**Software Transition Statements.** Defendants showed that Plaintiffs' challenge to Nutanix's statements regarding its transition to a software-based model (¶¶ 310, 337, 348, 365-366) were not actionable. Among other things, Defendants showed that Plaintiffs' claim that the transition impacted smaller customer growth was factually unsupported, and many of the challenged statements ("on track" or "successfully execut[ed]") were nonactionable puffery. Mot. at 23-24. In response, Plaintiffs abandon their claim regarding small customers and, instead, focus

---

[19] Plaintiffs also cite a document ***from Q4'19***—i.e., well after the Class Period. Opp. at 27 n.22. That document is irrelevant, but Plaintiffs also misinterpret it by conflating "enablement" with "pipeline spending" (*id.*) when the document itself delineates the ***separate*** concepts of "[demand generation] spend and pipeline, sales ***enablement***, [and] rigorous channel[.]" PX22 at NTNX-0032908.

on Nutanix's sales quotas, which they claim were "unreasonable" and resulted in sales disorganization.  Opp. at 28-29.  But the challenged statements regarding the progress of the transition to software do not expressly or impliedly represent anything about sales quotas.  And, in any event, Defendants showed that sales quotas are used as a motivational tool and, even if they are not met, that does not demonstrate the Company's poor performance.  Mot. at 18-19 (citing authorities).  Plaintiffs do not respond, nor do they cite any authority to the contrary.[20]

**Abandoned Challenged Statements.**  Plaintiffs effectively abandon their claims as to the remaining challenged statements.  Defendants' Motion showed that Plaintiffs' allegations regarding numerically accurate statements regarding headcount (¶¶ 296, 327, 356, 379, 391) and end customers (¶¶ 299, 314, 318, 319, 330, 359, 371, 382, 394) did not address the deficiencies the Court previously identified in dismissing them, *i.e.*, Plaintiffs did not adequately allege how a reasonable investor would have been misled by accurate headcount statements or that a reasonable investor would have conflated end customers with new customers.  Mot. at 26 (citing MTD II at 11).  Other than stating in passing that they are re-alleging their claims "[b]ased on the new materials attached to the [TAC] confirming the negative sales hiring and productivity trends," (Opp. at 22 n.17), Plaintiffs do not attempt to address the Court's prior holding that the statement that "[d]emand for our solutions remains strong" (¶ 337) is inactionable puffery.  And Plaintiffs likewise do not address Defendants' showing that the opinion statement regarding "lead generation spend" driving "strong pipeline generation" (¶ 425) is inactionable or that Nutanix's billing target "push[ing] . . . a quarter or 2" (*id.*) is a forward looking statement immunized by the PSLRA.

## III.    THE NEW "NEGATIVE TRENDS" THEORY DOES NOT PLEAD SCIENTER

This Court previously found scienter was a "close question," but ultimately ruled that

---

[20] Plaintiffs' authorities involved exceptional circumstances not present here. *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *2, *8, *12 (N.D. Cal. Jan. 6, 2022) (statements portraying FDA communications as "collaborative" and "on track" false where company later admitted it had "unusual period" of "no [ongoing] dialogue whatsoever" with the FDA); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816-17 (N.D. Ill. 2017) (parent corporation's statements regarding integration of two subsidiaries being "on track" were not immaterial as a matter of law because "the failure to timely integrate [the subsidiaries]" resulted in "significant inaccuracies in Akorn's reported financial performance"); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1076-77 (D. Minn. 2013) (statement that Best Buy was on track to deliver annual guidance actionable in light of particularized factual allegations of, *inter alia*, consecutive quarters of sales declines and a reduction in the revenue forecast).

Plaintiffs' CW allegations of declining pipeline and productivity were sufficient to give rise to a strong inference of scienter. MTD II at 15-17. In light of Plaintiffs' acknowledgement that sales pipeline and productivity did not decline and Plaintiffs' pivot to a new "negative trends" theory of declining growth *rates* (*supra* pp. 1-7), this reasoning no longer applies. The Court must now re-analyze the sufficiency of the scienter allegations in the TAC based on Plaintiffs' new "negative trends" theory—*i.e.*, that Defendants concealed declining rates of growth in pipeline and productivity, high attrition, and missed internal pipeline and hiring goals. *E.g.*, Opp. at 4-5.

The scienter inquiry is not satisfied by simply showing that Defendants were aware of problems regarding achievement of internal pipeline, hiring, or sales productivity targets. Instead, the scienter inquiry is satisfied only where Plaintiffs plead particularized facts to establish that Defendants "intentionally misled investors, or acted with deliberate recklessness, by not disclosing the problem sooner." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056-57 (9th. Cir. 2014); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 889-90 (N.D. Cal. 2020) (similar), *aff'd sub nom. Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022). In that regard, Plaintiffs' new "negative trends" theory falls far short.

Here, Defendants expressly warned investors that revenue growth was expected to slow; provided quarterly guidance that projected slowing revenue growth and ***met*** or ***exceeded*** that guidance in every quarter until Q3'19 (*i.e.*, well after any challenged statement); disclosed hiring shortfalls; and provided accurate counts of customers from which slowing growth rates could be easily calculated every quarter. When Defendants discussed their "real[] excite[ment]" and "renewed focus on new customer logos," their statements were supported by a ***growing*** sales pipeline, not a declining one. ¶ 346; *supra* pp. 3-4. And when Defendants stated that they experienced "record sales productivity" or added a "record number of new customers," ***they did exactly that***. And, although Nutanix did in fact miss its ambitious internal goals for pipeline generation,[21] Plaintiffs have completely ignored Defendants' showing that Nutanix was under no obligation to have disclosed that fact to investors. Mot. at 28-29 (citing authorities).

---

[21] Most of Plaintiffs' internal documents discussing pipeline creation shortfalls expressly refer to Nutanix's internal, undisclosed "targets" or "goals." *E.g.* PX25, 37, 46. In addition, many of the documents postdate any challenged statement and are irrelevant. *E.g.*, PX58, 60, 65, 67.

Plaintiffs' attempt to establish scienter based on attrition or hiring fares no better. Attrition was concededly modest (*supra* pp. 6-7); Nutanix **disclosed** the ratio of ramped (*i.e.*, fully productive) sales representatives to total sales representatives each quarter (*supra* p.12); and that it was not meeting its hiring targets. In Nutanix's earnings calls for both Q1'18 and Q2'18, Mr. Williams disclosed that Nutanix had ***fallen short*** of its hiring goals. Mot. at 3. And while Mr. Williams accurately described Nutanix's execution in Q3'18 of the remediation plan it had put in place the prior quarter—"flawlessly" and with "strong success" because Nutanix "added over 60 new sales teams" and hired "more new employees than in any previous quarter" (¶¶ 337, 343)—he simultaneously reported that Nutanix was ***"not yet at [its] planned headcount*.*"** ¶ 343.[22] Given these statements, no reasonable investor would have been misled regarding Nutanix's hiring.

In light of Plaintiffs' abandonment of the theory of fraud the Court previously credited, Defendants respectfully submit that the scienter inquiry is no longer a "close question" (MTD II at 15)—there are simply no facts to suggest that Defendants recklessly or intentionally misled the market by making the concededly accurate statements Plaintiffs challenge.

## CONCLUSION

For the foregoing reasons, the TAC and RFAC should be dismissed with prejudice.

---

[22] Plaintiffs also repeatedly assert that Defendants' "Class Period ending admissions" demonstrate that the challenged statements are actionable. Opp. at 3, 4, 19, 23, 35. This Court twice rejected Plaintiffs' assertion that Nutanix's statements at the end of the Class Period support scienter. MTD I at 20; MTD II at 14. Moreover, although Plaintiffs claim that Mr. Williams admitted to "inadequate marketing spending for pipeline generation" dating back to Q4'17 (Opp. at 19), he did no such thing. What Mr. Williams actually said was that from Q4'17 to Q3'18, Nutanix "kept lead generation spend flat" during which time "the company continued to perform quite well" because of "improved efficiencies within lead generation spend." Ex. 24 at 8. He then explained that those improved efficiencies did not materialize as expected in FY19 (*i.e.*, the fiscal year beginning August 1, 2018), after the challenged statements that survived dismissal were made. ¶ 405. And while Plaintiffs claim Mr. Williams admitted that hiring issues persisted throughout the Class Period (Opp. at 23), Plaintiffs ignore the fact that Nutanix disclosed its hiring and headcount shortfall in Q1, Q2 and Q3'18 (*supra* p. 20) and clearly attributed the disappointing news announced in February 2019 to a shortage of sales reps in FY19. ¶ 405.

Dated:  February 1, 2023

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  /s/ *Nina F. Locker*
　　　 Nina F. Locker

*Attorneys for Defendants Nutanix, Inc., Dheeraj Pandey and Duston M. Williams*

DEFS.' REPLY ISO OMNIBUS MTD
CASE NO. 3:19-CV-01651-WHO
CASE NO. 3:21-CV-04080-WHO

-21-