ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
KENNETH J. BLACK (291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
kennyb@rgrdlaw.com
          – and –
JAMES E. BARZ
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re NUTANIX, INC. SECURITIES LITIGATION | Case No. 3:19-cv-01651-WHO<br>Case No. 3:21-cv-04080-WHO |
| | CLASS ACTION |
| JOHN P. NORTON, ON BEHALF OF THE NORTON FAMILY LIVING TRUST UAD 11/15/2002, Individually and On Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>     vs.<br><br>NUTANIX, INC., DHEERAJ PANDEY, and DUSTON M. WILLIAMS,<br><br>                                    Defendants. | DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF: (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION, AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARD TO CLASS REPRESENTATIVE PURSUANT TO 15 U.S.C. §78u-4(a)(4)<br><br>DATE:     October 4, 2023<br>TIME:     2:00 p.m. (via videoconference)<br>JUDGE:   Honorable William H. Orrick |

4875-6605-5804.v1

I, STEPHEN R. ASTLEY, declare as follows, pursuant to 28 U.S.C. §1746:

1. I am a member of the law firm Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). Robbins Geller serves as lead counsel on behalf of the Court-appointed lead plaintiff California Ironworkers Field Pension Trust ("California Ironworkers") in the *Nutanix* Action.[1] I submit this declaration in support of: (i) final approval of the settlement ("Settlement") that California Ironworkers, named plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust in the *Nutanix* Action ("City of Miami"), and lead plaintiff John P. Norton, on behalf of the Norton Family Living Trust UAD November 15, 2002, in the *Norton* Action ("Norton," and collectively with California Ironworkers and City of Miami, "Plaintiffs") reached on behalf of themselves and the Class (defined below) with defendants Nutanix, Inc. ("Nutanix" or the "Company"), Dheeraj Pandey ("Pandey"), and Duston M. Williams ("Williams") (the "Individual Defendants" and collectively with Nutanix, the "Defendants"); (ii) approval of the proposed plan for the allocation of the Net Settlement Fund ("Plan of Allocation"); and (iii) approval of an award of attorneys' fees and litigation expenses and charges ("Fee and Expense Application"). Unless otherwise indicated, I have personal knowledge of the matters set forth herein based both on my extensive participation in the prosecution and settlement of the claims asserted in the *Nutanix* Action and my supervision of those working at my direction.

2. The Settlement will resolve all claims asserted in the *Nutanix* Action and the *Norton* Action (collectively, the "Actions") against all Defendants on behalf of the Class, which consists of all persons or entities who: (i) purchased or otherwise acquired Nutanix securities between November 30, 2017 and May 30, 2019, inclusive (the "Class Period"); and/or (ii) transacted in publicly traded call options and/or put options of Nutanix during the Class Period.[2]

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation of Settlement dated April 7, 2023 ("Stipulation") (*Nutanix* Action ECF 307-2; *Norton* Action ECF 117-2).

[2] Excluded from the Class are Nutanix and its subsidiaries and affiliates, the Individual Defendants, any of Defendants' respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a Controlling Interest. Order Preliminarily Approving Settlement and Providing for Notice as Amended, dated May 19, 2023 (*Nutanix* Action ECF 311; *Norton* Action ECF 121) ("Preliminary Approval Order"), ¶1. Also excluded from the Class are any persons or

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO        - 1 -
4875-6605-5804.v1

## I.    PRELIMINARY STATEMENT:  THE SIGNIFICANT RECOVERY ACHIEVED

3.    Through intensive efforts and after extensive arm's-length settlement negotiations, Lead Counsel achieved a $71 million settlement on behalf of the Class.  As set forth in the Stipulation, in exchange for this payment, the Settlement resolves all claims asserted in the Actions by Plaintiffs and the Class against Defendants.

4.    The Settlement was negotiated at arm's length and reached after mediation conducted under the auspices of nationally recognized mediator and retired United States District Judge, Hon. Layn R. Phillips, of Phillips ADR Enterprises, P.C.  Plaintiffs agreed to the Settlement only after they gained a thorough appreciation for the strengths and weaknesses of the Actions by, among other things, (i) conducting an extensive investigation; (ii) reviewing and analyzing 570,862 pages of documents produced by Defendants and third parties; (iii) incorporating documents produced by Defendants and other facts into detailed amended complaints; (iv) opposing Defendants' motions to dismiss and motion for judgment on the pleadings; (v) preparing detailed mediation statements; and (vi) participating in a mediation session with Judge Phillips, followed by months of settlement discussions with Judge Phillips' assistance.

5.    The $71 million Settlement represents a recovery of approximately 15% of the estimated aggregate damages as calculated by Plaintiffs' damages expert.  As set forth in the accompanying Memorandum of Points and Authorities in Support of Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (the "Final Approval Memorandum") (at 14-15), this is well within the range of reasonableness under the circumstances and warrants final approval of the Settlement.

6.    Plaintiffs and Lead Counsel obtained this substantial recovery despite the significant risks Plaintiffs faced in prosecuting the Actions.  Defendants strenuously maintained, and continue to maintain, that no liability or damages could be proven at trial.  When viewed in the context of these risks and uncertainties, the Settlement is a very favorable result for the Class.

entities who exclude themselves by submitting a request for exclusion in connection with the Notice that is accepted by the Court.  *Id.*, ¶2.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 2 -

## II.    BRIEF SUMMARY OF PLAINTIFFS' CLAIMS

7.    Plaintiffs allege that during the period between November 30, 2017 and May 30, 2019, Defendants made materially false or misleading statements and omissions in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, which caused the prices of Nutanix securities and publicly traded options to trade at artificially inflated prices.   Specifically, Plaintiffs allege that Defendants concealed Nutanix's transition to a new business model, which diverted its customer pipeline spending to the R&D of new software products, rather than sales and marketing efforts to obtain new customers. Plaintiffs allege that contrary to Defendants' Class Period statements indicating that Nutanix was making significant investments in sales and marketing while maintaining high profit margins, Defendants had actually decreased Nutanix's lead generation spending, which in turn drove higher margins and resulted in weak guidance.  According to Plaintiffs' allegations, Defendants knew that, without pipeline expenditures, Nutanix would see lower growth, fewer customer acquisitions, and declining sales productivity.  Plaintiffs further allege that these problems were compounded by an exodus of Nutanix's sales force.   Plaintiffs allege that Defendants attempted to conceal these negative trends by pulling in future sales based on inducements such as discounts and a novel rebate program, but ultimately, Defendants were unable to pull in sufficient sales to hide the lagging pipeline growth and sales productivity.  Plaintiffs allege that, when Defendants were forced to make a series of partial disclosures of disappointing financial results tied to the Company's sales pipeline and productivity issues, the prices of Nutanix securities and publicly traded options plummeted, causing massive losses to investors.

8.    Defendants have denied and continue to deny each and all of the claims and contentions alleged by Plaintiffs in these Actions.  Defendants further assert that they are entering into this Settlement solely to eliminate the burden, expense, and uncertainty of further protracted litigation.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 3 -

## III.   RELEVANT PROCEDURAL HISTORY AND NEGOTIATION OF THE SETTLEMENT

9.     On March 29, 2019, an initial class action complaint was filed in this Court against Defendants, alleging violations of Sections 10(b) and 20(a) of the Exchange Act. *Nutanix* Action ECF 1. On July 10, 2019, the Court entered an order consolidating the initial class action complaint with several related class action complaints against Defendants, appointing Shimon Hedvat ("Hedvat") as lead plaintiff of the consolidated action, and approving Hedvat's selection of lead counsel, Levi & Korsinsky, LLP ("Levi & Korsinsky" and collectively with Robbins Geller, "Lead Counsel"). *Nutanix* Action ECF 87.

10.    On September 9, 2019, Hedvat and City of Miami filed a consolidated amended complaint against Defendants on behalf of themselves and all other persons similarly situated who purchased or otherwise acquired Nutanix securities between November 30, 2017 and May 30, 2019, inclusive ("*Nutanix* FAC"). *Nutanix* Action ECF 102. On October 24, 2019, Defendants filed a motion to dismiss the *Nutanix* FAC. *Nutanix* Action ECF 108. On March 9, 2020, the Court granted the motion to dismiss with leave to amend. *Nutanix* Action ECF 121.

11.    On April 17, 2020, Hedvat and City of Miami filed a second consolidated amended complaint against Defendants ("*Nutanix* SAC"). *Nutanix* Action ECF 124. On May 22, 2020, Defendants moved to dismiss the *Nutanix* SAC. *Nutanix* Action ECF 125. On September 11, 2020, the Court granted in part and denied in part the motion to dismiss. *Nutanix* Action ECF 140.

12.    On October 23, 2020, Defendants filed their Answer to the *Nutanix* SAC. *Nutanix* Action ECF 145.

13.    On October 23, 2020, Hedvat and City of Miami served their Initial Disclosures on Defendants, and Defendants served their Initial Disclosures on Hedvat and City of Miami, pursuant to Federal Rule of Civil Procedure 26(a)(1)(A).

14.    On October 26, 2020, the Court entered a Stipulated Protective Order. *Nutanix* Action ECF 151.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 4 -

15. On October 27, 2020, the Court held a case management conference and entered a Pretrial Schedule with certain case management deadlines, including a deadline for Hedvat and City of Miami to file a motion for class certification by February 26, 2021. *Nutanix* Action ECF 152.

16. On November 4, 2020, Hedvat and City of Miami served their First Set of Requests for Production of Documents on Defendants.

17. On November 6, 2020, Hedvat and City of Miami issued subpoenas *duces tecum* to the following third parties: Wells Fargo Securities, LLC; RBC Capital Markets; Goldman Sachs & Co., LLC; J.P. Morgan Chase & Co.; Morgan Stanley & Co.; Oppenheimer & Co., Inc.; Bank of America Corporation; Deloitte & Touche LLP, Maxim Group LLC; KeyBanc Capital Markets, Inc.; JMP Securities LLC; Jefferies Group LLC; Garrison, Bradford & Associates, Inc.; Forbes Media, LLC; Deutsche Bank Securities Inc.; The Channel Company, LLC, d/b/a CRN; Accounting Research & Analytics, LLC; Barclays Bank PLC; BTIG, LLC; Wolfe Research Advisors, LLC; Zacks Investment Research; William Blair & Company, L.L.C.; TechTarget; Susquehanna International Group, LLP; Robert W. Baird & Co. Incorporated; Stifel, Nicolaus & Company, Incorporated; Piper Sandler & Co.; Raymond James Financial, Inc.; and Needham & Company, LLC.

18. On November 19, 2020, Hedvat, City of Miami, and Defendants stipulated and agreed to a protocol regarding the production of electronically stored information and hard copy documents, following negotiations over the terms of such protocol.

19. Between November 30, 2020 and February 11, 2022, the following third parties produced documents in response to the subpoenas *duces tecum* issued by Hedvat and City of Miami on November 6, 2020:

- Goldman Sachs & Co., LLC (1,302 pages on November 30, 2020);
- William Blair & Company, L.L.C. (290 pages on December 1, 2020);
- Morgan Stanley & Co. (289 pages on December 2, 2020);
- Raymond James Financial, Inc. (312 pages on December 2, 2020);
- Wolfe Research Advisors, LLC (7,751 pages on December 3, 2020);

- Deutsche Bank Securities Inc. (6,598 pages total on December 3, 2020 and February 1, 2021);

- RBC Capital Markets (2,519 pages on December 4, 2020);

- Robert W. Baird & Co. Incorporated (8,055 pages on December 4, 2020);

- Accounting Research & Analytics, LLC (2,743 pages on December 5, 2020);

- BTIG, LLC (42,660 pages total on December 7 and 11, 2020);

- JMP Securities LLC (4,968 pages on December 8, 2020);

- Needham & Company, LLC (514 pages on December 8, 2020);

- Jefferies Group LLC (2,420 pages on December 10, 2020);

- Piper Sandler & Co. (305,006 pages on December 10, 2020);

- Stifel, Nicolaus & Company, Incorporated (1,089 pages total on December 10, 16, and 22, 2020);

- The Channel Company, LLC, d/b/a CRN (17,407 pages on December 11, 2020);

- Maxim Group LLC (8,311 pages total on December 11, 2020 and February 9, 2021);

- KeyBanc Capital Markets, Inc. (6,459 pages on December 23, 2020);

- Zacks Investment Research (1,179 pages on December 24, 2020);

- Susquehanna International Group, LLP (67,940 pages on January 8, 2021);

- Bank of America Corporation (270 pages total on January 25, 2021 and January 4, 2022);

- Wells Fargo Securities, LLC (3,449 pages on January 24, 2022); and

- J.P. Morgan Chase & Co. (257 pages on February 11, 2022).

As these and the other third-party productions were made, Plaintiffs conducted a thorough review of the documents to assess their relevance to Plaintiffs' claims and organized them in preparation for anticipated depositions and motion practice.

20. On December 4, 2020, Defendants served their Responses & Objections to Plaintiffs' First Set of Requests for Production of Documents.

21. On December 12, 2020, Hedvat and City of Miami issued a subpoena *duces tecum* to third party FBN Securities, Inc., which was subsequently re-issued on December 15, 2020. On

January 12, 2021, FBN Securities, Inc. produced 338 pages of documents in response to the subpoena.

22. On January 18, 2021, Hedvat and City of Miami issued a subpoena *duces tecum* to third party Bain Capital, LP.

23. On January 27, 2021, Hedvat, City of Miami, and Jose Flores ("Flores") moved to withdraw Hedvat as lead plaintiff in the *Nutanix* Action, and to substitute Flores and City of Miami as co-lead plaintiffs and approve their selection of lead counsel. *Nutanix* Action ECF 161.

24. On February 4, 2021, the Court entered an Order Modifying Class Certification Deadlines, extending, in pertinent part, the deadline to file a motion for class certification to March 10, 2021. *Nutanix* Action ECF 165.

25. On February 19, 2021, City of Miami issued a subpoena *duces tecum* to Champlain Investment Partners.

26. On March 1, 2021, the Court entered an order withdrawing Hedvat as lead plaintiff and allowing any putative class member to file by March 22, 2021, an application to serve as lead plaintiff. *Nutanix* Action ECF 171. Up through and until the Court entered its March 1, 2021 order, City of Miami and its counsel had worked to prepare a motion for class certification, including by consulting with a market efficiency and damages expert.

27. On May 28, 2021, Norton filed a class action complaint in this Court against Defendants alleging violations of Sections 10(b) and 20(a) of the Exchange Act ("*Norton* Complaint"). *Norton* Action ECF 1. The *Norton* Complaint was filed on behalf of Norton and all other persons or entities similarly situated who transacted in publicly traded call options and/or put options of Nutanix between November 30, 2017 and May 30, 2019, inclusive. *Id.*

28. On June 2, 2021, the Court entered an order finding that the *Norton* Action was related to the *Nutanix* Action. *Norton* Action ECF 8; *Nutanix* Action ECF 223.

29. On June 10, 2021, the Court entered an order appointing California Ironworkers as lead plaintiff in the *Nutanix* Action and approving its selection of Robbins Geller as lead counsel. *Nutanix* Action ECF 224.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 7 -

30.    On July 8, 2021, California Ironworkers filed a motion for leave to supplement the *Nutanix* SAC to conform it to events related to the withdrawal of Hedvat and appointment of California Ironworkers as lead plaintiff. *Nutanix* Action ECF 229. The Court granted the motion on August 16, 2021, and California Ironworkers filed a supplement to the *Nutanix* SAC on the same day. *Nutanix* Action ECF 237-238.

31.    On July 26, 2021, Defendants made their first document production consisting of 265 pages. Plaintiffs carefully reviewed these documents as they continued to meet-and-confer with Defendants regarding further productions.

32.    On September 3, 2021, California Ironworkers served Lead Plaintiff's Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A).

33.    On September 8, 2021, the Court entered an order appointing Norton as lead plaintiff in the *Norton* Action and approving his selection of Levi & Korsinsky as lead counsel. *Norton* Action ECF 30.

34.    On September 17, 2021, Defendants served their First Set of Requests for Production of Documents and Electronically Stored Information to Lead Plaintiff California Ironworkers Field Pension Trust.

35.    On October 18, 2021, California Ironworkers served its Responses and Objections to Defendants' First Set of Requests for Production of Documents and Electronically Stored Information to Lead Plaintiff California Ironworkers Field Pension Trust.

36.    On October 22, 2021, Defendants served their First Set of Requests for Production of Documents and Electronically Stored Information to Lead Plaintiff John P. Norton, on Behalf of the Norton Family Living Trust UAD 11/15/2002.

37.    On October 28, 2021, Defendants made their second document production consisting of 1,273 pages.

38.    On November 1, 2021, Defendants filed a motion to dismiss the *Norton* Complaint. *Norton* Action ECF 41-42.

39.     On November 5, 2021, Defendants issued Subpoenas *Duces Tecum* for the Production of Documents to Hedvat and third parties Champlain Investment Partners LLC and RVK, Inc.

40.     On November 16, 2021, Hedvat served his Objections to Defendants' Subpoena *Duces Tecum* Dated November 5, 2021.

41.     On November 22, 2021, Norton served his Responses and Objections to Defendants' First Set of Requests for Production of Documents and Electronically Stored Information to Lead Plaintiff John P. Norton, on Behalf of the Norton Family Living Trust UAD 11/15/2002.

42.     On November 24, 2021, RVK, Inc. served its Responses and Objections to Subpoena to Produce Documents.

43.     On December 1, 2021, Champlain Investment Partners, LLC served its Response and Objections to Subpoena.

44.     On December 1, 2021, Defendants made their third document production consisting of 4,776 pages.

45.     On December 17, 2021, California Ironworkers issued subpoenas *duces tecum* to The Blueshirt Group, LLC and Joele Frank, Wilkinson Brimmer Katcher.

46.     On January 4, 2022, the parties informed the Court that they wished to explore a resolution of the Actions through the services of a private mediator.  *See Nutanix* Action ECF 252; *Norton* Action ECF 52.  On January 5, 2022, the Court entered orders vacating existing deadlines in the Actions in connection with the mediation.  *Nutanix* Action ECF 255; *Norton* Action ECF 53.

47.     The parties agreed that it would serve all parties' interests to engage a mediator with a track record of mediating complex class action litigation, and someone who had an understanding of the law and issues involved in PSLRA actions.  As a result, the parties agreed to retain retired United States District Judge, Layn R. Phillips.

48.     To facilitate a meaningful mediation process, Defendants made a series of additional document productions for the purposes of mediation only.  On January 27, 2022, Defendants made their first document production for purposes of mediation, consisting of 108 pages.

49.    On February 4, 2022, Defendants made their second document production for purposes of mediation, consisting of 2,945 pages.

50.    On February 11, 2022, Defendants made their third document production for purposes of mediation, consisting of 14,979 pages.

51.    On February 18, 2022, Defendants made their fourth document production for purposes of mediation, consisting of 17,655 pages.

52.    On February 25, 2022, Defendants made their fifth document production for purposes of mediation, consisting of 19,342 pages.

53.    On March 5, 2022, Defendants made their sixth document production for purposes of mediation, consisting of 2,068 pages.

54.    On March 12, 2022, Defendants made their seventh document production for purposes of mediation, consisting of 153 pages.

55.    On March 13, 2022, Defendants made their eighth document production for purposes of mediation, consisting of 6,403 pages.

56.    Prior to the mediation there were numerous issues about which the parties disagreed, including whether the statements made or facts allegedly omitted were material, false, misleading, or actionable and whether Plaintiffs had adequately alleged and could prove that Defendants acted with scienter.  Defendants also disputed loss causation as to the alleged corrective disclosures on May 30, 2019.

57.    The parties scheduled their mediation for April 26, 2022, and Judge Phillips instructed the parties to submit and exchange statements prior to mediation detailing their respective positions and supporting evidence.  Lead Counsel prepared Plaintiffs' opening and responsive mediation statements, marshaling the facts and documentary evidence obtained through their extensive investigation, including from the documents made available to Plaintiffs for purposes of the mediation and consultation with an expert on loss causation and damages.  The parties' respective mediation statements each included a thorough discussion of Plaintiffs' and Defendants' positions.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 10 -

58.     On April 26, 2022, through their representatives, the parties, along with representatives of Defendants' insurers, participated in a hybrid (in-person and virtual) mediation session in Corona del Mar, California, overseen by Judge Phillips.  During the mediation session, Lead Counsel elaborated upon certain facts set forth in Plaintiffs' mediation statements as to, *inter alia*, falsity, scienter, and damages.

59.     On May 11, 2022, the parties informed the Court that they were unable to resolve the Actions in mediation, and would present a joint proposed schedule to resume the Actions.  *Nutanix* Action ECF 262; *Norton* Action ECF 56.

60.     On May 23, 2022, Defendants re-produced 63,685 pages of documents they had produced earlier in the litigation for purposes of mediation, as described above.

61.     On May 27, 2022, Defendants filed a motion for partial judgment on the pleadings in the *Nutanix* Action.  *Nutanix* Action ECF 270.

62.     On June 16, 2022, the Court denied Defendants' motion to dismiss the *Norton* Complaint.  *Norton* Action ECF 64.

63.     On June 27, 2022, in response to a joint stipulation filed by the parties in the *Norton* Action (*Norton* Action ECF 66), the Court ruled that Defendants' deadline to answer the *Norton* Complaint would be held in abeyance, and that the parties would include joint (or competing) proposal(s) for a proposed deadline by which Defendants would answer the *Norton* Complaint in their scheduling submission(s) due on September 7, 2022 (*Norton* Action ECF 69).

64.     On August 5, 2022, Defendants made an additional document production consisting of 8,737 pages.  In total, Plaintiffs received and reviewed 570,862 documents produced by Defendants and third parties throughout the course of the litigation.

65.     On September 1, 2022, California Ironworkers and City of Miami filed a third consolidated amended complaint in the *Nutanix* Action ("*Nutanix* TAC") to add new allegations, including allegations based on documents obtained from Defendants, and to re-allege previous allegations from the *Nutanix* SAC.  *Nutanix* Action ECF 281.

66.     On September 1, 2022, Norton filed a first amended class action complaint in the *Norton* Action ("*Norton* FAC") to add new allegations, including allegations based on documents

obtained from Nutanix, and to re-allege previous allegations from the *Norton* Complaint. *Norton* Action ECF 74-78.

67. On September 7, 2022, Defendants withdrew their motion for partial judgment on the pleadings without prejudice because it was mooted by the *Nutanix* TAC. *Nutanix* Action ECF 282.

68. On September 7, 2022, in response to joint stipulations filed by the parties (*Nutanix* Action ECF 282; *Norton* Action ECF 79), the Court ruled that the parties' deadlines to submit a proposed case schedule, including any schedules regarding Defendants' motions to dismiss or other responses to the *Nutanix* TAC and *Norton* FAC, were extended to September 14, 2022, and that Defendants did not have to answer or otherwise respond to the *Nutanix* TAC or the *Norton* FAC by the deadline under Fed. R. Civ. P. 15 (*Nutanix* Action ECF 283; *Norton* Action ECF 80).

69. On September 14, 2022, the parties filed competing proposals for motion to dismiss briefing on the *Nutanix* TAC and *Norton* FAC. *Nutanix* Action ECF 284-286; *Norton* Action ECF 86-88.

70. On September 14, 2022, Norton filed a motion for leave file a Revised First Amended Complaint ("*Norton* RFAC") to conform the *Norton* FAC to the *Nutanix* TAC. *Norton* Action ECF 82-85.

71. On September 29, 2022, the Court granted Norton's motion for leave to file the *Norton* RFAC, and set a briefing schedule for an omnibus motion to dismiss the *Nutanix* TAC and the *Norton* RFAC. *Nutanix* Action ECF 288; *Norton* Action ECF 93.

72. On October 4, 2022, Norton filed the *Norton* RFAC. *Norton* Action ECF 94-98.

73. On November 14, 2022, Defendants filed an omnibus motion to dismiss the *Nutanix* TAC and the *Norton* RFAC. *Nutanix* Action ECF 292; *Norton* Action ECF 105. On December 29, 2022, Plaintiffs filed an omnibus opposition to the motion to dismiss. *Nutanix* Action ECF 296; *Norton* Action ECF 107. On February 1, 2023, Defendants filed a reply in support of the motion to dismiss. *Nutanix* Action ECF 298; *Norton* Action ECF 109. A hearing on the motion to dismiss was scheduled for February 15, 2023. *Nutanix* Action ECF 288; *Norton* Action ECF 93.

74. Prior to the motion to dismiss hearing, the parties agreed in principle to settle the Actions. The parties thereafter memorialized the final terms of the Settlement in the Stipulation. On

February 9, 2023, the parties filed the Stipulation informing the Court of the Settlement and requested that the Court vacate the motion to dismiss hearing. *Nutanix* Action ECF 301; *Norton* Action ECF 111. On February 10, 2023, the Court entered the parties' proposed order vacating the motion to dismiss hearing. *Nutanix* Action ECF 302; *Norton* Action ECF 112.

75. On April 7, 2023, Plaintiffs filed their Notice of Unopposed Motion and Motion for Preliminary Approval of Proposed Settlement and Memorandum of Points and Authorities in Support Thereof, together with the Stipulation, the proposed Plan of Allocation, the Postcard Notice, the Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), the Proof of Claim and Release Form (the "Proof of Claim" and, collectively, the Notice and Proof of Claim are referred to as the "Notice Package"), the Summary Notice, and a request that the Court preliminarily certify the Class. *See Nutanix* Action ECF 307; *Norton* Action ECF 117.

76. On May 17, 2023, the Court held a Preliminary Approval hearing. On May 19, 2023, the Court entered an order preliminarily approving the Settlement, approving the form and manner of notice to the Class as amended, and provisionally certifying the Class for settlement purposes (the "Preliminary Approval Order"). *Nutanix* Action ECF 311; *Norton* Action ECF 121.

77. Pursuant to the Preliminary Approval Order, a Settlement Hearing is scheduled for October 4, 2023. *Id.*

## IV. PLAINTIFFS' DAMAGES CONSULTANT

78. As part of their comprehensive investigation of the relevant facts and legal issues, Lead Counsel retained the services of an expert consultant from a reputable financial economics firm. The consultant assisted with analyzing the losses associated with declines in the prices of Nutanix securities and publicly traded options as a result of the alleged partial disclosures.

79. The consultant further assisted with preparing for negotiations of the Settlement and developing the Plan of Allocation.

## V. RISKS FACED BY PLAINTIFFS IN THE LITIGATION

80. Lead Counsel are confident that Plaintiffs would be able to prove their securities fraud claims, based on their investigation of the relevant facts and legal issues, their review of the documentary evidence produced by Defendants and third parties to date, and their expectation that

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO

4875-6605-5804.v1

- 13 -

additional discovery would provide further support.  Lead Counsel also realize, however, that Plaintiffs would face considerable risks and defenses in continuing to litigate their claims.

81.     Specifically, Plaintiffs would face substantial risks and uncertainties in proving that: (i) Defendants' alleged misstatements and omissions were materially false and misleading; (ii) made with scienter; and (iii) caused the alleged damages suffered by the Class, as required by the federal securities laws.  Plaintiffs and Lead Counsel carefully considered these risks and uncertainties during the months leading up to the Settlement and throughout the Settlement discussions with Defendants and Judge Phillips.

82.     But for this Settlement, there existed the distinct possibility that the Court would rule against Plaintiffs on Defendants' fully briefed omnibus motion to dismiss the *Nutanix* TAC and *Norton* RFAC.  Notably, according to NERA Economic Consulting, from 2013 through 2022, 61% of securities cases were dismissed (some without prejudice).  *See* Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review*, at 11, Figure 11 (NERA Economic Consulting Jan. 24, 2023), attached hereto as Ex. E. And, even if Plaintiffs survived the motion to dismiss that was pending at the time the parties agreed to settle, there is a distinct possibility that Defendants would ultimately prevail on summary judgment or at trial.

**A.     Risks Concerning Falsity**

83.     For Plaintiffs to prevail, they first would have to establish that Defendants made a material false or misleading statement or omission.  Plaintiffs believe that the material false and misleading statements and omissions alleged in the *Nutanix* TAC and *Norton* RFAC were particular and well supported by the alleged facts, including internal documents produced by Defendants.

84.     Defendants, on the other hand, have maintained that Plaintiffs cannot demonstrate that any of the alleged statements or omissions were materially false or misleading.  They argued that certain documents attached to the *Nutanix* TAC and *Norton* RFAC showed that Nutanix's sales pipeline and productivity were strong, and therefore the alleged statements concerning those matters were accurate when made.  They further argued that other alleged statements should be dismissed

because they were puffery, opinions, or forward-looking statements accompanied by meaningful risk factors.

85.    Plaintiffs believe additional discovery would have provided further support for their falsity allegations, but such discovery may have provided additional support for Defendants' arguments as well.

**B.    Risks Concerning Scienter**

86.    Defendants also contend that Plaintiffs did not sufficiently allege scienter.  Plaintiffs believe that a finding of scienter is well supported by numerous indicia, including internal documents received and discussed by the Individual Defendants.

87.    While Plaintiffs believe that their scienter allegations are both cogent and compelling, there is a substantial risk that the Court or a jury could disagree.  Even if the Court upheld the claims in the *Nutanix* TAC and *Norton* RFAC at the motion-to-dismiss stage, Plaintiffs anticipate that Defendants would have argued on summary judgment and again at trial that scienter was lacking because, among other things, certain internal Company documents showed that Nutanix's sales pipeline and productivity were strong.

88.    Such questions of scienter are often reduced to the jury's evaluation of the credibility of numerous witnesses.  The risk that Defendants' arguments would resonate with the Court and a jury is very real.  Moreover, as discussed above, there is a significant risk that Plaintiffs' arguments would never even reach the jury.

**C.    Risks Concerning Loss Causation and Damages**

89.    Plaintiffs also recognize the risk of ultimately proving loss causation and damages. To establish loss causation, Lead Plaintiff would have to prove "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Defendants' motion for judgment on the pleadings in the *Nutanix* Action challenged loss causation, arguing that certain of the alleged partial disclosures failed to reveal any new information about the alleged fraud.  Although Defendants withdrew the motion after the *Nutanix* TAC was filed, Plaintiffs may face similar arguments on summary judgment or at trial.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 15 -

90.     Aside from loss causation, the issue of damages would have been hotly disputed and, like loss causation, would have been the subject of expert testimony proffered by all parties.  The damages assessments of experts retained by the parties would involve complex analyses and surely vary substantially as to the existence and amount of damages.  Moreover, when, as here, Plaintiffs' loss causation and damage theories rest primarily on the testimony and opinions of experts, Plaintiffs face a serious risk of having their theories rejected by the Court on a *Daubert* motion.  Even were Plaintiffs to overcome this hurdle, no assurances can be made as to the outcome of a jury when it must balance the credibility of competing experts.  The opinions of the parties' opposing experts would be hotly contested at trial where the jury's reaction to such a "battle of the experts" would be uncertain and unpredictable, including the possibility that the jury rejects Plaintiffs' expert, leaving Plaintiffs unable establish loss causation or damages.

### D.     Risks Concerning the Expense, Delay, and Uncertainty of Further Litigation

91.     If not for this Settlement, the Actions would have continued to be highly contested by the parties at each significant stage, if the case even proceeded from its current posture.  Assuming for argument's sake that the *Nutanix* TAC and *Norton* RFAC survived Defendants' motions to dismiss, continued litigation would be complex, costly, and lengthy.  Among other things, document discovery would need to be completed; depositions taken; experts designated; and expert reports and discovery completed.  Motions for class certification and summary judgment also would likely have to be briefed and argued.  A trial could take weeks to complete, even without taking into account pre- and post-trial motions, and any favorable ruling to one party would almost certainly be appealed.

92.     Moreover, the insurance proceeds available to cover the claims in the Actions are limited, and therefore diminishing as litigation proceeds.  The longer the Actions continued, the more the available insurance proceeds would have been reduced by defense costs, reducing the amount available to the Class and resulting in the possibility that most, if not all, available insurance policies would have been exhausted before any verdict or later settlement.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 16 -

## VI.    PLAN OF ALLOCATION

93.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement proceeds must submit a valid Proof of Claim, including all required information, postmarked (if mailed) or received (if submitted online) on or before September 6, 2023.  As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, and all applicable taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation.  To date, no Class Member has objected to the Plan of Allocation.

94.    The proposed Plan of Allocation, which was set forth and explained in full in the Notice, is designed to achieve an equitable and rational distribution of the Net Settlement Fund, but it is not a formal damages analysis that would be submitted at trial.  Lead Counsel developed the Plan of Allocation in close consultation with Plaintiffs' damages consultant and it is based on the out-of-pocket measure of damages, *i.e.*, the difference between what Class Members paid for Nutanix securities and publicly traded options during the Class Period and what they would have paid had the misstatements not been made or omissions withheld.  Lead Counsel, therefore, believe that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

95.    The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to the amount of alleged artificial inflation in the prices of Nutanix securities and publicly traded options at various times during the Class Period, as quantified by Plaintiffs' damages consultant.  Plaintiffs' consultant analyzed the movement of the prices of Nutanix securities and publicly traded options and took into account the portion of the price drops attributable to the alleged fraud.  The Plan of Allocation ensures that the Net Settlement Fund will be fairly and equitably distributed based on the amount of inflation in the prices of Nutanix securities and publicly traded options during the Class Period that was attributable to the alleged wrongdoing.  The Plan of Allocation also incorporates the 90-day "look-back" provision required by the PSLRA.

96.    The Court-appointed claims administrator, Gilardi, under Lead Counsel's direction, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants.  Calculation of Recognized Loss will depend upon several factors, including when the claimants purchased or acquired Nutanix securities or publicly traded options during the Class Period, and whether the claimants sold Nutanix securities or publicly traded options during or after the Class Period, and if so, when.

97.    In sum, the proposed Plan of Allocation, developed in consultation with Plaintiffs' damages consultant, was designed to allocate the Net Settlement Fund fairly and rationally among Authorized Claimants.  Accordingly, Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate, and should be approved.

## VII.    LEAD COUNSEL'S FEE AND EXPENSE APPLICATION

98.    Based on the exceptional result obtained for the Class, and the extensive efforts of Lead Counsel required to achieve this result, Lead Counsel are requesting an award of attorneys' fees in the amount of 30% of the Settlement Amount, plus interest.  The percentage-of-the-fund method is the appropriate method of compensating counsel in PSLRA class actions because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time under the circumstances.  As set forth in the accompanying Memorandum of Points and Authorities in Support of Attorneys' Fees and Expenses (the "Fee Memorandum"), numerous courts have applied the percentage-of-the-fund method in awarding fees and doing so is consistent with the PSLRA.  *See* 15 U.S.C. §78u-4(a)(6). The percentage sought is merited in light of the results obtained and the efforts required.

### A.    The Requested Fee Is Reasonable

99.    Lead Counsel believe that the requested fee of 30% of the Settlement Amount, plus interest, is fair and reasonable in light of Lead Counsel's diligent prosecution of the Actions, the excellent result achieved in securing a significant and certain recovery for the Class, the complexity of the factual and legal issues presented in the Actions, and the substantial risks and uncertainties of prosecuting the Actions on a contingent basis without assurance of any compensation.  Considering

these and the other factors described in this Declaration and the Fee Memorandum, as well as the fact that the 30% fee request is consistent with fee awards in complex class actions within this District and the Ninth Circuit, the requested fee is well-supported.

**B.    Plaintiffs Support Lead Counsel's Fee and Expense Application**

100.    Plaintiff California Ironworkers is a Pasadena, California-based multi-employer defined pension benefit plan established by labor and employers through collective bargaining, and administered by a Board of Trustees. California Ironworkers is an experienced fiduciary with assets of over $2 billion. In addition to serving as the Court-appointed lead plaintiff in the *Nutanix* Action, California Ironworkers has prior experience serving as a lead plaintiff in other similar securities cases.

101.    Plaintiff City of Miami is a single employer defined benefit plan established by the City of Miami, Florida, and administered by a Board of Trustees. City of Miami is an experienced fiduciary with assets of over $1 billion. In addition to serving as a named plaintiff in the *Nutanix* Action, City of Miami has prior experience serving as a lead plaintiff in other similar securities cases.

102.    Plaintiff Norton is a sophisticated individual investor, having invested in the stock market for over 30 years, and a prior business owner. In addition to serving as the Court-appointed lead plaintiff in the *Norton* Action, Norton has prior experience overseeing and hiring counsel for general litigation matters during his time as a business owner.

103.    Plaintiffs have evaluated and fully support Lead Counsel's fee and expense request.[3]

**C.    The Risks and Unique Complexities of the Litigation**

104.    The Actions presented substantial challenges from the outset. The specific risks that were faced in proving Defendants' liability and damages are detailed herein.

105.    Lead Counsel respectfully submit that any assessment of the proposed fee request should appropriately account for those significant risks. Given that an exceptional result was

---

[3]    *See* Declaration of John Stonehouse on Behalf of California Ironworkers Field Pension Trust, ¶¶7-8; Declaration of Ornel N. Cotera on Behalf of City of Miami Fire Fighters' and Police Officers' Retirement Trust, ¶¶6-7; Declaration of John P. Norton, on Behalf of the Norton Family Living Trust UAD 11/15/2002, ¶¶6-7, attached hereto as Exs. A, B, and C, respectively.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

achieved for the Class in the face of these risks, Lead Counsel should be rewarded accordingly. Indeed, without the efforts and skill of Lead Counsel, this Settlement would not have been consummated.

106.   These risks are in addition to the more typical risks accompanying securities class actions, including that the Actions were undertaken on a contingent basis.

107.   In that regard, Lead Counsel understood from the outset that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of being compensated for the substantial investment of time and money the cases would require.   In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Actions, and that funds were available to compensate staff and to cover the considerable expenses that cases such as these require.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation during the course of the Actions, but have incurred more than 16,000 hours of time, for a total lodestar of $10,581,445.25, and have incurred $638,213.52 in expenses and charges in prosecuting the Actions for the benefit of the Class.[4]

108.   Lead Counsel also bore the risk that no recovery would be achieved (or that a judgment could not be collected, in whole or in part).  Even with the most vigorous and competent efforts, success in contingent-fee litigation, such as this, is never assured.

109.   Lead Counsel know from experience that the commencement of a class action does not guarantee a recovery.  To the contrary, it takes hard work and diligence by skilled counsel to

---

[4]   *See* Declaration of Stephen R. Astley Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Declaration" or "Robbins Geller Decl."), Exs. A-C; Declaration of Shannon L. Hopkins Filed on Behalf of Levi & Korsinky, LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Levi & Korsinsky Declaration" or "Levi & Korsinsky Decl."), Exs. A-C; Declaration of Robert D. Klausner Filed on Behalf of Klausner, Kaufman, Jensen & Levinson in Support of Application for Award of Attorneys' Fees and Expenses ("Klausner Declaration" or "Klausner Decl."), ¶4.  Collectively, the Robbins Geller, Levi & Korsinsky, and Klausner Declarations are referred to herein as the "Fee Declarations."

develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

110.    Lead Counsel are aware of many hard-fought lawsuits where because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or a decision of the court or a jury verdict following a trial on the merits, exceptional professional efforts of members of the plaintiffs' bar produced no fee for counsel.

111.    Accordingly, even if Plaintiffs had survived Defendants' omnibus motion to dismiss the *Nutanix* TAC and *Norton* RFAC and successfully opposed a motion for summary judgment, there is no guarantee that Plaintiffs would have prevailed at trial.  Indeed, while only a modest number of securities class actions have been tried before a jury, some have been lost in their entirety. Additionally, a plaintiff who succeeds at trial still may find its verdict overturned on appeal.  And, even when a plaintiff wins a jury verdict, it still may face substantial challenges in securing a recovery.

112.    When counsel undertook to act for the Class in this matter, it was aware that the only way it would be compensated was to achieve a successful result.  The benefits conferred on the members of the Class by the Settlement are noteworthy in that a common fund worth $71 million (plus interest) was obtained for the Class despite the existence of substantial risks and Defendants' zealous and vigorous defense.

113.    Here, diligent efforts by counsel in the face of substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Class.  In circumstances such as these, and in consideration of the substantial effort expended and the very favorable result achieved, the requested fee of 30% of the Settlement Amount and the requested payment of $638,213.52 in expenses and charges are reasonable and should be approved.

### D.    A Lodestar Cross-Check Supports the Requested Award of Attorneys' Fees

114.    A lodestar cross-check supports the requested attorneys' fees.  A lodestar cross-check is performed by multiplying the number of hours expended in the litigation by the hourly rates of the

attorneys.  While a lodestar cross-check is often a useful tool in determining the reasonability of a fee request, whether or not to perform one is within the Court's discretion.

115.    The Settlement occurred only after Lead Counsel spent significant time and effort prosecuting the Actions, including thoroughly investigating the Class' claims; researching and preparing the detailed *Nutanix* TAC and *Norton* RFAC and earlier iterations of complaints filed in the Actions; fully briefing Defendants' omnibus motion to dismiss the *Nutanix* TAC and *Norton* RFAC, Defendants' prior motions to dismiss earlier iterations of complaints, and Defendants' motion for judgment on the pleadings; negotiating with Defendants to obtain documents pursuant to Plaintiffs' requests for production; reviewing and analyzing 570,862 pages of documents produced by Defendants and third parties; consulting with loss causation, market efficiency, and damages experts; and engaging in an arm's-length mediation process, including the preparation of detailed mediation statements.  At all times throughout the pendency of the Actions, Lead Counsel's efforts were driven and focused on advancing the Actions to bring about the most successful outcome for the Class, whether through settlement or trial, by the most efficient means possible.

116.    Here, Plaintiffs' Counsel have expended over 16,000 hours in the prosecution and investigation of the Actions.  *See* Robbins Geller Decl., Ex. A; Levi & Korsinky Decl., Ex. A; Klausner Decl., Ex. A.  The resulting lodestar is $10,581,445.25.  Pursuant to a lodestar "cross-check," the requested fee of 30% of the Settlement Amount (which equates to $21.3 million, plus interest) results in a "multiplier" of 2.01 on the lodestar, which does not include any time that will necessarily be spent obtaining approval of and thereafter administering the Settlement.[5]  As further detailed in the Fee Memorandum, this level of multiplier is well within the range of multipliers approved in this Circuit and elsewhere.

---

[5]    Additional work will be required by Lead Counsel on an ongoing basis, including:  preparation for, and participation in, the final approval hearing; responding to any objections; supervising the claims administration process being conducted by the Claims Administrator (including responding to inquiries from Class Members); and supervising the distribution of the Net Settlement Fund to Class Members who have submitted valid Proofs of Claim.  Lead Counsel will ***not*** seek payment for this work.

## E.    Standing and Expertise of Lead Counsel

117.    Robbins Geller, the sole Court-appointed lead counsel in the *Nutanix* Action, is highly experienced in complex securities class actions and has successfully prosecuted numerous securities class action suits in this Circuit and throughout the country. *See* Robbins Geller Decl., Ex. E. Robbins Geller has been approved by courts to serve as lead counsel in scores of securities class actions throughout the United States. *See id.* Moreover, the firm has served as lead counsel in numerous high-profile matters which, during the last several years alone, have recovered billions of dollars for investors. *See id.*

118.    Levi & Korsinsky, the sole Court-appointed lead counsel in the *Norton* Action and additional counsel in the *Nutanix* Action, has extensive experience in successfully prosecuting complex securities class actions. *See* Levi & Korsinsky Decl., Ex. H. Levi & Korsinsky has often been appointed as lead or co-lead counsel in actions in this Circuit and across the country arising under the federal securities laws on behalf of investors. *See id.* Levi & Korsinsky has obtained numerous favorable judgments in these actions on behalf of investors. *See id.*

## F.    Standing and Caliber of Defense Counsel

119.    Nutanix was represented throughout the Actions by Wilson Sonsini Goodrich & Rosati, a well-respected law firm with substantial resources and expertise in the defense of complex securities litigation. This prominent law firm and its attorneys zealously provided its clients with a vigorous and aggressive defense of the Actions. In the face of this formidable opposition, Lead Counsel developed the case and successfully negotiated the Settlement.

## G.    Request for Litigation Expenses and Charges

120.    Lead Counsel also seek payment from the Settlement Fund of $638,213.52 in litigation expenses and charges reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

121.    From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Actions were successfully resolved. Thus, they were motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Actions.

The expenses and charges for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to litigants who are billed by the hour. These expenses include, among others, travel costs, computer-based research, and mediator and expert fees.

122. The Fee Declarations summarize by category the expenses and charges incurred by Plaintiffs' Counsel in connection with the prosecution of the Actions. These expenses and charges are reflected on the books and records maintained by Plaintiffs' Counsel. These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses and charges incurred.

123. All of the litigation expenses and charges incurred by Plaintiffs' Counsel, which total $638,213.52, were necessary for the successful prosecution and resolution of the claims against Defendants.

**H.      The Reaction of the Class to the Fee and Expense Application**

124. Consistent with the Preliminary Approval Order, as of August 29, 2023, a total of 154,004 Postcard Notices have been emailed or mailed to potential Class Members and nominees. *See* accompanying Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date, ¶¶5-11, attached hereto as Ex. D. The Postcard Notices stated that Lead Counsel would seek an award of attorneys' fees of no more than 30% of the Settlement Amount, plus interest, and payment of expenses and charges in an amount not greater than $750,000, plus interest. Additionally, the Summary Notice was published in *The Wall Street Journal* and transmitted over *Business Wire*. *Id*., ¶12. In addition, the Notice Package is available on the Settlement website maintained by Gilardi, www.NutanixSecuritiesSettlement.com. *Id.*, ¶14.

125. While the deadline set by the Court for Class Members to object to the requested fees, expenses, and charges has not yet passed, to date, not a ***single*** objection has been received. In Plaintiffs' reply papers, Lead Counsel will respond to any objections received by the September 13, 2023 deadline.

**VIII.   MISCELLANEOUS EXHIBIT**

126. Attached hereto as Exhibit F is a true and correct copy of William B. Rubenstein, *On Plaintiff "Incentive" Payments*, Class Action Attorney Fee Digest (Vol. 1, Apr. 2007), 95-97.

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

## IX.    CONCLUSION

127.    In view of the certain and meaningful recovery to the Class and the substantial risks of continued litigation, as described above and in the accompanying Final Approval Memorandum, Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and that the proposed Plan of Allocation should likewise be approved as fair and reasonable.  Further, in view of the significant recovery achieved in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, Lead Counsel respectfully request that the Court award attorneys' fees in the amount of 30% of the Settlement Amount, plus expenses and charges in the amount of $638,213.52, plus the interest earned thereon.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of August, 2023, at Boca Raton, Florida.

s/ Stephen R. Astley

STEPHEN R. ASTLEY

DECLARATION OF STEPHEN R. ASTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT - Case Nos. 3:19-cv-01651-WHO; 3:21-cv-04080-WHO
4875-6605-5804.v1

- 25 -