# EXHIBIT F

# The Expert's Corner

## ON PLAINTIFF "INCENTIVE" PAYMENTS
William B. Rubenstein*

In the January 2007 issue, *Class Action Attorney Fee Digest* reported an antitrust case in which the class representative received an incentive award of $1,250,000 for 415 hours of its staff's work, or about $3,000/hour. *Spartanburg Regional Health Services Dist., Inc. v. Hillenbrand Indus., Inc.*, No. 03-2141 (D.S.C. 2006) (1 CAAFD 5 (January 2007)). Good work if you can get it. But don't try too hard: in the March issue, the *Digest* reported a securities case in which the lead plaintiff was denied an $8,000 reimbursement for the 16 hours she spent on the case, billing these hours at her regular professional rate (as a CEO) of $500/hour. *See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. 2007) (1 CAAFD 84 (March 2007)).

What's going on here?

Well, for starters, I concede that I picked a rather extreme example, as the *Spartanburg* case is by far the largest incentive payment that I have ever seen a court award. Incentive payments[1] are neither automatic nor large. They are awarded in about 25% of class action cases, though that varies by field: a recent study documented incentive payments in about 50% of consumer and employment cases, roughly 25% of securities cases, and only about 10% of derivative and mass tort suits. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303 (2006). The average incentive award per class representative is about $16,000, while the median award per class representative is much lower (about $4,000), *id.* at 1308, so the *Spartanburg* award is truly an outlier.

The disparity I set up above is also attributable to the distinct statutory regimes governing the two cases. Congress' 1995 Private Securities Litigation Reform Act (PSLRA) contains a specific provision limiting payments to plaintiffs, beyond

> *Incentive payments are neither automatic nor large. They are awarded in about 25% of class action cases, though that varies by field [citing the Eisenberg & Miller study].*

their *pro rata* share of the settlement, to "reasonable costs and expenses (including lost wages) directly relating to the representation of the class." 15 U.S.C. § 77z-1(a)(4).[2] In the *Merrill Lynch* case, the court ruled that it was not enough for the plaintiff "to assert that she took time out of her workday;" rather, she had to demonstrate that she incurred actual expenses or gave up specific business opportunities as a consequence of serving as lead plaintiff. This ruling conceptualizes plaintiff payments under the PSLRA purely in terms of "reimbursement." By contrast, the plaintiff payment in the *Spartanburg* antitrust case was issued under the more general and lax approach of Rule 23, one that permits "incentive" payments that exceed simple reimbursement costs.[3]

That said, Rule 23 itself says nothing about incentive awards and the common law that has developed concerning these payments provides few guiding principles. How should courts think about them? Four issues present themselves: (1) Why provide incentive awards? (2) To whom? (3) In what circumstances? and (4) How much?

*Why Incentive Awards?* Courts award payments to class action plaintiffs for three functions that they perform. First, class representatives have *oversight and monitoring* responsibilities. They must watch class counsel so as to ensure these attorneys do not sell out the class for their own recovery. Class counsel must consult with the representatives, who must approve any important aspects of the litigation (including the settlement terms). Second, class representatives *serve as*

---

[1] I use the terms "incentive awards" or "incentive payments" generically, meaning it to encompass payments that simply reimburse the plaintiffs' costs (reimbursement payments) and those that actually provide plaintiffs money in recognition of the risks that they took and intangible services they provided (incentive awards).

*William B. Rubenstein, a law professor at UCLA School of Law, specializes in class action law; he has litigated, and regularly writes about, consults, and serves as an expert witness in class action cases, particularly on fee-related issues. Professor Rubenstein provides regular reporting on class action issues, including fees, at www.classactionprofessor. com. The opinions expressed in this article are solely those of the author.*

---

[2] The PSLRA further requires that the lead plaintiff file a sworn certification stating that it "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's *pro rata* share of any recovery, except as ordered or approved by the court in accordance with [the paragraph in the text above]." 15 U.S.C. § 78u-4(a)(2)(A)(vi).

[3] Courts are split on whether incentive payments, beyond pure compensation, are permissible in PSLRA cases. *Compare. e.g. Swack v. Credit Suisse First Boston, LLC*, 2006 U.S. Dist. LEXIS 75470 (D. Mass. Oct. 4, 2006) (incentive payments not permitted) (collecting cases) *with, e.g., In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) (notwithstanding PSLRA, incentive payments permissible).

(continued on page 96)

---

COPYRIGHT © 2007 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from **Expert's Corner,** page 95)

*exemplary litigants*, subjecting themselves to depositions and other discovery, perhaps even having to testify in court. Thus, in the *Spartanburg* case, the named plaintiff "was called upon to provide documents and witnesses for various discovery issues . . . [and] spent significant amounts of time monitoring the litigation, discussing issues with counsel, and deciding what it thought was best for the class as a whole." Third, class representatives play a *gate-keeping function* in that their presence is a necessary predicate for the class suit and often determines issues such as what forum the case will be filed in. *See* Richard A. Nagareda, *Restitution, Rent Extraction, and Class Representatives: Implications of Incentive Awards*, 53 UCLA L. REV. 1483 (2006).[4]

The general theory behind incentive awards is that the monitoring, litigating, and gate-keeping functions serve important public goals.

> *The general theory behind incentive awards is that the monitoring, litigating, and gate-keeping functions serve important public goals. Incentive awards encourage plaintiffs to step forward and provide these public goods. The common arguments against incentive awards are those of intra-class equity and conflicts of interest.*

Incentive awards encourage plaintiffs to step forward and provide these public goods. The common arguments against incentive awards are those of intra-class equity and conflicts of interest. If representatives get awards, they will get more than their *pro rata* share of the settlement; the disparity may seem particularly egregious in cases in which class members gets coupons but the representatives get a cash incentive award. Indeed, one might worry that provided a high enough cash award, the class representative would agree to a settlement embodying a meaningless class-wide recovery, such as a negligible coupon. While courts must monitor such conflicts, the intra-class inequity – assuming it is not too extreme (see below) – can be justified by the fact that the representative is not similarly situated to other class members: she did something they did not and is rightly paid for stepping forward and working to safeguard the class's interests.

*Who Can Get An Award?* Generally, it is the named plaintiffs and/or class representatives who perform the functions that trigger an award. However, not all named plaintiffs do such work and, in particular cases, other class members who are not the class representatives might do work justifying an award. *See* Jocelyn D. Larkin, *Incentive Awards to Class Representatives in Class Action Settlements* 12-13 (available at http://www.impactfund.org/pdfs/Class%20Incentives%20UPDATED.pdf). The best practice is that the named representatives should not automatically garner an award unless they did something to deserve it, and that other class members should not automatically be precluded from such an award if they did something to warrant one. The award should reward work done, not titles.

*When Provide An Award?* As noted, awards are not automatic. There is no statutory basis for them in general class actions, though in common fund cases, they are legitimated on the same restitutionary basis as the attorney's fee – the class representative's actions helped produce the common fund and hence the class would be unjustly enriched were the representative not compensated for this effort. *See In re Cont. Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (Posner, J.). In non-common fund cases, parties will often agree to incentive awards as part of a settlement and hence a court will be asked to accept or reject them in its normal fairness hearing inquiry. In the absence of a common fund or agreement, some courts have held that an incentive award is "plainly inappropriate." *Hadix v. Johnson*, 322 F.3d 895, 898 (6th Cir. 2003).

Where a common fund or agreement provides the context for an award, the award must still be justified. The Seventh Circuit once suggested that an "incentive award is appropriate if it is *necessary* to induce an individual to participate in the suit," *Cook v. Neidart*, 142 F.3d 1004, 1016 (7th Cir. 1988) (emphasis added), but courts generally do not require the parties to prove that the class representatives would not have participated *but for* the incentive award. Rather, courts ascertain the appropriateness of an award according to multi-factor tests examining such issues as: "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id. See also Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (articulating 5-factor test).

*How Much?* Perhaps the most peculiar feature of incentive awards is that there is no real method for quantifying them.

---

4    In *qui tam* cases, plaintiffs play a fourth function. The *qui tam* plaintiff is a government whistle blower who exposes corruption within the government and, through litigation, recoups the government's losses. She performs an invaluable *detection* function: because she works on the inside, she is particularly well-situated to see fraud when it occurs. At the same time, job security may make her loathe to step forward and report the fraud. The *qui tam* statute permits the plaintiff to retain a percentage of what she recovers for the government, thereby creating a significant incentive for her to play this detection function notwithstanding the risks involved.

(continued on page 97)

COPYRIGHT © 2007 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from **Expert's Corner,** page 96)

> *Given these principles,*
> *it seems clear that both Spartanburg and*
> *Merrill Lynch were wrongly decided.*

While attorney's fees are famously calculated according to either a lodestar or percentage method, neither of these is entirely relevant to incentive awards. Lodestar doesn't quite work because class representatives generally do not keep hours as attorneys do, nor are there readily ascertainable hourly billing rates for the functions they perform. The percentage method also is inapposite  – except in *qui tam* cases where statutes permit the named plaintiff to retain a percentage of the recovery – because courts have no measuring stick (like the contingent fee percentage provides for attorney's fee) by which to set a proper percentage.

Absent these familiar measuring sticks, courts are generally guided by the actual amount of time or effort that can be shown to have been spent, with some acknowledgment of the risk that was taken, as well. Whatever award is thereby selected is then tested against the other class members' recoveries to ensure that it is not so out of line that it creates a conflict between the representatives and the class. Astute readers will note that this formulation feels familiar from attorney's fees law: incentive awards are calculated according to a rough lodestar analysis, with a risk multiplier, and then cross-checked by intra-class equity.

Given these principles, it seems clear that both *Spartanburg* and *Merrill Lynch* were wrongly decided. The class representative in *Spartanburg* should have received something – perhaps even something large, given that the case constituted a huge, nearly $500 million settlement – but nowhere near $1 million or $3,000/hour. I know of but a few services that might warrant an hourly wage of that magnitude and none are, to my knowledge, provided by a class representative. On the other hand, the class representative in *Merrill Lynch* should have been compensated for her time, even under the PSLRA's tough standard. It permits awards for reasonable costs and expenses, including lost wages; while the CEO might not literally have lost wages by working on the case, she spent professional time doing so and should be compensated for that. Attorneys are permitted to recover fees without demonstrating that they actually gave up other work to undertake the present case. Class representatives should not be put to a more stringent test. Congress did intend to reign in loose payments to professional class representatives via the PSLRA; however, seeking compensation for 16 hours of actually-expended time hardly falls into that category. Moreover, the PSLRA has encouraged institutional plaintiffs to come forward and direct securities cases. It would be perverse to simultaneously engender professional monitoring but then deny the super-monitors any money for their time.

Before 1990, court-approved payments to class action plaintiffs were rare. They now occur regularly, though not in a majority of cases. Despite the PSLRA's apparent limitations, plaintiff payments are more likely to continue to increase – in frequency and size – than they are to disappear. Ω

COPYRIGHT © 2007 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.